**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

<table>
<tr><td>

24 HOUR FITNESS USA, INC., a California corporation, and 24 HOUR FITNESS WORLDWIDE, INC., a Delaware corporation,

     Plaintiffs,

v.

BALLY TOTAL FITNESS HOLDING CORP., a Delaware corporation, and MICHAEL SHEEHAN, an individual,

     Defendants.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

Civil Action No.

FILED: JULY 7, 2008
08CV3853
JUDGE LEFKOW
MAGISTRATE JUDGE DENLOW
JH

</td></tr>
</table>

## COMPLAINT

Plaintiffs 24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. (together "24 Hour Fitness" or "Plaintiffs"), by and through their attorneys, for their Complaint against Defendant Bally Total Fitness Holding Corporation ("Bally") and Defendant Michael Sheehan ("Sheehan") (together "Defendants") allege and state as follows:

## NATURE OF ACTION

1.     This is an action for the threatened or actual misappropriation of trade secrets arising under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*. and for breach of fiduciary duty.

## THE PARTIES

2.      Plaintiff 24 Hour Fitness USA, Inc. is a corporation organized and existing under the laws of the State of California, having its principal place of business at 12647 Alcosta Boulevard, Suite 500, San Ramon, California 94583.  Plaintiff 24 Hour Fitness Worldwide, Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 12647 Alcosta Boulevard, Suite 500, San Ramon, California 94583.

3.      On information and belief, Defendant Bally is a corporation organized and existing under the laws of Delaware, having its principal place of business at 8700 W. Bryn Mawr Ave., 3rd Floor, Chicago, Illinois 60631.

4.      On information and belief, Defendant Sheehan is a resident of Illinois at a location yet to be determined, with his address of employment at 8700 W. Bryn Mawr Ave., 3rd Floor, Chicago, Illinois 60631.  Defendant Sheehan is now the Chief Executive Officer ("CEO") of Defendant Bally, and immediately prior to joining Bally, Defendant Sheehan worked as the Chief Operating Officer ("COO") of 24 Hour Fitness.

## JURISDICTION AND VENUE

5.      This is an action for threatened or actual misappropriation of trade secrets and breach of fiduciary duty.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

6.      This Court has personal jurisdiction over Defendant Bally.  Defendant Bally is registered to do business in the State of Illinois.  Defendant Bally also has a regular and established place of business in Illinois and this District at 8700 W. Bryn Mawr Ave., 3rd Floor,

Chicago, Illinois 60631, and is and has been doing business in Illinois and this District at all times relevant hereto.

7.    This Court has personal jurisdiction over Defendant Sheehan.  On information and belief, at all times relevant hereto, Defendant Sheehan is transacting and/or has transacted business with Defendant Bally, is committing and/or has committed tortious acts in Illinois and this District, and Defendant Sheehan's wrongful conduct, as set forth in this Complaint, arises out of and is related to the business he has transacted and the tortious acts he has committed in this State and District.

8.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(a) and (c).

## GENERAL ALLEGATIONS

### 24 Hour Fitness's Winning Trade Secrets

9.    24 Hour Fitness operates one of the world's largest privately owned and operated chains of fitness centers.  From its beginnings in 1983, 24 Hour Fitness has grown to more than 400 fitness centers worldwide.  24 Hour Fitness is a fitness industry leader and presently is undergoing a phase of rapid growth and expansion by moving into new markets and providing new offerings to members and communities across the world.

10.    In the conduct of its business, 24 Hour Fitness has developed proprietary information and confidential methods and techniques related to the development and management of fitness centers, including but not limited to:  proprietary and confidential critical market strategies, including 24 Hour Fitness's Three Year Strategic Plan, updated annually; proprietary and confidential growth plans for new geographic markets; proprietary and confidential market segment development planning; proprietary and confidential market performance data and market reorganization planning; proprietary and confidential platform

expansion planning intended to utilize the Internet and other resources to facilitate memberships; proprietary and confidential marketing strategy related to advertising, marketing partnerships and marketing tie-ins with non-traditional media; proprietary and confidential compensation and personnel data; confidential litigation strategy; proprietary and confidential financial planning strategies; proprietary and confidential budgeting strategies; confidential information regarding revenues; confidential sales figures relating to all aspects of the 24 Hour Fitness's business; confidential relationships with key vendors; and proprietary and the unique confidential combinations and compilations of the above information relating to the 24 Hour Fitness successful business model and operations strategy (together, hereinafter, in the aggregate, "proprietary 24 Hour Fitness trade secrets and confidential information").

11.    24 Hour Fitness develops and maintains, at considerable expense, its proprietary 24 Hour Fitness trade secrets and confidential information.  At all times relevant hereto 24 Hour Fitness has used reasonable measures to protect the secrecy of the proprietary 24 Hour Fitness trade secrets and confidential information, including but not limited to:  restricted access on a need-to-know basis; company confidentiality policies; contractual restrictions of employees, vendors, and other third parties; physical security measures, including key cards; and password-protected electronic platforms, including remote desktop applications.  For example, during his employment with 24 Hour Fitness, Defendant Sheehan signed an Employment Agreement containing both a Covenant Not to Compete and restrictions on the use of confidential information.  (**A TRUE AND CORRECT COPY IS ATTACHED HERETO AS EXHIBIT A.**)  The terms of which include:

**Non-Compete and Non-Solicitation.**

**10.1**    For a period of two (2) years following the termination of Employee's employment with the Company, Employee agrees not

4

to directly or indirectly recruit, solicit, induce or encourage any employee of the Company to become an employee for any other person or entity; nor to directly or indirectly induce or encourage any independent contractor of the Company to terminate a contracting relationship with the Company.

**10.2**    Employee further agrees that during the Employment Term and for a period of two (2) years thereafter, Employee will not directly or indirectly own an interest in, operate, join, begin, control, advise, consult with, render services to or otherwise participate in or work for or on behalf of any entity or individual(s) which operates a fitness club within fifty (50) miles of any of the Company's fitness clubs or which otherwise competes with the business of the Company or the Company's affiliates.

**11.    Confidential Information**.  During the Employment Term and thereafter, Employee agrees to hold the Company's confidential and proprietary information in strictest confidence and not to use, disclose or disseminate any of such information except as such disclosure, use or dissemination may be required in connection with Employee's work for the Company or as expressly authorized by the Company in writing.    Employee further agrees that any work product created in connection with Employee's work for the Company will be the sole and exclusive property of the Company and hereby assigns to the Company all right, title and interest in all inventions and other intellectual property developed by Employee in working for the Company. . .

12.    In addition, on or about September 30, 2005, Defendant Sheehan signed a Stockholder's Agreement with 24 Hour Fitness through which he was granted ownership shares of 24 Hour Fitness in the form of Class B common stock.  (**A TRUE AND CORRECT COPY IS ATTACHED HERETO AS EXHIBIT B.**)  In that Agreement, Defendant Sheehan agreed that upon his separation from 24 Hour Fitness, the company could elect to repurchase a portion of his ownership in the company, and in the case of Defendant Sheehan engaging in competitive activity, *all* of his ownership interest in the Company.  Under the terms of that Agreement, 24 Hour Fitness will tender a repurchase demand to Defendant Sheehan that will compensate him for his stock.  The Stockholder's Agreement requires Defendant Sheehan to refrain from

appropriating 24 Hour Fitness's Confidential and Proprietary Information and engaging in competitive activity:

  **4.1 Prohibition Against Certain Activities.**  The Employee agrees that (a) the Employee will not at any time during the Employee's employment (other than in the course of such employment) with the Company or any Affiliate thereof, or after a Termination, disclose or furnish to any other Person or use for the Employee's own or any other Person's account any Confidential or Proprietary Information unless required to do so by law or judicial process, (b) if the Employee is Terminated, the Employee will not for three years following such Termination hire or employ, or directly or indirectly solicit for employment, including without limitation recommending to any subsequent employer the solicitation for employment of, any employee of the Company or any Affiliate thereof . . . .

  **4.2 Right to Purchase Shares.**  The Employee understands and agrees that the Company has granted to the Employee the right to purchase shares of Class B Common Stock to reward the Employee for the Employee's future efforts and loyalty to the Company and its Affiliates by giving the Employee the opportunity to participate in the potential future appreciation of the Company.  Accordingly, (a) if the Employee engages in any Prohibited Activity, or (b) if, at any time during the Employee's employment with the Company or any of its Affiliates or during the three years following a Termination, the Employee engages in any Competitive Activity . . . , then, in addition to any other rights and remedies available to the Company or any of its Affiliates (at law, in equity or under any employment agreement, award agreement or other agreement or arrangement of the Employee), the Company shall be entitled, at its option, exercisable by written notice (the "Repurchase Notice") to the Employee, to purchase all or any portion of the shares of Class B Common Stock then held by the Employee.

  12. The Stockholder's Agreement expressly identifies Defendant Bally as a competitor of 24 Hour Fitness.  (**EX. B.**)

13.     The proprietary 24 Hour Fitness trade secrets and confidential information are not known generally within the fitness center trade, and 24 Hour Fitness derives economic benefit from the secrecy of the proprietary 24 Hour Fitness trade secrets and confidential information.

14.     Accordingly, confidentiality regarding the proprietary 24 Hour Fitness trade secrets and confidential information is essential, and the disclosure of this information to any third party, but *especially* to a direct, head-to-head competitor, will cause irreparable harm and provide an unfair advantage in competing with 24 Hour Fitness.

**Defendant Bally's And Defendant Sheehan's Misappropriation Of Proprietary 24 Hour Fitness Trade Secrets And Confidential Information**

15.     During Defendant Sheehan's nearly eight-year tenure with 24 Hour Fitness, Defendant Sheehan helped develop, and had unfettered access to, all 24 Hour Fitness's proprietary 24 Hour Fitness trade secrets and confidential information.

16.     Many of the aspects of the proprietary 24 Hour Fitness trade secrets and confidential information were developed over considerable time, through trial and error, to which Defendant Sheehan had direct exposure and access.

17.     On or about June 23, 2008, without notice, Defendant Sheehan announced his resignation from 24 Hour Fitness, effective immediately, and stated his intention to join Defendant Bally, a direct, head-to-head competitor of 24 Hour Fitness, as Defendant Bally's CEO effective July 1, 2008.

18.     On June 24, 2008, Defendant Bally issued a press release announcing Defendant Sheehan's hire as CEO and touting his "comprehensive experience in the fitness industry" and "ideal blend of experience, leadership skills, creativity and commitment to health and fitness." (**A TRUE AND CORRECT COPY IS ATTACHED HERETO AS EXHIBIT C.**)  The press

release quotes Defendant Sheehan as stating that he is eager to join Defendant Bally and "eager to add value to this established brand."

19.    On information and belief, Defendant Bally targeted Defendant Sheehan to become CEO of Defendant Bally in order to obtain the proprietary 24 Hour Fitness trade secrets and confidential information as part of Defendant Bally's new business strategy and/or plans upon its emergence from Chapter 11 Bankruptcy on October 1, 2007.  Defendant Bally had experienced deteriorating financial and liquidity positions and reported losses from 2002 through 2005 and the first six months of 2007.

20.    On information and belief, Defendant Bally offered Defendant Sheehan a compensation package in excess of three times his last compensation package at 24 Hour Fitness.

21.    On information and belief, Defendant Sheehan assembled and organized a home library of proprietary 24 Hour Fitness trade secrets and confidential information by, on Fridays, removing copies of the 24 Hour Fitness documents on which he worked during the preceding week, in violation of the 24 Hour Fitness policies.  On information and belief, Defendant Sheehan then destroyed, without authorization, those copies maintained at his home after terminating his employment without notice with 24 Hour Fitness.

22.    On information and belief, Defendant Sheehan requested during the time he was interviewing with Defendant Bally, an assembly of eleven four-inch binders containing the most detailed Profit & Loss information for each and every 24 Hour Fitness club location.  On information and belief, Defendant Sheehan had not previously requested or reviewed this type of information during his eight years of employment with 24 Hour Fitness, and his position as COO of 24 Hour Fitness did not require such a request or review.

23.     On information and belief, Defendant Sheehan has no experience in the fitness industry outside of the specialized and unique knowledge that he gained during his eight years as an executive of 24 Hour Fitness with continuous exposure to the proprietary 24 Hour Fitness trade secrets and confidential information.

24.     On information and belief, as CEO of Defendant Bally, Defendant Sheehan will have responsibility for all facets of Defendant Bally's business strategies and plans, including but not limited to, market strategies, market segment development planning, market reorganization planning, platform expansion planning, marketing strategy related to advertising, marketing partnerships and marketing tie-ins, compensation of personnel, litigation strategy, financial planning strategies, and budgeting strategies.  Therefore, it is inevitable that Defendant Sheehan will disclose, and use, the proprietary 24 Hour Fitness trade secrets and confidential information in the course of his employment as CEO of 24 Hour Fitness's direct, head-to-head competitor, Defendant Bally, unless these activities are enjoined by this Court.

25.     The statements from Defendant Bally and Defendant Sheehan in paragraph 18 demonstrate a threat that Defendant Sheehan intends to use, in his new position as CEO of Defendant Bally, the proprietary 24 Hour Fitness trade secrets and confidential information obtained by him during his tenure with 24 Hour Fitness to directly compete with 24 Hour Fitness.

26.     Defendant Sheehan possesses the proprietary 24 Hour Fitness trade secrets and confidential information in his head.  Defendant Sheehan knows what works and what does not work.  Defendant Sheehan knows the blind alleys and the shortcuts.  As CEO of Defendant Bally, a direct, head-to-head competitor of 24 Hour Fitness, Defendant Sheehan cannot "unring

the bell," as he will be charged with executive responsibilities for the same areas that he worked in as COO of 24 Hour Fitness for eight years.

27.    On June 24, 2008, one day after Defendant Sheehan's announcement of his resignation as COO of 24 Hour Fitness and his acceptance of the position of CEO of Defendant Bally, 24 Hour Fitness CEO Carl Liebert sent letters to both Defendant Bally and Defendant Sheehan requesting that Defendant Sheehan not assume the position of CEO of Defendant Bally due to the inevitable disclosure of the proprietary 24 Hour Fitness trade secrets and confidential information.    (**TRUE AND CORRECT COPIES ARE ATTACHED HERETO AS EXHIBITS D AND E.**)  To date, neither Defendant Bally nor Defendant Sheehan has responded to these letters.

28.    On information and belief, 24 Hour Fitness already has sustained damages and losses based on the concert of actions of Defendant Sheehan's misappropriation of the proprietary 24 Hour Fitness trade secrets and confidential information and Defendant Bally's solicitation of the same.

29.    On information and belief, Defendants' concert of action has caused and will continue to cause 24 Hour Fitness great and irreparable harm and damage.  Unless restrained and enjoined by this Court, Defendants will persist in their unlawful activities, thereby causing further damage and irreparable harm to 24 Hour Fitness and to the public interest.

30.    24 Hour Fitness has no adequate remedy at law.

## Defendant Sheehan's Breach Of His Fiduciary Duties To 24 Hour Fitness

31.    On information and belief, Defendant Sheehan has used the property and resources of 24 Hour Fitness for his personal benefit and/or the benefit of Defendant Bally.

32.    On information and belief, Defendant Sheehan used the employees of 24 Hour Fitness to assemble eleven four-inch binders containing the most detailed Profit & Loss information for each and every 24 Hour Fitness club location, requiring at least 40 hours of employee time in addition to other 24 Hour Fitness company resources.

33.    On information and belief, Defendant Sheehan also spent time for which he was being paid for services to 24 Hour Fitness, instead performing services for his personal benefit or the benefit of Defendant Bally, including but not limited to:  supervising the assembly of and/or reviewing the eleven binders referred to in paragraph 32 above; interviewing with Defendant Bally's management and each and every member of Bally's Board of Directors; and generally assembling a working knowledge of confidential 24 Hour Fitness information.

34.    On information and belief, Defendant Sheehan accessed 24 Hour Fitness electronic and non-electronic property and confidential information without authorization, or exceeded his authorized access, after accepting employment with, or with the intention of accepting employment with, Defendant Bally, including but not limited to the destruction of 24 Hour Fitness electronic and non-electronic files and documents in his possession.

35.    On information and belief, Defendant Sheehan has not returned a 4-gigabyte "flash" drive purchased by Defendant Sheehan with 24 Hour Fitness resources.  On information and belief, Defendant Sheehan used the "flash" drive to copy, without authorization and in violation of 24 Hour Fitness policies, 24 Hour Fitness documents.

36.    On information and belief, Defendant Sheehan falsely recorded his activities and time spent working during the calendar year of 2008 and fraudulently requested compensation for time not spent working for 24 Hour Fitness.  Defendant Sheehan received a total amount of $63,382.18 for 320 unused hours of vacation time; however, Defendant Sheehan only recorded

three days of time off during the calendar year of 2008, March 13 and 14, and April 29, 2008, though he has stated that he interviewed with management of Defendant Bally and every member of the Board of Directors of Defendant Bally.

37.     On information and belief, 24 Hour Fitness already has sustained damages and losses based on the actions of Defendant Sheehan, including the misuse and fraudulent use of 24 Hour Fitness resources and property.

## COUNT ONE
### THREATENED OR ACTUAL
### MISAPPROPRIATION OF TRADE SECRETS
**(against Defendant Bally and Defendant Sheehan)**

38.     24 Hour Fitness repeats and realleges the averments of paragraphs 1-30 as if fully set forth herein.

39.     The proprietary 24 Hour Fitness trade secrets and confidential information, set forth individually and collectively in paragraph 10, *supra*, are statutory "trade secrets" protected by the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*

40.     At all times, 24 Hour Fitness has taken reasonable measures to protect the proprietary 24 Hour Fitness trade secrets and confidential information, and 24 Hour Fitness derives economic value and competitive advantage from such information not being generally known to the public or trade.

41.     On information and belief, there exists the threatened or actual misappropriation of trade secrets by the Defendants, acting individually and in concert, to acquire, disclose and/or use, by improper means, the proprietary 24 Hour Fitness trade secrets and confidential information for their own benefit and/or the benefit of others without 24 Hour Fitness's authorization and consent.

42.     Defendants, acting individually and in concert, know or have reason to know that they have acquired or will acquire the proprietary 24 Hour Fitness trade secrets and confidential information under circumstances giving rise to a duty to maintain the secrecy, or limit the use of, such information, and/or that such information was obtained or derived from others who owe a duty to 24 Hour Fitness to maintain the confidentiality of such information.

43.     On information and belief, 24 Hour Fitness has suffered or will suffer damages, and Defendants have or will be unjustly enriched in an amount to be proven at trial, as a direct result of Defendants' threatened or actual misappropriation of the proprietary 24 Hour Fitness trade secrets and confidential information.

44.     Defendants' threatened or actual misappropriation of the proprietary 24 Hour Fitness trade secrets and confidential information has been willful and malicious and entitles 24 Hour Fitness to exemplary damages and an award of attorneys' fees and costs pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*.

45.     24 Hour Fitness also is entitled to injunctive relief to prevent the threatened or actual misappropriation of the proprietary 24 Hour Fitness trade secrets and confidential information by Defendants pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*.

## COUNT TWO
### Breach of Fiduciary Duty

**(against Defendant Sheehan)**

46.     24 Hour Fitness repeats and realleges the averments of paragraphs 1-14 and 31-37 as if fully set forth herein.

47.     On information and belief, Defendant Sheehan used his position of trust and confidence as COO of 24 Hour Fitness to further his private interests, failed to protect the

interests of 24 Hour Fitness, and deprived 24 Hour Fitness of profit or advantage which his skill and ability might properly bring to 24 Hour Fitness.

48.    On information and belief, Defendant Sheehan, in acting as described above, did not exercise the care required of him as COO of 24 Hour Fitness.

49.    On information and belief, Defendant Sheehan acted with fraud, oppression, and/or malice.

50.    As a proximate result of the act(s) of Defendant Sheehan herein-above described, 24 Hour Fitness has been damaged in a sum to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief against Defendants, including:

a.    both preliminary and permanent relief pursuant to 735 ILCS 1065/1, *et seq.* restraining and enjoining Defendant Sheehan and all those in privity, concert or participation with him from the threatened or actual misappropriation of the proprietary 24 Hour Fitness trade secrets and confidential information;

b.    both preliminary and permanent relief pursuant to 735 ILCS 1065/1, *et seq.* restraining and enjoining Defendant Bally, its officers, directors, employees, agents, and all those in privity, concert or participation with it from the threatened or actual misappropriation of the proprietary 24 Hour Fitness trade secrets and confidential information;

c.    a finding that Defendants' acts and conduct constitute the actual or threatened misappropriation of trade secrets in violation of 735 ILCS 1065/1, *et seq.*, and that such acts and conduct have been willful and malicious;

d.    compensatory and increased damages sustained as a result of Defendants' wrongful actions, together with an accounting of Defendants' profits and unjust enrichment arising from such actions;

e.    compensatory damages, including disgorgement, for the breach of fiduciary duty by Defendant Sheehan, and exemplary damages for the acts constituting breach of fiduciary duty committed with fraud, oppression, and/or malice;

f.    attorneys' fees and costs pursuant to 735 ILCS 1065/1, *et seq.*; and

g.    such further relief as this Court may deem just and proper, in law or equity.

## **JURY DEMAND**

Pursuant to FED. R. CIV. P. 38(b), 24 Hour Fitness respectfully demands a trial by jury of all issues triable by a jury in its Complaint.

\*    \*    \*

Date:   July 7, 2008                    Respectfully submitted,


/s/ R. Mark Halligan
_____

**R. Mark Halligan (IL 6200723)**
mark.halligan@lovells.com
**Deanna R. Swits (IL 6287513)**
deanna.swits@lovells.com
**LOVELLS LLP**
330 N. Wabash Avenue
Suite 1900
Chicago, IL  60611
Tel:  312 832 4400
Fax:  312 832 4444

*Attorneys for Plaintiffs 24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc.*

```
08CV3853
JUDGE LEFKOW
MAGISTRATE JUDGE DENLOW
JH
```

# EXHIBIT A

## EMPLOYMENT AGREEMENT
## MIKE SHEEHAN

This Employment Agreement ("Agreement") is dated as of March 31, 2003, and is entered into by and between Mike Sheehan ("Employee") and 24 Hour Fitness USA, Inc. ("Company"). Company hereby agrees to employ Employee, and Employee hereby agrees to be employed by the Company, upon the terms and conditions set forth in this Agreement.

**1.      Employment Period.** Employee's employment with the Company shall be "at-will" employment and may be terminated by either party at any time, with or without cause or advance notice. The period of Employee's employment with the Company following the date of this Agreement shall be referred to as the "Employment Term."

**2.      The Position.**

    **2.1**      Employee shall serve as Senior Vice President of Operations of the Company.

    **2.2**      Notwithstanding the provisions of Section 2.1 above, it is expressly understood that the Chief Executive Officer ("CEO") shall be entitled to make such organizational and reporting changes as the CEO may, in good faith, deem desirable and for the good of the Company, which may include, without limitation, changing the title and duties of Employee.

**3.      Duties.** Employee agrees to faithfully, diligently and competently devote substantially all of the Employee's full time and attention, during normal business hours, to the business and affairs of the Company and, in particular, to performance of all the duties required of Employee's position set forth above.

**4.      Compensation.** Employee shall be paid the following as compensation for all services to be rendered by Employee:

    **4.1**      Employee will be paid a base salary as set forth in Employee's current Compensation Plan.

    **4.2**      Employee will be eligible for an annual incentive bonus based upon Employee's achievement of designated MBOs, and an annual incentive bonus based upon the Company's achievement of designated financial goals. Whether Employee receives these bonuses, and the amount of any such bonuses, shall be determined in the discretion of the Company's CEO, as provided in the applicable bonus plans.

    **4.3**      Employee may be entitled to receive periodic grants of stock options and/or restricted stock under the Company's Employee Stock Option Plan(s) and/or Executive Incentive Plan. The quantity and vesting schedule of any such grant shall be determined in the sole discretion of the Company's Compensation Committee.

**5.      Perquisites/Expenses.** Employee shall be entitled to customary perquisites, such as an appropriate office, administrative support, and fringe benefits such as a car allowance and cell phone allowance, to the extent consistent with benefits provided to employees of similar rank and to the extent necessary for Employee to perform Employee's duties. Employee shall also be

entitled to reimbursement of reasonable expenses incurred by Employee in the course of Employee's duties, to the extent allowed under applicable company policy.

## 6.   Benefit Plans.

**6.1**   Employee and Employee's dependents and beneficiaries shall be entitled to all payments and benefits and service credit for benefits during the Employment Term to which employees of similar rank and their dependents and beneficiaries are entitled as the result of the employment under the terms of employee benefit plans and practices of the Company.

**6.2**   Nothing in this Agreement shall preclude the Company from amending or terminating any employee benefit plan or practice in its sole discretion.

**7.   Effect of Death.** In the event of Employee's death during the Employment Term, the legal representative of the Employee's estate shall be entitled to six (6) months of Employee's base salary in effect prior to such death.   Such payments shall be made according to the Company's normal payroll practices, subject to standard withholdings and deductions.

**8.   Effect of Disability.** In the event of Employee's disability during the Employment Term, Employee shall be entitled to six (6) months of Employee's base salary in effect prior to such disability.   Such payments shall be made according to the Company's normal payroll practices, subject to standard withholdings and deductions.

**8.1**   The amount of any payments due under this Section 8 shall be reduced by any payments to which Employee may be entitled because of disability under any disability or pension plan or insurance of the Company or of any division, subsidiary, or affiliate thereof, or as the result of workers' compensation or non-occupational disability payments.

**8.2**   The term "disability," as used in this agreement, shall mean permanent and total disability as defined in Internal Revenue Code Section 22 (e)(3).

## 9.   Severance.

**9.1   In General.** In the event the Company terminates Employee without Cause, the Company shall provide severance benefits set forth below.  If Employee is terminated with Cause, or Employee voluntarily resigns, then Employee will receive no severance benefits (except as provided in Section 9.1(c)).

**(a)   Severance.** A severance allowance in an amount equal to twelve (12) months of Employee's base salary (the "severance allowance") commencing on the last day of the month following termination of Employee's employment and payable in equal monthly installments for a period of twelve (12) consecutive months thereafter.   Such severance allowance shall be ordinary income subject to applicable withholding for federal, state and local taxes.   The Compensation Committee of the Company's Board of Directors may extend the period of severance or adjust the payment schedule in its discretion.

**(b)   COBRA.** If the Employee qualifies and elects to continue health benefits pursuant to Employee's COBRA rights, the Company shall pay for the cost of such continued

benefits during the period that payments provided for in Section 9.1(a) are required to be made, except to the extent of the applicable "Employee Contribution" for all such continued benefits.

(c)    **Stock Option Acceleration/Vesting Following a Change of Control.** In addition to the payments to be made pursuant to Sections 9.1(a) and 9.1(b) above, in the event the Company terminates Employee's employment without Cause or if Employee terminates employment for Good Reason, within thirteen (13) months following a Change of Control, all of Employee's stock options granted under any of the stock and incentive plans of the Company and/or 24 Hour Fitness Worldwide, Inc. prior to the Change of Control shall immediately accelerate and become fully vested, and the Employee shall have up until two (2) years following the date of Employee's termination of employment to exercise such stock options.

9.2    **Definitions.** For purposes of this Agreement, the following definitions shall apply:

(a)    **Cause.** "Cause" shall mean (i) the Employee's engaging in an act or acts of fraud, theft or embezzlement which are harmful or injurious to the Company; (ii) the Employee's unreasonable neglect or refusal to perform the duties appropriate to Employee's position; or (iii) any conviction for a felony involving moral turpitude.

(b)    **Change of Control.** "Change of Control" shall mean (i) a stock sale, merger, consolidation, combination, reorganization or other transaction (other than a public offering of stock) of either the Company, 24 Hour Fitness United States, Inc., or 24 Hour Fitness Worldwide, Inc. resulting in less than 50% of the combined voting power of the surviving or resulting entity being directly or indirectly owned by either the shareholders of the Company, 24 Hour Fitness United States, Inc., or 24 Hour Fitness Worldwide, Inc. immediately prior to such transaction; or (ii) a liquidation or dissolution of the Company, or sale or other disposition of all or substantially all of the Company's assets or business.

(c)    **Good Reason.** "Good Reason" means the Employee voluntarily resigns within ninety (90) days after the occurrence of any of the following: (i) a material reduction by the Company of Employee's authority without Employee's consent, except to the extent that the authority of Employee and similarly situated Company executives is reduced solely as a result of a merger into a larger entity (e.g., retaining the same authority for divisional operations that are substantially identical to the Company's previous operations as an independent entity); (ii) a material reduction by the Company of Employee's base compensation or benefits without Employee's consent, except to the extent that the compensation of similarly situated executives at the Company is similarly reduced; or (iii) an involuntary change in the Employee's principal place of employment that would increase Employee's one-way commute by more than forty (40) miles.

9.3    Employee will not be entitled to receive the Severance allowed under this Section 9 until Company and Employee have executed the Company's Confidential Separation Agreement (which is available for your review in the office of the Company's General Counsel), which includes a general release of claims. Moreover, if after the Employment Term, Employee has breached any of the post-employment restrictions contained in Section 10 of this Agreement, then Employee's right to receive the severance benefits set forth in this Section 9 shall cease immediately, and Employee will not be entitled to any further severance.

9.4     The acceptance of the aforementioned payments by Employee shall constitute the exclusive remedy of Employee with respect to any claim Employee may have against the Company for termination of the employment of Employee or the Company's breach of this Agreement or for any other claim of any nature which the Employee may have against the Company.

10.    **Non-Compete and Non-Solicitation.**

10.1    For a period of two (2) years following the termination of Employee's employment with the Company, Employee agrees not to directly or indirectly recruit, solicit, induce or encourage any employee of the Company to become an employee for any other person or entity; nor to directly or indirectly induce or encourage any independent contractor of the Company to terminate a contracting relationship with the Company.

10.2    Employee further agrees that during the Employment Term and for a period of two (2) years thereafter, Employee will not directly or indirectly own an interest in, operate, join, begin, control, advise, consult with, render services to or otherwise participate in or work for or on behalf of any entity or individual(s) which operates a fitness club within fifty (50) miles of any of the Company's fitness clubs or which otherwise competes with the business of the Company or the Company's affiliates.

10.3    Employee and the Company intend that: (1) this covenant not to compete shall be construed as a series of separate covenants, one for each county; (2) if any portion of the restrictions set forth in this Section 10 should, for any reason whatsoever, be declared invalid by an arbitrator or a court of competent jurisdiction, the validity or enforceability of the remainder of such restrictions shall not thereby be adversely affected, nor shall such a decision adversely affect the Company's right to cease the severance payments set forth in Section 9 of this Agreement in the event that Employee has breached any of the obligations in this Section 10; and (3) the territorial and time limitations set forth in this Section 10 are reasonable and properly required for the adequate protection of the Company's business. In the event any such territorial or time limitation is deemed to be unreasonable by an arbitrator or a court of competent jurisdiction, Employee agrees to the reduction of the territorial or time limitation to the area or period which such arbitrator or court shall have deemed reasonable.

10.4    Employee further agrees that provided the Company makes the severance payments contemplated by Section 9, for a period of one (1) year following the termination of Employee's employment, Employee will advise and consult with the Company at the Company's discretion regarding Company business and operations and agrees to diligently and conscientiously use his best efforts to discharge projects as may be reasonably requested from time to time by the Company, including, but not limited to, communicating with various third parties on behalf of the Company on matters related to the Company's business. Notwithstanding the provisions of this Section 10.4, nothing in this Agreement shall preclude Employee from providing consulting services to any other person or entity for such projects which are not in violation of Section 10. It is understood that provision of these services would not preclude Employee's full time employment by another, non-competing, organization.

11.    **Confidential Information.**  During the Employment Term and thereafter, Employee agrees to hold the Company's confidential and proprietary information in strictest confidence and not to use, disclose or disseminate any of such information except as such disclosure, use or

dissemination may be required in connection with Employee's work for the Company or as expressly authorized by the Company in writing. Employee further agrees that any work product created in connection with Employee's work for the Company will be the sole and exclusive property of the Company and hereby assigns to the Company all right, title and interest in all inventions and other intellectual property developed by Employee in working for the Company, except for any inventions or other intellectual property that Employee can prove qualifies under California Labor Code Section 2870 (as set forth in Exhibit A). Furthermore, Employee agrees to refrain from any unauthorized use or disclosure of any confidential information or property of any former employer or other third party. Employee agrees to use only that information that is generally known and used by persons with training and experience comparable to Employee's, that is common knowledge in the industry or otherwise in the public domain, or that is provided by or developed by the Company or developed by Employee on behalf of the Company.

**12.    Successor in Interest.** This Agreement and the rights and obligations hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, and shall also bind and inure to the benefit of any successor of the Company by merger or consolidation or any purchaser or assignee of all or substantially all of its assets, but, except to any such successor, purchaser, or assignee of the Company, neither this Agreement nor any rights or benefits hereunder may be assigned by either party hereto.

**13.    Invalid Provision.** In the event that any provision or portion of this Agreement shall be determined to be invalid or unenforceable for any reason, the remaining provisions of this Agreement shall remain in full force and effect to the fullest extent permitted by law.

**14.    Arbitration of Disputes.** To ensure rapid and economical resolution of any disputes which may arise under this Agreement, Employee and the Company agree that any and all disputes or controversies of any nature whatsoever arising from or related to Employee's employment or the interpretation, performance, enforcement or breach of this Agreement shall be resolved, to the fullest extent allowed by law, by confidential, final and binding arbitration conducted before a single arbitrator with Judicial Arbitration and Mediation Services, Inc. ("JAMS"), under the then-applicable JAMS employment rules. (In the event that there is no JAMS office within seventy-five (75) miles of Employee's work location, the arbitration shall be conducted by the American Arbitration Association ("AAA") under the then-applicable AAA rules.) **The parties acknowledge that by agreeing to this arbitration procedure, they waive the right to resolve any such dispute through a trial by jury, judge or administrative proceeding.** The arbitrator shall: (a) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law; and (b) issue a written arbitration decision including the arbitrator's essential findings and conclusions and a statement of the award. The Company shall pay all JAMS' arbitration fees (or AAA fees, where applicable) in excess of those that would be required if the dispute were decided in a court of law. Nothing in this Agreement is intended to prevent either Employee or the Company from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration. The arbitrator, and not a court, shall be authorized to determine whether the provisions of this paragraph apply to a dispute, controversy or claim sought to be resolved in accordance with these arbitration procedures.

**15.     Governing Laws.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the state applicable to Agreements made and to be performed entirely in the State of California.

**16.     Headings.** Titles or captions of sections contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.

**17.     Stock Option Grant.** Simultaneous with Employee entering into this Agreement, and as additional consideration for entering into this Agreement, Employee is receiving options to purchase 190,200 shares of common stock in 24 Hour Fitness Worldwide, Inc. The specific terms of the grants of such options are set forth in the option agreements for such grants, which are conditioned upon Employee entering into this Agreement, and are also subject to approval by the Company's Board of Directors.

**18.     Entire Agreement.** This Agreement shall constitute the entire agreement between the parties on this subject matter, shall supersede all prior agreements, whether written or oral, and may not be modified or amended, and no waiver shall be effective, unless by written document signed by both Employee and a duly-authorized officer of the Company; provided, however, that any increase in base salary, as provided above, shall become an amendment to this Agreement when approved by the Compensation Committee of the Board of Directors of the Company and recorded in the approved minutes of such meeting.

Executed as of the 31st day of March, 2003.


Mike Sheehan                                             Company Representative

## EXHIBIT A

### LIMITED EXCLUSION NOTIFICATION

THIS IS NOTICE, in accordance with Section 2872 of the California Labor Code, that the foregoing Employment Agreement does not require Employee to assign or offer to assign to the Company any invention that Employee developed entirely on Employee's own time without using the Company's equipment, supplies, facilities or trade secret information except for those inventions that either:

1.　　Relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or

2.　　Result from any work performed by Employee for the Company.

To the extent a provision in the foregoing Employment Agreement purports to require Employee to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is unenforceable.

This limited exclusion does not apply to any patent or invention covered by a contract between the Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States.

08CV3853
JUDGE LEFKOW
MAGISTRATE JUDGE DENLOW
JH

# EXHIBIT B

STOCKHOLDER'S AGREEMENT, dated as of September 20, 2005 between 24 Hour Fitness Worldwide, Inc., a Delaware corporation, and Michael William Sheehan (the "Employee").

WHEREAS, Forstmann Little & Co. Equity Partnership-VII, L.P., a Delaware limited partnership ("Equity-VII"), and Forstmann Little & Co. Subordinated Debt and Equity Management Buyout Partnership-VIII, L.P., a Delaware limited partnership ("MBO-VIII"), are the holders of shares of Class A Common Stock;

WHEREAS, the Employee wishes to subscribe for and purchase and the Company desires to issue and sell to the Employee authorized but unissued shares of Class B Common Stock on the terms and subject to the conditions set forth herein; and

WHEREAS, the Employee and the Company wish to provide for certain arrangements with respect to the Employee's rights to hold and dispose of the shares of Class B Common Stock acquired by the Employee hereunder.

NOW, THEREFORE, the parties hereto agree as follows:

1.     Definitions.

1.1. Definitions; Rules of Construction.

(a) The following terms, as used herein, shall have the following meanings:

"Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Affiliate" shall mean, with respect to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.

"Affiliate Securities" shall mean any securities issued by an Affiliate of the Company.

"Aggregate Number of Acquired Shares" shall mean the aggregate number of shares of Class B Common Stock acquired by the Employee pursuant hereto (adjusted, where appropriate, to reflect any Capital Transaction).

"Aggregate Number of Shares Sold" shall mean, as at any date, the aggregate number of shares sold by the Employee pursuant to Section 3.3, 3.4 or 3.5 hereof prior to such date, if any (adjusted, where appropriate, to reflect any Capital Transaction effected after the date of any such sale).

"Agreement" shall mean this Stockholder's Agreement, as amended, supplemented or modified from time to time.

"Capital Transaction" shall mean any Stock Dividend, recapitalization (including, without limitation, any special dividend or distribution), reclassification, spin-off, partial liquidation or similar capital adjustments (including, without limitation, through merger or consolidation).

"Cash EBITDA" shall mean the Company's reported book EBITDA during any relevant period determined in a manner consistent with the Company's past practices, plus (i) management and advisory fees, (ii) non-cash compensation charges, (iii) goodwill impairment charges, (iv) asset impairment charges, (v) restructuring charges, (vi) one-time adjustments, (vii) charges resulting from any loss on fixed assets, (viii) exchange loss, (ix) deferred revenues, (x) deferred expenses, and (xi) deferred rent, in each case to the extent incurred during the relevant period.

"Cause" shall mean (i) the occurrence of any of the events set forth in Section 4.2(a), (b) or (c), or (ii) the Employee's having (a) grossly neglected his or her assigned duties or (b) engaged in willful misconduct resulting in, or reasonably likely to result in, material and demonstrable damage to the Company.

"Certificate of Incorporation" shall mean the Amended and Restated Certificate of Incorporation of the Company, as in effect from time to time.

"Class A Common Stock" shall mean the Class A Common Stock, par value $0.01 per share, of the Company. There shall be included within the term Class A Common Stock any Class A Common Stock now or hereafter authorized to be issued, and any and all securities of any kind whatsoever of the Company which may be issued after the date hereof in respect of, or in exchange for, shares of Class A Common Stock pursuant to a Capital Transaction or otherwise.

"Class B Common Stock" shall mean the Class B Common Stock, par value $0.01 per share, of the Company. There shall be included within the term Class B Common Stock any Class B Common Stock now or hereafter authorized to be issued, and any and all securities of any kind whatsoever of the Company which may be issued after the date hereof in respect of, or in exchange for, shares of Class B Common Stock pursuant to a Capital Transaction or otherwise. Without limiting the generality of the foregoing, all references herein to the Class B Common Stock shall include, and the provisions hereof (including, without limitation, Articles 3 and 4 hereof) shall also be applicable to, the Class A Common Stock for which the Class B Common Stock shall be exchanged pursuant to the Certificate of Incorporation.

"Closing" shall have the meaning ascribed to such term in Section 3.2(d) hereof.

"Closing Date" shall have the meaning ascribed to such term in Section 2.2 hereof.

"Company" shall mean 24 Hour Fitness Worldwide, Inc., a Delaware corporation, and shall include any successor thereto by merger, consolidation, acquisition of substantially all the assets thereof, or otherwise and shall include any subsidiary of 24 Hour Fitness Worldwide, Inc. or such successor when describing an employment relationship.

2

"Competitive Activity" shall mean engaging in any of the following activities: (i) serving as a director or executive officer of any Competitor; (ii) directly or indirectly (X) controlling any Competitor or (Y) owning any equity or debt interests in any Competitor (other than Existing Interests and equity or debt interests which are publicly traded and do not exceed 2% of the particular class of interests then outstanding) (it being understood that, if any such interests in any Competitor are owned by an investment vehicle or other entity in which the Employee owns an equity interest, a portion of the interests in such Competitor owned by such entity shall be attributed to the Employee, such portion determined by applying the percentage of the equity interest in such entity owned by the Employee to the interests in such Competitor owned by such entity); (iii) directly or indirectly soliciting, diverting, taking away, appropriating or otherwise interfering with any of the clients, customers or suppliers of the Company or any Affiliate of the Company or any person or entity whose business the Company or any Affiliate of the Company has solicited in the most recent three-year period; or (iv) employment by (including serving as an officer or director of), or providing consulting services to, any Competitor. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Competitor, whether through the ownership of equity or debt interests, by contract or otherwise. For purposes of this definition, the term "Existing Interests" means solely the equity or debt interests in a Competitor owned by the Employee as of the date hereof and set forth on Annex I attached hereto.

"Competitor" shall mean Life Time Fitness, Inc., L.A. Fitness International, LLC, Bally Total Fitness Holding Corporation, Town Sports International Holdings, Inc., Gold's Gym International, Inc., Equinox Holdings, Inc., Spectrum Sports Club, Inc., Club One, Inc., Curves International, Inc., any successor or affiliate of the foregoing in the same line of business or any other Person with annual revenues in excess of $200 million that is engaged in or planning to engage in owning, operating or acquiring directly or indirectly (through a corporation, trust, partnership or other Person) a Physical Fitness Business that operates in any of the same markets as and competes directly or indirectly with a Physical Fitness Business which, at the time the Employee is Terminated, is owned or operated by the Company or any of its subsidiaries or which the Company or any of its subsidiaries intends to own, operate or acquire. The determination as to whether or not any Physical Fitness Business competes directly or indirectly with the Company or any of its subsidiaries shall be made by the Company in its reasonable discretion.

"Confidential or Proprietary Information" shall mean any non-public information about the Company or any Affiliate thereof which was acquired during the Employee's employment with the Company or any Affiliate thereof and which has or is reasonably likely to have competitive value to the Company or any Affiliate thereof.

"Election Date" shall have the meaning ascribed to such term in Section 3.2(a) hereof.

"Equity-VII" shall have the meaning ascribed to such term in the first "Whereas" clause hereof.

3

"Exchange Rate" shall have the meaning ascribed to such term in Section 3.3 hereof.

"Expenses of Sale" shall mean all expenses incurred by the FL & Co. Companies and their Affiliates in connection with the sale of the shares of the selling stockholders pursuant to Section 3.3, 3.4 or 3.5 hereof to the extent that such expenses are not paid or reimbursed by the Company.

"Fair Value" shall mean, if the Class A Common Stock is listed or traded in a manner referred to below, as at any date of Termination or, in the case of a determination pursuant to Section 4.3, the date of any Repurchase Notice, (i) with respect to the Class B Common Stock, the product, rounded to three decimal places, of (x) the fraction of a share of Class A Common Stock for which a share of Class B Common Stock is exchangeable in accordance with the Exchange Rate and (y) an amount equal to the average of the daily Closing Prices on the twenty consecutive trading days immediately preceding the date of Termination or the applicable Repurchase Notice, as the case may be and (ii) with respect to the Class A Common Stock, an amount equal to the average of the daily Closing Prices on the twenty consecutive trading days immediately preceding the date of Termination or the applicable Repurchase Notice, as the case may be. As used in this Agreement, the term "Closing Price", with respect to the Class A Common Stock, on any day shall mean the last reported sales price on such day or, in the event no such sale takes place on such day, the average of the closing bid and asked prices, in each case on the New York Stock Exchange or, if the Class A Common Stock is not then listed or admitted to trading on such exchange, on the principal national securities exchange on which the Class A Common Stock is listed or admitted to trading, or, if the Class A Common Stock is not listed or admitted to trading on any such exchange, the average of the highest reported bid and lowest reported asked prices as furnished by the National Association of Securities Dealers through the National Association of Securities Dealers Automated Quotation System ("NASDAQ") (or a similar organization if NASDAQ is no longer reporting such information). If the Class A Common Stock is not listed and traded in a manner that the pricing information referred to above is available for the period required hereunder, the Fair Value per share of Class B Common Stock or Class A Common Stock, as the case may be, shall be determined by an appraisal or valuation by a nationally recognized valuation or investment banking firm selected by the Board of Directors of the Company; provided that for such time as the Board of Directors of the Company continues to consider Cash EBITDA to be an accurate measure of the Company's economic performance, the principal focus of such firm in determining the Fair Value shall be the Cash EBITDA of the Company.

"FL & Co. Companies" shall mean Equity VII and MBO-VIII, collectively.

"Legal Representative" shall mean the guardian, executor, administrator or other legal representative of the Employee. All references herein to the Employee shall be deemed to include references to the Employee's Legal Representative, if any, unless the context otherwise requires.

"Litigation" shall mean any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby.

4

"MBO-VIII" shall have the meaning ascribed to such term in the first "Whereas" clause hereof.

"Permitted Transferee" shall have the meaning ascribed to such term in Section 3.1(b) hereof.

"Person" shall mean an individual, a corporation, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Physical Fitness Business" shall mean (i) the business of operating or managing any physical fitness center or facility, (ii) any other business conducted by the Company or its subsidiaries or (iii) any other business or activity similar to or ancillary to the businesses described in clauses (i) or (ii) above.

"Prime Rate" shall mean the rate of interest per annum publicly announced from time to time by J.P. Morgan Chase & Co. or any successor bank thereto as its prime rate in effect at its principal office in New York City.

"Prohibited Activity" shall have the meaning ascribed to such term in Section 4.1 hereof.

"Promissory Note" shall mean any promissory note executed and delivered by the Employee to evidence the Employee's loan from the Company to finance in part the Employee's purchase of shares of Class B Common Stock hereunder.

"Purchase Closing" shall have the meaning ascribed to such term in Section 2.2 hereof.

"Purchased Shares" shall have the meaning ascribed to such term in Section 3.2(d) hereof.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.1 hereof.

"Put Date" shall have the meaning ascribed to such term in Section 3.2(a) hereof.

"Release Date" shall mean the date on which the FL & Co. Companies and their Affiliates shall cease to own in the aggregate directly or indirectly at least 20 percent of the then outstanding securities of the Company having the power to vote in the election of directors of the Company.

"Representative" shall have the meaning ascribed to such term in Section 6.13(b) hereof.

"Repurchase Notice" shall have the meaning ascribed to such term in Section 4.2 hereof.

5

"Sale Obligations" shall mean any liabilities and obligations (including liabilities and obligations for indemnification, amounts paid into escrow and post-closing adjustments) incurred by the selling stockholders in connection with the sale of their shares pursuant to Section 3.3, 3.4 or 3.5 hereof.

"Scheduled Closing Date" shall have the meaning ascribed to such term in Section 3.2(d) hereof.

"Section 3.2(b)(i) Notice Date" shall have the meaning ascribed to such term in Section 3.2(b)(i) hereof.

"Section 3.2(b)(ii) Notice Date" shall have the meaning ascribed to such term in Section 3.2(b)(ii) hereof.

"Section 3.4 Notice" shall have the meaning ascribed to such term in Section 3.4(a) hereof.

"Stock Dividend" shall mean any stock split, stock dividend, reverse stock split or similar transaction which changes the number of outstanding shares of capital stock of the Company.

"Stock Pledge Agreement" shall mean the stock pledge agreement which the Employee is entering into with the Company in connection with the financing in part of the Employee's purchase of shares of Class B Common Stock hereunder.

"Termination" or "Terminated" shall mean that the Employee's employment on a full-time basis by the Company and its subsidiaries shall have ceased for any reason whatsoever (including by reason of death, permanent disability or adjudicated incompetency) (it being understood that the Employee's employment by the Company and its subsidiaries shall not be deemed to have ceased during any leaves-of-absence or during the period of any consulting or advisory relationship between the Employee and the Company or any of its direct or indirect wholly-owned subsidiaries following the date on which such employment otherwise would have been deemed to cease, in each case to the extent approved by the Company on a case-by-case basis).  When used without the phrase "by the Company," the term "Termination" or "Terminated" shall mean that such employment shall have ceased as a result of actions taken by either the Company or any of its direct or indirect wholly-owned subsidiaries or the Employee, or by the death, permanent disability or adjudicated incompetency of the Employee.

"Third Party" shall mean any Person other than any FL & Co. Company or an Affiliate or a partner of any of the FL & Co. Companies or an Affiliate of such partner.

"Transaction" shall mean any sale pursuant to Section 3.3, 3.4 or 3.5 hereof.

"Unvested Shares" shall mean, as at any date, all shares of Class B Common Stock owned by the Employee which are not Vested Shares as of such date.

"Valuation Date" shall mean the last day of the fiscal year of the Company immediately preceding the fiscal year in which the Employee's employment is Terminated.

6

"Vested Shares" shall mean the number of shares of Class B Common Stock determined as follows: (i) if the Employee is Terminated on or before June 7, 2006, zero; (ii) if the Employee is Terminated after June 7, 2006 but on or before December 7, 2006, (x) 25 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (iii) if the Employee is Terminated after December 7, 2006 but on or before June 7, 2007, (x) 37.5 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (iv) if the Employee is Terminated after June 7, 2007 but on or before December 7, 2007, (x) 50 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (v) if the Employee is Terminated after December 7, 2007 but on or before June 7, 2008, (x) 62.5 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (vi) if the Employee is Terminated after June 7, 2008 but on or before December 7, 2008, (x) 75 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (vii) if the Employee is Terminated after December 7, 2008 but on or before June 7, 2009, (x) 87.5 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; and (viii) if the Employee is Terminated after June 7, 2009, (x) the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold.

(b) In this Agreement, unless the context otherwise requires, words in the singular number or in the plural number shall each include the singular number and the plural number.

2.    Purchase and Sale of Class B Common Stock.

2.1. Subscription of Class B Common Stock. The Employee hereby subscribes for the number of shares of Class B Common Stock set forth opposite the Employee's name on Annex A hereto, at a price of $5.051356 per share in cash (the "Purchase Price").

2.2. Closing of the Purchase and Sale. The closing of the transactions contemplated hereby (the "Purchase Closing") shall take place at the offices of Kirkland & Ellis LLP, 153 East 53rd Street, New York, New York 10022 at such time as the Company shall designate on the date hereof (the "Closing Date"). At the Purchase Closing, the Company shall deliver to the Employee a duly executed certificate representing the number of shares of Class B Common Stock being purchased by the Employee and shall enter the Employee's name on the books of the Company as the stockholder of record of such shares of Class B Common Stock as of the Closing Date. At or prior to the Purchase Closing, the Employee shall deliver to the Company an amount equal to the aggregate purchase price for such shares, by delivering a check payable to the Company, and by delivering an executed Promissory Note to the Company, in the respective amounts forth on Annex A. The Promissory Note shall be accompanied by an executed Stock Pledge Agreement. The Employee agrees that he or she shall properly execute and file an election under Section 83(b) of the Internal Revenue Code of 1986, as amended, with respect to his or her shares of Class B Common Stock within thirty days of the Closing Date.

3.    Rights and Restrictions on Class B Common Stock.

3.1. No Sale or Transfer.

7

(a) The Employee shall not sell, transfer, assign, exchange, pledge, encumber or otherwise dispose of any shares of Class B Common Stock acquired hereunder or grant any option or right to purchase such shares or any legal or beneficial interest therein, except in accordance with the provisions of this Agreement and the Stock Pledge Agreement.

(b) The Employee may transfer any shares of Class B Common Stock acquired hereunder by will or the laws of descent and distribution, but only to:

(i)     any spouse, parent, child (whether natural or adopted), grandchild, brother or sister of the Employee, or

(ii)     any trust, corporation, limited liability company or partnership which is controlled by any spouse, parent, child (whether natural or adopted), grandchild, brother or sister of the Employee

(the Person or Persons to which shares of Class B Common Stock are transferred in accordance with this Section 3.1(b) being herein referred to as the "Permitted Transferee"); provided, that, for any transfer to the Permitted Transferee to be effective hereunder, the Permitted Transferee shall agree in writing to be bound by all the terms of this Agreement applicable to the Employee (including, without limitation, Article 4 and Section 6.13(b) hereof) and the Promissory Note and the Stock Pledge Agreement as if the Permitted Transferee originally had been a party hereto; and provided, further, that all of the equity holders or trustees of any Permitted Transferee that is neither a natural person nor a partnership and all of the partners of any Permitted Transferee that is a partnership shall agree in writing not to transfer any equity interests they then own or control or may hereafter acquire in the Permitted Transferee that is neither a natural person nor a partnership or any partnership interests they then own or may hereafter acquire in the Permitted Transferee that is a partnership except to a Person described in paragraph (i) or (ii) above that has made the same agreement in writing to the Company, so long as such Permitted Transferee shall own any shares of Class B Common Stock.  Any reference herein to the Employee shall be to the Permitted Transferee from and after the date the transfer is effected in accordance with this Section 3.1(b).  Without limiting the generality of the foregoing, the provisions of Section 4.2 hereof shall be likewise applicable to any Permitted Transferee, commencing upon the date that such Person becomes a Permitted Transferee, for the respective periods they would have applied to the Employee.

3.2.Employment Termination.

(a) If the Employee shall be Terminated, irrespective of whether the Employee receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Company shall have the right, at its option, exercisable by delivery of written notice to the Employee within 90 days (or, in the case of a Termination by reason of death, permanent disability or adjudicated incompetency, 180 days) following the date of Termination (the date of delivery of such written notice being referred to herein as the "Election Date"), to purchase all or any portion of the Unvested Shares held by the Employee as of the date or such Termination.  If the Employee shall be Terminated by the Company without Cause or by reason of death, permanent disability or adjudicated incompetency, irrespective of whether the Employee

8

receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Employee shall have the right, at its option, exercisable by delivery of written notice to the Company within 90 days (or, in the case of a Termination by reason of death, permanent disability or adjudicated incompetency, 180 days) following the date of Termination (the date of delivery of such written notice being referred to herein as the "Put Date"), to require the Company to purchase all, but not less than all, of the Unvested Shares held by the Employee as of the date of such Termination; provided that within 5 business days of being notified by the Company of the purchase price per share of the shares of Class B Common Stock subject to repurchase pursuant to this sentence, if such purchase price per share is less than the Purchase Price, the Employee shall have the option to withdraw such notice but shall not have the option to redeliver any such notice thereafter. The purchase price per share of the shares of Class B Common Stock purchased pursuant to this Section 3.2(a) shall be equal to the lower of (i) Purchase Price, adjusted to reflect any Capital Transaction between the Closing Date and the Election Date or Put Date, as the case may be, and (ii) the Fair Value as of the date of such Termination.

(b) (i) If the Employee shall be Terminated by reason of death, permanent disability or adjudicated incompetency, irrespective of whether the Employee receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Employee shall have the right, at its option, exercisable by delivery of written notice to the Company within 180 days following the date of Termination (the date of delivery of such written notice being referred to herein as the "Section 3.2(b)(i) Notice Date"), to require the Company to purchase all, but not less than all, of the Vested Shares held by the Employee as of the date of such Termination; provided that within 5 business days of being notified by the Company of the purchase price per share of the shares of Class B Common Stock subject to repurchase pursuant to this Section 3.2(b)(i), the Employee shall have the option to withdraw such notice but shall not have the option to redeliver any such notice thereafter. The purchase price per share of the shares of Class B Common Stock purchased pursuant to this Section 3.2(b)(i) shall be equal to the Fair Value as of the date of such Termination.

(ii) If the Employee shall be Terminated by the Company without Cause (other than by reason of death, permanent disability or adjudicated incompetency), irrespective of whether the Employee receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Employee shall have the right, at its option, exercisable by delivery of written notice to the Company within 90 days following the date of Termination (the date of delivery of such written notice being referred to herein as the "Section 3.2(b)(ii) Notice Date"), to require the Company to purchase all, but not less than all, of the Vested Shares held by the Employee as of the date of such Termination; provided that within 5 business days of being notified by the Company of the purchase price per share of the shares of Class B Common Stock subject to repurchase pursuant to this Section 3.2(b)(ii), the Employee shall have the option to withdraw such notice but shall not have the option to redeliver any such notice thereafter. The purchase price per share of the shares of Class B Common Stock purchased pursuant to this

Section 3.2(b)(ii) shall be equal to the Fair Value as of the date of such Termination.

      (iii)    If the Employee shall be Terminated other than by the Company (or by reason of death, permanent disability or adjudicated incompetency) or if the Employee shall be Terminated by the Company for Cause, the Employee shall have no right to require the Company to purchase any Vested Shares.

      (c)  All shares of Class B Common Stock held by any Employee that the Company does not elect to purchase, or that the Employee does not require the Company to purchase, pursuant to the provisions of Section 3.2(a) or 3.2(b) shall continue to be subject to the provisions of this Agreement (including, without limitation, Sections 3.3, 3.4 and 3.5 and Article 4 hereof).

      (d)  Subject to Sections 3.2(e) and 3.2(f) hereof, the closing (the "Closing") of any purchase of shares of Class B Common Stock pursuant to Section 3.2(a) or 3.2(b) hereof (the "Purchased Shares") shall take place at the principal office of the Company on the later of (i) 10 days after the Election Date, the Put Date or the Section 3.2(b)(ii) Notice Date, as the case may be, (ii) (if applicable) 30 days after the Section 3.2(b)(i) Notice Date and (iii) (if applicable) 10 days after the appointment of a Legal Representative (such later date, the "Scheduled Closing Date").  At the Closing, the Employee shall sell, convey, transfer, assign and deliver to the Company all right, title and interest in and to the Purchased Shares, which shall constitute (and, at the Closing, the Employee shall certify the same to the Company in writing) good and unencumbered title to such shares, free and clear of all liens, security interests, encumbrances and adverse claims of any kind and nature (other than those in favor of the Company and the FL & Co. Companies pursuant to this Agreement), and shall deliver to the Company a certificate representing the shares duly endorsed for transfer, or accompanied by appropriate stock transfer powers duly executed, and with all necessary transfer tax stamps affixed thereto at the expense of the Employee, and the Company shall deliver to the Employee, in full payment of the purchase price for the Purchased Shares, either a wire transfer to an account designated by the Employee or a cashier's, certified or official bank check payable to the order of the Employee (the method of payment to be at the option of the Company), in the amount equal to the Purchase Price (adjusted as described in Section 3.2(a), if applicable) or the Fair Value, as the case may be, multiplied by the number of Purchased Shares.  Notwithstanding anything herein to the contrary, from and after the Election Date, the Put Date, the Section 3.2(b)(i) Notice Date or the Section 3.2(b)(ii) Notice Date, as the case may be, the Employee shall not have any rights with respect to any of the Purchased Shares (including any rights pursuant to Sections 3.3 and 3.4 hereof), except to receive the purchase price therefor.

      (e)  Notwithstanding the provisions of Section 3.2(d) hereof, if the Company exercises its option to purchase, or the Employee requires the Company to purchase, shares of Class B Common Stock pursuant to Section 3.2(a) or 3.2(b) hereof, but the Company is prohibited from effecting the Closing on the Scheduled Closing Date by any contractual obligation of the Company or any of its Affiliates (including any restriction in any agreement or arrangement with any lender) or by applicable law, then the Closing shall take place on the first practicable date on which the Company is permitted to purchase such shares, and, at the Closing, the Company shall pay to the Employee interest on the unpaid purchase price from and including

10

the Scheduled Closing Date to, but not including, the date of the Closing, at the Prime Rate. If at any time the prohibition shall cease to be applicable to any portion of the shares not purchased, then the Company shall purchase such portion on the first practicable date on which the Company is permitted to do so. The Company shall not declare or pay any dividend of cash or cash equivalents, or purchase any shares of Class A Common Stock or Class B Common Stock for cash or cash equivalents, until the purchase price for all of the Purchased Shares has been paid in full.

(f) Notwithstanding anything to the contrary contained in this Section 3.2, if at any time prior to any Scheduled Closing Date under this Section 3.2 the Company shall become entitled to purchase any shares of Class B Common Stock, then held by an Employee, pursuant to Section 4.2 hereof, the Company shall be relieved of any of its obligations under Section 3.2 to purchase such shares and the Company's rights to purchase such shares shall be governed by Section 4.2.

3.3.Participation in Sale of Class A Common Stock. The Employee, at the Employee's option, may participate proportionately (and the FL & Co. Companies shall allow the Employee to participate proportionately) in any sale (other than a public offering which shall be governed by Section 3.4 hereof) of all or a portion of the shares of Class A Common Stock owned by either of the FL & Co. Companies to any Third Party by (a) exchanging the same percentage of the Employee's shares of Class B Common Stock as the FL & Co. Companies propose to sell of their shares of Class A Common Stock to the Third Party (determined on the basis of the aggregate number of such shares of Class A Common Stock owned, and the aggregate number of such shares being sold by, the FL & Co. Companies) for shares of Class A Common Stock in accordance with the Exchange Rate, as defined in Subsection 4(d)(i) of Section A of Article Fourth of the Certificate of Incorporation (the "Exchange Rate"), and (b) selling the Class A Common Stock received in such exchange to the Third Party. The Company shall notify the Employee in writing of the FL & Co. Companies' intention to effect such a sale to a Third Party, the identity of the Third Party and the nature and purchase amount of consideration to be paid by the Third Party, and shall set forth its calculation of the Exchange Rate, at least 10 days, or such shorter time as the Company deems practicable, before the closing of any such proposed sale of shares of Class A Common Stock. Schedule I attached hereto sets forth an example illustrating the calculation of the Exchange Rate. Any sale of shares of Class A Common Stock by the Employee pursuant to this Section 3.3 shall be for the same consideration per share, on the same terms and subject to the same conditions as the sale of shares of Class A Common Stock owned by the FL & Co. Companies, provided that the Employee shall not be required to make representations to such Third Party that are solely related to the business of the Company. The Company shall, immediately prior to, and contingent upon, the consummation of such sale, exchange such shares of Class B Common Stock for Class A Common Stock in accordance with the Exchange Rate. If the Employee sells any shares pursuant to this Section 3.3, the Employee shall pay and be responsible for the Employee's proportionate share of the Expenses of Sale and the Sale Obligations; provided that all such Expenses of Sale and Sale Obligations for which the Employee shall be responsible shall be withheld from and shall not, in the aggregate, exceed the net consideration otherwise payable to the Employee in connection with such sale.

11

3.4. Participation in Public Offering of Class A Common Stock.

(a) Subject to the provisions of the Certificate of Incorporation (including, without limitation, Section A.4 of Article Fourth thereof), if the FL & Co. Companies propose to sell all or any portion of the shares of Class A Common Stock owned by the FL & Co. Companies in a public offering, the Employee shall be entitled, and shall be required as determined by the Board of Directors of the Company in its sole discretion, to participate in such public offering by (i) exchanging the same percentage of the Employee's shares of Class B Common Stock as the FL & Co. Companies propose to sell of their shares of Class A Common Stock in the public offering (determined on the basis of the aggregate number of shares of Class A Common Stock owned, and the aggregate number of such shares being sold, by the FL & Co Companies in the public offering, regardless of the amount specified in any registration statement or prospectus dated prior to the date of the public offering), and (ii) selling in the public offering the Class A Common Stock received in such exchange. The Company shall notify the Employee in writing of the FL & Co. Companies' intention to effect such public offering at least 10 days, or such shorter time as the Company deems practicable, before the filing with the Securities and Exchange Commission of the registration statement relating to such public offering (the "Section 3.4 Notice") and shall cause the Employee's shares to be sold in such public offering to be included therein. The Section 3.4 Notice shall indicate whether or not the Board of Directors of the Company has determined that the Employee shall be required to participate in the public offering. If the Board of Directors of the Company does not require the Employee to participate in the public offering and the Employee wishes to participate in such public offering, the Employee shall notify the Company in writing within five days after receipt of the Section 3.4 Notice of his or her intention to participate in such public offering, including the number of shares with respect to which he or she will so participate. Any failure by the Employee to so notify the Company within such five-day period shall be deemed an election by the Employee not to participate in such public offering with respect to any of his or her shares. If the Employee sells any shares pursuant to this Section 3.4, the Employee shall pay and be responsible for the Employee's proportionate share of the Expenses of Sale and the Sale Obligations (including indemnifying the underwriters of such public offering, but only with respect to written information furnished by the Employee expressly for use in the registration statement (or any amendment thereto), including any information statement, preliminary prospectus or final prospectus (or any amendment or supplement thereto)); provided that in no event shall the Employee be required to pay any such Expenses of Sale or Sale Obligations which, in the aggregate, exceed the net proceeds to be received by the Employee in connection with such sale.

(b) In connection with any proposed public offering of securities of the Company, whether by any of the FL & Co. Companies or the Company or otherwise, the Employee agrees (i) to supply any information reasonably requested by the Company in connection with the preparation of a registration statement and/or any other documents relating to such public offering, and (ii) to execute and deliver any agreements and instruments reasonably requested by the Company to effectuate such public offering, including, without limitation, an underwriting agreement, a custody agreement and a "lock up" or "hold back" agreement pursuant to which the Employee will agree not to sell or purchase any securities of the Company (whether or not such securities are otherwise governed by this Agreement) for the same period of time following the public offering as is agreed to by the FL & Co. Companies

12

with respect to themselves.  If the Company requests that the Employee take any of the actions referred to in clause (i) or (ii) of the previous sentence, the Employee shall take such action promptly but in any event within five days following the date of such request.

        3.5. Required Participation in Sale of Class A Common Stock by the FL & Co. Companies.  Notwithstanding any other provision of this Agreement to the contrary, if the FL & Co. Companies shall propose to sell (including by exchange, in a business combination or otherwise) all or any portion of their shares of Class A Common Stock in a bona fide arm's-length transaction, the FL & Co Companies, at their option, may require that (x) the Employee exchange the same percentage of the Employee's shares of Class B Common Stock as the FL & Co. Companies propose to sell of their shares of Class A Common Stock in the transaction (determined on the basis of the aggregate number of shares of Class A Common Stock owned, and the aggregate number of such shares being sold, by the FL & Co. Companies) for shares of Class A Common Stock in accordance with the Exchange Rate, and (y) sell all the Class A Common Stock received in such exchange for the same consideration per share, on the same terms and subject to the same conditions in the same transaction and, if stockholder approval of the transaction is required and the Employee is entitled to vote thereon, that the Employee vote the Employee's shares in favor thereof.  The Company shall calculate the Exchange Rate and shall, immediately prior to, and contingent upon, the consummation of the transaction exchange such shares of Class B Common Stock for Class A Common Stock in accordance with the Exchange Rate.  If the Employee sells any shares pursuant to this Section 3.5, the Employee shall pay and be responsible for the Employee's proportionate share of the Expenses of Sale and the Sale Obligations; provided that all such Expenses of Sale and Sale Obligations for which the Employee shall be responsible shall be withheld from and shall not, in the aggregate, exceed the net consideration otherwise payable to the Employee in connection with such sale.

        3.6. Termination of Restrictions and Rights.  Notwithstanding any other provision of this Agreement to the contrary, but subject to the restrictions of all applicable federal and state securities laws, including the restrictions in this Agreement relating thereto, from and after the Release Date any and all shares of Class B Common Stock owned by the Employee (a) may be sold, transferred, assigned, exchanged, pledged, encumbered or otherwise disposed of (and the Employee may grant any option or right to purchase such shares or any legal or beneficial interest therein, or may continue to hold such shares), free of the restrictions contained in this Agreement and (b) shall no longer be entitled to any of the rights contained in this Agreement.  Without limiting the generality of the foregoing, from and after the Release Date, the provisions of Articles 3 and 4 hereof (other than this Section 3.6 and Sections 4.1(a), 4.1(b) and 4.1(c) hereof) shall terminate and have no further force or effect.  This provision shall not relieve the Employee from any restrictions imposed by law or by any other agreement or arrangement.

4.      Prohibited Activities.

        4.1. Prohibition Against Certain Activities.  The Employee agrees that (a) the Employee will not at any time during the Employee's employment (other than in the course of such employment) with the Company or any Affiliate thereof, or after a Termination, disclose or furnish to any other Person or use for the Employee's own or any other Person's account any Confidential or Proprietary Information unless required to do so by law or judicial process, (b) if the Employee is Terminated, the Employee will not for three years following such Termination

hire or employ, or directly or indirectly solicit for employment, including without limitation recommending to any subsequent employer the solicitation for employment of, any employee of the Company or any Affiliate thereof, (c) the Employee will not at any time during the Employee's employment with the Company or any Affiliate thereof or after a Termination publish or make any disparaging statements about the Company, any Affiliate or any of their directors, officers or employees, under circumstances where it is reasonably foreseeable that the statements will be made public and (d) the Employee will not breach the provisions of Section 3.1 hereof (any activity prohibited by clause (a), (b), (c) or (d) of this Section 4.1 being referred to as a "Prohibited Activity").  For purposes of clause (c) of the previous sentence, a disparaging statement is a communication which, if made public, would tend to malign the business or reputation of the Person or entity about whom such statement is made.

4.2. Right to Purchase Shares.  The Employee understands and agrees that the Company has granted to the Employee the right to purchase shares of Class B Common Stock to reward the Employee for the Employee's future efforts and loyalty to the Company and its Affiliates by giving the Employee the opportunity to participate in the potential future appreciation of the Company.  Accordingly, (a) if the Employee engages in any Prohibited Activity, or (b) if, at any time during the Employee's employment with the Company or any of its Affiliates or during the three years following a Termination, the Employee engages in any Competitive Activity, or (c) if, at any time (whether during the Employee's employment or after any Termination thereof), the Employee is convicted of a felony, then, in addition to any other rights and remedies available to the Company or any of its Affiliates (at law, in equity or under any employment agreement, award agreement or other agreement or arrangement of the Employee), the Company shall be entitled, at its option, exercisable by written notice (the "Repurchase Notice") to the Employee, to purchase all or any portion of the shares of Class B Common Stock then held by the Employee.

4.3. Purchase Price; Closing.

(a) The purchase price per share of the shares of Class B Common Stock purchased pursuant to this Article 4 shall be equal to the lesser of (i) the Purchase Price (adjusted to reflect any Capital Transaction effected after the Closing Date and prior to the date of the Repurchase Notice) and (ii) the Fair Value as of the date of the Repurchase Notice.

(b) The closing of a purchase pursuant to this Section 4.3 shall take place at the principal office of the Company 10 days following the date of the Repurchase Notice (and if such tenth day is not a business day, then the first business day thereafter), except that if the Company is prohibited from repurchasing any shares of Class B Common Stock pursuant to this Article 4 by any contractual obligation of the Company or any of its Affiliates (including any restriction in any agreement or arrangement with any lender) or by applicable law, the closing of such purchase shall take place on the first practicable date on which the Company is permitted to purchase such shares (and the provisions of the last sentence of Section 3.2(e) shall likewise apply to purchases pursuant to this Article 4). At such closing, the Employee shall sell, convey, transfer, assign and deliver to the Company all right, title and interest in and to the shares of Class B Common Stock being purchased by the Company, which shall constitute (and, at the closing, the Employee shall certify the same to the Company in writing) good and unencumbered title to such shares, free and clear of all liens, security interests, encumbrances and adverse

14

claims of any kind and nature (other than those in favor of the Company and the FL & Co. Companies pursuant to this Agreement), and shall deliver to the Company a certificate representing the shares duly endorsed for transfer, or accompanied by appropriate stock transfer powers duly executed, and with all necessary transfer tax stamps affixed thereto at the expense of the Employee, and the Company shall deliver to the Employee, in full payment of the purchase price payable pursuant to this Section 4.3 for the shares of Class B Common Stock purchased, a check payable to the order of the Employee, in the amount of the aggregate purchase price for the shares purchased.  Notwithstanding anything herein to the contrary, from and after the date of the Repurchase Notice, the Employee shall not have any rights with respect to any shares of Class B Common Stock which the Employee is required to sell to the Company pursuant to this Article 4 (including any rights pursuant to Section 3.3 or 3.4 hereof), except to receive the purchase price therefor.

4.4.Notwithstanding anything to the contrary set forth in Sections 3.3, 3.4 or 3.5 hereof, if at the time of a Transaction in which the Employee is participating, the Company is entitled to purchase the Employee's shares of Class B Common Stock pursuant to this Article 4, and if the purchase price per share for a purchase pursuant to this Article 4 would be less than the proceeds per share to the Employee from such Transaction, then the Employee shall be entitled to receive only the aggregate purchase price payable under this Article 4, with the balance of the proceeds of sale in the Transaction being remitted to the other stockholders of the Company participating in such Transaction pro rata in accordance with their respective participation in such Transaction.

5.      Stock Certificate Legend and Investment Representations; Other Representations.

5.1.Legend.  All certificates representing shares of Class B Common Stock acquired hereunder or hereafter by the Employee (unless registered under the Act) shall bear the following legend:

> "The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended, or any securities regulatory authority of any state, and may not be sold, transferred, assigned, exchanged, pledged, encumbered or otherwise disposed of except in compliance with all applicable securities laws and except in accordance with the provisions of a Stockholder's Agreement with the Company, a copy of which is available for inspection at the offices of the Company."

5.2.Representations and Warranties of the Employee.  The Employee represents and warrants that: (a) the Employee understands that (i) the offer and sale of shares of Class B Common Stock in accordance with this Agreement have not been and will not be registered under the Act, and it is the intention of the parties hereto that the offer and sale of the securities be exempt from registration under the Act and the rules promulgated thereunder by the Securities and Exchange Commission; (ii) the reliance of the Company on such exemption is predicated upon such Employee's representations set forth herein; (iii) the shares of Class B Common Stock being acquired hereunder cannot be sold, transferred, assigned, exchanged, pledged, encumbered or otherwise disposed of unless they are registered under the Act or an exemption from

15

registration is available; (iv) the purchase of Class B Common Stock hereunder does not entitle the Employee to participate in any other equity program of the Company, whether now existing or hereafter established; and (v) the Company is relying on the representations contained in this Agreement in engaging in the sale of the Class B Common Stock and would not engage in such sale in the absence of the representations contained in this Agreement; (b) the Employee is acquiring the shares of Class B Common Stock being acquired hereunder for investment for the Employee's own account and not with a view to the distribution thereof; (c) the Employee will not directly or indirectly, sell, transfer, assign, exchange, pledge, encumber or otherwise dispose of any shares of Class B Common Stock being acquired hereunder except in accordance with this Agreement, the Stock Pledge Agreement and applicable law; (d) the Employee has, or the Employee together with the Employee's advisers, if any, have, such knowledge and experience in financial and business matters that the Employee is, or the Employee together with the Employee's advisers, if any, are, and will be capable of evaluating the merits and risks relating to the Employee's purchase of shares of Class B Common Stock under this Agreement; (e) the Employee has been given the opportunity to obtain information and documents relating to the Company and to ask questions of and receive answers from representatives of the Company concerning the Company and the Employee's investment in the Class B Common Stock; (f) the Employee's decision to invest in the Company has been based upon independent investigations made by the Employee and the Employee's advisers, if any; (g) the Employee is able to bear the economic risk of a total loss of the Employee's investment in the Company; (h) the Employee has adequate means of providing for the Employee's current needs and foreseeable personal contingencies and has no need for the Employee's investment in the Class B Common Stock to be liquid; (i) the Employee is an "accredited investor" within the meaning of either Rule 501(a)(5) or (a)(6) promulgated under the Securities Act of 1933, as amended; and (j) this Agreement has been duly executed and delivered by the Employee and constitutes a legal, valid and binding obligation of the Employee, enforceable in accordance with its terms, subject to limitations in bankruptcy and to other equitable limitations.

6.    Miscellaneous.

6.1. Distributions. In the event of any dividend, distribution or exchange paid or made in respect of the Class B Common Stock consisting of Affiliate Securities, (a) the restrictions and rights with respect to the Class B Common Stock that are contained in this Agreement shall be applicable to the Affiliate Securities without further action of the parties (with the references to Class B Common Stock being deemed references to the Affiliate Securities and the references to the Company being deemed references to the Affiliate), and (b) as a condition precedent to the receipt of the Affiliate Securities by the Employee, the Employee shall enter into a stockholder's agreement containing terms substantially equivalent to those contained herein with respect to the Affiliate Securities (but reflecting the economics of the dividend, distribution or exchange and the capitalization of the Affiliate). The Board of Directors of the Company, in good faith, shall determine such terms and its determination shall be final and binding on the Employee.

6.2. Further Assurances. Each party hereto shall do and perform or cause to be done and performed all further acts and things and shall execute and deliver all other agreements, certificates, instruments, and documents as any other party hereto reasonably may request in

16

order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

6.3. <u>Governing Law</u>. This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

6.4. <u>Specific Performance</u>. The parties hereto acknowledge that there will be no adequate remedy at law for a violation of any of the provisions of this Agreement and that, in addition to any other remedies which may be available, all of the provisions of this Agreement shall be specifically enforceable in accordance with their respective terms.

6.5. <u>Invalidity of Provisions</u>. The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity or enforceability of the remainder of this Agreement, in that jurisdiction or the validity or enforceability of this Agreement, including that provision, in any other jurisdiction. If any provision of this Agreement is held unlawful or unenforceable in any respect, such provision shall be revised or applied in a manner that renders it lawful and enforceable to the fullest extent possible.

6.6. <u>Notice</u>. All notices and other communications hereunder shall be in writing and, unless otherwise provided herein, shall be deemed to have been given when received by the party to whom such notice is to be given at its address set forth below, or such other address for the party as shall be specified by notice given pursuant hereto:

     (a)    If to the Company, to:

            24 Hour Fitness Worldwide, Inc.
            12647 Alcosta Boulevard., Suite 500
            San Ramon, California 94583
            Attention: Tony Bakos

            with a copy to:

            24 Hour Fitness Worldwide, Inc.
            12647 Alcosta Boulevard., Suite 500
            San Ramon, California 94583
            Attention: Colin Heggie

            and with a copy (which shall not constitute notice to the Company) to:

            Forstmann Little & Co.
            767 Fifth Avenue, 44th Floor
            New York, New York 10153
            Attention: Geoff McKay

            and with a copy (which shall not constitute notice to the Company) to:

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Attention: Andrew E. Nagel

(b)    If to the FL & Co. Companies, to:

Forstmann Little & Co.
767 Fifth Avenue, 44th Floor
New York, New York 10153
Attention: Geoff McKay

with a copy (which shall not constitute notice to the Company) to:

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Attention: Andrew E. Nagel

(c)    If to the Employee, to the address set forth below the Employee's signature, and if to the Legal Representative, to such Person at the address of which the Company is notified in accordance with this Section 6.6.

6.7.<u>Binding Effect</u>.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by the Employee without the prior written consent of the Company and any attempt to do so without such consent shall be void <u>ab initio</u>.  In addition, each of the FL & Co. Companies shall be a third party beneficiary of this Agreement and shall be entitled to enforce this Agreement.

6.8.<u>Amendment and Modification</u>.  This Agreement may be amended, modified or supplemented only by written agreement of the party against whom enforcement of such amendment, modification or supplement is sought.

6.9.<u>Headings; Execution in Counterparts</u>.  The headings and captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision hereof.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and which together shall constitute one and the same instrument.

6.10.   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement, and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

18

6.11.   <u>Withholding</u>.  The Company shall have the right to deduct from any amount payable under this Agreement any taxes or other amounts required by applicable law to be withheld.  The Employee agrees to indemnify the Company against any Federal, state, local and foreign withholding taxes for which the Company may be liable in connection with the Employee's acquisition, ownership or disposition of any Class B Common Stock or in connection with any election made with respect thereto.

6.12.   <u>No Right to Continued Employment</u>.  This Agreement shall not confer upon the Employee any right with respect to continuance of employment by the Company or any Affiliate thereof, nor shall it interfere in any way with the right of the Company or any Affiliate thereof to terminate the Employee's employment at any time.

6.13.   <u>Possession of Certificates; Power of Attorney</u>.

(a)  In order to provide for the safekeeping of the certificates representing the shares of Class B Common Stock purchased by the Employee pursuant hereto and to facilitate the enforcement of the terms and conditions hereof, at the Purchase Closing (i) the Employee shall redeliver to the Company, and the Company shall retain physical possession of, all certificates representing shares of Class B Common Stock acquired by the Employee pursuant hereto and (ii) the Employee shall deliver to the Company an undated stock power, duly executed in blank, for each such certificate to be used solely to effectuate the transactions described herein.  The Company intends to deposit such certificates and stock powers into an account at a nationally recognized trust company and to designate as sole custodians of such account Thomas H. Lister, Winston Hutchins and/or such other persons as the Company may from time to time determine.  The Employee shall be relieved of any obligation otherwise imposed by this Agreement to deliver certificates representing shares of Class B Common Stock if the same are in the custody of the Company or such persons.  After the Release Date, upon written request by the Employee therefor, the Company shall deliver to the Employee any certificates in its (or such person's) custody representing the Employee's shares of Class B Common Stock.

(b)  The Employee hereby irrevocably appoints the FL & Co. Companies, and each of them (individually and collectively, the "Representative"), the Employee's true and lawful agent and attorney-in-fact, with full powers of substitution, to act in the Employee's name, place and stead, to do or refrain from doing all such acts and things, and to execute and deliver all such documents, as are reasonable and customary in like circumstances and as the Representative shall deem necessary or appropriate, solely to facilitate and effectuate a public offering of securities of the Company or a sale pursuant to Section 3.3, 3.5 or 4.2 hereof, including, without limitation, in the case of a sale pursuant to Section 3.3 or 3.5 hereof, to execute and deliver on behalf of the Employee a purchase and sale agreement and any other agreements and documents that are reasonable and customary in like circumstances and that the Representative deems necessary in connection with any such sale, and in the case of a public offering, to execute and deliver on behalf of the Employee an underwriting agreement, a "lock up" or "hold back" agreement, a custody agreement, and any other agreements and documents that the Representative deems necessary in connection with any such public offering (each to be on terms no less favorable to the Employee than those described in Sections 3.3, 3.4 or 3.5 hereof, as applicable), and in the case of any sale pursuant to Section 3.3 or 3.5 hereof or any

19

public offering pursuant to Section 3.4(a) hereof, to receive on behalf of the Employee the proceeds of the sale or public offering of the Employee's shares, to hold back from any such proceeds any amount that the Representative deems necessary to reserve against the Employee's share of any Expenses of Sale and Sale Obligations and to pay such Expenses of Sale and Sale Obligations. The Employee hereby ratifies and confirms all that the Representative shall do or cause to be done by virtue of its appointment as the Employee's agent and attorney-in-fact. In acting for the Employee pursuant to the appointment set forth in this Section 6.13(b), the Representative shall not be responsible to the Employee for any loss or damage the Employee may suffer by reason of the performance by the Representative of its duties under this Agreement, except for loss or damage arising from willful violation of law or gross negligence by the Representative in the performance of its duties hereunder. The appointment of the Representative shall be deemed coupled with an interest and as such shall be irrevocable and shall survive the death, incompetency, mental illness or insanity of the Employee, and any Person dealing with the Representative may conclusively and absolutely rely, without inquiry, upon any act of the Representative as the act of the Employee in all matters referred to in this Section 6.13(b).

　　　　6.14.　Consent to Jurisdiction.　Each party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of New York and of the United States of America, in each case located in the County of New York, for any Litigation (and agrees not to commence any Litigation except in any such court), and further agrees that service of process, summons, notice or document by U.S. registered mail to such party's respective address set forth in Section 6.6 hereof shall be effective service of process for any Litigation brought against such party in any such court. Each party hereby irrevocably and unconditionally waives any objection to the laying of any venue of Litigation in the courts of the State of New York or of the United States of America, in each case located in the County of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any Litigation brought in any such court has been brought in an inconvenient forum.

　　　　6.15.　Amendment of Certificate of Incorporation.　Capitalized terms used in this paragraph but not defined in this Agreement have the meanings given to them in the Certificate of Incorporation. Prior to (i) declaring any dividend or distribution, or consummating any recapitalization, reclassification, reorganization, stock split, spin-off or similar change affecting the capital stock (any of the foregoing, a "Dividend") where the Aggregate Dividend Amount of such Dividend, taken with the Aggregate Dividend Amount of Dividends previously paid, would exceed the Total Capital Amount, (ii) making any payment upon a dissolution, liquidation or winding up of the Company where the sum of the Aggregate Dividend Amount of Dividends previously paid plus the Aggregate Liquidation Amount would exceed the Total Capital Amount, (iii) the consummation of one or more sales of shares of Class A Common Stock by either of the FL & Co. Companies to any Third Party, which sales would, assuming so declared by the Board of Directors of the Company, trigger a right or obligation on the part of holders of Class B Common Stock to exchange their shares of Class B Common Stock for shares of Class A Common Stock under Article Fourth, Section 4 of the Certificate of Incorporation at any time following the payment of any Dividend where the sum of the aggregate sale consideration plus the Aggregate Dividend Amount of such Dividends previously paid would exceed the Total Capital Amount or (iv) the payment of a Dividend where the sum of the Aggregate Dividend

Amount of such Dividend plus the Aggregate Dividend Amount of any Dividends previously paid plus the aggregate sale consideration from any sales of shares of Class A Common Stock by either of the FL & Co. Companies to any Third Party, which sales would, assuming so declared by the Board of Directors of the Company, trigger a right or obligation on the part of holders of Class B Common Stock to exchange their shares of Class B Common Stock for shares of Class A Common Stock under Article Fourth, Section 4 of the Certificate of Incorporation, would exceed the Total Capital Amount, the Company shall amend the Certificate of Incorporation (and the FL & Co. Companies will vote in favor of such amendment) to provide that holders of Class B Common Stock shall receive in respect of such Dividend, liquidation payment or sale an amount equal to (i) the amount they would have received in a partial or complete sale of the Common Stock to an unaffiliated entity under Article Fourth, Section 4 of the Certificate of Incorporation as if the consideration received in such a sale was equal to the sum of (A) the Aggregate Dividend Amount of all Dividends previously paid plus (B) the amount of such Dividend, liquidation payment or aggregate sale consideration, minus (ii) the Aggregate Dividend Amount of all Dividends previously paid on the Class B Common Stock.  Schedule II attached hereto sets forth an example illustrating the calculation of such payment.

21

IN WITNESS WHEREOF, this Agreement has been signed by or on behalf of each of the parties hereto, all as of the date first above written.

24 HOUR FITNESS WORLDWIDE, INC.

By: _____

    Name: MARK S. MASTROV
    Title: CEO

EMPLOYEE

_____

Name:  Michael William Sheehan
Address: 45 MARISOL
        NEWPORT COAST, CA. 92657

The undersigned hereby agree to be bound by the provisions of Sections 3.3 and 3.4 of the foregoing Stockholder's Agreement.

FORSTMANN LITTLE & CO. EQUITY
PARTNERSHIP-VII, L.P.

By:  FLC XXXII Partnership, L.P.
     its general partner

By:  _____
     Thomas H. Lister,
     a general partner

FORSTMANN LITTLE & CO. SUBORDINATED
DEBT AND EQUITY MANAGEMENT
BUYOUT PARTNERSHIP-VIII, L.P.

By:  FLC XXXIII Partnership, L.P.
     its general partner

By:  _____
     Thomas H. Lister,
     a general partner

The undersigned acknowledges that the undersigned has read the foregoing Agreement between 24 Hour Fitness Worldwide, Inc. and the undersigned's spouse, understands that the undersigned's spouse has purchased shares of Class B Common Stock as reflected in such Agreement. and agrees to be bound by the foregoing Agreement.

Employee's Spouse

**Schedule I**

Assume:   1)   The Company has a fair market value of $1,500,000,000. <u>There is no assurance that the Company will have such a fair market value.</u>

          2)   32,994,439 shares of Class A Common Stock and 3,065,057 shares of Class B Common Stock outstanding at the time of distribution.

          3)   The initial price of a share of Class A Common Stock is $15.154068 and the initial price of a share of Class B Common Stock is $5.051356.

Any terms not otherwise defined in this Schedule I are defined in the "Summary of Restated Certificate of Incorporation and Stockholder's Agreement" distributed with this Stockholder's Agreement.

<u>Step 1</u>

<u>Determine $ total for Class B</u>

   (a) <u>Determine Class B Capital Amount</u>:

       Number of outstanding shares of Class B Common Stock x Class B Price per Share:

$$3,065,057 \times \$5.051356 = \$15,482,694$$

   (b) <u>Determine Class B Appreciation Amount</u>:

       Divide (1) the excess of the fair market value of the Company over the Total Capital Amount by (2) the number of shares of Common Stock outstanding on the date the Company is valued and (3) multiply by the Total Class B Shares.

$$((\$1,500,000,000 - \$515,482,666) / 36,059,496) \times 3,065,057 = \$83,683,969$$

   (c) <u>Determine Adjusted Notch Amount</u>:

       The lesser of:

              (x) the Class B Appreciation Amount OR

              (y) the product of $2.525678 and the Total Class B Shares

       The lesser of (x) $83,683,969 and (y) $7,741,347 = $7,741,347

   (d) <u>Total for Class B</u>:

       Add Class B Capital Amount and Class B Appreciation Amount and subtract Adjusted Notch Amount.

$$\$15,482,694 + \$83,683,969 - \$7,741,347 = \underline{\$91,425,316}$$

Step 2

Determine $ total for Class A

    (e) Determine Class A Capital Amount:

        Number of outstanding shares of Class A Common Stock x Class A Price per Share:

        32,994,439 x $15.154068 = $499,999,972

    (f) Determine Class A Appreciation Amount:

        Divide (1) the excess of the fair market value of the Company over the Total Capital Amount by (2) the number of shares of Common Stock outstanding on the date the Company is valued and multiply by (3) the Total Class A Shares.

        (($1,500,000,000 - $515,482,666) / 36,059,496) x 32,994,439 = $900,833,365

    (g) Determine Adjusted Notch Amount:

        $7,741,347 (see Step 1, part (c) above):

    (h) Total for Class A:

        Add Class A Capital Amount, Class A Appreciation Amount and Adjusted Notch Amount.

        $499,999,972 + $900,833,365 + $7,741,347 = $1,408,574,684

Step 3

    x = $ total for Class B divided by 3,065,057        $29.828

Step 4

    y = $ total for Class A divided by 32,994,439        $42.691

Step 5

    Exchange Rate = x/y or 0.699 of a share of Class A Common Stock for each share of Class B Common Stock.

I-2

## Schedule II

**Assumptions**

| | | | | |
|---|---|---|---|---|
| Company Equity Value | $ 1,500,000,000 | Total Capital | $ | 515,482,666 |
| | | | | |
| Class A shares | 32,994,439 | Notch per share | $ | 2.525678 |
| Class A price | $ 15.154068 | Adjusted Notch Amount | $ | 7,741,347 |
| Class A capital | $ 499,999,972 | Notch Threshold Point | $ | 606,557,342 |
| Class A Ownership as converted | 91.5% | | | |
| | | | | |
| Class B shares | 3,065,057 | | | |
| Class B price | $ 5,051356 | | | |
| Class B capital | $ 15,482,694 | | | |
| Class B Ownership as converted | 8.5% | | | |

**Dividend of $100,000,000, followed by later sale of the Company for $1,400,000,000 equity value**

| | A Stock | B Stock | Total | Cumulative |
|---|---|---|---|---|
| Dividend - Return of Class A Capital Amount and Class B Capital Amount | $ 96,996,467 | $ 3,003,533 | $ 100,000,000 | $ 100,000,000 |
| Return of Capital Amounts | 403,003,506 | 12,479,161 | 415,482,666 | 515,482,666 |
| Class A Holders recover Adjusted Notch Amount | | | | |
| Class A Returns | 83,333,329 | - | 83,333,329 | |
| Notch Recovery | 7,741,347 | - | 7,741,347 | 606,557,342 |
| Remainder divided on basis of percentage of outstanding shares owned | 817,500,036 | 75,942,622 | 893,442,658 | 1,500,000,000 |
| Total proceeds from dividend and sale | $ 1,408,574,684 | $ 91,425,316 | 1,500,000,000 | |

II-1

## ANNEX A

| Employee | Number of Shares |
|---|---|
| Michael William Sheehan | 197,967 |

Cash Amount:     $750,001.79

Note Amount:     $250,000

Based on a Purchase Price of $5.051356 per share of Class B Common Stock

08CV3853
JUDGE LEFKOW
MAGISTRATE JUDGE DENLOW
JH

# EXHIBIT C



**The Times**

Home

About us | Mobile/PDA | News Alerts | Disclaimer | Contact

## Bally Total Fitness Announces New Chief Executive Officer

**Posted :** Tue, 24 Jun 2008 16:01:04 GMT
**Author :** Bally Total Fitness
**Category :** Press Release
**News Alerts** by Email click here )

Create your own RSS

News | Home

**Bally Total Fitness**
Everything to do with Bally Total Fitness items.
Yahoo.com

**Gyms Near You**
We list the areas local gyms in one place. Find the gym you want today.
www.GymTicket.com

**Bally Total Fitness**
Check Out Local.com To Find Bally Total Fitness In Your Area!
Local.com

**Interm & Turnaround CEOs**
Altamont Mgmt - Your First Choice for Interim and Turnaround CEOs
www.altamontmanagement.com

Ads by Google

CHICAGO, June 24 IL-Bally-CEO-Sheehan

CHICAGO, June 24 /PRNewswire/ -- Bally Total Fitness Holding Corporation today announced that it has appointed Michael Sheehan to serve as its Chief Executive Officer, effective July 1. Mr. Sheehan will also serve as a member of Bally's Board of Directors.

Mr. Sheehan, age 46, served as the Chief Operating Officer of 24 Hour Fitness since 2005. Before serving as Chief Operating Officer, Mr. Sheehan served as Executive Vice President, Operations of 24 Hour Fitness. In addition to his comprehensive experience in the fitness industry, Mr. Sheehan has played key operational, finance and sales roles with multi-unit consumer retailers, including management roles with Pepsico, Nestle and Yum Brands, a food service holding company with well-known brands including Taco Bell, Kentucky Fried Chicken and Pizza Hut. Mr. Sheehan is a graduate of Oregon State University (Bachelor of Science, Finance).

Michael Feder, an interim manager from AlixPartners, LLP, serving as Chief Operating Officer of Bally Total Fitness, said, "We are delighted to welcome Mike to Bally. Our Board of Directors was committed to hiring a CEO who was the best possible fit for the role and they have certainly achieved that goal. We believe that Mike has the ideal blend of experience, leadership skills, creativity and commitment to health and fitness. I am confident that under Mike's leadership, Bally will thrive."

Mr. Sheehan said, "I am looking forward to joining the Bally team and I am eager to add value to this established brand. For many years, Bally has been a leader in the fitness industry -- Bally's facilities, fitness programming and personnel are among the best in the business. Under my leadership, Bally will continue to focus on providing high-quality comprehensive fitness experiences to our members."

About Bally Total Fitness

Bally Total Fitness is among the largest commercial operators of fitness centers in the U.S., with 352 facilities operating under the Bally Total Fitness(R) and Bally Sports Clubs(R) brands. Bally offers a unique platform for distribution of a wide range of products and services targeted to active, fitness-conscious adult consumers.

SOURCE Bally Total Fitness

PR Newswire

Copyright © 2008 PR Newswire. All rights reserved.

More...

Choose Theme

Search

Web www.earthtimes.org

Google Search

You can

Current News

News Category

Business
Entertainment
Environment
General
Health
Sports
Technology
World

Ads by Google

**Bally Total Fitness**
Check Out Local.com To Find Bally Total Fitness In Your Area!
Local.com

**Interim & Turnaround CEOs**
Altamont Mgmt - Your First Choice for Interim and Turnaround CEOs
www.altamontmanagement.com

**VICE PRESIDENT STRATEGY**
Vistage Builds Better Key Execs, Resources Exclusively for Execs.
Vistage.com

**Free Local Gym Search**
Search prices and amenities for gyms in your area. Try it now.
www.MyPerfectGym.com

**Teeth Whitening Warning**
7 Teeth Whitening Products Tested, Rated, & Reviewed. A Must Read!
www.Best-Teeth-Whitening.com

Ads by Google

Ballys.com
Ballys Locations
Jungle Gym
Fitness Models
Bally Total

**Do Teeth Whiteners Work?**
Find Out Which Ones Can Brighten Your Smile, And Which Ones Can't!
www.Best-Teeth-Whitening.com

**Free Local Gym Search**
Search prices and amenities for gyms in your area. Try it now.
www.MyPerfectGym.com

**elements for women**
Expand your training business with an elements franchise.
www.elementsforwomen.com

**health club billing**
health club management software and payment processing services
www.efitfinancial.com

Ads by Google

```
08CV3853
JUDGE LEFKOW
MAGISTRATE JUDGE DENLOW
JH
```

# EXHIBIT D




June 24, 2008

Michael Sheehan
4542 Lilac Ridge Road
San Ramon, CA 94582

Dear Mike,

I was distressed and saddened yesterday when you informed me that you were resigning your position as our Chief Operating Officer in order to become Chief Executive Officer of Bally Total Fitness. As I have told you on many occasions, you have been an important member of our executive team since joining 24 Hour Fitness, and have rendered invaluable service to the Company in virtually every aspect of our operational and strategic efforts. I was looking forward to our continuing to work closely together as we moved the Company to new heights, and am extremely disappointed that you have chosen to leave us at this critical juncture in our efforts. As you can imagine, my disappointment is only deepened because you have chosen to join one of our most significant competitors.

All that being said, I must inform you that if you choose to continue this course of action, you will be acting in violation of your extensive contractual commitments to 24 Hour Fitness and may subject yourself to liability under a variety of causes of action. As you know, under your employment agreement you are subject to a Covenant Not to Compete, as well as a prohibition against the use of proprietary and confidential Company information. In addition to liability for breaching your contractual commitments to the Company, working for Bally as its Chief Executive Officer also will likely put you in violation of various statues involving the protection of trade secrets, unfair competition laws, and the breach of fiduciary duties. A finding of liability under these statutory and common law causes of action will also subject you to liability for damages and attorney fees. Accordingly, please consider yourself on notice that our Company will pursue all appropriate legal and equitable remedies to protect its interests.

Mike, given all of the above, please let me know immediately that you intend to observe all of your contractual and other legal obligations to the Company and will not be taking the CEO position with Bally. If you continue to proceed with this course of conduct, the Company will have no choice but to respond accordingly.

Sincerely yours,



Carl C. Liebert, III

carl c. liebert, III
chief executive officer

· 925 543 3370
· 925 543 3360

12647 alcosto blvd. suite 500
san ramon, ca 94583



```
08CV3853
JUDGE LEFKOW
MAGISTRATE JUDGE DENLOW
JH
```

# EXHIBIT E





June 24, 2008

Don Kornstein
Interim Chairman and Chief Restructuring Officer
Bally Total Fitness Corporation
8700 West Bryn Mawr Avenue Second Floor
Chicago, IL 60631

Dear Don:

Yesterday, Mike Sheehan informed me he was resigning his position as Chief Operating Officer of 24 Hour Fitness to become Chief Executive Officer of Bally Total Fitness. I'm writing to convey my extreme disappointment that Mike and Bally have collectively decided upon this course of action and to give you fair notice that our Company will hold both Mike and Bally legally accountable for their conduct.

As I can only assume you know, Mike is currently subject to significant non-compete and confidentiality obligations that preclude him for working with Bally. Bally is a direct competitor of our Company, and Mike's non-compete is governed by various laws, including the California Business and Professions Code. In addition, Mike is also contractually precluded from using in any way for the benefit of Bally the confidential and proprietary information he has learned during his tenure with 24 Hour Fitness. As a practical matter, Mike will be unable to work in any meaningful way as Bally's CEO without using such confidential information.

Given the circumstances under which Mike has announced his intention to join Bally, Bally likewise faces its own legal liability if it proceeds to hire Mike with knowledge of these restrictions. Bally will be subject to liability for its intentional interference with contract for inducing Mike to breach his contractual commitment to our Company, as well as liability for a violation of the California Business and Professions Code, California's unfair competition law. A finding of liability on such a claim can result in the award of damages, injunctive relief, disgorgement of profits and attorneys fees and costs.

I am hopeful that Bally will suspend its efforts to hire Mike. Should you continue to proceed, however, please know that our Company will take all necessary steps to protect its interests, including legal action against Bally as well as against Mike. I would urge you to reconsider this legally imprudent act.

Sincerely yours,

Carl C. Liebert, III



carl c. liebert, III
chief executive officer

925 543 3370            12647 alcosta blvd  suite 500
925 543 0300            san ramon, ca 94583

