**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**24 HOUR FITNESS USA,
INC.,
a California corporation,**

**Plaintiff,**

**v.**

**BALLY TOTAL FITNESS HOLDING
CORP., a Delaware corporation,
and MICHAEL SHEEHAN, an
individual,**

**Defendants.**

**Civil Action No. 08 CV 3853**

**Judge Joan Humphrey Lefkow
Magistrate Judge Morton Denlow**

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION OF
DEFENDANTS, MICHAEL SHEEHAN AND BALLY TOTAL FITNESS HOLDING
CORPORATION, TO MOTION OF PLAINTIFF, 24 HOUR FITNESS USA., INC., FOR
HEARING ON AT LEAST 59 DAYS' NOTICE ON ITS MOTION FOR PRELIMINARY
INJUNCTION AND FOR EXPEDITED DISCOVERY IN AID OF THAT MOTION**

Defendants, Michael Sheehan and Bally Total Fitness Holding Corporation

("Defendants"), submit this Request for Judicial Notice in Support of their Opposition to Motion

of Plaintiff, 24 Hour Fitness USA., Inc. ("Plaintiff"), For Hearing on at Least 59 Days' Notice on

Its Motion for Preliminary Injunction, and for Expedited Discovery in Aid of That Motion.

Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of

facts that are "not subject to reasonable dispute" because they are "capable of accurate and ready

determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Defendant respectfully requests that the Court take judicial notice of the following records of the Superior Court of the State of California for the County of Contra Costa:

A.  Complaint filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit A.

B.  Plaintiffs' Application for an Order to Show Cause and Temporary Restraining Order/Preliminary Injunction filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit B.

C.  Memorandum of Points and Authorities in Support of Application for Order to Show Cause and Temporary Restraining Order Re:  Preliminary Injunction Pursuant to C.C.P. §§ 526, 527, and Bus. & Prof. Code § 17203 filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit C.

D.  Declarations of Angela Read and William B. Donahue in Support of Application for Temporary Restraining Order and Preliminary Injunction filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit D.

E.  Declaration of Rex Berry Re Notice in Support of Application for Temporary Restraining Order/Preliminary Injunction filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit E.

F.  Declaration of Carl C. Liebert in Support of Application for Temporary Restraining Order and Preliminary Injunction filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit F.

G.  [Proposed] Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit G.

H.  Proof of Service filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit H.

I.  Opposition of Defendant, Michael Sheehan, to Plaintiff's *Ex Parte* Application for a Temporary Restraining Order; Declaration of Michael Sheehan; Declaration of Donald Kornstein filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael*

*Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit I.

J.   Amended Opposition of Defendant, Michael Sheehan, to Plaintiff's *Ex Parte* Application for a Temporary Restraining Order; Declaration of Michael Sheehan filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit J.

K.   Defendant's Objections to the Declarations of Angela Read and William R. Donohue Submitted in Support of Plaintiff's Application for an Order to Show Cause and Temporary Restraining Order filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit K.

L.   Defendant's Objections to the Declaration of Carl C. Liebert Submitted in Support of Plaintiff's Application for an Order to Show Cause and Temporary Restraining Order filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit L.

M.   Request for Judicial Notice in Support of Opposition of Defendant, Michael Sheehan, to Plaintiffs' *Ex Parte* Application for a Temporary Restraining Order filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit M.

N.  [Proposed] Order Granting Request for Judicial Notice in Support of Opposition of Defendant, Michael Sheehan, to Plaintiffs' *Ex Parte* Application for a Temporary Restraining Order filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit N.

O.  [Proposed] Order Denying Plaintiffs' *Ex Parte* Application for a Temporary Restraining Order filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit O.

P.  Proof of Service filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit P.

Q.  Order to Show Cause Regarding Preliminary Injunction filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit Q.

R.  Request for Dismissal filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.  A true and correct copy of which is attached hereto as Exhibit R.

Dated:  July 14, 2008                         WINSTON & STRAWN LLP


By:     /s/  Kimball R. Anderson_____
        Kimball R. Anderson
        WINSTON & STRAWN LLP
        35 West Wacker Drive
        Chicago, IL  60601-9703
        Tel:     (312) 558-5600
        Fax:     (312) 558 5700
        kanderson@winston.com

        Attorneys for Defendants
        MICHAEL SHEEHAN
        and BALLY TOTAL FITNESS
        HOLDING CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, one of the attorneys for Defendants Michael Sheehan and Bally Total Fitness Holding Corporation, hereby certifies that he has caused a true and correct copy of the foregoing REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION OF DEFENDANTS, MICHAEL SHEEHAN AND BALLY TOTAL FITNESS HOLDING CORPORATION, TO MOTION OF PLAINTIFF, 24 HOUR FITNESS USA., INC., FOR HEARING ON AT LEAST 59 DAYS' NOTICE ON ITS MOTION FOR PRELIMINARY INJUNCTION AND FOR EXPEDITED DISCOVERY IN AID OF THAT MOTION to be served via the Court's ECF filing system, this 14th day of July, 2008, addressed to:

R. Mark Halligan
Mark.Halligan@lovells.com
Deanna R. Swits
Deanna.swits@lovells.com
LOVELLS LLP
330 N. Wabash Avenue
Suite 1900
Chicago, IL  60611
Tel:  312-832-4400
Chicago, IL 60611

_____ /s/Kimball R. Anderson_____

## INDEX OF EXHBITS

**DESCRIPTION**                                                                 **EXHIBIT**

Complaint filed in the matter *24 Hour Fitness USA, Inc. and
24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*,
Superior Court of the State of California for the
County of Contra Costa No. C 08-01663........................................................................Exhibit A

Plaintiffs' Application for an Order to Show Cause and Temporary Restraining
Order/Preliminary Injunction filed in the matter *24 Hour Fitness USA, Inc.
and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100,
inclusive*, Superior Court of the State of California for the County of Contra
Costa No. C 08-01663......................................................................................Exhibit B

Memorandum of Points and Authorities in Support of Application for Order
to Show Cause and Temporary Restraining Order Re:  Preliminary Injunction
Pursuant to C.C.P. §§ 526, 527, and Bus. & Prof. Code § 17203 filed in the
matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v.
Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State
of California for the County of Contra Costa No. C 08-01663 .......................................Exhibit C

Declarations of Angela Read and William B. Donahue in Support of Application
for Temporary Restraining Order and Preliminary Injunction filed in the matter
*24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael
Sheehan and Does 1-100, inclusive*, Superior Court of the State of California
for the County of Contra Costa No. C 08-01663 ................................................Exhibit D

Declaration of Rex Berry Re Notice in Support of Application for Temporary
Restraining Order/Preliminary Injunction filed in the matter *24 Hour Fitness
USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does
1-100, inclusive*, Superior Court of the State of California for the County of
Contra Costa No. C 08-01663............................................................................. Exhibit E

Declaration of Carl C. Liebert in Support of Application for Temporary
Restraining Order and Preliminary Injunction filed in the matter *24 Hour
Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan
and Does 1-100, inclusive*, Superior Court of the State of California for the
County of Contra Costa No. C 08-01663......................................................... Exhibit F

[Proposed] Temporary Restraining Order and Order to Show Cause Regarding
Preliminary Injunction filed in the matter *24 Hour Fitness USA, Inc. and 24
Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*,
Superior Court of the State of California for the County of Contra
Costa No. C 08-01663....................................................................................Exhibit G

Proof of Service filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.......................................................................................Exhibit H

Opposition of Defendant, Michael Sheehan, to Plaintiff's *Ex Parte* Application for a Temporary Restraining Order; Declaration of Michael Sheehan; Declaration of Donald Kornstein filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663....................................................................................... Exhibit I

Amended Opposition of Defendant, Michael Sheehan, to Plaintiff's *Ex Parte* Application for a Temporary Restraining Order; Declaration of Michael Sheehan filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663 ......................................... Exhibit J

Defendant's Objections to the Declarations of Angela Read and William R. Donohue Submitted in Support of Plaintiff's Application for an Order to Show Cause and Temporary Restraining Order filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663 .................................................................Exhibit K

Defendant's Objections to the Declaration of Carl C. Liebert Submitted in Support of Plaintiff's Application for an Order to Show Cause and Temporary Restraining Order filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663................................................................................... Exhibit L

Request for Judicial Notice in Support of Opposition of Defendant, Michael Sheehan, to Plaintiffs' *Ex Parte* Application for a Temporary Restraining Order filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663 ........................................ Exhibit M

[Proposed] Order Granting Request for Judicial Notice in Support of Opposition of Defendant, Michael Sheehan, to Plaintiffs' *Ex Parte* Application for a Temporary Restraining Order filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663...................................................................................Exhibit N

[Proposed] Order Denying Plaintiffs' *Ex Parte* Application for a Temporary Restraining Order filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663..................................................................................................Exhibit O

Proof of Service filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663.................................................................................................. Exhibit P

Order to Show Cause Regarding Preliminary Injunction filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663...............................................................Exhibit Q

Request for Dismissal filed in the matter *24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. v. Michael Sheehan and Does 1-100, inclusive*, Superior Court of the State of California for the County of Contra Costa No. C 08-01663..................................................................................................Exhibit R

Exhibit

A

1   REX DARRELL BERRY (SBN 110219)
    SCOTT M. PLAMONDON (SBN 212294)
2   BERRY & BLOCK LLP
    2150 River Plaza Drive, Suite 415
3   Sacramento, CA  95833
    (916) 564-2000
4   (916) 564-2024 FAX

5

6   Attorneys for Plaintiffs
    24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS
7   WORLDWIDE, INC.

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       COUNTY OF CONTRA COSTA

10
    24 HOUR FITNESS USA, INC. and 24      ) Case No.  C  08 - 01663
11  HOUR FITNESS WORLDWIDE, INC.,         )
                                          )
12          Plaintiff,                    ) VERIFIED COMPLAINT FOR:
                                          )
13  v.                                    )    (1) Misappropriation of Trade Secrets
                                          )        (Cal. Civ. Code §3426, *et seq.*)
14  MICHAEL SHEEHAN and DOES 1-100,       )    (2) Breach of Employment Agreement
    inclusive,                            )    (3) Breach of Stockholder's Agreement
15                                        )    (4) Unfair Business Practices (Bus. and
            Defendants.                   )        Prof. Code §17200, *et seq.*)
16                                        )    (5) Injunctive Relief
                                          )
17                                        )
                                          )
18  _____  ) Unlimited Civil Case—Damages Exceed
                                            $25,000
19

20                              I. PARTIES

21  1.      At all times relevant to the allegations contained herein, 24 HOUR FITNESS USA, INC.

22  was a Corporation formed and organized under the laws of the State of California and 24

23  HOUR FITNESS WORLDWIDE, INC., was a Delaware corporation authorized to conduct

24  business in the State of California. Hereinafter both corporations are collectively referred to as

25  "24 HOUR FITNESS."

26  2.      24 HOUR FITNESS is one of the world's largest privately owned and operated fitness

27  center chains.  From its beginnings in 1983, 24 HOUR FITNESS has grown to more than 400

28  fitness centers worldwide.  24 HOUR FITNESS is a fitness industry leader and presently is

                                          1
                     COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  undergoing a phase of rapid growth and expansion. The Company is expanding into new

2  markets and intends to provide new offerings to members and communities across the world.

3  3.    24 HOUR FITNESS is informed and believes and on that basis alleges that at all

4  relevant times SHEEHAN was and is a resident of Contra Costa County.

5  4.    Until June 23, 2008, Defendant SHEEHAN was 24 HOUR FITNESS' Chief Operating

6  Officer ("COO"). On June 23, 2008, SHEEHAN announced without notice his intention to

7  resign his position as COO for 24 HOUR FITNESS, effective immediately, and his intention to

8  join Bally Total Fitness Corporation ("Bally") as Chief Executive Officer effective July 1, 2008.

9  Bally is 24 HOUR FITNESS' largest competitor in terms of revenues produced. According to

10  Bally's website, www.ballyfitness.com, Bally is "the largest and only nationwide commercial

11  operator of fitness centers with approximately 400 clubs in the USA, the Caribbean, Mexico,

12  South Korea, and China."

13  5.    The true names and capacities whether individual, corporate, associate, or otherwise of

14  Defendant Does 1 through 100, inclusive, are unknown to 24 HOUR FITNESS who therefore

15  sues these defendants by their fictitious names. 24 HOUR FITNESS is informed and believes

16  and thereon alleges that each of the defendants designated herein as a fictitiously named

17  defendant are in some manner responsible for the events and happenings herein referred to

18  either contractually or tortiously and caused the damage to 24 HOUR FITNESS herein alleged.

19  When 24 HOUR FITNESS ascertains the true names and capacities of Does 1 through 100,

20  inclusive, it will ask leave of this Court to amend this Complaint by setting forth the same.

21  ## II. JURISDICTION AND VENUE

22  6.    Jurisdiction in this court is proper because each of the causes of action set forth in this

23  Complaint arises under California law and because the amount of damages sought is within the

24  jurisdiction of the Superior Court.

25  7.    Venue is proper in Contra Costa County under California Code of Civil Procedure

26  sections 395 and 395.5 because (1) SHEEHAN resides in Contra Costa County; and (2) one or

27  more of the acts, breaches, misappropriation, and wrongs giving rise to the causes of action

28  asserted herein occurred or were to be performed in Contra Costa County.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## III. FACTS

8.    In the conduct of its business, 24 HOUR FITNESS possesses and employs Trade Secrets, proprietary information and confidential methods and techniques.  For example, 24 HOUR FITNESS has collected and maintains, at considerable expense, information regarding its market strategies, growth plans, new market developments and strategic plans.  Accordingly, confidentiality regarding this proprietary information is essential to 24 HOUR FITNESS' competitiveness.  The disclosure of this information to a third party, and *especially* to a direct and substantial competitor, would give that competitor an unfair advantage in competing with 24 HOUR FITNESS.

9.    During SHEEHAN'S nearly eight year tenure, SHEEHAN helped develop, and had unfettered access to, 24 HOUR FITNESS' most sensitive proprietary information, including but not limited to:

- Critical market strategies, including 24 HOUR FITNESS' Three Year Strategic Plan;
- Growth plans for new geographic markets;
- Market segment development planning;
- Market performance data and market reorganization planning;
- Platform expansion planning intended to utilize the internet and other resources to facilitate memberships;
- Marketing strategy related to advertising, marketing partnerships and marketing tie-ins with non-traditional media;
- Proprietary compensation and personnel data;
- Litigation strategy;
- Financial planning strategies;
- Budgeting strategies;
- Proprietary information on revenues;
- Sales figures relating to all aspects of the 24 HOUR FITNESS' business;
- Confidential relationships with key vendors; and

3

- An array of confidential and proprietary information about virtually *every* aspect of 24 HOUR FITNESS' business model and operations strategy.

10.    Many of these strategies and plans were developed over considerable time through trial and error experience in which SHEEHAN was directly involved.

11.    During his employment with 24 HOUR FITNESS, SHEEHAN signed an Employment Agreement. A true and correct copy of SHEEHAN's Employment Agreement is attached hereto as Exhibit A. That Agreement contains both a Covenant Not to Compete and restrictions on the use of confidential information, the terms of which are as follows:

**Non-Compete and Non-Solicitation.**

10.1    For a period of two (2) years following the termination of Employee's employment with the Company, Employee agrees not to directly or indirectly recruit, solicit, induce or encourage any employee of the Company to become an employee for any other person or entity; nor to directly or indirectly induce or encourage any independent contractor of the Company to terminate a contracting relationship with the Company.

10.2    Employee further agrees that during the Employment Term and for a period of two (2) years thereafter, Employee will not directly or indirectly own an interest in, operate, join, begin, control, advise, consult with, render services to or otherwise participate in or work for or on behalf of any entity or individual(s) which operates a fitness club within fifty (50) miles of any of the Company's fitness clubs or which otherwise competes with the business of the Company or the Company's affiliates.

11.    **Confidential Information.**    During the Employment Term and thereafter, Employee agrees to hold the Company's confidential and proprietary information in strictest confidence and not to use, disclose or disseminate any of such information except as such disclosure, use or dissemination may be required in connection with Employee's work for the Company or as expressly authorized by the Company in writing. Employee further agrees that any work product created in connection with Employee's work for the Company will be the sole and exclusive property of the Company and hereby assigns to the Company all right, title and interest in all inventions and other intellectual property developed by Employee in working for the Company. . .

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    12.    In addition, on or about September 30, 2005, SHEEHAN signed a Stockholder's

2    Agreement with 24 HOUR FITNESS through which he was granted ownership shares of 24

3    HOUR FITNESS in the form of Class B common stock. A true and correct copy of

4    SHEEHAN's Stockholder's Agreement is attached hereto as Exhibit B.  In that Agreement,

5    SHEEHAN agreed that upon his separation from 24 HOUR FITNESS, the company could elect

6    to repurchase a portion of his ownership in the company, and in the case of SHEEHAN

7    engaging in competitive activity, *all* of his ownership interest in the Company.  Under the terms

8    of that Agreement, 24 HOUR FITNESS will tender a repurchase demand to SHEEHAN that

9    will compensate him for his stock.  The Stockholder's Agreement requires SHEEHAN to

10   refrain from appropriating 24 HOUR FITNESS' Confidential and Proprietary Information and

11   engaging in competitive activity:

12        **4.1 Prohibition Against Certain Activities.**  The Employee agrees that
          (a) the Employee will not at any time during the Employee's
13        employment (other than in the course of such employment) with
          the Company or any Affiliate thereof, or after a Termination,
14        disclose or furnish to any other Person or use for the Employee's
          own or any other Person's account any Confidential or
15        Proprietary Information unless required to do so by law or judicial
          process, (b) if the Employee is Terminated, the Employee will not
16        for three years following such Termination hire or employ, or
          directly or indirectly solicit for employment, including without
17        limitation recommending to any subsequent employer the
          solicitation for employment of, any employee of the Company or
18        any Affiliate thereof . . . .

19
20        **4.2    Right to Purchase Shares.**    The Employee understands and
          agrees that the Company has granted to the Employee the right to
21        purchase shares of Class B Common Stock to reward the
          Employee for the Employee's future efforts and loyalty to the
22        Company and its Affiliates by giving the Employee the
          opportunity to participate in the potential future appreciation of
23        the Company.  Accordingly, (a) if the Employee engages in any
          Prohibited Activity, or (b) if, at any time during the Employee's
24        employment with the Company or any of its Affiliates or during
          the three years following a Termination, the Employee engages in
25        any Competitive Activity . . . , then, in addition to any other rights
          and remedies available to the Company or any of its Affiliates (at
26        law, in equity or under any employment agreement, award
          agreement or other agreement or arrangement of the Employee),
27        the Company shall be entitled, at its option, exercisable by written
          notice (the "Repurchase Notice") to the Employee, to purchase all
28

5

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1    or any portion of the shares of Class B Common Stock then held
     by the Employee.

2    13.    The Stockholder's Agreement expressly identifies Bally as a competitor of 24 HOUR

3    FITNESS.

4    14.    On or about June 23, 2008, without notice, SHEEHAN announced his resignation from

5    24 HOUR FITNESS, effective immediately, and stated his intention to join Bally, a direct and

6    substantial competitor of 24 HOUR FITNESS, as Bally's Chief Executive Officer ("CEO"),

7    effective July 1, 2008. On June 24, 2008, Bally issued a press release announcing SHEEHAN's

8    hire as CEO and touting his "comprehensive experience in the fitness industry" and "ideal blend

9    of experience, leadership skills, creativity and commitment to health and fitness." The press

10   release goes on to quote SHEEHAN as stating that he is eager to join Bally and "eager to add

11   value to this established brand." The statements from Bally and SHEEHAN demonstrate a

12   threat that SHEEHAN intends to use the confidential and proprietary information obtained by

13   him during his tenure with 24 HOUR FITNESS in his new CEO position with Bally, in order to

14   directly compete with 24 HOUR FITNESS.

15   15.    Based on the foregoing, 24 HOUR FITNESS is informed and believes, and on that basis

16   alleges that SHEEHAN may already have misappropriated 24 HOUR FITNESS' confidential

17   and proprietary information and Trade Secrets.

18                          **IV.  CAUSES OF ACTION**

19                          **FIRST CAUSE OF ACTION**

20   **(Misappropriation of Trade Secrets – Cal. Civ. Code section 3426, *et seq.*)**

21   16.    24 HOUR FITNESS realleges and incorporates herein by reference each and every

22   foregoing paragraph of this Complaint as if set forth fully herein.

23   17.    24 HOUR FITNESS possesses Trade Secrets as defined by California's Uniform Trade

24   Secrets Act, Civil Code sections 3426-3426.11.

25   18.    These Trade Secrets include, but are not limited to:

26        a.    Critical market strategies, including 24 HOUR FITNESS' Three Year Strategic

27   Plan, growth plans for new geographic markets, market segment development planning, market

28   performance data and market reorganization planning, platform expansion planning intended to

1   utilize the internet and other resources to facilitate memberships, marketing strategy related to

2   advertising, marketing partnerships and marketing tie-ins with non-traditional media,

3   proprietary compensation and personnel data, litigation strategy, financial planning strategies,

4   budgeting strategies, proprietary information on revenues, and an array of confidential and

5   proprietary information about virtually *every* aspect of 24 HOUR FITNESS' business model

6   and operations strategy;

7          b.      The identity of customers, specific customer preference information and

8   information systems, and information pertaining to 24 HOUR FITNESS' services used by its

9   clients as well as the identification of leads 24 HOUR FITNESS personnel have developed;

10         c.      The cost of vendor services, the identification of customer usage and analysis of

11  how 24 HOUR FITNESS' vendors assist in delivering value to 24 HOUR FITNESS'

12  customers; and

13         d.      24 HOUR FITNESS' confidential information regarding its employees,

14  including but not limited to, information concerning the employee's skills, compensation,

15  compensation history, history of employment and other sensitive employee data.

16  19.    24 HOUR FITNESS' Trade Secrets derive independent economic value, actual or

17  potential, from not being generally known to the public or to other persons who can obtain

18  economic value from their disclosure or use.

19  20.    24 HOUR FITNESS has taken reasonable measures to maintain the secrecy of the Trade

20  Secrets, including but not limited to, maintaining the information in a secure manner in 24

21  HOUR FITNESS' offices, including but not limited to, the usage of computer security

22  passwords and by requiring that 24 HOUR FITNESS' employees comply with the terms of

23  various Confidentiality and Non-Solicitation Agreements which expressly contain

24  confidentiality provisions.

25  21.    24 HOUR FITNESS is informed and believes and on that basis alleges that SHEEHAN

26  has misappropriated and threatens to further misappropriate the Trade Secrets by: (1) acquiring

27  24 HOUR FITNESS' Trade Secrets with knowledge or reason to know that the Trade Secrets

28  were acquired by improper means; (2) disclosing, using, and threatening to use the Trade

1  Secrets without 24 HOUR FITNESS' consent with knowledge or reason to know that the Trade

2  Secrets are proprietary to 24 HOUR FITNESS; and (3) soliciting and/or attempting to solicit 24

3  HOUR FITNESS' customers and/or employees by use of the Trade Secrets.

4  22.    24 HOUR FITNESS is informed and believes that, while employed by 24 HOUR

5  FITNESS, SHEEHAN has used the Trade Secrets with knowledge or reason to know that the

6  Trade Secrets were acquired under circumstances giving rise to a duty to maintain their secrecy.

7  In misappropriating 24 HOUR FITNESS' Trade Secrets, SHEEHAN has acted willfully and

8  with the intent to cause injury to 24 HOUR FITNESS and/or with a willful and conscious

9  disregard of 24 HOUR FITNESS' rights and with deceit or concealment of material facts

10  regarding his misconduct, the intent to cause 24 HOUR FITNESS injury, the intent to disrupt 24

11  HOUR FITNESS' business and customer relations, and the intent to deprive 24 HOUR

12  FITNESS of its Trade Secrets.

13  23.    24 HOUR FITNESS has suffered damages and SHEEHAN has been unjustly enriched

14  in amounts to be proven at trial as a direct result of SHEEHAN's trade secret misappropriation.

15  24.    SHEEHAN's misappropriation and threatened misappropriation of 24 HOUR FITNESS'

16  Trade Secrets has caused and continues to cause 24 HOUR FITNESS irreparable injury and

17  cannot be fully redressed through damages alone.  An injunction prohibiting SHEEHAN from

18  use or disclosure of 24 HOUR FITNESS' confidential information and Trade Secrets, and

19  requiring the return thereof to 24 HOUR FITNESS, is necessary to provide 24 HOUR FITNESS

20  with complete relief.

21  25.    SHEEHAN's misappropriation and threatened misappropriation of 24 HOUR FITNESS'

22  Trade Secrets was willful and malicious and entitles 24 HOUR FITNESS to an award of its

23  reasonable attorneys' fees pursuant to Civil Code section 3426.4.

24  26.    SHEEHAN's misappropriation and threatened misappropriation of 24 HOUR FITNESS'

25  Trade Secrets has been willful and malicious, entitling 24 HOUR FITNESS to exemplary

26  damages pursuant to Civil Code Section 3426.3(c).

27  27.    Wherefore 24 HOUR FITNESS prays for judgment as hereinafter set forth.

28  / / /

**SECOND CAUSE OF ACTION**

**(Breach of Contract-Employment Agreement)**

28.    24 HOUR FITNESS realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth fully herein.

29.    24 HOUR FITNESS entered into a written employment agreement with SHEEHAN whereby SHEEHAN agreed that, in exchange for continued employment, compensation, benefits and other consideration, SHEEHAN would maintain the confidentiality of 24 HOUR FITNESS' Trade Secrets and confidential information.  The Agreement further stated that SHEEHAN would not solicit 24 HOUR FITNESS' clients, vendors, or employees and would not compete with 24 HOUR FITNESS for a period of two (2) years following his separation from the company within a reasonable geographic scope.

30.    24 HOUR FITNESS has performed all material conditions, covenants, and promises required of it under the terms and conditions of the Employment Agreement with SHEEHAN.

31.    SHEEHAN breached his obligations under the Employment Agreement by taking a position as CEO at Bally, a direct competitor of 24 HOUR FITNESS, misappropriating, using and/or disclosing 24 HOUR FITNESS' confidential information and Trade Secrets, providing such confidential information and Trade Secrets to others, soliciting 24 HOUR FITNESS' employees and/or customers and usurping 24 HOUR FITNESS' business opportunities and otherwise doing the things alleged in this Complaint.

32.    As a direct and proximate result of SHEEHAN's breach of the Employment Agreement with 24 HOUR FITNESS, 24 HOUR FITNESS has been damaged in an amount to be proven at trial in excess of the jurisdictional minimums of this court.

33.    SHEEHAN's beach of the Agreement has caused and continues to cause 24 HOUR FITNESS irreparable injury and cannot be fully redressed through damages alone.  An injunction prohibiting SHEEHAN from further breaching the Employment Agreement, from commencing employment as Bally's CEO, from using or disclosing SHEEHAN's confidential information and Trade Secrets and requiring the return thereof to 24 HOUR FITNESS is necessary to provide 24 HOUR FITNESS with complete relief.

9

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1    34.    Wherefore 24 HOUR FITNESS prays for judgment as hereafter set forth.

2                        **THIRD CAUSE OF ACTION**

3              **(Breach of Contract-Stockholder's Agreement)**

4    35.    24 HOUR FITNESS realleges and incorporates herein by reference each and every

5    foregoing paragraph of this Complaint as if set forth fully herein.

6    36.    24 HOUR FITNESS entered into a written Stockholder's Agreement with SHEEHAN

7    whereby SHEEHAN agreed that, in exchange for the shares of Class B common stock in 24

8    HOUR FITNESS and other consideration, SHEEHAN would not compete with 24 HOUR

9    FITNESS, and would maintain the confidentiality of 24 HOUR FITNESS' Trade Secrets and

10    confidential information.  The Stockholder's Agreement further stated that SHEEHAN would

11    not engage in competitive activity with 24 HOUR FITNESS for a period of three (3) years by

12    working for a "competitor," and expressly identified "Bally Total Fitness Holdings

13    Corporation" as one such "competitor."

14    37.    24 HOUR FITNESS has performed all material conditions, covenants, and promises

15    required of it under the terms and conditions of the Stockholder's Agreement with SHEEHAN.

16    38.    24 HOUR FITNESS is informed and believes that, SHEEHAN breached his obligations

17    under the Stockholder's Agreement by accepting employment as Chief Executive Officer of

18    Bally's, in violation of the non-competition provisions of the Stockholder's Agreement,

19    misappropriating, using and/or disclosing 24 HOUR FITNESS' confidential information and

20    Trade Secrets, providing such confidential information and Trade Secrets to others, soliciting 24

21    HOUR FITNESS' customers, usurping 24 HOUR FITNESS' business opportunities, and

22    otherwise doing the things alleged in this Complaint.

23    39.    As a direct and proximate result of SHEEHAN's breach of the Stockholder's Agreement

24    with 24 HOUR FITNESS, 24 HOUR FITNESS has been damaged in an amount to be proven at

25    trial in excess of the jurisdictional minimums of this court.

26    40.    SHEEHAN's breach of the Agreement has caused and continues to cause 24 HOUR

27    FITNESS irreparable injury and cannot be fully redressed through damages alone.  An

28    injunction prohibiting SHEEHAN from further breaching the Agreement, from competing with

1 | 24 HOUR FITNESS in violation of the terms of the Stockholder's Agreement, from further

2 | using or disclosing 24 HOUR FITNESS' confidential information and Trade Secrets and

3 | requiring the return thereof to 24 HOUR FITNESS is necessary to provide 24 HOUR FITNESS

4 | with complete relief.

5 | 41.    Wherefore 24 HOUR FITNESS prays for judgment as hereafter set forth.

6 | **FOURTH CAUSE OF ACTION**

7 | **(Unfair Competition - Business and Professions Code section 17200, et seq.)**

8 | 42.    24 HOUR FITNESS realleges and incorporates herein by reference each and every

9 | foregoing paragraph of this Complaint as if set forth fully herein.

10 | 43.    24 HOUR FITNESS is informed and believes that, the wrongful conduct of SHEEHAN

11 | as alleged above, including but not limited to, the misappropriation of 24 HOUR FITNESS'

12 | Trade Secrets; using and/or threatening to use 24 HOUR FITNESS' misappropriated

13 | confidential information and Trade Secrets to mount a campaign to deliberately disrupt 24

14 | HOUR FITNESS' business, and accept employment in violation of the valid and enforceable

15 | non-competition provisions found in the Stockholder's Agreement and Employment Agreement

16 | all constitute unlawful and fraudulent business acts and practices under California Business and

17 | Professions Code section 17200, *et seq.*  SHEEHAN's conduct has harmed 24 HOUR FITNESS

18 | and has deprived it of significant business and business opportunities.

19 | 44.    California Business and Professions Code section 17203 authorizes injunctive and

20 | restitutionary relief against any person who engages or proposes to engage in unfair

21 | competition.  SHEEHAN has been and will continue to be unjustly enriched by virtue of his

22 | unfair competition as set forth herein.  24 HOUR FITNESS requests that the Court order

23 | SHEEHAN to restore to 24 HOUR FITNESS all monies and/or property acquired by means of

24 | SHEEHAN's unlawful, unfair, and fraudulent business practices.

25 | 45.    As a direct and proximate result of SHEEHAN's unfair competition, 24 HOUR

26 | FITNESS has suffered injury and harm and will continue to suffer injury and harm unless

27 | SHEEHAN is enjoined from the conduct alleged herein.

28 |

46.     24 HOUR FITNESS requests that the Court issue preliminary and permanent injunctive relief against SHEEHAN.  Unless SHEEHAN is restrained, he will continue to injure 24 HOUR FITNESS' business and reputation.  24 HOUR FITNESS has no adequate remedy at law for the injuries currently being suffered in that SHEEHAN will continue to engage in unfair competition and 24 HOUR FITNESS will be required to maintain a multiplicity of judicial proceedings to protect its interests.

47.     Wherefore 24 HOUR FITNESS prays for judgment as set forth herein.

## FIFTH CAUSE OF ACTION

### (Injunctive Relief)

48.     24 HOUR FITNESS realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth fully herein.

49.     The wrongful conduct of SHEEHAN in misappropriating 24 HOUR FITNESS' confidential information and Trade Secrets, competing with 24 HOUR FITNESS, soliciting 24 HOUR FITNESS' current and prospective customers and/or employees, engaging in unfair business practices, interfering with 24 HOUR FITNESS' actual and prospective economic advantages, and intentionally disrupting 24 HOUR FITNESS' business unless and until enjoined by this Court will cause great and irreparable injury to 24 HOUR FITNESS' future business in that 24 HOUR FITNESS will continue to lose business reputation, customers and good will for which monetary recovery is inadequate inasmuch as damages will not compensate 24 HOUR FITNESS for this loss.

50.     Monetary damages are also inadequate in the present case because unless enjoined by this Court, SHEEHAN will continue to disrupt 24 HOUR FITNESS' business, compete with 24 HOUR FITNESS, harm 24 HOUR FITNESS' reputation and good will, and solicit 24 HOUR FITNESS' current and prospective customers and/or employees and 24 HOUR FITNESS will be required to maintain a multiplicity of judicial proceedings to protect its interests. Accordingly, 24 HOUR FITNESS requests that the Court issue preliminary and permanent injunctive relief enjoining SHEEHAN: (1) from commencing employment as Bally's CEO; (2) from using and/or disclosing any of 24 HOUR FITNESS' Trade Secrets and/or confidential

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  information; (3) from soliciting any of 24 HOUR FITNESS' current or prospective customers

2  and/or employees; and (4) requiring SHEEHAN to turn over to 24 HOUR FITNESS any and all

3  confidential information, Trade Secrets and/or any other property of 24 HOUR FITNESS in his

4  possession, custody or control.

5  51.     Wherefore, 24 HOUR FITNESS prays for judgment as set forth herein.

6                              **V. PRAYER FOR RELIEF**

7          Wherefore, 24 HOUR FITNESS prays for judgment against SHEEHAN as follows:

8                          **As to the First Cause of Action**

9  1.     For an order enjoining SHEEHAN from the following actions:

10          a.   Assuming the position of Chief Executive Officer with Bally Total Fitness

11               Holding Corporation, or any related Bally entity ("Bally"), in breach of the terms

12               of his March 31, 2003 Employment Agreement with 24 Hour Fitness USA, Inc.

13               and September 30, 2005 Stockholder's Agreement with 24 Hour Fitness

14               Worldwide, Inc.;

15          b.   Competing with 24 Hour Fitness in violation of terms of his March 31, 2003

16               Employment Agreement with 24 Hour Fitness USA, Inc. and September 30,

17               2005 Stockholder's Agreement with 24 Hour Fitness Worldwide, Inc.;

18          c.   Directly or indirectly recruiting, soliciting, inducing or encouraging any

19               employee of 24 Hour Fitness to become an employee of Bally, or to directly or

20               indirectly encourage any independent contractor or vendor of 24 Hour Fitness to

21               terminate a contracting or vending relationship with 24 Hour Fitness;

22          d.   Directly or indirectly owning an interest in, operating, joining, beginning,

23               controlling, advising, consulting with, rendering services to, or otherwise

24               participating in or working for or on behalf of Bally;

25          e.   Using, disclosing or disseminating to Bally any of 24 Hour Fitness' Confidential

26               and Proprietary Information and/or any work product created in connection with

27               his employment by 24 Hour Fitness; or

28          f.   Using in any manner 24 Hour Fitness' trade secret information.

**As to the Second and Third Causes of Action**

1.    For damages in an amount to be proven at trial, plus interest thereon at the legal rate until paid in full;

2.    For an order requiring SHEEHAN to show cause, if any he has, why he should not be enjoined as set forth herein during the pendency of this action;

3.    For a preliminary and permanent injunction as set forth above;

4.    For its reasonable attorneys' fees and costs.

**As to the Fourth Cause of Action**

1.    For an order requiring SHEEHAN to show cause, if any he has, why he should not be enjoined as set forth herein during the pendency of this action;

2.    For a preliminary and permanent injunction as set forth above;

3.    For its reasonable attorneys' fees and costs.

**As to All Causes of Action**

1.    For costs of suit; and

2.    For such other and further relief as the court may deem just and proper.


DATED:  June 26, 2008                    BERRY & BLOCK LLP


                                         By_____
                                         REX DARRELL BERRY
                                         SCOTT M. PLAMONDON
                                         Attorneys for Plaintiffs
                                         24 HOUR FITNESS USA, INC., and
                                         24 HOUR FITNESS WORLDWIDE, INC.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, CARL C. LIEBERT, declare:

I currently am employed as the Chief Executive Officer of 24 HOUR FITNESS
WORLDWIDE, INC., and therefore I am authorized to make this Verification on its behalf
and on behalf of 24 HOUR FITNESS USA, INC.

I have read the foregoing Verified Complaint of 24 HOUR FITNESS USA, INC., and
24 HOUR FITNESS WORLDWIDE, INC. and know the contents thereof.  The same is true of
my own knowledge, except as to the matters which are therein stated on information or belief,
and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct.

Executed this 26th day of June, 2008 at SAN RAMON , California.

CARL C. LIEBERT

1

**EXHIBIT A**

## EMPLOYMENT AGREEMENT
## MIKE SHEEHAN

This Employment Agreement ("Agreement") is dated as of March 31, 2003, and is entered into by and between Mike Sheehan ("Employee") and 24 Hour Fitness USA, Inc. ("Company"). Company hereby agrees to employ Employee, and Employee hereby agrees to be employed by the Company, upon the terms and conditions set forth in this Agreement.

**1.     Employment Period.** Employee's employment with the Company shall be "at-will" employment and may be terminated by either party at any time, with or without cause or advance notice. The period of Employee's employment with the Company following the date of this Agreement shall be referred to as the "Employment Term."

**2.     The Position.**

**2.1**     Employee shall serve as Senior Vice President of Operations of the Company.

**2.2**     Notwithstanding the provisions of Section 2.1 above, it is expressly understood that the Chief Executive Officer ("CEO") shall be entitled to make such organizational and reporting changes as the CEO may, in good faith, deem desirable and for the good of the Company, which may include, without limitation, changing the title and duties of Employee.

**3.     Duties.** Employee agrees to faithfully, diligently and competently devote substantially all of the Employee's full time and attention, during normal business hours, to the business and affairs of the Company and, in particular, to performance of all the duties required of Employee's position set forth above.

**4.     Compensation.** Employee shall be paid the following as compensation for all services to be rendered by Employee:

**4.1**     Employee will be paid a base salary as set forth in Employee's current Compensation Plan.

**4.2**     Employee will be eligible for an annual incentive bonus based upon Employee's achievement of designated MBOs, and an annual incentive bonus based upon the Company's achievement of designated financial goals. Whether Employee receives these bonuses, and the amount of any such bonuses, shall be determined in the discretion of the Company's CEO, as provided in the applicable bonus plans.

**4.3**     Employee may be entitled to receive periodic grants of stock options and/or restricted stock under the Company's Employee Stock Option Plan(s) and/or Executive Incentive Plan. The quantity and vesting schedule of any such grant shall be determined in the sole discretion of the Company's Compensation Committee.

**5.     Perquisites/Expenses.** Employee shall be entitled to customary perquisites, such as an appropriate office, administrative support, and fringe benefits such as a car allowance and cell phone allowance, to the extent consistent with benefits provided to employees of similar rank and to the extent necessary for Employee to perform Employee's duties. Employee shall also be

entitled to reimbursement of reasonable expenses incurred by Employee in the course of Employee's duties, to the extent allowed under applicable company policy.

## 6.    Benefit Plans.

**6.1**    Employee and Employee's dependents and beneficiaries shall be entitled to all payments and benefits and service credit for benefits during the Employment Term to which employees of similar rank and their dependents and beneficiaries are entitled as the result of the employment under the terms of employee benefit plans and practices of the Company.

**6.2**    Nothing in this Agreement shall preclude the Company from amending or terminating any employee benefit plan or practice in its sole discretion.

**7.    Effect of Death.**    In the event of Employee's death during the Employment Term, the legal representative of the Employee's estate shall be entitled to six (6) months of Employee's base salary in effect prior to such death.   Such payments shall be made according to the Company's normal payroll practices, subject to standard withholdings and deductions.

**8.    Effect of Disability.**    In the event of Employee's disability during the Employment Term, Employee shall be entitled to six (6) months of Employee's base salary in effect prior to such disability.  Such payments shall be made according to the Company's normal payroll practices, subject to standard withholdings and deductions.

**8.1**    The amount of any payments due under this Section 8 shall be reduced by any payments to which Employee may be entitled because of disability under any disability or pension plan or insurance of the Company or of any division, subsidiary, or affiliate thereof, or as the result of workers' compensation or non-occupational disability payments.

**8.2**    The term "disability," as used in this agreement, shall mean permanent and total disability as defined in Internal Revenue Code Section 22 (e)(3).

## 9.    Severance.

**9.1    In General.**   In the event the Company terminates Employee without Cause, the Company shall provide severance benefits set forth below.  If Employee is terminated with Cause, or Employee voluntarily resigns, then Employee will receive no severance benefits (except as provided in Section 9.1(c)).

**(a)    Severance.**   A severance allowance in an amount equal to twelve (12) months of Employee's base salary (the "severance allowance") commencing on the last day of the month following termination of Employee's employment and payable in equal monthly installments for a period of twelve (12) consecutive months thereafter.    Such severance allowance shall be ordinary income subject to applicable withholding for federal, state and local taxes.  The Compensation Committee of the Company's Board of Directors may extend the period of severance or adjust the payment schedule in its discretion.

**(b)    COBRA.**   If the Employee qualifies and elects to continue health benefits pursuant to Employee's COBRA rights, the Company shall pay for the cost of such continued

benefits during the period that payments provided for in Section 9.1(a) are required to be made, except to the extent of the applicable "Employee Contribution" for all such continued benefits.

**(c)** **Stock Option Acceleration/Vesting Following a Change of Control.** In addition to the payments to be made pursuant to Sections 9.1(a) and 9.1(b) above, in the event the Company terminates Employee's employment without Cause or if Employee terminates employment for Good Reason, within thirteen (13) months following a Change of Control, all of Employee's stock options granted under any of the stock and incentive plans of the Company and/or 24 Hour Fitness Worldwide, Inc. prior to the Change of Control shall immediately accelerate and become fully vested, and the Employee shall have up until two (2) years following the date of Employee's termination of employment to exercise such stock options.

**9.2** **Definitions.** For purposes of this Agreement, the following definitions shall apply:

**(a)** **Cause.** "Cause" shall mean (i) the Employee's engaging in an act or acts of fraud, theft or embezzlement which are harmful or injurious to the Company; (ii) the Employee's unreasonable neglect or refusal to perform the duties appropriate to Employee's position; or (iii) any conviction for a felony involving moral turpitude.

**(b)** **Change of Control.** "Change of Control" shall mean (i) a stock sale, merger, consolidation, combination, reorganization or other transaction (other than a public offering of stock) of either the Company, 24 Hour Fitness United States, Inc., or 24 Hour Fitness Worldwide, Inc. resulting in less than 50% of the combined voting power of the surviving or resulting entity being directly or indirectly owned by either the shareholders of the Company, 24 Hour Fitness United States, Inc., or 24 Hour Fitness Worldwide, Inc. immediately prior to such transaction; or (ii) a liquidation or dissolution of the Company, or sale or other disposition of all or substantially all of the Company's assets or business.

**(c)** **Good Reason.** "Good Reason" means the Employee voluntarily resigns within ninety (90) days after the occurrence of any of the following: (i) a material reduction by the Company of Employee's authority without Employee's consent, except to the extent that the authority of Employee and similarly situated Company executives is reduced solely as a result of a merger into a larger entity (e.g., retaining the same authority for divisional operations that are substantially identical to the Company's previous operations as an independent entity); (ii) a material reduction by the Company of Employee's base compensation or benefits without Employee's consent, except to the extent that the compensation of similarly situated executives at the Company is similarly reduced; or (iii) an involuntary change in the Employee's principal place of employment that would increase Employee's one-way commute by more than forty (40) miles.

**9.3** Employee will not be entitled to receive the Severance allowed under this Section 9 until Company and Employee have executed the Company's Confidential Separation Agreement (which is available for your review in the office of the Company's General Counsel), which includes a general release of claims. Moreover, if after the Employment Term, Employee has breached any of the post-employment restrictions contained in Section 10 of this Agreement, then Employee's right to receive the severance benefits set forth in this Section 9 shall cease immediately, and Employee will not be entitled to any further severance.

**9.4**     The acceptance of the aforementioned payments by Employee shall constitute the exclusive remedy of Employee with respect to any claim Employee may have against the Company for termination of the employment of Employee or the Company's breach of this Agreement or for any other claim of any nature which the Employee may have against the Company.

**10.     Non-Compete and Non-Solicitation.**

**10.1**     For a period of two (2) years following the termination of Employee's employment with the Company, Employee agrees not to directly or indirectly recruit, solicit, induce or encourage any employee of the Company to become an employee for any other person or entity; nor to directly or indirectly induce or encourage any independent contractor of the Company to terminate a contracting relationship with the Company.

**10.2**     Employee further agrees that during the Employment Term and for a period of two (2) years thereafter, Employee will not directly or indirectly own an interest in, operate, join, begin, control, advise, consult with, render services to or otherwise participate in or work for or on behalf of any entity or individual(s) which operates a fitness club within fifty (50) miles of any of the Company's fitness clubs or which otherwise competes with the business of the Company or the Company's affiliates.

**10.3**     Employee and the Company intend that: (1) this covenant not to compete shall be construed as a series of separate covenants, one for each county; (2) if any portion of the restrictions set forth in this Section 10 should, for any reason whatsoever, be declared invalid by an arbitrator or a court of competent jurisdiction, the validity or enforceability of the remainder of such restrictions shall not thereby be adversely affected, nor shall such a decision adversely affect the Company's right to cease the severance payments set forth in Section 9 of this Agreement in the event that Employee has breached any of the obligations in this Section 10; and (3) the territorial and time limitations set forth in this Section 10 are reasonable and properly required for the adequate protection of the Company's business. In the event any such territorial or time limitation is deemed to be unreasonable by an arbitrator or a court of competent jurisdiction, Employee agrees to the reduction of the territorial or time limitation to the area or period which such arbitrator or court shall have deemed reasonable.

**10.4**     Employee further agrees that provided the Company makes the severance payments contemplated by Section 9, for a period of one (1) year following the termination of Employee's employment, Employee will advise and consult with the Company at the Company's discretion regarding Company business and operations and agrees to diligently and conscientiously use his best efforts to discharge projects as may be reasonably requested from time to time by the Company, including, but not limited to, communicating with various third parties on behalf of the Company on matters related to the Company's business. Notwithstanding the provisions of this Section 10.4, nothing in this Agreement shall preclude Employee from providing consulting services to any other person or entity for such projects which are not in violation of Section 10. It is understood that provision of these services would not preclude Employee's full time employment by another, non-competing, organization.

**11.     Confidential Information.**  During the Employment Term and thereafter, Employee agrees to hold the Company's confidential and proprietary information in strictest confidence and not to use, disclose or disseminate any of such information except as such disclosure, use or

dissemination may be required in connection with Employee's work for the Company or as expressly authorized by the Company in writing. Employee further agrees that any work product created in connection with Employee's work for the Company will be the sole and exclusive property of the Company and hereby assigns to the Company all right, title and interest in all inventions and other intellectual property developed by Employee in working for the Company, except for any inventions or other intellectual property that Employee can prove qualifies under California Labor Code Section 2870 (as set forth in Exhibit A). Furthermore, Employee agrees to refrain from any unauthorized use or disclosure of any confidential information or property of any former employer or other third party. Employee agrees to use only that information that is generally known and used by persons with training and experience comparable to Employee's, that is common knowledge in the industry or otherwise in the public domain, or that is provided by or developed by the Company or developed by Employee on behalf of the Company.

**12.    Successor in Interest.** This Agreement and the rights and obligations hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, and shall also bind and inure to the benefit of any successor of the Company by merger or consolidation or any purchaser or assignee of all or substantially all of its assets, but, except to any such successor, purchaser, or assignee of the Company, neither this Agreement nor any rights or benefits hereunder may be assigned by either party hereto.

**13.    Invalid Provision.** In the event that any provision or portion of this Agreement shall be determined to be invalid or unenforceable for any reason, the remaining provisions of this Agreement shall remain in full force and effect to the fullest extent permitted by law.

**14.    Arbitration of Disputes.** To ensure rapid and economical resolution of any disputes which may arise under this Agreement, Employee and the Company agree that any and all disputes or controversies of any nature whatsoever arising from or related to Employee's employment or the interpretation, performance, enforcement or breach of this Agreement shall be resolved, to the fullest extent allowed by law, by confidential, final and binding arbitration conducted before a single arbitrator with Judicial Arbitration and Mediation Services, Inc. ("JAMS"), under the then-applicable JAMS employment rules. (In the event that there is no JAMS office within seventy-five (75) miles of Employee's work location, the arbitration shall be conducted by the American Arbitration Association ("AAA") under the then-applicable AAA rules.) **The parties acknowledge that by agreeing to this arbitration procedure, they waive the right to resolve any such dispute through a trial by jury, judge or administrative proceeding.** The arbitrator shall: (a) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law; and (b) issue a written arbitration decision including the arbitrator's essential findings and conclusions and a statement of the award. The Company shall pay all JAMS' arbitration fees (or AAA fees, where applicable) in excess of those that would be required if the dispute were decided in a court of law. Nothing in this Agreement is intended to prevent either Employee or the Company from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration. The arbitrator, and not a court, shall be authorized to determine whether the provisions of this paragraph apply to a dispute, controversy or claim sought to be resolved in accordance with these arbitration procedures.

**15.    Governing Laws.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the state applicable to Agreements made and to be performed entirely in the State of California.

**16.    Headings.** Titles or captions of sections contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.

**17.    Stock Option Grant.** Simultaneous with Employee entering into this Agreement, and as additional consideration for entering into this Agreement, Employee is receiving options to purchase 190,200 shares of common stock in 24 Hour Fitness Worldwide, Inc.  The specific terms of the grants of such options are set forth in the option agreements for such grants, which are conditioned upon Employee entering into this Agreement, and are also subject to approval by the Company's Board of Directors.

**18.    Entire Agreement.** This Agreement shall constitute the entire agreement between the parties on this subject matter, shall supersede all prior agreements, whether written or oral, and may not be modified or amended, and no waiver shall be effective, unless by written document signed by both Employee and a duly-authorized officer of the Company; provided, however, that any increase in base salary, as provided above, shall become an amendment to this Agreement when approved by the Compensation Committee of the Board of Directors of the Company and recorded in the approved minutes of such meeting.

Executed as of the 31st day of March, 2003.


_____
Mike Sheehan

_____
Company Representative

EXHIBIT A

LIMITED EXCLUSION NOTIFICATION

THIS IS NOTICE, in accordance with Section 2872 of the California Labor Code, that the foregoing Employment Agreement does not require Employee to assign or offer to assign to the Company any invention that Employee developed entirely on Employee's own time without using the Company's equipment, supplies, facilities or trade secret information except for those inventions that either:

**1.** Relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or

**2.** Result from any work performed by Employee for the Company.

To the extent a provision in the foregoing Employment Agreement purports to require Employee to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is unenforceable.

This limited exclusion does not apply to any patent or invention covered by a contract between the Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States.

**EXHIBIT B**

STOCKHOLDER'S AGREEMENT, dated as of September _30_, 2005 between 24 Hour Fitness Worldwide, Inc., a Delaware corporation, and Michael William Sheehan (the "Employee").

WHEREAS, Forstmann Little & Co. Equity Partnership-VII, L.P., a Delaware limited partnership ("Equity-VII"), and Forstmann Little & Co. Subordinated Debt and Equity Management Buyout Partnership-VIII, L.P., a Delaware limited partnership ("MBO-VIII"), are the holders of shares of Class A Common Stock;

WHEREAS, the Employee wishes to subscribe for and purchase and the Company desires to issue and sell to the Employee authorized but unissued shares of Class B Common Stock on the terms and subject to the conditions set forth herein; and

WHEREAS, the Employee and the Company wish to provide for certain arrangements with respect to the Employee's rights to hold and dispose of the shares of Class B Common Stock acquired by the Employee hereunder.

NOW, THEREFORE, the parties hereto agree as follows:

1.    Definitions.

1.1. Definitions; Rules of Construction.

(a) The following terms, as used herein, shall have the following meanings:

"Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Affiliate" shall mean, with respect to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.

"Affiliate Securities" shall mean any securities issued by an Affiliate of the Company.

"Aggregate Number of Acquired Shares" shall mean the aggregate number of shares of Class B Common Stock acquired by the Employee pursuant hereto (adjusted, where appropriate, to reflect any Capital Transaction).

"Aggregate Number of Shares Sold" shall mean, as at any date, the aggregate number of shares sold by the Employee pursuant to Section 3.3, 3.4 or 3.5 hereof prior to such date, if any (adjusted, where appropriate, to reflect any Capital Transaction effected after the date of any such sale).

"Agreement" shall mean this Stockholder's Agreement, as amended, supplemented or modified from time to time.

"Capital Transaction" shall mean any Stock Dividend, recapitalization (including, without limitation, any special dividend or distribution), reclassification, spin-off, partial liquidation or similar capital adjustments (including, without limitation, through merger or consolidation).

"Cash EBITDA" shall mean the Company's reported book EBITDA during any relevant period determined in a manner consistent with the Company's past practices, plus (i) management and advisory fees, (ii) non-cash compensation charges, (iii) goodwill impairment charges, (iv) asset impairment charges, (v) restructuring charges, (vi) one-time adjustments, (vii) charges resulting from any loss on fixed assets, (viii) exchange loss, (ix) deferred revenues, (x) deferred expenses, and (xi) deferred rent, in each case to the extent incurred during the relevant period.

"Cause" shall mean (i) the occurrence of any of the events set forth in Section 4.2(a), (b) or (c), or (ii) the Employee's having (a) grossly neglected his or her assigned duties or (b) engaged in willful misconduct resulting in, or reasonably likely to result in, material and demonstrable damage to the Company.

"Certificate of Incorporation" shall mean the Amended and Restated Certificate of Incorporation of the Company, as in effect from time to time.

"Class A Common Stock" shall mean the Class A Common Stock, par value $0.01 per share, of the Company. There shall be included within the term Class A Common Stock any Class A Common Stock now or hereafter authorized to be issued, and any and all securities of any kind whatsoever of the Company which may be issued after the date hereof in respect of, or in exchange for, shares of Class A Common Stock pursuant to a Capital Transaction or otherwise.

"Class B Common Stock" shall mean the Class B Common Stock, par value $0.01 per share, of the Company. There shall be included within the term Class B Common Stock any Class B Common Stock now or hereafter authorized to be issued, and any and all securities of any kind whatsoever of the Company which may be issued after the date hereof in respect of, or in exchange for, shares of Class B Common Stock pursuant to a Capital Transaction or otherwise. Without limiting the generality of the foregoing, all references herein to the Class B Common Stock shall include, and the provisions hereof (including, without limitation, Articles 3 and 4 hereof) shall also be applicable to, the Class A Common Stock for which the Class B Common Stock shall be exchanged pursuant to the Certificate of Incorporation.

"Closing" shall have the meaning ascribed to such term in Section 3.2(d) hereof.

"Closing Date" shall have the meaning ascribed to such term in Section 2.2 hereof.

"Company" shall mean 24 Hour Fitness Worldwide, Inc., a Delaware corporation, and shall include any successor thereto by merger, consolidation, acquisition of substantially all the assets thereof, or otherwise and shall include any subsidiary of 24 Hour Fitness Worldwide, Inc. or such successor when describing an employment relationship.

2

"Competitive Activity" shall mean engaging in any of the following activities: (i) serving as a director or executive officer of any Competitor; (ii) directly or indirectly (X) controlling any Competitor or (Y) owning any equity or debt interests in any Competitor (other than Existing Interests and equity or debt interests which are publicly traded and do not exceed 2% of the particular class of interests then outstanding) (it being understood that, if any such interests in any Competitor are owned by an investment vehicle or other entity in which the Employee owns an equity interest, a portion of the interests in such Competitor owned by such entity shall be attributed to the Employee, such portion determined by applying the percentage of the equity interest in such entity owned by the Employee to the interests in such Competitor owned by such entity); (iii) directly or indirectly soliciting, diverting, taking away, appropriating or otherwise interfering with any of the clients, customers or suppliers of the Company or any Affiliate of the Company or any person or entity whose business the Company or any Affiliate of the Company has solicited in the most recent three-year period; or (iv) employment by (including serving as an officer or director of), or providing consulting services to, any Competitor. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Competitor, whether through the ownership of equity or debt interests, by contract or otherwise. For purposes of this definition, the term "Existing Interests" means solely the equity or debt interests in a Competitor owned by the Employee as of the date hereof and set forth on Annex I attached hereto.

"Competitor" shall mean Life Time Fitness, Inc., L.A. Fitness International, LLC, Bally Total Fitness Holding Corporation, Town Sports International Holdings, Inc., Gold's Gym International, Inc., Equinox Holdings, Inc., Spectrum Sports Club, Inc., Club One, Inc., Curves International, Inc., any successor or affiliate of the foregoing in the same line of business or any other Person with annual revenues in excess of $200 million that is engaged in or planning to engage in owning, operating or acquiring directly or indirectly (through a corporation, trust, partnership or other Person) a Physical Fitness Business that operates in any of the same markets as and competes directly or indirectly with a Physical Fitness Business which, at the time the Employee is Terminated, is owned or operated by the Company or any of its subsidiaries or which the Company or any of its subsidiaries intends to own, operate or acquire. The determination as to whether or not any Physical Fitness Business competes directly or indirectly with the Company or any of its subsidiaries shall be made by the Company in its reasonable discretion.

"Confidential or Proprietary Information" shall mean any non-public information about the Company or any Affiliate thereof which was acquired during the Employee's employment with the Company or any Affiliate thereof and which has or is reasonably likely to have competitive value to the Company or any Affiliate thereof.

"Election Date" shall have the meaning ascribed to such term in Section 3.2(a) hereof.

"Equity-VII" shall have the meaning ascribed to such term in the first "Whereas" clause hereof.

3

"Exchange Rate" shall have the meaning ascribed to such term in Section 3.3 hereof.

"Expenses of Sale" shall mean all expenses incurred by the FL & Co. Companies and their Affiliates in connection with the sale of the shares of the selling stockholders pursuant to Section 3.3, 3.4 or 3.5 hereof to the extent that such expenses are not paid or reimbursed by the Company.

"Fair Value" shall mean, if the Class A Common Stock is listed or traded in a manner referred to below, as at any date of Termination or, in the case of a determination pursuant to Section 4.3, the date of any Repurchase Notice, (i) with respect to the Class B Common Stock, the product, rounded to three decimal places, of (x) the fraction of a share of Class A Common Stock for which a share of Class B Common Stock is exchangeable in accordance with the Exchange Rate and (y) an amount equal to the average of the daily Closing Prices on the twenty consecutive trading days immediately preceding the date of Termination or the applicable Repurchase Notice, as the case may be and (ii) with respect to the Class A Common Stock, an amount equal to the average of the daily Closing Prices on the twenty consecutive trading days immediately preceding the date of Termination or the applicable Repurchase Notice, as the case may be. As used in this Agreement, the term "Closing Price", with respect to the Class A Common Stock, on any day shall mean the last reported sales price on such day or, in the event no such sale takes place on such day, the average of the closing bid and asked prices, in each case on the New York Stock Exchange or, if the Class A Common Stock is not then listed or admitted to trading on such exchange, on the principal national securities exchange on which the Class A Common Stock is listed or admitted to trading, or, if the Class A Common Stock is not listed or admitted to trading on any such exchange, the average of the highest reported bid and lowest reported asked prices as furnished by the National Association of Securities Dealers through the National Association of Securities Dealers Automated Quotation System ("NASDAQ") (or a similar organization if NASDAQ is no longer reporting such information). If the Class A Common Stock is not listed and traded in a manner that the pricing information referred to above is available for the period required hereunder, the Fair Value per share of Class B Common Stock or Class A Common Stock, as the case may be, shall be determined by an appraisal or valuation by a nationally recognized valuation or investment banking firm selected by the Board of Directors of the Company; provided that for such time as the Board of Directors of the Company continues to consider Cash EBITDA to be an accurate measure of the Company's economic performance, the principal focus of such firm in determining the Fair Value shall be the Cash EBITDA of the Company.

"FL & Co. Companies" shall mean Equity VII and MBO-VIII, collectively.

"Legal Representative" shall mean the guardian, executor, administrator or other legal representative of the Employee. All references herein to the Employee shall be deemed to include references to the Employee's Legal Representative, if any, unless the context otherwise requires.

"Litigation" shall mean any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby.

4

"MBO-VIII" shall have the meaning ascribed to such term in the first "Whereas" clause hereof.

"Permitted Transferee" shall have the meaning ascribed to such term in Section 3.1(b) hereof.

"Person" shall mean an individual, a corporation, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Physical Fitness Business" shall mean (i) the business of operating or managing any physical fitness center or facility, (ii) any other business conducted by the Company or its subsidiaries or (iii) any other business or activity similar to or ancillary to the businesses described in clauses (i) or (ii) above.

"Prime Rate" shall mean the rate of interest per annum publicly announced from time to time by J.P. Morgan Chase & Co. or any successor bank thereto as its prime rate in effect at its principal office in New York City.

"Prohibited Activity" shall have the meaning ascribed to such term in Section 4.1 hereof.

"Promissory Note" shall mean any promissory note executed and delivered by the Employee to evidence the Employee's loan from the Company to finance in part the Employee's purchase of shares of Class B Common Stock hereunder.

"Purchase Closing" shall have the meaning ascribed to such term in Section 2.2 hereof.

"Purchased Shares" shall have the meaning ascribed to such term in Section 3.2(d) hereof.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.1 hereof.

"Put Date" shall have the meaning ascribed to such term in Section 3.2(a) hereof.

"Release Date" shall mean the date on which the FL & Co. Companies and their Affiliates shall cease to own in the aggregate directly or indirectly at least 20 percent of the then outstanding securities of the Company having the power to vote in the election of directors of the Company.

"Representative" shall have the meaning ascribed to such term in Section 6.13(b) hereof.

"Repurchase Notice" shall have the meaning ascribed to such term in Section 4.2 hereof.

5

"Sale Obligations" shall mean any liabilities and obligations (including liabilities and obligations for indemnification, amounts paid into escrow and post-closing adjustments) incurred by the selling stockholders in connection with the sale of their shares pursuant to Section 3.3, 3.4 or 3.5 hereof.

"Scheduled Closing Date" shall have the meaning ascribed to such term in Section 3.2(d) hereof.

"Section 3.2(b)(i) Notice Date" shall have the meaning ascribed to such term in Section 3.2(b)(i) hereof.

"Section 3.2(b)(ii) Notice Date" shall have the meaning ascribed to such term in Section 3.2(b)(ii) hereof.

"Section 3.4 Notice" shall have the meaning ascribed to such term in Section 3.4(a) hereof.

"Stock Dividend" shall mean any stock split, stock dividend, reverse stock split or similar transaction which changes the number of outstanding shares of capital stock of the Company.

"Stock Pledge Agreement" shall mean the stock pledge agreement which the Employee is entering into with the Company in connection with the financing in part of the Employee's purchase of shares of Class B Common Stock hereunder.

"Termination" or "Terminated" shall mean that the Employee's employment on a full-time basis by the Company and its subsidiaries shall have ceased for any reason whatsoever (including by reason of death, permanent disability or adjudicated incompetency) (it being understood that the Employee's employment by the Company and its subsidiaries shall not be deemed to have ceased during any leaves-of-absence or during the period of any consulting or advisory relationship between the Employee and the Company or any of its direct or indirect wholly-owned subsidiaries following the date on which such employment otherwise would have been deemed to cease, in each case to the extent approved by the Company on a case-by-case basis). When used without the phrase "by the Company," the term "Termination" or "Terminated" shall mean that such employment shall have ceased as a result of actions taken by either the Company or any of its direct or indirect wholly-owned subsidiaries or the Employee, or by the death, permanent disability or adjudicated incompetency of the Employee.

"Third Party" shall mean any Person other than any FL & Co. Company or an Affiliate or a partner of any of the FL & Co. Companies or an. Affiliate of such partner.

"Transaction" shall mean any sale pursuant to Section 3.3, 3.4 or 3.5 hereof.

"Unvested Shares" shall mean, as at any date, all shares of Class B Common Stock owned by the Employee which are not Vested Shares as of such date.

"Valuation Date" shall mean the last day of the fiscal year of the Company immediately preceding the fiscal year in which the Employee's employment is Terminated.

6

"Vested Shares" shall mean the number of shares of Class B Common Stock determined as follows: (i) if the Employee is Terminated on or before June 7, 2006, zero; (ii) if the Employee is Terminated after June 7, 2006 but on or before December 7, 2006, (x) 25 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (iii) if the Employee is Terminated after December 7, 2006 but on or before June 7, 2007, (x) 37.5 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (iv) if the Employee is Terminated after June 7, 2007 but on or before December 7, 2007, (x) 50 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (v) if the Employee is Terminated after December 7, 2007 but on or before June 7, 2008, (x) 62.5 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (vi) if the Employee is Terminated after June 7, 2008 but on or before December 7, 2008, (x) 75 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (vii) if the Employee is Terminated after December 7, 2008 but on or before June 7, 2009, (x) 87.5 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; and (viii) if the Employee is Terminated after June 7, 2009, (x) the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold.

(b) In this Agreement, unless the context otherwise requires, words in the singular number or in the plural number shall each include the singular number and the plural number.

2.    Purchase and Sale of Class B Common Stock.

2.1. Subscription of Class B Common Stock. The Employee hereby subscribes for the number of shares of Class B Common Stock set forth opposite the Employee's name on Annex A hereto, at a price of $5.051356 per share in cash (the "Purchase Price").

2.2. Closing of the Purchase and Sale. The closing of the transactions contemplated hereby (the "Purchase Closing") shall take place at the offices of Kirkland & Ellis LLP, 153 East 53rd Street, New York, New York 10022 at such time as the Company shall designate on the date hereof (the "Closing Date"). At the Purchase Closing, the Company shall deliver to the Employee a duly executed certificate representing the number of shares of Class B Common Stock being purchased by the Employee and shall enter the Employee's name on the books of the Company as the stockholder of record of such shares of Class B Common Stock as of the Closing Date. At or prior to the Purchase Closing, the Employee shall deliver to the Company an amount equal to the aggregate purchase price for such shares, by delivering a check payable to the Company, and by delivering an executed Promissory Note to the Company, in the respective amounts forth on Annex A. The Promissory Note shall be accompanied by an executed Stock Pledge Agreement. The Employee agrees that he or she shall properly execute and file an election under Section 83(b) of the Internal Revenue Code of 1986, as amended, with respect to his or her shares of Class B Common Stock within thirty days of the Closing Date.

3.    Rights and Restrictions on Class B Common Stock.

3.1. No Sale or Transfer.

7

(a) The Employee shall not sell, transfer, assign, exchange, pledge, encumber or otherwise dispose of any shares of Class B Common Stock acquired hereunder or grant any option or right to purchase such shares or any legal or beneficial interest therein, except in accordance with the provisions of this Agreement and the Stock Pledge Agreement.

(b) The Employee may transfer any shares of Class B Common Stock acquired hereunder by will or the laws of descent and distribution, but only to:

(i)     any spouse, parent, child (whether natural or adopted), grandchild, brother or sister of the Employee, or

(ii)     any trust, corporation, limited liability company or partnership which is controlled by any spouse, parent, child (whether natural or adopted), grandchild, brother or sister of the Employee

(the Person or Persons to which shares of Class B Common Stock are transferred in accordance with this Section 3.1(b) being herein referred to as the "Permitted Transferee"); provided, that, for any transfer to the Permitted Transferee to be effective hereunder, the Permitted Transferee shall agree in writing to be bound by all the terms of this Agreement applicable to the Employee (including, without limitation, Article 4 and Section 6.13(b) hereof) and the Promissory Note and the Stock Pledge Agreement as if the Permitted Transferee originally had been a party hereto; and provided, further, that all of the equity holders or trustees of any Permitted Transferee that is neither a natural person nor a partnership and all of the partners of any Permitted Transferee that is a partnership shall agree in writing not to transfer any equity interests they then own or control or may hereafter acquire in the Permitted Transferee that is neither a natural person nor a partnership or any partnership interests they then own or may hereafter acquire in the Permitted Transferee that is a partnership except to a Person described in paragraph (i) or (ii) above that has made the same agreement in writing to the Company, so long as such Permitted Transferee shall own any shares of Class B Common Stock. Any reference herein to the Employee shall be to the Permitted Transferee from and after the date the transfer is effected in accordance with this Section 3.1(b). Without limiting the generality of the foregoing, the provisions of Section 4.2 hereof shall be likewise applicable to any Permitted Transferee, commencing upon the date that such Person becomes a Permitted Transferee, for the respective periods they would have applied to the Employee.

3.2. Employment Termination.

(a) If the Employee shall be Terminated, irrespective of whether the Employee receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Company shall have the right, at its option, exercisable by delivery of written notice to the Employee within 90 days (or, in the case of a Termination by reason of death, permanent disability or adjudicated incompetency, 180 days) following the date of Termination (the date of delivery of such written notice being referred to herein as the "Election Date"), to purchase all or any portion of the Unvested Shares held by the Employee as of the date or such Termination. If the Employee shall be Terminated by the Company without Cause or by reason of death, permanent disability or adjudicated incompetency, irrespective of whether the Employee

8

receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Employee shall have the right, at its option, exercisable by delivery of written notice to the Company within 90 days (or, in the case of a Termination by reason of death, permanent disability or adjudicated incompetency, 180 days) following the date of Termination (the date of delivery of such written notice being referred to herein as the "Put Date"), to require the Company to purchase all, but not less than all, of the Unvested Shares held by the Employee as of the date of such Termination; provided that within 5 business days of being notified by the Company of the purchase price per share of the shares of Class B Common Stock subject to repurchase pursuant to this sentence, if such purchase price per share is less than the Purchase Price, the Employee shall have the option to withdraw such notice but shall not have the option to redeliver any such notice thereafter.  The purchase price per share of the shares of Class B Common Stock purchased pursuant to this Section 3.2(a) shall be equal to the lower of (i) Purchase Price, adjusted to reflect any Capital Transaction between the Closing Date and the Election Date or Put Date, as the case may be, and (ii) the Fair Value as of the date of such Termination.

(b) (i) If the Employee shall be Terminated by reason of death, permanent disability or adjudicated incompetency, irrespective of whether the Employee receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Employee shall have the right, at its option, exercisable by delivery of written notice to the Company within 180 days following the date of Termination (the date of delivery of such written notice being referred to herein as the "Section 3.2(b)(i) Notice Date"), to require the Company to purchase all, but not less than all, of the Vested Shares held by the Employee as of the date of such Termination; provided that within 5 business days of being notified by the Company of the purchase price per share of the shares of Class B Common Stock subject to repurchase pursuant to this Section 3.2(b)(i), the Employee shall have the option to withdraw such notice but shall not have the option to redeliver any such notice thereafter.  The purchase price per share of the shares of Class B Common Stock purchased pursuant to this Section 3.2(b)(i) shall be equal to the Fair Value as of the date of such Termination.

(ii)    If the Employee shall be Terminated by the Company without Cause (other than by reason of death, permanent disability or adjudicated incompetency), irrespective of whether the Employee receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Employee shall have the right, at its option, exercisable by delivery of written notice to the Company within 90 days following the date of Termination (the date of delivery of such written notice being referred to herein as the "Section 3.2(b)(ii) Notice Date"), to require the Company to purchase all, but not less than all, of the Vested Shares held by the Employee as of the date of such Termination; provided that within 5 business days of being notified by the Company of the purchase price per share of the shares of Class B Common Stock subject to repurchase pursuant to this Section 3.2(b)(ii), the Employee shall have the option to withdraw such notice but shall not have the option to redeliver any such notice thereafter.  The purchase price per share of the shares of Class B Common Stock purchased pursuant to this

9

Section 3.2(b)(ii) shall be equal to the Fair Value as of the date of such Termination.

(iii)     If the Employee shall be Terminated other than by the Company (or by reason of death, permanent disability or adjudicated incompetency) or if the Employee shall be Terminated by the Company for Cause, the Employee shall have no right to require the Company to purchase any Vested Shares.

(c) All shares of Class B Common Stock held by any Employee that the Company does not elect to purchase, or that the Employee does not require the Company to purchase, pursuant to the provisions of Section 3.2(a) or 3.2(b) shall continue to be subject to the provisions of this Agreement (including, without limitation, Sections 3.3, 3.4 and 3.5 and Article 4 hereof).

(d) Subject to Sections 3.2(e) and 3.2(f) hereof, the closing (the "Closing") of any purchase of shares of Class B Common Stock pursuant to Section 3.2(a) or 3.2(b) hereof (the "Purchased Shares") shall take place at the principal office of the Company on the later of (i) 10 days after the Election Date, the Put Date or the Section 3.2(b)(ii) Notice Date, as the case may be, (ii) (if applicable) 30 days after the Section 3.2(b)(i) Notice Date and (iii) (if applicable) 10 days after the appointment of a Legal Representative (such later date, the "Scheduled Closing Date"). At the Closing, the Employee shall sell, convey, transfer, assign and deliver to the Company all right, title and interest in and to the Purchased Shares, which shall constitute (and, at the Closing, the Employee shall certify the same to the Company in writing) good and unencumbered title to such shares, free and clear of all liens, security interests, encumbrances and adverse claims of any kind and nature (other than those in favor of the Company and the FL & Co. Companies pursuant to this Agreement), and shall deliver to the Company a certificate representing the shares duly endorsed for transfer, or accompanied by appropriate stock transfer powers duly executed, and with all necessary transfer tax stamps affixed thereto at the expense of the Employee, and the Company shall deliver to the Employee, in full payment of the purchase price for the Purchased Shares, either a wire transfer to an account designated by the Employee or a cashier's, certified or official bank check payable to the order of the Employee (the method of payment to be at the option of the Company), in the amount equal to the Purchase Price (adjusted as described in Section 3.2(a), if applicable) or the Fair Value, as the case may be, multiplied by the number of Purchased Shares. Notwithstanding anything herein to the contrary, from and after the Election Date, the Put Date, the Section 3.2(b)(i) Notice Date or the Section 3.2(b)(ii) Notice Date, as the case may be, the Employee shall not have any rights with respect to any of the Purchased Shares (including any rights pursuant to Sections 3.3 and 3.4 hereof), except to receive the purchase price therefor.

(e) Notwithstanding the provisions of Section 3.2(d) hereof, if the Company exercises its option to purchase, or the Employee requires the Company to purchase, shares of Class B Common Stock pursuant to Section 3.2(a) or 3.2(b) hereof, but the Company is prohibited from effecting the Closing on the Scheduled Closing Date by any contractual obligation of the Company or any of its Affiliates (including any restriction in any agreement or arrangement with any lender) or by applicable law, then the Closing shall take place on the first practicable date on which the Company is permitted to purchase such shares, and, at the Closing, the Company shall pay to the Employee interest on the unpaid purchase price from and including

10

the Scheduled Closing Date to, but not including, the date of the Closing, at the Prime Rate.  If at any time the prohibition shall cease to be applicable to any portion of the shares not purchased, then the Company shall purchase such portion on the first practicable date on which the Company is permitted to do so.  The Company shall not declare or pay any dividend of cash or cash equivalents, or purchase any shares of Class A Common Stock or Class B Common Stock for cash or cash equivalents, until the purchase price for all of the Purchased Shares has been paid in full.

       (f)  Notwithstanding anything to the contrary contained in this Section 3.2, if at any time prior to any Scheduled Closing Date under this Section 3.2 the Company shall become entitled to purchase any shares of Class B Common Stock, then held by an Employee, pursuant to Section 4.2 hereof, the Company shall be relieved of any of its obligations under Section 3.2 to purchase such shares and the Company's rights to purchase such shares shall be governed by Section 4.2.

       3.3. Participation in Sale of Class A Common Stock.  The Employee, at the Employee's option, may participate proportionately (and the FL & Co. Companies shall allow the Employee to participate proportionately) in any sale (other than a public offering which shall be governed by Section 3.4 hereof) of all or a portion of the shares of Class A Common Stock owned by either of the FL & Co. Companies to any Third Party by (a) exchanging the same percentage of the Employee's shares of Class B Common Stock as the FL & Co. Companies propose to sell of their shares of Class A Common Stock to the Third Party (determined on the basis of the aggregate number of such shares of Class A Common Stock owned, and the aggregate number of such shares being sold by, the FL & Co. Companies) for shares of Class A Common Stock in accordance with the Exchange Rate, as defined in Subsection 4(d)(i) of Section A of Article Fourth of the Certificate of Incorporation (the "Exchange Rate"), and (b) selling the Class A Common Stock received in such exchange to the Third Party.  The Company shall notify the Employee in writing of the FL & Co. Companies' intention to effect such a sale to a Third Party, the identity of the Third Party and the nature and purchase amount of consideration to be paid by the Third Party, and shall set forth its calculation of the Exchange Rate, at least 10 days, or such shorter time as the Company deems practicable, before the closing of any such proposed sale of shares of Class A Common Stock.  Schedule I attached hereto sets forth an example illustrating the calculation of the Exchange Rate.  Any sale of shares of Class A Common Stock by the Employee pursuant to this Section 3.3 shall be for the same consideration per share, on the same terms and subject to the same conditions as the sale of shares of Class A Common Stock owned by the FL & Co. Companies, provided that the Employee shall not be required to make representations to such Third Party that are solely related to the business of the Company.  The Company shall, immediately prior to, and contingent upon, the consummation of such sale, exchange such shares of Class B Common Stock for Class A Common Stock in accordance with the Exchange Rate.  If the Employee sells any shares pursuant to this Section 3.3, the Employee shall pay and be responsible for the Employee's proportionate share of the Expenses of Sale and the Sale Obligations; provided that all such Expenses of Sale and Sale Obligations for which the Employee shall be responsible shall be withheld from and shall not, in the aggregate, exceed the net consideration otherwise payable to the Employee in connection with such sale.

3.4.<u>Participation in Public Offering of Class A Common Stock.</u>

(a) Subject to the provisions of the Certificate of Incorporation (including, without limitation, Section A.4 of Article Fourth thereof), if the FL & Co. Companies propose to sell all or any portion of the shares of Class A Common Stock owned by the FL & Co. Companies in a public offering, the Employee shall be entitled, and shall be required as determined by the Board of Directors of the Company in its sole discretion, to participate in such public offering by (i) exchanging the same percentage of the Employee's shares of Class B Common Stock as the FL & Co. Companies propose to sell of their shares of Class A Common Stock in the public offering (determined on the basis of the aggregate number of shares of Class A Common Stock owned, and the aggregate number of such shares being sold, by the FL & Co Companies in the public offering, regardless of the amount specified in any registration statement or prospectus dated prior to the date of the public offering), and (ii) selling in the public offering the Class A Common Stock received in such exchange. The Company shall notify the Employee in writing of the FL & Co. Companies' intention to effect such public offering at least 10 days, or such shorter time as the Company deems practicable, before the filing with the Securities and Exchange Commission of the registration statement relating to such public offering (the "Section 3.4 Notice") and shall cause the Employee's shares to be sold in such public offering to be included therein. The Section 3.4 Notice shall indicate whether or not the Board of Directors of the Company has determined that the Employee shall be required to participate in the public offering. If the Board of Directors of the Company does not require the Employee to participate in the public offering and the Employee wishes to participate in such public offering, the Employee shall notify the Company in writing within five days after receipt of the Section 3.4 Notice of his or her intention to participate in such public offering, including the number of shares with respect to which he or she will so participate. Any failure by the Employee to so notify the Company within such five-day period shall be deemed an election by the Employee not to participate in such public offering with respect to any of his or her shares. If the Employee sells any shares pursuant to this Section 3.4, the Employee shall pay and be responsible for the Employee's proportionate share of the Expenses of Sale and the Sale Obligations (including indemnifying the underwriters of such public offering, but only with respect to written information furnished by the Employee expressly for use in the registration statement (or any amendment thereto), including any information statement, preliminary prospectus or final prospectus (or any amendment or supplement thereto)); provided that in no event shall the Employee be required to pay any such Expenses of Sale or Sale Obligations which, in the aggregate, exceed the net proceeds to be received by the Employee in connection with such sale.

(b) In connection with any proposed public offering of securities of the Company, whether by any of the FL & Co. Companies or the Company or otherwise, the Employee agrees (i) to supply any information reasonably requested by the Company in connection with the preparation of a registration statement and/or any other documents relating to such public offering, and (ii) to execute and deliver any agreements and instruments reasonably requested by the Company to effectuate such public offering, including, without limitation, an underwriting agreement, a custody agreement and a "lock up" or "hold back" agreement pursuant to which the Employee will agree not to sell or purchase any securities of the Company (whether or not such securities are otherwise governed by this Agreement) for the same period of time following the public offering as is agreed to by the FL & Co. Companies

12

with respect to themselves. If the Company requests that the Employee take any of the actions referred to in clause (i) or (ii) of the previous sentence, the Employee shall take such action promptly but in any event within five days following the date of such request.

3.5. Required Participation in Sale of Class A Common Stock by the FL & Co. Companies. Notwithstanding any other provision of this Agreement to the contrary, if the FL & Co. Companies shall propose to sell (including by exchange, in a business combination or otherwise) all or any portion of their shares of Class A Common Stock in a bona fide arm's-length transaction, the FL & Co Companies, at their option, may require that (x) the Employee exchange the same percentage of the Employee's shares of Class B Common Stock as the FL & Co. Companies propose to sell of their shares of Class A Common Stock in the transaction (determined on the basis of the aggregate number of shares of Class A Common Stock owned, and the aggregate number of such shares being sold, by the FL & Co. Companies) for shares of Class A Common Stock in accordance with the Exchange Rate, and (y) sell all the Class A Common Stock received in such exchange for the same consideration per share, on the same terms and subject to the same conditions in the same transaction and, if stockholder approval of the transaction is required and the Employee is entitled to vote thereon, that the Employee vote the Employee's shares in favor thereof. The Company shall calculate the Exchange Rate and shall, immediately prior to, and contingent upon, the consummation of the transaction exchange such shares of Class B Common Stock for Class A Common Stock in accordance with the Exchange Rate. If the Employee sells any shares pursuant to this Section 3.5, the Employee shall pay and be responsible for the Employee's proportionate share of the Expenses of Sale and the Sale Obligations; provided that all such Expenses of Sale and Sale Obligations for which the Employee shall be responsible shall be withheld from and shall not, in the aggregate, exceed the net consideration otherwise payable to the Employee in connection with such sale.

3.6. Termination of Restrictions and Rights. Notwithstanding any other provision of this Agreement to the contrary, but subject to the restrictions of all applicable federal and state securities laws, including the restrictions in this Agreement relating thereto, from and after the Release Date any and all shares of Class B Common Stock owned by the Employee (a) may be sold, transferred, assigned, exchanged, pledged, encumbered or otherwise disposed of (and the Employee may grant any option or right to purchase such shares or any legal or beneficial interest therein, or may continue to hold such shares), free of the restrictions contained in this Agreement and (b) shall no longer be entitled to any of the rights contained in this Agreement. Without limiting the generality of the foregoing, from and after the Release Date, the provisions of Articles 3 and 4 hereof (other than this Section 3.6 and Sections 4.1(a), 4.1(b) and 4.1(c) hereof) shall terminate and have no further force or effect. This provision shall not relieve the Employee from any restrictions imposed by law or by any other agreement or arrangement.

4.    Prohibited Activities.

4.1. Prohibition Against Certain Activities. The Employee agrees that (a) the Employee will not at any time during the Employee's employment (other than in the course of such employment) with the Company or any Affiliate thereof, or after a Termination, disclose or furnish to any other Person or use for the Employee's own or any other Person's account any Confidential or Proprietary Information unless required to do so by law or judicial process, (b) if the Employee is Terminated, the Employee will not for three years following such Termination

hire or employ, or directly or indirectly solicit for employment, including without limitation recommending to any subsequent employer the solicitation for employment of, any employee of the Company or any Affiliate thereof, (c) the Employee will not at any time during the Employee's employment with the Company or any Affiliate thereof or after a Termination publish or make any disparaging statements about the Company, any Affiliate or any of their directors, officers or employees, under circumstances where it is reasonably foreseeable that the statements will be made public and (d) the Employee will not breach the provisions of Section 3.1 hereof (any activity prohibited by clause (a), (b), (c) or (d) of this Section 4.1 being referred to as a "Prohibited Activity"). For purposes of clause (c) of the previous sentence, a disparaging statement is a communication which, if made public, would tend to malign the business or reputation of the Person or entity about whom such statement is made.

4.2. <u>Right to Purchase Shares</u>. The Employee understands and agrees that the Company has granted to the Employee the right to purchase shares of Class B Common Stock to reward the Employee for the Employee's future efforts and loyalty to the Company and its Affiliates by giving the Employee the opportunity to participate in the potential future appreciation of the Company. Accordingly, (a) if the Employee engages in any Prohibited Activity, or (b) if, at any time during the Employee's employment with the Company or any of its Affiliates or during the three years following a Termination, the Employee engages in any Competitive Activity, or (c) if, at any time (whether during the Employee's employment or after any Termination thereof), the Employee is convicted of a felony, then, in addition to any other rights and remedies available to the Company or any of its Affiliates (at law, in equity or under any employment agreement, award agreement or other agreement or arrangement of the Employee), the Company shall be entitled, at its option, exercisable by written notice (the "Repurchase Notice") to the Employee, to purchase all or any portion of the shares of Class B Common Stock then held by the Employee.

4.3. <u>Purchase Price; Closing</u>.

(a) The purchase price per share of the shares of Class B Common Stock purchased pursuant to this Article 4 shall be equal to the lesser of (i) the Purchase Price (adjusted to reflect any Capital Transaction effected after the Closing Date and prior to the date of the Repurchase Notice) and (ii) the Fair Value as of the date of the Repurchase Notice.

(b) The closing of a purchase pursuant to this Section 4.3 shall take place at the principal office of the Company 10 days following the date of the Repurchase Notice (and if such tenth day is not a business day, then the first business day thereafter), except that if the Company is prohibited from repurchasing any shares of Class B Common Stock pursuant to this Article 4 by any contractual obligation of the Company or any of its Affiliates (including any restriction in any agreement or arrangement with any lender) or by applicable law, the closing of such purchase shall take place on the first practicable date on which the Company is permitted to purchase such shares (and the provisions of the last sentence of Section 3.2(e) shall likewise apply to purchases pursuant to this Article 4). At such closing, the Employee shall sell, convey, transfer, assign and deliver to the Company all right, title and interest in and to the shares of Class B Common Stock being purchased by the Company, which shall constitute (and, at the closing, the Employee shall certify the same to the Company in writing) good and unencumbered title to such shares, free and clear of all liens, security interests, encumbrances and adverse

14

claims of any kind and nature (other than those in favor of the Company and the FL & Co. Companies pursuant to this Agreement), and shall deliver to the Company a certificate representing the shares duly endorsed for transfer, or accompanied by appropriate stock transfer powers duly executed, and with all necessary transfer tax stamps affixed thereto at the expense of the Employee, and the Company shall deliver to the Employee, in full payment of the purchase price payable pursuant to this Section 4.3 for the shares of Class B Common Stock purchased, a check payable to the order of the Employee, in the amount of the aggregate purchase price for the shares purchased. Notwithstanding anything herein to the contrary, from and after the date of the Repurchase Notice, the Employee shall not have any rights with respect to any shares of Class B Common Stock which the Employee is required to sell to the Company pursuant to this Article 4 (including any rights pursuant to Section 3.3 or 3.4 hereof), except to receive the purchase price therefor.

4.4. Notwithstanding anything to the contrary set forth in Sections 3.3, 3.4 or 3.5 hereof, if at the time of a Transaction in which the Employee is participating, the Company is entitled to purchase the Employee's shares of Class B Common Stock pursuant to this Article 4, and if the purchase price per share for a purchase pursuant to this Article 4 would be less than the proceeds per share to the Employee from such Transaction, then the Employee shall be entitled to receive only the aggregate purchase price payable under this Article 4, with the balance of the proceeds of sale in the Transaction being remitted to the other stockholders of the Company participating in such Transaction pro rata in accordance with their respective participation in such Transaction.

5.    Stock Certificate Legend and Investment Representations; Other Representations.

5.1. Legend. All certificates representing shares of Class B Common Stock acquired hereunder or hereafter by the Employee (unless registered under the Act) shall bear the following legend:

>"The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended, or any securities regulatory authority of any state, and may not be sold, transferred, assigned, exchanged, pledged, encumbered or otherwise disposed of except in compliance with all applicable securities laws and except in accordance with the provisions of a Stockholder's Agreement with the Company, a copy of which is available for inspection at the offices of the Company."

5.2. Representations and Warranties of the Employee. The Employee represents and warrants that: (a) the Employee understands that (i) the offer and sale of shares of Class B Common Stock in accordance with this Agreement have not been and will not be registered under the Act, and it is the intention of the parties hereto that the offer and sale of the securities be exempt from registration under the Act and the rules promulgated thereunder by the Securities and Exchange Commission; (ii) the reliance of the Company on such exemption is predicated upon such Employee's representations set forth herein; (iii) the shares of Class B Common Stock being acquired hereunder cannot be sold, transferred, assigned, exchanged, pledged, encumbered or otherwise disposed of unless they are registered under the Act or an exemption from

15

registration is available; (iv) the purchase of Class B Common Stock hereunder does not entitle the Employee to participate in any other equity program of the Company, whether now existing or hereafter established; and (v) the Company is relying on the representations contained in this Agreement in engaging in the sale of the Class B Common Stock and would not engage in such sale in the absence of the representations contained in this Agreement; (b) the Employee is acquiring the shares of Class B Common Stock being acquired hereunder for investment for the Employee's own account and not with a view to the distribution thereof; (c) the Employee will not directly or indirectly, sell, transfer, assign, exchange, pledge, encumber or otherwise dispose of any shares of Class B Common Stock being acquired hereunder except in accordance with this Agreement, the Stock Pledge Agreement and applicable law; (d) the Employee has, or the Employee together with the Employee's advisers, if any, have, such knowledge and experience in financial and business matters that the Employee is, or the Employee together with the Employee's advisers, if any, are, and will be capable of evaluating the merits and risks relating to the Employee's purchase of shares of Class B Common Stock under this Agreement; (e) the Employee has been given the opportunity to obtain information and documents relating to the Company and to ask questions of and receive answers from representatives of the Company concerning the Company and the Employee's investment in the Class B Common Stock; (f) the Employee's decision to invest in the Company has been based upon independent investigations made by the Employee and the Employee's advisers, if any; (g) the Employee is able to bear the economic risk of a total loss of the Employee's investment in the Company; (h) the Employee has adequate means of providing for the Employee's current needs and foreseeable personal contingencies and has no need for the Employee's investment in the Class B Common Stock to be liquid; (i) the Employee is an "accredited investor" within the meaning of either Rule 501(a)(5) or (a)(6) promulgated under the Securities Act of 1933, as amended; and (j) this Agreement has been duly executed and delivered by the Employee and constitutes a legal, valid and binding obligation of the Employee, enforceable in accordance with its terms, subject to limitations in bankruptcy and to other equitable limitations.

6.      Miscellaneous.

        6.1. Distributions.  In the event of any dividend, distribution or exchange paid or made in respect of the Class B Common Stock consisting of Affiliate Securities, (a) the restrictions and rights with respect to the Class B Common Stock that are contained in this Agreement shall be applicable to the Affiliate Securities without further action of the parties (with the references to Class B Common Stock being deemed references to the Affiliate Securities and the references to the Company being deemed references to the Affiliate), and (b) as a condition precedent to the receipt of the Affiliate Securities by the Employee, the Employee shall enter into a stockholder's agreement containing terms substantially equivalent to those contained herein with respect to the Affiliate Securities (but reflecting the economics of the dividend, distribution or exchange and the capitalization of the Affiliate).  The Board of Directors of the Company, in good faith, shall determine such terms and its determination shall be final and binding on the Employee.

        6.2. Further Assurances.  Each party hereto shall do and perform or cause to be done and performed all further acts and things and shall execute and deliver all other agreements, certificates, instruments, and documents as any other party hereto reasonably may request in

16

order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

6.3.<u>Governing Law</u>.  This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

6.4.<u>Specific Performance</u>.  The parties hereto acknowledge that there will be no adequate remedy at law for a violation of any of the provisions of this Agreement and that, in addition to any other remedies which may be available, all of the provisions of this Agreement shall be specifically enforceable in accordance with their respective terms.

6.5.<u>Invalidity of Provisions</u>.  The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity or enforceability of the remainder of this Agreement, in that jurisdiction or the validity or enforceability of this Agreement, including that provision, in any other jurisdiction.  If any provision of this Agreement is held unlawful or unenforceable in any respect, such provision shall be revised or applied in a manner that renders it lawful and enforceable to the fullest extent possible.

6.6.<u>Notice</u>.  All notices and other communications hereunder shall be in writing and, unless otherwise provided herein, shall be deemed to have been given when received by the party to whom such notice is to be given at its address set forth below, or such other address for the party as shall be specified by notice given pursuant hereto:

      (a)    If to the Company, to:

      24 Hour Fitness Worldwide, Inc.
      12647 Alcosta Boulevard., Suite 500
      San Ramon, California  94583
      Attention:  Tony Bakos

      with a copy to:

      24 Hour Fitness Worldwide, Inc.
      12647 Alcosta Boulevard., Suite 500
      San Ramon, California  94583
      Attention:  Colin Heggie

      and with a copy (which shall not constitute notice to the Company) to:

      Forstmann Little & Co.
      767 Fifth Avenue, 44th Floor
      New York, New York 10153
      Attention: Geoff McKay

      and with a copy (which shall not constitute notice to the Company) to:

17

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Attention: Andrew E. Nagel

(b)    If to the FL & Co. Companies, to:

Forstmann Little & Co.
767 Fifth Avenue, 44th Floor
New York, New York 10153
Attention: Geoff McKay

with a copy (which shall not constitute notice to the Company) to:

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Attention: Andrew E. Nagel

(c)    If to the Employee, to the address set forth below the Employee's signature, and if to the Legal Representative, to such Person at the address of which the Company is notified in accordance with this Section 6.6.

6.7.Binding Effect.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by the Employee without the prior written consent of the Company and any attempt to do so without such consent shall be void ab initio.  In addition, each of the FL & Co. Companies shall be a third party beneficiary of this Agreement and shall be entitled to enforce this Agreement.

6.8.Amendment and Modification.  This Agreement may be amended, modified or supplemented only by written agreement of the party against whom enforcement of such amendment, modification or supplement is sought.

6.9.Headings; Execution in Counterparts.  The headings and captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision hereof.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and which together shall constitute one and the same instrument.

6.10.   Entire Agreement.  This Agreement constitutes the entire agreement, and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

18

6.11.   <u>Withholding</u>.  The Company shall have the right to deduct from any amount payable under this Agreement any taxes or other amounts required by applicable law to be withheld.  The Employee agrees to indemnify the Company against any Federal, state, local and foreign withholding taxes for which the Company may be liable in connection with the Employee's acquisition, ownership or disposition of any Class B Common Stock or in connection with any election made with respect thereto.

6.12.   <u>No Right to Continued Employment</u>.  This Agreement shall not confer upon the Employee any right with respect to continuance of employment by the Company or any Affiliate thereof, nor shall it interfere in any way with the right of the Company or any Affiliate thereof to terminate the Employee's employment at any time.

6.13.   <u>Possession of Certificates; Power of Attorney</u>.

(a)  In order to provide for the safekeeping of the certificates representing the shares of Class B Common Stock purchased by the Employee pursuant hereto and to facilitate the enforcement of the terms and conditions hereof, at the Purchase Closing (i) the Employee shall redeliver to the Company, and the Company shall retain physical possession of, all certificates representing shares of Class B Common Stock acquired by the Employee pursuant hereto and (ii) the Employee shall deliver to the Company an undated stock power, duly executed in blank, for each such certificate to be used solely to effectuate the transactions described herein.  The Company intends to deposit such certificates and stock powers into an account at a nationally recognized trust company and to designate as sole custodians of such account Thomas H. Lister, Winston Hutchins and/or such other persons as the Company may from time to time determine.  The Employee shall be relieved of any obligation otherwise imposed by this Agreement to deliver certificates representing shares of Class B Common Stock if the same are in the custody of the Company or such persons.  After the Release Date, upon written request by the Employee therefor, the Company shall deliver to the Employee any certificates in its (or such person's) custody representing the Employee's shares of Class B Common Stock.

(b)  The Employee hereby irrevocably appoints the FL & Co. Companies, and each of them (individually and collectively, the "Representative"), the Employee's true and lawful agent and attorney-in-fact, with full powers of substitution, to act in the Employee's name, place and stead, to do or refrain from doing all such acts and things, and to execute and deliver all such documents, as are reasonable and customary in like circumstances and as the Representative shall deem necessary or appropriate, solely to facilitate and effectuate a public offering of securities of the Company or a sale pursuant to Section 3.3, 3.5 or 4.2 hereof, including, without limitation, in the case of a sale pursuant to Section 3.3 or 3.5 hereof, to execute and deliver on behalf of the Employee a purchase and sale agreement and any other agreements and documents that are reasonable and customary in like circumstances and that the Representative deems necessary in connection with any such sale, and in the case of a public offering, to execute and deliver on behalf of the Employee an underwriting agreement, a "lock up" or "hold back" agreement, a custody agreement, and any other agreements and documents that the Representative deems necessary in connection with any such public offering (each to be on terms no less favorable to the Employee than those described in Sections 3.3, 3.4 or 3.5 hereof, as applicable), and in the case of any sale pursuant to Section 3.3 or 3.5 hereof or any

19

public offering pursuant to Section 3.4(a) hereof, to receive on behalf of the Employee the proceeds of the sale or public offering of the Employee's shares, to hold back from any such proceeds any amount that the Representative deems necessary to reserve against the Employee's share of any Expenses of Sale and Sale Obligations and to pay such Expenses of Sale and Sale Obligations. The Employee hereby ratifies and confirms all that the Representative shall do or cause to be done by virtue of its appointment as the Employee's agent and attorney-in-fact. In acting for the Employee pursuant to the appointment set forth in this Section 6.13(b), the Representative shall not be responsible to the Employee for any loss or damage the Employee may suffer by reason of the performance by the Representative of its duties under this Agreement, except for loss or damage arising from willful violation of law or gross negligence by the Representative in the performance of its duties hereunder. The appointment of the Representative shall be deemed coupled with an interest and as such shall be irrevocable and shall survive the death, incompetency, mental illness or insanity of the Employee, and any Person dealing with the Representative may conclusively and absolutely rely, without inquiry, upon any act of the Representative as the act of the Employee in all matters referred to in this Section 6.13(b).

6.14.    Consent to Jurisdiction. Each party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of New York and of the United States of America, in each case located in the County of New York, for any Litigation (and agrees not to commence any Litigation except in any such court), and further agrees that service of process, summons, notice or document by U.S. registered mail to such party's respective address set forth in Section 6.6 hereof shall be effective service of process for any Litigation brought against such party in any such court. Each party hereby irrevocably and unconditionally waives any objection to the laying of any venue of Litigation in the courts of the State of New York or of the United States of America, in each case located in the County of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any Litigation brought in any such court has been brought in an inconvenient forum.

6.15.    Amendment of Certificate of Incorporation. Capitalized terms used in this paragraph but not defined in this Agreement have the meanings given to them in the Certificate of Incorporation. Prior to (i) declaring any dividend or distribution, or consummating any recapitalization, reclassification, reorganization, stock split, spin-off or similar change affecting the capital stock (any of the foregoing, a "Dividend") where the Aggregate Dividend Amount of such Dividend, taken with the Aggregate Dividend Amount of Dividends previously paid, would exceed the Total Capital Amount, (ii) making any payment upon a dissolution, liquidation or winding up of the Company where the sum of the Aggregate Dividend Amount of Dividends previously paid plus the Aggregate Liquidation Amount would exceed the Total Capital Amount, (iii) the consummation of one or more sales of shares of Class A Common Stock by either of the FL & Co. Companies to any Third Party, which sales would, assuming so declared by the Board of Directors of the Company, trigger a right or obligation on the part of holders of Class B Common Stock to exchange their shares of Class B Common Stock for shares of Class A Common Stock under Article Fourth, Section 4 of the Certificate of Incorporation at any time following the payment of any Dividend where the sum of the aggregate sale consideration plus the Aggregate Dividend Amount of such Dividends previously paid would exceed the Total Capital Amount or (iv) the payment of a Dividend where the sum of the Aggregate Dividend

20

Amount of such Dividend plus the Aggregate Dividend Amount of any Dividends previously paid plus the aggregate sale consideration from any sales of shares of Class A Common Stock by either of the FL & Co. Companies to any Third Party, which sales would, assuming so declared by the Board of Directors of the Company, trigger a right or obligation on the part of holders of Class B Common Stock to exchange their shares of Class B Common Stock for shares of Class A Common Stock under Article Fourth, Section 4 of the Certificate of Incorporation, would exceed the Total Capital Amount, the Company shall amend the Certificate of Incorporation (and the FL & Co. Companies will vote in favor of such amendment) to provide that holders of Class B Common Stock shall receive in respect of such Dividend, liquidation payment or sale an amount equal to (i) the amount they would have received in a partial or complete sale of the Common Stock to an unaffiliated entity under Article Fourth, Section 4 of the Certificate of Incorporation as if the consideration received in such a sale was equal to the sum of (A) the Aggregate Dividend Amount of all Dividends previously paid plus (B) the amount of such Dividend, liquidation payment or aggregate sale consideration, minus (ii) the Aggregate Dividend Amount of all Dividends previously paid on the Class B Common Stock.  Schedule II attached hereto sets forth an example illustrating the calculation of such payment.

21

IN WITNESS WHEREOF, this Agreement has been signed by or on behalf of each of the parties hereto, all as of the date first above written.

24 HOUR FITNESS WORLDWIDE, INC.

By: _____

    Name: MARK S. MASTROV

    Title: CEO


EMPLOYEE

_____

Name:  Michael William Sheehan

Address:  45 MARISOL

         NEWPORT COAST, CA. 92657

The undersigned hereby agree to be bound by the provisions of Sections 3.3 and 3.4 of the foregoing Stockholder's Agreement.

FORSTMANN LITTLE & CO. EQUITY
PARTNERSHIP-VII, L.P.

By:   FLC XXXII Partnership, L.P.
      its general partner

By:   _____
      Thomas H. Lister,
      a general partner

FORSTMANN LITTLE & CO. SUBORDINATED
DEBT AND EQUITY MANAGEMENT
BUYOUT PARTNERSHIP-VIII, L.P.

By:   FLC XXXIII Partnership, L.P.
      its general partner

By:   _____
      Thomas H. Lister,
      a general partner

The undersigned acknowledges that the undersigned has read the foregoing Agreement between 24 Hour Fitness Worldwide, Inc. and the undersigned's spouse, understands that the undersigned's spouse has purchased shares of Class B Common Stock as reflected in such Agreement. and agrees to be bound by the foregoing Agreement.

Employee's Spouse

**Schedule I**

Assume:  1) The Company has a fair market value of $1,500,000,000. There is no assurance that the Company will have such a fair market value.

2) 32,994,439 shares of Class A Common Stock and 3,065,057 shares of Class B Common Stock outstanding at the time of distribution.

3) The initial price of a share of Class A Common Stock is $15.154068 and the initial price of a share of Class B Common Stock is $5.051356.

Any terms not otherwise defined in this Schedule I are defined in the "Summary of Restated Certificate of Incorporation and Stockholder's Agreement" distributed with this Stockholder's Agreement.

<u>Step 1</u>

<u>Determine $ total for Class B</u>

  (a) <u>Determine Class B Capital Amount</u>:

      Number of outstanding shares of Class B Common Stock x Class B Price per Share:

$$3,065,057 \times \$5.051356 = \$15,482,694$$

  (b) <u>Determine Class B Appreciation Amount</u>:

      Divide (1) the excess of the fair market value of the Company over the Total Capital Amount by (2) the number of shares of Common Stock outstanding on the date the Company is valued and (3) multiply by the Total Class B Shares.

$$((\$1,500,000,000 - \$515,482,666) / 36,059,496) \times 3,065,057 = \$83,683,969$$

  (c) <u>Determine Adjusted Notch Amount</u>:

      The lesser of:

              (x) the Class B Appreciation Amount OR

              (y) the product of $2.525678 and the Total Class B Shares

      The lesser of (x) $83,683,969 and (y) $7,741,347 = $7,741,347

  (d) <u>Total for Class B</u>:

      Add Class B Capital Amount and Class B Appreciation Amount and subtract Adjusted Notch Amount.

$$\$15,482,694 + \$83,683,969 - \$7,741,347 = \underline{\$91,425,316}$$

Step 2

Determine $ total for Class A

    (e) Determine Class A Capital Amount:

        Number of outstanding shares of Class A Common Stock x Class A Price per Share:

$$32,994,439 \times \$15.154068 = \$499,999,972$$

    (f) Determine Class A Appreciation Amount:

        Divide (1) the excess of the fair market value of the Company over the Total Capital Amount by (2) the number of shares of Common Stock outstanding on the date the Company is valued and multiply by (3) the Total Class A Shares.

$$((\$1,500,000,000 - \$515,482,666) / 36,059,496) \times 32,994,439 = \$900,833,365$$

    (g) Determine Adjusted Notch Amount:

        $7,741,347 (see Step 1, part (c) above):

    (h) Total for Class A:

        Add Class A Capital Amount, Class A Appreciation Amount and Adjusted Notch Amount.

$$\$499,999,972 + \$900,833,365 + \$7,741,347 = \underline{\$1,408,574,684}$$

Step 3

    x = $ total for Class B divided by 3,065,057        $29.828

Step 4

    y = $ total for Class A divided by 32,994,439        $42.691

Step 5

    Exchange Rate = x/y or <u>0.699</u> of a share of Class A Common Stock for each share of Class B Common Stock.

## Schedule II

**Assumptions**

| | | | |
|---|---|---|---|
| Company Equity Value | $ 1,500,000,000 | Total Capital | $ 515,482,666 |
| | | | |
| Class A shares | 32,994,439 | Notch per share | $ 2.525678 |
| Class A price | $ 15.154068 | Adjusted Notch Amount | $ 7,741,347 |
| Class A capital | $ 499,999,972 | Notch Threshold Point | $ 606,557,342 |
| Class A Ownership as converted | 91.5% | | |
| | | | |
| Class B shares | 3,065,057 | | |
| Class B price | $ 5,051356 | | |
| Class B capital | $ 15,482,694 | | |
| Class B Ownership as converted | 8.5% | | |

**Dividend of $100,000,000, followed by later sale of the Company for $1,400,000,000 equity value**

| | A Stock | B Stock | Total | Cumulative |
|---|---|---|---|---|
| Dividend - Return of Class A Capital Amount and Class B Capital Amount | $ 96,996,467 | $ 3,003,533 | $ 100,000,000 | $ 100,000,000 |
| Return of Capital Amounts | 403,003,506 | 12,479,161 | 415,482,666 | 515,482,666 |
| Class A Holders recover Adjusted Notch Amount | | | | |
| Class A Returns | 83,333,329 | - | 83,333,329 | |
| Notch Recovery | 7,741,347 | - | 7,741,347 | 606,557,342 |
| Remainder divided on basis of percentage of outstanding shares owned | 817,500,036 | 75,942,622 | 893,442,658 | 1,500,000,000 |
| Total proceeds from dividend and sale | $ 1,408,574,684 | $ 91,425,316 | 1,500,000,000 | |

II-1

## ANNEX A

| Employee | Number of Shares |
|---|---|
| Michael William Sheehan | 197,967 |

Cash Amount:    $750,001.79

Note Amount:    $250,000

Based on a Purchase Price of $5.051356 per share of Class B Common Stock

# Exhibit

# B

1 | REX DARRELL BERRY, State Bar No. 110219
2 | SCOTT M. PLAMONDON, State Bar No. 212294
BERRY & BLOCK LLP
3 | 2150 River Plaza Drive, Suite 415
Sacramento, CA 95833
4 | (916) 564-2000
(916) 564-2024 FAX

FILED

2008 JUL -1 P 2: 01

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.

BY: _____
D. Wagner, Deputy Clerk

5
6 | Attorneys for Plaintiffs
24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS
7 | WORLDWIDE, INC.

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **COUNTY OF CONTRA COSTA**

10

11 | 24 HOUR FITNESS USA, INC. and 24     ) Case No.  C-08-01663
HOUR FITNESS WORLDWIDE, INC.         )
12 |                                      )
           Plaintiffs,                  ) **PLAINTIFFS' APPLICATION FOR AN**
13 |                                      ) **ORDER TO SHOW CAUSE AND**
      v.                                ) **TEMPORARY RESTRAINING**
14 |                                      ) **ORDER/PRELIMINARY INJUNCTION**
MICHAEL SHEEHAN and DOES 1-100,      )
15 | inclusive,                           ) Date: June 27, 2008
                                       ) Time: 1:30 p.m.
16 |        Defendants.                   ) Dept.: 60
                                       )
17 | _____

18 | TO DEFENDANT MICHAEL SHEEHAN:

19 |        Plaintiffs 24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS WORLDWIDE,

20 | INC. ( collectively "24 Hour Fitness") hereby apply for a temporary restraining order and for an

21 | order requiring Defendant MICHAEL SHEEHAN ("SHEEHAN") to show cause why a

22 | preliminary injunction should not issue pending trial in this action enjoining SHEEHAN from

23 | the following actions:

24 | 1.     Assuming the position of Chief Executive Officer with Bally Total Fitness Holding

25 | Corporation, or any related Bally entity ("Bally"), in breach of the terms of his March 31, 2003

26 | Employment Agreement with 24 Hour Fitness USA, Inc. and September 30, 2005 Stockholder's

27 | Agreement with 24 Hour Fitness Worldwide, Inc.;

28

---

1

**PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION
AGAINST DEFENDANT, MICHAEL SHEEHAN**

1    2.      Competing with 24 Hour Fitness in violation of terms of his March 31, 2003

2    Employment Agreement with 24 Hour Fitness USA, Inc. and September 30, 2005 Stockholder's

3    Agreement with 24 Hour Fitness Worldwide, Inc.;

4    3.      Directly or indirectly recruiting, soliciting, inducing or encouraging any employee of 24

5    Hour Fitness to become an employee of Bally, or to directly or indirectly encourage any

6    independent contractor or vendor of 24 Hour Fitness to terminate a contracting or vending

7    relationship with 24 Hour Fitness;

8    4.      Directly or indirectly owning an interest in, operating, joining, beginning, controlling,

9    advising, consulting with, rendering services to, or otherwise participating in or working for or

10    on behalf of Bally;

11    5.      Using, disclosing or disseminating to Bally any of 24 Hour Fitness' Confidential and

12    Proprietary Information and/or any work product created in connection with his employment by

13    24 Hour Fitness; or

14    6.      Using in any manner 24 Hour Fitness' trade secret information.

15         This application is made pursuant to the provisions of Code of Civil Procedure section

16    527 on the grounds that SHEEHAN has repudiated and/or breached his March 31, 2003

17    Employment Agreement with 24 Hour Fitness USA, Inc. and September 30, 2005 Stockholder's

18    Agreement with 24 Hour Fitness Worldwide, Inc., or has stated his intention to do so, and

19    threatened the misuse of 24 Hour Fitness' confidential and proprietary information and trade

20    secrets, by commencing employment in the position of Chief Executive Officer with Bally,

21    effective July 1, 2008.

22         This application is based upon the Memorandum of Points and Authorities in Support,

23    the Declarations of Carl Liebert and Rex Darrell Berry and exhibits thereto, all the pleadings,

24    orders and files in this action, and such other and further evidence as may be presented at

25    hearing.

26         Pursuant to Local Rule 7.C, the Court may make a tentative ruling on the merits of this

27    matter by 1:30 p.m. on the court day prior to the hearing. To receive the tentative ruling, access

28    the court's website at www.cc-courts.org or call 925-957-5799. The tentative ruling shall

**PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION
AGAINST DEFENDANT, MICHAEL SHEEHAN**

1    become the ruling of the court, unless a party desiring to be heard so advises the clerk of the

2    designated department no later than 4:00 p.m. on the court day preceding the hearing, and

3    further advises the clerk that such party has notified the other side of its intention to appear.

4

5    DATED:  June 26, 2008                    BERRY & BLOCK LLP

6

7                                            By_____

8                                               REX DARRELL BERRY
                                                SCOTT M. PLAMONDON
9                                               Attorneys for Plaintiffs
                                                24 HOUR FITNESS USA INC., and 24
10                                              HOUR FITNESS WORLDWIDE, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINITIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION
AGAINST DEFENDANT, MICHAEL SHEEHAN

Exhibit

C

1   REX DARRELL BERRY (SBN) 110219)
    SCOTT M. PLAMONDON (SBN 212294)
2   BERRY & BLOCK LLP
    2150 River Plaza Drive, Suite 415
3   Sacramento, CA  95833
    (916) 564-2000
4   (916) 564-2024 FAX

5

6   Attorneys for Plaintiffs
    24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS
7   WORLDWIDE, INC.

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF CONTRA COSTA

10

11  24 HOUR FITNESS USA, INC. and 24     ) Case No.  C 08- 01663
    HOUR FITNESS WORLDWIDE, INC.,        )
                                         )
12          Plaintiff,                   ) **MEMORANDUM OF POINTS AND**
                                         ) **AUTHORITIES IN SUPPORT OF**
13  v.                                   ) **APPLICATION FOR ORDER TO**
                                         ) **SHOW CAUSE AND TEMPORARY**
14  MICHAEL SHEEHAN and DOES 1-100,      ) **RESTRAINING ORDER RE:**
    inclusive,                           ) **PRELIMINARY INJUNCTION**
15                                       ) **PURSUANT TO C.C.P. §§ 526, 527 and**
            Defendants.                  ) **BUS. & PROF. CODE § 17203**
16                                       )
                                         ) Date:  June 27, 2008
17                                       ) Time:  1:30 p.m.
                                         ) Dept.:  60
18  _____

19

20

21

22

23

24

25

26

27

28

---

                                         1

1

## **Table of Contents**

2    I. INTRODUCTION ........................................................................................................ 4

3    II.  FACTS ..................................................................................................................... 5

4    III.  ARGUMENT ........................................................................................................... 9

5        A.  The Standard for Issuing a Restraining Order. ................................................. 9

6        B.  24 HOUR FITNESS will be Irreparably Harmed if SHEEHAN is not Enjoined from

7    Becoming Bally's CEO. ................................................................................................ 10

8        C.  24 HOUR FITNESS Can Demonstrate a Strong Likelihood of Success on the Merits... 11

9            1.  SHEEHAN is party to an enforceable covenant not to compete. ................................. 11

10           2.  SHEEHAN has repudiated and/or breached his Confidential Information Agreement

11   and Violated the Uniform Trade Secrets Act. ................................................................. 12

12           3.  SHEEHAN'S Unlawful Actions Constitute Unfair Competition. ............................... 13

13   IV.  CONCLUSION ...................................................................................................... 14

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ORDER TO SHOW CAUSE AND TEMPORARY**
**RESTRAINING ORDER RE: PRELIMINARY INJUNCTION PURSUANT TO C.C.P. §§ 526, 527 and BUS. & PROF. CODE § 17203**

1

## <u>Table of Authorities</u>

2

**Cases**

3

*Alliant Insurance Services, Inc. v. Gaddy* (2008) 159 Cal.App 4th 1292 ...................................... 9

4

*Courtesy Temporary Service, Inc. v. Leonel Camacho, et al.,*(1990) 222 Cal.App.3d 1278 ....... 14

5

*Forde v. Bank of Finance* (1982) 136 Cal.App.3d 38 ................................................................... 9

6

*Hilb, Rogal and Hamilton Insurance Services of Orange County, Inc. v. Robb* (1995) 33

7

    Cal.App. 4th 1812 ............................................................................................................. 12

8

*Monogram Industries, Inc. v. Sar Industries, Inc.*(1976)  64 Cal.App.3d 692............................. 9

9

*National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.,* (1982) 532 F.Supp.

10

    651 ............................................................................................................................... 10

11

*Pillsbury, Madison & Sutro v. Schectman* (1997) 55 Cal.App.4th 1279 ....................................... 9

12

*Podolsky, et al. v. First Healthcare Corporation* (1996) 50 Cal.App.4th 632............................ 14

13

*Readylink Healthcare v. Jerome Cotton* (2005) 126 Cal.App.4th 1006 ........................................ 9

14

*Summit Technology, Inc. v. High-Line Medical Instruments, Co.* (1996) 933 F.Supp. 918 ........ 14

15

*U. C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore* (1984) 154

16

    Cal.App.3d 1157................................................................................................................... 11

17

*Whyte v. Schlage* (2002) 101 Cal. App. 4th 1443 ....................................................................... 13

18

**Statutes**

19

Cal. Bus. & Prof. Code section 16601 ........................................................................................ 11

20

Cal. Bus. & Prof. Code section 17203 ........................................................................................ 10

21

Cal. Civ. Code § 3426.1(b)(1), (2) ............................................................................................. 13

22

Cal. Code Civ. Proc. section 527(a) .............................................................................................. 9

23

California Civil Code section 3426.1(d) ..................................................................................... 12

24

25

26

27

28

3

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ORDER TO SHOW CAUSE AND TEMPORARY**
**RESTRAINING ORDER RE: PRELIMINARY INJUNCTION PURSUANT TO C.C.P. §§ 526, 527 and BUS. & PROF. CODE § 17203**

### I. INTRODUCTION

Plaintiffs 24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS WORLDWIDE, INC. (collectively "24 HOUR FITNESS"), come before this Court seeking a temporary restraining order and preliminary injunction compelling Defendant MICHAEL SHEEHAN ("SHEEHAN"), to honor the terms of two express written agreements in which he covenanted not to compete with 24 HOUR FITNESS, and agreed not to misappropriate 24 HOUR FITNESS' confidential and proprietary information and trade secrets. Actions that SHEEHAN has already taken demonstrate his intent to breach those agreements by leaving without notice, his position as Chief Operating Officer for 24 HOUR FITNESS, and assuming, effective July 1, 2008, the position of Chief Executive Officer with Bally Total Fitness Holding Corporation ("Bally"), a direct and substantial competitor of 24 HOUR FITNESS.

A temporary restraining order and preliminary injunction precluding SHEEHAN from taking the CEO position with Bally is necessary to prevent grave and irreparable harm to 24 HOUR FITNESS. SHEEHAN has extensive, broad, and deep knowledge of virtually every aspect of 24 HOUR FITNESS' business operations, plans, and strategies. Bally clearly wants to hire SHEEHAN to exploit his knowledge of 24 HOUR FITNESS' confidential information. Bally's own press release emphasizes that it values SHEEHAN's "ideal blend of experience, leadership skills, creativity and commitment to health and fitness" and SHEEHAN's "comprehensive experience in the fitness industry." In fact, SHEEHAN's "comprehensive experience in the fitness industry" was gained solely through his employment with 24 HOUR FITNESS, is a synonym for the confidential and proprietary information and trade secrets that SHEEHAN would take with him from 24 HOUR FITNESS to Bally. In other words, the only reasonable way to interpret Bally's statement is that Bally plans to use the confidential and proprietary information that SHEEHAN gained during nearly eight years that he worked at 24 HOUR FITNESS. Given SHEEHAN's refusal to honor the terms of his agreements, and threat to misappropriate trade secrets, a temporary restraining order and preliminary injunction are the only avenues available to 24 HOUR FITNESS to protect its legitimate business interests.

## II.  FACTS

Until this week, Defendant SHEEHAN was 24 HOUR FITNESS' Chief Operating Officer ("COO").  On June 23, 2008 SHEEHAN announced without notice his intention to leave 24 HOUR FITNESS immediately in order to take the position of CEO with Bally, effective July 1, 2008.  (Declaration of Carl Liebert in Support of Application for Temporary Restraining Order and Preliminary Injunction ("Liebert Decl."), ¶ 3.)  Bally is one of 24 HOUR FITNESS' largest competitors in terms of revenues produced.  (*Id.*, ¶ 4.)  When SHEEHAN announced his resignation, he stated that he had been in discussions with Bally for several weeks, and had interviewed with Bally's management and every member of Bally's Board of Directors.  (Id., 10.)

24 HOUR FITNESS is the one of the world's largest privately owned and operated fitness center chains.  (*Id.*, ¶ 2).  From its beginnings in 1983, 24 HOUR FITNESS has grown to more than 400 fitness centers worldwide, (*Id.*), and is currently is undergoing rapid growth and expansion.  (*Id.*)  As a leader in the fitness industry, the Company is expanding into new markets and intends to provide new offerings to members and communities across the world.  (*Id.*).  As is explained more below, SHEEHAN's move to Bally puts all of these plans at risk.

Bally is 24 HOUR FITNESS' largest competitor in terms of revenue. (*Id.*, ¶ 4).  Bally states on its website that it is "the largest one only nationwide commercial operator of fitness centers with approximately 400 clubs in the USA, the Caribbean, Mexico, South Korea and China." (*Id.*)

In the conduct of its business, 24 HOUR FITNESS possesses and employs trade secrets, proprietary information and confidential methods and techniques.  (*Id.*, ¶ 5.)  For example, 24 HOUR FITNESS has collected and maintains, at considerable expense, information regarding its market strategies, growth plans, new market developments and strategic plans.  (*Id.*)  In order to maintain its lead in the extremely competitive fitness industry, 24 HOUR FITNESS must maintain the confidentiality of this proprietary information.  (*Id.*)   Any disclosure of this information to a third party, and *especially* to a direct and substantial competitor like Bally, would give that competitor an unfair advantage in competing with 24 HOUR FITNESS.

1    Due to his eight-year tenure at 24 HOUR FITNESS, and due to the fact that as the

2  Company's COO he had intimate involvement in literally every aspect of the Company's

3  operations, SHEEHAN helped develop, and had unfettered access to, 24 HOUR FITNESS'

4  most sensitive proprietary information. This information includes, but is not limited to:

5       • Critical market strategies, including 24 HOUR FITNESS' Three Year Strategic

6         Plan;

7       • Daily Sales Reports

8       • Growth plans for new geographic markets;

9       • Market segment development planning;

10      • Market performance data and market reorganization planning;

11      • Platform expansion planning intended to utilize the internet and other resources

12        to facilitate memberships;

13      • Marketing strategy related to advertising, marketing partnerships and marketing

14        tie-ins with non-traditional media;

15      • Proprietary compensation and personnel data;

16      • Litigation strategy;

17      • Financial Planning Strategies;

18      • Budgeting Strategies;

19      • Proprietary Information on Revenues;

20      • Sales figures relating to all aspects of the 24 HOUR FITNESS' business;

21      • Confidential relationships with key vendors; and

22      • An array of confidential and proprietary information about virtually *every* aspect

23        of 24 HOUR FITNESS' business model and operations strategy.

24   (*Id.*, ¶ 6). Many of these strategies and plans were developed over considerable time

25  through trial-and-error experience in which SHEEHAN was directly involved.

26    During his employment with 24 HOUR FITNESS, SHEEHAN signed an Employment

27  Agreement. That Agreement contains both a Covenant Not to Compete and restrictions on the

28  use of confidential information, the terms of which are as follows:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ORDER TO SHOW CAUSE AND TEMPORARY
RESTRAINING ORDER RE: PRELIMINARY INJUNCTION PURSUANT TO C.C.P. §§ 526, 527 and BUS. & PROF. CODE § 17203**

**Non-Compete and Non-Solicitation.**

**10.1** For a period of two (2) years following the termination of Employee's employment with the Company, Employee agrees not to directly or indirectly recruit, solicit, induce or encourage any employee of the Company to become an employee for any other person or entity; nor to directly or indirectly induce or encourage any independent contractor of the Company to terminate a contracting relationship with the Company.

**10.2** Employee further agrees that during the Employment Term and for a period of two (2) years thereafter, Employee will not directly or indirectly own an interest in, operate, join, begin, control, advise, consult with, render services to or otherwise participate in or work for or on behalf of any entity or individual(s) which operates a fitness club within fifty (50) miles of any of the Company's fitness clubs or which otherwise competes with the business of the Company or the Company's affiliates.

**11.    Confidential Information.** During the Employment Term and thereafter, Employee agrees to hold the Company's confidential and proprietary information in strictest confidence and not to use, disclose or disseminate any of such information except as such disclosure, use or dissemination may be required in connection with Employee's work for the Company or as expressly authorized by the Company in writing. Employee further agrees that any work product created in connection with Employee's work for the Company will be the sole and exclusive property of the Company and hereby assigns to the Company all right, title and interest in all inventions and other intellectual property developed by Employee in working for the Company. . .

(*Id.*, ¶ 7, Ex A.)

In addition, on or about September 30, 2005, SHEEHAN signed a Stockholder's Agreement with 24 HOUR FITNESS through which he was granted ownership shares of 24 HOUR FITNESS' in the form of Class B common stock. In that agreement, SHEEHAN agreed that upon his separation from 24 HOUR FITNESS, the Company could elect to repurchase a portion of his ownership in the Company, and in the case of his engaging in competitive activity, all of his ownership interest in the Company. Under the terms of that Agreement, 24 HOUR FITNESS will tender a repurchase demand to SHEEHAN that will compensate him for

his stock.    The Stockholder's Agreement requires SHEEHAN to refrain from appropriating 24

HOUR FITNESS' Confidential and Proprietary Information and engaging in competitive

activity:

> **4.1  Prohibition Against Certain Activities**.    The Employee agrees that (a) the Employee will not at any time during the Employee's employment (other than in the course of such employment) with the Company or any Affiliate thereof, or after a Termination, disclose or furnish to any other Person or use for the Employee's own or any other Person's account any Confidential or Proprietary Information unless required to do so by law or judicial process, (b) if the Employee is Terminated, the Employee will not for three years following such Termination hire or employ, or directly or indirectly solicit for employment, including without limitation recommending to any subsequent employer the solicitation for employment of, any employee of the Company or any Affiliate thereof . . . .
>
> **4.2    Right to Purchase Shares**.    The Employee understands and agrees that the Company has granted to the Employee the right to purchase shares of Class B Common Stock to reward the Employee for the Employee's future efforts and loyalty to the Company and its Affiliates by giving the Employee the opportunity to participate in the potential future appreciation of the Company.    Accordingly, (a) if the Employee engages in any Prohibited Activity, or (b) if, at any time during the Employee's employment with the Company or any of its Affiliates or during the three years following a Termination, the Employee engages in any Competitive Activity . . . , then, in addition to any other rights and remedies available to the Company or any of its Affiliates (at law, in equity or under any employment agreement, award agreement or other agreement or  arrangement of the Employee), the Company shall be entitled, at its option, exercisable     by written notice (the "Repurchase Notice") to the Employee, to purchase all or any portion of the shares of Class B Common Stock then held by the Employee.

(*Id.*, ¶ 8, Ex B.)

On June 24, 2008, the day after SHEEHAN's resignation, Bally issued a press release

announcing SHEEHAN's hire as its CEO and touting his "comprehensive experience in the

fitness industry" and "ideal blend of experience, leadership skills, creativity and commitment to

health and fitness." (*Id.*, Ex C.)  The press release goes on to quote SHEEHAN as stating that

he is eager to join Bally and "eager to add value to this established brand."  The statements from

Bally and SHEEHAN demonstrate a threat that SHEEHAN intends to use the confidential and

proprietary information obtained by him during his tenure with 24 HOUR FITNESS in his new

CEO position with Bally, in order to directly compete with 24 HOUR FITNESS.  (*Id.*)

24 HOUR FITNESS attempted to resolve this matter on June 24, 2008 by sending letters

to SHEEHAN and Bally requesting that SHEEHAN not assume the position of CEO with Bally

1   in violation of his contractual commitments, state statutes, and the common law.  To date,

2   neither SHEEHAN nor Bally has responded.  (*Id.*, ¶ 12, Ex D.)

3                              **III.  ARGUMENT**

4   **A.       The Standard for Issuing a Restraining Order.**

5            Provisional relief like a preliminary injunction may be granted at any time before

6   judgment.  *See* Cal. Code Civ. Proc. section 527(a).  In determining whether to grant an

7   application for a preliminary injunction, a court must consider (1) the relative hardships of the

8   parties resulting from granting or not granting the application; and (2) the likelihood that the

9   moving party will prevail at trial on the merits.  *See Forde v. Bank of Finance* (1982) 136

10  Cal.App.3d 38, 42;  *Alliant Insurance Services, Inc. v. Gaddy* (2008) 159 Cal.App 4th 1292,

11  1299 (same).

12           A threat to engage in competitive activity in violation of an agreement not to compete

13  warrants the imposition of injunctive relief.  *See Monogram Industries, Inc. v. Sar Industries,*

14  *Inc.*(1976)  64 Cal.App.3d 692, 701.  Likewise, a former employee's use of trade secrets and

15  confidential customer information to compete warrants the imposition of an injunction.  *See*

16  *Readylink Healthcare v. Jerome Cotton* (2005) 126 Cal.App.4[th] 1006, 1018 ("The court may

17  also enjoin the use or disclosure of trade secrets under the unfair competition provisions,

18  particularly Business and Professions Code section 17203, which provides for injunctive relief

19  against '[a]ny person who engages, has engaged, or proposes to engage in unfair

20  competition....'").

21           The Court considers two interrelated factors when deciding whether to grant provisional

22  relief:

23           The first is the likelihood that the [moving party] will prevail on the merits [of
             its claims] at trial.  The second is the interim harm that [the moving party] is
24           likely to sustain if the injunction were denied as compared to the harm the
             [non-moving party] is likely to suffer if the preliminary injunction were issued.

25  *Pillsbury, Madison & Sutro v. Schectman* (1997) 55 Cal.App.4[th] 1279 [citation omitted].

26           California Business & Professions Code section 17203 further provides:

27           Any person who engages, has engaged, or proposes to engage in unfair competition may
28           be enjoined in any court of competent jurisdiction.  The court may make such orders or

                                                   9

1    judgments . . . as may be necessary to prevent the use or employment by any person of
     any practice which constitutes unfair competition . . . .

2    *See* Cal. Bus. & Prof. Code section 17203.

3        Additionally, when unfair competition has been alleged and adequately demonstrated,

4    courts generally will grant an injunction to protect a party from harm to its business.  "An

5    injunction is the standard remedy in unfair competition cases."  *National Football League*

6    *Properties, Inc. v. Wichita Falls Sportswear, Inc.,* (1982) 532 F.Supp. 651, 664.  Given the

7    foregoing, this Court may grant an injunction if the circumstances warrant it.

8        The facts before the Court warrant injunctive relief.  SHEEHAN has demonstrated that

9    he has no intention of abiding by the agreement(s) between himself and 24 HOUR FITNESS in

10   which he agreed to refrain from competing with 24 HOUR FITNESS.  He also has demonstrated

11   that he intends to use 24 HOUR FITNESS' proprietary and confidential information in his new

12   position as Bally's CEO.  Consequently, 24 HOUR FITNESS' only remedy is for this Court to

13   enjoin SHEEHAN from unlawful actions and to enforce the agreements between the parties.

14   **B.    24 HOUR FITNESS will be Irreparably Harmed if SHEEHAN is not Enjoined**

15   **        from Becoming Bally's CEO.**

16       If the Court does not enjoin SHEEHAN from becoming Bally's CEO, 24 FITNESS will

17   be irreparably harmed.  Over the last eight years of his tenure, SHEEHAN has participated daily

18   in the planning and execution of the details of 24 HOUR FITNESS' business and market

19   strategies.  That experience undoubtedly is the very reason Bally wants SHEEHAN for the CEO

20   position in the first place; to utilize, in their own words, his "comprehensive experience in the

21   fitness industry," acquired *solely* through his employment with 24 HOUR FITNESS.  From the

22   first day in his new position, SHEEHAN will put this information to use for the benefit of Bally.

23   No practical mechanism exists that would permit SHEEHAN to segregate what little *non-*

24   proprietary knowledge he might have about the fitness industry, from the vast knowledge he

25   gained directly via his work with 24 HOUR FITNESS.  The harm to 24 HOUR FITNESS will

26   be deep and irreparable.

27       In contrast, if a temporary restraining order and preliminary injunction are granted,

28   SHEEHAN will experience little, if any, hardship.  If 24 HOUR FITNESS ultimately prevails in

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ORDER TO SHOW CAUSE AND TEMPORARY
RESTRAINING ORDER RE: PRELIMINARY INJUNCTION PURSUANT TO C.C.P. §§ 526, 527 and BUS. & PROF. CODE § 17203

1    this action, SHEEHAN is unharmed by the grant of provisional injunctive relief.  In the unlikely

2    event SHEEHAN prevails, he only will have been sidelined for a brief period of time before

3    proceeding to join Bally.  A balance of the relative hardships tips sharply in favor of 24 HOUR

4    FITNESS.

5    **C.**      **24 HOUR FITNESS Can Demonstrate a Strong Likelihood of Success on the**

6            **Merits.**

7         In determining whether a preliminary injunction or temporary restraining order should

8    issue, a court must determine if the moving party is likely to succeed on the merits of the case.

9    *U. C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore* (1984) 154

10    Cal.App.3d 1157, 1160.  The facts in this case demonstrate that 24 HOUR FITNESS is likely to

11    succeed on the merits of its claims.

12         **1.**      **SHEEHAN is party to an enforceable covenant not to compete.**

13         California law enforces covenants not to compete where the noncompetition obligation

14    arises in the context of the sale by a party of his or her entire ownership interest in a business.

15    *See* Cal. Bus. & Prof. Code section 16601.  Under that circumstance, a reasonable covenant not

16    to compete will be enforced to ensure that the purchasing party receives the full benefit of the

17    bargain. *Id.*

18         The facts here clearly fall within California's laws.  Specifically, SHEEHAN agreed in

19    *two* separate agreements – The Employment Agreement and the Stockholder Agreement - that

20    he would not engage in competitive activity against 24 HOUR FITNESS by joining a competing

21    fitness industry business with locations within 50 miles of existing 24 HOUR FITNESS

22    facilities for (depending on the governing contract section) two or three years.  Both the duration

23    and geographic scope of these restrictions are reasonable and are likely to be enforced.  The

24    noncompetition obligations under SHEEHAN'S Employment Agreement are implicated upon

25    his separation from 24 HOUR FITNESS, which matures his obligation to resell his ownership

26    interest to 24 HOUR FITNESS for significant consideration.  As such, the covenant not to

27

28

11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ORDER TO SHOW CAUSE AND TEMPORARY
RESTRAINING ORDER RE: PRELIMINARY INJUNCTION PURSUANT TO C.C.P. §§ 526, 527 AND BUS. & PROF. CODE § 17203

1    compete falls within the class of covenants expressly permitted by Section 16601 of the

2    California Business and Professions Code.[1]

3         Against that background, the statements by SHEEHAN and Bally in Bally's own press

4    release leave no doubt that SHEEHAN intends to compete directly with 24 HOUR FITNESS,

5    and do so in violation of his covenant not to compete.  SHEEHAN's actions undoubtedly will

6    cause irreparable harm to 24 HOUR FITNESS.  Indeed, that was in essence the point that Bally

7    emphasized in its press release.  As a result, 24 HOUR FITNESS is likely to prevail on this

8    claim.

9         **2.    SHEEHAN has repudiated and/or breached his Confidential Information**

10             **Agreement and Violated the Uniform Trade Secrets Act.**

11        The required elements for a breach of contract cause of action are: 1) a valid contract; 2)

12   the breach; and 3) the resulting damage to the non-breaching party.  *Reichert v. General Ins. Co.*

13   *of America* (1968) 68 Cal.2d 822, 830.  The provisions of SHEEHAN's Employment Agreement

14   requiring him to maintain the confidentiality of 24 HOUR FITNESS' proprietary information

15   are valid and enforceable.  SHEEHAN and Bally have made plain their intentions that

16   SHEEHAN will use that information to compete directly with 24 HOUR FITNESS.  Such unfair

17   competition will result in significant damage to 24 HOUR FITNESS and should be enjoined.

18        In addition, SHEEHAN'S actions in misappropriating 24 HOUR FITNESS' proprietary

19   information violates California Civil Code section 3426.1(d), otherwise known as the Uniform

20   Trade Secrets Act (hereinafter "UTSA").  Section 3426.1 (d) defines a trade secret as follows:

21

22        . . . information, including a formula, pattern, compilation, program, device,
         method, technique, or process, that: [¶] (1) Derives independent economic
23       value, actual or potential, from not being generally known to the public or to
         other persons who can obtain economic value from its disclosure or use; and
24

25   _____

26   [1] The fact that the noncompetition obligation exists in two agreements does not impact its
         enforceability.  *See Hilb, Rogal and Hamilton Insurance Services of Orange County, Inc.*
27       *v. Robb* (1995) 33 Cal.App. 4th 1812, 1825-26 ("The validity of that covenant is not
         affected by its location in the employment contract rather than the merger agreement.
28       Nothing in section 16601 requires that the covenant be contained in a particular type of
         document.").

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ORDER TO SHOW CAUSE AND TEMPORARY**
**RESTRAINING ORDER RE: PRELIMINARY INJUNCTION PURSUANT TO C.C.P. §§ 526, 527 and BUS. & PROF. CODE § 17203**

[¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

24 HOUR FITNESS' proprietary information falls squarely within this definition. The UTSA defines misappropriation as "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent . . . ." Cal. Civ. Code § 3426.1(b)(1), (2). SHEEHAN's actions indisputably constitute "misappropriation" under the UTSA, and 24 HOUR FITNESS is likely to succeed on this claim.[2] Indeed, given that SHEEHAN was in discussions with Bally for several weeks prior to resigning, the likelihood is strong that he *already* has misappropriated 24 HOUR FITNESS' confidential trade secrets. (Liebert Decl., ¶10.)

### 3.    SHEEHAN'S Unlawful Actions Constitute Unfair Competition.

Unfair competition is defined as "any unlawful, unfair or fraudulent business act or practice . . . ." Cal. Bus. & Prof. Code section 17200. Section 17200 was drafted broadly to include anything that can properly be called a business practice. *Podolsky, et al. v. First*

---

[2] The case of *Whyte v. Schlage* (2002) 101 Cal. App. 4th 1443, does not compel a different result. There, the Fourth District Court of Appeals restricted application of the use of the "inevitable disclosure doctrine" to support a claim of trade secret misappropriation. But the facts of that case are different from the case at hand. There, the Court stated that its concern was that, in the *absence* of an enforceable noncompetition agreement, a party might seek to use nondisclosure obligations as a "de facto" noncompete agreement. The Court also found that the evidence did not support a finding of any threat to misappropriate trade secrets. In contrast, here, the parties *have* entered into a valid noncompetition agreement between them, and SHEEHAN and Bally have made plain their intention to use for Bally's benefit 24 HOUR FITNESS' confidential information. Therefore, *Whyte* poses no obstacle to granting the temporary restraining order sought by 24 HOUR FITNESS.

1    *Healthcare Corporation* (1996) 50 Cal.App.4[th] 632; *Summit Technology, Inc. v. High-Line*

2    *Medical Instruments, Co.* (1996) 933 F.Supp. 918, 942.

3        In cases such as this one where a former employee is using proprietary information to

4    compete with a former employer, "the cases are legion holding that a former employee's use of

5    confidential information obtained from his former employer to compete with him and solicit the

6    business of his former employer's customers is regarded as unfair competition." *Courtesy*

7    *Temporary Service, Inc. v. Leonel Camacho, et al.,*(1990) 222 Cal.App.3d 1278, 1292.

8        In the instant case, SHEEHAN gained proprietary information through his eight years of

9    work with 24 HOUR FITNESS, and now threatens to use that same information against 24

10   HOUR FITNESS.  SHEEHAN'S actions demonstrate a classic case of unfair competition, and

11   24 HOUR FITNESS is likely to prevail on this claim.

12   **IV.   CONCLUSION**

13       Unless enjoined by this Court, SHEEHAN's actions in assuming the position of CEO

14   with Bally will breach his covenant not to compete with 24 HOUR FITNESS.  SHEEHAN's use

15   of 24 HOUR FITNESS' proprietary information also will violate his covenant not to appropriate

16   that information, and constitutes a violation of the Uniform Trade Secrets Act.  All of these

17   activities together will make SHEEHAN liable for unfair competition under Section 17200 of

18   the California Business & Professions Code.  A balance of the relative hardships tips sharply in

19   favor of 24 HOUR FITNESS, who is likely to prevail on the claims asserted.  For those reasons,

20   this Court should enter the temporary restraining order and preliminary injunction requested.

21   DATED:  June 26, 2008          BERRY & BLOCK LLP

22

23                       By_____

24                          REX DARRELL BERRY

                            SCOTT M. PLAMONDON

25

26                          Attorneys for Plaintiffs

                            24 HOUR FITNESS USA, INC. and

27                          24 HOUR FITNESS WORLDWIDE, INC.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ORDER TO SHOW CAUSE AND TEMPORARY
RESTRAINING ORDER RE: PRELIMINARY INJUNCTION PURSUANT TO C.C.P. §§ 526, 527 and BUS. & PROF. CODE § 17203

Exhibit

D

BERRY & BLOCK LLP

June 29, 2008

*Via Facsimile Only* **(925.957.5916)**

Commissioner Judith A. Sanders
Department 60
Contra Costa County Superior Court
725 Court St.
Martinez, CA   94553

Re:   **24 Hour Fitness USA, Inc., et al v. Sheehan; Case No. C-08-01663; Application for Temporary Restraining Order and Preliminary Injunction; Monday, June 30, 2008 at 2:00pm.**

Dear Commissioner Sanders:

I represent 24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. in the above referenced matter.  Enclosed please find two declarations in support of 24 Hour Fitness' application for provisional relief.   The declarations of Angela Read and William B. Donahue support 24 Hour Fitness' reasonable belief that Defendant Michael Sheehan already has engaged in illegal competitive activity and misappropriation of 24 Hour Fitness' confidential information.

Concurrent with faxing this letter and attachments to the Court, I also am serving copies of these materials on counsel for Mr. Sheehan by facsimile and e-mail on Sunday, June 29, 2008.

Very truly yours,

REX DARRELL BERRY

RDB/rdb

cc (via facsimile and e-mail): Joan B. Tucker Fife (counsel for Mr. Sheehan)

*2150 River Plaza Drive, Suite 415, Sacramento, CA 95833*
*tel: 916.564.2000 | fax: 916.564.2024 | toll free: 877.564.2770*
*web: www.berryblock.com*

1 REX DARRELL BERRY, State Bar No. 110219
SCOTT M. PLAMONDON, State Bar No. 212294
2 BERRY & BLOCK LLP
2150 River Plaza Drive, Suite 415
3 Sacramento, CA 95833
(916) 564-2000
4 (916) 564-2024 FAX

5

Attorneys for Plaintiffs
6 24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS
WORLDWIDE, INC.
7

8 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 **COUNTY OF CONTRA COSTA**

10

| | |
|---|---|
| 11  24 HOUR FITNESS USA, INC. and 24<br>HOUR FITNESS WORLDWIDE, INC., | ) Case No. C-08-01663<br>) |
| 12            Plaintiff, | )<br>) **DECLARATION OF ANGELA READ** |
| 13  v. | ) **IN SUPPORT OF APPLICATION FOR**<br>) **TEMPORARY RESTRAINING ORDER**<br>) **AND PRELIMINARY INJUNCTION** |
| 14  MICHAEL SHEEHAN and DOES 1-100,<br>inclusive, | )<br>) |
| 15 | ) Date:  June 30, 2008<br>) Time:  2:00 pm |
| 16            Defendants. | ) Dept.: 60 |

17 _____

18 _____

19 I, ANGELA READ, hereby declare as follows:

20 1.      I currently am employed by 24 Hour Fitness USA, Inc. in the position of Executive

21 Assistant to the Senior Vice President of Merchandising.  Until June 23, 2008, I was Executive

22 Assistant for Mike Sheehan, the Chief Operating Officer for 24 Hour Fitness.  I worked directly

23 for Mr. Sheehan as his Executive Assistant from the time of my hire in April 2007 until he left

24 the Company on June 23, 2008.  I have personal knowledge of the facts stated herein, and could

25 testify competently thereto if asked to do so.

26 2.      In my position as Executive Assistant for Mr. Sheehan, I worked with him on a daily

27 basis to support him in all aspects in his work as Chief Operating Officer. My tasks included

28 calendaring, scheduling, making travel arrangements, maintenance of documents, obtaining data

1  for Mr. Sheehan in both hard copy and electronic format, and assisting him in preparing for

2  meetings.

3  3.    Prior to June 23, 2008, I was given no indication by Mr. Sheehan that he was planning

4  on leaving 24 Hour Fitness.

5  4.    During the time I worked for Mr. Sheehan, he regularly asked me to download on

6  Fridays all materials on which he had been working on during the week, to a portable hard drive

7  that he would take home with him. As a result, at one time or another, Mr. Sheehan had on a

8  portable hard drive virtually every document  on which he worked during my tenure with 24

9  Hour Fitness.  The documents could include, for example, real estate committee documents,

10  marketing, sales, labor, and financial reports, business process initiatives, direct report

11  performance reviews, etc.

12  5.    On or about May 5, 2008, Mr. Sheehan asked me to assemble the 2007 year end, and the

13  first quarter of 2008 24 Hour Fitness individual club Profit & Loss statements.  This required

14  me to access detail Profit & Loss information on 400 plus individual clubs.   I obtained and

15  assembled this information for Mr. Sheehan in hard copy which consisted of 11 separate

16  volumes of tabbed index binders.  These 11 volumes contain the minute detail about the

17  performance of each individual club including which clubs were profitable and those which

18  were not profitable.   I completed assembling these 11 volumes in mid to late May, 2008.

19  6.    I was aware that Mr. Sheehan had a 500 gigabyte portable hard drive and a 4 gigabyte

20  "flash" drive in his office, which were not among the inventory of returned items provided by

21  Mr. Sheehan.

22  7.    Based on my review of Mr. Sheehan's schedule, I know that during 2008, Mr. Sheehan

23  took only 2 days of Personal Time Off ("PTO") on March 13 and 14, 2008.  On the other days

24  when Mr. Sheehan was out of the office, I had no way of verifying his location because I

25  communicated with him through cell phone and Blackberry.

26        Executed this 28th day of June, 2008, at San Ramon, California.

27

28  _____
   ANGELA READ

2

**DECLARATION OF ANGELA READ IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING
ORDER/PRELIMINARY INJUNCTION**

1   REX DARRELL BERRY, State Bar No. 110219
    SCOTT M. PLAMONDON, State Bar No. 212294
2   BERRY & BLOCK LLP
    2150 River Plaza Drive, Suite 415
3   Sacramento, CA  95833
    (916) 564-2000
4   (916) 564-2024 FAX

5
    Attorneys for Plaintiffs
6   24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS
    WORLDWIDE, INC.
7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF CONTRA COSTA

10

11  24 HOUR FITNESS USA, INC. and 24      ) Case No. C-08-01663
    HOUR FITNESS WORLDWIDE, INC.,         )
12                                        )
        Plaintiff,                        ) DECLARATION OF WILLIAM B.
13                                        ) DONAHUE IN SUPPORT OF
    v.                                    ) APPLICATION FOR TEMPORARY
14                                        ) RESTRAINING ORDER AND
    MICHAEL SHEEHAN and DOES 1-100,       ) PRELIMINARY INJUNCTION
15  inclusive,                            )
                                          ) Date: June 30, 2008
16      Defendants.                       ) Time:  2:00 pm
                                          ) Dept.: 60
17

18

19  _____

    I, WILLIAM B.DONAHUE, hereby declare as follows:
20
    1.      I currently am employed by 24 Hour Fitness USA, Inc. in the position of Senior Vice
21
    President and Chief Information Officer. I have personal knowledge of the facts stated herein
22
    and could testify competently thereto if asked to do so.
23
    2.      In my position as Chief Information Officer, I am familiar with 24 Hour Fitness'
24
    information technology practices and policies concerning the proper handling of confidential
25
    information. Protection of our confidential information is critically important to 24 Hour
26
    Fitness due to the highly competitive nature of our industry. To protect this confidential
27
    information, 24 Hour Fitness has in place confidential and proprietary information and trade
28

1  secrets policies. These policies require all employees of 24 Hour Fitness to treat confidential

2  and proprietary information with the utmost care, and to ensure that it is not put at risk of

3  disclosure to third parties.

4  3.      I have reviewed the Declaration of Michael Sheehan which was submitted to the Court

5  in conjunction with this action. In that Declaration, Mr. Sheehan testifies that he emailed to

6  himself "work related emails to my personal email account" and that he took with him when he

7  left the office "documents relating to 24 Hour [Fitness]."

8  4.      The practices described by Mr. Sheehan violate 24 Hour Fitness' confidential and

9  proprietary information and trade secrets policies. Had I been made aware that Mr. Sheehan

10  was engaging in these activities, I immediately would have instructed Mr. Sheehan to stop

11  doing so.

12         Executed this 28th day of June, 2008, at San Ramon, California.

13

14

15  WILLIAM B DONOHUE

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit

# E

1   REX DARRELL BERRY, State Bar No. 110219
    SCOTT M. PLAMONDON, State Bar No. 212294
2   BERRY & BLOCK LLP
    2150 River Plaza Drive, Suite 415
3   Sacramento, CA 95833
    (916) 564-2000
4   (916) 564-2024 FAX

5

6   Attorneys for Plaintiffs
    24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS
    WORLDWIDE, INC.
7

**FILED**

2008 JUL -1  P 2: 02

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.
BY_____
       D. Wagner, Deputy Clerk

8                  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                         **COUNTY OF CONTRA COSTA**

10

11  24 HOUR FITNESS USA, INC. and 24      ) Case No. C-08-01663
    HOUR FITNESS WORLDWIDE, INC.,         )
12                                         )
             Plaintiff,                    ) **DECLARATION OF REX BERRY RE**
13                                         ) **NOTICE IN SUPPORT OF**
    v.                                     ) **APPLICATION FOR TEMPORARY**
14                                         ) **RESTRAINING**
    MICHAEL SHEEHAN and DOES 1-100,       ) **ORDER/PRELIMINARY INJUNCTION**
15  inclusive,                            )
                                           ) Date:  June 27, 2008
16           Defendants.                   ) Time:  1:30pm
    _____       ) Dept.: 60
17

18

19  _____

    I, REX DARRELL BERRY, hereby declare as follows:
20
    1.    I am a partner in the law firm of Berry & Block LLP, attorneys of record for Plaintiffs 24
21
    Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. in the above-referenced matter.  I
22
    have personal knowledge of the matters set forth herein, and would testify competently thereto if
23
    asked to do so.
24
    2.    No previous applications for a restraining order have been made in this matter.
25
    3.    On July 26, 2008, I caused to be delivered to the home of Defendant MICHAEL
26
    SHEEHAN, located at 4542 Lilac Ridge Rd., San Ramon. CA 94582, a letter advising him of
27
    the nature of the relief requested in this proceeding and the date, time and place for the
28

_____

                                         1
    **DECLARATION OF REX DARRELL BERRY IN SUPPORT OF APPLICATION FOR TEMPORARY**
                  **RESTRAINING ORDER/PRELIMINARY INJUNCTION**

1   presentation of this application.  I was advised via email communication from Federal Express

2   that said letter was delivered to Mr. Sheehan's residence at approximately 7:30 am on July 26,

3   2008.   A true and correct copy of that letter is attached hereto as Exhibit A.

4   4.       At approximately 9:15 am on July 26, 2008, I telephoned Defendant MICHAEL

5   SHEEHAN at his home telephone number (925.804.6583) and cell telephone number

6   (949.584.7218), and left messages on the voice mails of both telephones stating the same

7   information described herein.  I followed up the telephone calls with an email to Defendant

8   MICHAEL SHEEHAN's email address confirming the same information.  A true and correct

9   copy of my email message is attached hereto as Exhibit B.  As of the execution of this

10  declaration, I have had no response from Defendant MICHAEL SHEEHAN or anyone acting on

11  his behalf.

12  5        At approximately 11:00 am on June 26, 2008, I received a telephone call from an

13  attorney in Atlanta, Georgia named Alston Correll.  Mr. Correll stated that he represented Bally

14  Total Fitness Holdings Corporation.  He stated that he did not represent Defendant MICHAEL

15  SHEEHAN at this time, but might represent him in the future.  I asked if he intended to appear

16  at the hearing on our TRO application.  He stated that Bally would "field a team."  I take this to

17  mean that Mr. Correll plans to attend the proceedings on behalf of Bally.  I have no basis to

18  know whether anyone will appear on behalf of Defendant MICHAEL SHEEHAN.

19

20       I declare under penalty of perjury under the laws of the State of California that the

21  foregoing is true and correct.

22  Executed this _2⁄6_ day of June, 2008, at Sacramento, California.

23

24

25                                        REX DARRELL BERRY

26

27

28

                                    2
DECLARATION OF REX DARRELL BERRY IN SUPPORT OF APPLICATION FOR TEMPORARY
                    RESTRAINING ORDER/PRELIMINARY INJUNCTION

**EXHIBIT A**

**B&B**

June 26, 2008

BERRY & BLOCK LLP

*Hand Delivered*

Michael Sheehan
4542 Lilac Ridge Rd.
San Ramon, CA  94582

Re:     **24 Hour Fitness USA, Inc., et al  v. Sheehan; Notice of Application for Temporary Restraining Order and Preliminary Injunction**

Dear Mr. Sheehan:

I represent 24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc.  The purpose of this letter is to inform you that on **Friday, June 27, 2008, at 1:30 pm**, my clients will appear before the Contra Costa County Superior Court to make application for a Temporary Restraining Order and Preliminary Injunction ordering that you not commence employment with Ballys Total Fitness as Chief Executive Officer, not misappropriate 24 Hour Fitness' confidential and proprietary information, and otherwise observe the terms of the noncompetition and confidential information agreements to which you are a party.

The hearing location is as follows:

Contra Costa County Superior Court
Department 60, Room 102
725 Court Street
Martinez, CA  94553

Please advise me at your earliest convenience whether you will attend the hearing.

Very truly yours,

REX DARRELL BERRY

RDB/jlo

*2150 River Plaza Drive, Suite 415, Sacramento, CA 95833*
*tel: 916.564.2000 | fax: 916.564.2024 | toll free: 877.564.2770*
*web: www.berryblock.com*

**Rex Berry**

---

**From:**        Scott Plamondon
**Sent:**        Thursday, June 26, 2008 8:57 AM
**To:**          Rex Berry
**Subject:**     FW: FedEx Shipment 798468686486 Delivered

---

This tracking update has been requested by:

Company Name: Berry & Block LLP
Name:        Jenny O'Shaughnessy
E-mail:      jenny@berryblock.com

---

Our records indicate that the following shipment has been delivered:

Reference:              24 hour fitness
Ship (P/U) date:        Jun 25, 2008
Delivery date:          Jun 26, 2008 7:32 AM
Sign for by:            Signature Release on file
Delivered to:           Residence
Service type:           FedEx First Overnight
Packaging type:         FedEx Envelope
Number of pieces:       1
Weight:                 0.50 lb.
Special handling/Services: Residential Delivery
                        Deliver Weekday

Tracking number: 798468686486


Shipper Information                 Recipient Information
Jenny O'Shaughnessy                 Michael Sheehan
Berry & Block LLP                   4542 LILAC RIDGE RD
2150 River Plaza Drive;Suite 415    SAN RAMON
Sacramento                          CA
CA                                  US
US                                  945825050
95833

Please do not respond to this message. This email was sent from an unattended
mailbox. This report was generated at approximately 9:35 AM CDT
on 06/26/2008.
To learn more about FedEx Express, please visit our website at fedex.com.


All weights are estimated.


To track the latest status of your shipment, click on the tracking number above,
or visit us at fedex.com.

1

This tracking update has been s  .t to you by FedEx on the behalf of  ne
Requestor noted above. FedEx does not validate the authenticity of the
requestor and does not validate, guarantee or warrant the authenticity of the
request, the requestor's message, or the accuracy of this tracking update. For
tracking results and fedex.com's terms of use, go to fedex.com.

Thank you for your business.

**EXHIBIT B**

**Rex Berry**

| | |
|---|---|
| **From:** | Rex Berry |
| **Sent:** | Thursday, June 26, 2008 9:35 AM |
| **To:** | 'msheehan1962@comcast.net' |
| **Subject:** | 24 Hour Fitness v. Sheehan-TRO Notice for 6/27/08 at 1:30pm; Contra Costa County Superior Court |
| **Importance:** | High |

Mr. Sheehan-

This email will confirm the telephone messages I left for you on your voice mail at 9:15 this morning at 925.804.6583 and 949.584.7218, as well as the letter delivered to your home this morning by Federal Express at approximately 7:30am.

I represent 24 Hour Fitness USA, Inc. and 24 Hour Fitness Worldwide, Inc. On **Friday, June 27, 2008, at 1:30pm**, or as soon thereafter as the court will hear the matter, 24 Hour Fitness will apply to the Contra Costa County Superior Court for a Temporary Restraining Order and Preliminary Injunction ordering that you not commence employment with Ballys Total Fitness as Chief Executive Officer, not misappropriate 24 Hour Fitness' confidential and proprietary information, and otherwise observe the terms of the noncompetition and confidential information agreements to which you are a party.

The hearing location is as follows:

Contra Costa County Superior Court
Department 60, Room 102
725 Court Street
Martinez, CA 94553

Please advise me at your earliest convenience whether you will be attending the hearing.

Rex Berry.

Rex Darrell Berry
Berry & Block LLP
2150 River Plaza Drive, Suite 415
Sacramento, CA 95833
Tel: 916.564.2000
Fax: 916.564.2024
Toll Free: 877.564.2770
rex@berryblock.com
www.berryblock.com

**POSSIBLE ATTORNEY/CLIENT COMMUNICATION**

*This transmission may contain material covered by the Attorney/Client privilege and may be intended as a confidential communication. This communication is intended for the addressee only. If you are not the intended recipient or an employee responsible for receipt of this transmission, you should be aware that any distribution, copying or communication of this transmission*

1

is prohibited.  If you have received this communication in error, please notify us immediately.

To ensure compliance with requirements imposed by the IRS, Berry & Block, LLP informs you that, if any advice concerning a U.S. Federal tax issue is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# Exhibit

# F

1 | REX DARRELL BERRY, State Bar No. 110219
SCOTT M. PLAMONDON, State Bar No. 212294
2 | BERRY & BLOCK LLP
2150 River Plaza Drive, Suite 415
3 | Sacramento, CA 95833
(916) 564-2000
4 | (916) 564-2024 FAX

FILED

2008 JUL -1 P 2: 02

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.

BY
D. Wagner, Deputy Clerk

5

6 | Attorneys for Plaintiffs
24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS
7 | WORLDWIDE, INC.

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **COUNTY OF CONTRA COSTA**

10

11 | 24 HOUR FITNESS USA, INC. and 24   ) Case No.   C 08- 01663
HOUR FITNESS WORLDWIDE, INC.,   )
12 |   )
      Plaintiff,   ) **DECLARATION OF CARL C.**
13 |   ) **LIEBERT IN SUPPORT OF**
v.   ) **APPLICATION FOR TEMPORARY**
14 |   ) **RESTRAINING ORDER AND**
MICHAEL SHEEHAN and DOES 1-100,   ) **PRELIMINARY INJUNCTION**
15 | inclusive,   )
  ) Date: June 27, 2008
16 |       Defendants.   ) Time: 1:30 pm
     Dept.: 60
17

18

19 | I, CARL C. LIEBERT, hereby declare as follows:

20 | 1.      I currently am employed as the Chief Executive Officer of 24 Hour Fitness Worldwide,

21 | Inc. In that position, I am responsible for the long term planning and day to day operations of

22 | nearly all aspects of the Company, as well as certain of its affiliated companies, such as 24 Hour

23 | Fitness USA, Inc. I have personal knowledge of the matters set forth herein, and would testify

24 | competently thereto if asked to do so.

25 | 2.      24 HOUR FITNESS is one of the world's largest privately owned and operated fitness

26 | center chains. From its beginnings in 1983, 24 HOUR FITNESS has grown to more than 400

27 | fitness centers worldwide. 24 HOUR FITNESS is a fitness industry leader and presently is

28

---

1

**DECLARATION OF CARL C. LIEBERT IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING
ORDER/PRELIMINARY INJUNCTION**

1  undergoing a phase of rapid growth and expansion.  The Company is expanding into new

2  markets and intends to provide new offerings to members and communities across the world.

3  3.      Until June 23, 2008, Michael Sheehan was 24 HOUR FITNESS' Chief Operating

4  Officer ("COO").  On June 23, 2008, Mr. Sheehan told me that he intended to resign his

5  position as COO for 24 HOUR FITNESS, effective immediately, and told me of his intention to

6  join Bally Total Fitness Corporation ("Bally") as Chief Executive Officer effective July 1, 2008.

7  4.      Bally is one of 24 HOUR FITNESS' largest competitors in terms of revenues produced.

8  According to Bally's website, www.ballyfitness.com, Bally is "the largest and only nationwide

9  commercial operator of fitness centers with approximately 400 clubs in the USA, the Caribbean,

10  Mexico, South Korea, and China."

11  5.      In the conduct of its business, 24 HOUR FITNESS possesses and employs Trade

12  Secrets, proprietary information and confidential methods and techniques.  For example, 24

13  HOUR FITNESS has collected and maintains, at considerable expense, information regarding

14  its market strategies, growth plans, new market developments and strategic plans.  Accordingly,

15  confidentiality regarding this proprietary information is essential to 24 HOUR FITNESS'

16  competitiveness.  The disclosure of this information to a third party, and *especially* to a direct

17  and substantial competitor, would give that competitor an unfair advantage in competing with

18  24 HOUR FITNESS.

19  6.      During Mr. Sheehan's nearly eight year tenure with 24 HOUR FITNESS, he helped

20  develop, and had unfettered access to, 24 HOUR FITNESS' most sensitive proprietary

21  information, including but not limited to:

22      • Critical market strategies, including 24 HOUR FITNESS' Three Year Strategic

23        Plan;

24      • Growth plans for new geographic markets;

25      • Market segment development planning;

26      • Market performance data and market reorganization planning;

27      • Platform expansion planning intended to utilize the internet and other resources

28        to facilitate memberships;

DECLARATION OF CARL C. LIEBERT IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING
ORDER/PRELIMINARY INJUNCTION

1    • Marketing strategy related to advertising, marketing partnerships and marketing

2    tie-ins with non-traditional media;

3    • Proprietary compensation and personnel data;

4    • Litigation strategy;

5    • Financial planning strategies;

6    • Budgeting strategies;

7    • Proprietary information on revenues;

8    • Sales figures relating to all aspects of the 24 HOUR FITNESS' business;

9    • Confidential relationships with key vendors; and

10    • An array of confidential and proprietary information about virtually *every* aspect

11    of 24 HOUR FITNESS' business model and operations strategy.

12    Many of these strategies and plans were developed over considerable time through trial and

13    error experience in which Mr. Sheehan was directly involved.

14    7.    During his employment with 24 HOUR FITNESS, Mr. Sheehan signed an Employment

15    Agreement.  A true and correct copy of that Employment Agreement is attached hereto as

16    Exhibit A. That Agreement contains both a Covenant Not to Compete and restrictions on the

17    use of confidential information, the terms of which are as follows:

18    **Non-Compete and Non-Solicitation.**

19
20    **10.1**    For a period of two (2) years following the termination of
      Employee's employment with the Company, Employee agrees not
21    to directly or indirectly recruit, solicit, induce or encourage any
      employee of the Company to become an employee for any other
22    person or entity; nor to directly or indirectly induce or encourage
      any independent contractor of the Company to terminate a
23    contracting relationship with the Company.

24    **10.2**    Employee further agrees that during the Employment
      Term and for a period of two (2) years thereafter, Employee will
25    not directly or indirectly own an interest in, operate, join, begin,
      control, advise, consult with, render services to or otherwise
26    participate in or work for or on behalf of any entity or
      individual(s) which operates a fitness club within fifty (50) miles
27    of any of the Company's fitness clubs or which otherwise

28

**DECLARATION OF CARL C. LIEBERT IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING
ORDER/PRELIMINARY INJUNCTION**

competes with the business of the Company or the Company's affiliates.

**11.    Confidential Information.**    During the Employment Term and thereafter, Employee agrees to hold the Company's confidential and proprietary information in strictest confidence and not to use, disclose or disseminate any of such information except as such disclosure, use or dissemination may be required in connection with Employee's work for the Company or as expressly authorized by the Company in writing.    Employee further agrees that any work product created in connection with Employee's work for the Company will be the sole and exclusive property of the Company and hereby assigns to the Company all right, title and interest in all inventions and other intellectual property developed by Employee in working for the Company. . .

8.     In addition, on or about September 30, 2005, Mr. Sheehan signed a Stockholder's Agreement with 24 HOUR FITNESS through which he was granted ownership shares of 24 HOUR FITNESS' in the form of Class B common stock. A true and correct copy of that Stockholder's Agreement is attached hereto as Exhibit B.  In that Agreement, Mr. Sheehan agreed that upon his separation from 24 HOUR FITNESS, the Company could elect to repurchase a portion of his ownership in the Company, and in the case of his engaging in competitive activity, *all* of his ownership interest in the Company.  Under the terms of that Agreement, 24 HOUR FITNESS will tender a repurchase demand to Mr. Sheehan that will compensate him for his stock.  The Stockholder's Agreement requires Mr. Sheehan to refrain from appropriating 24 HOUR FITNESS' Confidential and Proprietary Information and engaging in competitive activity:

**4.1 Prohibition Against Certain Activities.**  The Employee agrees that (a) the Employee will not at any time during the Employee's employment (other than in the course of such employment) with the Company or any Affiliate thereof, or after a Termination, disclose or furnish to any other Person or use for the Employee's own or any other Person's account any Confidential or Proprietary Information unless required to do so by law or judicial process, (b) if the Employee is Terminated, the Employee will not for three years following such Termination hire or employ, or directly or indirectly solicit for employment, including without limitation recommending to any subsequent employer the

4

**DECLARATION OF CARL C. LIEBERT IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION**

1

solicitation for employment of, any employee of the Company or any Affiliate thereof . . . .

2

3

4

5

6

7

8

9

10

11

12

**4.2    Right to Purchase Shares**.  The Employee understands and agrees that the Company has granted to the Employee the right to purchase shares of Class B Common Stock to reward the Employee for the Employee's future efforts and loyalty to the Company and its Affiliates by giving the Employee the opportunity to participate in the potential future appreciation of the Company.  Accordingly, (a) if the Employee engages in any Prohibited Activity, or (b) if, at any time during the Employee's employment with the Company or any of its Affiliates or during the three years following a Termination, the Employee engages in any Competitive Activity . . . , then, in addition to any other rights and remedies available to the Company or any of its Affiliates (at law, in equity or under any employment agreement, award agreement or other agreement or arrangement of the Employee), the Company shall be entitled, at its option, exercisable by written notice (the "Repurchase Notice") to the Employee, to purchase all or any portion of the shares of Class B Common Stock then held by the Employee.

13

14

The Stockholder's Agreement also expressly identifies Bally as a "competitor" of 24 HOUR FITNESS.

15

16

17

18

19

20

21

22

23

9.    On June 24, 2008, Bally issued a press release announcing Mr. Sheehan's hire as CEO and touting his "comprehensive experience in the fitness industry" and "ideal blend of experience, leadership skills, creativity and commitment to health and fitness."  A true an correct copy of that press release is attached hereto as Exhibit C.  The press release goes on to quote Mr. Sheehan as stating that he is eager to join Bally and "eager to add value to this established brand."  The statements from Bally and Mr. Sheehan demonstrate a threat that Mr. Sheehan intends to use the confidential and proprietary information obtained by him during his tenure with 24 HOUR FITNESS in his new CEO position with Bally, in order to directly compete with 24 HOUR FITNESS.

24

25

26

27

28

10.    At this point in time, I have not yet been able to confirm, but I believe that Mr. Sheehan likely already has misappropriated 24 HOUR FITNESS' confidential and proprietary information and Trade Secrets.  I believe this because, at approximately 8:30 am on June 23, 2008, when Mr. Sheehan entered my office and informed me of his resignation, he told me that:

**DECLARATION OF CARL C. LIEBERT IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION**

1     •   He was resigning his position as Chief Operating Officer of 24 Hour Fitness, effective

2        immediately;

3     •   He had been interviewing with Bally over a period of several weeks;

4     •   He had interviewed with Bally's management and every member of Bally's Board of

5        Directors;

6     •   This was the second offer of employment made to him by Bally;

7     •   He had rejected Bally's first offer, and Bally "sweetened the deal;" and

8     •   Bally had offered to Mr. Sheehan a compensation package worth almost three times his

9        compensation package at 24 HOUR FITNESS.

10   11.     Following receipt of Mr. Sheehan's resignation; 24 HOUR FITNESS announced news

11   of Mr. Sheehan's resignation on June 23, 2008.

12   12.     I attempted to resolve this matter on June 24, 2008 by sending letters to Mr. Sheehan

13   and Bally requesting that Mr. Sheehan not assume the position of CEO with Bally.  Attached

14   hereto as Exhibit D are true and correct copies of these letters.  To date, neither Mr. Sheehan nor

15   Bally has responded.

16        I declare under penalty of perjury under the laws of the State of California that the

17   foregoing is true and correct.

18   Executed this _27ᵗʰ_ day of June, 2008, at San Ramon, California.

19

20

21            CARL C. LIEBERT

22

23

24

25

26

27

28

**DECLARATION OF CARL C. LIEBERT IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION**

Exhibit    A

## EMPLOYMENT AGREEMENT
## MIKE SHEEHAN

This Employment Agreement ("Agreement") is dated as of March 31, 2003, and is entered into by and between Mike Sheehan ("Employee") and 24 Hour Fitness USA, Inc. ("Company"). Company hereby agrees to employ Employee, and Employee hereby agrees to be employed by the Company, upon the terms and conditions set forth in this Agreement.

**1.    Employment Period.** Employee's employment with the Company shall be "at-will" employment and may be terminated by either party at any time, with or without cause or advance notice. The period of Employee's employment with the Company following the date of this Agreement shall be referred to as the "Employment Term."

**2.    The Position.**

   **2.1**    Employee shall serve as Senior Vice President of Operations of the Company.

   **2.2**    Notwithstanding the provisions of Section 2.1 above, it is expressly understood that the Chief Executive Officer ("CEO") shall be entitled to make such organizational and reporting changes as the CEO may, in good faith, deem desirable and for the good of the Company, which may include, without limitation, changing the title and duties of Employee.

**3.    Duties.** Employee agrees to faithfully, diligently and competently devote substantially all of the Employee's full time and attention, during normal business hours, to the business and affairs of the Company and, in particular, to performance of all the duties required of Employee's position set forth above.

**4.    Compensation.** Employee shall be paid the following as compensation for all services to be rendered by Employee:

   **4.1**    Employee will be paid a base salary as set forth in Employee's current Compensation Plan.

   **4.2**    Employee will be eligible for an annual incentive bonus based upon Employee's achievement of designated MBOs, and an annual incentive bonus based upon the Company's achievement of designated financial goals. Whether Employee receives these bonuses, and the amount of any such bonuses, shall be determined in the discretion of the Company's CEO, as provided in the applicable bonus plans.

   **4.3**    Employee may be entitled to receive periodic grants of stock options and/or restricted stock under the Company's Employee Stock Option Plan(s) and/or Executive Incentive Plan. The quantity and vesting schedule of any such grant shall be determined in the sole discretion of the Company's Compensation Committee.

**5.    Perquisites/Expenses.** Employee shall be entitled to customary perquisites, such as an appropriate office, administrative support, and fringe benefits such as a car allowance and cell phone allowance, to the extent consistent with benefits provided to employees of similar rank and to the extent necessary for Employee to perform Employee's duties. Employee shall also be

entitled to reimbursement of reasonable expenses incurred by Employee in the course of Employee's duties, to the extent allowed under applicable company policy.

## 6.    Benefit Plans.

6.1    Employee and Employee's dependents and beneficiaries shall be entitled to all payments and benefits and service credit for benefits during the Employment Term to which employees of similar rank and their dependents and beneficiaries are entitled as the result of the employment under the terms of employee benefit plans and practices of the Company.

6.2    Nothing in this Agreement shall preclude the Company from amending or terminating any employee benefit plan or practice in its sole discretion.

7.    **Effect of Death.** In the event of Employee's death during the Employment Term, the legal representative of the Employee's estate shall be entitled to six (6) months of Employee's base salary in effect prior to such death.  Such payments shall be made according to the Company's normal payroll practices, subject to standard withholdings and deductions.

8.    **Effect of Disability.** In the event of Employee's disability during the Employment Term, Employee shall be entitled to six (6) months of Employee's base salary in effect prior to such disability.  Such payments shall be made according to the Company's normal payroll practices, subject to standard withholdings and deductions.

8.1    The amount of any payments due under this Section 8 shall be reduced by any payments to which Employee may be entitled because of disability under any disability or pension plan or insurance of the Company or of any division, subsidiary, or affiliate thereof, or as the result of workers' compensation or non-occupational disability payments.

8.2    The term "disability," as used in this agreement, shall mean permanent and total disability as defined in Internal Revenue Code Section 22 (e)(3).

## 9.    Severance.

9.1    **In General.** In the event the Company terminates Employee without Cause, the Company shall provide severance benefits set forth below.  If Employee is terminated with Cause, or Employee voluntarily resigns, then Employee will receive no severance benefits (except as provided in Section 9.1(c)).

(a)    **Severance.** A severance allowance in an amount equal to twelve (12) months of Employee's base salary (the "severance allowance") commencing on the last day of the month following termination of Employee's employment and payable in equal monthly installments for a period of twelve (12) consecutive months thereafter.  Such severance allowance shall be ordinary income subject to applicable withholding for federal, state and local taxes.  The Compensation Committee of the Company's Board of Directors may extend the period of severance or adjust the payment schedule in its discretion.

(b)    **COBRA.** If the Employee qualifies and elects to continue health benefits pursuant to Employee's COBRA rights, the Company shall pay for the cost of such continued

benefits during the period that payments provided for in Section 9.1(a) are required to be made, except to the extent of the applicable "Employee Contribution" for all such continued benefits.

(c) **Stock Option Acceleration/Vesting Following a Change of Control.** In addition to the payments to be made pursuant to Sections 9.1(a) and 9.1(b) above, in the event the Company terminates Employee's employment without Cause or if Employee terminates employment for Good Reason, within thirteen (13) months following a Change of Control, all of Employee's stock options granted under any of the stock and incentive plans of the Company and/or 24 Hour Fitness Worldwide, Inc. prior to the Change of Control shall immediately accelerate and become fully vested, and the Employee shall have up until two (2) years following the date of Employee's termination of employment to exercise such stock options.

9.2 **Definitions.** For purposes of this Agreement, the following definitions shall apply:

(a) **Cause.** "Cause" shall mean (i) the Employee's engaging in an act or acts of fraud, theft or embezzlement which are harmful or injurious to the Company; (ii) the Employee's unreasonable neglect or refusal to perform the duties appropriate to Employee's position; or (iii) any conviction for a felony involving moral turpitude.

(b) **Change of Control.** "Change of Control" shall mean (i) a stock sale, merger, consolidation, combination, reorganization or other transaction (other than a public offering of stock) of either the Company, 24 Hour Fitness United States, Inc., or 24 Hour Fitness Worldwide, Inc. resulting in less than 50% of the combined voting power of the surviving or resulting entity being directly or indirectly owned by either the shareholders of the Company, 24 Hour Fitness United States, Inc., or 24 Hour Fitness Worldwide, Inc. immediately prior to such transaction; or (ii) a liquidation or dissolution of the Company, or sale or other disposition of all or substantially all of the Company's assets or business.

(c) **Good Reason.** "Good Reason" means the Employee voluntarily resigns within ninety (90) days after the occurrence of any of the following: (i) a material reduction by the Company of Employee's authority without Employee's consent, except to the extent that the authority of Employee and similarly situated Company executives is reduced solely as a result of a merger into a larger entity (e.g., retaining the same authority for divisional operations that are substantially identical to the Company's previous operations as an independent entity); (ii) a material reduction by the Company of Employee's base compensation or benefits without Employee's consent, except to the extent that the compensation of similarly situated executives at the Company is similarly reduced; or (iii) an involuntary change in the Employee's principal place of employment that would increase Employee's one-way commute by more than forty (40) miles.

9.3 Employee will not be entitled to receive the Severance allowed under this Section 9 until Company and Employee have executed the Company's Confidential Separation Agreement (which is available for your review in the office of the Company's General Counsel), which includes a general release of claims. Moreover, if after the Employment Term, Employee has breached any of the post-employment restrictions contained in Section 10 of this Agreement, then Employee's right to receive the severance benefits set forth in this Section 9 shall cease immediately, and Employee will not be entitled to any further severance.

9.4     The acceptance of the aforementioned payments by Employee shall constitute the exclusive remedy of Employee with respect to any claim Employee may have against the Company for termination of the employment of Employee or the Company's breach of this Agreement or for any other claim of any nature which the Employee may have against the Company.

## 10.     Non-Compete and Non-Solicitation.

10.1     For a period of two (2) years following the termination of Employee's employment with the Company, Employee agrees not to directly or indirectly recruit, solicit, induce or encourage any employee of the Company to become an employee for any other person or entity; nor to directly or indirectly induce or encourage any independent contractor of the Company to terminate a contracting relationship with the Company.

10.2     Employee further agrees that during the Employment Term and for a period of two (2) years thereafter, Employee will not directly or indirectly own an interest in, operate, join, begin, control, advise, consult with, render services to or otherwise participate in or work for or on behalf of any entity or individual(s) which operates a fitness club within fifty (50) miles of any of the Company's fitness clubs or which otherwise competes with the business of the Company or the Company's affiliates.

10.3     Employee and the Company intend that: (1) this covenant not to compete shall be construed as a series of separate covenants, one for each county; (2) if any portion of the restrictions set forth in this Section 10 should, for any reason whatsoever, be declared invalid by an arbitrator or a court of competent jurisdiction, the validity or enforceability of the remainder of such restrictions shall not thereby be adversely affected, nor shall such a decision adversely affect the Company's right to cease the severance payments set forth in Section 9 of this Agreement in the event that Employee has breached any of the obligations in this Section 10; and (3) the territorial and time limitations set forth in this Section 10 are reasonable and properly required for the adequate protection of the Company's business. In the event any such territorial or time limitation is deemed to be unreasonable by an arbitrator or a court of competent jurisdiction, Employee agrees to the reduction of the territorial or time limitation to the area or period which such arbitrator or court shall have deemed reasonable.

10.4     Employee further agrees that provided the Company makes the severance payments contemplated by Section 9, for a period of one (1) year following the termination of Employee's employment, Employee will advise and consult with the Company at the Company's discretion regarding Company business and operations and agrees to diligently and conscientiously use his best efforts to discharge projects as may be reasonably requested from time to time by the Company, including, but not limited to, communicating with various third parties on behalf of the Company on matters related to the Company's business. Notwithstanding the provisions of this Section 10.4, nothing in this Agreement shall preclude Employee from providing consulting services to any other person or entity for such projects which are not in violation of Section 10. It is understood that provision of these services would not preclude Employee's full time employment by another, non-competing, organization.

11.     **Confidential Information.**     During the Employment Term and thereafter, Employee agrees to hold the Company's confidential and proprietary information in strictest confidence and not to use, disclose or disseminate any of such information except as such disclosure, use or

4.

dissemination may be required in connection with Employee's work for the Company or as expressly authorized by the Company in writing. Employee further agrees that any work product created in connection with Employee's work for the Company will be the sole and exclusive property of the Company and hereby assigns to the Company all right, title and interest in all inventions and other intellectual property developed by Employee in working for the Company, except for any inventions or other intellectual property that Employee can prove qualifies under California Labor Code Section 2870 (as set forth in Exhibit A). Furthermore, Employee agrees to refrain from any unauthorized use or disclosure of any confidential information or property of any former employer or other third party. Employee agrees to use only that information that is generally known and used by persons with training and experience comparable to Employee's, that is common knowledge in the industry or otherwise in the public domain, or that is provided by or developed by the Company or developed by Employee on behalf of the Company.

**12.   Successor in Interest.** This Agreement and the rights and obligations hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, and shall also bind and inure to the benefit of any successor of the Company by merger or consolidation or any purchaser or assignee of all or substantially all of its assets, but, except to any such successor, purchaser, or assignee of the Company, neither this Agreement nor any rights or benefits hereunder may be assigned by either party hereto.

**13.   Invalid Provision.** In the event that any provision or portion of this Agreement shall be determined to be invalid or unenforceable for any reason, the remaining provisions of this Agreement shall remain in full force and effect to the fullest extent permitted by law.

**14.   Arbitration of Disputes.** To ensure rapid and economical resolution of any disputes which may arise under this Agreement, Employee and the Company agree that any and all disputes or controversies of any nature whatsoever arising from or related to Employee's employment or the interpretation, performance, enforcement or breach of this Agreement shall be resolved, to the fullest extent allowed by law, by confidential, final and binding arbitration conducted before a single arbitrator with Judicial Arbitration and Mediation Services, Inc. ("JAMS"), under the then-applicable JAMS employment rules. (In the event that there is no JAMS office within seventy-five (75) miles of Employee's work location, the arbitration shall be conducted by the American Arbitration Association ("AAA") under the then-applicable AAA rules.) **The parties acknowledge that by agreeing to this arbitration procedure, they waive the right to resolve any such dispute through a trial by jury, judge or administrative proceeding.** The arbitrator shall: (a) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law; and (b) issue a written arbitration decision including the arbitrator's essential findings and conclusions and a statement of the award. The Company shall pay all JAMS' arbitration fees (or AAA fees, where applicable) in excess of those that would be required if the dispute were decided in a court of law. Nothing in this Agreement is intended to prevent either Employee or the Company from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration. The arbitrator, and not a court, shall be authorized to determine whether the provisions of this paragraph apply to a dispute, controversy or claim sought to be resolved in accordance with these arbitration procedures.

**15.    Governing Laws.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the state applicable to Agreements made and to be performed entirely in the State of California.

**16.    Headings.** Titles or captions of sections contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.

**17.    Stock Option Grant.** Simultaneous with Employee entering into this Agreement, and as additional consideration for entering into this Agreement, Employee is receiving options to purchase 190,200 shares of common stock in 24 Hour Fitness Worldwide, Inc. The specific terms of the grants of such options are set forth in the option agreements for such grants, which are conditioned upon Employee entering into this Agreement, and are also subject to approval by the Company's Board of Directors.

**18.    Entire Agreement.** This Agreement shall constitute the entire agreement between the parties on this subject matter, shall supersede all prior agreements, whether written or oral, and may not be modified or amended, and no waiver shall be effective, unless by written document signed by both Employee and a duly-authorized officer of the Company; provided, however, that any increase in base salary, as provided above, shall become an amendment to this Agreement when approved by the Compensation Committee of the Board of Directors of the Company and recorded in the approved minutes of such meeting.

Executed as of the 31st day of March, 2003.

Mike Sheehan

Company Representative

## EXHIBIT A

### LIMITED EXCLUSION NOTIFICATION

THIS IS NOTICE, in accordance with Section 2872 of the California Labor Code, that the foregoing Employment Agreement does not require Employee to assign or offer to assign to the Company any invention that Employee developed entirely on Employee's own time without using the Company's equipment, supplies, facilities or trade secret information except for those inventions that either:

1.    Relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or

2.    Result from any work performed by Employee for the Company.

To the extent a provision in the foregoing Employment Agreement purports to require Employee to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is unenforceable.

This limited exclusion does not apply to any patent or invention covered by a contract between the Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States.

Exhibit B

STOCKHOLDER'S AGREEMENT, dated as of September _30_, 2005 between 24 Hour Fitness Worldwide, Inc., a Delaware corporation, and Michael William Sheehan (the "Employee").

WHEREAS, Forstmann Little & Co. Equity Partnership-VII, L.P., a Delaware limited partnership ("Equity-VII"), and Forstmann Little & Co. Subordinated Debt and Equity Management Buyout Partnership-VIII, L.P., a Delaware limited partnership ("MBO-VIII"), are the holders of shares of Class A Common Stock;

WHEREAS, the Employee wishes to subscribe for and purchase and the Company desires to issue and sell to the Employee authorized but unissued shares of Class B Common Stock on the terms and subject to the conditions set forth herein; and

WHEREAS, the Employee and the Company wish to provide for certain arrangements with respect to the Employee's rights to hold and dispose of the shares of Class B Common Stock acquired by the Employee hereunder.

NOW, THEREFORE, the parties hereto agree as follows:

1.     Definitions.

        1.1. Definitions; Rules of Construction.

                (a) The following terms, as used herein, shall have the following meanings:

        "Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

        "Affiliate" shall mean, with respect to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.

        "Affiliate Securities" shall mean any securities issued by an Affiliate of the Company.

        "Aggregate Number of Acquired Shares" shall mean the aggregate number of shares of Class B Common Stock acquired by the Employee pursuant hereto (adjusted, where appropriate, to reflect any Capital Transaction).

        "Aggregate Number of Shares Sold" shall mean, as at any date, the aggregate number of shares sold by the Employee pursuant to Section 3.3, 3.4 or 3.5 hereof prior to such date, if any (adjusted, where appropriate, to reflect any Capital Transaction effected after the date of any such sale).

        "Agreement" shall mean this Stockholder's Agreement, as amended, supplemented or modified from time to time.

"Capital Transaction" shall mean any Stock Dividend, recapitalization (including, without limitation, any special dividend or distribution), reclassification, spin-off, partial liquidation or similar capital adjustments (including, without limitation, through merger or consolidation).

"Cash EBITDA" shall mean the Company's reported book EBITDA during any relevant period determined in a manner consistent with the Company's past practices, plus (i) management and advisory fees, (ii) non-cash compensation charges, (iii) goodwill impairment charges, (iv) asset impairment charges, (v) restructuring charges, (vi) one-time adjustments, (vii) charges resulting from any loss on fixed assets, (viii) exchange loss, (ix) deferred revenues, (x) deferred expenses, and (xi) deferred rent, in each case to the extent incurred during the relevant period.

"Cause" shall mean (i) the occurrence of any of the events set forth in Section 4.2(a), (b) or (c), or (ii) the Employee's having (a) grossly neglected his or her assigned duties or (b) engaged in willful misconduct resulting in, or reasonably likely to result in, material and demonstrable damage to the Company.

"Certificate of Incorporation" shall mean the Amended and Restated Certificate of Incorporation of the Company, as in effect from time to time.

"Class A Common Stock" shall mean the Class A Common Stock, par value $0.01 per share, of the Company. There shall be included within the term Class A Common Stock any Class A Common Stock now or hereafter authorized to be issued, and any and all securities of any kind whatsoever of the Company which may be issued after the date hereof in respect of, or in exchange for, shares of Class A Common Stock pursuant to a Capital Transaction or otherwise.

"Class B Common Stock" shall mean the Class B Common Stock, par value $0.01 per share, of the Company. There shall be included within the term Class B Common Stock any Class B Common Stock now or hereafter authorized to be issued, and any and all securities of any kind whatsoever of the Company which may be issued after the date hereof in respect of, or in exchange for, shares of Class B Common Stock pursuant to a Capital Transaction or otherwise. Without limiting the generality of the foregoing, all references herein to the Class B Common Stock shall include, and the provisions hereof (including, without limitation, Articles 3 and 4 hereof) shall also be applicable to, the Class A Common Stock for which the Class B Common Stock shall be exchanged pursuant to the Certificate of Incorporation.

"Closing" shall have the meaning ascribed to such term in Section 3.2(d) hereof.

"Closing Date" shall have the meaning ascribed to such term in Section 2.2 hereof.

"Company" shall mean 24 Hour Fitness Worldwide, Inc., a Delaware corporation, and shall include any successor thereto by merger, consolidation, acquisition of substantially all the assets thereof, or otherwise and shall include any subsidiary of 24 Hour Fitness Worldwide, Inc. or such successor when describing an employment relationship.

2

"Competitive Activity" shall mean engaging in any of the following activities: (i) serving as a director or executive officer of any Competitor; (ii) directly or indirectly (X) controlling any Competitor or (Y) owning any equity or debt interests in any Competitor (other than Existing Interests and equity or debt interests which are publicly traded and do not exceed 2% of the particular class of interests then outstanding) (it being understood that, if any such interests in any Competitor are owned by an investment vehicle or other entity in which the Employee owns an equity interest, a portion of the interests in such Competitor owned by such entity shall be attributed to the Employee, such portion determined by applying the percentage of the equity interest in such entity owned by the Employee to the interests in such Competitor owned by such entity); (iii) directly or indirectly soliciting, diverting, taking away, appropriating or otherwise interfering with any of the clients, customers or suppliers of the Company or any Affiliate of the Company or any person or entity whose business the Company or any Affiliate of the Company has solicited in the most recent three-year period; or (iv) employment by (including serving as an officer or director of), or providing consulting services to, any Competitor. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Competitor, whether through the ownership of equity or debt interests, by contract or otherwise. For purposes of this definition, the term "Existing Interests" means solely the equity or debt interests in a Competitor owned by the Employee as of the date hereof and set forth on Annex I attached hereto.

"Competitor" shall mean Life Time Fitness, Inc., L.A. Fitness International, LLC, Bally Total Fitness Holding Corporation, Town Sports International Holdings, Inc., Gold's Gym International, Inc., Equinox Holdings, Inc., Spectrum Sports Club, Inc., Club One, Inc., Curves International, Inc., any successor or affiliate of the foregoing in the same line of business or any other Person with annual revenues in excess of $200 million that is engaged in or planning to engage in owning, operating or acquiring directly or indirectly (through a corporation, trust, partnership or other Person) a Physical Fitness Business that operates in any of the same markets as and competes directly or indirectly with a Physical Fitness Business which, at the time the Employee is Terminated, is owned or operated by the Company or any of its subsidiaries or which the Company or any of its subsidiaries intends to own, operate or acquire. The determination as to whether or not any Physical Fitness Business competes directly or indirectly with the Company or any of its subsidiaries shall be made by the Company in its reasonable discretion.

"Confidential or Proprietary Information" shall mean any non-public information about the Company or any Affiliate thereof which was acquired during the Employee's employment with the Company or any Affiliate thereof and which has or is reasonably likely to have competitive value to the Company or any Affiliate thereof.

"Election Date" shall have the meaning ascribed to such term in Section 3.2(a) hereof.

"Equity-VII" shall have the meaning ascribed to such term in the first "Whereas" clause hereof.

3

"Exchange Rate" shall have the meaning ascribed to such term in Section 3.3 hereof.

"Expenses of Sale" shall mean all expenses incurred by the FL & Co. Companies and their Affiliates in connection with the sale of the shares of the selling stockholders pursuant to Section 3.3, 3.4 or 3.5 hereof to the extent that such expenses are not paid or reimbursed by the Company.

"Fair Value" shall mean, if the Class A Common Stock is listed or traded in a manner referred to below, as at any date of Termination or, in the case of a determination pursuant to Section 4.3, the date of any Repurchase Notice, (i) with respect to the Class B Common Stock, the product, rounded to three decimal places, of (x) the fraction of a share of Class A Common Stock for which a share of Class B Common Stock is exchangeable in accordance with the Exchange Rate and (y) an amount equal to the average of the daily Closing Prices on the twenty consecutive trading days immediately preceding the date of Termination or the applicable Repurchase Notice, as the case may be and (ii) with respect to the Class A Common Stock, an amount equal to the average of the daily Closing Prices on the twenty consecutive trading days immediately preceding the date of Termination or the applicable Repurchase Notice, as the case may be. As used in this Agreement, the term "Closing Price", with respect to the Class A Common Stock, on any day shall mean the last reported sales price on such day or, in the event no such sale takes place on such day, the average of the closing bid and asked prices, in each case on the New York Stock Exchange or, if the Class A Common Stock is not then listed or admitted to trading on such exchange, on the principal national securities exchange on which the Class A Common Stock is listed or admitted to trading, or, if the Class A Common Stock is not listed or admitted to trading on any such exchange, the average of the highest reported bid and lowest reported asked prices as furnished by the National Association of Securities Dealers through the National Association of Securities Dealers Automated Quotation System ("NASDAQ") (or a similar organization if NASDAQ is no longer reporting such information). If the Class A Common Stock is not listed and traded in a manner that the pricing information referred to above is available for the period required hereunder, the Fair Value per share of Class B Common Stock or Class A Common Stock, as the case may be, shall be determined by an appraisal or valuation by a nationally recognized valuation or investment banking firm selected by the Board of Directors of the Company; provided that for such time as the Board of Directors of the Company continues to consider Cash EBITDA to be an accurate measure of the Company's economic performance, the principal focus of such firm in determining the Fair Value shall be the Cash EBITDA of the Company.

"FL & Co. Companies" shall mean Equity VII and MBO-VIII, collectively.

"Legal Representative" shall mean the guardian, executor, administrator or other legal representative of the Employee. All references herein to the Employee shall be deemed to include references to the Employee's Legal Representative, if any, unless the context otherwise requires.

"Litigation" shall mean any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby.

4

"MBO-VIII" shall have the meaning ascribed to such term in the first "Whereas" clause hereof.

"Permitted Transferee" shall have the meaning ascribed to such term in Section 3.1(b) hereof.

"Person" shall mean an individual, a corporation, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Physical Fitness Business" shall mean (i) the business of operating or managing any physical fitness center or facility, (ii) any other business conducted by the Company or its subsidiaries or (iii) any other business or activity similar to or ancillary to the businesses described in clauses (i) or (ii) above.

"Prime Rate" shall mean the rate of interest per annum publicly announced from time to time by J.P. Morgan Chase & Co. or any successor bank thereto as its prime rate in effect at its principal office in New York City.

"Prohibited Activity" shall have the meaning ascribed to such term in Section 4.1 hereof.

"Promissory Note" shall mean any promissory note executed and delivered by the Employee to evidence the Employee's loan from the Company to finance in part the Employee's purchase of shares of Class B Common Stock hereunder.

"Purchase Closing" shall have the meaning ascribed to such term in Section 2.2 hereof.

"Purchased Shares" shall have the meaning ascribed to such term in Section 3.2(d) hereof.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.1 hereof.

"Put Date" shall have the meaning ascribed to such term in Section 3.2(a) hereof.

"Release Date" shall mean the date on which the FL & Co. Companies and their Affiliates shall cease to own in the aggregate directly or indirectly at least 20 percent of the then outstanding securities of the Company having the power to vote in the election of directors of the Company.

"Representative" shall have the meaning ascribed to such term in Section 6.13(b) hereof.

"Repurchase Notice" shall have the meaning ascribed to such term in Section 4.2 hereof.

5

"Sale Obligations" shall mean any liabilities and obligations (including liabilities and obligations for indemnification, amounts paid into escrow and post-closing adjustments) incurred by the selling stockholders in connection with the sale of their shares pursuant to Section 3.3, 3.4 or 3.5 hereof.

"Scheduled Closing Date" shall have the meaning ascribed to such term in Section 3.2(d) hereof.

"Section 3.2(b)(i) Notice Date" shall have the meaning ascribed to such term in Section 3.2(b)(i) hereof.

"Section 3.2(b)(ii) Notice Date" shall have the meaning ascribed to such term in Section 3.2(b)(ii) hereof.

"Section 3.4 Notice" shall have the meaning ascribed to such term in Section 3.4(a) hereof.

"Stock Dividend" shall mean any stock split, stock dividend, reverse stock split or similar transaction which changes the number of outstanding shares of capital stock of the Company.

"Stock Pledge Agreement" shall mean the stock pledge agreement which the Employee is entering into with the Company in connection with the financing in part of the Employee's purchase of shares of Class B Common Stock hereunder.

"Termination" or "Terminated" shall mean that the Employee's employment on a full-time basis by the Company and its subsidiaries shall have ceased for any reason whatsoever (including by reason of death, permanent disability or adjudicated incompetency) (it being understood that the Employee's employment by the Company and its subsidiaries shall not be deemed to have ceased during any leaves-of-absence or during the period of any consulting or advisory relationship between the Employee and the Company or any of its direct or indirect wholly-owned subsidiaries following the date on which such employment otherwise would have been deemed to cease, in each case to the extent approved by the Company on a case-by-case basis). When used without the phrase "by the Company," the term "Termination" or "Terminated" shall mean that such employment shall have ceased as a result of actions taken by either the Company or any of its direct or indirect wholly-owned subsidiaries or the Employee, or by the death, permanent disability or adjudicated incompetency of the Employee.

"Third Party" shall mean any Person other than any FL & Co. Company or an Affiliate or a partner of any of the FL & Co. Companies or an. Affiliate of such partner.

"Transaction" shall mean any sale pursuant to Section 3.3, 3.4 or 3.5 hereof.

"Unvested Shares" shall mean, as at any date, all shares of Class B Common Stock owned by the Employee which are not Vested Shares as of such date.

"Valuation Date" shall mean the last day of the fiscal year of the Company immediately preceding the fiscal year in which the Employee's employment is Terminated.

"Vested Shares" shall mean the number of shares of Class B Common Stock determined as follows: (i) if the Employee is Terminated on or before June 7, 2006, zero; (ii) if the Employee is Terminated after June 7, 2006 but on or before December 7, 2006, (x) 25 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (iii) if the Employee is Terminated after December 7, 2006 but on or before June 7, 2007, (x) 37.5 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (iv) if the Employee is Terminated after June 7, 2007 but on or before December 7, 2007, (x) 50 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (v) if the Employee is Terminated after December 7, 2007 but on or before June 7, 2008, (x) 62.5 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (vi) if the Employee is Terminated after June 7, 2008 but on or before December 7, 2008, (x) 75 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; (vii) if the Employee is Terminated after December 7, 2008 but on or before June 7, 2009, (x) 87.5 percent of the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold; and (viii) if the Employee is Terminated after June 7, 2009, (x) the Aggregate Number of Acquired Shares minus (y) the Aggregate Number of Shares Sold.

(b) In this Agreement, unless the context otherwise requires, words in the singular number or in the plural number shall each include the singular number and the plural number.

2.    Purchase and Sale of Class B Common Stock.

2.1. Subscription of Class B Common Stock. The Employee hereby subscribes for the number of shares of Class B Common Stock set forth opposite the Employee's name on Annex A hereto, at a price of $5.051356 per share in cash (the "Purchase Price").

2.2. Closing of the Purchase and Sale. The closing of the transactions contemplated hereby (the "Purchase Closing") shall take place at the offices of Kirkland & Ellis LLP, 153 East 53rd Street, New York, New York 10022 at such time as the Company shall designate on the date hereof (the "Closing Date"). At the Purchase Closing, the Company shall deliver to the Employee a duly executed certificate representing the number of shares of Class B Common Stock being purchased by the Employee and shall enter the Employee's name on the books of the Company as the stockholder of record of such shares of Class B Common Stock as of the Closing Date. At or prior to the Purchase Closing, the Employee shall deliver to the Company an amount equal to the aggregate purchase price for such shares, by delivering a check payable to the Company, and by delivering an executed Promissory Note to the Company, in the respective amounts forth on Annex A. The Promissory Note shall be accompanied by an executed Stock Pledge Agreement. The Employee agrees that he or she shall properly execute and file an election under Section 83(b) of the Internal Revenue Code of 1986, as amended, with respect to his or her shares of Class B Common Stock within thirty days of the Closing Date.

3.    Rights and Restrictions on Class B Common Stock.

3.1. No Sale or Transfer.

7

(a) The Employee shall not sell, transfer, assign, exchange, pledge, encumber or otherwise dispose of any shares of Class B Common Stock acquired hereunder or grant any option or right to purchase such shares or any legal or beneficial interest therein, except in accordance with the provisions of this Agreement and the Stock Pledge Agreement.

(b) The Employee may transfer any shares of Class B Common Stock acquired hereunder by will or the laws of descent and distribution, but only to:

(i) any spouse, parent, child (whether natural or adopted), grandchild, brother or sister of the Employee, or

(ii) any trust, corporation, limited liability company or partnership which is controlled by any spouse, parent, child (whether natural or adopted), grandchild, brother or sister of the Employee

(the Person or Persons to which shares of Class B Common Stock are transferred in accordance with this Section 3.1(b) being herein referred to as the "Permitted Transferee"); provided, that, for any transfer to the Permitted Transferee to be effective hereunder, the Permitted Transferee shall agree in writing to be bound by all the terms of this Agreement applicable to the Employee (including, without limitation, Article 4 and Section 6.13(b) hereof) and the Promissory Note and the Stock Pledge Agreement as if the Permitted Transferee originally had been a party hereto; and provided, further, that all of the equity holders or trustees of any Permitted Transferee that is neither a natural person nor a partnership and all of the partners of any Permitted Transferee that is a partnership shall agree in writing not to transfer any equity interests they then own or control or may hereafter acquire in the Permitted Transferee that is neither a natural person nor a partnership or any partnership interests they then own or may hereafter acquire in the Permitted Transferee that is a partnership except to a Person described in paragraph (i) or (ii) above that has made the same agreement in writing to the Company, so long as such Permitted Transferee shall own any shares of Class B Common Stock. Any reference herein to the Employee shall be to the Permitted Transferee from and after the date the transfer is effected in accordance with this Section 3.1(b). Without limiting the generality of the foregoing, the provisions of Section 4.2 hereof shall be likewise applicable to any Permitted Transferee, commencing upon the date that such Person becomes a Permitted Transferee, for the respective periods they would have applied to the Employee.

3.2. Employment Termination.

(a) If the Employee shall be Terminated, irrespective of whether the Employee receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Company shall have the right, at its option, exercisable by delivery of written notice to the Employee within 90 days (or, in the case of a Termination by reason of death, permanent disability or adjudicated incompetency, 180 days) following the date of Termination (the date of delivery of such written notice being referred to herein as the "Election Date"), to purchase all or any portion of the Unvested Shares held by the Employee as of the date or such Termination. If the Employee shall be Terminated by the Company without Cause or by reason of death, permanent disability or adjudicated incompetency, irrespective of whether the Employee

8

receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Employee shall have the right, at its option, exercisable by delivery of written notice to the Company within 90 days (or, in the case of a Termination by reason of death, permanent disability or adjudicated incompetency, 180 days) following the date of Termination (the date of delivery of such written notice being referred to herein as the "Put Date"), to require the Company to purchase all, but not less than all, of the Unvested Shares held by the Employee as of the date of such Termination; provided that within 5 business days of being notified by the Company of the purchase price per share of the shares of Class B Common Stock subject to repurchase pursuant to this sentence, if such purchase price per share is less than the Purchase Price, the Employee shall have the option to withdraw such notice but shall not have the option to redeliver any such notice thereafter. The purchase price per share of the shares of Class B Common Stock purchased pursuant to this Section 3.2(a) shall be equal to the lower of (i) Purchase Price, adjusted to reflect any Capital Transaction between the Closing Date and the Election Date or Put Date, as the case may be, and (ii) the Fair Value as of the date of such Termination.

(b) (i) If the Employee shall be Terminated by reason of death, permanent disability or adjudicated incompetency, irrespective of whether the Employee receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Employee shall have the right, at its option, exercisable by delivery of written notice to the Company within 180 days following the date of Termination (the date of delivery of such written notice being referred to herein as the "Section 3.2(b)(i) Notice Date"), to require the Company to purchase all, but not less than all, of the Vested Shares held by the Employee as of the date of such Termination; provided that within 5 business days of being notified by the Company of the purchase price per share of the shares of Class B Common Stock subject to repurchase pursuant to this Section 3.2(b)(i), the Employee shall have the option to withdraw such notice but shall not have the option to redeliver any such notice thereafter. The purchase price per share of the shares of Class B Common Stock purchased pursuant to this Section 3.2(b)(i) shall be equal to the Fair Value as of the date of such Termination.

(ii) If the Employee shall be Terminated by the Company without Cause (other than by reason of death, permanent disability or adjudicated incompetency), irrespective of whether the Employee receives, in connection with such Termination, any severance or other payment from the Company or any of its Affiliates under any employment agreement or otherwise, the Employee shall have the right, at its option, exercisable by delivery of written notice to the Company within 90 days following the date of Termination (the date of delivery of such written notice being referred to herein as the "Section 3.2(b)(ii) Notice Date"), to require the Company to purchase all, but not less than all, of the Vested Shares held by the Employee as of the date of such Termination; provided that within 5 business days of being notified by the Company of the purchase price per share of the shares of Class B Common Stock subject to repurchase pursuant to this Section 3.2(b)(ii), the Employee shall have the option to withdraw such notice but shall not have the option to redeliver any such notice thereafter. The purchase price per share of the shares of Class B Common Stock purchased pursuant to this

9

Section 3.2(b)(ii) shall be equal to the Fair Value as of the date of such Termination.

(iii)    If the Employee shall be Terminated other than by the Company (or by reason of death, permanent disability or adjudicated incompetency) or if the Employee shall be Terminated by the Company for Cause, the Employee shall have no right to require the Company to purchase any Vested Shares.

(c)    All shares of Class B Common Stock held by any Employee that the Company does not elect to purchase, or that the Employee does not require the Company to purchase, pursuant to the provisions of Section 3.2(a) or 3.2(b) shall continue to be subject to the provisions of this Agreement (including, without limitation, Sections 3.3, 3.4 and 3.5 and Article 4 hereof).

(d)    Subject to Sections 3.2(e) and 3.2(f) hereof, the closing (the "Closing") of any purchase of shares of Class B Common Stock pursuant to Section 3.2(a) or 3.2(b) hereof (the "Purchased Shares") shall take place at the principal office of the Company on the later of (i) 10 days after the Election Date, the Put Date or the Section 3.2(b)(ii) Notice Date, as the case may be, (ii) (if applicable) 30 days after the Section 3.2(b)(i) Notice Date and (iii) (if applicable) 10 days after the appointment of a Legal Representative (such later date, the "Scheduled Closing Date"). At the Closing, the Employee shall sell, convey, transfer, assign and deliver to the Company all right, title and interest in and to the Purchased Shares, which shall constitute (and, at the Closing, the Employee shall certify the same to the Company in writing) good and unencumbered title to such shares, free and clear of all liens, security interests, encumbrances and adverse claims of any kind and nature (other than those in favor of the Company and the FL & Co. Companies pursuant to this Agreement), and shall deliver to the Company a certificate representing the shares duly endorsed for transfer, or accompanied by appropriate stock transfer powers duly executed, and with all necessary transfer tax stamps affixed thereto at the expense of the Employee, and the Company shall deliver to the Employee, in full payment of the purchase price for the Purchased Shares, either a wire transfer to an account designated by the Employee or a cashier's, certified or official bank check payable to the order of the Employee (the method of payment to be at the option of the Company), in the amount equal to the Purchase Price (adjusted as described in Section 3.2(a), if applicable) or the Fair Value, as the case may be, multiplied by the number of Purchased Shares. Notwithstanding anything herein to the contrary, from and after the Election Date, the Put Date, the Section 3.2(b)(i) Notice Date or the Section 3.2(b)(ii) Notice Date, as the case may be, the Employee shall not have any rights with respect to any of the Purchased Shares (including any rights pursuant to Sections 3.3 and 3.4 hereof), except to receive the purchase price therefor.

(e)    Notwithstanding the provisions of Section 3.2(d) hereof, if the Company exercises its option to purchase, or the Employee requires the Company to purchase, shares of Class B Common Stock pursuant to Section 3.2(a) or 3.2(b) hereof, but the Company is prohibited from effecting the Closing on the Scheduled Closing Date by any contractual obligation of the Company or any of its Affiliates (including any restriction in any agreement or arrangement with any lender) or by applicable law, then the Closing shall take place on the first practicable date on which the Company is permitted to purchase such shares, and, at the Closing, the Company shall pay to the Employee interest on the unpaid purchase price from and including

10

the Scheduled Closing Date to, but not including, the date of the Closing, at the Prime Rate. If at any time the prohibition shall cease to be applicable to any portion of the shares not purchased, then the Company shall purchase such portion on the first practicable date on which the Company is permitted to do so. The Company shall not declare or pay any dividend of cash or cash equivalents, or purchase any shares of Class A Common Stock or Class B Common Stock for cash or cash equivalents, until the purchase price for all of the Purchased Shares has been paid in full.

(f) Notwithstanding anything to the contrary contained in this Section 3.2, if at any time prior to any Scheduled Closing Date under this Section 3.2 the Company shall become entitled to purchase any shares of Class B Common Stock, then held by an Employee, pursuant to Section 4.2 hereof, the Company shall be relieved of any of its obligations under Section 3.2 to purchase such shares and the Company's rights to purchase such shares shall be governed by Section 4.2.

3.3. Participation in Sale of Class A Common Stock. The Employee, at the Employee's option, may participate proportionately (and the FL & Co. Companies shall allow the Employee to participate proportionately) in any sale (other than a public offering which shall be governed by Section 3.4 hereof) of all or a portion of the shares of Class A Common Stock owned by either of the FL & Co. Companies to any Third Party by (a) exchanging the same percentage of the Employee's shares of Class B Common Stock as the FL & Co. Companies propose to sell of their shares of Class A Common Stock to the Third Party (determined on the basis of the aggregate number of such shares of Class A Common Stock owned, and the aggregate number of such shares being sold by, the FL & Co. Companies) for shares of Class A Common Stock in accordance with the Exchange Rate, as defined in Subsection 4(d)(i) of Section A of Article Fourth of the Certificate of Incorporation (the "Exchange Rate"), and (b) selling the Class A Common Stock received in such exchange to the Third Party. The Company shall notify the Employee in writing of the FL & Co. Companies' intention to effect such a sale to a Third Party, the identity of the Third Party and the nature and purchase amount of consideration to be paid by the Third Party, and shall set forth its calculation of the Exchange Rate, at least 10 days, or such shorter time as the Company deems practicable, before the closing of any such proposed sale of shares of Class A Common Stock. Schedule I attached hereto sets forth an example illustrating the calculation of the Exchange Rate. Any sale of shares of Class A Common Stock by the Employee pursuant to this Section 3.3 shall be for the same consideration per share, on the same terms and subject to the same conditions as the sale of shares of Class A Common Stock owned by the FL & Co. Companies, provided that the Employee shall not be required to make representations to such Third Party that are solely related to the business of the Company. The Company shall, immediately prior to, and contingent upon, the consummation of such sale, exchange such shares of Class B Common Stock for Class A Common Stock in accordance with the Exchange Rate. If the Employee sells any shares pursuant to this Section 3.3, the Employee shall pay and be responsible for the Employee's proportionate share of the Expenses of Sale and the Sale Obligations; provided that all such Expenses of Sale and Sale Obligations for which the Employee shall be responsible shall be withheld from and shall not, in the aggregate, exceed the net consideration otherwise payable to the Employee in connection with such sale.

11

3.4.<u>Participation in Public Offering of Class A Common Stock</u>.

(a) Subject to the provisions of the Certificate of Incorporation (including, without limitation, Section A.4 of Article Fourth thereof), if the FL & Co. Companies propose to sell all or any portion of the shares of Class A Common Stock owned by the FL & Co. Companies in a public offering, the Employee shall be entitled, and shall be required as determined by the Board of Directors of the Company in its sole discretion, to participate in such public offering by (i) exchanging the same percentage of the Employee's shares of Class B Common Stock as the FL & Co. Companies propose to sell of their shares of Class A Common Stock in the public offering (determined on the basis of the aggregate number of shares of Class A Common Stock owned, and the aggregate number of such shares being sold, by the FL & Co Companies in the public offering, regardless of the amount specified in any registration statement or prospectus dated prior to the date of the public offering), and (ii) selling in the public offering the Class A Common Stock received in such exchange. The Company shall notify the Employee in writing of the FL & Co. Companies' intention to effect such public offering at least 10 days, or such shorter time as the Company deems practicable, before the filing with the Securities and Exchange Commission of the registration statement relating to such public offering (the "Section 3.4 Notice") and shall cause the Employee's shares to be sold in such public offering to be included therein. The Section 3.4 Notice shall indicate whether or not the Board of Directors of the Company has determined that the Employee shall be required to participate in the public offering. If the Board of Directors of the Company does not require the Employee to participate in the public offering and the Employee wishes to participate in such public offering, the Employee shall notify the Company in writing within five days after receipt of the Section 3.4 Notice of his or her intention to participate in such public offering, including the number of shares with respect to which he or she will so participate. Any failure by the Employee to so notify the Company within such five-day period shall be deemed an election by the Employee not to participate in such public offering with respect to any of his or her shares. If the Employee sells any shares pursuant to this Section 3.4, the Employee shall pay and be responsible for the Employee's proportionate share of the Expenses of Sale and the Sale Obligations (including indemnifying the underwriters of such public offering, but only with respect to written information furnished by the Employee expressly for use in the registration statement (or any amendment thereto), including any information statement, preliminary prospectus or final prospectus (or any amendment or supplement thereto)); provided that in no event shall the Employee be required to pay any such Expenses of Sale or Sale Obligations which, in the aggregate, exceed the net proceeds to be received by the Employee in connection with such sale.

(b) In connection with any proposed public offering of securities of the Company, whether by any of the FL & Co. Companies or the Company or otherwise, the Employee agrees (i) to supply any information reasonably requested by the Company in connection with the preparation of a registration statement and/or any other documents relating to such public offering, and (ii) to execute and deliver any agreements and instruments reasonably requested by the Company to effectuate such public offering, including, without limitation, an underwriting agreement, a custody agreement and a "lock up" or "hold back" agreement pursuant to which the Employee will agree not to sell or purchase any securities of the Company (whether or not such securities are otherwise governed by this Agreement) for the same period of time following the public offering as is agreed to by the FL & Co. Companies

12

with respect to themselves. If the Company requests that the Employee take any of the actions referred to in clause (i) or (ii) of the previous sentence, the Employee shall take such action promptly but in any event within five days following the date of such request.

        3.5. Required Participation in Sale of Class A Common Stock by the FL & Co. Companies. Notwithstanding any other provision of this Agreement to the contrary, if the FL & Co. Companies shall propose to sell (including by exchange, in a business combination or otherwise) all or any portion of their shares of Class A Common Stock in a bona fide arm's-length transaction, the FL & Co Companies, at their option, may require that (x) the Employee exchange the same percentage of the Employee's shares of Class B Common Stock as the FL & Co. Companies propose to sell of their shares of Class A Common Stock in the transaction (determined on the basis of the aggregate number of shares of Class A Common Stock owned, and the aggregate number of such shares being sold, by the FL & Co. Companies) for shares of Class A Common Stock in accordance with the Exchange Rate, and (y) sell all the Class A Common Stock received in such exchange for the same consideration per share, on the same terms and subject to the same conditions in the same transaction and, if stockholder approval of the transaction is required and the Employee is entitled to vote thereon, that the Employee vote the Employee's shares in favor thereof. The Company shall calculate the Exchange Rate and shall, immediately prior to, and contingent upon, the consummation of the transaction exchange such shares of Class B Common Stock for Class A Common Stock in accordance with the Exchange Rate. If the Employee sells any shares pursuant to this Section 3.5, the Employee shall pay and be responsible for the Employee's proportionate share of the Expenses of Sale and the Sale Obligations; provided that all such Expenses of Sale and Sale Obligations for which the Employee shall be responsible shall be withheld from and shall not, in the aggregate, exceed the net consideration otherwise payable to the Employee in connection with such sale.

        3.6. Termination of Restrictions and Rights. Notwithstanding any other provision of this Agreement to the contrary, but subject to the restrictions of all applicable federal and state securities laws, including the restrictions in this Agreement relating thereto, from and after the Release Date any and all shares of Class B Common Stock owned by the Employee (a) may be sold, transferred, assigned, exchanged, pledged, encumbered or otherwise disposed of (and the Employee may grant any option or right to purchase such shares or any legal or beneficial interest therein, or may continue to hold such shares), free of the restrictions contained in this Agreement and (b) shall no longer be entitled to any of the rights contained in this Agreement. Without limiting the generality of the foregoing, from and after the Release Date, the provisions of Articles 3 and 4 hereof (other than this Section 3.6 and Sections 4.1(a), 4.1(b) and 4.1(c) hereof) shall terminate and have no further force or effect. This provision shall not relieve the Employee from any restrictions imposed by law or by any other agreement or arrangement.

4.      Prohibited Activities.

        4.1. Prohibition Against Certain Activities. The Employee agrees that (a) the Employee will not at any time during the Employee's employment (other than in the course of such employment) with the Company or any Affiliate thereof, or after a Termination, disclose or furnish to any other Person or use for the Employee's own or any other Person's account any Confidential or Proprietary Information unless required to do so by law or judicial process, (b) if the Employee is Terminated, the Employee will not for three years following such Termination

13

hire or employ, or directly or indirectly solicit for employment, including without limitation recommending to any subsequent employer the solicitation for employment of, any employee of the Company or any Affiliate thereof, (c) the Employee will not at any time during the Employee's employment with the Company or any Affiliate thereof or after a Termination publish or make any disparaging statements about the Company, any Affiliate or any of their directors, officers or employees, under circumstances where it is reasonably foreseeable that the statements will be made public and (d) the Employee will not breach the provisions of Section 3.1 hereof (any activity prohibited by clause (a), (b), (c) or (d) of this Section 4.1 being referred to as a "Prohibited Activity"). For purposes of clause (c) of the previous sentence, a disparaging statement is a communication which, if made public, would tend to malign the business or reputation of the Person or entity about whom such statement is made.

4.2. Right to Purchase Shares. The Employee understands and agrees that the Company has granted to the Employee the right to purchase shares of Class B Common Stock to reward the Employee for the Employee's future efforts and loyalty to the Company and its Affiliates by giving the Employee the opportunity to participate in the potential future appreciation of the Company. Accordingly, (a) if the Employee engages in any Prohibited Activity, or (b) if, at any time during the Employee's employment with the Company or any of its Affiliates or during the three years following a Termination, the Employee engages in any Competitive Activity, or (c) if, at any time (whether during the Employee's employment or after any Termination thereof), the Employee is convicted of a felony, then, in addition to any other rights and remedies available to the Company or any of its Affiliates (at law, in equity or under any employment agreement, award agreement or other agreement or arrangement of the Employee), the Company shall be entitled, at its option, exercisable by written notice (the "Repurchase Notice") to the Employee, to purchase all or any portion of the shares of Class B Common Stock then held by the Employee.

4.3. Purchase Price; Closing.

(a) The purchase price per share of the shares of Class B Common Stock purchased pursuant to this Article 4 shall be equal to the lesser of (i) the Purchase Price (adjusted to reflect any Capital Transaction effected after the Closing Date and prior to the date of the Repurchase Notice) and (ii) the Fair Value as of the date of the Repurchase Notice.

(b) The closing of a purchase pursuant to this Section 4.3 shall take place at the principal office of the Company 10 days following the date of the Repurchase Notice (and if such tenth day is not a business day, then the first business day thereafter), except that if the Company is prohibited from repurchasing any shares of Class B Common Stock pursuant to this Article 4 by any contractual obligation of the Company or any of its Affiliates (including any restriction in any agreement or arrangement with any lender) or by applicable law, the closing of such purchase shall take place on the first practicable date on which the Company is permitted to purchase such shares (and the provisions of the last sentence of Section 3.2(e) shall likewise apply to purchases pursuant to this Article 4). At such closing, the Employee shall sell, convey, transfer, assign and deliver to the Company all right, title and interest in and to the shares of Class B Common Stock being purchased by the Company, which shall constitute (and, at the closing, the Employee shall certify the same to the Company in writing) good and unencumbered title to such shares, free and clear of all liens, security interests, encumbrances and adverse

14

claims of any kind and nature (other than those in favor of the Company and the FL & Co. Companies pursuant to this Agreement), and shall deliver to the Company a certificate representing the shares duly endorsed for transfer, or accompanied by appropriate stock transfer powers duly executed, and with all necessary transfer tax stamps affixed thereto at the expense of the Employee, and the Company shall deliver to the Employee, in full payment of the purchase price payable pursuant to this Section 4.3 for the shares of Class B Common Stock purchased, a check payable to the order of the Employee, in the amount of the aggregate purchase price for the shares purchased. Notwithstanding anything herein to the contrary, from and after the date of the Repurchase Notice, the Employee shall not have any rights with respect to any shares of Class B Common Stock which the Employee is required to sell to the Company pursuant to this Article 4 (including any rights pursuant to Section 3.3 or 3.4 hereof), except to receive the purchase price therefor.

4.4. Notwithstanding anything to the contrary set forth in Sections 3.3, 3.4 or 3.5 hereof, if at the time of a Transaction in which the Employee is participating, the Company is entitled to purchase the Employee's shares of Class B Common Stock pursuant to this Article 4, and if the purchase price per share for a purchase pursuant to this Article 4 would be less than the proceeds per share to the Employee from such Transaction, then the Employee shall be entitled to receive only the aggregate purchase price payable under this Article 4, with the balance of the proceeds of sale in the Transaction being remitted to the other stockholders of the Company participating in such Transaction pro rata in accordance with their respective participation in such Transaction.

5.     <u>Stock Certificate Legend and Investment Representations; Other Representations.</u>

5.1. <u>Legend</u>. All certificates representing shares of Class B Common Stock acquired hereunder or hereafter by the Employee (unless registered under the Act) shall bear the following legend:

> "The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended, or any securities regulatory authority of any state, and may not be sold, transferred, assigned, exchanged, pledged, encumbered or otherwise disposed of except in compliance with all applicable securities laws and except in accordance with the provisions of a Stockholder's Agreement with the Company, a copy of which is available for inspection at the offices of the Company."

5.2. <u>Representations and Warranties of the Employee</u>. The Employee represents and warrants that: (a) the Employee understands that (i) the offer and sale of shares of Class B Common Stock in accordance with this Agreement have not been and will not be registered under the Act, and it is the intention of the parties hereto that the offer and sale of the securities be exempt from registration under the Act and the rules promulgated thereunder by the Securities and Exchange Commission; (ii) the reliance of the Company on such exemption is predicated upon such Employee's representations set forth herein; (iii) the shares of Class B Common Stock being acquired hereunder cannot be sold, transferred, assigned, exchanged, pledged, encumbered or otherwise disposed of unless they are registered under the Act or an exemption from

15

registration is available; (iv) the purchase of Class B Common Stock hereunder does not entitle the Employee to participate in any other equity program of the Company, whether now existing or hereafter established; and (v) the Company is relying on the representations contained in this Agreement in engaging in the sale of the Class B Common Stock and would not engage in such sale in the absence of the representations contained in this Agreement; (b) the Employee is acquiring the shares of Class B Common Stock being acquired hereunder for investment for the Employee's own account and not with a view to the distribution thereof; (c) the Employee will not directly or indirectly, sell, transfer, assign, exchange, pledge, encumber or otherwise dispose of any shares of Class B Common Stock being acquired hereunder except in accordance with this Agreement, the Stock Pledge Agreement and applicable law; (d) the Employee has, or the Employee together with the Employee's advisers, if any, have, such knowledge and experience in financial and business matters that the Employee is, or the Employee together with the Employee's advisers, if any, are, and will be capable of evaluating the merits and risks relating to the Employee's purchase of shares of Class B Common Stock under this Agreement; (e) the Employee has been given the opportunity to obtain information and documents relating to the Company and to ask questions of and receive answers from representatives of the Company concerning the Company and the Employee's investment in the Class B Common Stock; (f) the Employee's decision to invest in the Company has been based upon independent investigations made by the Employee and the Employee's advisers, if any; (g) the Employee is able to bear the economic risk of a total loss of the Employee's investment in the Company; (h) the Employee has adequate means of providing for the Employee's current needs and foreseeable personal contingencies and has no need for the Employee's investment in the Class B Common Stock to be liquid; (i) the Employee is an "accredited investor" within the meaning of either Rule 501(a)(5) or (a)(6) promulgated under the Securities Act of 1933, as amended; and (j) this Agreement has been duly executed and delivered by the Employee and constitutes a legal, valid and binding obligation of the Employee, enforceable in accordance with its terms, subject to limitations in bankruptcy and to other equitable limitations.

6.    <u>Miscellaneous</u>.

6.1.<u>Distributions</u>.  In the event of any dividend, distribution or exchange paid or made in respect of the Class B Common Stock consisting of Affiliate Securities, (a) the restrictions and rights with respect to the Class B Common Stock that are contained in this Agreement shall be applicable to the Affiliate Securities without further action of the parties (with the references to Class B Common Stock being deemed references to the Affiliate Securities and the references to the Company being deemed references to the Affiliate), and (b) as a condition precedent to the receipt of the Affiliate Securities by the Employee, the Employee shall enter into a stockholder's agreement containing terms substantially equivalent to those contained herein with respect to the Affiliate Securities (but reflecting the economics of the dividend, distribution or exchange and the capitalization of the Affiliate).  The Board of Directors of the Company, in good faith, shall determine such terms and its determination shall be final and binding on the Employee.

6.2.<u>Further Assurances</u>.  Each party hereto shall do and perform or cause to be done and performed all further acts and things and shall execute and deliver all other agreements, certificates, instruments, and documents as any other party hereto reasonably may request in

16

order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

6.3.<u>Governing Law</u>.  This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

6.4.<u>Specific Performance</u>.  The parties hereto acknowledge that there will be no adequate remedy at law for a violation of any of the provisions of this Agreement and that, in addition to any other remedies which may be available, all of the provisions of this Agreement shall be specifically enforceable in accordance with their respective terms.

6.5.<u>Invalidity of Provisions</u>.  The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity or enforceability of the remainder of this Agreement, in that jurisdiction or the validity or enforceability of this Agreement, including that provision, in any other jurisdiction.  If any provision of this Agreement is held unlawful or unenforceable in any respect, such provision shall be revised or applied in a manner that renders it lawful and enforceable to the fullest extent possible.

6.6.<u>Notice</u>.  All notices and other communications hereunder shall be in writing and, unless otherwise provided herein, shall be deemed to have been given when received by the party to whom such notice is to be given at its address set forth below, or such other address for the party as shall be specified by notice given pursuant hereto:

       (a)     If to the Company, to:

            24 Hour Fitness Worldwide, Inc.
            12647 Alcosta Boulevard., Suite 500
            San Ramon, California  94583
            Attention:  Tony Bakos

            with a copy to:

            24 Hour Fitness Worldwide, Inc.
            12647 Alcosta Boulevard., Suite 500
            San Ramon, California  94583
            Attention:  Colin Heggie

            and with a copy (which shall not constitute notice to the Company) to:

            Forstmann Little & Co.
            767 Fifth Avenue, 44th Floor
            New York, New York 10153
            Attention: Geoff McKay

            and with a copy (which shall not constitute notice to the Company) to:

17

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Attention: Andrew E. Nagel

(b) If to the FL & Co. Companies, to:

Forstmann Little & Co.
767 Fifth Avenue, 44th Floor
New York, New York 10153
Attention: Geoff McKay

with a copy (which shall not constitute notice to the Company) to:

Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Attention: Andrew E. Nagel

(c) If to the Employee, to the address set forth below the Employee's
signature, and if to the Legal Representative, to such Person at the
address of which the Company is notified in accordance with this
Section 6.6.

6.7. Binding Effect. This Agreement shall inure to the benefit of and shall be
binding upon the parties hereto and their respective heirs, legal representatives, successors and
assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be
assigned by the Employee without the prior written consent of the Company and any attempt to
do so without such consent shall be void ab initio. In addition, each of the FL & Co. Companies
shall be a third party beneficiary of this Agreement and shall be entitled to enforce this
Agreement.

6.8. Amendment and Modification. This Agreement may be amended, modified
or supplemented only by written agreement of the party against whom enforcement of such
amendment, modification or supplement is sought.

6.9. Headings; Execution in Counterparts. The headings and captions contained
herein are for convenience only and shall not control or affect the meaning or construction of any
provision hereof. This Agreement may be executed in any number of counterparts, each of
which shall be deemed to be an original and which together shall constitute one and the same
instrument.

6.10. Entire Agreement. This Agreement constitutes the entire agreement, and
supersedes all prior agreements and understandings, oral and written, between the parties hereto
with respect to the subject matter hereof.

6.11.   Withholding.  The Company shall have the right to deduct from any amount payable under this Agreement any taxes or other amounts required by applicable law to be withheld.  The Employee agrees to indemnify the Company against any Federal, state, local and foreign withholding taxes for which the Company may be liable in connection with the Employee's acquisition, ownership or disposition of any Class B Common Stock or in connection with any election made with respect thereto.

6.12.   No Right to Continued Employment.  This Agreement shall not confer upon the Employee any right with respect to continuance of employment by the Company or any Affiliate thereof, nor shall it interfere in any way with the right of the Company or any Affiliate thereof to terminate the Employee's employment at any time.

6.13.   Possession of Certificates; Power of Attorney.

(a)  In order to provide for the safekeeping of the certificates representing the shares of Class B Common Stock purchased by the Employee pursuant hereto and to facilitate the enforcement of the terms and conditions hereof, at the Purchase Closing (i) the Employee shall redeliver to the Company, and the Company shall retain physical possession of, all certificates representing shares of Class B Common Stock acquired by the Employee pursuant hereto and (ii) the Employee shall deliver to the Company an undated stock power, duly executed in blank, for each such certificate to be used solely to effectuate the transactions described herein.  The Company intends to deposit such certificates and stock powers into an account at a nationally recognized trust company and to designate as sole custodians of such account Thomas H. Lister, Winston Hutchins and/or such other persons as the Company may from time to time determine.  The Employee shall be relieved of any obligation otherwise imposed by this Agreement to deliver certificates representing shares of Class B Common Stock if the same are in the custody of the Company or such persons.  After the Release Date, upon written request by the Employee therefor, the Company shall deliver to the Employee any certificates in its (or such person's) custody representing the Employee's shares of Class B Common Stock.

(b)  The Employee hereby irrevocably appoints the FL & Co. Companies, and each of them (individually and collectively, the "Representative"), the Employee's true and lawful agent and attorney-in-fact, with full powers of substitution, to act in the Employee's name, place and stead, to do or refrain from doing all such acts and things, and to execute and deliver all such documents, as are reasonable and customary in like circumstances and as the Representative shall deem necessary or appropriate, solely to facilitate and effectuate a public offering of securities of the Company or a sale pursuant to Section 3.3, 3.5 or 4.2 hereof, including, without limitation, in the case of a sale pursuant to Section 3.3 or 3.5 hereof, to execute and deliver on behalf of the Employee a purchase and sale agreement and any other agreements and documents that are reasonable and customary in like circumstances and that the Representative deems necessary in connection with any such sale, and in the case of a public offering, to execute and deliver on behalf of the Employee an underwriting agreement, a "lock up" or "hold back" agreement, a custody agreement, and any other agreements and documents that the Representative deems necessary in connection with any such public offering (each to be on terms no less favorable to the Employee than those described in Sections 3.3, 3.4 or 3.5 hereof, as applicable), and in the case of any sale pursuant to Section 3.3 or 3.5 hereof or any

19

public offering pursuant to Section 3.4(a) hereof, to receive on behalf of the Employee the proceeds of the sale or public offering of the Employee's shares, to hold back from any such proceeds any amount that the Representative deems necessary to reserve against the Employee's share of any Expenses of Sale and Sale Obligations and to pay such Expenses of Sale and Sale Obligations. The Employee hereby ratifies and confirms all that the Representative shall do or cause to be done by virtue of its appointment as the Employee's agent and attorney-in-fact. In acting for the Employee pursuant to the appointment set forth in this Section 6.13(b), the Representative shall not be responsible to the Employee for any loss or damage the Employee may suffer by reason of the performance by the Representative of its duties under this Agreement, except for loss or damage arising from willful violation of law or gross negligence by the Representative in the performance of its duties hereunder. The appointment of the Representative shall be deemed coupled with an interest and as such shall be irrevocable and shall survive the death, incompetency, mental illness or insanity of the Employee, and any Person dealing with the Representative may conclusively and absolutely rely, without inquiry, upon any act of the Representative as the act of the Employee in all matters referred to in this Section 6.13(b).

6.14.    Consent to Jurisdiction.  Each party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of New York and of the United States of America, in each case located in the County of New York, for any Litigation (and agrees not to commence any Litigation except in any such court), and further agrees that service of process, summons, notice or document by U.S. registered mail to such party's respective address set forth in Section 6.6 hereof shall be effective service of process for any Litigation brought against such party in any such court. Each party hereby irrevocably and unconditionally waives any objection to the laying of any venue of Litigation in the courts of the State of New York or of the United States of America, in each case located in the County of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any Litigation brought in any such court has been brought in an inconvenient forum.

6.15.    Amendment of Certificate of Incorporation.  Capitalized terms used in this paragraph but not defined in this Agreement have the meanings given to them in the Certificate of Incorporation.  Prior to (i) declaring any dividend or distribution, or consummating any recapitalization, reclassification, reorganization, stock split, spin-off or similar change affecting the capital stock (any of the foregoing, a "Dividend") where the Aggregate Dividend Amount of such Dividend, taken with the Aggregate Dividend Amount of Dividends previously paid, would exceed the Total Capital Amount, (ii) making any payment upon a dissolution, liquidation or winding up of the Company where the sum of the Aggregate Dividend Amount of Dividends previously paid plus the Aggregate Liquidation Amount would exceed the Total Capital Amount, (iii) the consummation of one or more sales of shares of Class A Common Stock by either of the FL & Co. Companies to any Third Party, which sales would, assuming so declared by the Board of Directors of the Company, trigger a right or obligation on the part of holders of Class B Common Stock to exchange their shares of Class B Common Stock for shares of Class A Common Stock under Article Fourth, Section 4 of the Certificate of Incorporation at any time following the payment of any Dividend where the sum of the aggregate sale consideration plus the Aggregate Dividend Amount of such Dividends previously paid would exceed the Total Capital Amount or (iv) the payment of a Dividend where the sum of the Aggregate Dividend

20

Amount of such Dividend plus the Aggregate Dividend Amount of any Dividends previously paid plus the aggregate sale consideration from any sales of shares of Class A Common Stock by either of the FL & Co. Companies to any Third Party, which sales would, assuming so declared by the Board of Directors of the Company, trigger a right or obligation on the part of holders of Class B Common Stock to exchange their shares of Class B Common Stock for shares of Class A Common Stock under Article Fourth, Section 4 of the Certificate of Incorporation, would exceed the Total Capital Amount, the Company shall amend the Certificate of Incorporation (and the FL & Co. Companies will vote in favor of such amendment) to provide that holders of Class B Common Stock shall receive in respect of such Dividend, liquidation payment or sale an amount equal to (i) the amount they would have received in a partial or complete sale of the Common Stock to an unaffiliated entity under Article Fourth, Section 4 of the Certificate of Incorporation as if the consideration received in such a sale was equal to the sum of (A) the Aggregate Dividend Amount of all Dividends previously paid plus (B) the amount of such Dividend, liquidation payment or aggregate sale consideration, minus (ii) the Aggregate Dividend Amount of all Dividends previously paid on the Class B Common Stock.  Schedule II attached hereto sets forth an example illustrating the calculation of such payment.

IN WITNESS WHEREOF, this Agreement has been signed by or on behalf of each of the parties hereto, all as of the date first above written.

24 HOUR FITNESS WORLDWIDE, INC.

By: _____

    Name: MARK S. MASTROV

    Title: CEO


EMPLOYEE

_____

Name: Michael William Sheehan

Address: 45 MARISOL

        NEWPORT COAST, CA. 92657

The undersigned hereby agree to be bound by the provisions of Sections 3.3 and 3.4 of the foregoing Stockholder's Agreement.

FORSTMANN LITTLE & CO. EQUITY
PARTNERSHIP-VII, L.P.

By:  FLC XXXII Partnership, L.P.
     its general partner

     By:  _____
          Thomas H. Lister,
          a general partner

FORSTMANN LITTLE & CO. SUBORDINATED
DEBT AND EQUITY MANAGEMENT
BUYOUT PARTNERSHIP-VIII, L.P.

By:  FLC XXXIII Partnership, L.P.
     its general partner

     By:  _____
          Thomas H. Lister,
          a general partner

The undersigned acknowledges that the undersigned has read the foregoing Agreement between 24 Hour Fitness Worldwide, Inc. and the undersigned's spouse, understands that the undersigned's spouse has purchased shares of Class B Common Stock as reflected in such Agreement. and agrees to be bound by the foregoing Agreement.

Employee's Spouse

**Schedule I**

Assume:  1)  The Company has a fair market value of $1,500,000,000.  There is no assurance that the Company will have such a fair market value.

2)  32,994,439 shares of Class A Common Stock and 3,065,057 shares of Class B Common Stock outstanding at the time of distribution.

3)  The initial price of a share of Class A Common Stock is $15.154068 and the initial price of a share of Class B Common Stock is $5.051356.

Any terms not otherwise defined in this Schedule I are defined in the "Summary of Restated Certificate of Incorporation and Stockholder's Agreement" distributed with this Stockholder's Agreement.

Step 1

Determine $ total for Class B

(a) Determine Class B Capital Amount:

Number of outstanding shares of Class B Common Stock x Class B Price per Share:

3,065,057 x $5.051356 = $15,482,694

(b) Determine Class B Appreciation Amount:

Divide (1) the excess of the fair market value of the Company over the Total Capital Amount by (2) the number of shares of Common Stock outstanding on the date the Company is valued and (3) multiply by the Total Class B Shares.

(($1,500,000,000 - $515,482,666) / 36,059,496) x 3,065,057 = $83,683,969

(c) Determine Adjusted Notch Amount:

The lesser of:

(x) the Class B Appreciation Amount OR

(y) the product of $2.525678 and the Total Class B Shares

The lesser of (x) $83,683,969 and (y) $7,741,347 = $7,741,347

(d) Total for Class B:

Add Class B Capital Amount and Class B Appreciation Amount and subtract Adjusted Notch Amount.

$15,482,694 + $83,683,969 - $7,741,347 = $91,425,316

I-1

Step 2

Determine $ total for Class A

    (e)  Determine Class A Capital Amount:

        Number of outstanding shares of Class A Common Stock x Class A Price per Share:

$$32{,}994{,}439 \times \$15.154068 = \$499{,}999{,}972$$

    (f)  Determine Class A Appreciation Amount:

        Divide (1) the excess of the fair market value of the Company over the Total Capital Amount by (2) the number of shares of Common Stock outstanding on the date the Company is valued and multiply by (3) the Total Class A Shares.

$$((\$1{,}500{,}000{,}000 - \$515{,}482{,}666) / 36{,}059{,}496) \times 32{,}994{,}439 = \$900{,}833{,}365$$

    (g)  Determine Adjusted Notch Amount:

        $7,741,347 (see Step 1, part (c) above):

    (h)  Total for Class A:

        Add Class A Capital Amount, Class A Appreciation Amount and Adjusted Notch Amount.

$$\$499{,}999{,}972 + \$900{,}833{,}365 + \$7{,}741{,}347 = \underline{\$1{,}408{,}574{,}684}$$

Step 3

    x = $ total for Class B divided by 3,065,057        $29.828

Step 4

    y = $ total for Class A divided by 32,994,439        $42.691

Step 5

    Exchange Rate = x/y or 0.699 of a share of Class A Common Stock for each share of Class B Common Stock.

I-2

## Schedule II

| Assumptions | | | |
|---|---|---|---|
| Company Equity Value | $ 1,500,000,000 | Total Capital | $ 515,482,666 |
| Class A shares | 32,994,439 | Notch per share | $ 2.525678 |
| Class A price | $ 15.154068 | Adjusted Notch Amount | $ 7,741,347 |
| Class A capital | $ 499,999,972 | Notch Threshold Point | $ 606,557,342 |
| Class A Ownership as converted | 91.5% | | |
| Class B shares | 3,065,057 | | |
| Class B price | $ 5.051356 | | |
| Class B capital | $ 15,482,694 | | |
| Class B Ownership as converted | 8.5% | | |

**Dividend of $100,000,000, followed by later sale of the Company for $1,400,000,000 equity value**

| | A Stock | B Stock | Total | Cumulative |
|---|---|---|---|---|
| Dividend - Return of Class A Capital Amount and Class B Capital Amount | $ 96,996,467 | $ 3,003,533 | $ 100,000,000 | $ 100,000,000 |
| Return of Capital Amounts | 403,003,506 | 12,479,161 | 415,482,666 | 515,482,666 |
| Class A Holders recover Adjusted Notch Amount | | | | |
| Class A Returns | 83,333,329 | - | 83,333,329 | |
| Notch Recovery | 7,741,347 | - | 7,741,347 | 606,557,342 |
| Remainder divided on basis of percentage of outstanding shares owned | 817,500,036 | 75,942,622 | 893,442,658 | 1,500,000,000 |
| Total proceeds from dividend and sale | $ 1,408,574,684 | $ 91,425,316 | 1,500,000,000 | |

II-1

## ANNEX A

| Employee | Number of Shares |
|---|---|
| Michael William Sheehan | 197,967 |

Cash Amount:    $750,001.79

Note Amount:    $250,000

Based on a Purchase Price of $5.051356 per share of Class B Common Stock

Exhibit C

Bally Total Fitness Announces New Chief Executive Officer          Page 1 of 2





Home

About us | Mobile/PDA | News Alerts | Disclaimer | Contact

## Bally Total Fitness Announces New Chief Executive Officer

Posted : Tue, 24 Jun 2008 16:01:04 GMT

**Author :** Bally Total Fitness

**Category :** Press Release

**News Alerts** by Email click here )

RSS 2.0 Create your own RSS

News | Home

**Bally Total Fitness**
Everything to do with Bally Total Fitness items.
Yahoo.com

**Gyms Near You**
We list the areas local gyms in one place. Find the gym you want today.
www.GymTicket.com

**Bally Total Fitness**
Check Out Local.com To Find Bally Total Fitness In Your Area!
Local.com

**Interim & Turnaround CEOs**
Altamont Mgmt - Your First Choice for Interim and Turnaround CEOs
www.altamontmanagement.com

Ads by Google

CHICAGO, June 24 IL-Bally-CEO-Sheehan

CHICAGO, June 24 /PRNewswire/ -- Bally Total Fitness Holding Corporation today announced that it has appointed Michael Sheehan to serve as its Chief Executive Officer, effective July 1. Mr. Sheehan will also serve as a member of Bally's Board of Directors.

Mr. Sheehan, age 46, served as the Chief Operating Officer of 24 Hour Fitness since 2005. Before serving as Chief Operating Officer, Mr. Sheehan served as Executive Vice President, Operations of 24 Hour Fitness. In addition to his comprehensive experience in the fitness industry, Mr. Sheehan has played key operational, finance and sales roles with multi-unit consumer companies, including management roles with Pepsico, Nestle and Yum Brands, a food service holding company with well-known brands including Taco Bell, Kentucky Fried Chicken and Pizza Hut. Mr. Sheehan is a graduate of Oregon State University (Bachelor of Science, Finance).

Michael Feder, an interim manager from AlixPartners, LLP, serving as Chief Operating Officer of Bally Total Fitness, said, "We are delighted to welcome Mike to Bally. Our Board of Directors was committed to hiring a CEO who was the best possible fit for the role and they have certainly achieved that goal. We believe that Mike has the ideal blend of experience, leadership skills, creativity and commitment to health and fitness. I am confident that under Mike's leadership, Bally will thrive."

Mr. Sheehan said, "I am looking forward to joining the Bally team and I am eager to add value to this established brand. For many years, Bally has been a leader in the fitness industry -- Bally's facilities, fitness programming and personnel are among the best in the business. Under my leadership, Bally will continue to focus on providing high-quality comprehensive fitness experiences to our members."

About Bally Total Fitness

Bally Total Fitness is among the largest commercial operators of fitness centers in the U.S., with 352 facilities operating under the Bally Total Fitness(R) and Bally Sports Clubs(R) brands. Bally offers a unique platform for distribution of a wide range of products and services targeted to active, fitness-conscious adult consumers.

SOURCE  Bally Total Fitness

PRNewswire
United Business Media

Copyright © 2008 PR Newswire. All rights reserved.

Ads by Google          VV

**Bally Total Fitness**
Check Out Local.com To Find Bally Total Fitness In Your Area!
Local.com

**Interim & Turnaround CEOs**
Altamont Mgmt - Your First Choice for Interim and Turnaround CEOs
www.altamontmanagement.com

**VICE PRESIDENT STRATEGY**
Vistage Builds Better Key Execs; Resources Exclusively for Execs.
Vistage.com

**Free Local Gym Search**
Search prices and amenities for gyms in your area. Try it now.
www.MyPerfectGym.com

**Teeth Whitening Warning**
7 Teeth Whitening Products Tested, Rated, & Reviewed. A Must Read!
www.Best-Teeth-Whitening.com

### Choose Theme

### Search

○   ◉   www.earthtimes.org
Web
Google Search

### You can

### Current News

News Category
Business
Entertainment
Environment
General
Health
Sports
Technology
World

Ads by Google
Ballys com
Ballys Locations
Jungle Gym
Fitness Models
Bally Total

More...

**Do Teeth Whiteners Work?**
Find Out Which Ones Can Brighten Your Smile, And Which Ones Can't
www.Best-Teeth-Whitening.com

**Free Local Gym Search**
Search prices and amenities for gyms in your area. Try it now.
www.MyPerfectGym.com

**elements for women**
Expand your training business with an elements franchise.
www.elementsforwomen.com

**health club billing**
health club management software and payment processing services
www.efitfinancial.com

Ads by Google

Exhibit D





June 24, 2008

Michael Sheehan
4542 Lilac Ridge Road
San Ramon, CA 94582

Dear Mike,

I was distressed and saddened yesterday when you informed me that you were resigning your position as our Chief Operating Officer in order to become Chief Executive Officer of Bally Total Fitness. As I have told you on many occasions, you have been an important member of our executive team since joining 24 Hour Fitness, and have rendered invaluable service to the Company in virtually every aspect of our operational and strategic efforts. I was looking forward to our continuing to work closely together as we moved the Company to new heights, and am extremely disappointed that you have chosen to leave us at this critical juncture in our efforts. As you can imagine, my disappointment is only deepened because you have chosen to join one of our most significant competitors.

All that being said, I must inform you that if you choose to continue this course of action, you will be acting in violation of your extensive contractual commitments to 24 Hour Fitness and may subject yourself to liability under a variety of causes of action. As you know, under your employment agreement you are subject to a Covenant Not to Compete, as well as a prohibition against the use of proprietary and confidential Company information. In addition to liability for breaching your contractual commitments to the Company, working for Bally as its Chief Executive Officer also will likely put you in violation of various statues involving the protection of trade secrets, unfair competition laws, and the breach of fiduciary duties. A finding of liability under these statutory and common law causes of action will also subject you to liability for damages and attorney fees. Accordingly, please consider yourself on notice that our Company will pursue all appropriate legal and equitable remedies to protect its interests.

Mike, given all of the above, please let me know immediately that you intend to observe all of your contractual and other legal obligations to the Company and will not be taking the CEO position with Bally. If you continue to proceed with this course of conduct, the Company will have no choice but to respond accordingly.

Sincerely yours,

Carl C. Liebert, III

carl c. liebert, III
chief executive officer

1 925 543 3370
1 925 543 3380

12647 alcosta blvd. suite 500
san ramon, ca 94583





June 24, 2008

Don Kornstein
Interim Chairman and Chief Restructuring Officer
Bally Total Fitness Corporation
8700 West Bryn Mawr Avenue Second Floor
Chicago, IL 60631

Dear Don:

Yesterday, Mike Sheehan informed me he was resigning his position as Chief Operating Officer of 24 Hour Fitness to become Chief Executive Officer of Bally Total Fitness. I'm writing to convey my extreme disappointment that Mike and Bally have collectively decided upon this course of action and to give you fair notice that our Company will hold both Mike and Bally legally accountable for their conduct.

As I can only assume you know, Mike is currently subject to significant non-compete and confidentiality obligations that preclude him for working with Bally. Bally is a direct competitor of our Company, and Mike's non-compete is governed by various laws, including the California Business and Professions Code. In addition, Mike is also contractually precluded from using in any way for the benefit of Bally the confidential and proprietary information he has learned during his tenure with 24 Hour Fitness. As a practical matter, Mike will be unable to work in any meaningful way as Bally's CEO without using such confidential information.

Given the circumstances under which Mike has announced his intention to join Bally, Bally likewise faces its own legal liability if it proceeds to hire Mike with knowledge of these restrictions. Bally will be subject to liability for its intentional interference with contract for inducing Mike to breach his contractual commitment to our Company, as well as liability for a violation of the California Business and Professions Code, California's unfair competition law. A finding of liability on such a claim can result in the award of damages, injunctive relief, disgorgement of profits and attorneys fees and costs.

I am hopeful that Bally will suspend its efforts to hire Mike. Should you continue to proceed, however, please know that our Company will take all necessary steps to protect its interests, including legal action against Bally as well as against Mike. I would urge you to reconsider this legally imprudent act.

Sincerely yours,

Carl C. Liebert, III


carl c. liebert, III
chief executive officer

: 925 543 3376
: 925 543 3360

12647 alcosta blvd. suite 500
san ramon, ca 94583



# Exhibit

# G

1   REX DARRELL BERRY, State Bar No. 110219
    SCOTT M. PLAMONDON, State Bar No. 212294
2   BERRY & BLOCK LLP
    2150 River Plaza Drive, Suite 415
3   Sacramento, CA 95833
    (916) 564-2000
4   (916) 564-2024 FAX

5

6   Attorneys for Plaintiffs
    24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS
7   WORLDWIDE, INC.

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    COUNTY OF CONTRA COSTA

10

11  24 HOUR FITNESS USA, INC. and 24    ) Case No. C-08-01663
    HOUR FITNESS WORLDWIDE, INC.        )
12                                      )
         Plaintiffs,                    ) [PROPOSED] TEMPORARY
13                                      ) RESTRAINING ORDER AND ORDER
    v.                                  ) TO SHOW CAUSE REGARDING
14                                      ) PRELIMINARY INJUNCTION
    MICHAEL SHEEHAN and DOES 1-100,     )
15  inclusive,                          )
                                        ) Date:  June 27, 2008
16       Defendants.                    ) Time:  1:30pm
    _____ ) Dept.: 60
17

18  _____

19                         ORDER TO SHOW CAUSE

20  To Defendant, MICAHEL SHEEHAN:

21          Based upon the Complaint filed in this action and on the declarations of Carl Liebert and

22  Rex Darrell Berry and the exhibits thereto, you are ordered to appear on _____ at

23  _____ a.m./p.m. in Department ___ of this Court located at _____,

24  California to show cause why a preliminary injunction should not be ordered restraining and

25  enjoining you from the following pending trial in this action:

26                   TEMPORARY RESTRAINING ORDER

27          Pending hearing on the Order to Show Cause, you restrained and enjoined from:

28

                                        1
        [PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING
                            PRELIMINARY INJUNCTION

1.     Assuming the position of Chief Executive Officer with Ballys Total Fitness Holding Corporation, or any related entity ("Ballys"), in breach of the terms of his March 31, 2003 Employment Agreement with 24 Hour Fitness USA, Inc. and September 30, 2005 Stockholder's Agreement with 24 Hour Fitness Worldwide, Inc.;

2.     Competing with 24 Hour Fitness in violation of terms of his March 31, 2003 Employment Agreement with 24 Hour Fitness USA, Inc. and September 30, 2005 Stockholder's Agreement with 24 Hour Fitness Worldwide, Inc.;

3.     Directly or indirectly recruiting, soliciting, inducing or encouraging any employee of 24 Hour Fitness to become an employee of Ballys, or to directly or indirectly encourage any independent contractor or vendor of 24 Hour Fitness to terminate a contracting or vending relationship with 24 Hour Fitness;

4.     Directly or indirectly owning an interest in, operating, joining, beginning, controlling, advising, consulting with, rendering services to, or otherwise participating in or working for or on behalf of Ballys;

5.     Using, disclosing or disseminating to Ballys any of 24 Hour Fitness' Confidential and Proprietary Information and/or any work product created in connection with his employment by 24 Hour Fitness; or

6.     Using in any manner 24 Hour Fitness' trade secret information.

**IT IS FURTHER ORDERED THAT:**

This Order to Show Cause and Temporary Restraining Order shall be served on Defendant MICHAEL SHEEHAN, no later than _____ by _____. Proof of such service shall be filed at least five (5) court days prior to the hearing.

Any opposition papers to the Order to Show Cause shall be filed and served on counsel for Plaintiff, 24 HOUR FITNESS by _____ no later than _____. Any reply papers to the opposition shall be filed and served on Defendant MICHAEL SHEEHAN by _____ no later than _____.

**[PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**

1        The restraining order granted herein shall expire on _____.

2

3    IT IS SO ORDERED.

4

5

6    Dated: _____        _____

7                                  Judge of the Superior Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**[PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**

Exhibit

H

1  REX DARRELL BERRY, State Bar No. 110219
   SCOTT M. PLAMONDON, State Bar No. 212294
2  BERRY & BLOCK LLP
   2150 River Plaza Drive, Suite 415
3  Sacramento, CA 95833
   (916) 564-2000
4  (916) 564-2024 FAX

5

6  Attorneys for Plaintiffs
   24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS WORLDWIDE, INC.

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                    **COUNTY OF CONTRA COSTA**

10  24 HOUR FITNESS USA, INC., 24 HOUR ) Case No. C 08-01663
    FITNESS WORLDWIDE, INC.,          )
11                                     )
              Plaintiffs,              ) **PROOF OF SERVICE**
12                                     )
    v.                                 )
13                                     ) *Complaint filed: 06/27/08*
    MICHAEL SHEEHAN and DOES 1-100,    )
14  inclusive,                         )
                                       )
15            Defendants.              )
                                       )
16  _____  )

17

18

19

20

21

22

23

24

25

26

27

28

FILED

2008 JUL -1 P 2: 01

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.
BY_____
         D. Wagner, Deputy Clerk

**PROOF OF SERVICE**

*24 Hour Fitness USA, Inc., 24 Hour Fitness Worldwide, Inc. v. .Michael Sheehan*
Contra Costa Superior Court, Case No. C 08- 01663

## PROOF OF SERVICE

I am a citizen of the United States, over the age of 18 years, and not a party to or interested in this action. I am an employee of Berry & Block LLP, and my business address is 2150 River Plaza Drive, Suite 415, Sacramento, CA 95833. On this day I caused to be served the following document(s):

**VERIFIED COMPLAINT; APPLICATION FOR TEMPORARY RESTRAINING ORDER; DECLARATION OF REX BERRY RE NOTICE IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION; DECLARATION OF CARL C. LIEBERT IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER RE: PRELIMINARY INJUNCTION PURSUANT TO C.C.P. §§ 526, 527 and BUS. & PROF. CODE § 17203; [PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**

☒ by placing ☐ the original ☒ a true copy into sealed envelopes addressed and served as follows:

> Michael Sheehan
> 4542 Lilac Ridge Rd.
> San Ramon, California 94582
> Telephone: (925) 804-6583

☐ BY MAIL: I am familiar with this firm's practice whereby the mail, after being placed in a designated area, is given fully prepaid postage and is then deposited with the U.S. Postal Service at Sacramento, California, after the close of the day's business.

☒ BY PERSONAL DELIVERY: I caused such envelope to be delivered by hand.

☐ BY OVERNIGHT COURIER: I caused such envelope to be placed for collection and delivery in accordance with standard overnight delivery procedures for delivery the next business day.

☐ BY FACSIMILE: I caused such documents(s) to be transmitted by facsimile transmission from (916) 564-2024 to the person(s) and facsimile transmission without number(s) shown about. The facsimile transmission was reported as complete without error and a transmission report was properly issued by the transmitting facsimile machine. A true and correct copy of the transmission report will be attached to this proof of service after facsimile service is completed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 27, 2008 at Sacramento, California.

Scott M. Plamondon

# Exhibit

# I

1 | Paul J. Coady (SBN: 81698)
pcoady@winston.com

2 | Joan B. Tucker Fife (SBN: 144572)
jfife@winston.com

3 | Robert Spagat (SBN: 157388)
rspagat@winston.com

4 | WINSTON & STRAWN LLP
101 California Street

5 | San Francisco, CA 94111-5894
Telephone:    415-591-1000

6 | Facsimile:    415-591-1400

7 | Attorneys for Defendant
MICHAEL SHEEHAN

8

9



FILED

2008 JUL -2 P 1: 49

K TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.

BY_____
B. Montsay, Deputy Clerk

**ORIGINAL**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

10 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

11 | COUNTY OF CONTRA COSTA

12

13 | 24 HOUR FITNESS,

14 | Plaintiff,

15 | vs.

16 | MICHAEL SHEEHAN,

17 | Defendant.

18

19

20

21

22

23

24

25

26

27

28

Case No. *C08-01663*

**OPPOSITION OF DEFENDANT
MICHAEL SHEEHAN TO PLAINTIFF'S
EX PARTE APPLICATION FOR A
TEMPORARY RESTRAINING ORDER;
DECLARATION OF MICHAEL
SHEEHAN; DECLARATION OF DONALD
KORNSTEIN**

BY FAX

SF:209903.2

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

## I.    INTRODUCTION

By their application for a temporary restraining order, Plaintiff 24 Hour Fitness USA, Inc. ("24 Hour") seeks to engage the equitable power of this Court to enforce a covenant not to compete that plainly violates California Business & Professions Code Sections 16600 and 17200 and the fundamental public policy of the state of California. Defendant Michael Sheehan has engaged in no unlawful conduct. At no time has 24 Hour even accused, much less established, that he has misappropriated a trade secret, disclosed 24 Hour's proprietary business information or otherwise engaged in unfair competition. Yet, 24 Hour seeks to prevent Sheehan from taking employment with Bally Total Fitness Corporation ("Bally"), a competitor, on the sole grounds that Sheehan executed a non-compete included in an employment contract imposed upon employees by 24 Hour. As stated by 24 Hour's CEO in a letter sent to Bally's Chairman of the Board of Directors:

> As I can only assume you know, [Sheehan] is currently subject to significant non-compete and confidentiality obligations *that preclude him from working with Bally.* ...
>
> *I am hopeful that Bally will suspend its efforts to hire [Sheehan].* Should you continue to proceed, however, please know that our Company will take all necessary steps to protect its interests, including legal action against Bally as well as [Sheehan]. I would urge you to reconsider this legally imprudent act.

(Declaration of Donald Kornstein ("Kornstein Decl."), attached, Exhibit A.) (Emphasis added.)

24 Hour cannot possibly show a likelihood of success on the merits because the covenant not to compete it seeks to enforce is in plain violation of Business & Profession Code § 16600. The balance of harms also tips sharply in favor of Sheehan because he will be unable to work in an entire industry in violation of the fundamental public policy of the state of California if a temporary restraining order were entered, while 24 Hour will only be deprived of the benefit of an illegal bargain if Plaintiff's application is denied. Finally, 24 Hour cannot show irreparable injury or immediate danger, a prerequisite for a Temporary Restraining Order ("TRO") to issue. Accordingly, Plaintiffs' application should be denied.

## II.    FACTUAL BACKGROUND

Sheehan was employed by 24 Hour as Senior Vice President of Operations. (Declaration of Michael Sheehan, attached ("Sheehan Decl."), ¶ 2.) On June 23, 2008, Sheehan resigned to accept

1

SF:209903.2

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  employment as CEO of Bally. (*Id.*) His employment agreement with 24 Hour included the

2  following provisions:

3
> For a period of two (2) years following the termination of Employee's
> employment with the Company, Employee will not directly or
> indirectly own an interest in, operate, join, begin, control, advise,
> consult with, render services to or otherwise participate in or work for
> or on behalf of any entity or individual(s) which operates a fitness club
> within fifty (50) miles of any of the Company's fitness clubs or which
> otherwise competes with the business of the Company of the
> Company's affiliates.

8
> This Agreement shall be governed by and construed and enforced in
> accordance with the laws applicable to Agreements made and to be
> performed entirely in the State of California.

10  Sheehan has never disclosed any confidential or proprietary information of 24 Hour to any

11  person outside 24 Hour except as required in connection with his work for 24 Hour. (*Id.*, ¶ 3.) He

12  did not take any confidential or proprietary information when he left 24 Hour, and he

13  deleted/destroyed all such information he had on his home computer and personal e-mail account

14  from when he had been employed by 24 Hour. (*Id.* ¶¶ 3-5.) Sheehan no longer has, or has access to,

15  any documents containing confidential or proprietary information of 24 Hour. (*Id.*, ¶ 6.) He has not

16  solicited any employees of 24 Hour to quit their jobs with 24 hour. (*Id.*, ¶ 7.)

17  On June 24, 2008, 24 Hour's CEO, Carl Liebert, sent a letter to Bally's Interim Chairman and

18  Chief Restructuring Officer, Don Kornstein. (Declaration of Donald Kornstein, attached, Exh. A.)

19  The letter stated in pertinent part:

20
> Yesterday, Mike Sheehan informed me he was resigning his position
> as Chief Operating Officer of 24 Hour Fitness to become Chief
> Executive Officer of Bally Total Fitness. I'm writing to convey my
> extreme disappointment that Mike and Bally have collectively decided
> upon this course of action and to give you fair notice that our
> Company will hold both Mike and Bally legally accountable for their
> conduct.

24
> As I can only assume you know, *Mike is currently subject to
> significant non-compete and confidentiality obligations that preclude
> him for working with Bally.* Bally is a direct competitor of our
> Company, and Mike's non-compete is governed by various laws,
> including the California Business and Professions Code. In addition,
> Mike is also contractually precluded from using in any way for the
> benefit of Bally the confidential and proprietary information he has
> learned during his tenure with 24 Hour Fitness. *As a practical matter,*

2

> *Mike will be unable to work in any meaningful way as Bally's CEO without using such confidential information.*
>
> Given the circumstances under which Mike has announced his intention to join Bally, *Bally likewise faces its own legal liability it is proceeds to hire Mike with knowledge of these restrictions. Bally will be subject to liability for its intentional interference with contract for inducing Mike to breach his contractual commitment to our Company, as well as liability for a violation of the California Business and Professions Code, California's unfair competition law. A finding of liability on such a claim can result in the award of damages, injunctive relief, disgorgement of profits and attorneys' fees and costs.*
>
> *I am hopeful that Bally will suspend its efforts to hire Mike. Should you continue to proceed, however, please know that our Company will take all necessary steps to protect its interests, including legal action against Bally as well as against Mike. I would urge you to reconsider this legally imprudent act.*

(Kornstein Decl., Exh. A.)  (Emphasis added.)

On June 26, 2006, counsel for 24 Hour sent an e-mail to Sheehan stating:

> 24 Hour Fitness will apply to the Contra Costa County Superior Court for a Temporary Restraining Order and Preliminary Injunction ordering that you not commence employment with Ballys [sic] Total Fitness as Chief Executive Officer, not misappropriate 24 Hour Fitness' confidential and proprietary information, and otherwise observe the terms of the noncompetition and confidential information agreements to which you are a party.

As of today, when this brief was finalized, Defendant has not received a complaint or any of the papers supporting 24 Hour's application for a TRO.

## III.   ARGUMENT

### A.   Legal Standard

An *ex parte* applicant for a TRO "must make an affirmative factual showing in a declaration containing competent testimony based on personal knowledge of irreparable harm, immediate danger or any other statutory basis for granting relief *ex parte*." CRC 3.1201(c).  In determining whether to issue a TRO, the court weighs two interrelated factors:  the likelihood that the moving party ultimately will prevail on the merits, and the relative harm to the parties from the issuance or non-issuance of the TRO. *Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

3

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    Here, 24 Hour cannot, through competent evidence, establish irreparable harm, a likelihood

2    of success on the merits, or balance of harms favoring the issuance of a TRO.

3    **B.    24 Hour Cannot Show A Likelihood Of Success On The Merits.**

4    **1.    24 Hour Cannot Succeed In Enforcing Its Illegal Non-Compete.**

5

6    **a.    The Agreement Purporting To Prevent Sheehan From Working For Bally Is Unenforceable**

7    24 Hour *cannot* succeed on the merits of its claim because it seeks to enforce a non-compete

8    governed by California law that plainly violates Cal. Business & Professions Code § 16600

9    ("Section 16600"). Section 16600 provides: "Except as provided in this chapter, every contract by

10   which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to

11   that extent void." None of the exceptions apply here. Section 16600 represents the "strong public

12   policy of the State of California" that "the interests of the employee in his own mobility and

13   betterment are deemed paramount to the competitive business interest interests of the employers."

14   *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 990. Section 16600

15   presents "an absolute bar to post-employment restraints." *KGB, Inc. v. Giannoulas* (1980) 104

16   Cal.App.3d 844, 848. Accordingly, the courts routinely construe § 16600 to invalidate contracts that

17   purport to prohibit an employee from working in competition with the employer after termination of

18   the employment contract. *See e.g., Muggill v. Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239,

19   242 (employee has the right to enter into competition with former employer despite having agreed

20   not to compete); *Application Group, supra* (refusing to apply contractual choice of law provision

21   because § 16600 articulates fundamental public policy of the state of California and invalidating

22   non-compete as violative of § 16600); *Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 407; *Frame v.*

23   *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1971) 20 Cal.App.3d 668, 672.

24   In *Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 859 the

25   court invalidated one year covenant not to compete that applied in the employee's in local

26   geographic area. *See also Kolani* (invalidating covenant not to compete in 40 mile radius for one

27   year). Here, Sheehan's covenant not to compete purports to prevent him from working for a

28   competitor within 50 miles of *any* 24 Hour Fitness studio for a period of *two years*. There are more

4

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   than *two hundred* 24 Hour Fitness clubs in California and more than 30 in the Bay Area. (*See*

2   Request for Judicial Notice, filed herewith.)  Thus, if enforced, the 24 Hour covenant would prevent

3   Sheehan from working for a competitor anywhere in California for two years.  Therefore, the

4   covenant is plainly unenforceable.

5   **b.     The Court Cannot Reform An Illegal Non-Compete.**

6        The Courts will not save an illegal or overbroad covenant not to compete. *Kolani, supra,* 64

7   Cal.App.4[th] at 407-08; *D'sa v. Playhut, Inc.* (2000) 85 Cal.App.4[th] 927, 934-35 (refusing to narrowly

8   construe, and therefore invalidating, one year covenant not to compete).  As the Court reasoned in

9   *Kolani*, the policies underlying Section 16600 would be undermined by reforming illegal non-

10  competes because:

> Employers could insert broad, facially illegal covenants not to compete
> in their employment contracts.  Many, perhaps most, employees would
> honor these clauses without consulting counsel or challenging the
> clause in court, thus directly undermining the statutory policy favoring
> competition.  Employers would have no disincentive to use the broad,
> illegal clauses if permitted to retreat to a narrow, lawful construction in
> the event of litigation.

*Id.*, at 407.

16       24 Hour violated Section 16600 by including an illegal non-compete in its employment

17  agreements.  Accordingly, there are no means by which Sheehan's agreement can be conformed to

18  be lawful.  The entire covenant is void and unenforceable.

19  **c.     24 Hour's Attempt To Enforce Its Illegal Non-Compete Violates
Business & Professions Code § 17200.**

21       It is a violation of Business & Professions Code § 17200 for an employer to attempt to

22  enforce a non-compete that is void under § 16600. *Application Group*, 61 Cal.App.4[th] at 881.  Here,

23  24 Hour is seeking to enforce an illegal covenant.  Worse, 24 Hour sent a letter making threats to

24  assert meritless legal claims unless Sheehan and Bally honor the illegal non-compete and do not

25  form an employment relationship.  The letter asserts, for example, that *Bally* would commit a

26  violation of Business and Professions Code § 17200 if it hired Sheehan in violation of his non-

27  compete with 24 Hour, and that 24 Hour would sue Bally for damages, injunctive relief,

28  disgorgement of profits and attorneys' fees and costs in such case.  (Kornstein Decl., Exh. A.)

5

1 | 24 Hour's conduct plainly violates § 17200. Far from establishing a likelihood of success on the

2 | merits of its claim, this legal action is an abuse of legal process.

### 2. 24 Hour Cannot Show A Likelihood Of Success On Its Claim For Violation Of The Confidentiality Aspect Of The Illegal Non-Compete.

#### a. There Is No Evidence Of The Misappropriation Of Any Confidential Or Proprietary Business Information.

Sheehan does not have any confidential or proprietary business documents of 24 Hour. He has testified that he does not intend to disclose any such information, and he has not done so. 24 Hour has never confronted him or Bally with any evidence to the contrary. Accordingly, there is no risk of actual or threatened misappropriation of trade secrets on this record.

24 Hour apparently seeks to bridge this fatal gap in the evidence by asserting "[a]s a practical matter, [Sheehan] will be unable to work in any meaningful way as Bally's CEO without using such confidential information." (Kornstein Decl., Exh. A.) However, the California courts have rejected the "inevitable disclosure" doctrine as violative of § 16600. *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1457 ("threatened" misappropriation cannot be proven by evidence that the employee had access to former employer's trade secrets and accepted a position with a competitor with duties identical to those at the former employer). As a result, 24 Hour cannot demonstrate a likelihood of success on the merits of its claim for misappropriation of confidential or proprietary information.

#### b. 24 Hour Cannot Seek Equitable Enforcement Of The Confidentiality Agreement While Engaging In An Unfair Business Practice.

As discussed above, the courts cannot reform an illegal covenant not to compete so as to enforce a narrower agreement. *Kolani, supra, D'sa, supra.* One who seeks equity must do equity.

24 Hour cannot attempt to enforce its illegal covenant and then assert a narrower contract right as a "fall back" position. Here, 24 Hour seeks to engage the court's equitable powers to grant it extraordinary relief while at the same time, through the contract it seeks to enforce and this action to enforce it, it is committing an unfair business practice in violation of § 17200. The Court should not reward 24 Hour's unlawful conduct by entering a TRO.

6

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

SF:209903.2

C.     **The Balance Of Harms Tips Sharply In Sheehan's Favor.**

If the TRO is granted, Sheehan will suffer irreparable harm. First, the courts have made clear that Business & Professions Code § 16600 articulates a fundamental public policy that protects a person's right to engage in their chosen profession. If a TRO is entered, he will be prevented from doing so. Second, Sheehan must earn a living to support his family. (Sheehan Decl., ¶ 8.) If a TRO is entered, he will be unable to do so.

By contrast, 24 Hour cannot show any harm, much less irreparable harm or immediate danger, if a TRO is not entered. At most, 24 Hour can show it is concerned that some un-defined bit of confidential information might be disclosed. Such a showing falls well short of that required to establish a right to a TRO pursuant to CRC 3.1202(c), let alone the showing required to establish that the balance of harms tips in its favor. Ultimately, 24 Hour cannot show any legally cognizable harm to tip the scales of equity in its favor because it seeks to enforce an illegal non-compete in violation of Business & Professions Code §§ 16600 and 17200.

D.     **24 Hour Cannot Show Irreparable Injury or Immediate Danger.**

It is 24 Hour's burden to establish present competent evidence based on personal knowledge establishing that it will suffer irreparable injury or that it will be in immediate danger if a TRO does not issue. CRC 3.1202(c). It has failed to meet this high burden. At most, 24 Hour has established that, if its application is denied, it will be denied the benefit of its illegal bargain. Such a showing is patently insufficient to justify the issuance of a TRO.

IV.   **CONCLUSION**

24 Hour is trying to engage this court's equitable power to enforce a blatantly illegal non-compete so that a California citizen is prevented from earning a living in his chosen profession. 24 Hour cannot show that it has a likelihood of success on the merits of its claims or that the balance of harms favors it. 24 Hour has failed to present competent testimony based on personal knowledge

///
///
///
///

7

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  that it will suffer irreparable injury if a TRO does not issue.  Accordingly, the Court should deny

2  Plaintiff's application for a TRO.

3

4  Dated:  June 27, 2008                                WINSTON & STRAWN LLP

5

6                                                       By:  _____

7                                                            Paul J. Coady
                                                             Joan B. Tucker Fife
                                                             Robert Spagat
8                                                            Attorneys for Defendant
                                                             MICHAEL SHEEHAN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5894

8

# DECLARATION

I, MICHAEL SHEEHAN, DECLARE:

    1.    I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them

    2.    Beginning in 2000 I was employed as Senior Vice President of Operations of 24 Hour Fitness USA, Inc. ("24 Hour"). On June 23, 2008, I resigned my employment with 24 Hour, effective that day.

    3.    I have not, at any time, disclosed or disseminated any confidential or proprietary information of 24 Hour to any person outside the company except as required in connection with my work for 24 Hour. Further, when I resigned and left 24 Hour I did not take any confidential or proprietary information relating to the business of 24 Hour with me. I do not intend to disclose or disseminate any confidential or proprietary information of 24 Hour to any person outside the company in the future.

    4.    From time to time while I was employed at 24 Hour, I would send work related emails to my personal email account so that I could view them on my home computer. This was usually when I needed to read an email or document that was inconvenient to read on my Blackberry handheld device. I have deleted all such emails and documents which contained any confidential or proprietary information relating to 24 Hour from my home computer and from my personal email account.

    5.    Also when I was employed by 24 Hour, I would sometimes take documents relating to 24 Hour with me when I left my office so that I could work at home or when I traveled. I have destroyed all such documents relating to the business of 24 Hour.

    6.    To my knowledge, I do not now have, or have access to, any documents containing confidential or proprietary information relating to 24 Hour.

    7.    I have not attempted, and I do not intend, to recruit, solicit, induce or encourage any employee of 24 Hour to become an employee of another company. I have not attempted, and I do

1

MICHAEL SHEEHAN DECLARATION

not intend, to recruit, solicit, induce or encourage any independent contractor of 24 Hour to terminate a contracting relationship with 24 Hour.

8.    I have accepted an offer to become employed as Chief Executive Officer of Bally Total Fitness. Inasmuch as I have resigned from 24 Hour, I need the salary from my employment at Bally to support my family. 24 Hour has not discussed any arrangement whereby I could pursue employment at Bally. 24 Hour has not accused me of any illegal conduct.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 27th day of June, 2008, at _SAN RAMON_ California.

_Michael Sheehan_

Michael Sheehan

# DECLARATION

I, DON KORNSTEIN, DECLARE:

1.    I am the Chairman of the Board of Directors of Bally Total Fitness Holding Corporation ("Bally"). I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them.

2.    Attached hereto as Exhibit A is a true and correct letter I received on June 24, 2008, from Carl C. Liebert, III, Chief Executive Officer of 24 Hour Fitness USA, Inc. ("24 Hour"). To my knowledge, 24 Hour has not accused Mr. Sheehan of engaging in any unlawful conduct. Per the attached letter, 24 Hour only has contended that Mr. Sheehan's employment with Bally would violate provisions of his employment contract purporting to prevent him from working for a competitor of 24 Hour.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed this 27th day of June, 2008, at New York, New York.

_____
Don Kornstein

MICHAEL SHEEHAN DECLARATION

SF:209935.1

# EXHIBIT A





June 24, 2008

Don Kornstein
Interim Chairman and Chief Restructuring Officer
Bally Total Fitness Corporation
8700 West Bryn Mawr Avenue Second Floor
Chicago, IL 60631

Dear Don:

Yesterday, Mike Sheehan informed me he was resigning his position as Chief Operating Officer of 24 Hour Fitness to become Chief Executive Officer of Bally Total Fitness. I'm writing to convey my extreme disappointment that Mike and Bally have collectively decided upon this course of action and to give you fair notice that our Company will hold both Mike and Bally legally accountable for their conduct.

As I can only assume you know, Mike is currently subject to significant non-compete and confidentiality obligations that preclude him for working with Bally. Bally is a direct competitor of our Company, and Mike's non-compete is governed by various laws, including the California Business and Professions Code. In addition, Mike is also contractually precluded from using in any way for the benefit of Bally the confidential and proprietary information he has learned during his tenure with 24 Hour Fitness. As a practical matter, Mike will be unable to work in any meaningful way as Bally's CEO without using such confidential information.

Given the circumstances under which Mike has announced his intention to join Bally, Bally likewise faces its own legal liability if it proceeds to hire Mike with knowledge of these restrictions. Bally will be subject to liability for its intentional interference with contract for inducing Mike to breach his contractual commitment to our Company, as well as liability for a violation of the California Business and Professions Code, California's unfair competition law. A finding of liability on such a claim can result in the award of damages, injunctive relief, disgorgement of profits and attorneys fees and costs.

I am hopeful that Bally will suspend its efforts to hire Mike. Should you continue to proceed, however, please know that our Company will take all necessary steps to protect its interests, including legal action against Bally as well as against Mike. I would urge you to reconsider this legally imprudent act.

Sincerely yours,

Carl C. Liebert, III

carl c. liebert, III
chief executive officer

925 543 3370
925 543 3360

12647 alcosta blvd. suite 500
san ramon, ca 94583



Exhibit


J

1  Paul J. Coady (SBN: 81698)
   pcoady@winston.com
2  Joan B. Tucker Fife (SBN: 144572)
   jfife@winston.com
3  Robert Spagat (SBN: 157388)
   rspagat@winston.com
4  WINSTON & STRAWN LLP
   101 California Street
5  San Francisco, CA 94111-5894
   Telephone:    415-591-1000
6  Facsimile:    415-591-1400

7  Attorneys for Defendant
   MICHAEL SHEEHAN



FILED

2008 JUL -2  P 1: 51

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.
BY:_____
        B. Montany, Deputy Clerk

8

9

10                SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                       COUNTY OF CONTRA COSTA

12

13  24 HOUR FITNESS USA, Inc. *et al.*,          Case No.  C-08-01663

14                 Plaintiff,

15           vs.                                 **AMENDED OPPOSITION OF
                                                 DEFENDANT MICHAEL SHEEHAN TO
16  MICHAEL SHEEHAN,                             PLAINTIFF'S EX PARTE APPLICATION
                                                 FOR A TEMPORARY RESTRAINING
17                 Defendant.                    ORDER; DECLARATION OF MICHAEL
                                                 SHEEHAN**

18                                               **DATE: JUNE 30, 2008
                                                 TIME: 2:00**
19                                               **DEPT: 60**

20

21                                        

22

23        **THIS BRIEF AMENDS AND SUPERSEDES THE OPPOSITION BRIEF FILED ON

24  JUNE 27, 2008, BY RESPONDING TO THE ADDITIONAL ARGUMENTS RAISED IN

25                         PLAINTIFFS' APPLICATION.**

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1

## **TABLE OF CONTENTS**

2

**Page**

3   I.     INTRODUCTION .................................................................................................................1

4   II.    FACTUAL BACKGROUND ..............................................................................................2

5          A.     In 2003, Sheehan Executed An Employment Agreement With 24 Hour Fitness
6                 USA, Inc. ..................................................................................................................2

7          B.     In 2005, Sheehan Executed A Stockholder's Agreement With A Different
                  Entity, 24 Hour Fitness Worldwide, Inc. ..................................................................2

8          C.     On June 23, 2008, Sheehan Resigned from 24 Hour USA To Work For Bally
9                 Total Fitness Corp. ...................................................................................................4

10         D.     On June 24, 2008, Plaintiffs Threatened To Sue Sheehan And Bally If They
                  Did Not Honor The Illegal Non-Compete .................................................................4

11         E.     Sheehan Has Not Disclosed Or Threatened To Disclose Any Confidential Or
12                Proprietary Information, And Does Not Intend To Do So In The Future .....................4

13  III.   ARGUMENT .......................................................................................................................5

14         A.     Legal Standard ..........................................................................................................5

           B.     Plaintiffs Cannot Show A Likelihood Of Success On The Merits. ............................5

15                1.     There Is No Admissible Evidence To Support Plaintiffs' First Cause
16                       Of Action For Misappropriation Of Trade Secrets ...........................................5

17                2.     Plaintiffs' Second Cause Of Action Is Founded On A Breach Of An
18                       Unenforceable Non-Compete. ...........................................................................6

19                       a.     Non-Competes Are Unenforceable In California Other Than In
                                Exceptional Circumstances Not Present In This Case. .............................6

20                       b.     The Court Cannot Reform An Illegal Non-Compete. ...............................7

21                       c.     Plaintiffs' Attempt To Enforce Its Illegal Non-Compete
22                              Violates Business & Professions Code § 17200. .....................................8

23                3.     Plaintiffs Have No Likelihood Of Success On The Third Cause Of
                         Action For Breach Of The Stockholder's Agreement Because It Does
24                       Not Prohibit Competitive Activity. ....................................................................8

25                4.     Plaintiffs Cannot Rely Upon The 2005 Stockholder's Agreement To
                         Render Enforceable The 2003 Employment Agreement's Non-
26                       Compete. ...........................................................................................................9

27                       a.     Section 16601 Does Not Legitimize A Non-Compete In An
                                Employment Agreement That Was Executed Years Before The
28                              2005 Stock Agreement And Sheehan's Resignation. ...........................10

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

i

b. Section 16601 Does Not Authorize Non-Competes Made In Connection With The Kind Of Stock Agreement At Issue In This Case......................................................................................10

c. The Language Of The Agreements Precludes Plaintiffs' Post Hoc Interpretation. ...................................................................12

5. Plaintiffs Have No Likelihood Of Success On Their Fourth Cause Of Action For Unfair Business Practices. ........................................12

6. Plaintiffs Have No Likelihood of Success On Their Fifth Cause Of Action For Injunction.............................................................13

7. Plaintiffs' Causes Of Action Are Not Saved By The Doctrine Of Inevitable Disclosure .............................................................13

C. Plaintiffs Have Failed To Meet Their Evidentiary Burden To Establish A Right To A TRO ...........................................................14

D. The Balance Of Harms Tips Sharply In Sheehan's Favor. ...........................14

E. Plaintiffs Cannot Seek A TRO While Engaging In An Unfair Business Practice...................................................................15

IV. CONCLUSION..........................................................................15

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

ii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Application Group, Inc. v. Hunter Group, Inc.*
(1998) 61 Cal.App.4th 881 ...........................................................................7, 8, 9

*Bayer Corp. v. Roche Molecular Sys., Inc.*
(N.D. Cal. 1999) 72 F. Supp. 2d 1111 .............................................................14

*Bosley Medical Group v. Abramson*
(1984) 161 Cal.App.3d at 284.....................................................................10, 11

*Computer Sciences Corp. v. Computer Assocs. Int'l, Inc.*
(C.D. Cal. 1999) 1999 U.S. Dist. LEXIS 21803, 1999 WL 675446 ...............14

*Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc.,*
(2008) 160 Cal. App. 4th 288 ............................................................................6

*D'sa v. Playhut, Inc.*
(2000) 85 Cal.App.4th 927 ................................................................................7

*Danjaq LLC v. Sony Corp.*
(C.D. Cal. 1999) 1999 U.S. Dist. LEXIS 22486, 1999 WL 317629 ................14

*Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*
(S.D. Fla. 2001) 148 F. Supp. 2d 1326 ...........................................................14

*Globespan, Inc. v. O'Neill*
(C.D. Cal. 2001) 151 F. Supp. 2d 1229 ...........................................................13

*Hilb, Rogal and Hamilton Ins. Svcs. of Orange County, Inc. v. Robb*
(1995) 33 Cal.App.4th 1812 ............................................................................10

*Hill Medical Corp. v. Wycoff*
(2001) 86 Cal.App.4th 895 .........................................................................10, 11

*Hunt v. Superior Court*
(1999) 21 Cal.4th 984 ........................................................................................5

*Int'l Paper Co. v. Suwyn*
(S.D.N.Y. 1997) 966 F.Supp. 246......................................................................14

*Kaye v. Tellsen*
(1954) 129 Cal.App.2d 115 ................................................................................9

*KGB, Inc. v. Giannoulas*
(1980) 104 Cal.App.3d 844 ................................................................................7

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

iii

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1
2      *Kolani v. Gluska*
       (1998) 64 Cal.App.4ᵗʰ 402 ..............................................................................7

3      *Marlin v. Aimco Venezia, LLC,*
       (2007) 154 Cal. App. 4th 154 ........................................................................13
4
5      *Metro Traffic Control, Inc. v. Shadow Traffic Network*
       (1994) 22 Cal.App.4ᵗʰ 853 ............................................................................7

6      *Muggill v. Reuben H. Donnelley Corp.*
7      (1965) 62 Cal.2d 239 .........................................................................7, 10, 11

8      *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.,*
       (2002) 104 Cal. App. 4th 508 ......................................................................12
9
10     *Sargent Fletcher, Inc. v. Able Corp.,*
       (2003) 110 Cal. App. 4th 1658 ......................................................................6

11     *Whyte v. Schlage*
       (2002) 101 Cal.App.4ᵗʰ 1443 ..................................................................13, 14
12

13

**STATUTES**

14
Business & Professions Code § 16600 ........................................................... passim
15
Business & Professions Code § 16601 ........................................................... passim
16
Business & Professions Code § 17200 ........................................................... passim
17
Civil Code § 3426 .................................................................................................5, 6
18
Civil Code § 3426.2 ...............................................................................................6
19

20

21     **RULES**

22
California Rule of Court 3.1202(c) .....................................................................5, 14
23

24

25

26

27

28

AM. OPP. OF DEF. M. SHEEHAN TO PL.'S EX PARTE APP. FOR A TEM. RES. ORDER; DECL. OF M. SHEEHAN

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

# I.    INTRODUCTION

By their application for a temporary restraining order, Plaintiffs 24 Hour Fitness USA, Inc. ("24 Hour USA") and 24 Hour Fitness Worldwide, Inc. ("24 Hour Worldwide," collectively "Plaintiffs") seek to engage the equitable power of this Court to enforce a covenant not to compete in a 2003 Employment Agreement that plainly violates California Business & Professions Code Sections 16600 and 17200 and the fundamental public policy of the state of California. Defendant Michael Sheehan has engaged in no unlawful conduct. Plaintiffs concede that they have "not been able to confirm" that he has misappropriated a single trade secret, though they worry that he "may have done so." (Declaration of Carl C. Liebert in Support of Application for Temporary Restraining Order and Preliminary Injunction ("Liebert Decl."), ¶ 10.) The sole "evidence" in support of their allegations is a facially neutral press release by Bally Total Fitness Corporation ("Bally") stating that Sheehan will join Bally as its CEO on July 1, and testimony that he sometimes worked at home. Yet, Plaintiffs seek to prevent Sheehan from taking employment with Bally on the grounds that doing so would violate a non-compete in Sheehan's Employment Agreement with 24 Hour USA.

Plaintiffs cannot possibly show a likelihood of success on the merits. The non-compete is illegal under Business & Professions Code § 16600, and is not resurrected into a legal non-compete by operation of a Stockholder's Agreement Sheehan executed two and a half years later with a different entity, by which Sheehan was entitled to purchase approximately one-half of one percent of that entity's highly restricted stock. In addition, Plaintiffs have no admissible evidence of the theft of any trade secret. Plaintiffs' attempt to cloak their illegal non-compete in the mantle of Business & Professions Code § 16601 is a red herring. First, and perhaps most fundamentally, the non-compete at issue was not executed in connection with the sale of a business. Second, although Plaintiffs have stated under oath that the Stockholder's Agreement contains a non-compete (Plaintiff's Verified Complaint ("Cmplt."), ¶ 36), it does not. To the contrary, it *anticipates* and *allows* Sheehan to compete, though such competition triggers an option to 24 Hour Worldwide to buy back his stock at a price yielding him no profit if he does. Third, the illegal non-compete in the 2003 Employment Agreement cannot somehow be transformed into an enforceable non-compete through Plaintiffs' attempt to wed it to the 2005 Stockholder Agreement with a different party *post hoc*. This is

1

1    precisely the type of subterfuge that California courts have condemned when California employers

2    have attempted to enforce unenforceable non-compete agreements.

3        The balance of harms also tips sharply in favor of Sheehan because he will be unable to work

4    in an entire industry in violation of the fundamental public policy of the state of California if a

5    Temporary Restraining Order ("TRO") were entered, while Plaintiffs will only be deprived of the

6    benefit of an illegal bargain if their Application is denied.  Finally, Plaintiffs have failed to present

7    competent evidence based on personal knowledge establishing irreparable injury or immediate

8    danger, a prerequisite for a TRO to issue.  Plaintiffs' application should be denied.

## II.    FACTUAL BACKGROUND

### A.    In 2003, Sheehan Executed An Employment Agreement With 24 Hour Fitness USA, Inc.

On March 31, 2003, Sheehan entered into an employment agreement with 24 Hour USA ("Employment Agreement").  (Cmplt., Exh. A.)  The Employment Agreement stated that, for a period of two years following the termination of his employment, Sheehan would not work for "any entity or individual(s) which operates a fitness club within fifty (50) miles of any of the Company's fitness clubs or which otherwise competes with the business of the Company of the Company's affiliates." (*Id.*, § 10.2)  The Employment Agreement additionally provided:  *"This Agreement shall be governed by and construed and enforced in accordance with the laws applicable to Agreements made and to be performed entirely in the State of California."*  (*Id.*, § 15; emphasis added.) Sheehan resided and worked in California.  (Cmplt., ¶ 3.)

### B.    In 2005,  Sheehan Executed A Stockholder's Agreement With A Different Entity, 24 Hour Fitness Worldwide, Inc.

On September 30, 2005 – two and a half years after he executed his Employment Agreement with 24 Hour USA, Sheehan entered into a Stockholder's Agreement with 24 Hour Worldwide, a separate corporate entity from 24 Hour USA.  (Cmplt., Exhibit B.)  The Stockholder's Agreement allowed Sheehan to buy 197,967 shares of Class B Common Stock for $1,000,001.79.  (*Id.*, Annex A.)  At this time, 24 Hour Worldwide had 32,994,439 Class A shares and 3,065,057 Class B Shares. Class B Shares were "restricted" and could not be transferred, sold or hypothecated, except under

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

2

1  highly limited circumstances.  (Cmplt., Exh. B, § 3.)  The Stockholder's Agreement does ***not*** contain

2  an agreement not to compete.  Instead, it provides that, in the event that Sheehan leaves the company

3  and goes to work for a competitor, 24 Hour Worldwide can buy back the stock Sheehan purchased

4  for the amount Sheehan paid for it or its current market value, whichever is less.  (*Id.,* § 4.2.)

5  Therefore, it makes clear that as a penalty for competing, if the Company elects to buy back the

6  stock, Sheehan can obtain no gain or profit from holding or selling the stock.  (*Id.*)  The

7  Stockholder's Agreement states in pertinent part:

8      1.1  <u>Definitions</u>.  . . . "Competitive Activity" shall mean engaging in
9            any of the following activities:  (i) serving as a director or
             executive officer of any Competitor . . . . or (iv) employment by
10           (including serving as an officer or director of) . . . any
             Competitor. . . .  "Competitor" shall mean . . . Bally Total Fitness
11           Holding Company.

    4.1  <u>Prohibition Against Certain Activities</u>.  The Employee agrees that
12           (a) the Employee will not at any time during the Employee's
             employment (other than in the course of such employment) with
13           the Company or any Affiliate thereof, or after a Termination,
             disclose or furnish to any other Person or use for the Employee's
14           own or any other Person's account any Confidential or Proprietary
             Information unless required to do so by law or judicial process, (b)
15           if the Employee is Terminated, the Employee will not for three
             years following such Termination hire or employ, directly or
16           indirectly solicit for employment, including without limitation
             recommending to any subsequent employer the solicitation for
17           employment of, any employee of the Company or any Affiliate
             thereof, (c) the Employee will not at any time during the
18           Employee's employment with the Company or any Affiliate
             thereof or after a Termination publish or make any disparaging
19           statements about the Company, any Affiliate or any of their
             directors, officers or employees, under circumstances where it is
20           reasonably foreseeable that the statements will be made public and
             (d) the Employee will not breach the provisions of Section 3.1
21           hereof [governing sale and transfer of the stock] (any activity
             prohibited by clause (a), (b), (c) or (d) of this Section 4.1 being
             referred to as "Prohibited Activity").  . . .
22     4.2  <u>Right to Purchase Shares</u>.  The Employee understands and agrees
             that the Company has granted to the Employee the right to
23           purchase shares of Class B Common Stock to reward the
             Employee for Employee's future efforts and loyalty to the
24           Company and its affiliates by giving the Employee the opportunity
             to participate in the potential future appreciation of the Company.
25           Accordingly, (a) if the Employee engages in any Prohibited
             Activity, or (b) ***if***, at any time during the employee's employment
26           with the Company or any of its Affiliates or ***during the three***
             ***years following a Termination, the employee engages in***
27           ***Competitive Activity***, . . . then, in addition to any other rights and
             remedies available to the Company or any of its Affiliates (at law,
28           in equity or under any employment agreement, award agreement

3

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

or other agreement or arrangement of the Employee), *the Company shall be entitled, at its option, exercisable by written notice (the "Repurchase Notice") to the Employee, to purchase all or any portion of the shares of Class B Common Stock then held by the Employee*.

(*Id*.) (Emphasis added.) While "Competitive Activity" is a defined term in the Stockholder's Agreement, it expressly is not one of the Prohibited Activities set forth in Section 4.1.

**C.     On June 23, 2008, Sheehan Resigned from 24 Hour USA To Work For Bally Total Fitness Corp.**

On June 23, 2008, Sheehan announced that he was resigning from 24 Hour USA to join Bally as its CEO. (Cmplt., ¶ 4.)

**D.     On June 24, 2008, Plaintiffs Threatened To Sue Sheehan And Bally If They Did Not Honor The Illegal Non-Compete**

On June 24, 2008, 24 Hour Worldwide's CEO, Carl Liebert, sent letters to Sheehan and Bally's Chairman of the Board of Directors, Don Kornstein. (Liebert Decl., Exhibit D.) The letters stated, *inter alia*: (1) Sheehan is "subject to significant non-compete and confidentiality obligations that preclude him for working with Bally"; (2) he "will be unable to work in any meaningful way as Bally's CEO without using such confidential information*"*; (3) Sheehan and Bally , "face[] legal liability," *inter alia,* for violation of the California Business & Professions Code if Sheehan works for Bally; (4) Liebert hopes that Bally would "suspend its efforts to hire" Sheehan; and (5) if Sheehan does commence employment with Bally, Plaintiffs "will take all necessary steps to protect its interests, including legal action against Bally as well as against [Sheehan]." (*Id*.)

**E.     Sheehan Has Not Disclosed Or Threatened To Disclose Any Confidential Or Proprietary Information, And Does Not Intend To Do So In The Future.**

It is undisputed that Sheehan has never disclosed any confidential or proprietary information of Plaintiffs to any person outside Plaintiffs except as required in connection with his work for 24 Hour USA. (Supplemental Declaration of Michael Sheehan ("Sheehan Decl."), attached, ¶ 3.) He did not take any confidential or proprietary information when he left 24 Hour USA, and he deleted/destroyed all such information he had on his home computer and personal e-mail account that he used to work from home when he had been employed by 24 Hour USA. (*Id.* ¶¶ 3-6.)

4

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   Sheehan no longer has, or has access to, any documents containing confidential or proprietary

2   information of Plaintiffs.  (*Id.*, ¶ 12.)  This evidence is ***undisputed***:  Carl Liebert, 24 Hour

3   Worldwide's CEO, ***concedes*** that Plaintiffs have not been able to confirm the misappropriation of

4   any confidential or proprietary information or trade secrets by Sheehan.  (Liebert Decl., ¶ 10.)

5   Instead, the only purported "evidence" relied upon by Plaintiffs is Bally's facially neutral press

6   release, announcing that Sheehan would join Bally on July 1, 2008.[1]

7   **III.   ARGUMENT**

8        **A.     Legal Standard**

9        An *ex parte* applicant for a TRO "must make an affirmative factual showing in a declaration

10   containing competent testimony based on personal knowledge of irreparable harm, immediate

11   danger or any other statutory basis for granting relief *ex parte*."  California Rule of Court 3.1201(c).

12   In determining whether to issue a TRO, the court weighs two interrelated factors:  the likelihood that

13   the moving party ultimately will prevail on the merits, and the relative harm to the parties from the

14   issuance or non-issuance of the TRO.  *Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999.

15        **B.     Plaintiffs Cannot Show A Likelihood Of Success On The Merits.**

16        The Complaint purports to state five causes of action:  (1) Misappropriation of Trade Secrets

17   in Violation of California Civil Code § 3426 *et seq.*; (2) Breach of Employment Agreement; (3)

18   Breach of Stockholder's Agreement; (4) Unfair Business Practices in Violation of Business &

19   Professions Code § 17200; and (5) Injunctive Relief.  Plaintiffs cannot show a likelihood of success

20   on any of these alleged causes of action.

21             **1.      There Is No Admissible Evidence To Support Plaintiffs' First Cause Of
                         Action For Misappropriation Of Trade Secrets**

22

---

23   [1]  On Sunday, June 29, 2008, Plaintiffs submitted declarations from Angela Read, Sheehan's, former
     assistant, and William B. Donahue, 24 Hour USA's CIO.  Neither declaration identifies a
24   misappropriation or threatened misappropriation of a trade secret.  Read testifies that she routinely
     downloaded materials Sheehan had worked onto a portable hard drive for him, that she produced
25   Profit & Loss reports for him, and that he had a flash drive.  This amounts to business as usual:  she
     backed up his hard drive weekly in case it crashed, and provided Profit & Loss reports for him every
26   quarter, which he used in the normal course of business. (Sheehan Decl., ¶ 8.)  Sheehan does not
     have the portable hard drive, the reports, or the flash drive.  (*Id.*, ¶ 8, 10-12.)  Donahue testified that
27   Sheehan violated 24 Hour USA's policies governing confidential information when he e-mailed
     documents to his personal account to work from home.  Sheehan testified that he was not aware of
28   such a policy, and that it was common practice for executives to do the same to stay on top of their
     workloads. (*Id.*, ¶ 7.)

Plaintiffs' first cause of action alleges that Sheehan misappropriated their trade secrets in violation of Cal. Civil Code § 3426 *et seq.* To prevail on this cause of action, Plaintiffs must show: (1) they owned a trade secret, (2) Sheehan acquired, disclosed, or used their trade secret through improper means, and (3) Sheehan's actions damaged them." *Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc.* (2008) 160 Cal. App. 4th 288, 297; *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal. App. 4th 1658, 1665. To obtain injunctive relief on this cause of action, Plaintiffs must show "actual or threatened misappropriation." Civil Code § 3426.2.

The Liebert Declaration concedes that Plaintiffs do ***not*** have any competent testimony that Sheehan actually misappropriated, or threatened to misappropriate a single trade secret. He states:

> At this point in time, ***I have not been able to confirm***, but I believe that Mr. Sheehan likely already has misappropriated 24 Hour Fitness' confidential and proprietary information and trade secrets.

(Liebert Decl., ¶ 10.) (Emphasis added.) Nor do the Read or Donahue declarations show anything other than business as usual. The undisputed evidence is that Sheehan has ***not*** misappropriated or threatened to misappropriate any trade secrets and that he does not intend to do so. (Sheehan Decl., ¶¶ 3-6, 12.) Nor have Plaintiffs established that any information they purportedly seek to protect actually is a trade secret. They simply assert that every aspect of their business somehow is "confidential." There is not a scintilla of admissible evidence that would justify a finding on this record that Plaintiffs have a likelihood of success on the merits of this cause of action. To the extent that Plaintiffs' remaining causes of action are based upon an alleged misappropriation of trade secrets, there is no likelihood of success on the merits for the same reasons.

### 2. Plaintiffs' Second Cause Of Action Is Founded On A Breach Of An Unenforceable Non-Compete.

#### a. Non-Competes Are Unenforceable In California Other Than In Exceptional Circumstances Not Present In This Case.

Plaintiffs' second cause of action alleges that, by working for Bally, Sheehan would be in breach of a non-compete agreement contained in his 2003 Employment Agreement. Plaintiffs cannot succeed on the merits because they seek to enforce a non-compete, governed by California law, that plainly violates Business & Professions Code § 16600 ("Section 16600"). Section 16600 represents the "strong public policy of the State of California" that "the interests of the employee in

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

his own mobility and betterment are deemed paramount to the competitive business interest interests of the employers." *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4[th] 881, 909. Section 16600 presents "an absolute bar to post-employment restraints." *KGB, Inc. v. Giannoulas* (1980) 104 Cal.App.3d 844, 848. Accordingly, courts routinely construe Section 16600 to invalidate contracts that purport to prohibit an employee from working in competition with the employer after termination of the employment contract. *See Muggill v. Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239, 242 (employee has the right to enter into competition with former employer despite having agreed not to compete); *Application Group, supra* (invalidating non-compete as violative of § 16600 and refusing to apply choice of law provision that would lead to a different result).

Here, Sheehan's covenant not to compete purports to prevent him from working for a competitor within 50 miles of *any* 24 Hour Fitness studio for a period of *two years*. There are more than *two hundred* 24 Hour Fitness Clubs in California and more than 30 in the Bay Area. (Sheehan Decl., ¶ 14.) Thus, if enforced, the covenant would prevent Sheehan from working for a competitor anywhere in California for two years. The covenant is plainly unenforceable. *Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4[th] 853, 859 (invalidating a one year covenant not to compete that applied in the employee's in the Los Angeles local television market); *Kolani v. Gluska* (1998) 64 Cal.App.4[th] 402, 407 (invalidating covenant not to compete in 40 mile radius for one year).

### b.     The Court Cannot Reform An Illegal Non-Compete.

Courts will not save an illegal or overbroad covenant not to compete. *Kolani, supra,* 64 Cal.App.4[th] at 407-08; *D'sa v. Playhut, Inc.* (2000) 85 Cal.App.4[th] 927, 934-35 (refusing to narrowly construe, and therefore invalidating, covenant not to compete). As the Court reasoned in *Kolani*, the policies underlying Section 16600 would be undermined by reforming illegal non-competes because:

> Employers could insert broad, facially illegal covenants not to compete in their employment contracts. Many, perhaps most, employees would honor these clauses without consulting counsel or challenging the clause in court, thus directly undermining the statutory policy favoring competition. Employers would have no disincentive to use the broad, illegal clauses if permitted to retreat to a narrow, lawful construction in the event of litigation.

*Id.,* at 407. 24 Hour USA violated Section 16600 by including an illegal non-compete in its

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  Employment Agreement. There are no means by which Sheehan's agreement can be conformed to

2  be lawful. The entire covenant was void and unenforceable *ab initio* when it was executed in 2003.

**c.    Plaintiffs' Attempt To Enforce Its Illegal Non-Compete Violates
Business & Professions Code § 17200.**

5  It is a violation of Business & Professions Code § 17200 for an employer to attempt to

6  enforce a non-compete that is void under § 16600. *Application Group*, 61 Cal.App.4th at 881. Here,

7  Plaintiffs are seeking to enforce an illegal covenant. Worse, Plaintiffs sent a letter to Sheehan

8  directly, and to the Chairman of the Board of Bally, his future employer, making threats to assert

9  meritless legal claims unless Sheehan and Bally honor the illegal non-compete and do not form an

10  employment relationship. The letter asserts, for example, that *Bally* would commit a violation of

11  Business and Professions Code § 17200 if it hired Sheehan in violation of his non-compete with

12  Plaintiffs, and that Plaintiffs would sue Bally and Sheehan in such case. (Liebert Decl., Exh. D.)

13  Plaintiffs' conduct plainly violates § 17200. Far from establishing a likelihood of success on the

14  merits of their claim, this legal action is an abuse of legal process.[2]

**3.    Plaintiffs Have No Likelihood Of Success On The Third Cause Of Action
For Breach Of The Stockholder's Agreement Because It Does *Not*
Prohibit Competitive Activity.**

17  Plaintiffs misrepresent the terms of the Stockholder's Agreement by asserting that it prohibits

18  Sheehan from engaging in "Competitive Activity," defined in the agreement to include serving as an

19  executive officer of Bally. (Cmplt., Exh. B, §§ 1.1, 4.1, 4.2, at pp. 3, 13-14.) Nowhere does the

20  Stockholder's Agreement prohibit such "Competitive Activity." To the contrary, the Agreement

21  clearly sets forth the actions constituting "Prohibited Activities" – including the disclosure of

22  confidential information and solicitation of employees – but does ***not*** include "Competitive Activity"

23  or "serving as an executive officer of Bally." (*Id.*, § 4.1.) The definition of "Prohibited Activity"

24  confirms that it has "the meaning ascribed to such term in Section 4.1." (*Id.*, § 1.1.) "Competitive

25  Activity" is referenced *only* in Section 4.2. Indeed, Section 4.2 identifies "Competitive Activity"

26  and "Prohibited Activity" separately as events triggering the Company's ***option*** to re-purchase all or

27

28  [2]  Defendant reserves the right bring cross-claims against Plaintiffs, *inter alia*, for abuse of process, and violation of § 17200 for their unlawful attempts to restrain him in violation of § 16600.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

8

1     part of the shares held by the Employee at the lower of the current fair market value or the

2     Employee's purchase price. Taken together, these provisions lead inexorably to the conclusion that

3     Sheehan **can** serve as an executive officer of Bally – a "Competitive Activity" but not a "Prohibited

4     Activity," expressly contemplated by the Stockholder's Agreement – but if he does so, 24 Hour

5     Worldwide has the "option" to re-purchase his stock, at a price ensuring that he realizes no gain from

6     the sale. Therefore, to the extent his work resulted in increased goodwill or value to the Company,

7     he is unable to recover such from the sale.

8         Where a contract does not have an explicit non-compete, the Courts will not imply one.

9     *Kaye v. Tellsen* (1954) 129 Cal.App.2d 115, 118. Here, the Stockholder's Agreement does not

10    prohibit competition, it **anticipates** competition. Thus, to the extent that Plaintiffs seek to establish

11    breach of the Stockholder's Agreement based on Sheehan's act of competing, the cause of action

12    fails. To the extent they seek to assert a claim for breach of the buy-back provisions of the

13    Agreement, the claim fails because there is no evidence that 24 Hour Worldwide has tendered its

14    option to buy back the stock as required by the Agreement and Sheehan has refused to honor the

15    tender. Either way, Plaintiffs have no likelihood of success on the merits of their cause of action for

16    breach of the Stockholder's Agreement, and their Verified Complaint stating that the Stockholder's

17    Agreement contains a prohibition on "Competitive Activity" is plainly wrong.

18            **4.**     **Plaintiffs Cannot Rely Upon The 2005 Stockholder's Agreement To**

19                 **Render Enforceable The 2003 Employment Agreement's Non-Compete.**

20         The fundamental public policy of the state of California protects Sheehan's right to work in

21    his chosen field, even though by doing so he will compete with his former employer. *Application*

22    *Group,* 61 Cal.App.4[th] at 906. Plaintiffs seek to prevent Sheehan from going into competition

23    against them, but they have in their arsenal only an illegal 2003 non-compete with 24 Hour USA that

24    was imposed upon him in violation of Business & Professions Code § 17200 and a Stockholder's

25    Agreement executed two and one half years later with another entity, 24 Hour Worldwide, which on

26    its face allows him to compete. Plaintiffs attempt to legitimize an illegal non-compete by falsely

27    claiming that it was entered into in connection with the sale of a business. Bus. & Prof. Code §

28    16601. As set forth below, this is pure sophistry, as (1) the non-compete was entered into two and

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   one-half years *before* Sheehan executed the Stockholder's Agreement; (2) the non-compete was

2   signed with his employer, whereas the Stockholder's Agreement was with a different entity; and (3)

3   Sheehan's ownership interest in 24 Hour Worldwide, a non-employer entity, was *de minimis.*

<br>

         **a.**      **Section 16601 Does Not Legitimize A Non-Compete In An Employment Agreement That Was Executed Years Before The 2005 Stock Agreement And Sheehan's Resignation.**

6         Section 16601 provides that a person who sells ownership of a business may agree to a non-

7   compete in connection with the sale. Bus. & Prof. Code § 16601. Section 16601 is a narrow

8   exception to Section 16600. *Hill Medical Corp. v. Wycoff* (2001) 86 Cal.App.4th 895, 901. It

9   reflects the public policy that persons who sell the goodwill of a business may agree to refrain from

10  carrying on similar businesses following the sale. *Id.,* at 901-02. The purpose of Section 16601 is

11  served only when "the covenant [not-to-compete] is executed *in connection with* the sale and

12  disposition of all of the shareholder's stock." *Hilb, Rogal and Hamilton Ins. Svcs. of Orange*

13  *County, Inc. v. Robb* (1995) 33 Cal.App.4th 1812, 1825-26 (emphasis added).

14        Here, the non-compete was not made in connection with any sale (or even the 2005 purchase)

15  of Sheehan's stock. It was made in 2003, with a different legal entity, as part of his Employment

16  Agreement. It was a blatant violation of Sections 16600 and 17200, and was void when executed in

17  2003. *Muggill*, 62 Cal.2d at 242; *Bosley Medical Group v. Abramson* (1984) 161 Cal.App.3d, 284

18  288. There is no authority under Section 16601 to support Plaintiffs' novel contention that their

19  illegal covenant, unlawfully obtained, is rendered enforceable *post hoc,* simply because Sheehan

20  executed a Stockholder's Agreement two and a half years later that did not incorporate it by

21  reference, and then an option to purchase the stock was triggered five years later by his decision to

22  work for a competitor. California courts have soundly condemned this kind of subterfuge to render

23  enforceable an otherwise unenforceable non-compete. *Bosley Medical Group, supra.*

<br>

         **b.**      **Section 16601 Does Not Authorize Non-Competes Made In Connection With The Kind Of Stock Agreement At Issue In This Case.**

26        Even if Plaintiffs had done what they did not do – *i.e.,* include a non-compete in the

27  Stockholder's Agreement – it would be unenforceable. In *Bosley Medical Group*, 161 Cal.App.3d at

28  290, the Court rejected the contention that Section 16601 could be applied to a case in which the sale

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1    of stock did not include a transfer of goodwill. The Court reasoned:

> 2    Literally applied, section 16601 would permit a major public
> 3    corporation to require any employee to purchase one of several million
>    shares and to enter into an agreement not to work for a competitor – an
> 4    absurd result, and contrary to this state's public policy prohibiting such
>    agreements. Even on the facts of this case, a literal interpretation of
> 5    section 16601 leads to a mischievous and absurd result.

6    *Id.*, at 291. At issue in *Bosley Medical Group* was an agreement through which an employee was

7    required to sell a ten percent interest in the company upon his termination pursuant to a "stock

8    agreement" that included a non-compete. The Court refused to enforce the agreement.

9    Plaintiffs do not, and cannot, assert that Sheehan somehow would be selling goodwill to them

10    if and when 24 Hour Worldwide exercises its option to claw back stock from him at potentially less

11    than fair market value. There is no evidence whatsoever that any members of Plaintiffs' clubs are

12    aware that Sheehan was its COO, much less that they patronize the clubs for that reason. Nor could

13    Sheehan's ownership of restricted Class B stock amounting to less than one percent of the overall

14    amount of 24 Hour Worldwide's stock be deemed a sale of goodwill. *Hill*, 86 Cal.App.4[th] at 904

15    (sale must involve "a substantial interest in the corporation" to infer that the owner of the shares is

16    transferring goodwill). Even if it could, it is apparent that Sheehan would not be selling any

17    goodwill in a sale forced upon him at potentially less than fair market value. *Hill*, at 907

18    (employee's forced re-sale to employer of seven percent of the company's stock at a below market

19    rate does not evidence transfer of goodwill). In reality, the sale operates as a penalty for competing.

20    As such, the re-purchase provision of the Stockholder's Agreement is itself unenforceable. *Muggill*,

21    62 Cal.2d at 242 (contract provisions imposing a penalty for competing violate Section 16600 and

22    are therefore void).

23    This is precisely the type of case the *Bosley Medical Group* warned against, in which a big

24    corporation seeks to impose a non-compete on an employee through the artifice of a sale of an

25    insignificant percentage of its stock. Section 16601 seeks to protect the buyer of local restaurants

26    and dry cleaners from the prospect of competing against the seller who has earned the goodwill of

27    the business' customers. It was not intended to protect large companies from their own employees.

28    Plaintiffs cannot wed the Employment Agreement to the Stockholder's Agreement to create an

*Winston & Strawn LLP*
*101 California Street*
*San Francisco, CA 94111-5894*

11

1   enforceable non-compete where none existed before.  This is a transparent effort to achieve

2   indirectly what California law prohibits them from achieving directly.

           c.     **The Language Of The Agreements Precludes Plaintiffs' *Post Hoc* Interpretation.**

5           The agreements themselves do not allow for an interpretation that would unite them so that

6   together they could achieve what neither of them achieves separately.  Rather, the Stockholder's

7   Agreement provides that 24 Hour Worldwide's right to repurchase shares is "in addition to any other

8   rights and remedies available to the Company or any of its Affiliates (at law, in equity or under any

9   employment agreement . . .)."  Thus, the Stockholder's Agreement, which was executed two and a

10  half years after the Employment Agreement, is intended to be a side agreement with its own rights

11  and remedies, which applies ***without affecting*** the parties' pre-existing legal and contractual rights

12  and remedies.  Plaintiffs admit as much when they concede that the Employment Agreement and the

13  Stockholder Agreement are "two separate agreements."  (Application, at 11:19.)

14          The conclusion that the two agreements operate independently is confirmed by fact that the

15  Stockholder's Agreement does not incorporate the Employment Agreement by reference, but it

16  includes an integration clause that extinguishes all prior agreements "on the subject matter hereof."

17  (Cmplt., Exh. D., § 6.10.)  Only two outcomes are possible.  Either the Stockholder's Agreement

18  extinguishes the 2003 Employment Agreement, or the 2003 Employment Agreement addresses a

19  separate subject matter, which must therefore be enforced separately.  Either way, as a matter of pure

20  contract interpretation, the 2003 Employment Agreement's illegal non-compete cannot be

21  resurrected and made lawful by bootstrapping it to the 2005 Stockholder's Agreement.

           5.     **Plaintiffs Have No Likelihood Of Success On Their Fourth Cause Of Action For Unfair Business Practices.**

24          Plaintiffs' cause of action for the purported violation of Business & Profession Code § 17200

25  by Sheehan for not honoring its illegal non-compete is duplicative of the prior causes of action.  *See*

26  *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal. App. 4th 508, 515 (§ 17200

27  borrows violations of other laws and treats them as unfair business practices).  It fails for the same

28  reasons as the claims based on the underlying laws.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1

       **6.      Plaintiffs Have No Likelihood of Success On Their Fifth Cause Of Action For Injunction**

2

3

       This purported cause of action fails as a matter of law because injunction is a remedy, not a

4

cause of action. *Marlin v. Aimco Venezia, LLC* (2007) 154 Cal. App. 4th 154, 162.  In any event, the

5

purported cause of action is duplicative of the other claims and fails for the same reasons.

6

       **7.      Plaintiffs' Causes Of Action Are Not Saved By The Doctrine Of Inevitable Disclosure**

7

8

       Bereft on any evidence that Sheehan actually has disclosed, or has threatened to disclose, any

9

trade secrets or confidential or proprietary business information, Plaintiffs seek to save their illegal

10

non-compete by relying on the doctrine of inevitable disclosure.  They assert that they "believe" he

11

"may have already" misappropriated trade secrets, and that, as CEO of Bally, Sheehan "inevitably"

12

will disclose trade secrets.  Yet, California categorically has rejected the inevitable disclosure

13

doctrine. *Whyte v. Schlage* (2002) 101 Cal.App.4[th] 1443.  Plaintiffs make a half-hearted attempt to

14

distinguish *Whyte* in a footnote, by asserting – erroneously – that, unlike *Whyte*, there is an

15

enforceable non-compete and evidence of the disclosure of confidential information in this case.

16

(Application, at 13, fn. 2.)  Even if Plaintiffs could distinguish *Whyte* on the facts – and they

17

cannot – their contention still would fail.  Plaintiffs neglect to cite the *Whyte* Court's holding:

18

> ***Lest there be any doubt about our holding, our rejection of the inevitable disclosure doctrine is complete.*** If a covenant not to

19

> compete (which would include, for example, a nonsolicitation clause), is part of the employment agreement, the inevitable disclosure doctrine

20

> cannot be invoked to supplement the covenant, alter its meaning, or make an otherwise unenforceable covenant enforceable. California

21

> law concerning enforcement of noncompetition agreements, not the inevitable disclosure doctrine, would measure the covenant's scope,

22

> meaning, and validity. Our opinion does not change that law. Under the circumstances presented in this case, an employer might prevent

23

> disclosure of trade secrets through, for example, an agreed-upon and reasonable nonsolicitation clause that is narrowly drafted for the

24

> purpose of protecting trade secrets. ***Thus, regardless whether a covenant not to compete is part of the employment agreement, the***

25

> ***inevitable disclosure doctrine cannot be used as a substitute for proving actual or threatened misappropriation of trade secrets***.

26

27

*Id.*, at 1463-64.  *Whyte* is binding authority, but it is hardly an outlying case.  Courts routinely reject

28

claims based on "inevitable disclosure."  *Globespan, Inc. v. O'Neill* (C.D. Cal. 2001) 151 F. Supp.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

13

1  2d 1229, 1235 (applying California law); *Bayer Corp. v. Roche Molecular Sys., Inc.* (N.D. Cal.

2  1999) 72 F. Supp. 2d 1111, 1112 (applying California law); *Computer Sciences Corp. v. Computer*

3  *Assocs. Int'l, Inc.* (C.D. Cal. 1999) 1999 U.S. Dist. LEXIS 21803, 1999 WL 675446 (applying

4  California law); *Danjaq LLC v. Sony Corp.* (C.D. Cal. 1999) 1999 U.S. Dist. LEXIS 22486, 1999

5  WL 317629 (applying California law); *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.* (S.D.

6  Fla. 2001) 148 F. Supp. 2d 1326, 1336-37 (applying California and Florida law). *See also Int'l*

7  *Paper Co. v. Suwyn* (S.D.N.Y. 1997) 966 F.Supp. 246 (rejecting an application for injunctive relief

8  based on inevitable disclosure doctrine in a case in which an executive vice president left company

9  to become CEO of a competitor). Plaintiffs cannot rely upon the inevitable disclosure doctrine to fill

10  the gaping hole left by their failure to present admissible evidence sufficient to demonstrate a

11  likelihood of success on the merits on any of their claims.

### C. Plaintiffs Have Failed To Meet Their Evidentiary Burden To Establish A Right To A TRO

14  It is Plaintiffs burden to "make an affirmative factual showing in a declaration containing

15  competent evidence based on personal knowledge of irreparable harm, immediate danger, or any

16  other statutory basis for granting relief *ex parte.*" California Rule of Court 3.1202(c). Plaintiffs

17  have not offered competent evidence based on personal knowledge establishing that they will suffer

18  any irreparable harm if a TRO does not issue. ***The CEO of 24 Hour Worldwide concedes that***

19  ***Plaintiffs have been unable to confirm that a single trade secret has been misappropriated, or***

20  ***threatened to be misappropriated***. (Liebert Decl., ¶ 10.) Instead, Plaintiffs speculate that Sheehan

21  "likely already has misappropriated" trade secrets. (*Id.*) Plaintiffs' additional declarations establish

22  nothing more than that Sheehan sometimes worked at home while employed by 24 Hour USA. That

23  is patently insufficient to meet Plaintiffs' burden under CRC 3.1202(c). Nor can Plaintiffs'

24  speculation that Sheehan will "inevitably disclose" fill the gap in the evidence. *Whyte*, 101

25  Cal.App.4th 1464. Plaintiffs have failed to make the threshold showing necessary to support a TRO.

### D. The Balance Of Harms Tips Sharply In Sheehan's Favor.

27  If the TRO is granted, Sheehan will suffer irreparable harm. The courts have made clear that

28  Business and Professions Code § 16600 articulates a fundamental public policy that protects the

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

14

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1 | right to engage in one's chosen profession. If a TRO is entered, Sheehan will be prevented from

2 | doing so, and unable to earn a living to support his family. (Sheehan Decl.,¶ 8.) By contrast,

3 | Plaintiffs have not shown any harm, much less irreparable harm, if a TRO is not entered. At most,

4 | they have established that, if its application is denied, they will suffer the indignity of having an

5 | illegal non-compete invalidated, and they will worry that Sheehan "may" disclose trade secrets.

6 | Such a showing does not outweigh the hardship to Sheehan and his family if a TRO were entered.

7 | **E.    Plaintiffs Cannot Seek A TRO While Engaging In An Unfair Business Practice.**

8 | One who seeks equity must do equity. Here, Plaintiffs seek to engage the Court's equitable

9 | power to grant it extraordinary relief while at the same time, through the contract they seek to

10 | enforce and this action to enforce it, they are committing an unfair business practice in violation of §

11 | 17200. The Court should not reward Plaintiffs' unlawful conduct by entering a TRO.

12 | **IV.    CONCLUSION**

13 | Plaintiffs are trying to engage this court's equitable power to enforce a blatantly illegal non-

14 | compete so that a California citizen is prevented from earning a living in his chosen profession.

15 | Plaintiffs cannot show that they have a likelihood of success on the merits of their claims or that the

16 | balance of harms favors them. Plaintiffs have failed to present competent testimony based on

17 | personal knowledge that they will suffer irreparable injury if a TRO does not issue. Accordingly, the

18 | Court should deny Plaintiffs' application for a TRO.

19 |

20 | Dated: June 30, 2008                    WINSTON & STRAWN LLP

21 |

22 | By: _____
     Paul J. Coady

23 |     Joan B. Tucker Fife
       Robert Spagat

24 |     Attorneys for Defendant
       MICHAEL SHEEHAN

25 |

26 |

27 |

28 |

15

# EXHIBIT A

1

## SUPPLEMENTAL DECLARATION OF MICHAEL SHEEHAN

2  I, MICHAEL SHEEHAN, DECLARE:

3      1.      I have personal knowledge of the facts set forth in this declaration, and if called as a

4  witness, I could and would testify competently to them.

5      2.      Beginning in 2000 I was employed as Senior Vice President of Operations of 24 Hour

6  Fitness USA, Inc. ("24 Hour"). On June 23, 2008, I resigned my employment with 24 Hour,

7  effective that day.

8      3.      As I noted in my earlier Declaration, I have not, at any time, disclosed or

9  disseminated any confidential or proprietary information of 24 Hour to any person outside the

10  company except as required in connection with my work for 24 Hour.  Further, I did not disclose or

11  disseminate any confidential or proprietary information of 24 Hour to any person at Bally, including

12  Bally management and members of Bally's Board of Directors, during any of the interviews that I

13  had with Bally leading up to my offer of employment from Bally, or since I received my offer of

14  employment.

15      4.      As I noted in my earlier Declaration, when I resigned and left 24 Hour I did not take

16  any confidential or proprietary information relating to the business of 24 Hour with me.

17      5.      As I noted in my earlier Declaration, I do not intend to disclose or disseminate any

18  confidential or proprietary information of 24 Hour to any person outside the company in the future.

19      6.      As I noted in my earlier Declaration, from time to time while I was employed at 24

20  Hour, I would send work related emails to my personal email account so that I could view them on

21  my home computer.  This was usually when I needed to read an email or document that was

22  inconvenient to read on my Blackberry handheld device.  I have deleted all such emails and

23  documents which contained any confidential or proprietary information relating to 24 Hour from my

24  home computer and from my personal email account.  As I noted in my earlier Declaration, when I

25  was employed by 24 Hour, I would sometimes take documents relating to 24 Hour with me when I

26  left my office so that I could work at home or when I traveled.  I have destroyed all such documents

27  relating to the business of 24 Hour Fitness.

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1
Supplemental Declaration of Michael Sheehan

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

7.    I understand that William Donahue has signed a Declaration that states that to the extent I emailed to myself "work related emails to my personal email account," or took documents related to 24 Hour Fitness when I left the office, so that I could work from home, that these actions violated "24 Hour Fitness' confidential and proprietary information and trade secrets policies." I do not know which policies Mr. Donahue is referring to. I was not aware of any policy that prohibited an executive from emailing information to his/her home, or taking information home or while traveling to work on company business outside of work. In fact, I was assigned a laptop, and could have taken my laptop home with me at any time, or logged onto 24 Hour Fitness' system remotely from my home. Many executives routinely took their laptops home with them or on travel to perform work when they were outside the office. I chose instead to email information to my self or take documents home because it was more convenient for me than carrying my laptop. In fact, it was common practice for other executives to do the same, to stay ahead of their busy work schedules. No one ever told me that my actions violated any company policy. .

8.    I understand that Angela Reed has also executed a Declaration, stating that I regularly asked her to download on Fridays all materials on which I had been working on during the week, to a portable hard drive. I asked her to download information I maintained on my laptop's hard drive to a portable hard drive to back up the laptop's hard drive, in case the lap top crashed. This was merely a precaution to protect the information. Indeed, I rarely took this portable hard drive out of the office, just as I rarely took my lap top out of the office. In fact, I had not taken this portable hard drive out of my office at 24 Hour for at least a month prior to my termination. I last saw the portable hard drive on my last day of employment at 24 Hour; it was sitting in my office next to my computer. I do not have this hard drive.

9.    Ms. Read's Declaration refers to a 500 gigabyte portable hard drive that was not among the inventory of returned item. She might be referring to a portable hard drive that I purchased new. I had the box containing this hard drive in my office, but it was never opened in the corporate office to the best of my knowledge. I gave this hard drive to employee Randy Drake, who took the hard drive home with him, to download his personal music files. To the best of my knowledge, nothing other than personal music files were loaded on this hard drive. These files,

2

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  however, do not belong to 24 Hour Fitness; and to the best of my knowledge, do not contain any

2  confidential or proprietary information of 24 Hour Fitness.  Rather these files contain personal music

3  files.

4        10.    Ms. Read also notes that in May I asked her to assemble certain Profit & Loss

5  statements, in hard copy, and place such information in binders.  This was part of the information

6  that I would routinely request be gathered to assist me in my position.  I would use this information

7  when I visited Clubs.  However, I have never used the information Ms. Read prepared in May 2008.

8  In fact, I did not ever open any of these binders and look at the information.  The binders that Ms.

9  Read compiled were on the shelf in my office at 24 Hour Fitness the day I terminated my

10  employment.  I have not seen these binders since, and do not have these binders or any copies of

11  these binders in my possession.

12        11.    Ms. Read also states that I had a flash drive in my office.  I no longer have this flash

13  drive. I had not used this flash drive in the several weeks before my termination.  I assume that this

14  flash drive is my office at 24 Hour Fitness.  I did not see it the day I terminated my employment, and

15  I do not have this flash drive, or any copies of this flash drive in my possession.  I have not seen this

16  flash drive since before my termination.  Executives at 24 Hour Fitness had flash drives and would

17  routinely take their laptops and/or their flash drives home with them to work in the evenings or over

18  the weekend.

19        12.    As I noted in my earlier Declaration, to my knowledge, I do not now have, or have

20  access to, any documents containing confidential or proprietary information relating to 24 Hour.

21        13.    Throughout my employment with 24 Hour, I lived and worked in California.

22        14.    There are more than two hundred 24 Hour Fitness Centers in California.

23        15.    Information contained on 24 Hour Fitness' public website includes pricing for both

24  personal training and members, as well as a listing of clubs, which are not yet open, but which are

25  opening in the future.

26

27

28

Supplemental Declaration of Michael Sheehan

1    I declare under penalty of perjury under the laws of the State of California that the foregoing

2    is true and correct.

3    Executed this 30th day of June, 2008, at _SAN RAMON_, California.

4

5

6

7    Michael Sheehan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Supplemental Declaration of Michael Sheehan

# EXHIBIT B

## DECLARATION

I, MICHAEL SHEEHAN, DECLARE:

1.     I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them

2.     Beginning in 2000 I was employed as Senior Vice President of Operations of 24 Hour Fitness USA, Inc. ("24 Hour"). On June 23, 2008, I resigned my employment with 24 Hour, effective that day.

3.     I have not, at any time, disclosed or disseminated any confidential or proprietary information of 24 Hour to any person outside the company except as required in connection with my work for 24 Hour. Further, when I resigned and left 24 Hour I did not take any confidential or proprietary information relating to the business of 24 Hour with me. I do not intend to disclose or disseminate any confidential or proprietary information of 24 Hour to any person outside the company in the future.

4.     From time to time while I was employed at 24 Hour, I would send work related emails to my personal email account so that I could view them on my home computer. This was usually when I needed to read an email or document that was inconvenient to read on my Blackberry handheld device. I have deleted all such emails and documents which contained any confidential or proprietary information relating to 24 Hour from my home computer and from my personal email account.

5.     Also when I was employed by 24 Hour, I would sometimes take documents relating to 24 Hour with me when I left my office so that I could work at home or when I traveled. I have destroyed all such documents relating to the business of 24 Hour.

6.     To my knowledge, I do not now have, or have access to, any documents containing confidential or proprietary information relating to 24 Hour.

7.     I have not attempted, and I do not intend, to recruit, solicit, induce or encourage any employee of 24 Hour to become an employee of another company. I have not attempted, and I do

1

MICHAEL SHEEHAN DECLARATION

not intend, to recruit, solicit, induce or encourage any independent contractor of 24 Hour to terminate a contracting relationship with 24 Hour.

8.     I have accepted an offer to become employed as Chief Executive Officer of Bally Total Fitness. Inasmuch as I have resigned from 24 Hour, I need the salary from my employment at Bally to support my family. 24 Hour has not discussed any arrangement whereby I could pursue employment at Bally. 24 Hour has not accused me of any illegal conduct.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 27th day of June, 2008, at _Sᴀɴ Rᴀᴍᴏɴ_ California.

Michael Sheehan

# Exhibit K

1  Paul J. Coady (SBN: 81698)
   pcoady@winston.com
2  Joan B. Tucker Fife (SBN: 144572)
   jfife@winston.com
3  Robert Spagat (SBN: 157388)
   rspagat@winston.com
4  WINSTON & STRAWN LLP
   101 California Street
5  San Francisco, CA 94111-5894
   Telephone:   415-591-1000
6  Facsimile:   415-591-1400

7  Attorneys for Defendant
   MICHAEL SHEEHAN

FILED

2008 JUL -2  P 1: 46

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.

BY:
      G. Montany, Deputy Clerk

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                    COUNTY OF CONTRA COSTA

11

12  24 HOUR FITNESS, et al.,                    Case No.  C-08-01663

13              Plaintiffs

                                               DEFENDANT'S OBJECTIONS TO THE
14       vs.                                   DECLARATIONS OF ANGELA READ
                                               AND WILLIAM R. DONAHUE
15  MICHAEL SHEEHAN,                            SUBMITTED IN SUPPORT OF
                                               PLAINTIFFS' APPLICATION FOR AN
16              Defendant.                      ORDER TO SHOW CAUSE AND
                                               TEMPORARY RESTRAINING ORDER

17
                                               DATE: JUNE 30, 2008
18                                             TIME: 2:00
                                               DEPT: 60
19

20                                                            BY FAX

21

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1  Defendant Michael Sheehan ("Defendant") hereby objects to the declarations of Angela Read

2  and William Donahue submitted in support of plaintiffs 24 Hour Fitness USA, Inc., and 24 Hour

3  Fitness Worldwide, Inc.'s ("Plaintiffs") Application for an Order to Show Cause and Temporary

4  Restraining Order (the "Declarations").

## I.   GENERAL OBJECTIONS[1]

6  Based on each of the General and Specific Objections as set forth below, the information

7  contained in the Declarations is invalid or inadmissible as a matter of law and should not be

8  considered by this Court.

9  1.   Defendant generally objects to Plaintiffs' submission of both declarations on the

10  grounds that they are untimely and were filed without authorization from the Court.  Plaintiffs

11  presented their ex parte application on Friday, June 27 at 1:30 p.m. and personally served it at that

12  time.  Because Defendant had not previously seen Plaintiffs' papers, the Court continued the matter

13  until 2:00 p.m. on June 30 to allow Defendant an opportunity to respond to Plaintiffs' arguments and

14  evidence.  Plaintiffs faxing of their new declarations to Defendant late Sunday afternoon was

15  without authorization and constituted an improper attempt to sandbag Defendant.

16  2.   Defendant generally objects to the Declarations as they contains statements which

17  lack personal knowledge. *See* Evid. Code § 702; *Guthrey v. State of California*, 63 Cal.App.4th

18  1108, 1120 (1998).  Personal knowledge must be established or the Declarations are invalid as a

19  matter of law. *See id.*  To the extent the Declarations lack personal knowledge, they should not be

20  considered by this Court.

21  3.   Defendant generally objects to the Declarations as the statements contained therein

22  lack foundation. *See* Evid. Code § 403.  As the Declarations lack foundation, they should not be

23  considered by this Court as a matter of law.

24  4.   Defendant generally objects to the Declarations as the statements contained therein

25  contain legal conclusions.  Courts have consistently held that legal conclusions are not admissible at

26  

---

[1]   The following general objections apply to the entirety of the Declarations and the assertion of the
same, similar, or additional objections to the Declarations does not waive any of Defendant's General or
Specific Objections as set forth below.

1

**DEFENDANT'S OBJECTIONS TO THE DECLARATIONS OF ANGELA READ AND WILLIAM R.
DONAHUE SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO
SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

1  trial and should be excluded. *See Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863;

2  *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155; *Communications Satellite Corp. v.*

3  *Franchise Tax Board* (1984) 156 Cal.App.3d 726; *Downer v. Bramet* (1984) 152 Cal.App.3d 837.

4  Because the Declarations contain legal conclusions, they should not be considered by this Court as a

5  matter of law.

6       5.    Defendant generally objects to the Declarations as the statements contained therein

7  are based on conclusory statements without adequate accompanying facts or documents to support

8  the conclusions asserted. Evid. Code §§ 403, 702; *see Sheppard v. Morgan Keegan & Co.*, 218

9  Cal.App.3d 61 (1990); *Sesma v. Cueto*, 129 Cal.App.3d 108 (1982). Thus, as the Declarations

10  contain conclusory statements, they should not be considered by this Court as a matter of law.

11       6.    Defendant generally objects to the Declarations as they contain improper lay opinion.

12  Opinions of a lay witness are limited to opinions that are (a) rationally based on the perception of the

13  witness; and (2) helpful to a clear understanding of his testimony. *See* Evid. Code § 800 (emphasis

14  added); *People v. McAlpin*, 53 Cal. 3d 1289, 1308 (1991)(opinions only admissible if based on

15  matters personally observed). To the extent the Declarations contain improper lay opinion, they

16  should not be considered by this Court as a matter of law.

17       7.    Defendants generally object to the Declarations as they are based on allegations

18  asserted without any specificity. Without more, the allegations merely are unsupported, unspecific,

19  and rely on speculative conclusions that should not be considered by this Court.

20       8.    Defendant generally objects to the Declarations to the extent that they fail to provide

21  any supporting documents, materials, or other evidence to corroborate the allegations made therein.

22  Without more, all such allegations merely are unsupported, unspecific, and relies on speculative

23  conclusions that should not be considered by this Court.

24       9.    Defendant generally objects to the Declarations as they are irrelevant. *See* Evid.

25  Code §§ 210, 350. All statements contained in the Declarations that are irrelevant should not be

26  considered by this Court.

*Winston & Strawn LLP / 101 California Street / San Francisco, CA 94111-5894*

**DEFENDANT'S OBJECTIONS TO THE DECLARATIONS OF ANGELA READ AND WILLIAM R. DONAHUE SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

10.    Defendant generally objects to the Declarations as they contain or are based on inadmissible hearsay.  *See* Evid. Code §§ 1200 *et. seq.*  All such statements are inadmissible and should not be considered by this Court.

11.    Defendant generally objects to the Declarations on the ground that they are vague and ambiguous.  All such vague and ambiguous statements contained in the Declarations should not be considered by this Court.

Because of their objectionable nature, the Declarations should be stricken in their entirety.  In the alternative, the Court should strike and disregard the specific portions of the Declarations set forth below.

## II.    SPECIFIC OBJECTIONS TO THE DECLARATION OF ANGELA READ

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| Paragraph 3:  Prior to June 23, 2008, I was given no indication by Mr. Sheehan that he was planning on leaving 24 Hour Fitness. | Irrelevant; Lacks foundation; Hearsay; Speculative; Improper lay conclusion | |
| Paragraph 4:  During the time I worked for Mr. Sheehan, he regularly asked me to download on Fridays all materials on which he had been working on during the week, to a portable hard drive that he would take home with him. | Irrelevant; Hearsay | |

**DEFENDANT'S OBJECTIONS TO THE DECLARATIONS OF ANGELA READ AND WILLIAM R. DONAHUE SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| Paragraph 4:  As a result, at one time or another, Mr. Sheehan had on a portable hard drive virtually every document on which he worked during my tenure with 24 Hour Fitness. The documents could include, for example, real estate committee documents, marketing, sales, labor, and financial reports, business process initiatives, direct report performance reviews, etc. | Improper lay conclusion; Speculative; Lacks personal knowledge; Lacks foundation | |
| Paragraph 5:  On or about May 5, 2008, Mr. Sheehan asked me to assemble the 2007 year end, and the first quarter of 2008 24 Hour Fitness individual club Profit & Loss statements. | Hearsay; | |
| Paragraph 5:  This required me to access detail Profit & Loss information on 400 plus individual clubs. I obtained and assembled this | Speculative; Lacks foundation; Improper lay opinion; Hearsay | |

4

**DEFENDANT'S OBJECTIONS TO THE DECLARATIONS OF ANGELA READ AND WILLIAM R. DONAHUE SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111-5894**

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| information for Mr. Sheehan in hard copy which consisted of 11 separate volumes of tabbed index binders. These 11 volumes contain the minute detail about the performance of each individual club including which clubs were profitable and those which were not profitable. I completed assembling these 11 volumes in mid to late May, 2008. | | |
| Paragraph 6: I was aware that Mr. Sheehan had a 500 gigabyte portable hard drive and a 4 gigabyte "flash" drive in his office, which were not among the inventory of returned items provided by Mr. Sheehan. | Speculative; Lacks foundation; Hearsay; Irrelevant; Hearsay | |
| Paragraph 7: Based on my review of Mr. Sheehan's | Speculative; Lacks foundation; Hearsay; Irrelevant | |

5

**DEFENDANT'S OBJECTIONS TO THE DECLARATIONS OF ANGELA READ AND WILLIAM R. DONAHUE SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|-----------|------------|----------------------|
| schedule, I know that during 2008, Mr. Sheehan took only 2 days of Personal Time Off ("PTO") on March 13 and 14, 2008. On the other days when Mr. Sheehan was out of the office, I had no way of verifying his location because I communicated with him through cell phone and Blackberry. | | |

///

///

///

6

**DEFENDANT'S OBJECTIONS TO THE DECLARATIONS OF ANGELA READ AND WILLIAM R. DONAHUE SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

1   **III.    SPECIFIC OBJECTIONS TO THE DECLARATION OF WILLIAM R. DONAHUE**

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| <u>Paragraph 3:</u>  Protection of our confidential information is critically important to 24 hour Fitness due to the highly competitive nature of our industry. To protect this confidential information, 24 Hour Fitness has in place confidential and proprietary information and trade secrets policies. | Improper legal conclusions; Improper lay opinion; Speculative; Lacks personal knowledge; Lacks foundation | |
| <u>Paragraph 3:</u>  These policies require all employees of 24 Hour Fitness to treat confidential and proprietary information with the utmost care, and to ensure that it is not put at risk of disclosure to third parties. | Improper legal conclusions; Improper lay opinion; Speculative; Lacks personal knowledge; Lacks foundation; | |

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

7

| Paragraph 5: The practices described by Mr. Sheehan violate 24 Hour Fitness' confidential and proprietary information and trade secrets policies. Had I been made aware that Mr. Sheehan was engaging in these activities, I immediately would have instructed Mr. Sheehan to stop doing so. | Improper legal conclusions; Improper lay conclusions Speculative; Lacks personal knowledge; Lacks foundation | |

Dated:  June 30, 2008

WINSTON & STRAWN LLP

By: _____

Paul J. Coady
Joan B. Tucker Fife
Robert Spagat
Attorneys for Defendant
MICHAEL SHEEHAN

8

**DEFENDANT'S OBJECTIONS TO THE DECLARATIONS OF ANGELA READ AND WILLIAM R. DONAHUE SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

Exhibit L

1 | Paul J. Coady (SBN: 81698)
pcoady@winston.com
2 | Joan B. Tucker Fife (SBN: 144572)
jfife@winston.com
3 | Robert Spagat (SBN: 157388)
rspagat@winston.com
4 | WINSTON & STRAWN LLP
101 California Street
5 | San Francisco, CA 94111-5894
Telephone:    415-591-1000
6 | Facsimile:    415-591-1400

7 | Attorneys for Defendant
MICHAEL SHEEHAN

8

FILED

2008 JUL -2 P 1: 45

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.
BY:_____
B. Hockney, Deputy Clerk

9 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

10 | COUNTY OF CONTRA COSTA

11

12 | 24 HOUR FITNESS, et al.,

13 |               Plaintiffs

14 |       vs.

15 | MICHAEL SHEEHAN,

16 |            Defendant.

Case No.  C-08-01663

**DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN SUPPORT OF PLAINTIFF'S APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

**DATE: JUNE 30, 2008**
**TIME: 2:00**
**DEPT: 60**

17

18

19

20 | BY FAX

21

22

23

24

25

26

27

28

**DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1   Defendant Michael Sheehan ("Defendant") hereby objects to the declaration of Carl C.

2   Liebert submitted in support of plaintiffs 24 Hour Fitness USA, Inc., and 24 Hour Fitness

3   Worldwide, Inc.'s ("Plaintiffs") Application for Temporary Restraining Order(the "Liebert

4   Declaration").

5   **GENERAL OBJECTIONS**[1]

6   Based on each of the General and Specific Objections as set forth below, the information

7   contained in this Declaration is invalid or inadmissible as a matter of law and should not be

8   considered by this Court.

9   1.   Defendant generally objects to the Liebert Declaration as it contains statements which

10   lack personal knowledge. *See* Evid. Code § 702; *Guthrey v. State of California*, 63 Cal.App.4th

11   1108, 1120 (1998).  Personal knowledge must be established or the Liebert Declaration is invalid as

12   a matter of law.  *See id.*  To the extent the Liebert Declaration lacks personal knowledge, it should

13   not be considered by this Court.

14   2.   Defendant generally objects to the Liebert Declaration as the statements contained

15   therein lack foundation.  *See* Evid. Code § 403.  To the extent the Liebert Declaration lacks

16   foundation, it should not be considered by this Court as a matter of law.

17   3.   Defendant generally objects to the Liebert Declaration as the statements contained

18   therein contain legal conclusions.  Courts have consistently held that legal conclusions are not

19   admissible at trial and should be excluded.  *See Sheldon Appel Co. v. Albert & Oliker* (1989) 47

20   Cal.3d 863; *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155; *Communications Satellite*

21   *Corp. v. Franchise Tax Board* (1984) 156 Cal.App.3d 726; *Downer v. Bramet* (1984) 152

22   Cal.App.3d 837.  Because the Liebert Declaration contains legal conclusions, it should not be

23   considered by this Court as a matter of law.

24   4.   Defendant generally objects to the Liebert Declaration as the statements contained

25   therein are based on conclusory statements without adequate accompanying facts or documents to

26

27   [1]   The following general objections apply to the entirety of the Liebert Declaration and the assertion of
the same, similar, or additional objections to the Declaration does not waive any of Defendant's General or
Specific Objections as set forth below.

28

1

**DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN
SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND
TEMPORARY RESTRAINING ORDER**

1    support the conclusions asserted. Evid. Code §§ 403, 702; *see Sheppard v. Morgan Keegan & Co.*,

2    218 Cal.App.3d 61 (1990); *Sesma v. Cueto*, 129 Cal.App.3d 108 (1982). Thus, as the Liebert

3    Declaration contains conclusory statements, it should not be considered by this Court as a matter of

4    law.

5         5.    Defendant generally objects to the Liebert Declaration to the extent that it contains

6    improper lay opinion. Opinions of a lay witness are limited to opinions that are (a) rationally based

7    on the perception of the witness; and (2) helpful to a clear understanding of his testimony. *See* Evid.

8    Code § 800 (emphasis added); *People v. McAlpin*, 53 Cal. 3d 1289, 1308 (1991)(opinions only

9    admissible if based on matters personally observed). To the extent the Liebert Declaration contains

10   improper lay opinion, it should not be considered by this Court as a matter of law.

11        6.    Defendants generally object to the Liebert Declaration as it is based on allegations

12   asserted without any specificity. Without more, the allegations merely are unsupported, unspecific,

13   and rely on speculative conclusions that should not be considered by this Court.

14        7.    Defendant generally objects to the Liebert Declaration to the extent that it fails to

15   provide any supporting documents, materials, or other evidence to corroborate the allegations made

16   therein. Without more, all such allegations merely are unsupported, unspecific, and relies on

17   speculative conclusions that should not be considered by this Court.

18        8.    Defendant generally objects to the Liebert Declaration as it is irrelevant. *See* Evid.

19   Code §§ 210, 350. All statements contained in the Liebert Declaration that are irrelevant should not

20   be considered by this Court.

21        9.    Defendant generally objects to the Liebert Declaration as it contains or is based on

22   inadmissible hearsay. *See* Evid. Code §§ 1200 *et. seq*. All such statements are inadmissible and

23   should not be considered by this Court.

24        10.   Defendant generally objects to the Liebert Declaration on the ground that it is vague

25   and ambiguous. All such vague and ambiguous statements contained in the Liebert Declaration

26   should not be considered by this Court.

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

2

**DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

1    Because of its objectionable nature, the Liebert Declaration should be stricken in its entirety.

2    In the alternative, the Court should strike and disregard the specific portions of the Liebert

3    Declaration set forth below.

4    **SPECIFIC OBJECTIONS TO THE DECLARATION OF CARL LIEBERT**

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| <u>Paragraph 4</u>:  Bally is one of 24 HOUR FITNESS' largest competitors in terms of revenues produced. | Lacks foundation; Speculative; Lacks personal knowledge | |
| <u>Paragraph 4</u>:  According to Bally's website, www.ballyfitness.com, Bally is "the largest and only nationwide commercial operator of fitness centers with approximately 400 clubs in the USA, the Caribbean, Mexico, South Korea, and China." | Hearsay; Lacks foundation; Lacks personal knowledge; Documents lack authentication | |
| <u>Paragraph 5</u>:  In the conduct of its business, 24 HOUR FITNESS possesses and employs Trade Secrets, proprietary information and confidential methods and techniques.  For example, 24 | Improper legal conclusions; Speculative; Lacks personal knowledge; Lacks foundation | |

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

3

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111-5894**

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| HOUR FITNESS has collected and maintains, at considerable expense, information regarding its market strategies, growth plans, new market development and strategic plans. Accordingly, confidentiality regarding this proprietary information is essential to 24 HOUR FITNESS' competitiveness. The disclosure of this information to a third party, and *especially* a substantial competitor, would give that competitor an unfair advantage in competing with 24 HOUR FITNESS. | | |
| <u>Paragraph 6</u>: During Mr. Sheehan's nearly eight year tenure with 24 HOUR FITNESS, he helped develop, and had access to, 24 HOUR FITNESS' most sensitive proprietary information, | Improper legal conclusions; Speculative; Lacks personal knowledge; Lacks foundation; Irrelevant | |

4

**DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| including but not limited to:<br><br>• Critical market strategies, including 24 HOUR FITNESS' Three Year Strategic Growth Plan;<br><br>• Growth plans for new geographic markets;<br><br>• Market segment development planning;<br><br>• Market performance data and market reorganization planning;<br><br>• Platform expansion intended to utilize the internet and other resources to facilitate memberships;<br><br>• Marketing strategy related to advertising, marketing partnerships and marketing tie-ins with non-traditional media;<br><br>• Proprietary compensation and personnel data;<br><br>• Litigation strategy; | | |

5

**DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| • Financial planning strategies; <br><br> • Budgeting strategies; <br><br> • Proprietary information on revenues; <br><br> • Sales figures relating to all aspects of the 24 HOUR FITNESS' business; <br><br> • Confidential relationships with key vendors; <br><br> • An array of confidential and proprietary information about virtually *every* aspect of 24 HOUR FITNESS' business model and operations strategy. | | |
| Paragraph 6: Many of these strategies were developed over considerable time through trial and error experience, in which Mr. Sheehan was directly involved. | Improper legal conclusions; Speculative; Lacks personal knowledge; Lacks foundation; Irrelevant | |
| Paragraph 7: That Agreement contains both a Covenant Not | Improper legal conclusions; Speculative; Lacks foundation; | |

6

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| To Compete and restrictions on the use of confidential information, the terms of which are as follows: | Hearsay | |
| Paragraph 8: In that Agreement, Mr. Sheehan agreed that upon his separation from 24 HOUR FITNESS, the Company could elect to repurchase a portion of his ownership in the Company, and in the case of his engaging in competitive activity, *all* of his ownership in the company. Under the terms of that Agreement, 24 HOUR FITNESS will tender a repurchase demand to Mr. Sheehan that will compensate him for his stock. | Improper legal conclusions; Speculative; lacks foundation; Hearsay | |
| Paragraph 8: The Stockholder's Agreement requires Mr. Sheehan to refrain from appropriating 24 HOUR FITNESS' Confidential and | Improper legal conclusions; Speculative; Lacks foundation, because, inter alia, it misrepresents the terms of the Stockholder's Agreement that | |

7

**DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| Proprietary Information and engaging in competitive activity. | no where prohibits Sheehan from engaging in competitive activity; Hearsay; Irrelevant | |
| Paragraph 9:  On June 24, 2008, Bally issued a press release announcing Mr. Sheehan's hire of as CEO and touting his "comprehensive experience in the fitness industry" and "ideal blend of experience, leadership skills, creativity and commitment to health and fitness."  A true and correct copy of that press release is attached hereto as Exhibit C. The press release goes on to quote Mr. Sheehan as stating that he is "eager to join Bally" and "eager to add value to this established brand." | Irrelevant; Hearsay; Lacks foundation; Document lack authentication | |
| Paragraph 9:  The statements from Bally and Mr. Sheehan demonstrate a threat that Mr. Sheehan intends to use the | Irrelevant; Hearsay; Improper legal conclusions; Speculative; Lacks Personal Knowledge; Lacks Foundation; Improper | |

8

**DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| confidential and proprietary information obtained by him during his tenure with 24 HOUR FITNESS in his new CEO position with Bally, in order to directly compete with 24 HOUR FITNESS. | lay opinion | |
| Paragraph 10: At this point, I have not been able to confirm, but I believe that Mr. Sheehan likely already has misappropriated 24 HOUR FITNESS' confidential and proprietary information and Trade Secrets. | Irrelevant; Improper legal conclusions; Speculative; Improper lay opinion; Lacks foundation | |
| Paragraph 12: I believe this because, at approximately 8:30 am on June 23, 2008, when Mr. Sheehan entered my office and informed me of his resignation, he told me that:<br>• He was resigning his position as Chief Operating Officer of 24 HOUR FITNESS, effective immediately; | Irrelevant; Improper legal conclusions; Speculative; Improper lay opinion; Hearsay | |

9

**DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| • He had been interviewing with Bally over a period of several weeks; <br><br> • He had interviewed with Bally's management and every member of Bally's Board of Directors; <br><br> • This was the second offer of employment made to him by Bally; <br><br> • He had rejected Bally's first offer, and Bally "sweetened the deal;" and <br><br> • Bally had offered Mr. Sheehan a compensation package worth almost three times his compensation package with 24 HOUR FITNESS. | | |
| <u>Paragraph 11:</u> Following receipt of Mr. Sheehan's resignation; 24 HOUR FITNESS announced news of Mr. Sheehan's resignation on June 23, 2008. | Irrelevant; Hearsay | |

10

**DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

| STATEMENT | OBJECTIONS | SUSTAINED/ OVERRULED |
|---|---|---|
| Paragraph 12: I attempted to resolve this matter on June 24, 2008 by sending letters to Mr. Sheehan and Bally requesting that Mr. Sheehan not assume the position of CEO with Bally. Attached hereto as Exhibit D are true and correct copies of these letters. To day, neither Mr. Sheehan nor Bally has responded. | Irrelevant | |

Dated:  June 30, 2008

WINSTON & STRAWN LLP

By: _____
Paul J. Coady
Joan B. Tucker Fife
Robert Spagat
Attorneys for Defendant
MICHAEL SHEEHAN

11

**DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Exhibit M

1   Paul J. Coady (SBN: 81698)
    pcoady@winston.com
2   Joan B. Tucker Fife (SBN: 144572)
    jfife@winston.com
3   Robert Spagat (SBN: 157388)
    rspagat@winston.com
4   WINSTON & STRAWN LLP
    101 California Street
5   San Francisco, CA 94111-5894
    Telephone:    415-591-1000
6   Facsimile:    415-591-1400

7   Attorneys for Defendant
    MICHAEL SHEEHAN

8

9

FILED

2008 JUL -2 P 1:50

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.
BY: _____
     B. Honlany, Deputy Clerk

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                     COUNTY OF CONTRA COSTA

12

13  24 HOUR FITNESS,                    Case No. C08-01663

14            Plaintiff,
                                        REQUEST FOR JUDICIAL NOTICE IN
15       vs.                            SUPPORT OF OPPOSITION OF
                                        DEFENDANT MICHAEL SHEEHAN TO
16  MICHAEL SHEEHAN,                    PLAINTIFF'S EX PARTE APPLICATION
                                        FOR A TEMPORARY RESTRAINING
17            Defendant.                ORDER

18

19                                      BY FAX

20

21

22

23

24

25

26

27

28

          REQUEST FOR JUDICIAL NOTICE BY DEFENDANT MICHAEL SHEEHAN
       IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR TRO

SF:209971.1

1        Pursuant to California Rules of Court 8.520(g) and 8.252(a), as well as California Evidence

2    Code sections 452(h), Defendant Michael Sheehan respectfully requests that this Court take notice of

3    the following record:  printouts from www.yellowpages.com which list approximately two hundred

4    twenty-two (222) locations of 24 Hour Fitness centers in the state of California.  A true and correct

5    copy of these printouts is attached hereto as Exhibit A.

6        The California Evidence Code provides that "judicial notice may be taken" of "facts and

7    propositions that are not reasonably subject to dispute and are capable of immediate and accurate

8    determination by resort to sources of reasonably indisputable accuracy."  Cal. Evid. Code § 452(h).

9    The record referenced above, Exhibit A, is not reasonably subject to dispute.  Further, the record is

10   subject to accurate determination by resort to sources of reasonably indisputable accuracy.

11       For the foregoing reasons, Defendant Sheehan respectfully requests that this Court take

12   judicial notice of the above referenced record.

13

14

15   Dated:  June 27, 2008                    WINSTON & STRAWN LLP

16

17                                            By:  _____
                                                  Paul J. Coady
18                                                Joan B. Tucker Fife
                                                  Robert Spagat
19                                                Attorneys for Defendant
                                                  MICHAEL SHEEHAN
20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

1

REQUEST FOR JUDICIAL NOTICE BY DEFENDANT MICHAEL SHEEHAN
IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR TRO

SF:209971.1

# EXHIBIT A

# YELLOWPAGES.COM

**Standard**  |  **Distance**  |  **Phone Number**

**Map Search Results**

Home > CA > Name Search - 24 hour fitness

See **22 matches** for business information.

## 24 Hour Fitness

140 Alamo Plz
Alamo, CA 94507 Map

**(925) 362-1730**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it**  |  **Read Reviews**
Improve this listing

Send to Mobile  |  Map It  |  E-mail It  |  Get Directions  |  Search Nearby  |  Save This Listing  |  Save a Note

## 24 Hour Fitness

2180 Lincoln Ave
Altadena, CA 91001 Map

**(626) 296-8700**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it**  |  **Read Reviews**
Improve this listing

Send to Mobile  |  Map It  |  E-mail It  |  Get Directions  |  Search Nearby  |  Save This Listing  |  Save a Note

## 24 Hour Fitness

1430 N Lemon St
Anaheim, CA 92801 Map

**(714) 525-9924**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Based on 1 review.
**Rate it**  |  **Read Reviews**
Improve this listing

Send to Mobile  |  Map It  |  E-mail It  |  Get Directions  |  Search Nearby  |  Save This Listing  |  Save a Note

## 24 Hour Fitness

2280 E Lincoln Ave
Anaheim, CA 92806 Map

**(714) 491-2500**

Visit Web Site

**More Info**

★ ★ ★ ★
Review This Business!
**Rate it**  |  **Read Reviews**
Improve this listing

Send to Mobile  |  Map It  |  E-mail It  |  Get Directions  |  Search Nearby  |  Save This Listing  |  Save a Note

## 24 Hour Fitness

300 S Festival Dr
Anaheim, CA 92808 Map

**(714) 637-4262**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it | Read Reviews**
Improve this listing

---

## 24 Hour Fitness

7905 Walerga Rd
Antelope, CA 95843 Map

**(916) 723-2432**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Based on 1 review.
**Rate it | Read Reviews**
Improve this listing

---

## 24 Hour Fitness

2632 Somersville Rd
Antioch, CA 94509 Map

**(925) 753-1553**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Based on 1 review.
**Rate it | Read Reviews**
Improve this listing

---

## 24 Hour Fitness

3305 Deer Valley Rd
Antioch, CA 94531 Map

**(925) 776-1624**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it | Read Reviews**
Improve this listing

---

## 24 Hour Fitness

125 N 1st Ave
Arcadia, CA 91006 Map

**(626) 446-3000**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it | Read Reviews**
Improve this listing

---

## 24 Hour Fitness

32 E Huntington Dr
Arcadia, CA 91006 Map

**(626) 446-3000**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

3400 Bernard St
Bakersfield, CA 93306 Map

**(661) 873-8000**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★★★★★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

3633 Rosedale Hwy
Bakersfield, CA 93308 Map

**(661) 325-3600**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★★★☆★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

2072 Addison St
Berkeley, CA 94704 Map

**(510) 548-0497**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★★★★★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

965 E Birch St
Brea, CA 92821 Map

**(714) 256-2500**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★★★★★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

8309 On The Mall
Buena Park, CA 90620 Map

**(714) 236-1800**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

8888 Knott Ave
Buena Park, CA 90620 Map

**(714) 527-8800**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

415 Carmen Dr
Camarillo, CA 93010 Map

**(805) 482-2444**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

453 Carmen Dr
Camarillo, CA 93010 Map

**(805) 482-2444**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

5964 La Place Ct
Carlsbad, CA 92008 Map

**(800) 510-3393**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

5114 Arden Way
Carmichael, CA 95608 Map

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

**(916) 484-2024**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

34461 Date Palm Dr
Cathedral City, CA 92234 Map

**(760) 324-0504**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

5420 Philadelphia St
Chino, CA 91710 Map

**(909) 590-4454**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1660 Broadway
Chula Vista, CA 91911 Map

**(619) 425-6600**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

234 3rd Ave
Chula Vista, CA 91910 Map

**(619) 427-2424**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

320 3rd Ave
Chula Vista, CA 91910 Map

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

# YELLOWPAGES.COM

**Standard**  |  **Distance**  |  **Phone Number**

**Map Search Results**

Home > CA > Name Search - 24 hour fitness

See **22 matches** for business information.

## 24 Hour Fitness

870 Amena Ct
Chula Vista, CA 91910 Map

**(619) 656-0018**

Visit Web Site

★ ★ ★ ★ ★
Review This Business!
**Rate it**  |  **Read Reviews**
Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

6633 Auburn Blvd
Citrus Heights, CA 95621 Map

**(916) 725-2028**

Visit Web Site

★ ★ ★ ★ ★
Review This Business!
**Rate it**  |  **Read Reviews**
Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

359 Sun Valley Mall
Concord, CA 94520 Map

**(925) 674-8412**

Visit Web Site

★ ★ ★ ★ ★
Based on 1 review.
**Rate it**  |  **Read Reviews**
Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

265 E Ontario Ave
Corona, CA 92879 Map

**(951) 340-2442**

Visit Web Site

★ ★ ★ ★ ★
Review This Business!
**Rate it**  |  **Read Reviews**
Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

275 Teller St
Corona, CA 92879 Map

**(951) 734-0121**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

1600 Adams Ave
Costa Mesa, CA 92626 Map

**(714) 557-4401**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

555 W 19th St
Costa Mesa, CA 92627 Map

**(949) 650-3600**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

589 Anton Blvd
Costa Mesa, CA 92626 Map

**(714) 751-2724**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

21271 Stevens Creek Blvd
Cupertino, CA 95014 Map

**(408) 777-2908**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

## 24 Hour Fitness

373 Gellert Blvd
Daly City, CA 94015 Map

**(650) 756-3303**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

850 Arnele Ave
El Cajon, CA 92020 Map

**(619) 442-0293**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

455 Santa Fe Dr
Encinitas, CA 92024 Map

**(760) 634-2760**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

400 La Terraza Blvd
Escondido, CA 92025 Map

**(760) 233-1145**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

1519 Gateway Blvd
Fairfield, CA 94533 Map

**(707) 421-7247**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

1006 Riley St
Folsom, CA 95630 Map

**(916) 984-1924**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it | Read Reviews**
Improve this listing

---

## 24 Hour Fitness

671 E Bidwell St
Folsom, CA 95630 Map

**(916) 984-1924**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ☆
Review This Business!
**Rate it | Read Reviews**
Improve this listing

---

## 24 Hour Fitness

10200 Juniper Ave
Fontana, CA 92335 Map

**(909) 357-8000**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ☆
Review This Business!
**Rate it | Read Reviews**
Improve this listing

---

## 24 Hour Fitness

18305 Brookhurst St
Fountain Valley, CA 92708 Map

**(714) 593-5690**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it | Read Reviews**
Improve this listing

---

## 24 Hour Fitness

39300 Paseo Padre Pkwy
Fremont, CA 94538 Map

**(510) 795-6666**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ☆
Review This Business!
**Rate it | Read Reviews**
Improve this listing

## 24 Hour Fitness

240 N Brand Blvd
Glendale, CA 91203 Map

**(818) 240-5111**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

450 N Brand Blvd
Glendale, CA 91203 Map

**(818) 247-4334**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Based on 2 reviews.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

1000 E Route 66
Glendora, CA 91740 Map

**(626) 804-2403**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

2831 W 120th St
Hawthorne, CA 90250 Map

**(323) 756-2466**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

24727 Amador St
Hayward, CA 94544 Map

**(510) 264-3275**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

303 3rd St
Huntington Beach, CA 92648 Map

**(714) 374-3700**

Visit Web Site

Review This Business!
**Rate It** | **Read Reviews**
Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## RELATED BUSINESSES

**Capital Athletic Club Inc**



1515 8th St
Sacramento, CA 95818
**(916) 596-3086**
More Info | Web Site

**Bally Total Fitness**



Click here to find a location
**(800) 477-5557**
More Info | Web Site

**University Of Sports**



555 Rohnert Park Expressway
Suite C
Rohnert Park, CA 94928
**(707) 206-7062**
More Info | Web Site

**Spare Time Clubs**

Spare Time Clubs

11290 Pyrites Way
Rancho Cordova, CA 95670
**(916) 859-5910**
More Info | Web Site

**Foster City Athletic Club**

# YELLOWPAGES.COM

**Standard**  |  **Distance**  |  **Phone Number**

Map Search Results

Home > CA > Name Search - 24 hour fitness

See **22 matches** for business information.

## 24 Hour Fitness

5858 Warner Ave
Huntington Beach, CA 92649 Map

**(714) 840-3888**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

5898 Edinger Ave
Huntington Beach, CA 92649 Map

**(714) 840-2441**

Visit Web Site

**More Info**

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

7887 Center Ave
Huntington Beach, CA 92647 Map

**(714) 373-8969**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

15315 Culver Dr
Irvine, CA 92604 Map

**(949) 262-0600**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

18007 Von Karman Ave
Irvine, CA 92612 Map

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

**(949) 250-4422**

Visit Web Site

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

31 Fortune Dr
Irvine, CA 92618 Map

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

**(949) 885-1921**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

8697 Irvine Center Dr
Irvine, CA 92618 Map

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

**(949) 753-0045**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

7680 Girard Ave
La Jolla, CA 92037 Map

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

**(858) 551-7800**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

7685 Girard Ave
La Jolla, CA 92037 Map

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

**(858) 551-7800**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

3633 Avocado Blvd
La Mesa, CA 91941 Map

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

**(619) 660-5024**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

5601 Grossmont Center Dr
La Mesa, CA 91942 Map

**(619) 667-7607**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

---

## 24 Hour Fitness

7450 University Ave
La Mesa, CA 91941 Map

**(619) 667-4770**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

---

## 24 Hour Fitness

13395 Beach Blvd
La Mirada, CA 90638 Map

**(562) 902-2455**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

---

## 24 Hour Fitness

200 Corporate Dr
Ladera Ranch, CA 92694 Map

**(949) 365-5000**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**

Improve this listing

---

## 24 Hour Fitness

25252 Mcintyre St
Laguna Hills, CA 92653 Map

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

**(949) 586-6600**

Visit Web Site

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

23954 Aliso Creek Rd
Laguna Niguel, CA 92677 Map

**(949) 614-1024**

Visit Web Site

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

32451 Golden Lantern
Laguna Niguel, CA 92677 Map

**(949) 443-2440**

Visit Web Site

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

26781 Rancho Pkwy
Lake Forest, CA 92630 Map

**(949) 830-4213**

Visit Web Site

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

4678 Daneland St
Lakewood, CA 90712 Map

**(562) 630-0069**

Visit Web Site

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1020 Commerce Center Dr
Lancaster, CA 93534 Map

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

**(661) 940-6333**

Visit Web Site

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1001 Larkspur Landing Cir
Larkspur, CA 94939 Map

★ ★ ★ ★

Review This Business!
**Rate it | Read Reviews**

Improve this listing

**(415) 925-0333**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1456 Railroad Ave
Livermore, CA 94550 Map

★ ★ ★ ★

Review This Business!
**Rate it | Read Reviews**

Improve this listing

**(925) 447-4496**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

100 Oceangate
Long Beach, CA 90802 Map

★ ★ ★ ★

Review This Business!
**Rate it | Read Reviews**

Improve this listing

**(562) 435-6300**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

4141 Katella Ave
Los Alamitos, CA 90720 Map

★ ★ ★ ★

Based on 3 reviews.
**Rate it | Read Reviews**

Improve this listing

**(714) 826-7172**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

4951 Katella Ave
Los Alamitos, CA 90720 Map

★ ★ ★ ★

Based on 3 reviews.
**Rate it | Read Reviews**

# YELLOWPAGES.COM

**Standard**  |  **Distance**  |  **Phone Number**

Map Search Results

Home > CA > Name Search - 24 hour fitness

See **22 matches** for business information.

## 24 Hour Fitness

3660 Wilshire Blvd
Los Angeles, CA 90010 Map

**(213) 388-2700**

Visit Web Site

**More Info**

Based on 2 reviews.
**Rate it | Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

3699 Wilshire Blvd
Los Angeles, CA 90010 Map

**(213) 388-2700**

Visit Web Site

**More Info**

Review This Business!
**Rate it | Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

5045 W Slauson Ave
Los Angeles, CA 90056 Map

**(323) 293-2481**

Visit Web Site

**More Info**

Review This Business!
**Rate it | Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

5120 W Goldleaf Cir
Los Angeles, CA 90056 Map

**(323) 293-2481**

Visit Web Site

**More Info**

Review This Business!
**Rate it | Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

5711 W Century Blvd
Los Angeles, CA 90045 Map

**(310) 410-9909**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

5959 W Century Blvd
Los Angeles, CA 90045 Map

**(310) 410-9909**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

9911 W Pico Blvd
Los Angeles, CA 90035 Map

**(310) 553-7600**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1090 N Main St
Manteca, CA 95336 Map

**(209) 825-4141**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

6635 Alhambra Ave
Martinez, CA 94553 Map

**(925) 932-7424**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

383 Miller Ave
Mill Valley, CA 94941 Map

**(415) 380-1200**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

979 Broadway
Millbrae, CA 94030 Map

**(650) 651-1003**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

301 Jacklin Rd
Milpitas, CA 95035 Map

**(408) 586-0524**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

23166 Los Alisos Blvd
Mission Viejo, CA 92691 Map

**(949) 855-0587**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

9734 Central Ave
Montclair, CA 91763 Map

**(909) 621-5424**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

594 Moraga Rd
Moraga, CA 94556 Map

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

**(925) 377-2400**                              Improve this listing

**More Info**

  Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

23750 Alessandro Blvd
Moreno Valley, CA 92553 Map

**(951) 653-7100**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

  Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

850 Tennant Ave
Morgan Hill, CA 95037 Map

**(408) 779-5555**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

  Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

550 Showers Dr
Mountain View, CA 94040 Map

**(650) 941-2268**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**

Improve this listing

  Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

560 Showers Dr
Mountain View, CA 94040 Map

**(650) 429-1305**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

  Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

40396 Murrieta Hot Springs Rd
Murrieta, CA 92563 Map

**(951) 304-2053**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

5234 Newpark Plz
Newark, CA 94560 Map

**(510) 494-9348**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

2050 Webster St
Oakland, CA 94612 Map

**(510) 433-1144**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

3950 Alameda Av Bldg Trlr
Oakland, CA 94601 Map

**(510) 434-2495**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

4000 Alameda Ave
Oakland, CA 94601 Map

**(510) 434-2495**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

2213 S El Camino Real
Oceanside, CA 92054 Map

**(760) 439-4404**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

# YELLOWPAGES.COM

**Standard**  |  **Distance**  |  **Phone Number**

Map Search Results

Home > CA > Name Search - 24 hour fitness

See **45 matches** for business information.

## 24 Hour Fitness

4655 Frazee Rd
Oceanside, CA 92057 Map

**(760) 757-3712**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it**  |  **Read Reviews**
Improve this listing

Send to Mobile  |  Map It  |  E-mail It  |  Get Directions  |  Search Nearby  |  Save This Listing  |  Save a Note

## 24 Hour Fitness

2403 S Vineyard Ave
Ontario, CA 91761 Map

**(909) 923-2233**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it**  |  **Read Reviews**
Improve this listing

Send to Mobile  |  Map It  |  E-mail It  |  Get Directions  |  Search Nearby  |  Save This Listing  |  Save a Note

## 24 Hour Fitness

3521 E Chapman Ave
Orange, CA 92869 Map

**(714) 639-9300**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Based on 1 review.
**Rate it**  |  **Read Reviews**
Improve this listing

Send to Mobile  |  Map It  |  E-mail It  |  Get Directions  |  Search Nearby  |  Save This Listing  |  Save a Note

## 24 Hour Fitness

3600 W Orangewood Ave
Orange, CA 92868 Map

**(714) 385-0024**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it**  |  **Read Reviews**
Improve this listing

Send to Mobile  |  Map It  |  E-mail It  |  Get Directions  |  Search Nearby  |  Save This Listing  |  Save a Note

## 24 Hour Fitness

555 Oceana Blvd
Pacifica, CA 94044 Map

**(650) 738-7824**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

1335 W Rancho Vista Blvd
Palmdale, CA 93551 Map

**(661) 947-1200**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

2140 E Palmdale Blvd
Palmdale, CA 93550 Map

**(661) 947-2999**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Based on 2 reviews.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

8350 Van Nuys Blvd
Panorama City, CA 91402 Map

**(818) 830-1600**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

465 N Halstead St
Pasadena, CA 91107 Map

**(626) 351-2222**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

## 24 Hour Fitness

525 E Colorado Blvd
Pasadena, CA 91101 Map

**(626) 229-9788**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

6 Petaluma Blvd N
Petaluma, CA 94952 Map

**(707) 789-9050**

Visit Web Site

**More Info**

★★★★☆

Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

5860 W Las Positas Blvd
Pleasanton, CA 94588 Map

**(925) 463-1515**

Visit Web Site

**More Info**

★★★★☆

Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

2244 Sunrise Blvd
Rancho Cordova, CA 95670 Map

**(916) 859-3400**

★★★★★

Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

11787 Foothill Blvd
Rancho Cucamonga, CA 91730 Map

**(909) 944-1000**

Visit Web Site

**More Info**

★★★★☆

Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

8188 Rochester Ave
Rancho Cucamonga, CA 91730 Map

★★★★★

Review This Business!
**Rate it** | **Read Reviews**

**(909) 466-0880**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

8576 Baldy Vista Dr
Rancho Cucamonga, CA 91730 Map

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

**(909) 920-0793**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

22331 El Paseo
Rancho Santa Margarita, CA 92688 Map

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

**(949) 589-8500**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

700 E Redlands Blvd
Redlands, CA 92373 Map

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

**(909) 798-7777**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

7960 Limonite Ave
Riverside, CA 92509 Map

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

**(951) 360-1696**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

336 N Sunrise Ave
Roseville, CA 95661 Map

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

**(916) 772-2400**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1140 Coiner Ct
Rowland Heights, CA 91748 Map

**(626) 810-8181**

★ ★ ★ ★ ★
Review This Business!
**Rate It | Read Reviews**
Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1600 S Azusa Ave
Rowland Heights, CA 91748 Map

**(626) 965-0570**

★ ★ ★ ★ ★
Review This Business!
**Rate it | Read Reviews**
Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

342 Puente Hills Mall
Rowland Heights, CA 91748 Map

**(626) 839-1700**

★ ★ ★ ★ ★
Review This Business!
**Rate it | Read Reviews**
Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1020 7th St
Sacramento, CA 95814 Map

**(916) 658-1626**

★ ★ ★ ★ ★
Review This Business!
**Rate it | Read Reviews**
Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1314 Fulton Ave
Sacramento, CA 95825 Map

**(916) 925-7055**

★ ★ ★ ★ ★
Review This Business!
**Rate it | Read Reviews**
Improve this listing

# YELLOWPAGES.COM

**Standard**  |  **Distance**  |  **Phone Number**

**Map Search Results**

Home > CA > Name Search - 24 hour fitness

See **22 matches** for business information.

## 24 Hour Fitness

545 Downtown Plz
Sacramento, CA 95814 Map

**(916) 658-1626**

Visit Web Site

**More Info**

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

7600 Greenhaven Dr
Sacramento, CA 95831 Map

**(916) 399-8321**

**More Info**

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

8785 Center Pkwy
Sacramento, CA 95823 Map

**(916) 688-8733**

Visit Web Site

**More Info**

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

9574 Micron Ave
Sacramento, CA 95827 Map

**(916) 363-4382**

Visit Web Site

**More Info**

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

★ ★ ★ ★

295 E Caroline St
San Bernardino, CA 92408 Map

**(909) 370-1111**

Visit Web Site

Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1650 Industrial Rd
San Carlos, CA 94070 Map

**(650) 595-3000**

Visit Web Site

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1 Horton Plz
San Diego, CA 92101 Map

**(619) 232-4024**

Visit Web Site

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

10025 Carmel Mountain Rd
San Diego, CA 92129 Map

**(858) 538-4400**

Visit Web Site

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1640 Camino Del Rio N
San Diego, CA 92108 Map

**(619) 294-2424**

Visit Web Site

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

17170 Bernardo Center Dr

★ ★ ★ ★ ★
Based on 1 review.

San Diego, CA 92128 Map

**(858) 485-7177**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Rate it | **Read Reviews**

Improve this listing

---

## 24 Hour Fitness

3675 Midway Dr
San Diego, CA 92110 Map

**(619) 224-2902**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★

Review This Business!

**Rate it** | **Read Reviews**

Improve this listing

---

## 24 Hour Fitness

3965 5th Ave
San Diego, CA 92103 Map

**(619) 683-2424**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★

Based on 1 review.

**Rate it** | **Read Reviews**

Improve this listing

---

## 24 Hour Fitness

4405 La Jolla Village Dr
San Diego, CA 92122 Map

**(858) 457-3930**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★

Review This Business!

**Rate it** | **Read Reviews**

Improve this listing

---

## 24 Hour Fitness

6348 College Grove Way
San Diego, CA 92115 Map

**(619) 229-6112**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★

Review This Business!

**Rate it** | **Read Reviews**

Improve this listing

---

## 24 Hour Fitness

7620 Balboa Ave
San Diego, CA 92111 Map

★ ★ ★ ★

Review This Business!

**Rate it** | **Read Reviews**

**(858) 292-7079**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

909 Garnet Ave
San Diego, CA 92109 Map

**(858) 270-4255**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

9550 Miramar Rd
San Diego, CA 92126 Map

**(858) 693-3500**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1034 W Arrow Hwy
San Dimas, CA 91773 Map

**(909) 599-9997**

Visit Web Site

**More Info:** Payment Methods

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

100 California St
San Francisco, CA 94111 Map

**(415) 434-5080**

Visit Web Site

**More Info**

★ ★ ★ ☆
Based on 1 review.
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1200 Van Ness Ave
San Francisco, CA 94109 Map

★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**

**(415) 929-4688**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness
1645 Bryant St
San Francisco, CA 94103 Map

**(415) 437-4188**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it | Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness
2145 Market St
San Francisco, CA 94114 Map

**(415) 864-0822**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Based on 2 reviews.
**Rate it | Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness
303 2nd St
San Francisco, CA 94107 Map

**(415) 543-7808**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it | Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness
3741 Buchanan St
San Francisco, CA 94123 Map

**(415) 563-3535**

Visit Web Site

**More Info**

☆ ★ ★ ★ ☆
Review This Business!
**Rate it | Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness
3800 24th St
San Francisco, CA 94114 Map

★ ★ ★ ★ ☆
Review This Business!
**Rate it | Read Reviews**

# YELLOWPAGES.COM

**Standard** | **Distance** | **Phone Number**

**Map Search Results**

**Home > CA > Name Search - 24 hour fitness**

See **22 matches** for business information.

## 24 Hour Fitness

45 Montgomery St
San Francisco, CA 94104 Map

**(415) 434-5171**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

1531 Parkmoor Ave
San Jose, CA 95128 Map

**(408) 295-6668**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

1825 Hillsdale Ave
San Jose, CA 95124 Map

**(408) 723-2639**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

2306 Almaden Rd
San Jose, CA 95125 Map

**(408) 513-3398**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

375 N Capitol Ave
San Jose, CA 95133 Map

**(408) 923-2639**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

5278 Moorpark Ave
San Jose, CA 95129 Map

**(408) 864-4000**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

6223 Santa Teresa Blvd
San Jose, CA 95119 Map

**(408) 225-4024**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

27131 Calle Arroyo
San Juan Capistrano, CA 92675 Map

**(949) 489-9900**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

16250 E 14th St
San Leandro, CA 94578 Map

**(510) 278-5348**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

12647 Alcosta Blvd
San Ramon, CA 94583 Map

**(925) 244-2030**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

4450 Norris Canyon Rd
San Ramon, CA 94583 Map

**(925) 244-9855**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

2929 31st St
Santa Monica, CA 90405 Map

**(310) 450-4464**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

3550 Industrial Dr
Santa Rosa, CA 95403 Map

**(707) 542-9600**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

9906 Mission Gorge Rd
Santee, CA 92071 Map

**(619) 258-3658**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

18764 Cox Ave
Saratoga, CA 95070 Map

**(408) 364-2444**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

15301 Ventura Blvd
Sherman Oaks, CA 91403 Map

**(818) 728-0156**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

1308 Madera Rd
Simi Valley, CA 93065 Map

**(805) 526-0064**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

1352 Madera Rd
Simi Valley, CA 93065 Map

**(805) 520-3440**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

2335 Gloryette Ave
Simi Valley, CA 93063 Map

**(805) 583-3031**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

2350 Tapo St
Simi Valley, CA 93063 Map

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

**(805) 520-3269**

Visit Web Site·

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

975 Lomas Santa Fe Dr
Solana Beach, CA 92075 Map

**(858) 523-9060**

★ ★ ★ ★ ☆ ·
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

3137 W Benjamin Holt Dr
Stockton, CA 95219 Map

**(209) 951-5999**

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1211 E Arques Ave
Sunnyvale, CA 94085 Map

**(408) 749-0300**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

150 E Fremont Ave
Sunnyvale, CA 94087 Map

**(408) 737-8600**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

27520 Ynez Rd
Temecula, CA 92591 Map

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

# YELLOWPAGES.COM

**Standard  |  Distance  |  Phone Number**

**Map Search Results**

Home > CA > Name Search - 24 hour fitness

See **22 matches** for business information.

## 24 Hour Fitness

2595 E Thousand Oaks Blvd
Thousand Oaks, CA 91362 Map

**(805) 777-7300**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it | Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

2685 Pacific Coast Hwy
Torrance, CA 90505 Map

**(310) 534-5100**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it | Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

4240 Redondo Beach Blvd
Torrance, CA 90504 Map

**(310) 750-1143**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it | Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

1192 Irvine Blvd
Tustin, CA 92780 Map

**(714) 665-1234**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Review This Business!
**Rate it | Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness

16200 Bear Valley Rd
Victorville, CA 92395 Map

**(760) 955-2200**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

2033 N Main St
Walnut Creek, CA 94596 Map

**(925) 930-7900**

Visit Web Site

**More Info**

★ ★ ★ ★ ☆
Based on 2 reviews.
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1422 S Azusa Ave
West Covina, CA 91791 Map

**(626) 257-2422**

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

6429 Fallbrook Ave
West Hills, CA 91307 Map

**(818) 887-2582**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

6653 Fallbrook Ave
West Hills, CA 91307 Map

**(818) 887-2582**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

8612 Santa Monica Blvd
West Hollywood, CA 90069 Map

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

**(310) 652-7440**                          Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

6731 Westminster Blvd
Westminster, CA 92683 Map

**(714) 230-1722**

Visit Web Site

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

15600 La Forge St
Whittier, CA 90603 Map

**(562) 943-3771**

Visit Web Site

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

18200 Yorba Linda Blvd
Yorba Linda, CA 92886 Map

**(714) 524-0500**

Visit Web Site

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

Serving the CA Area

**(310) 536-9238**

Visit Web Site

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

**More Info**

E-mail It | Save This Listing | Save a Note

---

## 24 Hour Fitness

Serving the CA Area

**(510) 733-5291**

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

---

Visit Web Site

**More Info**

E-mail It | Save This Listing | Save a Note

---

## 24 Hour Fitness

Serving the CA Area

**(661) 398-1487**

Visit Web Site

**More Info**

E-mail It | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

Serving the CA Area

**(714) 537-9106**

Visit Web Site

**More Info**

E-mail It | Save This Listing | Save a Note

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

Serving the CA Area

**(949) 831-8852**

Visit Web Site

**More Info**

E-mail It | Save This Listing | Save a Note

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

3005 S Festival Dr
Anaheim, CA 92803

**(714) 637-4262**

Send to Mobile | E-mail It | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

1265 Laurel Tree Ln
Carlsbad, CA 92011

**(760) 602-5001**

Send to Mobile | E-mail It | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness

★ ★ ★ ★ ★

8475 Elk Grove Florin Rd
Elk Grove, CA 95624

**(916) 681-2424**

Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | E-mail It | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

PO Box 8003
Fremont, CA 94537

**(510) 278-9744**

Visit Web Site

**More Info**

Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | E-mail It | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

1357 E Gladstone St
Glendora, CA 91740

**(626) 804-2403**

Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | E-mail It | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

4255 Campus Dr
Irvine, CA 92612

**(949) 854-3198**

Visit Web Site

**More Info**

Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | E-mail It | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness

600 Fashion Island
Newport Beach, CA 92658

**(949) 640-5300**

Visit Web Site

**More Info**

Review This Business!
**Rate it** | **Read Reviews**

Improve this listing

Send to Mobile | E-mail It | Search Nearby | Save This Listing | Save a Note

---

## RELATED BUSINESSES

**Capital Athletic Club Inc**



# YELLOWPAGES.COM

**Standard  |  Distance  |  Phone Number**

**Map Search Results**

Home > CA > Name Search - 24 hour fitness

See **22 matches** for business information.

## 24 Hour Fitness
Rancho Mission Rd
San Diego, CA 92138

**(619) 281-5543**

Visit Web Site

**More Info**

Send to Mobile  |  E-mail It  |  Search Nearby  |  Save This Listing  |  Save a Note

☆ ☆ ☆ ☆ ☆
Review This Business!
**Rate it  |  Read Reviews**
Improve this listing

## 24 Hour Fitness
6415 S Rancho Santa Fe Rd
San Marcos, CA 92078

**(760) 591-7700**

Send to Mobile  |  E-mail It  |  Search Nearby  |  Save This Listing  |  Save a Note

☆ ☆ ☆ ☆ ☆
Review This Business!
**Rate it  |  Read Reviews**
Improve this listing

## 24 Hour Fitness
San Pablo, CA 94806

**(510) 758-2224**

Send to Mobile  |  E-mail It  |  Search Nearby  |  Save This Listing  |  Save a Note

★ ★ ★ ☆ ☆
Based on 2 reviews.
**Rate it  |  Read Reviews**
Improve this listing

## 24 Hour Fitness Club 054
820 State St
Santa Barbara, CA 93101 Map

**(805) 899-4008**

Visit Web Site

**More Info**

Send to Mobile  |  Map It  |  E-mail It  |  Get Directions  |  Search Nearby  |  Save This Listing  |  Save a Note

☆ ☆ ☆ ☆ ☆
Review This Business!
**Rate it  |  Read Reviews**
Improve this listing

## 24 Hour Fitness Club 097
1605 Pacific Coast Hwy
Hermosa Beach, CA 90254 Map

**(310) 374-4524**

☆ ☆ ☆ ☆ ☆
Review This Business!
**Rate it  |  Read Reviews**
Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness Club 147

700 E Redlands Blvd
Redlands, CA 92373 Map

**(909) 307-3487**

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness Club 165

685 W Foothill Blvd
Upland, CA 91786 Map

**(909) 949-2422**

★ ★ ★ ★ ★
Based on 1 review.
**Rate it** | **Read Reviews**
Improve this listing

---

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness Club 180

4200 Chino Hills Pkwy
Chino Hills, CA 91709 Map

**(909) 393-0724**

Visit Web Site

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness Club 708

946 Diablo Ave
Novato, CA 94947 Map

**(415) 892-1690**

**More Info**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness Club 851

7881 Edinger Ave
Huntington Beach, CA 92647 Map

**(714) 373-8969**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

---

## 24 Hour Fitness Club 851

7887 Center Ave
Huntington Beach, CA 92647 Map

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

---

**(714) 903-8640**

Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness Club 901

9744 Central Ave
Montclair, CA 91763 Map

**(909) 621-5329**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness Club 905

505 S Flower St
Los Angeles, CA 90071 Map

**(213) 683-1524**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness Club 907

15310 Summit Ave
Fontana, CA 92336 Map

**(909) 463-9520**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness Club Apex

4035 E Thousand Oaks Blvd
Thousand Oaks, CA 91362 Map

**(805) 449-2174**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness File As Twenty Four

945 E Dominguez St
Carson, CA 90746 Map

**(310) 323-1424**

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

## 24 Hour Fitness Irvine

18101 Von Karman Ave Ste 100
Irvine, CA 92612 Map

**(949) 851-0024**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness Training Center

1390 Madera Rd
Simi Valley, CA 93065 Map

**(805) 527-7505**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Health & Fitness

1551 N La Brea Ave
Los Angeles, CA 90028 Map

**(323) 845-1420**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ☆
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Health & Fitness

1551 S La Brea Ave Apt N
Los Angeles, CA 90019 Map

**(323) 845-1420**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Nautilus Fitness Centers

7301 Greenback Ln Bldg A
Citrus Heights, CA 95621 Map

**(916) 722-7588**

Visit Web Site

**More Info**

Send to Mobile | Map It | E-mail It | Get Directions | Search Nearby | Save This Listing | Save a Note

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**
Improve this listing

---

## 24 Hour Fitness Club 910

1357 E Gladstone St
Glendora, CA 91740

★ ★ ★ ★ ★
Review This Business!
**Rate it** | **Read Reviews**

# Exhibit N

1  Paul J. Coady (SBN: 81698)
   pcoady@winston.com
2  Joan B. Tucker Fife (SBN: 144572)
   jfife@winston.com
3  Robert Spagat (SBN: 157388)
   rspagat@winston.com
4  WINSTON & STRAWN LLP
   101 California Street
5  San Francisco, CA 94111-5894
   Telephone:    415-591-1000
6  Facsimile:    415-591-1400

7  Attorneys for Defendant
   MICHAEL SHEEHAN

8

9

10        SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                 COUNTY OF CONTRA COSTA

12

13  24 HOUR FITNESS,                    Case No. C08-01663

14              Plaintiff,
                                        [PROPOSED] ORDER GRANTING
15       vs.                            REQUEST FOR JUDICIAL NOTICE IN
                                        SUPPORT OF OPPOSITION OF
16  MICHAEL SHEEHAN,                    DEFENDANT MICHAEL SHEEHAN TO
                                        PLAINTIFF'S EX PARTE APPLICATION
17              Defendant.              FOR A TEMPORARY RESTRAINING
                                        ORDER
18

19                                      BY FAX

20       Having considered Defendant Michael Sheehan's Request for Judicial Notice in Support of

21  Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order, it is hereby

22       ORDERED that: Defendant's Request for Judicial Notice is GRANTED.

23

24
    Date: _____       _____
25
                                         Superior Court Judge
26

27

28

    [PROPOSED] ORDER GRANTING REQUEST FOR JUDICIAL NOTICE BY DEFENDANT MICHAEL SHEEHAN
         IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR TRO

SF:209974.1

RECEIVED
JUL 0 2 2008

Exhibit O

1  Paul J. Coady (SBN: 81698)
   pcoady@winston.com
2  Joan B. Tucker Fife (SBN: 144572)
   jfife@winston.com
3  Robert Spagat (SBN: 157388)
   rspagat@winston.com
4  WINSTON & STRAWN LLP
   101 California Street
5  San Francisco, CA 94111-5894
   Telephone:   415-591-1000
6  Facsimile:    415-591-1400

7  Attorneys for Defendant
   MICHAEL SHEEHAN

8

9



RECEIVED

JUL 0 2 2008

E. TORRE, CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA
B. Montany
Deputy clerk

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                        COUNTY OF CONTRA COSTA

12

13  24 HOUR FITNESS,                    Case No.  C08-01663

14            Plaintiff,

15      vs.                             [PROPOSED] ORDER DENYING
                                        PLAINTIFF'S EX PARTE APPLICATION
16  MICHAEL SHEEHAN,                    FOR A TEMPORARY RESTRAINING
                                        ORDER
17            Defendant.
                                        BY FAX
18

19      Having considered Plaintiff's Ex Parte Application for a Temporary Restraining Order,

20  Defendant's opposition, the evidence in the record, and the statements of counsel at the hearing, it is

21  hereby

22      ORDERED that:  Plaintiff's Ex Parte Application for a Temporary Restraining Order is

23  DENIED.

24

25

26  Date: _____        _____

27                                    Superior Court Judge

28

        [PROPOSED] ORDER DENYING PLAINTIFF'S EX PARTE APPLICATION FOR TRO

SF:209979.1

*101 California Street*
*San Francisco, CA 94111-5894*

Exhibit P

1   Paul J. Coady (SBN: 81698)
    pcoady@winston.com
2   Joan B. Tucker Fife (SBN: 144572)
    jfife@winston.com
3   Robert Spagat (SBN: 157388)
    rspagat@winston.com
4   WINSTON & STRAWN LLP
    101 California Street
5   San Francisco, CA  94111-5894
    Telephone:  415-591-1000
6   Facsimile:  415-591-1400

7   Attorneys for Defendant
    MICHAEL SHEEHAN

8

9

10         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11              **COUNTY OF CONTRA COSTA**

12

13

14   24 HOUR FITNESS USA, Inc. *et al.*,      Case No.  C-08-01663

15          Plaintiff,

16     vs.                    **PROOF OF SERVICE**

     MICHAEL SHEEHAN,

17          Defendant.

18

19

20

21

22

23

24

25

26

27

28

FILED

2008 JUL -2 P 1: 48

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.

BY:_____
     B. Hostsey, Deputy Clerk

BY FAX

1          **PROOF OF SERVICE**

2

3          I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Winston & Strawn LLP, 101 California Street, San Francisco, CA  94111-5894.  On July 2, 2008, I served the within documents:

4

5     1.   **OPPOSITION OF DEFENDANT MICHAEL SHEEHAN TO PLAINTIFF'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER; DECLARATION OF MICHAEL SHEEHAN; DECLARATION OF DONALD KORNSTEIN;**

6

7

8     2.   **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION OF DEFENDANT MICHAEL SHEEHAN TO PLAINTIFF'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER;**

9

10    3.   **[PROPOSED] ORDER GRANTING REQUEST FOR JUDICIAL NOTICE SUPPORT OF OPPOSITION OF DEFENDANT MICHAEL SHEEHAN TO PLAINTIFF'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER;**

11

12

13    4.   **[PROPOSED] ORDER DENYING PLAINTIFF'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER;**

14

15    5.   **AMENDED OPPOSITION OF DEFENDANT MICHAEL SHEEHAN TO PLAINTIFF'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER;**

16

17    6.   **DEFENDANT'S OBJECTIONS TO THE DECLARATION OF CARL C. LIEBERT SUBMITTED IN SUPPORT OF PLAINTIFF'S APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; AND**

18

19    7.   **DEFENDANT'S OBJECTIONS TO THE DECLARATIONS OF ANGELA READ AND WILLIAM R. DONAHUE SUBMITTED IN SUPPORT OF PLAINTIFF'S APPLICATION FOR AN ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

20

21

22

23   ☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, addressed as set forth below.

24

25        Rex Darrell Berry
          Berry & Block LLP
26        2150 River Plaza Drive, Suite 415
          Sacramento, CA  95883
27        Tel:   (916) 564-2000
          Fax:   (916) 564-2024

28

                              2

1    I declare under penalty of perjury under the laws of the State of California that the above
is true and correct.

2

3    Executed on July 2, 2008, at San Francisco, California.

4                                                           *Thelma Tannis*
                                                            Thelma A. Tannis

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit Q

1  REX DARRELL BERRY, State Bar No. 110219
   SCOTT M. PLAMONDON, State Bar No. 212294
2  BERRY & BLOCK LLP
   2150 River Plaza Drive, Suite 415
3  Sacramento, CA  95833
   (916) 564-2000
4  (916) 564-2024 FAX

5

   Attorneys for Plaintiffs
6  24 HOUR FITNESS USA, INC. and 24 HOUR FITNESS
   WORLDWIDE, INC.
7

8                  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                          **COUNTY OF CONTRA COSTA**

10

11  24 HOUR FITNESS USA, INC. and 24      ) Case No. C-08-01663
    HOUR FITNESS WORLDWIDE, INC.          )
12                                        )
              Plaintiffs,                 ) [PROPOSED] TEMPORARY
13                                        ) RESTRAINING ORDER AND ORDER
    v.                                    ) TO SHOW CAUSE REGARDING
14                                        ) PRELIMINARY INJUNCTION
    MICHAEL SHEEHAN and DOES 1-100,       )
15  inclusive,                            )
                                          ) Date:  June 27, 2008
16            Defendants.                 ) Time:  1:30pm
    _____ ) Dept.: 60
17

18  _____

19                          **ORDER TO SHOW CAUSE**

20  To Defendant, MICAHEL SHEEHAN:

21        Based upon the Complaint filed in this action and on the declarations of Carl Liebert and

22  Rex Darrell Berry and the exhibits thereto, you are ordered to appear on JUN 15 2008 at

23  9:00 a.m./p.m. in Department 9 of this Court located at 725 Court St,

24  California to show cause why a preliminary injunction should not be ordered restraining and

25  enjoining you from the following pending trial in this action:

26                      **TEMPORARY RESTRAINING ORDER**

27        Pending hearing on the Order to Show Cause, you restrained and enjoined from:

28

                                          1
    **[PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING
    PRELIMINARY INJUNCTION**

1.    Assuming the position of Chief Executive Officer with Ballys Total Fitness Holding Corporation, or any related entity ("Ballys"), in breach of the terms of his March 31, 2003 Employment Agreement with 24 Hour Fitness USA, Inc. and September 30, 2005 Stockholder's Agreement with 24 Hour Fitness Worldwide, Inc.;

2.    Competing with 24 Hour Fitness in violation of terms of his March 31, 2003 Employment Agreement with 24 Hour Fitness USA, Inc. and September 30, 2005 Stockholder's Agreement with 24 Hour Fitness Worldwide, Inc.;

3.    Directly or indirectly recruiting, soliciting, inducing or encouraging any employee of 24 Hour Fitness to become an employee of Ballys, or to directly or indirectly encourage any independent contractor or vendor of 24 Hour Fitness to terminate a contracting or vending relationship with 24 Hour Fitness;

4.    Directly or indirectly owning an interest in, operating, joining, beginning, controlling, advising, consulting with, rendering services to, or otherwise participating in or working for or on behalf of Ballys;

5.    Using, disclosing or disseminating to Ballys any of 24 Hour Fitness' Confidential and Proprietary Information and/or any work product created in connection with his employment by 24 Hour Fitness; or

6.    Using in any manner 24 Hour Fitness' trade secret information.

**IT IS FURTHER ORDERED THAT:**

This Order to Show Cause and Temporary Restraining Order shall be served on Defendant MICHAEL SHEEHAN, no later than 5:00 pm by JULY 1, 2008. Proof of such service shall be filed at least five (5) court days prior to the hearing.

Any opposition papers to the Order to Show Cause shall be filed and served on counsel for Plaintiff, 24 HOUR FITNESS by 3:00 pm no later than JULY 8, 2008. Any reply papers to the opposition shall be filed and served on Defendant MICHAEL SHEEHAN by 3:00 pm no later than on JULY 10, 2008.

2

1    ~~The restraining order granted herein shall expire on~~ _____.

2

3    IT IS SO ORDERED.

4

5

6    Dated: JUNE 30, 2008                    _____

7                                            Judge of the Superior Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING
PRELIMINARY INJUNCTION

# Exhibit R

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and address)*: | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|

Rex Darrell Berry (SBN 110219)   (916) 564-2000
BERRY & BLOCK, LLP
2150 River Plaza Drive, Suite 415
Sacramento, CA  95833

ATTORNEY FOR *(Name)*: Plaintiffs, 24 HOUR FITNESS USA, INC., et al.

FOR COURT USE ONLY

FILED

2008 JUL -7  A 11: 27

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CASE
BY: _____ DEPUTY CLERK

Insert name of court and name of judicial district and branch court, if any:

CONTRA COSTA COUNTY SUPERIOR COURT

PLAINTIFF/PETITIONER:  24 HOUR FITNESS USA, INC., et al.

DEFENDANT/ RESPONDENT:  MICHAEL SHEEHAN

| REQUEST FOR DISMISSAL | CASE NUMBER: |
|---|---|
| [ ] Personal Injury, Property Damage, or Wrongful Death<br>　[ ] Motor Vehicle  [ ] Other<br>[ ] Family Law<br>[ ] Eminent Domain<br>[✓] Other *(specify)* : Breach of Contract | C 08-01663 |

- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -

1. TO THE CLERK: Please **dismiss** this action as follows:
　a. (1) [ ] With prejudice   (2) [✓] Without prejudice
　b. (1) [ ] Complaint   (2) [ ] Petition
　　(3) [ ] Cross-complaint filed by *(name)*:　　　　　　　　on *(date)*:
　　(4) [ ] Cross-complaint filed by *(name)*:　　　　　　　　on *(date)*:
　　(5) [✓] Entire action of all parties and all causes of action
　　(6) [ ] Other *(specify)*:*

Date:  July 7, 2008

REX DARRELL BERRY
..............................................
(TYPE OR PRINT NAME OF [✓] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

► _____
(SIGNATURE)

Attorney or party without attorney for:
[✓] Plaintiff/Petitioner      [ ] Defendant/Respondent
[ ] Cross - complainant

2. **TO THE CLERK:** Consent to the above dismissal is hereby given.**
　Date:

_____
(TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

** If a cross-complaint-or Response (Family Law) seeking affirmative relief -is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

► _____
(SIGNATURE)

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner      [ ] Defendant/Respondent
[ ] Cross - complainant

*(To be completed by clerk)*
3. [✓] Dismissal entered as requested on *(date)*:     JUL 0 7 2008
4. [ ] Dismissal entered on *(date)*:                  as to only *(name)*:
5. [ ] Dismissal **not entered** as requested for the following reasons *(specify)*:

6. [ ] a. Attorney or party without attorney notified on *(date)*:
　　　b. Attorney or party without attorney not notified. Filing party failed to provide
　　　　[ ] a copy to conformed [ ] means to return conformed copy

Date:  JUL 0 7 2008      Clerk, by  J. Myovich  , Deputy

Page 1 of 1

Form Adopted for Mandatory use
Judicial Council of California
CIV-110 [Rev. January 1, 2007]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.,
Cal. Rules of Court, rule 3.1390
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

*24 Hour Fitness, et al. v. Sheehan, et al.*
Contra Costa County Superior Court, Case No. C 08-01663

**DECLARATION OF SERVICE**

I am a citizen of the United States, over the age of 18 years, and not a party to or interested in this action. I am an employee of Berry & Block LLP, and my business address is 2150 River Plaza Drive, Suite 415, Sacramento, CA 95833. On this day I caused to be served the following document(s):

**REQUEST FOR DISMISSAL**

☒ by placing ☐ the original ☒ a true copy into sealed envelopes addressed and served as follows:

> Joan B. Fife
> WINSTON & STRAWN LLP
> 101 California Street
> San Francisco, CA 94111
> (415) 591-1000; Fax: (415) 591-1400
> jfife@winston.com

☐ **BY MAIL:** I am familiar with this firm's practice whereby the mail, after being placed in a designated area, is given fully prepaid postage and is then deposited with the U.S. Postal Service at Sacramento, California, after the close of the day's business.

☐ **BY PERSONAL DELIVERY:** I caused such envelope to be delivered by hand.

☒ **BY OVERNIGHT COURIER:** I caused such envelope to be placed for collection and delivery in accordance with standard overnight delivery procedures for delivery the next business day.

☐ **BY FACSIMILE:** I caused such documents(s) to be transmitted by facsimile transmission from (916) 564-2024 to the person(s) and facsimile transmission without number(s) shown about. The facsimile transmission was reported as complete without error and a transmission report was properly issued by the transmitting facsimile machine. A true and correct copy of the transmission report will be attached to this proof of service after facsimile service is completed.

☒ **BY EMAIL:** I caused such documents(s) to be transmitted by email transmission from rberry@berryblock.com to the person(s) shown above. The email transmission was reported as complete without error and a transmission report was properly issued by the transmitting email program. A true and correct copy of the transmission report will be attached to this proof of service after email service is completed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on ***July 7, 2008***, at Sacramento, California.

_____
Jenny O'Shaughnessy

**PROOF OF SERVICE**
