**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| 24 HOUR FITNESS USA, INC., a California corporation, )<br>)<br>) | |
| Plaintiff, ) | Civil Action No. 08 cv 3853 |
| ) | |
| v. ) | Judge Joan Humphrey Lefkow |
| ) | |
| BALLY TOTAL FITNESS HOLDING CORP., a Delaware corporation, and MICHAEL SHEEHAN, an individual, )<br>)<br>) | Magistrate Judge Morton Denlow |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S RESPONSE TO MOTION OF DEFENDANTS, MICHAEL SHEEHAN AND BALLY TOTAL FITNESS HOLDING CORPORATION, TO DISMISS THE FIRSTAMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTIONAND/OR FOR FAILURE TO JOIN A NECESSARY PARTY**

Plaintiff 24 Hour Fitness USA, Inc. ("24 Hour Fitness" or "Plaintiff"), by and through its attorneys, hereby submits its Response to the Motion of Defendants, Michael Sheehan ("Sheehan") and Bally Total Fitness Holding Corporation ("Bally"), to Dismiss the First Amended Complaint For Lack of Subject Matter Jurisdiction and/or For Failure to Join a Necessary Party (the "Motion"):

## I.    FACTUAL BACKGROUND

On June 23, 2008, Sheehan, without notice, resigned from his position as Chief Operating Officer (COO) of 24 Hour Fitness and suddenly announced that he had accepted the position of Chief Executive Officer (CEO) of Defendant Bally, a direct head-to-head competitor, with a starting date of July 1, 2008 in Chicago, Illinois.  The next day, June 24, 2008, Bally issued a national press release announcing to the public and to the trade that Sheehan would become the CEO and a member of the Board of Directors of Bally in Chicago on July 1, 2008:

> CHICAGO, June 24 / PRNewswire/—Bally Total Fitness Holding Corporation today announced that it has appointed Michael Sheehan to

> serve as its Chief Executive Officer, effective July 1.  Mr. Sheehan will also serve as a member of Bally's Board of Directors.
>
> * * * *
>
> Mr. Sheehan said "I am looking forward to joining the Bally team and I am eager to add value to this established brand.  For many years, Bally has been a leader in the fitness industry—Bally's facilities, fitness programming and personnel are among the best in the business.  Under my leadership, Bally will continue to focus on providing high-quality comprehensive fitness experiences to our members."

(Am. Compl. Ex. C.)

### A.  The California Lawsuit

24 Hour Fitness filed an emergency application for a temporary restraining order (TRO) against Sheehan in California on June 26, 2008.  No lawsuit was filed against Bally in California. The claims were filed under California law for breach of contract and other California causes of action.  The California court held a hearing and denied the TRO application on June 30, 2008. That evening, Sheehan flew to Chicago and, the next morning, July 1, 2008, reported for work at Bally's headquarters in Chicago as the new CEO of Bally.  (**EX. A**, Sheehan Dep. 30:22-31:23, July 22, 2008.)

### B.  The Chicago Lawsuit

Sheehan was domiciled in Illinois on July 1, 2008, and he reported to work at the corporate headquarters of Bally in Chicago on July 1, 2008.  Sheehan's assumption of duties at Bally created the threatened or actual misappropriation of trade secrets involving both his new employer, Defendant Bally, as well as Sheehan.  The California lawsuit was dismissed without prejudice, and this new lawsuit then was filed against new party, Defendant Bally, and against Sheehan, on July 7, 2008.[1]

---

[1] The Amended Complaint, filed July 8, 2008, is the only operable complaint in this action, and neither the original Complaint, nor the complaint filed in the California action, control this action in any manner. *See Manning v. Ashland Oil Co.*, 721 F.2d 192, 197 (7th Cir. 1983) (*quoting Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) ("'It is well-established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.'").  Contrary to Defendants' posturing, there has been no "fraudulent averment" nor any "admissions" made in the original Complaint (Mot. pp. 4-5), and Plaintiff acted in good faith in promptly and independently curing the inadvertent inclusion of 24 Hour Fitness Worldwide, Inc., Plaintiff's parent, not "affiliate."  (Mot. p. 2.)  While 24 Hour Fitness Worldwide was a proper party in the California action's claim for breach of a Shareholder's Agreement between it and Sheehan, no such claim ever was pleaded in this action.  Clerical and/or typographical errors can occur, especially when time is of the essence, as Defendants must recognize:  counsel for Defendants failed to sign the underlying Motion pursuant to Fed. R. Civ. P. 11 (2008).

Service was effectuated on both Defendants, and Plaintiff filed motions for expedited discovery and to set a preliminary injunction hearing date, noticing the motions before this court for July 15, 2008.  On the morning of July 15, 2008, before the hearing, Defendants' counsel, *sua sponte*, asserted that Sheehan intended to remain in California even though he had reported to work as Bally's new CEO on July 1, 2008.  Faced with this incongruous position, Plaintiff's counsel requested the immediate deposition of Sheehan to confirm under oath that Sheehan was in fact a domiciliary of Illinois on July 7, 2008 when the complaint in this action was filed.

Sheehan's was deposed on July 22, 2008, and his sworn testimony confirmed that Sheehan reported to work on July 1, 2008 and was, as of that date, present in Illinois as the CEO of Bally.  The Notice of Deposition requested production of any employment agreements with Defendant Bally and documents regarding assistance in relocation to Chicago.  Defendants produced three documents, including the Employment Agreement that Sheehan executed on June 20, 2008.  This agreement unequivocally demonstrates that Sheehan's intent to be a domiciliary of Illinois was fixed on June 20, 2008 when Sheehan executed the contract accepting and manifesting his intent to become the CEO of Bally and to make Chicago his home.

As of the date this lawsuit was filed, July 7, 2008, Sheehan was physically present in Illinois—with the intent to remain in Illinois—and this intent was fixed on June 20, 2008 when Sheehan executed this contract to become Bally's CEO, as Sheehan admitted during his deposition on July 22, 2008:

> [Counsel]:  The contract states, you agree, you being Mr. Sheehan, Michael Sheehan, you agree to move your permanent residence to the Chicago area.  That was your agreement and intent at the time you agreed and accepted the position as CEO in what you now are saying was late June, 22 correct?
>
> [Sheehan]:  Can you clarify the question a little bit for me.
>
> [Counsel]:  Let's just take the words.  You agreed to move your permanent residence to the Chicago area.  You understand what that means?
>
> [Sheehan]:  Yes.
>
> [Counsel]:  You agreed to move your permanent residence to the Chicago area when you accepted the position as CEO of Bally that was predicated upon your acceptance and intent to move your permanent residence to Chicago?
>
> [Sheehan]:  By July 31st, yes.
>
> [Counsel]:  Oh.  So you're saying by July 31st.  You're putting that qualifier on it.  But your intent at the time you accepted the CEO position was to move your permanent residence to Chicago, correct?

[Sheehan]:  On the date I accepted, yes.

* * * *

[Counsel]:  Okay.  So let's make this Exhibit 4-A.  It is now the signed page 6.

(Exhibit 4-A marked as requested.)

[Counsel]:  I'm handing you, Mr. Sheehan, what I have marked as Exhibit 4-A.  Is that a true and correct copy of your signature on Exhibit 4-A?

[Sheehan]:  Yes.

[Counsel]:   And June 20, 2008, is the date upon which you accepted the conditions of employment to become the CEO Bally?

[Sheehan]:  No.

[Counsel]:  Well, it's dated June 20.

[Sheehan]:  Yes.

[Counsel]:  So when you signed it dated June 20, were you accepting employment as the CEO of Bally on that date?

[Sheehan]:  No.

[Counsel]:  Well, it says, "Accepted this 20th day of June 2008."  Can you state for the record what was accepted on that date.

[Counsel for Defendants]:  Object to the form of the question.

[Sheehan]:  That's the date I wrote in, the 20th.

[Counsel]:  No.  You say it says, "Accepted this blank day of June 2008?"  Do you see that?

[Sheehan]:  Yes.

[Counsel]:  And you signed "Michael Sheehan," correct?

[Sheehan]:  Yes.

[Counsel]:  What did you accept on June 20, 2008?

[Sheehan]:  The agreement.

(**EX. A**, Sheehan Dep. 21:20-22:18, 46:5-47:14; **EX. B**, Employment Agreement, 3, 6.)

Despite this unequivocal admission by Sheehan, Defendants filed the underlying motion the next day, attaching, in an unsuccessful attempt to recant, retract, amend, and/or explain away his admissions of fact made during his deposition, a surprise declaration executed by Sheehan averring that an unnamed Director of Defendant Bally had "orally" modified the Employment Agreement, allegedly allowing Sheehan to delay the purchase of a local residence until thirty

(30) days after the end of the litigation.[2]  (Sheehan Decl. ¶ 9, July 23, 2008.)  The exact move-in date to an Illinois residence does not alter the fact that Defendant Sheehan was present in Illinois on July 7, 2008 on the date the Complaint was filed with the intent (fixed on June 20, 2008 when he signed the Employment Agreement) to make Illinois his home and to stay in Illinois indefinitely.  (**EX. B**.)  Also, though not mentioned in his declaration, Sheehan listed his California residence for sale with a real estate agent the same day his declaration was executed.  (**EX. C**, MLS Fact Sheet for 4542 Lilac Ridge Road, Contra Costa, Cal., July 23, 2008.)

## II. ARGUMENT

The Amended Complaint properly pleads diversity jurisdiction pursuant to 28 U.S.C. § 1332, as complete diversity exists between Plaintiff 24 Hour Fitness, a citizen of California, and Bally and Sheehan, citizens of Illinois and Delaware.  Sheehan became a citizen of Illinois on the evening of June 30, 2008, when he arrived in Chicago, Illinois to assume the position of CEO of Chicago-based Bally, with the intent to remain in Illinois indefinitely, i.e. to establish his domicile in Illinois.  Furthermore, Plaintiff 24 Hour Fitness USA's parent corporation, 24 Hour Fitness Worldwide, Inc., a citizen of California and Delaware, is neither a necessary nor indispensable party pursuant to Rule 19 of the Federal Rules of Civil Procedure.  Therefore, this Court has subject matter jurisdiction through complete diversity pursuant to 28 U.S.C. § 1332, and the Court should deny Defendants' motion.[3]

### A.    Sheehan Is A Citizen Of Illinois.

Defendants' attempts to blur the standard for determining domicile cannot contradict the facts—that at the time the instant action was filed, Sheehan was present in Illinois and intended to remain in Illinois indefinitely, thereby establishing his domicile, and citizenship, in Illinois and establishing this Court's diversity jurisdiction.  *See generally, Midwest Transit, Inc. v. Hicks*, 79 Fed. Appx. 205 (7th Cir. 2003).  A person's domicile is separate and distinct from his residence; while an individual may have multiple residences, he or she only has one particular domicile at

---

[2] This unsubstantiated statement is inadmissible hearsay pursuant to Fed. R. Evid. 802 (2008).

[3] This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  On July 22, 2008, Plaintiff filed a Motion for Leave to File Second Amended Complaint *Instanter*, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure to add a third cause of action against Defendant Sheehan for his violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*  Justice requires that Plaintiff be granted leave to file the Second Amended Complaint *Instanter* pursuant to Fed.R.Civ.P. 15(a)(2).

any point in time.  Domicile is determined by establishing two elements:  (1) an individual's physical presence or residence in a state and (2) the individual's intent to remain indefinitely, or in other words, to "make that place home 'for the time at least.'"  *Sadat v. Mertes*, 615 F.2d 1176, 1180 (7th Cir. 1980); *accord, Mader v. Motorola, Inc.*, No. 92 c 8089, 1999 U.S. Dist. LEXIS 11224, *8-9 (N.D. Ill. July 14, 1999); *Samudio v. O'Loughlin*, No. 96 c 2958, 1997 U.S. Dist. LEXIS 3370, *6-7 (N.D. Ill. Mar. 12, 1997).  Moreover, courts have recognized that in today's modern and mobile society, the test can turn into "a complex, even arbitrary, inquiry into an individual's intent."  *Midwest Transit*, 79 Fed. Appx. at 208 (*citing Galva Foundry Co. v. Heiden*, 924 F.2d 729, 730 (7th Cir. 1991)).

In this case, there is no dispute that Sheehan was present in Illinois at the time of the filing of the action, and the admissions of Sheehan and his counsel,[4] and the other evidence, demonstrate Sheehan's unambiguous intent to remain in Illinois indefinitely and thereby establish Illinois as his domicile and state of citizenship.  Should this Court determine that questions of fact remain regarding Sheehan's domicile, then an evidentiary hearing on the issue is warranted.  *Midwest Transit*, 79 Fed. Appx. at 210 (remanding and ordering an evidentiary hearing regarding the citizenship claim).

### 1.    Sheehan Was Present In Illinois At The Time This Action Was Filed.

Defendants do not dispute, and there is absolutely no question, that Sheehan was physically present in Illinois on the date Plaintiff 24 Hour Fitness filed this action, and the first element of the test for domicile is satisfied.  (**EX. A**, Sheehan Dep. 33:20-34:7.)  In fact, Sheehan has been present in Illinois most days from June 30, 2008 to this date.  (**EX. A**, Sheehan Dep. 33:20-41:22.)  Therefore, Sheehan was present in Illinois at the time the instant action was filed, and the first element of the test for domicile is satisfied.

### 2.    Sheehan Intends To Remain In Illinois Indefinitely.

Defendants' claim that Sheehan is a citizen of California is legally unsupportable, as both Sheehan and his counsel have admitted that Sheehan's intent is to remain in Illinois indefinitely. As this Court recognized at the hearing of July 24, 2008, Defendants' assertion that Sheehan is a citizen of California is based on the misconstruction of the difference between "residence" and

---

[4] Defendants' counsel likewise has stated that Sheehan "may be hoping to move his family here" and "[i]f the Bally job goes well, he will likely move to Illinois, but he has not done so yet."  (**EX. F**, K. Anderson Letter 1, July 15, 2008.)

"domicile." (**EX. D**, Hr'g Tr. 3:9-16, July 15, 2008; **EX. E**, Hr'g Tr. 6:1-14, July 24, 2008.) Defendants' *ex post facto* attempts to cure Sheehan's admission under oath that his intent to make Chicago his home was fixed on June 20, 2008 should not be countenanced by this Court.

During his deposition of July 22, 2008, Sheehan admitted that his "intent at the time [he] accepted the CEO position was to move his permanent residence to Chicago." (**EX. A**, Sheehan Dep. 22:15-18.) Sheehan formally accepted the CEO position by signing the Employment Agreement on June 20, 2008. (**EX. A**, Sheehan Dep. 47:13-14; **EX. B**, 6.) In fact, the Employment Agreement with Bally requires that Sheehan establish his "permanent residence in the Chicago area immediately, but no later than July 30, 2008." (**EX. B**, 3.)

Sheehan's attempts to undercut this explicit and concrete evidence of his intent through the self-serving Declaration attached to the underlying motion carries no weight, and if even allowed, actually serves to support the fact that his domicile is Illinois. "Time and time again, parties attempt to use after-the-fact self-serving affidavits to recant, retract, amend, and explain away admissions of fact made at depositions, and the courts remind them that it cannot be done." *Mader*, 1999 U.S. Dist. LEXIS 11224 at 8-9 (disregarding defendant's reliance on a self-serving affidavit regarding domicile (internal citations omitted)). "The black letter law is clear, 'where [a] deposition and [an] affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the deposition was mistaken....'" *Id*. Sheehan's self-serving Declaration must be disregarded here.

First, Sheehan alleges that an unidentified member of Bally's Board of Directors "orally modified" his Employment Agreement, extending the deadline that Sheehan has to establish a local residence in Illinois to "30 days after the termination of litigation commenced against [him] by 24 Hour Fitness." (Sheehan Decl. ¶ 9, July 23, 2008.) This oral modification does not change Sheehan's intent, fixed on June 20, 2008, to make Chicago his home. Instead, this "oral modification" changes only the date that Sheehan has to purchase a permanent residence. That Sheehan will remain in Illinois indefinitely, and for at least as long as this litigation continues, only indicates Sheehan's intent to make Chicago his home.

Furthermore, Sheehan's statement that "the mortgage on [his] home is held by a bank in California" is unpersuasive and insincere; Sheehan's California home was listed for sale on the very same day that his Declaration was executed—July 23, 2008. (**EX. C**.) Likewise, it is clear that Sheehan's trips to California since July 1, 2008 are for the limited and explicit purpose of

relocating to Chicago—the travel records submitted by Defendants explicitly state: "Travel Purpose:   RELOCATION" (**EX. G**, Sheehan Travel Records 2, 3, 5), and Sheehan's Employment Agreement guarantees "two trips a month for up to four months for you and your spouse (i.e. a maximum of eight trips for each of you) for home visits and/or house hunting trips in the Chicago area. (**EX. B**, 3.)

Finally, Defendants' rote recitation of the general, historical factors evaluated in determining an individuals' domiciliary intent, when that intent is ambiguous, also falls flat, and Sheehan's self-serving declaration cannot be used to contradict his prior sworn admissions. *See Mader*, 1999 U.S. Dist. LEXIS 11224 at 8-9. These factors are aides used only when there is no clear intent,[5] and the U.S. Court of Appeals for the Seventh Circuit has recognized that the test can become an "arbitrary inquiry into an individual's intent." *Midwest Transit*, 79 Fed. Appx. at 208. This is especially true here, since the change in domicile occurred within a matter of days or even hours. The fact that Sheehan has not transferred his driver's license, voter registration, phone service, or mail service is unavailing. (Sheehan Decl. ¶¶ 6, 8.) These circumstances simply cannot contradict Defendant's clear intent to remain in Illinois, especially in light of the modern conveniences of national banks and ATMs, direct deposit, e-mail, faxes, and cell phones with no roaming charges. Moreover, in light of the multi-million dollar compensation package provided to Sheehan as CEO of Defendant Bally, he is not constrained by the financial considerations of most people—the motivation to rent an apartment or purchase a house is likely much lower when provided with a $250 plus per night hotel suite for three months and four months of house hunting trips. (**EX. H**, Expense Report 2; *see also* **EX. B**, 3, stating that Bally will provide "up to 90 days of corporate apartment housing in the Chicago area during the period of time before [Sheehan has] relocated [his] household to a local residence.") The controlling factor is Sheehan's intent, manifested by his agreement to make Chicago his home as a condition of assuming the position of CEO of Defendant Bally.

---

[5] To determine an individual's domiciliary intent where it is unclear, which is not the case here, courts historically have looked to eight general factors: (1) place of employment; (2) location of any real property; (3) voter registration and voting practices; (4) location of residence(s); (5) membership in organizations and clubs; (6) states of vehicle registration and driver's licenses; (7) location of financial accounts; and (8) states in which taxes are paid. *See Midwest Transit,* 79 Fed. Appx. at 206. No one factor is determinative, and evidence of any type of contact with a state is considered, including home ownership, real estate filings and holdings, marriage licenses and/or dissolutions, business interests, location of attorney(s) and/or doctor(s), and evidence of location at time of attempted service. *Id.*

In summary, Sheehan, as CEO of Chicago-based Bally, is required by his duties and his Employment Agreement to live and work in Illinois. Sheehan's admissions and actions, coupled with the statements of his counsel and other evidence, indicate that he has no intent to return to California, but instead, intends to remain in Illinois indefinitely. Sheehan is domiciled in Illinois, and, therefore, a citizen of Illinois, establishing complete diversity.

**B.  24 Hour Fitness Worldwide Is Neither A Necessary Nor An Indispensable Party.**

24 Hour Fitness Worldwide, the parent corporation of Plaintiff 24 Hour Fitness USA, is neither a necessary nor an indispensable party to the instant action. Defendants' arguments to the contrary are flawed and fail for several reasons. First, there is no basis to assert that 24 Hour Fitness Worldwide is a necessary party because of any "joint ownership" of trade secrets. Second, a party with only a financial interest in litigation, the only interest 24 Hour Fitness Worldwide arguably could have, is never a "necessary" party. Finally, and most egregious, Defendants' assertions that the interests of 24 Hour Fitness Worldwide are "identical" to those of Plaintiff actually support a ruling that 24 Hour Fitness Worldwide is *not* a necessary or indispensable party, because where there is identity of interests between a current party and an absent party, the current party can "adequately represent" the interests of the absent party and neither Defendant is at risk of incurring double or inconsistent obligations through the operation of *res judicata*.

As an initial matter, a ruling on a motion to dismiss for failure to join a necessary and indispensable party requires the court to accept the allegations of the complaint[6] as true, and defendants have the burden of showing that the plaintiff has failed to join a necessary and indispensable party. *See Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 479-80 n.2, 4 (7th Cir. 2001); *Ploog v. HomeSide Lending, Inc.*, 209 F.Supp.2d 863, 873 (N.D. Ill. 2002). Rule 19 sets forth a "two-step inquiry for determining when it is proper to dismiss an action for inability to obtain jurisdiction over an individual interest in the litigation." *Hansen v. Peoples Bank of Bloomington*, 594 F.2d 1149, 1150 (7th Cir. 1979); Fed. R. Civ. P. 19. Defendants only

---

[6] As discussed *supra*, n. 1, the Amended Complaint is the only complaint in effect in this litigation. *See Florian, et al. v. Sequa Corp.*, No. 98 C 7459, 2002 U.S. Dist. LEXIS 24149, *9, 19-20 n.2, 9 (N.D. Ill. Dec. 16, 2002) (holding that the presence of dismissed, non-diverse defendants in the caption of an amended complaint is "irrelevant" to the determination of diversity and that an "inadvertent reference to [their] liability" in that same amended complaint did not render them necessary or indispensable parties).

cursorily address the first step, the standard for a "necessary" party, let alone *demonstrate* that 24 Hour Fitness Worldwide satisfies the second step of "indispensability." Therefore, Defendants have not met their burden and have not demonstrated that 24 Hour Fitness Worldwide is a necessary and indispensable party.[7]

### 1. 24 Hour Fitness Worldwide Is Not Required To Be Joined As A "Co-Owner" Of Any Trade Secrets.

Neither Plaintiff nor its parent, 24 Hour Fitness Worldwide, has alleged that any trade secrets are "jointly owned" by both entities. Defendants' argument to the contrary is based on a strained and adulterated interpretation of inoperable previous pleadings. The use of a "short form" to refer to a group of parties in a pleading does *not* create any "admission" as to the rights and/or obligations shared between the parties, and any previous pleading referred only to "possession" of trade secrets—not ownership. To the extent that any trade secret at issue "possessed" by Plaintiff is also possessed by its parent, no published decision in the United States has required that joint possessors of trade secrets must be joined in an action for misappropriation.

Moreover, just as multiple tort claimants are never necessary, and therefore, never indispensable parties, multiple claimants for the breach of the misappropriation of a trade secret, a tort, likewise are never necessary nor indispensable. *See Salton, Inc. v. Philips Domestic Appliances & Personal Care*, 391 F.3d 871, 877 (7th Cir. 2004) (recognizing that as with any other tort claim, multiple alleged tortfeasors in a case for misappropriation of trade secrets are not necessary nor indispensable parties). There is no legal basis to find 24 Hour Fitness Worldwide a necessary and indispensable party based on "joint ownership" of trade secrets, as evidenced by Defendants' failure to cite any law for this proposition.

---

[7] In fact, Defendants only use the word "indispensable" once, in the final paragraph of their memorandum, and give short shrift to the actual test, that an absent party only should be joined as a "necessary" party if, in its absence, (1) complete relief cannot be afforded or (2) existing parties will be subject to multiple or inconsistent liabilies. Fed. R. Civ. P. 19(a). However, even if this is satisfied, if joinder is not "feasible," because, for example, joinder would destroy complete diversity, then the court must determine if the party is so "indispensable" to the litigation that the court cannot "in equity and good conscience" proceed in the party's absence. *Id.* at 19(b). Defendants also cite only one decision, *Takeda v. Northwestern Nat'l Life Ins. Co.*, which states that "a party must be joined even if there is only a 'possibility' of such harm absent a party's joinder." (Mot. p. 13, *citing* 765 F.2d 815, 821 (9th Cir. 1985)). While this is moot based on the identity of interests discussed *infra*, it is important that the U.S. Court of Appeals for the Seventh Circuit has held that a "hypothetical" risk is not sufficient to establish a potential for multiple or otherwise inconsistent liabilities; there must be "substantial risk." *Davis Cos.*, 268 F.3d at 485.

## 2. A Party With Only A Financial Interest Is Never "Necessary."

A party with only "'a financial interest, or an interest of convenience'" is never a "necessary" party pursuant to Rule 19(a).  *See Burger King Corp. v. American Nat'l Bank and Trust Co. of Chicago*, 119 F.R.D. 672, 675 (N.D. Ill. 1988).  Here, the only arguable interest 24 Hour Fitness Worldwide has in this action is "financial," as all of the claims relate to the interests of its wholly-owned subsidiary, Plaintiff 24 Hour Fitness USA, Sheehan's former employer and the real party in interest.  (*See* Compl. Ex. A.)  Because 24 Hour Fitness Worldwide is not necessary, it cannot be indispensable.

## 3. Plaintiff Can "Adequately Represent" Its Parent And There Is No Risk Of Incomplete Relief Or Of Multiple Or Inconsistent Liabilities.

Here, Defendants themselves fervently assert, again and again, that the interests of Plaintiff and its parent, 24 Hour Fitness Worldwide, are "identical."  (Mot. 2, 3, 12, 13.)  Where the interests of a current party and an absent party are identical, the current party will "adequately represent" the interests of the absent party, thereby rendering the absent party neither necessary nor indispensable.  *See Etri, Inc. v. Nippon Miniature Bearing Corp.*, 1989 U.S. Dist. LEXIS 10129, *12-14 (N.D. Ill. Aug. 17, 1989) (holding that a subsidiary was an adequate representative of a parent corporation where the parent was on notice of both the action and the potential effect of a judgment on both companies' rights in the mark at issue); *see also Extra Equipamentos E Exportacao Ltda, et al. v. Case Corp.*, 361 F.3d 359, 364 (7th Cir. 2004) ("we have great difficulty seeing how a 100 percent subsidiary could *ever* be an indispensable party").

Additionally, *res judicata* removes any risk that 24 Hour Fitness Worldwide could expose Defendants to multiple or inconsistent obligations by bringing a subsequent action for the claims asserted here.  (Mot. 12-13.)  *Res judicata* precludes privies, especially parent and subsidiary corporations, from relitigating claims or issues that were or could have been raised in a previous action.  *See Extra Equipamentos*, 361 F.3d at 363-64 (holding that the parent and a wholly-owned subsidiary had identical interests, and *res judicata* prohibited either from relitigating the same claims, such that the non-diverse party was not indispensable to the action).  Privity between parties is established where those parties' interests are so closely aligned that they represent the same legal interests.  *Id.*  Under Illinois law, it is presumed that a corporation is in privity with its controlling shareholder.  *Gann v. William Timblin Transit, Inc.*, 552 F.Supp.2d 1021, 1029 (N.D. Ill. 2007) (holding that the president and controlling shareholder of

a corporation was in privity of the corporation for purposes of claim preclusion); *see also Martino v. McDonald's System, Inc.*, 598 F.2d 1079, 1083 n.7 (7th Cir. 1979) (holding that a corporation was in privity with its sole shareholder and with its president). As the 100 percent shareholder of Plaintiff, 24 Hour Fitness Worldwide is most definitely in privity with, and thereby "adequately represented" by, Plaintiff.

Defendants' zealous avowals that the interests of Plaintiff 24 Hour Fitness USA and its parent, 24 Hour Fitness Worldwide, are "identical" in this litigation are conclusive that 24 Hour Fitness Worldwide is *not*, and can never be, a necessary nor an indispensable party to this action. The Court should, therefore, deny Defendants' motion.

## III. CONCLUSION

For the reasons set forth above, Plaintiff 24 Hour Fitness USA, Inc. requests that this Court deny the Motion Of Defendants, Michael Sheehan And Bally Total Fitness Holding Corporation, To Dismiss The First Amended Complaint For Lack Of Subject Matter Jurisdiction And/Or For Failure To Join A Necessary Party and grant Plaintiff such further relief that this Court deems just and proper under the circumstances.

*        *        *

Date:   August 7, 2008                 Respectfully submitted,

24 Hour Fitness USA, Inc.

 /s/ R. Mark Halligan

**R. Mark Halligan (IL 6200723)**
mark.halligan@lovells.com
**Deanna R. Swits (IL 6287513)**
deanna.swits@lovells.com
**LOVELLS LLP**
330 N. Wabash Avenue
Suite 1900
Chicago, IL  60611
Tel:  312 832 4400
Fax:  312 832 4444

*Attorneys for Plaintiff 24 Hour Fitness USA, Inc.*

- 12 -

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO MOTION OF DEFENDANTS, MICHAEL SHEEHAN AND BALLY TOTAL FITNESS HOLDING CORPORATION, TO DISMISS THE FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND/OR FOR FAILURE TO JOIN A NECESSARY PARTY** was served on the below counsel via this Court's ECF notification system August 7, 2008:

> Kimball R. Anderson
> Cardelle B. Spangler
> Amanda C. Wiley
> Winston & Strawn LLP
> 35 W. Wacker Drive
> Chicago, Illinois 60601
> kanderson@winston.com
> cspangler@winston.com
> awiley@winston.com
>
> John T. Gabrielides
> NBC Tower, Suite 3600
> 455 North Cityfront Plaza Drive
> Chicago, IL 60611-5599
> jtg@usebrinks.com


> By:   /s/ Deanna R. Swits
> *An attorney for Plaintiff 24 Hour Fitness USA, Inc.*

<u>Exhibit List</u>

Exhibit A        Deposition of Michael Sheehan, July 22, 2008

Exhibit B        Employment Agreement

Exhibit C        MLS Fact Sheet for 4542 Lilac Ridge Road, Contra Costa, Cal., July 23, 2008

Exhibit D        Transcript of Proceedings, Motion before the Honorable Joan Humphrey Lefkow, July 15, 2008

Exhibit E        Transcript of Proceedings, Motion before the Honorable Joan Humphrey Lefkow, July 24, 2008

Exhibit F        Letter from Kimball Anderson, July 15, 2008

Exhibit G        Michael Sheehan Travel Records

Exhibit H        Michael Sheehan Expense Report

Page 1

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF ILLINOIS

3                        EASTERN DIVISION

4    24 HOUR FITNESS USA, INC., a        )

5    California corporation,             )

6                    Plaintiff,          )

7         vs.                            )No. 08 cv 3853

8    BALLY TOTAL FITNESS HOLDING CORP., )

9    a Delaware corporation, and MICHAEL)

10   SHEEHAN, an individual,             )

11                   Defendants.         )

12

13          The deposition of MICHAEL SHEEHAN, called for

14   examination, taken pursuant to the Federal Rules of Civil

15   Procedure of the United States District Courts pertaining

16   to the taking of depositions, taken before LISA SCHWAM,

17   CSR No. 840-4650, a Notary Public within and for the

18   County of Cook, State of Illinois, and a Certified

19   Shorthand Reporter of said state, at Suite 1900, 333 North

20   Wabash Street, Chicago, Illinois, commencing, on the 22nd

21   day of July, A.D. 2008, at 1:11 p.m.

22

23

24

MICHAEL SHEEHAN,  JULY 22, 2008

Page 18

1          You gave me the page -- what is page 6 of the
2   exhibit.  You see that?  But your signature isn't there.
3   Where is the signed copy?
4          A.   I'm not sure where the signed copy is.
5          Q.   Okay.  Let's go to number 3.  Three was asking
6   you to bring any document consisting of, or referring to
7   or relating to, the rejection or acceptance made by
8   Michael Sheehan to any offer of employment by Bally Total
9   Fitness Holding Corporation and/or any entity related to
10  Bally Total Fitness Holding Corporation.
11         Did you bring that document with you?
12         A.   Yes.
13         Q.   Where is that document?
14         A.   You have it.
15         Q.   Oh, you're saying now Exhibit 4 is responsive to
16  three?  Where is your signature showing acceptance of
17  employment on Exhibit 4?
18         A.   That copy does not have a signature on it.
19         Q.   Right.  Well, the fact, is Mr. Sheehan, I do not
20  have any evidence here of your acceptance of the offer of
21  employment.  There is no signed document that's been
22  produced, correct?
23         MR. ANDERSON:  Well, you do have evidence of
24  it.  He testified that he signed it.

Page 19

1          MR. HALLIGAN:  I don't want you making speeches.
2          MR. ANDERSON:  I object to your argument.  Well,
3   You're sitting here making speeches.  I'm just objecting
4   to your incorrect statements of fact.
5          MR. HALLIGAN:  You're making speaking
6   objections influencing the witness's testimony.  I
7   object to that.  That's improper.
8          MR. ANDERSON:  Go on and ask your questions.
9   If you're going to preface your questions with
10  arguments, I'm going to object.
11         MR. HALLIGAN:  Well, that's fine.  Just say
12  "object."
13  BY MR. HALLIGAN:
14         Q.   My point is, and the question on the floor is:
15  Exhibit 4 does not have your signed signature, correct?
16         MR. ANDERSON:  That's been asked and answered
17  now twice.  Object.
18  BY MR. HALLIGAN:
19         Q.   Correct?
20         A.   Yes.
21         Q.   And you don't know where the signed signature
22  is?
23         A.   At this point, I don't know where it is.
24         Q.   Okay.  Four asks for a true and correct copy of

Page 20

1   any document consisting of, or referring or relating to,
2   the compensation benefits and/or relocation assistance
3   provided to Michael Sheehan by Bally Total Fitness Holding
4   Corporation and/or any entity related to Bally Total
5   Fitness Holding Corporation.
6          Did you bring those documents with you?
7          A.   I believe they are in document 4 -- or
8   Exhibit 4.
9          Q.   Okay.  Show me in Exhibit 4, so we have a clear
10  record, of where you claim the compensation benefits and
11  relocation assistance is described in Exhibit 4.
12         Is it your testimony that the total extent of
13  documentation you received from Bally relating to
14  relocation assistance is set forth at pages 3 and 4 of
15  Exhibit 4?
16         MR. HALLIGAN:  And I'd like to have that read
17  back so the witness clearly understands the
18  question.
19         (Record read as requested.)
20  BY THE WITNESS:
21         A.   Yes.
22  BY MR. HALLIGAN:
23         Q.   So looking at page 3 of Exhibit 4, your intent
24  in acceptance of the position of the CEO of Bally, was

Page 21

1   premised on your obligation and intent to move your
2   permanent residence to the Chicago area, as reflected at
3   page 3, correct?
4          MR. ANDERSON:  Object to the form of the
5   question.  Could you read it back, please.
6          (Record read as requested.)
7   BY THE WITNESS:
8          A.   Can you clarify the question, please.
9   BY MR. HALLIGAN:
10         Q.   Can I clarify the question?  Paragraph 3 --
11  Strike that.
12         Page 3, which you pointed out, and page 4, after
13  you had an opportunity to review it, and you testified, is
14  the only documentation that you received from Bally
15  relating to relocation.
16         We established that, correct?
17         A.   The only documentation that I received.
18         Q.   From Bally relating to relocation?
19         A.   Yes.
20         Q.   States, you agree, you being Mr. Sheehan,
21  Michael Sheehan, you agree to move your permanent
22  residence to the Chicago area.  That was your agreement
23  and intent at the time you agreed and accepted the
24  position as CEO in what you now are saying was late June,

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087    800.708.8087    FAX: 312.704.4950

MICHAEL SHEEHAN,   JULY 22, 2008

Page 22

1  correct?
2      A.  Can you clarify the question a little bit for
3  me.
4      Q.  Let's just take the words.  You agreed to move
5  your permanent residence to the Chicago area.
6          You understand what that means?
7      A.  Yes.
8      Q.  You agreed to move your permanent residence to
9  the Chicago area when you accepted the position as CEO of
10  Bally that was predicated upon your acceptance and intent
11  to move your permanent residence to Chicago?
12      A.  By July 31st, yes.
13      Q.  Oh.  So you're saying by July 31st.  You're
14  putting that qualifier on it.
15          But your intent at the time you accepted the CEO
16  position was to move your permanent residence to Chicago,
17  correct?
18      A.  On the date I accepted, yes.
19      Q.  All right.  Let's look at number 5.
20          And by the way -- just following up on that --
21  when you announced your resignation suddenly without
22  notice to Carl Liebert on Monday morning, June 23rd, you
23  met with him face to face to tell him you had decided to
24  become the CEO of Bally, correct?

Page 23

1      MR. ANDERSON:  Object to the form of the
2  question.  Assumes facts not in evidence.
3  Argumentative and unrelated to the citizenship
4  issue here.
5      MR. HALLIGAN:  Well, I think we've
6  established the citizenship issue.
7  BY MR. HALLIGAN:
8      Q.  I just want to confirm that you met with Carl
9  Liebert on the 23rd of June, correct?
10      A.  I believe so.
11      Q.  You told him you were moving to Chicago?
12      A.  No.
13      Q.  At that meeting, you told him that you were
14  moving to Chicago.  In fact, he asked about your wife.
15  And you said she will just have to get used to the Chicago
16  weather, correct?
17      A.  I don't recall that.
18      Q.  You don't recall that.  You told him you were
19  moving to Chicago on June 23rd when you met with him.
20      MR. ANDERSON:  Well, excuse him.  That's been
21  asked and answered.
22      MR. HALLIGAN:  He denied it.
23      MR. ANDERSON:  Do you have a different question?
24  BY MR. HALLIGAN:

Page 24

1      Q.  You deny that you told Carl Liebert on June 23rd
2  that you had accepted a position at Bally and you were
3  moving to Chicago?
4      MR. ANDERSON:  And, counsel, you just asked
5  exactly the same question.
6      MR. HALLIGAN:  It's fine.  I want to get the
7  answer.
8      MR. ANDERSON:  Well, You did get an answer.
9      MR. HALLIGAN:  I'm not sure we have a clear
10  answer.
11      MR. ANDERSON:  It's very clear to me.  He
12  said he didn't recall saying that.
13      MR. HALLIGAN:  That's not what he said.  He
14  denied it.
15  BY MR. HALLIGAN:
16      Q.  I want you to deny it.
17          You did not tell Carl Liebert -- I don't want
18  any of this not recollection stuff.
19          Did you tell Carl Liebert when you met with him
20  on June 23rd -- When you announced you were resigning, you
21  told him you were moving to Chicago, correct?
22      MR. ANDERSON:  Counsel, it doesn't matter
23  what you want or don't want.  What matters is he
24  is telling -- He is going to give you a truthful

Page 25

1  answer.
2      MR. HALLIGAN:  I want a truthful answer.
3      MR. ANDERSON:  You're berating him.
4      MR. HALLIGAN:  I'm not berating him.  You're
5  interrupting the deposition.
6      THE REPORTER:  One at a time, please.
7      MR. ANDERSON:  And I am going one at a time.  Counsel
8  keeps interrupting me.
9      MR. HALLIGAN:  You're making speaking
10  objections which are improper.  Simple question.
11  I'm going to get the answer.
12      MR. ANDERSON:  Can I finish my remarks before
13  you interrupt me again?
14      MR. HALLIGAN:  No.  Honestly, I mean, all you
15  have to do is object, right?
16      MR. ANDERSON:  So you're just going to keep
17  interrupting me?
18      MR. HALLIGAN:  No.  I mean, If you really
19  want to say something more, go ahead.
20      MR. ANDERSON:  I do want to say something.
21      MR. HALLIGAN:  Go ahead.
22      MR. ANDERSON:  I want to say that your
23  argument and speechmaking on the record is
24  improper, and I object to it.  He has answered

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087    800.708.8087    FAX: 312.704.4950

MICHAEL SHEEHAN,   JULY 22, 2008

Page 30

1      Q.   Well, then, who paid for it if it wasn't Bally?
2      MR. ANDERSON:  Counsel, he has answered the
3   question three times now.  And furthermore, I
4   haven't a clue what this has to do with the
5   citizenship issue.  And until you explain to me,
6   I'm not going to allow you to ask the question a
7   fourth time.
8   BY MR. HALLIGAN:
9      Q.   Well, let's just keep it you're in Chicago on
10  June 30th because this is a special deposition.  I'll have
11  the opportunity to take your deposition again in this
12  litigation.
13     We'll --
14     MR. ANDERSON:  Maybe, maybe not.  Why don't
15  you just stick with the questions within the
16  subject matter today.
17     MR. HALLIGAN:  I think I'm within the subject
18  matter.  I'm testing the credibility and demeanor
19  and memory of this witness, and I'm entitled to do
20  that, Counsel.
21  BY MR. HALLIGAN:
22     Q.   Okay.  Let's just take this back.  You're in
23  Chicago now on June 30th.  And it's a Monday night.
24  You've arrived on a commercial airliner from California.

Page 31

1      Did anybody else come with you?
2      A.   No.
3      Q.   No one from your family?
4      A.   No.
5      Q.   Where did you stay after you arrived at the
6   airport?
7      A.   I believe it's called -- a Sheraton hotel.
8      Q.   Sheraton hotel located where?
9      A.   Very close to the Bally headquarters.  I'm not
10  sure the address or city it is in.
11     Q.   And you stayed there the evening of the 30th of
12  June?
13     A.   Correct.
14     Q.   And how many other nights did you stay there
15  other than the 30th of June?
16     A.   Can you clarify the time frame you're referring
17  to.
18     Q.   Well, Mr. Sheehan, it's Monday night.  You've
19  arrived in Chicago.  You're to report for work as the CEO
20  of Bally on Tuesday, July 1st.
21     You arrive in the airport, I assume, in the
22  evening on June 30th by your testimony, correct?
23     A.   Correct.
24     Q.   You need to have a place to sleep.  You're now

Page 32

1   in Chicago, in Illinois.  I've established you stayed at
2   the Sheraton hotel that's close to the corporate
3   headquarters of Bally.
4      Okay.  My next question is:  How many other
5   nights did you stay at the Sheraton once you were here on
6   the 30th of June?  Did you stay there, for example, on the
7   night of July 1st?
8      A.   Yes.
9      Q.   Did you stay there the night of July 2nd?
10     A.   Yes.
11     Q.   You stay there the night of July 3rd?
12     A.   No.
13     Q.   Where did you stay on the night of July 3rd?
14     A.   At my home in California.
15     Q.   Well, you had to fly back to California,
16  right?
17     A.   Correct.
18     Q.   Okay.  So when did you leave to go back to
19  California?
20     A.   July 3rd.
21     Q.   At what time on July 3rd?
22     A.   I don't recall.
23     Q.   At the end of the day?  At night?  After your
24  workday?

Page 33

1      A.   Yes.  After my workday.
2      Q.   Okay.  So it would have been in the evening.
3   You flew back to California on the evening of July 3rd,
4   correct?
5      A.   Early evening, yes.
6      Q.   All right.  So when did you return to Chicago?
7   Your counsel's pointing to a document and showing his
8   finger.
9      Look, just -- I ask that you just answer the
10  questions I'm asking, okay?
11     MR. ANDERSON:  Okay.  He's got the itinerary
12  in front of him.
13     MR. HALLIGAN:  I'm testing his demeanor and
14  credibility and his recollection.
15     MR. ANDERSON:  Oh, for Pete's sake, you're
16  just wasting time.  You've got the itinerary right
17  in front of you.
18     MR. HALLIGAN:  I don't have any itinerary.
19  BY MR. HALLIGAN:
20     Q.   Put that document aside and just answer my
21  questions.  We'll come back to the document.
22     When did you return to Chicago from
23  California?
24     A.   Late Monday evening.

9 (Pages 30 to 33)

MICHAEL SHEEHAN,  JULY 22, 2008

Page 34

1    Q.   And when you arrived on Monday evening, where
2  did you stay?
3    A.   At the same hotel.
4    Q.   The Sheraton hotel.
5    A.   I believe that's what it's called.
6    Q.   So when you say late Monday evening, it's
7  July 7, correct?
8    A.   Yes.
9    Q.   Okay.  And on July 8 -- did you go into the
10 corporate headquarters of Bally at any time on July 7th?
11   A.   No.
12   Q.   Okay.  On July 8 you reported for work as the
13 CEO?
14   A.   Yes.
15   Q.   And where did you stay on the evening of
16 July 8?
17   A.   At the same hotel, which is actually called the
18 Renaissance -- That's a correction.  Not the Sheraton.
19   Q.   Getting a chance to look at this documentation
20 now, you know it was a Renaissance hotel close to the
21 Bally corporate headquarters?
22   A.   No.  Just recalling that Sheraton didn't seem
23 right.
24   Q.   But my point is, the hotel you stayed at, we've

Page 35

1  established is the same hotel?
2    A.   Correct.
3    Q.   And it's close to the Bally headquarters?
4    A.   That's correct.
5    Q.   Where do you work?
6    A.   That is correct.
7    Q.   But now you believe the name of the hotel is a
8  Renaissance hotel, as opposed to a Sheraton hotel,
9  correct?
10   A.   Yes.
11   Q.   That's after looking at this document your
12 counsel put in front of you, correct?
13   MR. ANDERSON:  I didn't put it in front of
14 him.
15   MR. HALLIGAN:  I don't have the document in front of
16 me.  I'm trying to ask the questions of the witness.
17 We'll get back to whatever else is in that pile.
18        I only have one set of it.  I haven't marked it
19 as an exhibit yet.  Haven't looked at it.
20 BY MR. HALLIGAN:
21   Q.   I'm just trying to find out where you were
22 physically staying in Illinois and the point is that you
23 now say it's the resonance.
24   MR. HALLIGAN:  In fact, let's just mark this document

Page 36

1  because -- since you're going to continue to point to it.
2  Let me just get it marked.
3    MR. ANDERSON:  Counsel, there you go again,
4  you interrupted me mid-sentence.  I think it's
5  professionally rude and, frankly, incompetent for
6  you to keep interrupting me.
7        It is the same document he produced to you at
8  the outset of the deposition.  And I would appreciate it
9  if you would stop interrupting me mid-sentence.
10   MR. HALLIGAN:  Well, the record will reflect
11 I'm not interrupting you.  You talk, you stop, and
12 then you indicate you're still making a speaking
13 objection, which I think is improper.
14        But my point is that the only document that's
15 been marked is Exhibit 4.  And the document that you gave
16 to the witness, and the witness put in front of him, I
17 believe, is a separate document.  And I'd like to mark it
18 as an exhibit now.
19        He has the only copy?  How did it get over
20 there?
21   MR. ANDERSON:  The fact is your recollection
22 is incorrect.  He handed you all these documents.
23 You then shoved them back in front of him when
24 he -- as you began asking questions about it.

Page 37

1    MR. HALLIGAN:  I didn't shove it back in
2  front of him.  I gave it to him so he could select
3  a document responsive to a document request.
4        In any event, let's mark as Exhibit 5 another
5  document.  We'll get some foundation on it.
6        (Exhibit 5 marked as requested.)
7  BY MR. HALLIGAN:
8    Q.   Okay.  Handing you what now has been marked for
9  purposes of identification as Sheehan Exhibit 5 is an
10 e-mail communication that came from the Gant Travel
11 Management at ganttravel.com.
12        And it shows at the bottom of the first page of
13 this exhibit that the hotel where you stayed on the
14 evening of June 30, 2008, is the Renaissance O'Hare
15 located at 8500 West Bryn Mawr Avenue, Chicago, Illinois,
16 60631, which is close to the Bally headquarters.
17        This is a confirmation of the hotel that, in
18 fact, you did stay at, correct?
19   A.   Yes.
20   Q.   All right.  Now, you came back in the evening on
21 July 7.  And it's your testimony you stayed at this same
22 hotel again, correct, and reported for work on July 8th as
23 the CEO of Bally, correct?
24   A.   Yes.

MICHAEL SHEEHAN,  JULY 22, 2008

Page 38

1    Q.   And that evening on Tuesday, the 8th, you stayed
2    again at the Renaissance hotel?
3    A.   Yes.
4    Q.   Okay.  Wednesday, July 9th, where did you
5    stay?
6    A.   At the Renaissance.
7    Q.   Thursday, July 10th, where did you stay?
8    A.   At the Renaissance.
9    Q.   Okay.  So that Friday, July -- Let's see.
10   Thursday is the 10th.
11        So Friday, July 11th, where did you stay?
12   A.   At home in California.
13   Q.   So you left on Friday in the evening -- on
14   Friday evening and returned to California?
15   A.   Yes.  I believe it was the evening.
16   Q.   In other words, you worked all day at Bally on
17   the 11th, and then in the evening you returned to
18   California on Friday, the 11th?  Is that your testimony?
19   MR. ANDERSON:  Object to the form of the
20   question.  His testimony is what it was.  It's not
21   proper to be asking him what his testimony is.
22   BY MR. HALLIGAN:
23   Q.   I'm trying to confirm when you left for
24   California on the 11th.

Page 39

1        Was it after the workday?
2    A.   I believe I left around 4 o'clock -- left the
3    office around 4 o'clock.
4    Q.   And headed to O'Hare Airport to return to
5    California on a commercial flight?
6    A.   Yes.
7    Q.   And then when did you return to Chicago?
8        I noticed you're looking at Exhibit 5.  Does
9    that help answer the question.
10   A.   It doesn't because it doesn't have my travel
11   itinerary on that date.
12   Q.   I assume that travel agency would have your
13   itinerary for that date?
14   A.   Yes.
15   MR. ANDERSON:  Object to the form of the
16   question.
17   BY MR. HALLIGAN:
18   Q.   The question is:  When did you return from
19   California?  Was it Sunday, July 13th?
20   A.   I don't recall if it was Sunday or Monday.
21   Q.   Well, do you recall when you reported for work
22   on Monday, the 14th?
23   A.   I don't recall if it was early afternoon or if
24   it was Monday morning on the 13th.

Page 40

1    Q.   Okay.  So if it was Monday morning, that would
2    mean you came in late on the 13th.  If it was Monday
3    afternoon, that means you came in on the morning from
4    California.
5    A.   That's correct.
6    Q.   So the evening of the 14th, where did you
7    stay?
8    A.   At the Renaissance.
9    Q.   Okay.  Tuesday, the 15th, you report to work as
10   the CEO of Bally at their corporate headquarters?
11   A.   Yes.
12   Q.   And where did you stay on the evening of the
13   15th?
14   A.   At the Renaissance.
15   Q.   On Wednesday, July 16th, you report as the CEO
16   of Bally -- report for work?
17   A.   Yes.
18   Q.   And where did you stay on the evening of the
19   16th?
20   A.   At the Renaissance.
21   Q.   On Thursday, July 17, you reported to work as
22   the CEO of Bally?
23   A.   Yes.
24   Q.   And where did you stay the evening of the

Page 41

1    17th?
2    A.   At my home in California.
3    Q.   Okay.  So when did you go back to California?
4    On the evening of the 17th after work?
5    A.   I believe it was around 4 o'clock.
6    Q.   All right.  And when did you return to
7    Chicago?
8    A.   Monday afternoon.
9    Q.   July 21st?
10   A.   Yes.
11   Q.   And did you go into work at Bally when you
12   returned on Monday, July 21st?
13   A.   Yes.
14   Q.   And today is July 22nd.  Did you report to work
15   at Bally this morning?
16   A.   Yes.
17   Q.   Have you stayed at any other location other than
18   the Renaissance hotel in Chicago, Illinois, since
19   June 30?
20   A.   No.
21   Q.   And where are you staying tonight?
22   A.   At the Renaissance.
23   Q.   And these expenses at the Renaissance, all of
24   these expenses have been paid by Bally?

11 (Pages 38 to 41)

MICHAEL SHEEHAN,   JULY 22, 2008

Page 46

1   signature page.  It appears that the paralegal
2   made a mistake and redacted the signature.
3          But I now have it here.  It's also dated, and
4   I'll tender you now the signature page.
5          MR. HALLIGAN:  Okay.  So let's make this
6   Exhibit 4-A.  It is now the signed page 6.
7          (Exhibit 4-A marked as requested.)
8   BY MR. HALLIGAN:
9      Q.  I'm handing you, Mr. Sheehan, what I have marked
10  as Exhibit 4-A.  Is that a true and correct copy of your
11  signature on Exhibit 4-A?
12     A.  Yes.
13     Q.  And June 20, 2008, is the date upon which you
14  accepted the conditions of employment to become the CEO of
15  Bally?
16     A.  No.
17     Q.  Well, it's dated June 20.
18     A.  Yes.
19     Q.  So when you signed it dated June 20, were you
20  accepting employment as the CEO of Bally on that date?
21     A.  No.
22     Q.  Well, it says, "Accepted this 20th day of
23  June 2008."
24          Can you state for the record what was accepted

Page 47

1   on that date.
2          MR. ANDERSON:  Object to the form of the
3   question.
4   BY THE WITNESS:
5      A.  That's the date I wrote in, the 20th.
6   BY MR. HALLIGAN:
7      Q.  No.  You say it says, "Accepted this blank day
8   of June 2008?"
9          Do you see that?
10     A.  Yes.
11     Q.  And you signed "Michael Sheehan," correct?
12     A.  Yes.
13     Q.  What did you accept on June 20, 2008?
14     A.  The agreement.
15     MR. HALLIGAN:  Thank you.  I have no further
16  questions.  That concludes the deposition.
17     MR. ANDERSON:  Signature is reserved.
18          You have the right to review the transcript and
19  to make sure that the court reporter has accurately
20  transcribed everything and to make sure that you actively
21  spoke.  And she will provide you with an errata page.  If
22  you see a mistake, you can submit an errata.  And if
23  everything is okay, you can sign it.
24          So that will all be coming to you soon in due

Page 48

1   course.
2          (Proceedings adjourned at 2:48 p.m.)

Page 49

1          IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4   24 HOUR FITNESS USA, INC., a         )
5   California corporation,              )
6              Plaintiff,        )
7          vs.                )No. 08 cv 3853
8   BALLY TOTAL FITNESS HOLDING CORP., )
9   a Delaware corporation, and MICHAEL)
10  SHEEHAN, an individual,           )
11              Defendants.        )
12
13     I hereby certify that I have read the foregoing
14  transcript of my deposition given at the time and place
15  aforesaid, consisting of Pages 1 to 48, inclusive, and I
16  do again subscribe and make oath that the same is a true,
17  correct, and complete transcript of my deposition so given
18  as aforesaid, and includes changes, if any, so made by me.
19
20          MICHAEL SHEEHAN
21  SUBSCRIBED AND SWORN TO
22  before me this  day
23  of    , A.D. 2008.
24     Notary Public

13 (Pages 46 to 49)

# BALLY TOTAL FITNESS HOLDING CORPORATION
### 8700 WEST BRYN MAWR
### CHICAGO, ILLINOIS 60631

**PERSONAL AND CONFIDENTIAL**

Michael Sheehan

      Re:    Offer of Employment

Dear Mike:

      On behalf of the Board of Directors of Bally Total Fitness Holding Corporation (the "Company"), I am pleased to confirm to you the following offer to serve as the Company's Chief Executive Officer.

and your office will be located in Chicago, Illinois.

**REDACTED**



Michael Sheehan

Page 2

**REDACTED**

Michael Sheehan

Page 3

REDACTED

**Relocation Benefit**:  Should you sell your San Francisco area residence within 18 months of the Start Date and the net sales price is less than your cost of acquiring that residence, plus documented capital improvements of approximately $50,000, the Company will reimburse you for the difference.  If you are due the difference between the sales price and your cost of acquiring that residence, such payment will be grossed-up to cover taxes due on this payment.  This benefit will be capped at $1 million, inclusive of any such tax gross up.  You agree to move your permanent residence to the Chicago area promptly following the Start Date, but in any event not later than July 30, 2008.  In addition, you will be eligible for the following relocation benefits:

- You will be provided $10,000 net to cover all of your living expenses, any miscellaneous relocation expenses, and temporary housing expenses beyond the first 90-day period provided by the Company.

- During your interim living period, the Company will pay for two trips a month for up to four months for you and your spouse (i.e., a maximum of eight trips for each of you) for home visits and/or house hunting trips in the Chicago area.

- You will be provided up to 90 days of corporate apartment housing in the Chicago area during the period of time before you have relocated your household to a local residence.

Michael Sheehan

Page 4

- The Company will cover reasonable and customary closing costs (excluding discount points, hazard insurance, deposits and other prepaid expenses) associated with the sale of your existing primary residence in San Francisco and the purchase of a new residence in the Chicago area.

- A moving company approved by the Company will arrange for and cover the costs of packing and transporting your household goods and vehicles in accordance with company policy. All taxable relocation benefits will be grossed up in accordance with the Company's relocation policy.

- If you voluntarily leave the Company or are terminated for cause within 12 months from the date of the last relocation payment to you related to the sale of your San Francisco area residence, you will be required to reimburse the Company for all related payments.

**REDACTED**

Michael Sheehan

Page 5

**REDACTED**

Michael Sheehan

Page 6

**REDACTED**

Sincerely,

BALLY TOTAL FITNESS HOLDING
CORPORATION

Gene Davis
For the Board of Directors
Bally Total Fitness Holding Corporation

cc: Board of Directors

Accepted this __ day of June, 2008

_____
Michael Sheehan

06/22/2008  16:27     925-277-1495          FEDEX KINKO'S   5154                    PAGE  01

Michael Sheehan
June 20, 2008
Page 6

*Redacted*

    I trust these terms are acceptable to you and I look forward to work ng with you.
Please indicate your acceptance of the above terms by signing in the sp ce indicated
below and returning a fully executed copy to me.

                  Sincerely,

                  BALLY TOTAL FITNESS H( LDING
                  CORPORATION

                  Gene Davis
                  For the Board of Directors
                  Bally Total Fitness Holding C rporation

cc: Board of Directors

Accepted this 20 day of June, 2008

Michael Sheehan

## 4542 Lilac Ridge Rd
## SAN RAMON, CA 94582

## Price: $2,380,000

| | |
|---|---|
| BEDS: | 5 |
| BATHS: | 5.5 |
| SQ. FT.: | 6,819 |
| $/SQ. FT.: | $349 |
| LOT SIZE: | 0.26 Acres |
| PROPERTY TYPE: | Single Family Detached |
| PROPERTY STYLE: | Spanish |
| YEAR BUILT: | 2001 |
| STORIES: | 2 |
| VIEW: | Canyon, City Lights, Golf Course, Hills, Panoramic |
| NEIGHBORHOOD: | BRIDGES |
| AREA: | San Ramon |
| COUNTY: | Contra Costa |
| MLS#: | 40357797 |
| SOURCE: | EBRD |
| STATUS: | Active |
| ON REDFIN: | 15 days |

Sweeping views of The Bridges Golf Course & beyond. Former Model & Award-winning Shapell home at Summit Bridge. 5 bed suites + office + wine tasting room. Master Suite has retreat, exercise room, 4 closets, balcony. Courtyard w fountain and fireplace. Separate living quarters with kit, w/ d.

### BEDROOM INFORMATION
- 4 Bedrooms on Upper Level
- 1 Bedroom on Street Level

### ROOMS
- # of Rooms: 16
- In-Law Quarters
- Office
- Other Additional Rooms (See Remarks)

### FLOORING INFORMATION
- Tile
- Wall-to-Wall Carpeting
- Wood

### BATHROOM INFORMATION
- 4 Baths on Upper Level
- 1.5 Baths on Street Level

### FIREPLACE INFORMATION
- # of Fireplaces: 4
- In Dining Room
- In Family Room
- In Living Room
- Other (See Remarks)

### KITCHEN FEATURES
- Breakfast Nook
- Stone Counter
- Dishwasher
- Double Oven

### MASTER BATHROOM FEATURES
- Bidet
- Solid Surface Counter
- Split Bath
- Stall Shower
- Tub with Jets
- Other Features (See Remarks)

### LAUNDRY INFORMATION
- On Street Level
- Laundry Room

### ADDITIONAL EQUIPMENT
- Central Vacuum
- Fire Sprinklers
- Garage Door Opener

### HEATING & COOLING

- 2+ Zone Heating (Forced Air)
- 2+ Zone A/C (Central)

### PARKING INFORMATION

- # of Garage Spaces: 3
- Has Garage
- Attached Garage

### LOT INFORMATION

- Lot Size (Acres): 0.26
- APN: 222160001
- Premium Lot

### HOMEOWNERS ASSOCIATION INFORMATION

- Has Homeowners Association
- Fee: $46.00
- Monthly
- Transfer Fees: Paid by Seller
- Name: PEACHTREE
- Phone: 800-547-3224

### DISCLOSURES

- Other Disclosures (Call/See Agent)

- Garbage Disposal
- Island
- Microwave
- Built-in Range/Oven
- Trash Compactor
- Other Kitchen Features (See Remarks)

### WATER & SEWER INFORMATION

- Public Sewer System
- Public Water

### POOL INFORMATION

- Other (See Remarks)

### LOCATION INFORMATION

- Thomas Brothers Guide: 673G1
- Census Tract: 3451.09
- Cross Street: Shoreline
- Directions to Property: Crow Canyon, Shoreline, Lilac Ridge

### HOMEOWNERS ASSOCIATION DOCUMENTS

- Budget
- Bylaws
- CC&R's
- Rules and Regulations

### SCHOOL INFORMATION

- Elementary School: Coyote Creek Elementary
- Middle School: Call School District
- High School: Call School District
- School District: San Ramon (925) 552-5500

- Built-In Stereo Speakers
- Other (See Remarks)

### BUILDING INFORMATION

- Slab Foundation
- Tile Roof
- Stucco Exterior
- Builder/Architect: Shapell
- Model: Santa Barbara

### YARD DESCRIPTION

- Fenced Yard
- Automatic Sprinklers
- Other (See Remarks)

### PROPERTY INFORMATION

- Sq. Ft. Source: Public Records

### HOMEOWNERS ASSOCIATION FEATURES

- Common Area Maintenance
- Management Fee
- Other Benefits (See Remarks)
- Greenbelt
- Playground
- Pool
- Tennis Court(s)
- Other Amenities (See Remarks)

### LISTING INFORMATION

- Previous Price: $2,380,000.00
- Original Price: $2,380,000.00
- List Date: Wednesday, July 23, 2008

---

**Book a tour**. It's easy & there's no obligation.



Take the nerdiest home-buying class. Get data-driven tips & local pricing trends.

## Listing Price History

Redfin has no price changes for this listing.

## Sales History

| Date | Price | Appreciation |
|------|-------|--------------|
| May 09, 2005 | $2,400,000 | -- |
| Jun 29, 2007 | $2,521,000 | 2.3%/yr |

Source: Public Records

## Property Tax

| | Taxable Value |
|---|---|
| Land | $891,865 |
| Additions | $1,372,635 |
| Total | $2,264,500 |

2007 Property Tax: $26,347

Source: Public Records

## Home Value Estimates

| | Low | Estimate | High |
|---|-----|----------|------|
| Zillow | $1,754,400 | $2,193,000 | $2,390,370 |
| Eppraisal | $1,646,310 | $1,936,835 | $2,227,361 |
| Cyberhomes | $2,054,158 | $2,282,398 | $2,624,758 |



1 yr | 5 yr | 10 yr

90% of homes in the zip code have a

value lower than this home. See more charts at Zillow.com

| **What should you offer** for this home? |
| --- |

## Nearby Similar Listings

Closest listings of similar size and type:


**$1,705,900**
4518 LILAC RIDGE Rd
0.06 miles
5 bd / 4.5 ba
5,570 Sq. Ft.


**$1,799,000**
4506 LILAC RIDGE Rd
0.1 miles
5 bd / 5.5 ba
6,081 Sq. Ft.


**$2,150,000**
5332 Cypress Hawk Ct
0.15 miles
6 bd / 5.5 ba
6,819 Sq. Ft.


**$1,795,000**
5452 HEATHERLAND Dr
0.23 miles
5 bd / 4.5 ba
5,228 Sq. Ft.


**$2,099,000**
5545 Satin Leaf Way
0.28 miles
5 bd / 4.5 ba
5,228 Sq. Ft.

**Range:** $1,705,900 - $2,150,000
**Average:** $332/Sq. Ft.
**This home at $332/Sq. Ft.:** $2,266,977

## Nearby Similar Sales

Closest homes of similar size and type, and sold within the past six months:

**$1,615,000**
4518 Lilac Ridge Rd
0.06 miles
4 bd / 4 ba
Sold on Jun 12, 2008
5,443 Sq. Ft.

**$2,287,500**
5343 Cypress Hawk Ct
0.15 miles
5 bd / 4 ba
Sold on Apr 17, 2008
6,819 Sq. Ft.

**$1,753,125**
5332 Cypress Hawk Ct
0.15 miles
5 bd / 4 ba
Sold on Jul 16, 2008
6,819 Sq. Ft.

**Range:** $1,615,000 - $2,287,500
**Average:** $296/Sq. Ft.
**This home at $296/Sq. Ft.:** $2,021,288

Link to this page at http://www.redfin.com/CA/San-Ramon/4542-Lilac-Ridge-Rd-94582/home/1214695

1    IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3
     24 HOUR FITNESS USA, INC., a        )
4    California corporation, et al.,     )
                                         )
5              Plaintiffs,               )
                                         )
6              vs.                       )  No. 08 C 3853
                                         )
7    BALLY TOTAL FITNESS HOLDING CORP., a)
     Delaware corporation and MICHAEL    )
8    SHEEHAN, an individual,             )  Chicago, Illinois
                                         )  July 15, 2008
9              Defendants.               )  9:30 A.M.

10         TRANSCRIPT OF PROCEEDINGS - Motion
        BEFORE THE HONORABLE JOAN HUMPHREY LEFKOW
11
     APPEARANCES:
12
     For the Plaintiffs:       LOVELLS LLP
13                             330 North Wabash Avenue
                               Suite 1900
14                             Chicago, Illinois  60611
                               BY:  MR. ROBERT MARK HALLIGAN
15

16   For the Defendants:       WINSTON & STRAWN LLP
                               35 West Wacker Drive
17                             Chicago, Illinois   60601-9703
                               BY:  MR. KIMBALL RICHARD ANDERSON
18

19
                   PAMELA S. WARREN, CSR, RPR
20                    Official Court Reporter
                    219 South Dearborn Street
21                         Room 1928
                    Chicago, Illinois   60604
22                       (312) 294-8907

23

24

25

1        (Proceedings had in open court.)

2        THE CLERK:  08 C 3853, 24 Hour Fitness USA versus

3   Bally Total Fitness.

4        MR. HALLIGAN:  Good morning, your Honor.  Mark

5   Halligan on behalf of the plaintiff 24 Hour Fitness USA.

6        THE COURT:  Good morning.

7        MR. ANDERSON:  Kimball Anderson, your Honor, good

8   morning, appearing on behalf of the defendants Bally Total

9   Fitness Holding Corporation and Michael Sheehan.

10        THE COURT:  Good morning.

11        MR. HALLIGAN:  Your Honor, just a few minutes ago

12   outside the courtroom, Mr. Anderson, who entered his appearance

13   yesterday, has raised the issue of subject matter jurisdiction

14   and taking the position that there may be an issue regarding

15   whether or not Michael Sheehan is a resident domiciliary in the

16   State of Illinois.

17        And I told Mr. Anderson that if we have to go to Cook

18   County Chancery Division, we should probably determine this

19   right away.  I have asked that Mr. Sheehan be produced for a

20   special emergency deposition so we can get the facts nailed

21   down and then the Court can make a ruling on whether or not the

22   Court believes it has subject matter jurisdiction or not.

23        I believe it is a fact intensive motion, and I would

24   like to nail down the facts.  It would be a short deposition.

25   Mr. Sheehan I know is in town.  He's the chief executive

1    officer of Bally.  We personally served him at Bally.  So

2    hopefully we can produce him for a deposition.

3         MR. ANDERSON:  I agree with that suggestion for

4    resolving the issue.  And here is the issue:  The plaintiff is

5    a California corporation, resident of California.  And

6    Mr. Sheehan, I believe, is also a resident of California. He's

7    lived there for nine years.  And he has been hired as the new

8    CEO of Bally, but he has not yet moved here.

9         And I looked at the authorities and the statute last

10   night.  The statute, 28 USC 1332, does not define what a

11   citizen is, but the Courts have weighed in is that you look at

12   where their principal residence is, voting and driver's

13   license, utilities, phone service.  And although he may be

14   hoping to move his family here, as of the date of the filing of

15   the complaint, he remains a resident of California.  The

16   complaint was filed on July 8th, 2008.

17        So I told counsel, certainly he didn't have to accept

18   my word for it, I would get to him the facts today as I

19   understand them.  And if he would like to pursue a short

20   jurisdictional deposition, I'll try to make that happen this

21   week as soon as possible.

22        And then counsel can make an informed decision as to

23   whether we need to ask your Honor to resolve the jurisdictional

24   issue or not.  But as we all know Rule 12 -- I think it is --

25   (a)(3) says that at any time it becomes apparent to the Court

1   that there is a lack of subject matter jurisdiction, counsel

2   should call it to the attention of the Court, and the Court

3   should dismiss the case.

4        So we're going to try to resolve this among ourselves

5   within the next couple of days, and then we will report back to

6   your Honor.

7        THE COURT:  All right.

8        MR. HALLIGAN:  Your Honor, I just -- for the record,

9   the rules that counsel state were -- those were at one time the

10  rules, but the Courts now take cognizance of the world in which

11  we live in where you are the COO of a corporation in California

12  one day, and then the next week you move to Chicago where you

13  become a CEO.  And the Courts look at whether the defendant is

14  present in the jurisdiction with an intent to stay.  And I

15  would respectfully submit that a CEO with the world

16  headquarters here in Chicago, it is hard for me to believe that

17  he is going to attempt to stay in California.

18       So the only point I want to make for the Court is this

19  is not -- this is not something that can -- I mean, there are

20  facts here.

21       THE COURT:  Right.  Well, I'll continue the motion for

22  one week then.  Is that all right?

23       MR. HALLIGAN:  Yes.

24       MR. ANDERSON:  That will be fine.

25       THE COURT:  Okay.

1          MR. HALLIGAN:  Thank you very much.

2          MR. ANDERSON:  See you at 9:30 on Tuesday.

3          THE CLERK:  July 22nd.

4      (Which concluded the proceedings in the above-entitled

5  matter.)

6                    C E R T I F I C A T E

7

8      I hereby certify that the foregoing is a transcript of

9  proceedings before the Honorable Joan Humphrey Lefkow on

10  July 15, 2008.

11  DATED:  July 16, 2008

1        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

4    24 HOUR FITNESS USA, INC., a          )
     California corporation, and           )
5    24 HOUR FITNESS WORLDWIDE,            )
     INC., a Delaware corporation,        )
6                                          )
             Plaintiffs,                   )
7                                          )
     vs.                                   )   No. 08 C 3853
8                                          )
     BALLY TOTAL FITNESS HOLDING          )   Chicago, Illinois
9    CORPORATION, a Delaware              )   July 24, 2008
     corporation, and MICHAEL             )   9:30 o'clock a.m.
10   SHEEHAN, an Individual,              )
                                           )
11           Defendants.                   )

12

13           TRANSCRIPT OF PROCEEDINGS - MOTION
       BEFORE THE HONORABLE JOAN HUMPHREY LEFKOW

14

15

16   APPEARANCES:

17

18   For the Plaintiff:      LOVELLS
                             MR. ROBERT M. HALLIGAN
19                           330 North Wabash Avenue
                             Chicago, Illinois 60611
20                           312-832-4420

21

22   For the Defendant:      WINSTON & STRAWN
                             MR. KIMBALL R. ANDERSON
23                           35 West Wacker Drive
                             Chicago, Illinois 60601
24                           312-558-5600

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Court Reporter:          FEDERAL OFFICIAL COURT REPORTER
                         MS. KRISTA FLYNN BURGESON
                         219 South Dearborn Street
                         Chicago, Illinois 60604
                         312-435-5567

1        THE CLERK:  08 C 3853, 24 Hour Fitness versus Bally
2  Total Fitness Holding.

3        MR. HALLIGAN:  Good morning, your Honor.  Mark
4  Halligan for the plaintiff.

5        THE COURT:  Good morning.

6        MR. HALLIGAN:  You will recall -- I'm sorry.

7        MR. ANDERSON:  Good morning, your Honor.  Kimball
8  Anderson on behalf of the defendants, Mr. Sheehan and Bally
9  Fitness.

10        THE COURT:  Good morning.

11        MR. HALLIGAN:  I apologize.

12        Your Honor, you will recall that we were here on July
13  15th.

14        THE COURT:  Yes.

15        MR. HALLIGAN:  That was on our motion for expedited
16  discovery and the motion to set a preliminary injunction
17  hearing date, and the issue of subject matter jurisdiction was
18  raised, and we asked for a week to address that issue.

19        We took Mr. Sheehan's deposition on Tuesday, and we
20  established that he was physically present in the jurisdiction
21  in Illinois on July 7, 2008, when the complaint was filed, and
22  we also established that -- and fixed the date of June 20,
23  2008, as the date of his intent to make Illinois his home for
24  when he executed the contract from the Board of Directors of
25  Bally Total Fitness, which required him to have his office in

4

1    Chicago, Illinois, and live and work in Chicago, Illinois.

2         THE COURT:  Okay.

3         MR. HALLIGAN:  So, if there is still an issue on

4    jurisdiction, your Honor, we can brief that issue, but in the

5    meantime, based on our continuing investigation, we have filed

6    a motion for leave to file a second amended complaint in

7    stanter to add a claim under the Computer Fraud and Abuse Act

8    for actionable claims under the Computer Fraud and Abuse Act

9    which gives this Court jurisdiction under 28 USC 1331 and, of

10   course, jurisdiction over the pendent State law claims under

11   28 USC 1367.

12        My point is I do not want to delay any further this

13   expedited discovery.  Those requests were served on July 10th.

14   It has now been 14 days since those discovery requests were

15   served.  I sent a protective order over last week on July 17th

16   so we could get the confidentiality protective order in place,

17   we could start exchanging documents, and there has been no

18   response to the proposed protective order.

19        So, I am asking the Court for direction to sort of

20   expedite this and move this case along.  We have six

21   interrogatories directed to Mr. Sheehan, five interrogatories

22   directed to Bally, seven document production requests directed

23   to each of the defendants.  This is discovery tailored

24   specifically to the expedited nature of this case, not merits

25   discovery, and then we would like to have an evidentiary

1    hearing.

2            MR. ANDERSON:  May I respond, your Honor?

3            THE COURT:  Go ahead, Mr. Anderson.

4            MR. ANDERSON:  The United States Supreme Court and

5    the 7th Circuit have repeatedly admonished the District

6    Courts, not necessarily this District Court, but the District

7    Courts in general to determine as a threshold matter whether

8    Federal subject matter jurisdiction exists, and I believe, and

9    I have been practicing in this courthouse for now 31 years,

10   that the Court does not have Federal subject matter

11   jurisdiction for which reasons I can explain, and I would

12   respectfully suggest that that threshold issue needs to be

13   resolved before we go off with what counsel characterized as

14   tailored discovery and I would characterize as scorched earth

15   discovery.

16           I think if I spend maybe just a minute re-visiting

17   the procedural issue your Honor will have a good understanding

18   of my concerns about Federal subject matter jurisdiction.

19           The plaintiffs started out with this journey in the

20   California State Court, and on June 24th, they filed a State

21   Court action alleging that Mr. Sheehan was about ready to

22   start work at my client, Bally, and had allegedly stolen trade

23   secrets, significantly two plaintiffs in that case, 24 Hour

24   Fitness USA, which is a California corporation, and 24 Hour

25   Fitness Worldwide, a Delaware corporation.

1    The matter came before the State Court at a TRO

2    hearing; it was denied.  State Court, however, scheduled the

3    matter for a preliminary injunction hearing on July 15th.

4    Rather than avail themselves of that preliminary injunction

5    hearing on July 15th, the plaintiffs dismissed that case and

6    refiled the identical case here in the Northern District of

7    Illinois.  That filing was -- let's just say it was not well

8    thought out, because 24 Hour Worldwide is a Delaware

9    corporation, Bally is a Delaware corporation, and also

10   Mr. Sheehan was then and remains today a California resident,

11   and 24 Hour Fitness USA is a California corporation.  There

12   was no diversity.

13        THE COURT:  The issue is whether Mr. Sheehan is

14   domiciled here, isn't it?

15        MR. ANDERSON:  That is an issue, and it appears to be

16   a contested issue, and that issue is -- that is one of the

17   issues.

18        There is another issue, which is the plaintiffs

19   alleged in the California case in their initial filing here

20   that 24 Hour Worldwide was a co-owner, a joint owner, of the

21   theft of trade secrets.  Plaintiffs realized that 24 Hour

22   Worldwide's citizenship destroyed diversity and then they

23   filed a first amended complaint.  We were last here on a first

24   amended complaint in which they attempted to conveniently drop

25   Worldwide.

1          That creates an issue under Rule 19, because if 24

2    Hour Fitness Worldwide, as they alleged under oath in

3    California, is a joint owner of these trade secrets, then it

4    becomes an indispensable party under Rule 19, because my

5    client is then subject to multiple risks of inconsistent and

6    serial litigation by co-owners, some who come to court and

7    then drop out.

8          So, that is another issue in addition to Mr. Sheehan,

9    Judge.

10         THE COURT:  Let's take a break here.

11         MR. ANDERSON:  Okay.

12         THE COURT:  It looks like these issues are complex

13   enough that I am going to have to look at the law and decide

14   it.

15         So, do you want to brief these issues?

16         MR. ANDERSON:  I have filed yesterday a Rule 12

17   motion to dismiss the first amended complaint.

18         THE COURT:  Yes, I got that.

19         MR. ANDERSON:  And then you also have Mr. Halligan's

20   motion for leave under Rule 15 to file a second amended

21   complaint, which we also believe is defective.

22         THE COURT:  Okay.

23         MR. ANDERSON:  So, here is my suggestion, and I will

24   end where I started, and that is that there are substantial

25   subject matter jurisdiction issues, I think the Court would

1   benefit from briefing them, and I think that Mr. Halligan
2   would probably like to respond to our motion to dismiss the
3   first amended complaint, and we would like to file a quick
4   response to his motion for leave to file a second amended
5   complaint, and then you will have the parties' respective law
6   on the subject matter jurisdiction issues.

7        I will add one more footnote as to why this last
8   attempt, the second amended complaint, to add a Federal
9   statutory basis will not fail -- will not succeed, and that is
10   because the 7th Circuit and several of these District Courts
11   have rejected this effort saying that a theft of trade secrets
12   case will not ally under the Federal Computer Abuse Act
13   because the mere theft of the trade secret is not a loss
14   within the meaning of the statute.

15        So, we see the plaintiffs here, I think in fairness
16   scrambling, and I would say it is in an attempt to create
17   Federal jurisdiction where there is not any, and I will just
18   be quiet with this remark, but I think your Honor needs to
19   take a look at their arguments as to why they have now created
20   Federal subject matter jurisdiction, our arguments as to why
21   we have not, and determine whether there is any basis to go
22   forward, or if this should be back in State Court where we
23   started.

24        MR. HALLIGAN:  Your Honor --
25        THE COURT:  Let me say this.

1          Go agree on a briefing schedule and we will hear it

2     at the end, or just pass a note to Mr. Dooley and we will

3     enter that order.

4          Now, the other issue is the expedited discovery.  And

5     Mr. Anderson, are you willing to do anything in response to

6     this?

7          MR. ANDERSON:  I have done something, your Honor.

8     I have presented the CEO of my client for deposition on the

9     residency issue.  The remaining discovery is scorched earth,

10    in all fairness, and it should not be ordered until this

11    Court determines that it has Federal subject matter

12    jurisdiction.

13         I would also point out that there can't possibly be

14    any prejudice to the plaintiffs because they had an

15    opportunity to go forward on a preliminary injunction hearing

16    on July 15th and they abandoned that.

17         And even in their own papers they don't want you to

18    set a preliminary injunction hearing for another 60 days at a

19    minimum.

20         MR. HALLIGAN:  Well, your Honor --

21         MR. ANDERSON:  So, in the interim, we can figure out,

22    your Honor can figure out, whether you have Article 3 subject

23    matter jurisdiction before you inflict this on the Court and

24    the parties, and I respectfully suggest the parties should not

25    be ordered to do that unless you have determined that you have

1   subject matter jurisdiction.

2          MR. HALLIGAN:  Your Honor, I have to note for the

3   record that I believe their attacks on subject matter

4   jurisdiction are meritless.  We had these discussions before

5   coming into this Court, and I would like to --

6          THE COURT:  I don't want to hear the argument on it.

7   I want the briefing schedule done and then the issue of

8   expedited discovery.  I think it is serious enough a question

9   of jurisdiction that I can't decide discovery.  But I will try

10  to give you a prompt ruling on the issue of jurisdiction.

11         MR. HALLIGAN:  Could we just --

12         MR. ANDERSON:  I would --

13         THE COURT:  Just agree on a schedule and put the

14  ruling date 30 days approximately thereafter.

15         MR. ANDERSON:  I am prepared to agree to a briefing

16  schedule right now.

17         I will respond to their motion for leave to file a

18  second amended complaint in 14 days.

19         THE COURT:  That puts us at August 7th.

20         MR. ANDERSON:  Fine.

21         THE COURT:  Reply will be on August 21st.

22         MR. HALLIGAN:  Yes, your Honor.

23         THE COURT:  So, September 25th for ruling, and it

24  will be in court unless you hear from me otherwise.

25         MR. ANDERSON:  9:30 a.m., your Honor?

1 THE COURT:  Yes.

2 MR. ANDERSON:  Okay.

3 MR. HALLIGAN:  Now, what about the other motions,

4 same briefing schedule?

5 THE COURT:  Continued to that same date, I guess.

6 MR. HALLIGAN:  I meant the other -- their rule to --

7 the motion they filed at 12:02 a.m.?

8 THE COURT:  All of it.

9 MR. HALLIGAN:  Everything is on that schedule?

10 THE COURT:  Yes, everything.

11 MR. HALLIGAN:  Okay.

12 THE COURT:  And don't give me 15 pages on each motion

13 if you can avoid it, because it is a lot of material to go

14 through.

15 MR. ANDERSON:  We will try to keep it short.

16 THE COURT:  Okay.

17 MR. HALLIGAN:  Thank you, your Honor.

18 MR. ANDERSON:  Thank you.

19 (Proceedings concluded.)

20

21

22

23

24

25

1             <u>C E R T I F I C A T E</u>

2

3      I certify that the foregoing is a correct transcript

4 from the record of proceedings in the above-entitled matter.

5

6

7                                               7-28-08

   Krista Flynn Burgeson,                   Date

8    CSR, RPR, RMR, CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# WINSTON & STRAWN LLP

43 RUE DU RHONE
1204 GENEVA, SWITZERLAND

99 GRESHAM STREET
LONDON EC2V 7NG

333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-1543

35 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-9703

(312) 558-5600

FACSIMILE (312) 558-5700

www.winston.com

200 PARK AVENUE
NEW YORK, NEW YORK 10166-4193

25 AVENUE MARCEAU
75116 PARIS, FRANCE

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111-5894

1700 K STREET, N.W.
WASHINGTON, D.C. 20006-3817

KIMBALL R. ANDERSON
(312) 558-5858
kanderson@winston.com

July 15, 2008

**VIA E-MAIL AND U.S. MAIL**
R. Mark Halligan
Lovells LLP
330 N. Wabash Avenue
Suite 1900
Chicago, IL 60611

Re:    **24 Hour Fitness USA, Inc. v. Bally Total Fitness Holding Corp. and Michael Sheehan**

Dear Mark:

It was a pleasure meeting you today. As promised, here are the jurisdictional facts as I presently understand them.

Although Mr. Sheehan was hired as Bally's CEO effective July 1, 2008, he has not yet changed his residence from California. The critical date for determining jurisdiction is the date of filing the Chicago federal action, namely July 8, 2008. As of July 8, 2008, Mr. Sheehan's principal residence, indeed his only residence, remains in California where he has lived for over fifteen years. All of Mr. Sheehan's personal property is located in California (including automobiles licensed in California), other than clothing and incidentals that he travels with. He is registered to vote in California, licensed to drive in California, pays taxes in California, lives with his family in California, has personal phone service in California, etc.

To be sure, Mr. Sheehan has spent some time at Bally's headquarters in Chicago. He also has spent time at other Bally locations around the country. When he is in Chicago he stays at hotels. He has not purchased or rented a residence in Illinois, transferred his drivers license, voter registration, phones, mail service, etc. His family remains in California where he returns every weekend to be with them. If the Bally job goes well, he likely will move to Illinois but he has not done so yet. On the other hand, he may never move to Illinois if your client is successful with its request for injunctive relief. I am informed that Mr. Sheehan has not been served with summons and complaint in Illinois.

My review of the case law indicates that the federal court does not have jurisdiction because, as you know, diversity of citizenship jurisdiction requires that all defendants be of

WINSTON & STRAWN LLP

R. Mark Halligan
July 15, 2008
Page 2

diverse citizenship from the plaintiff. Here, it appears that Mr. Sheehan and Plaintiff were both citizens of the State of California as of July 8, 2008. The following case law appears pertinent.

The party seeking to preserve diversity jurisdiction bears the burden of showing that it has met the amount-in-controversy and complete-diversity-of-citizenship requirements. Gravdahl v. Conwell, Case No. 00-C-0579, 2002 U.S. Dist. LEXIS 4184, at *3 (N.D. Ill. Mar. 14, 2002) (internal citation omitted). In responding to a motion challenging the basis for subject matter jurisdiction, a plaintiff may not rest solely on the pleadings, but must produce evidence containing specific facts that show subject matter jurisdiction is proper. Samudio v. O'Loughlin, Case No. 96-C-2958, 1997 U.S. Dist. LEXIS 3370, at *3-*4 (N.D. Ill. Mar. 18, 1997).

The Supreme Court has held that, "in order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States and be domiciled within the State." Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 828 (1989) (internal citations omitted). A court determines citizenship for the purpose of establishing diversity jurisdiction as of the date of the filing of the suit. Zafar v. Matlock, Case No. 92-C-5807, 1992 U.S. Dist. LEXIS 18264, at *2 (N.D. Ill. Dec. 2, 1992) (citing Smith v. Sperling, 354 U.S. 91, 93 n.1 (1957)). A presumption exists in favor of the old, established domicile over the alleged, newly acquired domicile. Id. (citing Lewis v. Moss, 797 F.2d 747, 751 (9th Cir. 1986)). "A domicile once established, whether by origin or choice, continues until a new domicile is acquired. The four elements of change are: (1) physical abandonment of the first domicile, (2) intention not to return, (3) physical presence in the new domicile, and (4) intent to make that his domicile." Koerber v. Apollo Golf, Inc., Case No. 93-C-711, 1993 U.S. Dist. LEXIS 1721, at *4 (N.D. Ill. Feb. 16, 1993).

A court determines domicile from a totality of the circumstances; no single factor governs. Gravdahl, 2002 U.S. Dist. LEXIS 4184, at *4. Courts look at various factors including, but not limited to: (1) current residence; (2) voting registration; (3) driver's license and automobile registration; (4) location of personal property; (5) place of employment or business; (6) membership in clubs or other associations; (7) family ties; (8) payment of taxes; and (9) length of time living in the State. Id.; see also Samudio, 1997 U.S. Dist. LEXIS 3370, at *7-*8.

The decision in Audi Performance & Racing, LLC v. Kasberger, 273 F. Supp. 2d 1220 (M.D. Ala. 2003), involved facts similar to our case. In the Audi decision, the court found that the plaintiff had not proven diversity of citizenship between it -- a citizen of Alabama -- and an individual defendant the court deemed was also a citizen of Alabama, despite the plaintiff's contention that the defendant had chosen a new domicile in Florida. Id. at 1228. Defendant Kasberger had been living in Alabama but had accepted, pre-lawsuit, a position with a company in Florida. Id. at 1223. Audi filed the lawsuit against him on March 11, 2003, but Kasberger did not begin his position in Florida until April 1, 2003. Id. On February 18, 2003, Kasberger moved some of his personal possessions and clothing to Florida, but lived -- rent- and utility-free -- with his parents in their Florida home. Id. He did not own or lease any property in Florida at the time Audi filed its complaint. Id. Kasberger's wife remained in Alabama until March 15,

WINSTON & STRAWN LLP

R. Mark Halligan
July 15, 2008
Page 3


2003 (post-complaint), when the couple's furniture and household goods were sent to Florida, as well. Id. Between February 18, 2003 and March 15, 2003, Kasberger returned to Alabama to stay with his wife at least two or three times; he stayed for periods of at least two or three days at a time. Id. Further, at the time Audi filed its lawsuit, Kasberger had taken no steps to obtain a Florida driver's license (and had retained his Alabama license); had not registered to vote in Florida or taken steps to remove himself from the Alabama voter rolls; continued to use his Alabama cell phone with an Alabama phone number after moving to Florida; and, as of the filing of the lawsuit, had not applied for a Florida telephone number. Id. at 1224. Kasberger also did not file a change of address with the United States Postal Service seeking to reroute his mail to Florida, nor did he give up any club or social memberships in Alabama. Id. Based on the above facts, the court held that Kasberger was an Alabama citizen as of the date the lawsuit was filed, and stated that it "need not explore whether Kasberger successfully changed his domicile at some later date." Id. at 1228. Thus, Audi had not proven complete diversity of citizenship. Id.

    Mark, you may be aware of additional cases that I should review. If so, please share them with me. Also, if after reviewing this letter and the case law, you need additional facts to make an informed judgment about jurisdiction I will make every effort to accommodate your request.

                            Very truly yours,

                            Kimball R. Anderson

KRA:dmr

## Raimondi, Mary

| | |
|---|---|
| **From:** | Gant Travel Management [bally@ganttravel.com] |
| **Sent:** | Wednesday, June 25, 2008 1:05 PM |
| **To:** | Raimondi, Mary |
| **Cc:** | Travel Department; Farruggia, Barbara |
| **Subject:** | 6/30/08: Ticketed itinerary for MICHAEL SHEEHAN to Chicago IL |
| **Attachments:** | itineraryTSZFL4_25JUN.pdf |



Gant Travel Management

Gant Travel Management
650 East Devon, Suite 115
Itasca, IL 60143
Phone: (630) 227-3870 Fax: (630) 227-3875
Toll Free: (800) 323-7459

[ Add to Calendar ]          What is this?

**Wednesday, 25JUN 2008 02:04 PM (EST)**
**Passengers: MICHAEL SHEEHAN (19000)**
Agency Reference Number: TSZFL4
Agent: Louise -x1151

Click here for a copy of your E-ticket receipt

Please review this itinerary for accuracy and reply to this email within 24 hours if any discrepancies.
Ticketed itineraries are subject to airline fees and additional charges if changed for any reason.

| **AIR** | **Monday, 30JUN 2008** | |  |
|---|---|---|---|
| | United Airlines | Flight Number: 830 | Class: P-First |
| | From: (SFO) San Francisco CA, USA | Depart: 10:55 AM | |
| | To: (ORD) Chicago O'Hare IL, USA | Arrive: 05:06 PM | |
| | Stops: 0 | Duration: 4 hour(s) 11 minute(s) | |
| | Seats: 03B | Status: CONFIRMED | Miles: 1846 |
| | Equipment: Boeing 757 200 Jet | Meal: LUNCH | |

DEPARTS SFO TERMINAL 3 - - ARRIVES ORD TERMINAL 1
Frequent Flyer number: UA00175825959 - M SHEEHAN
United Airlines Confirmation number is TSZFL4

| **HOTEL** | **Monday, 30JUN 2008** | |
|---|---|---|
| | RENAISSANCE OHARE (RENAISSANCE) | |
| | 8500 West Bryn Mawr Avenue Chicago IL 60631 US | |
| | Number of Rooms: 1 | Confirmation Number: 82036181 |
| | Phone: 773-380-9600 | Fax: 773-380-9601 |
| | Rate: USD 229 | Room GUARANTEED TO MASTER CARD |
| | Check out: Thursday, 3JUL 2008 | |
| | BEST AVAILABLE RATE / NON SMOKING KING REQUESTED | |



Δ π EXHIBIT 5
M Sheehan
Deponent
Date 7-22-08  Rptr.
WWW.DEPOBOOK.COM

7/16/2008

GUARANTEED TO MASTERCARD / CANCEL BY 4PM DAY OF ARRIVAL

| | | | |
|---|---|---|---|
| AIR | **Thursday, 3JUL 2008** | | |

| | | |
|---|---|---|
| United Airlines | Flight Number: 907 | Class: P-First |
| From: (ORD) Chicago O'Hare IL, USA | Depart: 05:05 PM | |
| To: (SFO) San Francisco CA, USA | Arrive: 07:35 PM | |
| Stops: 0 | Duration: 4 hour(s) 30 minute(s) | |
| Seats: 02C | Status: CONFIRMED | Miles: 1846 |
| Equipment: Boeing 757 200 Jet | Meal: DINNER | |

DEPARTS ORD TERMINAL 1 - - ARRIVES SFO TERMINAL 3
Frequent Flyer number: UA00175825959 - M SHEEHAN
United Airlines Confirmation number is TSZFL4

| | |
|---|---|
| OTHER | **Wednesday, 1OCT 2008** |
| | THANK YOU FOR USING GANT TRAVEL |

TRAVEL PURPOSE: RELOCATION
TRIP APPROVED 24JUN BY BARB FARRUGGIA
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
Contact Gant prior to departure if this transaction is not used.

**Ticket Information:**

| | | | |
|---|---|---|---|
| Ticket for: | MICHAEL SHEEHAN | | |
| Date issued: | 06/24/08 | Invoice nbr: 0 | |
| Ticket Nbr: | 0167512521838  Electronic: Yes | Amount: 2736.64 USD | |
| Charged to: | CA**********06735 | | |

| | | |
|---|---|---|
| Svc fee for: | MICHAE SHEEHAN | |
| Date issued: | 06/24/08 | |
| Document Nbr: 8908133423974 | Amount: 35.00 USD | |

Total Tickets: 2736.64
Total Fees:    35.00
Total Amount: 2771.64

The Gant Equation Great People + Fantastic Technology = Delighted Travelers
Be sure to visit our website for additional travel tools and information
Click here to get advance boarding passes on these carriers:
United

For After hours emergency service: 877-546-2406 - CODE WH6
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
For Domestic flights - check in 2 hours prior to departure
For International flights - check in 3 hours prior to departure
Contact Gant prior to departure if this transaction is not used.

If you need to cancel this hotel reservation, contact Gant Travel Management.
Be sure to obtain a cancellation number for your records.

Thank you -- Louise -x1151

7/16/2008

## Raimondi, Mary

| | |
|---|---|
| **From:** | Gant Travel Management [bally@ganttravel.com] |
| **Sent:** | Thursday, July 03, 2008 2:08 PM |
| **To:** | Raimondi, Mary |
| **Cc:** | Travel Department |
| **Subject:** | 7/3/08: Ticketed itinerary for MICHAEL SHEEHAN to San Francisco CA |
| **Attachments:** | itineraryR5XV1W_03JUL.pdf |



Gant Travel Management

Gant Travel Management
650 East Devon, Suite 115
Itasca, IL 60143
Phone: (630) 227-3870 Fax: (630) 227-3875
Toll Free: (800) 323-7459

**Add to Calendar**          What is this?

Thursday, 3JUL 2008 03:07 PM (EDT)
**Passengers: MICHAEL SHEEHAN (19000)**
Agency Reference Number: R5XV1W
Agent: Louise -x1151

Click here for a copy of your E-ticket receipt

**Please review this itinerary for accuracy and reply to this email within 24 hours if any discrepancies.**
Ticketed itineraries are subject to airline fees and additional charges if changed for any reason.

| AIR | **Thursday, 3JUL 2008** | | |
|---|---|---|---|
| | American Airlines | Flight Number: 1835 | Class: H-Coach |
| | From: (ORD) Chicago O'Hare IL, USA | Depart: 05:20 PM | |
| | To: (SFO) San Francisco CA, USA | Arrive: 07:50 PM | |
| | Stops: 0 | Duration: 4 hour(s) 30 minute(s) | |
| | Seats: 20B | Status: CONFIRMED | Miles: 1846 |
| | Equipment: McDonnell Douglas MD-83 Jet | Meal: FOOD TO PURCHASE | |
| | DEPARTS ORD TERMINAL 3 - - ARRIVES SFO TERMINAL 3 | | |
| | American Airlines Confirmation number is FDFYRZ | | |

TRAVEL PURPOSE: RELOCATION
TRIP APPROVED 03JUL BY BARB FARRUGGIA
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
Contact Gant prior to departure if this transaction is not used.

**Ticket Information:**

Ticket for:   MICHAEL SHEEHAN
Date issued:  07/03/08        Invoice nbr: 0

Ticket Nbr:     0017512523154   Electronic: Yes          Amount: 857.50 USD
Charged to:     CA**********06735

Svc fee for:    MICHAE SHEEHAN
Date issued:    07/03/08
Document Nbr: 8908136166453                  Amount: 35.00 USD

                              Total Tickets:  857.50
                                Total Fees:   35.00
                              Total Amount:  892.50


The Gant Equation Great People + Fantastic Technology = Delighted Travelers
Be sure to visit our website for additional travel tools and Information
Click here to get advance boarding passes on these carriers:
American


For After hours emergency service: 877-546-2406 - CODE WH6
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
For Domestic flights - check in 2 hours prior to departure
For International flights - check in 3 hours prior to departure
Contact Gant prior to departure if this transaction is not used.


Thank you — Louise -x1151

## Raimondi, Mary

| | |
|---|---|
| **From:** | Gant Travel Management [bally@ganttravel.com] |
| **Sent:** | Thursday, July 03, 2008 10:18 AM |
| **To:** | Raimondi, Mary |
| **Cc:** | Travel Department |
| **Subject:** | 7/7/08: Itinerary for MICHAEL SHEEHAN to Chicago IL |
| **Attachments:** | itineraryM0PV16_03JUL.pdf |



Gant Travel Management

Gant Travel Management
650 East Devon, Suite 115
Itasca, IL 60143
Phone: (630) 227-3870 Fax: (630) 227-3875
Toll Free: (800) 323-7459

Add to Calendar                    What is this?

Thursday, 3JUL 2008 11:17 AM (EDT)
**Passengers: MICHAEL SHEEHAN (19000)**
Agency Reference Number: M0PV16
Agent: Louise -x1151

Click here for a copy of your E-ticket receipt

**Please review this itinerary for accuracy and reply to this email within 24 hours if any discrepancies.**
Ticketed itineraries are subject to airline fees and additional charges if changed for any reason.

| **AIR** | **Monday, 7JUL 2008** | | |
|---|---|---|---|
| | Southwest Airlines | Flight Number: 3167 | Class: K-Coach |
| | From: (OAK) Oakland CA, USA | Depart: 02:50 PM | |
| | To: (MDW) Chicago Midway IL, USA | Arrive: 08:50 PM | |
| | Stops: 0 | Duration: 4 hour(s) 0 minute(s) | |
| | | Status: CONFIRMED | Miles: 1844 |
| | Equipment: Boeing 737-700 Jet | | |
| | DEPARTS OAK TERMINAL 2 | | |
| | Southwest Airlines Confirmation number is 2JQQKD | | |

| **HOTEL** | **Monday, 7JUL 2008** | |
|---|---|---|
| | RENAISSANCE OHARE (RENAISSANCE) | |
| | 8500 West Bryn Mawr Avenue Chicago IL 60631 US | |
| | Number of Rooms: 1 | Confirmation Number: 85572613 |
| | Phone: 773-380-9600 | Fax: 773-380-9601 |
| | Rate: USD 229 | Room GUARANTEED TO MASTER CARD |
| | Check out: Friday, 11JUL 2008 | |
| | CONTACT GANT OR HOTEL DIRECTLY IF YOU NEED TO CANCEL THIS RESERVATION. | |
| | BE SURE TO OBTAIN A CANCELLATION NUMBER FOR YOUR RECORDS. | |

TRAVEL PURPOSE: RELOCATION
CONFIRMATION NUMBER FOR SOUTHWEST IS 2SK8WS
SOUTHWEST FREQUENT FLIER NUMBER APPLIED
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
Contact Gant prior to departure if this transaction is not used.


The Gant Equation Great People + Fantastic Technology = Delighted Travelers
Be sure to visit our website for additional travel tools and information
Click here to get advance boarding passes on these carriers:
Southwest


For After hours emergency service: 877-546-2406 - CODE WH6
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
For Domestic flights - check in 2 hours prior to departure
For International flights - check in 3 hours prior to departure
Contact Gant prior to departure if this transaction is not used.


Thank you — Louise -x1151

# BALLY TOTAL FITNESS

8700 W. Bryn Mawr, 2nd Floor, Chicago, IL 60631  (773) 380-3000

**NAME:  Michael Sheehan**                    **WEEK ENDED SATURDAY:**      7/5/2008

RETURN TO:  Mary Raimondi - Chicago corporate

| DAY<br>DATE | SUNDAY<br>6/29/2007 | MONDAY<br>6/30/2007 | TUESDAY<br>7/1/2007 | WEDNESDAY<br>7/2/2007 | THURSDAY<br>7/3/2007 | FRIDAY<br>7/4/2007 | SATURDAY<br>7/5/2007 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| OVERNIGHT AT: CITY | | | Chicago | | | | | |
| MEALS: | | | | | | | | |
| BREAKFAST* | | $4.44 | | | | | | $4.44 |
| LUNCH* | | | | | | | | $0.00 |
| DINNER* | | $11.00 | | | $31.00 | | | $42.00 |
| ENTERTAINMENT* | | | | | | | | $0.00 |
| SUBTOTAL | $0.00 | $15.44 | $0.00 | $0.00 | $31.00 | $0.00 | $0.00 | $46.44 |
| AIR-RAIL-BUS | | $2,771.64 | | | | | | $2,771.64 |
| TAXI | | $20.00 | | | | | | $20.00 |
| SEDAN SERVICE | | | | | | | | $0.00 |
| PARKING | | | | | | | | $0.00 |
| HOTEL ROOM | | | | | | | $842.35 | $842.35 |
| HOTEL( to be reimbursed) | | | | | | | | |
| TELEPHONE | | | | | | | | $0.00 |
| AUTO-GAS/TOLLS** | | | | | | | | $0.00 |
| OTHER**  (gratuities) | | | | | | | | $0.00 |
| SUBTOTAL | $0.00 | $2,791.64 | $0.00 | $0.00 | $0.00 | $0.00 | $842.35 | $3,633.99 |
| TOTAL | $0.00 | $2,807.08 | $0.00 | $0.00 | $31.00 | $0.00 | $842.35 | $3,680.43 |
| LESS AMOUNTS PAID BY THE COMPANY  (CIRCLE AMOUNTS ABOVE) | | | | | | | | ($2,771.64) |
| LESS AMOUNTS PAID BY THE COMPANY  (CIRCLE AMOUNTS ABOVE) | | | | | | | | ($842.35) |
| DUE TO (FROM) EMPLOYEE | | | | | | | | $66.44 |

| DATE | BUSINESS PURPOSE OF EACH TRIP |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Δ π EXHIBIT 6
M Sheehan
Deponent
7-22-08
Date                Rptr.
WWW.DEPOBOOK.COM

EMPLOYEE SIGNATURE _____  DATE  7/25/08

APPROVER SIGNATURE _____  DATE  7/16/08

*  Complete reverse side when paying for meals/entertainment of others.

** Complete reverse side.

6/07/08  115108

## RENAISSANCE.
CHICAGO O'HARE HOTEL **RENAISSANCE O'HARE SUITES**

8500 WEST BRYN MAWR AVENUE
CHICAGO, IL 60631
(773) 380 9600
RENAISSANCEHOTELS.COM/CHIBR

**GUEST FOLIO**

| 1630 | SHEEHAN/MICHAEL | | 229.00 | 07/03/08 | 13:00 | 10245 |
|------|-----------------|---|--------|----------|-------|-------|
| ROOM | NAME | | RATE | DEPART | TIME | ACCT# |
| RENA | | | | 06/30/08 | 17:52 | |
| TYPE | | | | ARRIVE | TIME | |
| 18 | | | | | | |

| ROOM CLERK | ADDRESS | | PAYMENT | | MR#: 826031643 |
|------------|---------|---|---------|---|----------------|

| DATE | REFERENCE | | CHARGES | CREDITS | BALANCE |
|------|-----------|---|---------|---------|---------|
| 06/30 | ROOM | 1630, 1 | 229.00 | | |
| 06/30 | ROOM TAX | 1630, 1 | 27.25 | | |
| 06/30 | OCC TAX | 1630, 1 | 8.02 | | |
| 07/01 | LAUNDRY | AG | 17.64 | | |
| 07/01 | ROOM | 1630, 1 | 229.00 | | |
| 07/01 | ROOM TAX | 1630, 1 | 27.25 | | |
| 07/01 | OCC TAX | 1630, 1 | 8.02 | | |
| 07/02 | FRESH | 38631630 | 31.90 | | |
| 07/02 | ROOM | 1630, 1 | 229.00 | | |
| 07/02 | ROOM TAX | 1630, 1 | 27.25 | | |
| 07/02 | OCC TAX | 1630, 1 | 8.02 | | |
| 07/03 | MC CARD | | | $842.35 | |

**TO BE SETTLED TO:    MASTERCARD    CURRENT BALANCE   .00**

THANK YOU FOR CHOOSING RENAISSANCE!  TO EXPEDITE YOUR
CHECK-OUT, PLEASE CALL THE FRONT DESK, OR PRESS "MENU" ON
YOUR TV REMOTE CONTROL TO ACCESS VIDEO CHECK-OUT.

```
------------------ EXP. REPORT SUMMARY -------------------
06/30  ROOM                 229.00
       ROOM TAX              27.25
       OCC TAX                8.02
                                                264.27
07/01  LAUNDRY               17.64
       ROOM                 229.00
       ROOM TAX              27.25
       OCC TAX                8.02
                                                281.91
07/02  FRESH                 31.90
       ROOM                 229.00
       ROOM TAX              27.25
       OCC TAX                8.02
                                                296.17
```

GET ALL YOUR HOTEL BILLS BY EMAIL BY UPDATING YOUR MARRIOTT
REWARDS PREFERENCES. OR, ASK THE FRONT DESK TO EMAIL YOUR
BILL FOR THIS STAY. SEE "INTERNET PRIVACY STATEMENT" ON
MARRIOTT.COM
Marriott Rewards Account # 826031643
Date 06/30/08-07/03/08 Est. Eligible Revenue      $718.90
Est.     Points Earned: 7189
For account activity: 801-468-4000 or www.Marriott.com

## RENAISSANCE.
CHICAGO O'HARE HOTEL

8500 WEST BRYN MAWR AVENUE
CHICAGO, IL 60631
(773) 380 9600
RENAISSANCEHOTELS.COM/CHIBR

ACCOUNTS PAST 30 DAYS SUBJECT TO SERVICE CHARGE OF 1.5% PER MONTH (ANNUAL RATE OF 18%)
This statement is your only receipt. You have agreed to pay in cash or by approved personal check or to authorize us to charge your credit card for all amounts charged to you.
The amount shown in the credits column opposite any credit card entry in the reference column above will be charged to the credit card number set forth above. (The credit
card company will bill in the usual manner.) If for any reason the credit card company does not make payment on this account, you will owe us such amount. If you are direct-
billed, in the event payment is not made within 30 days after check-out, you will owe us interest from the check-out date on any unpaid amount at the rate of 1.5% per month
(ANNUAL RATE 18%), or the maximum allowed by law, plus the reasonable cost of collection, including attorney fees.

Signature X

FOR RESERVATIONS AT ANY RENAISSANCE HOTEL, CALL 1 (800) HOTELS-1

## Raimondi, Mary

| | |
|---|---|
| **From:** | Gant Travel Management [bally@ganttravel.com] |
| **Sent:** | Wednesday, June 25, 2008 1:05 PM |
| **To:** | Raimondi, Mary |
| **Cc:** | Travel Department; Farruggia, Barbara |
| **Subject:** | 6/30/08: Ticketed itinerary for MICHAEL SHEEHAN to Chicago IL |
| **Attachments:** | itineraryTSZFL4_25JUN.pdf |



Gant Travel Management

Gant Travel Management
650 East Devon, Suite 115
Itasca, IL 60143
Phone: (630) 227-3870 Fax: (630) 227-3875
Toll Free: (800) 323-7459

Add to Calendar                What is this?

**Wednesday, 25JUN 2008 02:04 PM (EST)**
**Passengers: MICHAEL SHEEHAN (19000)**
Agency Reference Number: TSZFL4
Agent: Louise -x1151

Click here for a copy of your E-ticket receipt

**Please review this itinerary for accuracy and reply to this email within 24 hours if any discrepancies.**
Ticketed itineraries are subject to airline fees and additional charges if changed for any reason.

| | | | |
|---|---|---|---|
| **AIR** | **Monday, 30JUN 2008** | | |
| | United Airlines | Flight Number: 830 | Class: P-First |
| | From: (SFO) San Francisco CA, USA | Depart: 10:55 AM | |
| | To: (ORD) Chicago O'Hare IL, USA | Arrive: 05:06 PM | |
| | Stops: 0 | Duration: 4 hour(s) 11 minute(s) | |
| | Seats: 03B | Status: CONFIRMED | Miles: 1846 |
| | Equipment: Boeing 757 200 Jet | Meal: LUNCH | |
| | DEPARTS SFO TERMINAL 3 - - ARRIVES ORD TERMINAL 1 | | |
| | Frequent Flyer number: UA00175825959 - M SHEEHAN | | |
| | United Airlines Confirmation number is TSZFL4 | | |

| | | | |
|---|---|---|---|
| **HOTEL** | **Monday, 30JUN 2008** | | |
| | RENAISSANCE OHARE (RENAISSANCE) | | |
| | 8500 West Bryn Mawr Avenue Chicago IL 60631 US | | |
| | Number of Rooms: 1 | Confirmation Number: 82036181 | |
| | Phone: 773-380-9600 | Fax: 773-380-9601 | |
| | Rate: USD 229 | Room GUARANTEED TO MASTER CARD | |
| | Check out: Thursday, 3JUL 2008 | | |
| | BEST AVAILABLE RATE / NON SMOKING KING REQUESTED | | |

7/16/2008

GUARANTEED TO MASTERCARD / CANCEL BY 4PM DAY OF ARRIVAL

| | | | |
|---|---|---|---|
| AIR | **Thursday, 3JUL 2008** | | |
| | United Airlines | Flight Number: 907 | Class: P-First |
| | From: (ORD) Chicago O'Hare IL, USA | Depart: 05:05 PM | |
| | To: (SFO) San Francisco CA, USA | Arrive: 07:35 PM | |
| | Stops: 0 | Duration: 4 hour(s) 30 minute(s) | |
| | Seats: 02C | Status: CONFIRMED | Miles: 1846 |
| | Equipment: Boeing 757 200 Jet | Meal: DINNER | |

DEPARTS ORD TERMINAL 1 - - ARRIVES SFO TERMINAL 3
Frequent Flyer number: UA00175825959 - M SHEEHAN
United Airlines Confirmation number is TSZFL4

| | |
|---|---|
| OTHER | **Wednesday, 1OCT 2008** |
| | THANK YOU FOR USING GANT TRAVEL |

TRAVEL PURPOSE: RELOCATION
TRIP APPROVED 24JUN BY.BARB FARRUGGIA
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
Contact Gant prior to departure if this transaction is not used.

**Ticket Information:**

Ticket for:    MICHAEL SHEEHAN
Date issued:  06/24/08        Invoice nbr: 0
Ticket Nbr:   0167512521838  Electronic: Yes        Amount: 2736.64 USD
Charged to:   CA**********06735

Svc fee for:   MICHAE SHEEHAN
Date issued:  06/24/08
Document Nbr: 8908133423974        Amount: 35.00 USD

Total Tickets: 2736.64
Total Fees:  35.00
Total Amount: 2771.64

The Gant Equation Great People + Fantastic Technology = Delighted Travelers
Be sure to visit our website for additional travel tools and information
Click here to get advance boarding passes on these carriers:
United

For After hours emergency service: 877-546-2406 - CODE WH6
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
For Domestic flights - check in 2 hours prior to departure
For International flights - check in 3 hours prior to departure
Contact Gant prior to departure if this transaction is not used.

If you need to cancel this hotel reservation, contact Gant Travel Management.
Be sure to obtain a cancellation number for your records.

Thank you — Louise -x1151

7/16/2008



**2550 W. Lexington**
**Chicago, IL**
**312.666.1100**

Date 6/30  Time 5:45

From Airport

To Residence

Cab No._____ Driver_____

Cab Fare  $20

Lost & Found: ChicagoDispatcher.com

*includes $20*

*Looking for a cab to drive?*
**Drive With The Best!**
-Vans-
-Sedans-
-Hybrids-
-Wheelchair Vans-
-Stretch Crown Vics-
**Call 312-666-1100**
*Want to lease your medallion?*
*We pay $550/month plus expenses.*

Receipt Advertising: ChicagoDispatcher.com

---

**BENNIGAN'S**
8420 W BRYN MAWR
CHICAGO, IL  60631
773-380-1010

463 Chaunese
------------------------------
Tbl 61/1    Chk 3357      Gst
        Jun30'08 08:43PM
------------------------------
1 Water                    0.00
1 GG Bacon Burger          8.29
    Medium
    Wheat Bun
    No

    Subtotal              8.29
    Tax                   0.79
08:57 Total             9.08

Thank you for coming to
Bennigan's Grill & Tavern!!!

---

**BENNIGAN'S**
8420 W BRYN MAWR
CHICAGO, IL  60631
773-380-1010
 e:      Jun30'08 09:02PM
 d Type:  Visa
 t #:     XXXXXXXXXXXX0708
  p Date:  XX/XX
Auth Code:  00622B
Check:      3357
Table:      61/1
Server:     463 Chaunese
VSCA: Auth Driver
    MICHAEL SHEEHAN

Subtotal:          9.08

Tip:_____  1 92

Total:_____  11 ⁰⁰

 ignature_____

 agree to pay above total
 cording to my card issuer
 reement.

  USTOMER COPY



**Peets Coffee**
AND TEA

San Francisco Intl Airport
San Francisco, CA 94128
(650) 821-8954
PEET'S 72
Date:          Jun30'08 10:06AM
Card Type:     VISA
Acct #:        XXXXXXXXXXXX0708
Exp Date:      04/11
Auth Code:     09620B
Check:         3965
Server:        125 EVANGELI
     MICHAEL              SHEEHAN

btotal:              4.44

_____
ATUITY
_____
AL
_____
SIGNATURE
I agree to pay above total
according to my card issuer
agreement.
* * * CUSTOMER COPY * * *

HMSHOST
MACARONI GRILL 773-686-6180
CHICAGO O'HARE AIRPORT
CHECK:        5810
TABLE:        310/1
SERVER:       9455 MARCO
DATE:         JUL03'08  4:49PM
CARD TYPE:    VISA      AO 4*
ACCT #:       XXXXXXXXXXXX0708
EXP DATE:     XX/XX
AUTH CODE:    05509B
     MICHAEL SHEEHAN

TOTAL:              26.17

TIP_____4.83

TOTAL_____

X_____  31.00
I AGREE TO PAY THE ABOVE AMOUNT
IN ACCORDANCE WITH THE CARD
ISSUER'S AGREEMENT.