**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| 24 HOUR FITNESS USA, INC., a California corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 08 cv 3853 |
| v. | ) ) ) | |
| BALLY TOTAL FITNESS HOLDING CORP., a Delaware corporation, and MICHAEL SHEEHAN, an individual, | ) ) ) ) | Judge Joan Humphrey Lefkow  Magistrate Judge Morton Denlow |
| Defendants. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR LEAVE TO FILE A
SECOND AMENDED COMPLAINT**

Plaintiff 24 Hour Fitness USA, Inc. ("24 Hour Fitness" or "Plaintiff"), by and through its attorneys, hereby submits its Reply in Support of its Motion for Leave to File a Second Amended Complaint (the "Motion"): [1]

This case involves the threatened or actual misappropriation of trade secrets and breach of fiduciary duty by Defendants Michael Sheehan ("Sheehan") and Bally Total Fitness Holding Corporation ("Bally"). After commencing this litigation, based on a continuing investigation [2] of Defendant Sheehan's unauthorized access to its computers, networks, and electronic documents,

---

[1] The Amended Complaint is the only operable complaint in this action, and neither the original Complaint, nor the complaint filed in the California action, control this action in any manner. *See Manning v. Ashland Oil Co.*, 721 F.2d 192, 197 (7th Cir. 1983) (*quoting Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) ("'It is well-established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.'").) Contrary to the suggestions in the Opposition, no prior complaints contain any "fraudulent averment" nor any "admissions," and Plaintiff acted in good faith to promptly and independently cure the inadvertent inclusion of 24 Hour Fitness Worldwide, Inc., Plaintiff's parent, as a plaintiff.

[2] Defendants state that it is "notable" that Plaintiff did not make a claim under the CFAA in the California action (Opp. 3). There is nothing "notable" about it -- Plaintiff simply had not had the opportunity to complete enough of its investigation to make the claim at that time.

Plaintiff filed the instant Motion to add a claim for violation of the Computer Fraud and Abuse Act ("CFAA").[3] 18 U.S.C. §1030, *et al.* (2002). While the addition of a claim for violation of the CFAA does provide an additional basis for subject matter jurisdiction through 28 U.S.C. § 1331, and for the other claims through 28 U.S.C. § 1367, Plaintiff seeks to amend its complaint to redress violations of the CFAA under federal law.

Justice requires that the Court grant Plaintiff leave to file its Second Amended Complaint. Time is of the essence in preventing further acts of wrongful conduct by the Defendants and the threatened or actual misappropriation of trade secrets. Plaintiff has moved for both expedited discovery and a preliminary injunction. Proposed interrogatories and document production requests have already been submitted to the Court and Plaintiff is seeking a Court Order for expedited depositions and a date for the preliminary injunction hearing.

Though Defendants have contested diversity in their Motion to Dismiss, even if the Court were to find that diversity were not complete, rather than dismissing and forcing Plaintiff to take the technical steps to refile, it can, and should, allow Plaintiff to file the proposed Second Amended Complaint, and thereby establish federal question jurisdiction. Furthermore, Plaintiff's proposed CFAA claim is not futile. This Court should grant Plaintiff leave to file its proposed Second Amended Complaint.

A.      **Justice, Fairness And Efficiency Require That This Court Grant Plaintiff Leave To Amend To Add A Claim Under The CFAA.**

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Justice, fairness and efficiency dictate that that Plaintiff be allowed to amend its complaint to add a claim under the CFAA. Under these circumstances, though Defendants contest diversity,[4] this Court can and should grant Plaintiff leave to amend its complaint.

---

[3] Defendants did not file their Motion to Dismiss based on a purported lack of subject matter jurisdiction, which 24 Hour Fitness opposes, until the next day. Given the timing, Defendants' suggestion that Plaintiff seeks to add the CFAA claim merely in response to the Motion to Dismiss is not well taken.

[4] As explained in Plaintiff's Opposition to Defendants' Motion to Dismiss, Plaintiff maintains that this Court has subject matter jurisdiction based upon diversity.

1.      **Denying leave to amend would result only in a waste of judicial resources and further prejudicial delay.**

Denying Plaintiff leave to amend its complaint to include a CFAA claim would result only in a waste of judicial resources, delay and prejudice to Plaintiff.  Even if this Court were to find that complete diversity is lacking and were to dismiss Plaintiff's claims, Plaintiff would merely refile this action with the CFAA claim, as pleaded in the proposed Second Amended Complaint.  Recognizing the absurdity of this type of result, courts have granted leave to amend a complaint in order to cure jurisdictional defects.  *See e.g., Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 837 (1989); *Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985) (factors considered by court should include prejudice to movant and judicial economy); *see also Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981) (court considered factors in *Foman v. Davis, [infra]* as well as prejudice to movant that arises with denial, in determining whether to grant leave to amend); *Lockett v. General Fin. Loan Co. of Downtown*, 623 F.2d 1128, 1131 (5th Cir. 1980) (granting leave to amend, stating that court must consider prejudice to non-movant and weigh it against prejudice to movant).

In this case, denying leave to amend due to lack of subject matter jurisdiction would not only be impractical and inefficient from the standpoint of judicial resources, it would result in unnecessary delay and cause Plaintiff further irreparable damage.  As the Court is aware, this case involves the threatened or actual misappropriation of Plaintiff's proprietary trade secrets and other confidential information, and Plaintiff has moved for both a preliminary injunction and expedited discovery to stop ongoing misappropriation.  Denying leave to amend due to the existence of contested jurisdictional issues, and thereby forcing Plaintiff to incur further delay in protecting its proprietary trade secrets and other confidential information, would be inequitable and contrary to the interests of justice.  Here, justice requires that the Court grant Plaintiff leave to amend its complaint to add a claim under the CFAA.

2.      **This Court can, and should, grant leave to add a CFAA claim conferring federal question and supplemental jurisdiction regardless of Defendants' challenge to subject matter jurisdiction based upon diversity.**

Contrary to Defendants' assertion,[5] courts have granted leave to amend complaints where

---

[5] The decisions cited by Defendants are inapposite:  in those instances, courts either were not considering a motion for leave to amend, or refused to grant leave to amend where subject matter jurisdiction was

subject matter jurisdiction is contested in order to prevent a waste of time and judicial resources "for the sake of hypertechnical jurisdictional purity." *Newman-Green, Inc.*, 490 U.S. at 837 (dismissing non-diverse defendant to establish complete diversity rather than dismissing and requiring plaintiff to refile case against diverse defendants); *see also Charles Schwab & Co., Inc. v. Carter, et al.*, No. 04 c 7071, 2005 WL 351929, at *3 (N.D. Ill. Feb.11, 2005) (attached hereto as **EXHIBIT E**); *Moll v. Southern Charters, Inc.*, 81 F.R.D. 77, 78 (E.D.N.Y. 1979) (allowing plaintiff to amend to assert claims within the court's admiralty and maritime jurisdiction when diversity jurisdiction was lacking); *Barrett Landfill, Inc. v. Comerford*, 1982 U.S. Dist. LEXIS 17773 at *5 (N.D. Ill. Jan. 27, 1982) (where court considered plaintiff's motion for leave to amend before addressing jurisdictional motions, but found that proposed amendment did not provide federal question jurisdiction) (attached as Authority); *Sessions v. Rusk State Hospital*, 648 F.2d 1066, 1070 (5th Cir. Tex. 1981).

In *Schwab v. Carter*, the plaintiff initially filed a complaint based on complete diversity for several state law claims, including misappropriation of trade secrets and breach of fiduciary duty. (*See* **EXHIBIT A**, No. 04 c 7071, Compl., Nov. 2, 2004.) The *Carter* court dismissed the complaint, without prejudice, for failure to sufficiently plead diversity jurisdiction, but granted the plaintiff thirty days to file "an amended complaint alleging the citizenship of each [defendant] or some other basis for federal jurisdiction." (*See* **EXHIBIT B**, No. 04 c 7071, Min. Order, Nov. 3, 2004.) The plaintiff filed an amended complaint adding a CFAA claim and thereby established subject matter jurisdiction based on federal question jurisdiction. (*See* **EXHIBIT C**, No. 04 c 7071, Am. Compl., Nov. 3, 2004.) Though the defendants opposed the addition of the CFAA claim and its generation of subject matter jurisdiction, (*see* **EXHIBIT D**, No. 04 c 7071, Memo. By Defendants On Subject Matter Jurisdiction, Nov. 10, 2004), the Court ultimately refused to dismiss the CFAA claim. (*See* **EX. E**, *Carter,* 2005 WL 351929 at *3.)

---

otherwise lacking only because the amendment would have been futile and, therefore, would not have cured the jurisdictional defects. *See, e.g., Vt. Agency of Natural Res. v. U.S. ex. rel. Stevens*, 529 U.S. 765, 787 (2000) (finding false claim act does not subject state agency to liability); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109-10 (1998) (holding that no Art. III standing existed because there could be no remedy for the claim proposed); *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1386 (9th Cir. 1988) (dismissing action where no current or proposed claim would provide the court with subject matter jurisdiction, therefore making amendment futile). It is undisputed that Plaintiff's proposed CFAA claim would establish federal question jurisdiction and supplemental jurisdiction, and as discussed in Section B, *infra,* the proposed CFAA claim is not futile.

Furthermore, a plaintiff may amend its complaint to state a different claim over which the federal court has jurisdiction where the amendment arises out of the conduct or occurrence set forth in the original complaint. *Carney v. Resolution Trust Corp.*, 19 F.3d 950, 954 (5th Cir. 1994) (holding that an amendment that states new basis or changes jurisdictional basis relates back to the original complaint as long as the amendment arises out of the original factual situation).

> A complaint that is defective because it does not allege a claim within the subject matter jurisdiction of a federal court may be amended to state a different claim over which the federal court has jurisdiction....[i]f the claim asserted in the amendment arises out of the conduct or occurrence set forth in the original complaint...

*Sessions,* 648 F.2d at 1070. Similarly, the Seventh Circuit has held that where there is a defect in subject matter jurisdiction, but a new claim presenting a federal question is available to cure that defect, that new claim will be allowed to "relate back" to the date of the original complaint. *See Woods v. Ind. Univ.-Purdue Univ. at Indianapolis*, 996 F.2d 880, 884 (7th Cir. 1993) (relation back uniformly allowed to cure jurisdictional or venue defects); *see also Rohler v. TRW, Inc.*, 576 F.2d 1260, 1266 (7th Cir. 1978) (finding that plaintiff should have been given leave to amend to attempt to comply with jurisdictional requirements).

Here, there is no doubt that the claim presented against Defendant Sheehan under the CFAA arises out of some of the same conduct set forth in the Original Complaint and the First Amended Complaint. Both complaints allege the initial facts that suggest wrongdoing under the CFAA. They allege that Defendant Sheehan failed to return a "flash" drive used to copy, without authorization, 24 Hour Fitness documents, and "accessed 24 Hour Fitness electronic...confidential information without authorization, or exceeded his authorized access...including but not limited to the destruction of 24 Hour Fitness electronic...files and documents." (*See* Compl. ¶¶ 34-35; Am. Compl. ¶¶ 34-35.) As Plaintiff's claim under the CFAA arises out of the same conduct alleged in and relates back to the Original Complaint and the Amended Complaint, this Court should grant Plaintiff leave to file its Second Amended Complaint, thereby establishing subject matter jurisdiction based on federal question and supplemental jurisdiction of the state law claims, so Plaintiff can proceed with expedited discovery.

**B.      Plaintiff's Proposed CFAA Claim Alleges Both Damage And Loss, And Is Not Futile.**

A court should deny leave to amend only when there are circumstances present such as undue delay, dilatory motive, undue prejudice to the opposing party, or when the amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Under the requirements of notice pleading, the complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The allegations simply must be "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007). A claim must be pleaded with sufficient particularity to give a defendant "'fair notice' of the nature of the claim but also the grounds upon which the claim rests." *Id.*

Defendants assert that Plaintiff's proposed Second Amended Complaint does not allege both "damage" and "loss" under the CFAA sufficient to sustain a claim under Subsection (a)(5)(a).[6] However, Plaintiff has properly alleged both "damage" and "loss" pursuant to Subsections (a)(5)(a) and (a)(5)(b), through the impairment to the availability of its information and through the impairment to the integrity of its data. Plaintiff has alleged that Defendant Sheehan did not return a "flash" drive that contained proprietary 24 Hour Fitness trade secrets and confidential information (Mot. Ex. A ¶ 37), the destruction of its information (*Id.* at ¶¶ 43-44, 62), the transmission of its confidential information to non-secure systems (*Id.* at ¶¶ 41-43, 64, 66), and the undertaking of investigative measures (*Id.* at ¶65), all of which constitute "damage."[7] 18 U.S.C. §1030(e)(8); *Cardionet, Inc. v. Lifewatch Corp.*, No. 07 c 6625, 2008 WL

---

[6] Even though Defendants continuously refer to the requirement that a plaintiff allege "permanent" damage (Opp. 10-13), the CFAA does *not* require that damage be permanent. In fact, the CFAA does not contain the word "permanent;" the decisions cited by Defendants, including *Citrin*, do not in fact require permanent (or any synonym thereof) damage; and courts have held that permanent damage is *not* required to sustain a claim under the CFAA. *See Shurgard Storage Centers, Inc. v Safeguard Self-Storage Inc.*, 119 F.Supp.2d 1121, 1127 (W.D. Wash. 2000) (holding that "damage" through impairment of the integrity of data occurred from defendant's "collect[ion] and disseminat[ion of] confidential information", even though "no data was physically changed or erased"); *see also Cardionet*, 2008 WL 567223 at *5. Plaintiff has no obligation to plead "permanent" damage.

[7] Defendant Sheehan's self-serving affidavit concerning his actions with respect to 24 Hours' electronic records in no way constitutes "overwhelming evidence." If it did, any defendant could simply submit an affidavit denying any claims made against it in order to achieve dismissal. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) ("It is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact").

567223, *5 (N.D. Ill. Feb. 27, 2008) (Conlon, J.); *Black & Decker (US), Inc. v. Smith*, No. 07-1201, 2008 WL 257081, *7 (W.D. Tenn. July 11, 2008); *Therapeutic Research Facility v. NBTY, Inc.*, 488 F.Supp.2d 991, 996 (E.D. Cal. 2007).

In *Int'l Airport Centers v. Citrin*, the Court recognized that defendant's access to his employer's secure electronic network was without authorization at the moment defendant had ceased to access the network for the benefit of his employer. 440 F.3d 418, 420-21 (7th Cir. 2006) (Posner, J.). In reaching its conclusion that a claim under Subsection (a)(5)(A) was adequately stated, *Citrin* relied on the widely and positively cited decision *Shurgard Storage Centers, Inc. v Safeguard Self-Storage Inc*. *Id*. In *Shurgard*, the court held that "damage" through impairment of the integrity of data occurred from defendant's "collect[ion] and disseminat[ion of] confidential information...[even though] no data was physically changed or erased." 119 F.Supp.2d at 1127. 24 Hour Fitness has appropriately alleged "damage" as described above, and also has alleged that it has sustained at least $5,000 in "loss" pursuant to Subsection (a)(5)(B)(i), thereby adequately alleging a claim pursuant to Subsection (a)(5)(A).

Moreover, Plaintiff has also properly pleaded claims under Subsections (a)(2) and (a)(4) for which it also is entitled to relief. The CFAA provides civil remedies for violations of *any* of its provisions where "conduct involves one of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)." 18 U.S.C. § 1030(g). The underlying violation may be of any one of its provisions: (a)(1), a(2), a(3), a(4), *or* (a)(5)(a). *See C.H. Robinson Worldwide, Inc. v. Command Transp., LLC*, No. 05 C 3401, 2005 WL 3077998, at * 2 (N.D. Ill. Nov. 16, 2005) ("[A] party bringing a civil action under the CFAA must allege both: (1) a violation of **one of the subsections** of Section 1030; and (2) one of the listed factors in Section 1030(a)(5)(B)(i)-(v)") (emphasis added) (*citing Carter*, 2005 WL 351929 at *3); *see also George S. May Int'l Co. v. Hostetler*, No. 04 C 1606, 2004 WL 1197395, *3 (N.D. Ill. May 28, 2004) ("causes of action are available under each of the subsections listed above," including (a)(2)(C), (a)(4), and (a)(5)); *Shurgard*, 119 F.Supp.2d at 1124-26 (denying a motion to dismiss and holding that plaintiffs adequately plead claims for violation of Subsections (a)(2) and (a)(4)). 24 Hour Fitness has properly stated a claim pursuant to at least Subsections (a)(2), (a)(4), and (a)(5)(A) of the CFAA, and that proposed claim is not futile.

Additionally, in *Carter*, the court denied a motion to dismiss a claim under the CFAA pleaded nearly identically to the CFAA claim at issue here. (Mot., Ex. A ¶¶ 61-66; **EX. E**, 2005

WL 351929, at *3; **EX. C,** Am. Compl. ¶¶ 75-80.)  Notably, when filing its fourth and fifth amended complaints, which both included that CFAA claim, the plaintiff in *Carter* was represented by Winston & Strawn LLP, the same firm representing Defendant in the instant matter. (*See* **EXHIBIT F**, No. 04 c 7071, Notices of Appearance, Oct. 20, 2005; **EXHIBIT G**, No. 04 c 7071, Fourth Am. Compl., Nov. 23, 2005; **EXHIBIT H**, No. 04 c 7071, Fifth Am. Compl., Feb. 15, 2006.)

## CONCLUSION

Time is of the essence in preventing further acts of wrongful conduct by Defendants and threatened or actual misappropriation of trade secrets.  Plaintiff has properly alleged a CFAA claim in its proposed Second Amended Complaint.  This Court can, and should, allow Plaintiff to file the proposed Second Amended Complaint and allow this case to move forward.

For the reasons set forth above, Plaintiff 24 Hour Fitness USA, Inc. requests that this Court GRANT its Motion for Leave to file A Second Amended Complaint and such further relief that this Court deems just and proper under the circumstances.

*        *        *

Dated: August 21, 2008                          Respectfully submitted,

24 Hour Fitness USA, Inc.

/s/ R. Mark Halligan

**R. Mark Halligan (IL 6200723)**
mark.halligan@lovells.com
**Deanna R. Swits (IL 6287513)**
deanna.swits@lovells.com
**LOVELLS LLP**
330 N. Wabash Avenue
Suite 1900
Chicago, IL  60611
Tel:  312 832 4400
Fax:  312 832 4444

*Attorneys for Plaintiff 24 Hour Fitness USA, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT** was served on the below counsel via this Court's ECF notification system August 21, 2008:

> Kimball R. Anderson
> Cardelle B. Spangler
> Amanda C. Wiley
> Winston & Strawn LLP
> 35 W. Wacker Drive
> Chicago, Illinois 60601
> kanderson@winston.com
> cspangler@winston.com
> awiley@winston.com
>
> John T. Gabrielides
> NBC Tower, Suite 3600
> 455 North Cityfront Plaza Drive
> Chicago, IL 60611-5599
> jtg@usebrinks.com
>
>
> By:   /s/ Deanna R. Swits
> *An attorney for Plaintiff 24 Hour Fitness USA, Inc.*

# AUTHORITY

LEXSEE 1982 U.S. DIST. LEXIS 17773

**BARRETT LANDFILL, INC., Plaintiff, vs. GEORGE L. COMERFORD, ET AL., Defendants.**

**No. 80 C 5785**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

*1982 U.S. Dist. LEXIS 17773*

**January 27, 1982**

**OPINION BY:** [*1] PARSONS

**OPINION**

*MEMORANDUM OPINION AND ORDER*

This suit is complicated by several outstanding motions. These motions include: 1) a motion of certain bank defendants [1] to dismiss for want of diversity jurisdiction and because of certain exculpatory provisions; 2) a motion of plaintiff to dismiss defendants' counterclaim for lack of subject matter jurisdiction and/or alternatively to remand the case to the state court; 3) a motion of certain defendants for summary judgment [2]; 4) a motion of counter-plaintiffs to amend counterclaim to add additional parties; 5) a motion of certain other defendants for summary judgment [3]; 6) a motion of the plaintiff for a preliminary and a permanent injunction; 7) a motion of certain defendants to strike and dismiss plaintiff's motion for a preliminary and permanent injunction for want of jurisdiction; 8) a motion of the plaintiff for leave to file an amended complaint; and 9) objections in the form of a motion of certain defendants to plaintiff's motion to amend the complaint or in the alternative to strike the plaintiff's eighth claim as frivolous.

1 These defendants are American National Bank and Trust Company of Chicago, American National Bank and Trust Company of Chicago Trust No. 77854, Union Bank and Trust Company of Joliet, and Union National Bank and Trust Company of Joliet Trust No. 2303, Will County.
2 These defendants are Fred D. Bennit, Trustee Benjamin A. Benitt Trust, American National Bank and Trust Company of Chicago, American National Bank and Trust Company of Chicago Trust No. 77854, Union National Bank and Trust

Company of Joliet, and Union National Bank and Trust Company of Joliet Trust No. 2303, Will County.
3 These defendants are George L. Comerford and Joliet Sand and Gravel Company.

[*2] The judge who originally had this case before it was reassigned to me referred the case to a Magistrate to act as a special master and to guide discovery. In addition, the judge referred defendant Joliet Sand and Gravel's motion to amend its counterclaim and to add additional parties to the Magistrate who then reserved issuing his report and recommendation on this motion until there had been a ruling on the substantive motions relating to jurisdiction.

Plaintiff, Barrett Landfill, Inc. ("Barrett") brought this action initially in this court alleging a conspiracy to violate a contract. The defendants were George L. Comerford ("Comerford"), the Joliet Sand and Gravel Company ("Joliet Sand & Gravel"), Fred D. Bennitt as Trustee of the Benjamin A. Bennitt Trust ("Bennitt Trust"), the American National Bank and Trust Company of Chicago ("American National"), American National Bank Trust No. 77854 ("American National Trust"), the Union National Bank and Trust Company of Joliet ("Union National"), and Union National Bank Trust No. 2303 ("Union National Trust"). In its complaint, the plaintiff predicated jurisdiction of the court on diversity jurisdiction, *28 U.S.C. § 1332*. All of [*3] the defendants have challenged diversity. They have done this either in their answers (Comerford, Joliet Sand & Gravel, and the Bennitt Trust), or in motions to dismiss for lack of subject matter jurisdiction (American National, American National Trust, Union National, and Union National Trust.)

Plaintiff now seeks leave of the court to file an amended complaint alleging an eighth claim predicated on federal question jurisdiction, *28 U.S.C. § 1331*. If this

claim stands the others might stay even if there is no diversity. This federal question allegedly involves the Comprehensive Environmental Response, Compensation and Liability Act, *42 U.S.C. § 9601, et seq.* The pertinent part of this eighth claim states:

That the defendants, GEORGE L. COMERFORD, acting individually, and JOLIET SAND & GRAVEL COMPANY, INC. are presently engaged and have engaged in activities that will irreparably harm the plaintiff in that these entities:

a. are presently engaged in dynamiting activities in and around the area of BARRETT LANDFILL so as to endanger the landfill cells presently in place, and,

b. have altered the natural flow to the East of the BARRETT LANDFILL site so as to flood [*4] and contaminate landfill cells, and,

c. have damaged monitoring wells. That the aforementioned are all in violation of the Comprehensive Environmental Response, Compensation and Liability Act in that they ma create a substantial threat of release into the environment of pollutants and/or contaminants and/or other hazardous substances which may present an immanent and substantial danger to the public health and welfare, as well as already having irreparably damaged the plaintiff.

The eighth claim also alleges deprivation of prospective advantage and waste upon the leasehold.

Defendants Fred D. Bennitt and Unional National have counterclaimed against Barrett for 1) wrongful withholding of possession of certain property, and 2) asking for a declaratory judgment with respect to an invalid assignment of a lease, asking for the termination of the lease, charging insufficiency of a castover agreement conferring easement rights, asking for termination of the castover agreement, asking for a declaration of voidness of a modification agreement due to Barrett's misrepresentations, asking for an accounting of all rentals for materials removed, asking for a declaration of a condition [*5] precedent of payment of 10 percent of the rentals before the granting of an extension of the lease term, and asking for a declaration of nonfulfillment of a condition precedent, and requiring Barrett to comply with all governmental regulations regarding the cessation of operations.

Before addressing the jurisdictional motions it is necessary that I first rule upon plaintiff's motion for leave to file an amended complaint pursuant to *Fed.R.Civ.P. 15(a).* Plaintiff cannot amend its complaint to plead a violation of *42 U.S.C. § 9601* because *Fed.R.Civ.P. 15(c)* precludes the relation back of the amendment in this instance. It provides:

*Relation Back of Amendments.* Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. *Fed.R.Civ.P. 15(c).*

In this case the transactions involved were included in the original complaint. Title *42 U.S.C. § 9603* became effective December 11, 1980, 43 days after the date of the filing of the complaint, October 29, 1980.

Plaintiff argues that the addition [*6] of this eighth claim to its complaint is nevertheless saved because the court may take it as a supplemental pleading under *Fed.R.Civ.P. 15(d).* I cannot do that either. *Rule 15(d)* reads:

*Supplemental Pleadings.* Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve supplemental pleading setting forth transactions or occurrences or events which *have happened since the date of the pleading sought to be supplemented.* Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense. If the court deems it advisable that the adverse party plead to the supplemental pleading, it shall so order, specifying the time therefor. *Fed.R.Civ.P. 15(d).* (emphasis added).

The transactions, occurrences, or events alleged in the supplemental pleading are those alleged in the original complaint and thus are not new facts which the court can be considered to have been unaware. In short, they are not additional transactions "which have happened since the date of the pleadings sought to be supplemented," but are merely the application of a new federal statute to the same case. [*7] Therefore, *Rule 15(d)* is not applicable. [4] *See, e.g. U.S. v. Reiten, 313 F. 2d 673, 674 (9th Cir. 1963).* The granting or denial of leave to file a supplemental pleading is within the sound discretion of the trial court. *313 F. 2d at 675*; 3 Moore, Federal Practice P15.16[4] at 15-252 (2d ed. 1979). The court should not apply *Rule 15(d)* in this instance. The court should and does hereby deny plaintiff's motion for leave to file its amended complaint.

4    "Subdivision (d) has limited supplemental pleading to its true office: the presentation of subsequent matter related to the claim or defense presented in the original pleading." 3 Moore, Federal Practice P15.16[1] at 15-242 (2d ed. 1979).

Even if the court were to grant plaintiff leave to file this supplemental pleading, the court would find it has no jurisdiction under *42 U.S.C. § 9601.* It is well settled

that a court has jurisdiction to determine jurisdiction. Title *42 U.S.C. § 9601 et seq.* has no application or relevance to the transacting occurrences, events, or facts of this suit. Defendants (Bennitt Bennitt Trust, American National, American National Trust, Union National Trust) argue correctly the [*8] nonapplicability of *Section 9601 et seq.*:

(a) Comerford does not operate a facility at which hazardous substances were disposed of. The quarrying for sand, gravel and stone does not constitute the transportation or storage of hazardous substances. Liability may be imposed only upon operators or owners of facilities for the disposal, transportation or storage of hazardous substances.

(b) There has been no release of hazardous substance from the facility operated by Comerford or the facility operated by plaintiff.

(c) Neither the State nor the United States Government has incurred costs of removal of hazardous substances or remedial action.

(d) No other costs of response or remedial action have been incurred by plaintiff or any other person consistent with any contingency plan or otherwise.

(e) The motion merely seeks an injunction and does not seek damages for injury to the destruction of, or the loss of natural resources.

(f) Prior to the filing of the motion for injunction, plaintiff has filed no claim with any federal administrator for damages pursuant to Title *42 U.S.C.A. § 9601* or any other law.

(g) Title *42 U.S.C.A. § 9613* is devoid of any provision [*9] for conferring jurisdiction upon district courts in abatement proceedings instituted by private citizens.

(h) Title *42 U.S.C.A. § 9613* is devoid of any provision conferring jurisdiction authorizing the owner or operator of a facility for the storage or disposal of hazardous substance, to recover damages from third persons based upon release or potential release of hazardous substances from his own facility. (Motion to Strike and Dismiss Plaintiff's Motion for a Preliminary and Permanent Injunction for Want of Jurisdiction, pp. 6-7).

For these very reasons, I find no federal question jurisdiction in this proposed supplemental pleading under *42 U.S.C. § 9601 et seq.*

Plaintiff, Barrett, contends that the court has diversity jurisdiction of the original complaint because it is a Wisconsin corporation. Barrett asserts that it is a Wisconsin corporation with its principal place of business in Wisconsin. It states that it is the successor in interest to "Barrett Landfill, Inc.," an Illinois corporation that

merged with its Wisconsin corporation in December of 1979. Attached as Exhibit 1 to defendants' motion to dismiss, however, is a copy of a letter from the Office of [*10] the Illinois Secretary of State. This letter, dated December 9, 1980, states that Barrett Landfill, Inc. was incorporated in Illinois in 1974, "and appears to be in good standing on the records of [that] office." The letter further states that the Secretary of State's Office has no record of any merger pertaining to Barrett Landfill, Inc.

For purposes of *28 U.S.C. § 1332*, diversity is determined as of the time that suit is commenced. *Hoefferle Truck Sales, Inc. v. Divco-Wayne Corp., 523 F. 2d 543, 548 (7th Cir. 1975)*; *Julien v. Sarkes Tarzian, Inc., 352 F. 2d 845, 846 (7th Cir. 1965)*. As stated above, the complaint in this case was filed on October 29, 1980. Once diversity is challenged, the nonmoving party has the burden of proving the existence of federal jurisdiction. As the court stated in *Factor v. Pennington Press, Inc., 230 F. Supp. 906, 911 (N.D. Ill. 1963)*:

Under the rule of *McNult v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L. Ed. 1135 (1936)*, the plaintiff in a case based on the diversity jurisdiction of the Federal courts must bear the burden of proof of the essential jurisdictional facts whenever the defendant challenges [*11] the court's jurisdiction. (*See also, Thompson v. Gaskill, 315 U.S. 442, 62 S. Ct. 673, 86 L. Ed. 951 (1942)*.

*See also, Mas v. Perry, 489 F. 2d 1396, 1399* (Fifth Cir.), *reh. denied, 492 F. 2d 1242, cert. denied, 419 U.S. 942 (1974)* ("The burden of pleading the diverse citizenship is upon the party invoking federal jurisdiction... and if the diversity jurisdiction is properly challenged, that party * * * bears the burden of proof. * * * *Howes v. Club Ecuestre el Comandate, 598 F. 2d 698 (1st Cir. 1979)*; *Ray v. Bird & Son & Asset Realization Co., 519 F. 2d 1081 (5th Cir. 1975)*.

Defendants here challenged Barrett's assertion of diversity jurisdiction, and have shown that according to the Secretary of the State of Illinois, Barrett was an Illinois corporation in good standing at the time the complaint was filed. Merely asserting with nothing more that there also is a "Barrett Landfill, Inc." incorporated in Wisconsin is insufficient to rebut the evidence presented by defendants. The motion to dismiss should be allowed. It is true that that motion was made by only those of the defendants which are Chicago banks, but its failure to show diversity as to the [*12] other defendants, leaves the question moot as to them also. Accordingly, the case is dismissed for lack of subject matter jurisdiction. [5]

5  Only one group of defendants (American National, American National Trust No. 77854, Union National, and Union National Trust No. 2303)

challenged the court's diversity jurisdiction in a motion to dismiss. However, *Rule 12(h)(3)* permits a court to dismiss an action *sua sponte* when the court determines that it lacks subject matter jurisdiction. *Choudry v. Jenkins, 559 F. 2d 1085, 1091 (7th Cir. 1977)*; *Fed.R.Civ.P. 12(h)(3)*.

Jurisdiction on the complaint does not extend to defendant Bennitt's and Union National's compulsory counterclaims since their counterclaims, to survive dismissal of the complaint, would have to rest on some independent basis. *Wetherington v. Phillips, 380 F. Supp. 426, 429 (E.D.N.C. 1974)* (citing *National Research Bureau, Inc. v. Bartholomew, 482 F. 2d 386 (3d Cir. 1973))*. Despite the ancillary jurisdiction the court would have had were the complaint not dismissed, they cannot survive since the court must find that it must dismiss a counter-claim when the complaint upon which it rides is dismissed. [*13] The dismissal as to these counterclaims is without prejudice. Wherefore, the defendants are free to pursue their separate sections in a state court should they so desire. 3 Moore, Federal Practice P13.5[1] (1972 & Supp. 1980-81).

The court denies plaintiff's motion for leave to file an amended complaint. The court dismisses plaintiff's complaint as to all defendants for lack of diversity jurisdiction and want of federal question jurisdiction. The court dismisses without prejudice Bennitt's and Union National's Counterclaim for lack of independent subject matter jurisdiction. Because of this action, all other motions become moot and are denied.

It is so ordered.

## EXHIBIT LIST

**EXHIBIT A**:          No. 04 c 7071, Compl., Nov. 2, 2004.

**EXHIBIT B**:          No. 04 c 7071, Min, Order, Nov. 3, 2004.

**EXHIBIT C**:          No. 04 c 7071, Am. Compl., Nov. 4, 2004.

**EXHIBIT D**:          No. 04 c 7071, Mem. By Defendants On Subject Matter Jurisdiction, Nov. 10, 2004.

**EXHIBIT E**:          *Charles Schwab & Co., Inc. v. Carter, et al.*, No. 04 c 7071, 2005 WL 351929, at *3 (N.D. Ill. Feb.11, 2005).

**EXHIBIT F**:          No. 04 c 7071, Notices of Appearance, Oct. 10, 2005.

**EXHIBIT G**:          No. 04 c 7071, Fourth Am. Compl., Nov. 23, 2005.

**EXHIBIT H**:          No. 04 c 7071, Fifth Am. Compl., Feb. 15, 2006.

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE AMY ST. EVE

CHARLES SCHWAB & CO., INC. )
)
Plaintiff, )
)
v. )
)
BRIAN D. CARTER, ACORN ADVISORY )
MANAGEMENT, L.L.C., and ACORN )
ADVISORY CAPITAL, L.P., )
)
Defendants. )

04C 7071

Judge:

Magistrate Judge: MAGISTRATE JUDGE KEYS

Case No.:

FILED FOR DOCKETING ED-7
04 NOV -2 PM 3: 53
CLERK U.S. DISTRICT COURT

## VERIFIED COMPLAINT
## FOR TEMPORARY RESTRAINING ORDER,
## PRELIMINARY INJUNCTION, AND OTHER RELIEF

Plaintiff Charles Schwab & Co., Inc. ("Schwab"), by its attorneys, brings this

action for immediate injunctive and other relief. Schwab complains as follows:

### CASE OVERVIEW

1.     This action arises out of the actual and threatened misappropriation of

confidential business information by Defendants. Prior to defendant Brian D. Carter's ("Carter")

resignation from Schwab, he was the Director of Information Technology for Schwab

Soundview Capital Markets' Investment Analytics division ("IA"). Carter resigned without

notice on October 22, 2004, to join defendant Acorn Advisory Management, L.L.C. and/or

defendant Acorn Advisory Capital, L.P. (collectively, "Acorn").

2.     Prior to November 1, 2004, IA had been in the business of providing proprietary

analytical research to approximately 100 institutional clients. The analytical research distributed

by IA was derived from approximately eighteen, trade secret financial models (the "Models"),

which are confidential, complex analytical formulations prepared over many years by and at

great expense to Schwab.

3.     Carter served IA in a supporting, technology capacity. He did not develop the IA Models or provide ongoing analytical research used to maintain the Models. IA employed numerous highly trained analysts (PhDs and MBAs) who, working with Carter, ran and maintained the IA Models for Schwab.

4.     In or about September 2004, Schwab announced it was closing IA, effective November 1, 2004. In connection with the closing of IA, Schwab offered its IA employees generous severance packages or employment within other areas of Schwab.

5.     On October 1, 2004, Acorn made a written offer to acquire IA. Acorn and its affiliates manage in excess of $750 million in hedge fund assets and had been one of IA's institutional clients. Acorn expressed interest to Schwab in acquiring IA's Models, because, on information and belief, Acorn appreciated the value of IA's Models, including to Acorn's hedge fund business. Acorn proposed to acquire all of IA's intellectual property, including specifically the proprietary Models IA had developed, as well as six IA employees, including Carter and several of IA's analysts.

6.     Schwab rejected Acorn's offer. The Models IA used are closely related to the proprietary financial models Schwab continues to use in connection with Schwab Equity Ratings, the investment research offered to its retail client base. Schwab has made substantial investments in developing and advertising its Schwab Equity Ratings, and that service is a vital component of Schwab's retail client offering. Accordingly, to maintain the competitive value of the models used for its retail client base, Schwab decided to retain IA's confidential intellectual property, including the Models.

7.     On information and belief, on or about October 15, 2004, *after* Schwab rejected Acorn's offer to acquire IA, Acorn made offers to employ Carter and several of IA's analysts. On information and belief, all IA analysts rejected Acorn's employment offers on or about October 18, 2004.

8.     Although all of the IA analysts Acorn had hoped to hire declined Acorn's offer, Acorn did not withdraw its offer to Carter. On October 18, 2004, on information and belief in preparation for joining Acorn, Carter e-mailed confidential data to Acorn relating to certain of the outside data sources used in IA's Models.

9.     On Thursday, October 21, 2004, also on information and belief, in continuing preparation to join Acorn, Carter came to work at IA's office with a powerful, new, laptop, containing a DVD burner, suitable for copying massive amounts of digital information, such as IA's Models. This laptop was either Carter's personal property or the property of Acorn; it was not one of the laptops Schwab provided Carter for use on Schwab's behalf. On information and belief, Carter copied IA's Models using this new laptop. On information and belief, Carter copied the Models on behalf of and/or for the benefit of his future employer, Acorn.

10.     Carter had previously told colleagues at IA that he had or was going to copy and keep IA's Models. When told by a subordinate IA employee that such conduct was illegal, Carter argued that it was not because Schwab was closing IA.

11.     On October 22, 2004, the day after appearing in IA's offices with the new laptop with DVD burner, Carter resigned from Schwab without warning. Had Carter remained at Schwab for another week, he would have received a severance package from Schwab.

12.     On information and belief, Acorn paid Carter a substantial amount of money to induce him to join Acorn before his severance payment from Schwab was paid to him and to bring along to Acorn the IA proprietary information Carter had copied, including the IA Models.

13.     On information and belief, Acorn does not have an office in Illinois. On information and belief, Carter's value to Acorn is primarily the proprietary IA Models Carter unlawfully misappropriated from IA.

14. Defendants' conduct is already causing irreparable harm and threatens further irreparable harm to Schwab through the misappropriation and misuse of trade secret and other confidential information, and harm to Schwab's business.

15. Defendants' conduct against Schwab, which is described in more detail below, constitutes unfair competition, breach of fiduciary duty, inducement to breach fiduciary duties, misappropriation of trade secrets and conversion. Carter's conduct also violates Schwab's confidentiality policies to which Carter agreed as a condition of and throughout his employment with Schwab.

16. By this action, Schwab does not seek to restrain Carter from working for Acorn. Rather, Schwab seeks immediate injunctive relief to prevent Defendants from using and profiting from the information Carter has no right to retain or share with Acorn.

**PARTIES**

17. Schwab is a full service investment and securities firm. Schwab is a California corporation with its principal place of business in San Francisco, California.

18. Brian Carter currently resides in Tinley Park, Illinois.

19. Acorn Advisory Management, L.L.C., is a diversified portfolio of hedge-fund assets. Acorn Advisory Management, L.L.C. is a Delaware Limited Liability Company with its principal place of business in New York, New York.

20. Acorn Advisory Capital, L.P. is a Delaware limited partnership affiliated with Acorn Advisory Management, L.L.C. with its principal place of business in New York, New York.

**JURISDICTION AND VENUE**

21. This District Court has personal jurisdiction over Defendants because they reside and/or do business in this District.

22. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists between the parties and the amount in controversy exceeds $75,000, including, without limitation, the value to Schwab of the injunctive relief requested herein.

23. Venue also is proper in this District because Carter resides in the District and the events giving rise to the claims at issue in this Verified Complaint occurred here. See 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

A. **Carter received access to Schwab's confidential information pursuant to his fiduciary and contractual relationship with Schwab.**

24. Schwab acquired IA's predecessor for substantial consideration, in part to acquire IA's proprietary Models and other intellectual property IA owned. Through IA, Schwab generated and maintained substantial amounts of confidential information, including proprietary investment research strategies and analytical tools. The Models provided Schwab with a competitive edge in the marketplace, and have substantial worth. The complex Models were kept confidential and were not disclosed to customers of IA or other individuals outside of Schwab.

25. Schwab used the IA Models in developing similar models now used by Schwab Equity Ratings, which serves investment research needs of Schwab retail clients. Thus, despite Schwab's determination in 2004 to close IA, the continued confidentiality and protection of trade secrets generated and maintained by IA provides Schwab with a continuing competitive advantage in other areas of its business.

26. To protect the confidentiality of its trade secret information, Schwab has instituted numerous policies and precautions. Schwab has security at all of its offices and restricts access

- 5 -

to confidential information on a need-to-know basis. Schwab also has other security provisions, including computer pass codes and detailed security procedures.

27.      To further protect the confidentiality of its information, Schwab also has confidentiality policies to which Carter agreed. For example, as recently as February 2004, Carter signed a Charles Schwab Confidentiality, Nonsolicitation and Assignment Agreement (the "Confidentiality Agreement"), expressly agreeing to protect the confidentiality of Confidential Information owned, maintained, or developed by Charles Schwab. A true and correct copy of the Confidentiality Agreement signed by Carter is attached hereto as Ex. A.

28.      The Confidentiality Agreement defines Confidential Information to include Schwab's confidential and trade secret information. *See* Ex. A at § 1.

29.      Pursuant to the Confidentiality Agreement, Carter agreed as follows (at § 4):

> I . . . will not, for any purpose, directly or indirectly, disclose, reproduce, use, or disseminate in any manner during or after my employment with Schwab, on my own behalf or on behalf of any other person, company or entity, any Confidential Information.

30.      Carter further agreed (at § 8):

> I agree that during my employment with Schwab, I will not remove any property of Schwab in original or copied form, including, but not limited to, any Confidential Information existing in any form from Schwab's premises, except as required in the ordinary course of my duties at Schwab and as necessary for me to perform my duties. I agree that I will promptly return to Schwab immediately upon Schwab's request, my acceptance of other employment, or the termination of my employment for any reason, any and all documents and materials that contain, refer to, or relate in any way to any Confidential Information, as well as any other property of Schwab in my possession or control . . .. I further agree that I will permit Schwab to inspect any materials provided by Schwab to me or developed by me as a result of or in connection with my employment with Schwab when I accept other employment or otherwise separate from my employment, regardless of where said materials are located.

31.      In the Confidentiality Agreement, Carter also agreed that in the event of a breach of the Agreement by Carter, Schwab was entitled to injunctive relief including specifically (at § 11(a)):

- 6 -

I specifically CONSENT TO THE ISSUANCE OF INJUNCTIVE RELIEF ordering, among other things: . . . (a) that I return to Schwab all records of any kind or nature (including but not limited to original and duplicate, typed and handwritten, soft (electronic, diskette) and hard copy and any other form) containing, referring to, or otherwise based on Confidential Information, and that I be prohibited from using or disclosing such records or the information in such records.

32.     In reliance on his promises to maintain the confidentiality of Schwab's confidential information, Carter was furnished with and granted access to substantial amounts of Schwab's proprietary and confidential information.

33.     At the time of Carter's resignation, he had access to the entire information network of the IA division, including access to the Models, the production platforms on which the Models were processed, and customer information.

**B.     Carter breached his duties to Charles Schwab, including by misappropriating its confidential information.**

34.     While still serving as an employee of Schwab and in a position of trust and confidence at Schwab, Carter coordinated with Acorn to divest Charles Schwab of proprietary and confidential business information.

35.     On information and belief, Defendants agreed that Carter would resign from Schwab without waiting one additional week for the severance package being offered by Schwab and would bring along copies of IA's models and other confidential information useful to Acorn in its business.

36.     On information and belief, Defendants have converted Schwab's confidential business information, including misappropriated copies of IA's Models. This information is Schwab's property and contains Schwab's proprietary and trade secret information.

37.     While Carter was entitled to have access to and to use this information to perform his duties for Schwab, he had no authorization or right to copy all or part of such records for

- 7 -

personal use and was specifically required by his Confidentiality Agreement and Schwab's policies to return all such records and copies thereof to Schwab upon terminating from Schwab.

38.     Schwab has uncovered powerful evidence of Carter's misappropriation and conversion of Schwab's business information.  For example, on October 18, 2004, Carter sent an email to Gary Sabot, a manager at Acorn, attaching documents that could facilitate Acorn's access to an information database licensed by Schwab and used in connection with the proprietary IA Models.  On information and belief, Carter also provided Acorn with additional information facilitating Acorn's unauthorized access to this information database.

39.     On October 21, 2004, the day before he resigned, Carter came to IA's offices with a new, high-powered personal laptop computer – *i.e.*, not one of the computers issued to him by Schwab for use in connection with his work for Schwab.  This new laptop computer contained a high-speed disc burner that allowed Carter to download and burn to a digital medium large amounts of data.  On information and belief, Carter used this personal laptop computer to download and store copies of Schwab's confidential, trade secret information, including but not limited to copies of the Models, which Carter then removed from the Schwab IA office without authorization.  Carter had informed other IA employees that he had intended to download information from Schwab's computers.

40.     Schwab's confidential trade secrets, including the Models, are not publicly available and cannot be reconstructed from other sources.  The Models represent years of investment, calculations, research, and refinement of strategies and analytical tools.

41.     On information and belief, Carter copied and removed from Schwab's offices confidential information, including copies of the Models.  On information and belief, this information was or is about to be delivered to Acorn.

42.     In connection with the filing of this lawsuit, Schwab is demanding the return of all confidential information taken by Carter and received by Acorn.

**C.** **Defendants threaten to inflict serious and irreparable injury on Schwab.**

43.     On information and belief, Defendants continue to have possession or control of Schwab's proprietary and trade secret information, including the detailed, confidential Models and other proprietary business information belonging to Schwab.

44.     On information and belief, Defendants have used or are about to use the Schwab proprietary and trade secret information in their possession or control to do one or more of the following: (a) undermine Schwab's competitive advantages arising from its proprietary and trade secret information; (b) use Schwab proprietary and trade secret information to improve Acorn's own research technologies and strategies without compensating Schwab for the unauthorized use of this proprietary information; and (c) otherwise engage in acts constituting conversion and misappropriation of Schwab trade secrets and confidential information, breach of fiduciary duties, and other tortious conduct.

## COUNT I

## MISAPPROPRIATION OF TRADE SECRETS
### (AGAINST ALL DEFENDANTS)

45.     Schwab incorporates the above allegations.

46.     Schwab has protectable trade secrets in the Models and other confidential information to which Carter had full access while an employee of Schwab.

47.     Schwab derives economic value from these trade secrets due to them not being generally known to other persons who could obtain economic value from their disclosure or use.

48.     Schwab has made reasonable efforts under the circumstances to maintain its trade secrets' secrecy and confidentiality.

49.     Defendants have misappropriated or threaten to misappropriate Schwab's trade secrets.

50.     Schwab has been injured and is continuing to be injured by Defendants' misappropriation of its trade secrets.

- 9 -

## COUNT II

### CONVERSION
### (AGAINST ALL DEFENDANTS)

51.    Schwab incorporates the above allegations.

52.    Defendants have wrongfully, and without authorization, retained possession, custody or control over files and information belonging to Schwab.

53.    Schwab is the rightful owner of all copies of the Models, the platforms on which the Models are processed, customer records and information, and Schwab's business information taken by Carter at Acorn's direction or with Acorn's active support.

54.    Schwab's right to possession of this property is immediate, absolute, and unconditional.

55.    Schwab has been injured and is continuing to be injured by Defendants' misappropriation.

## COUNT III

### BREACH OF FIDUCIARY DUTY
### (AGAINST CARTER)

56.    Schwab incorporates the above allegations.

57.    As an employee of Schwab who was allowed access to Schwab's confidential and other information, Carter owed Schwab certain fiduciary duties.

58.    Among these fiduciary duties are the duty of loyalty and fair dealing while working for Schwab, the duty to advance the interests of Schwab, the duty to preserve Schwab's information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to Schwab's interests.

59.    Carter breached these duties by, among other things, converting Schwab's confidential and trade secret information to his personal use and the use of Acorn while affiliated with Schwab, and afterwards; using this information against Schwab's interests.

60.    Schwab has been injured and is continuing to be injured by Carter's breaches.

- 10 -

## COUNT IV

## BREACH OF CONTRACT
### (AGAINST CARTER)

61.     Schwab incorporates the above allegations.

62.     Carter signed and agreed to comply with the requirements set forth in the
Confidentiality Agreement (Ex. A).

63.     In this Confidentiality Agreement, Carter expressly agreed that he would not
divulge and disseminate Schwab's confidential and proprietary information.

64.     These terms are reasonable in that they impose restraints on Carter that are no
greater than required to protect Schwab's legitimate interests, do not impose undue burden on
Carter, and are not injurious to the public.

65.     These terms protect Schwab's legitimate interests in its trade secret and other
confidential information and in its goodwill.

66.     Carter has willfully breached the terms of his Confidentiality Agreement by,
among other things, converting to his personal benefit and the benefit of Acorn confidential
business information owned and maintained by Schwab.

67.     Schwab has been injured and is continuing to be injured by Carter's breaches.

## COUNT V

## AIDING AND ABETTING AND/OR INDUCING A BREACH OF FIDUCIARY DUTY
### (AGAINST ACORN DEFENDANTS)

68.     Schwab incorporates the above allegations.

69.     As an employee of Schwab who was allowed access to Schwab's confidential and
other information, Carter owed Schwab certain fiduciary duties.

70.     Among these fiduciary duties are the duty of loyalty and fair dealing while
working for Schwab, the duty to advance the interests of Schwab, the duty to preserve Schwab's

information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to Schwab's interests.

71.     On information and belief, Carter breached these duties by, among other things, converting Schwab's confidential and trade secret information to his personal use and the use of Acorn while affiliated with Schwab, and afterwards; using this information against Schwab's interests.

72.     On information and belief, Acorn assisted Carter in breaching his fiduciary duties and/or induced Carter to breach such duties to Schwab through one or more of the following acts: (a) compensating Carter if he left Schwab abruptly and without notice; (b) encouraging Carter to misappropriate copies of the Models and other confidential Schwab information prior to Carter's resignation; (c) requesting that Carter provide Acorn with information Acorn knew was proprietary Schwab information; (d) offering Carter a performance bonus based on Carter's ability to provide Acorn with the Models and other Schwab proprietary information.

73.     On information and belief, Acorn took such actions with knowledge that its actions would assist Carter in breaching his fiduciary duties and/or induced Carter to breach such duties to Charles Schwab.

74.     Schwab has been injured and is continuing to be injured as a result of the Acorn Defendants' aiding and abetting of Carter's breach of fiduciary duties and/or the Acorn Defendants' inducement to Carter to breach fiduciary duties.

**WHEREFORE**, Schwab respectfully requests the following relief:

A.      Direct Defendants to return all originals and copies of information, documents and other things taken from Schwab, including all copies of the Models and other Schwab business information in Defendants' possession or control, in hard copy or electronically stored (all electronically stored records must also be deleted permanently from Defendants' computers or other electronic memory files);

B.      Enjoin Defendants, their agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms and corporations acting in connection or participation with them or on their behalf, from revealing,

disclosing or using in any manner information contained in the records of Charles Schwab, including the Models and any other Schwab business information;

C.   Impose a constructive trust for Schwab's benefit on all proceeds of Carter's fiduciary breaches;

D.   Award damages and attorney's fees and costs; and

E.   Grant such other relief as just and appropriate.

November 2, 2004                                   Respectfully submitted,

                                                   CHARLES SCHWAB & CO., INC.

                                                   By:

Eric D. Brandfonbrener
Darrell J. Graham
Jonathan Buck
PERKINS COIE LLP
131 S. Dearborn, Suite 1700
Chicago, IL  60603
Tel:  (312) 324-8400
Fax:  (312) 324-9400

# Charles Schwab

## CONFIDENTIALITY, NONSOLICITATION AND ASSIGNMENT AGREEMENT

Charles Schwab & Co., Inc., its parent compan(ies) and/or its/their subsidiaries, affiliates, joint venturers, and successors (collectively, "Schwab" or the "Company") desires to protect its Confidential Information (as more fully described and defined in Paragraph 1, below), to maintain and protect the confidential and/or proprietary nature of such Confidential Information, and to protect against the unauthorized use of such Confidential Information. In consideration for my at-will employment with Schwab and in consideration for the compensation paid and to be paid to me and the receipt of other benefits by Schwab, the receipt and adequacy of which I acknowledge and agree, I am willing to enter into this Confidentiality, Nonsolicitation and Assignment Agreement (this "Agreement") to provide and facilitate the protection of Schwab Confidential Information during and after my employment with the Company in accordance with the terms and conditions set forth below.

1. (a) I acknowledge and agree that during and related to my employment with Schwab, I will obtain, have access to, and/or be exposed to certain information that is confidential and/or proprietary to, and/or trade secrets of Schwab (collectively, "Confidential Information"). I understand that such Confidential Information may be in any form, and will include all copies, reproductions, summaries, analyses or extracts thereof, based thereon or derived therefrom, and which is the sole and exclusive property of Schwab. Confidential Information may include, but not be limited to:

    (i) Confidential information about previous, current and/or contemplated products and services, confidential know-how, techniques, computer passwords, computer software designs, and hardware configurations, and confidential training materials, policies and procedures, and research projects;

    (ii) Market, financial, trade, and sales information and data, pricing, financial models or formulae, business plans, financial and business forecasts and estimates, account valuation, and information about costs and profits;

    (iii) The identities of Schwab customers or Prospective Customers, as defined in Paragraph 6 (including but not limited to, names, addresses, telephone numbers and/or social security numbers), any account, personal, business, financial and other information pertaining to such customers or Prospective Customers, Schwab customer or Prospective Customer lists in any form, and any information related to the assets and obligations carried in an account by a Schwab customer, a customer's positions, and/or account valuation;

    (iv) Account, personnel or financial information pertaining to current and former employees of Schwab, business, financial, and other information pertaining to Schwab's vendors and independent contractors, and any lists of such employees, vendors and/or independent contractors;

    (v) All Developments, as defined in Paragraph 5 below, and all information that relates to said Developments; and/or

    (vi) All information which Schwab has a legal obligation to treat as confidential, or which Schwab treats as proprietary or designates as confidential or for internal use only, whether or not owned or developed by Schwab.

    (b) "Trade secret," as used in this Agreement, shall mean, without limitation, any technical or non-technical data or other business information, which (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its use; and (ii) is the subject of reasonable efforts on the part of Company to maintain its secrecy.

    (c) Notwithstanding the definition in Paragraph 1 hereof, Confidential Information shall not include any information that is in its protected form (i) in the public domain through no fault of an employee of Schwab or otherwise, (ii) readily and accurately discernable from publicly-available products, literature or other information, or (iii) approved for disclosure by prior written permission of an authorized senior or executive officer of Schwab specifically designated by Schwab to give such authorization as required hereunder ("Authorized Officer").

116423                                    1.                                    Rev. 1/04

2. I acknowledge that such Confidential Information has been developed by or on behalf of Schwab or licensed by Schwab at great expenditure of both financial and human resources and that such Confidential Information may be unique and not capable of being duplicated, or may only be acquired by significant expense. I acknowledge and agree that Schwab owns or licenses all such Confidential Information and that such information is entrusted to me for the sole and exclusive purpose of enabling me to conduct the business of providing brokerage and financial advice to customers and Prospective Customers (the "Business") on behalf of Schwab. I further understand that Schwab desires (or is under a legal obligation, in the case of information owned by others) to protect such information's confidential and proprietary nature, and takes, and requires me to take, all reasonable measures to maintain the confidentiality and proprietary nature of such information.

3. I acknowledge that Schwab's Business is intensely competitive and as an employee of Schwab in my position I have or will be exposed to Confidential Information, the direct or indirect disclosure of which to existing and potential competitors of Schwab would place Schwab at a competitive disadvantage and would do damage, monetary or otherwise, to Schwab's Business. I acknowledge that the Confidential Information constitutes a protectable business interest of Schwab.

4. I agree that I will not, at any time, assert any claim, ownership or other property interest in any Confidential Information. I also will not, for any purpose, directly or indirectly, disclose, reproduce, use, or disseminate in any manner during or after my employment with Schwab, on my own behalf or on behalf of any other person, company or entity, any Confidential Information, unless: (a) such disclosure is required in the ordinary course of my duties at Schwab and is necessary for me to perform my duties; (b) I have received advance written consent from an Authorized Officer; or (c) I am legally compelled (by deposition, interrogatory, request for documents, subpoena, or similar process) to disclose any of the Confidential Information; provided, however, prior to disclosing such Confidential Information, I shall give Schwab prompt prior written notice of such requirement so that Schwab may seek a protective order or other appropriate remedy and/or waive my compliance with the terms of this Agreement. In the event that such protective order or other remedy is not sought or obtained, or that Schwab waives my compliance with the terms hereof, to the extent I shall be legally compelled to disclose the Confidential Information, I agree to provide only that limited portion of the Confidential Information that is legally required and to exercise reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information. I will promptly notify Schwab if I become aware of or suspect any unauthorized (whether intentional or accidental) use or disclosure of Confidential Information by me or by any other person, company or entity.

5. I will promptly disclose in confidence to Schwab all inventions, improvements, designs, original works of authorship, formulas, processes, computer software programs, databases and trade secrets (collectively, "Developments") that I make, conceive, first reduce to practice, or create, either alone or jointly with others while I am employed by Schwab, and that: (a) result from any work performed by me for Schwab, whether or not in the normal course of my employment or during normal business hours; (b) reasonably relate to the actual or anticipated business, services, products, research or development of Schwab; or (c) are developed with the use of Schwab time, equipment, supplies, Confidential Information or facilities. I must promptly disclose Developments whether or not such Developments are patentable, copyrightable or protectible as trade secrets. I understand and agree that all Developments shall be the sole and exclusive property of Schwab, and I hereby irrevocably assign, transfer and convey to Schwab, exclusively and perpetually, all rights, title and interest that I may have or acquire in and to such Developments throughout the world, including without limitation any copyrights and patents, and the right to secure registrations, renewals, reissues, and extensions thereof. I agree to sign any documents and to do all things necessary, without additional compensation, whether during my employment or after, to assist Schwab to register, perfect, maintain and enforce Schwab's rights in any Development, including without limitation any patent, copyright, trade secret or other right or interest. I understand that if I am now a California resident, or if I become a California resident while employed by Schwab, then this paragraph will not apply to any Developments which fully qualify under Section 2870 of the California Labor Code, which section is set forth in the accompanying Exhibit A, attached hereto and made a part hereof.

6. I acknowledge that during my employment, Schwab will be providing me with resources that enable me to develop, enhance, maintain and/or support account relationships with Schwab's customers and prospective customers, which such prospective customers have been designated as such by virtue of being listed, classified or otherwise identified by me or others, to which I have knowledge of, during my employment with Schwab ("Prospective Customers"). I also acknowledge that such resources are provided at Schwab's expense and the development, enhancement, maintenance and/or support of the account relationships with Schwab's customers and Prospective Customers are solely for Schwab's benefit. I acknowledge and agree that any account relationships I develop, enhance, maintain or support during my employment with Schwab are account relationships that belong solely to Schwab and not to me, with the

116423                                              2.                                              Rev. 1/04

exception of account relationships of my immediate family or other relatives, or individuals or entities that I provided financial services to prior to joining Schwab, and which I have identified in the accompanying Exhibit B, attached hereto and made a part hereof. I agree that I will undertake to update this Exhibit B, as and when necessary, by written notice to Schwab.

7.  I agree that during my employment with Schwab, I will not, directly or indirectly, on my behalf or on behalf of any other person, company or entity, solicit or induce, or attempt to solicit or induce (which shall include, but is not limited to, contact or communication in any manner for the purpose of soliciting or inducing): (a) any customer or Prospective Customer of Schwab to divert, transfer or otherwise take away any business from Schwab; or (b) any employee, vendor or independent contractor of, or consultant to, Schwab to leave his or her employment or assignment with Schwab.

8.  I agree that during my employment with Schwab, I will not remove any property of Schwab in original or copied form, including, but not limited to, any Confidential Information existing in any form from Schwab's premises, except as required in the ordinary course of my duties at Schwab and as necessary for me to perform my duties. I agree that I will promptly return to Schwab immediately upon Schwab's request, my acceptance of other employment, or the termination of my employment for any reason, any and all documents and materials that contain, refer to, or relate in any way to any Confidential Information, as well as any other property of Schwab in my possession or control, including, but not limited to, any information pertaining and/or relating to Schwab's customers and Prospective Customers, and all originals, copies and derivations of Schwab's documents, electronic and telephonic equipment, credit cards, security badges, and passwords. I further agree that I will permit Schwab to inspect any materials provided by Schwab to me or developed by me as a result of or in connection with my employment with Schwab when I accept other employment or otherwise separate from my employment, regardless of where said materials are located.

9.  I further agree that for a period of eighteen (18) months after my employment with Schwab ceases beginning on the date of my termination (the "Proscribed Period"), I will not, directly or indirectly, or on behalf of any third party: (a) solicit or attempt to solicit any existing customers I serviced, directly or indirectly, and/or any Prospective Customers (with the exception of individuals or entities listed in the attached Exhibit B), or customers whose identities I learned as a result of my employment with Schwab, in an attempt to divert, transfer or otherwise take away business or prospective business from Schwab; (b) sell or offer to sell any security, retirement, insurance or annuity product or related service to any customer or Prospective Customer of Schwab that I solicited or attempted to solicit in breach of my obligations hereunder; or (c) solicit or attempt to solicit or induce (which shall include, but is not limited to, contact or communication in any manner for the purpose of soliciting or inducing) any employee, vendor or independent contractor of, or consultant to, Schwab to leave his or her employment or assignment with Schwab. I further agree that the purpose of this provision is to prevent the intentional or inadvertent unlawful use of Schwab's Confidential Information, including its trade secrets. Nothing in this Paragraph 9 is intended to prevent me from discussing possible employment or prospective business with any customer, Prospective Customer, employee, consultant or independent contractor who contacts me directly on his or her own volition without my solicitation or attempted solicitation of him or her. I understand that nothing in this Paragraph 9 limits my absolute obligation under Paragraph 4 to never use Confidential Information for any other purpose at any time after my employment with Schwab ceases. Sections (a) and (b) of this Paragraph 9 shall not apply to any institutional customer or institutional Prospective Customer of Schwab Capital Markets L.P. whose identity is publicly available (notwithstanding the provisions in paragraph 6).

10. I represent and warrant that I do not have any agreement(s) with any former employer or other third party that would be breached by my performance of my duties at Schwab or that would limit, impair or otherwise adversely affect my performance of such duties, and that I will not take any action to breach any such agreement while I am employed by Schwab. In any event, I will not use or disclose to Schwab any confidential information that belongs to others. I have listed on Exhibit C to this Agreement all the confidential, proprietary, trade secret, non-solicitation and/or non-competition agreements to which I am subject and affirm that those agreements, if any, would not be breached by performance of my duties at Schwab. I also agree that I will disclose my obligations under this Agreement to any prospective or future employer or contractor and that my obligations under this Agreement in their entirety shall survive the termination of my employment with Schwab regardless of the reason for the termination.

11. I understand and agree that any breach of this Agreement may subject me to disciplinary action, up to and including termination of my employment (if I am still employed at Schwab). I also understand and agree that any breach of this Agreement by me will cause immediate irreparable injury to Schwab that cannot be adequately compensated by money damages or whose damages may be difficult to ascertain. If a court of competent jurisdiction or an arbitration panel finds that injunctive relief is appropriate to enforce any provision of this Agreement, I agree that Schwab is entitled to such injunctive relief, in order to, among other things, prevent a continuing breach or to protect and preserve the status

116423

3.

Rev. 1/04

quo pending full resolution of any dispute relating to this Agreement and under such circumstances, I specifically CONSENT TO THE ISSUANCE OF INJUNCTIVE RELIEF ordering, among other things:

    (a)    that I return to Schwab all records of any kind or nature (including but not limited to original and duplicate, typed and handwritten, soft (electronic, diskette) and hard copy and any other form) containing, referring to, or otherwise based on Confidential Information, and that I be prohibited from using or disclosing such records or the information in such records; and

    (b)    that, for the Proscribed Period, I shall be prohibited from soliciting or attempting to solicit (i) any Schwab customer whom I serviced (directly or indirectly) or any Schwab customer or Prospective Customer whose identity I learned as a result of my employment with Schwab to divert, transfer or otherwise take away business or prospective business from Schwab; and/or (ii) any employee, vendor or independent contractor of, or consultant to, Schwab to leave their employment or assignment with Schwab.

12. I understand and agree that in the event of a breach of this Agreement by Schwab or me, either party may seek interim injunctive relief against the other in an appropriate forum. The parties agree to expedited discovery, including depositions, in connection with any proceeding alleging breach of this Agreement, whether or not the laws of the jurisdiction or the applicable rules of arbitration procedure imposed by a regulatory body or by agreement provide for such expedited discovery. To the extent applicable, this provision is intended to supplement and not to supersede the rights and obligations of the parties to this Agreement under the terms of the Form U-4 signed or to be signed by me to become a registered individual with the Company or the terms of a separate arbitration agreement. The parties further agree that a party's application to a court or an arbitration forum for injunctive relief shall not be construed as a waiver by the other party of the right to arbitrate or demand arbitration of claims, where applicable.

13. I understand and agree that should I violate Paragraph 7(a) or Paragraph 9 of this Agreement, Schwab will suffer irreparable harm and damages that may be difficult to ascertain at the time of the violation, including, but would not be limited to, costs associated with investigating, monitoring, restricting and/or terminating the use of Confidential Information by me in violation of this Agreement, revenue lost from assets diverted or transferred in violation of this Agreement, and costs associated with maintaining, restoring or repairing Schwab's relationship with customers or Prospective Customers that were solicited in violation of this Agreement. I therefore understand and agree that I will be liable to pay Schwab liquidated damages of four percent (4%) of any existing customer or Prospective Customer assets found by a court of competent jurisdiction or an arbitration panel to have been diverted, transferred or otherwise taken away from Schwab in violation of Paragraph 7(a) or Paragraph 9 above. I agree that this formula represents a reasonable estimate of Schwab's actual damages and does not constitute a penalty. I understand and agree that liquidated damages are in addition to any other relief that Schwab may be entitled to, including, but not limited to, injunctive relief and/or punitive damages.

14. This Agreement and the rights and obligations of the parties hereto shall bind and inure to the benefit of any successor or successors of Schwab, but neither this Agreement nor any rights or benefits hereunder may be assigned by me.

15. In the event that a party to this Agreement brings an action to enforce any provision of this Agreement, the prevailing party shall be entitled to attorneys' fees and costs incurred to enforce such claim.

16. If any provision or portion of any provision of this Agreement is found to be invalid or unenforceable, that provision or portion thereof will be enforced to the maximum extent permissible, and the remaining provisions or portions thereof shall remain in full force and effect. I agree that the terms of this Agreement and any disputes arising out of it shall be governed by, and construed in accordance with, the laws of the state in which I was last employed by Schwab, without giving effect to such state's conflict of law principles.

[NO FURTHER TEXT ON THIS PAGE]

116423

4.

Rev. 1/04

17. This Agreement shall be effective as of the date written below.  I understand and agree that part of the consideration for this Agreement is the continuation of my employment relationship with Schwab, but that nothing in this Agreement changes my "at will" employment status, and that either Schwab or I may end the employment relationship at any time, with or without notice, for any reason or no reason at all.

Signed: _____

Printed Name: __BRIAN K. CARTER__          Date: __2/19/04__

Employee ID Number: _____ _or_ last 4 digits of Social Security Number: __5940_____

116423                                       5.                              Rev. 1/04

## EXHIBIT A

### California Labor Code Section 2870

(a)   Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

   (1)  Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

   (2)  Result from any work performed by the employee for the employer.

(b)   To the extent that a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

RECEIVED TIME   OCT. 27.   10:58AM               PRINT TIME   OCT. 27.   11:00AM

## EXHIBIT B

List of family members and other relatives (identified by familial status) and individuals or entities that I provided financial services to prior to joining Schwab (attach additional pages if necessary)

_____
Initials

116423

7.

Rev. 1/04

## EXHIBIT C

### List of Prior Agreements

Initials

116423

8.

Rev. 1/04

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES SCHWAB & CO., INC. | ) | |
| | ) | |
| Plaintiff, | ) | Judge: |
| | ) | |
| v. | ) | Magistrate Judge: |
| | ) | |
| BRIAN D. CARTER, ACORN ADVISORY | ) | Case No.: |
| MANAGEMENT, L.L.C., and ACORN | ) | |
| ADVISORY CAPITAL, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFICATION BY CERTIFICATION

I, Pete Matthew, being first duly sworn on oath, depose and state as follows:

1.      I am a Vice President of plaintiff Charles Schwab & Co., Inc., and am familiar with the facts set forth herein.

2.      I certify that the factual statements set forth in the Verified Complaint For Temporary Restraining Order, Preliminary Injunction, And Other Relief are true and correct, except as to matters therein stated to be on information and belief, and as to such matters I certify that I verily believe the same to be true.

FURTHER AFFIANT SAYETH NOT.

SUBSCRIBED and SWORN to
before me this _2_ day of
November, 2004.

_____
Notary Public

LAURA CARNERO
COMM. #1451971
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires Dec. 8, 2007



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s): Charles Schwab & Co., Inc.**

County of Residence: San Francisco

Plaintiff's Atty:    See Attachment.

**Defendant(s):Brian D. Carter, Acorn Advisory Management, L.L.C. and Acorn Advisory Capital, L.P.**    JUDGE AMY ST. EVE

County of Residence:

Defendant's Atty:    04C  7071

MAGISTRATE JUDGE KEYS

**II. Basis of Jurisdiction:**    **4. Diversity (complete item III)**

**III. Citizenship of Principal Parties (Diversity Cases Only)**

Plaintiff:- **5 Non IL corp and Principal place of Business outside IL**

Defendant:- **5 Non IL corp and Principal place of Business outside IL**

**IV. Origin :**    **1. Original Proceeding**

**V. Nature of Suit:**    **290 Other Real Property**

**VI.Cause of Action:**    **Misappropriation of trade secrets.**

**VII. Requested in Complaint**

Class Action:**No**

Dollar Demand:

Jury Demand:**No**

**VIII. This case IS NOT a refiling of a previously dismissed case.**

Signature:

Date:    11/2/04

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**    Revised: 06/28/00

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES SCHWAB & CO., INC. | ) | |
| | ) | |
| Plaintiff, | ) | Judge: |
| | ) | |
| v. | ) | Magistrate Judge: |
| | ) | |
| BRIAN D. CARTER, ACORN ADVISORY | ) | Case No.: |
| MANAGEMENT, L.L.C., and ACORN | ) | |
| ADVISORY CAPITAL, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

## ATTACHMENT TO CIVIL COVER SHEET

**Plaintiff's Attorney Information:**

Eric D. Brandfonbrener
Darrell J. Graham
Jonathan R. Buck
PERKINS COIE LLP
131 South Dearborn Street, Suite 1700
Chicago, IL 60603-5559
Phone: (312) 324-8400
Fax: (312) 324-9400

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

**EASTERN DIVISION**

In the Matter of
CHARLES SCHWAB & CO., INC.
Plaintiff,
v.
BRIAN D. CARTER, ACORN ADVISORY
MANAGEMENT, L.L.C., ACORN
ADVISORY CAPITAL, L.P.,
Defendants.

JUDGE AMY ST. EVE

Case Number:

04C 7071

MAGISTRATE JUDGE KEYS

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff: Charles Schwab & Co., Inc.

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Eric D. Brandfonbrener | NAME Darrell J. Graham |
| FIRM Perkins Coie LLP | FIRM Same as A. |
| STREET ADDRESS 131 South Dearborn St., #1700 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL 60603 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 324-8602 — FAX NUMBER (312) 324-9400 | TELEPHONE NUMBER (312) 312-8637 — FAX NUMBER (312) 324-9400 |
| E-MAIL ADDRESS ebrand@perkinscoie.com | E-MAIL ADDRESS dgraham@perkinscoie.com |
| IDENTIFICATION NUMBER 06195674 | IDENTIFICATION NUMBER 06190511 |
| MEMBER OF TRIAL BAR? YES ☒ NO ☐ | MEMBER OF TRIAL BAR? YES ☒ NO ☐ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☒ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Jonathan R. Buck | NAME |
| FIRM Same as A. | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 324-8644 — FAX NUMBER (312) 324-9400 | TELEPHONE NUMBER — FAX NUMBER |
| E-MAIL ADDRESS jbuck@perkinscoie.com | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER 06281672 | IDENTIFICATION NUMBER |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

# EXHIBIT B

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 7071 | **DATE** | 11/3/2004 |
| **CASE TITLE** | Charles Schwabb & Co., Inc. vs. Brian D. Carter, et al | | |

MOTION:

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  The Court hereby dismisses Plaintiff's Complaint without prejudice for failure to sufficiently plead diversity jurisdiction.  Plaintiff shall have thirty (30) days to file an amended complaint alleging the citizenship of each of Acorn Advisory Management, L.L.C.'s and Acorn Advisory Capital, L.P.'s members or some other basis for federal jurisdiction.  Plaintiff's motion for a temporary restraining order and motion for preliminary injunction is denied without prejudice.  Plaintiff's emergency motion for expedited discovery and preservation of evidence is also denied without prejudice.

(11) ■ [For further detail see order on the reverse side of the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

NOV – 4 2004
date docketed

date mailed notice

courtroom deputy's initials  TH✓

Date/time received in central Clerk's Office

docketing deputy initials

mailing deputy initials

Document Number

5

(Reserved for use by the Court)

# ORDER

Plaintiff Charles Schwab & Co., Inc. has sued Brian D. Carter, Acorn Advisory Management, L.L.C. and Acorn Advisory Capital, L.P. Plaintiff's Complaint asserts diversity as the sole basis for subject matter jurisdiction. "It is axiomatic that a federal court must assure itself that it possesses jurisdiction over the subject matter of an action before it can proceed to take any action respecting the merits of the action. The requirement that jurisdiction be established as a threshold matter 'springs from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Cook v. Winfrey*, 141 F.3d 322, 325 (7th Cir. 1998), *quoting Steel C. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998).

Plaintiff alleges that Acorn Advisory Management, L.L.C. is "is a Delaware Limited Liability Company with its principal place of business in New York, New York." Plaintiff further alleges that Acorn Advisory Capital, L.P. is a "Delaware limited partnership affiliated with Acorn Advisory Management, L.L.C. with is principal place of business in New York, New York." Plaintiff does not identify any members of Acorn Advisory Management, L.L.C. or Acorn Advisory Capital, L.P. Further, Plaintiff does not particularize any citizenship allegations as to the members of either of these entities. As the Seventh Circuit has noted, "the citizenship of an LLC for purposes of the diversity jurisdiction is the citizenship of its members." *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998). Similarly, "[t]he citizenship of a partnership is the citizenship of the partners, even if they are limited partners, so that if even one of the partners (general or limited) is a citizen of the same state as the plaintiff, the suit cannot be maintained as a diversity suit." *Id.*

Accordingly, the Court hereby dismisses the Complaint without prejudice for failure to sufficiently plead diversity jurisdiction. Plaintiff shall have thirty (30) days to file an amended complaint alleging the citizenship of each of Acorn Advisory Management, L.L.C.'s and Acorn Advisory Capital, L.P.'s members or some other basis for federal jurisdiction.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| CHARLES SCHWAB & CO., INC. | ) | |
| | ) | |
| Plaintiff, | ) | Judge Amy J. St. Eve |
| | ) | |
| v. | ) | Magistrate Judge Arlander Keys |
| | ) | |
| BRIAN D. CARTER, ACORN ADVISORY | ) | Case No. 04 C 7071 |
| MANAGEMENT, L.L.C., and ACORN | ) | |
| ADVISORY CAPITAL, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED VERIFIED COMPLAINT
FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND OTHER RELIEF**

Plaintiff Charles Schwab & Co., Inc. ("Schwab"), by its attorneys, brings this

action for immediate injunctive and other relief. Schwab complains as follows:

## CASE OVERVIEW

1.      This action arises out of the actual and threatened misappropriation of

confidential business information by Defendants.  Prior to defendant Brian D. Carter's ("Carter")

resignation from Schwab, he was the Director of Information Technology for Schwab

Soundview Capital Markets' Investment Analytics division ("IA").  Carter resigned without

notice on October 22, 2004, to join defendant Acorn Advisory Management, L.L.C. and/or

defendant Acorn Advisory Capital, L.P. (collectively, "Acorn").

2.      Prior to November 1, 2004, IA had been in the business of providing proprietary

analytical research to approximately 100 institutional clients nationwide.  The analytical research

distributed by IA was derived from approximately eighteen, trade secret financial models (the

"Models"), which are confidential, complex analytical formulations prepared over many years by

and at great expense to Schwab and maintained on Schwab's computer systems.

3.     Carter served IA in a supporting, technology capacity.  He did not develop the IA Models or provide ongoing analytical research used to maintain the Models.  IA employed numerous highly trained analysts (PhDs and MBAs) who, working with Carter, ran and maintained the IA Models for Schwab.

4.     In or about September 2004, Schwab announced it was closing IA, effective November 1, 2004.  In connection with the closing of IA, Schwab offered its IA employees generous severance packages or employment within other areas of Schwab.

5.     On October 1, 2004, Acorn made a written offer to acquire IA.  Acorn and its affiliates manage in excess of $750 million in hedge fund assets and had been one of IA's institutional clients.  Acorn expressed interest to Schwab in acquiring IA's Models, because, on information and belief, Acorn appreciated the value of IA's Models, including to Acorn's hedge fund business.  Acorn proposed to acquire all of IA's intellectual property, including specifically the proprietary Models IA had developed, as well as six IA employees, including Carter and several of IA's analysts.

6.     Schwab rejected Acorn's offer.  The Models IA used are closely related to the proprietary financial models Schwab continues to use in connection with Schwab Equity Ratings, the investment research offered to its retail client base.  Schwab has made substantial investments in developing and advertising its Schwab Equity Ratings, and that service is a vital component of Schwab's retail client offering.  Accordingly, to maintain the competitive value of the models used for its retail client base, Schwab decided to retain IA's confidential intellectual property, including the Models.

7.     On information and belief, on or about Friday, October 15, 2004, *after* Schwab rejected Acorn's offer to acquire IA, Acorn made offers to employ Carter and several of IA's analysts.  On information and belief, all IA analysts rejected Acorn's employment offers on or about Monday, October 18, 2004.

8.      Although all of the IA analysts Acorn had hoped to hire declined Acorn's offer,
Acorn did not withdraw its offer to Carter. On Monday, October 18, 2004, on information and
belief in preparation for joining Acorn and with the support and encouragement of Acorn, Carter
e-mailed confidential data to Acorn relating to certain of the outside data sources used in IA's
Models. Schwab's records indicate that Carter accessed huge volumes of Schwab computer
information (approximately 15,000 computer files in a single day) over the weekend preceding
October 18, 2004. On information and belief, Carter did not regularly work on weekends and
would have no reason to be accessing this volume of data on Schwab's behalf.

9.      On Thursday, October 21, 2004, also on information and belief, in continuing
preparation to join Acorn, Carter came to work at IA's office with a powerful, new, laptop,
containing a DVD burner, suitable for copying massive amounts of digital information, such as
IA's Models. This laptop was either Carter's personal property or the property of Acorn; it was
not one of the laptops Schwab provided Carter for use on Schwab's behalf. On information and
belief, Carter copied IA's Models and other computer information using this new laptop. On
information and belief, Carter copied the Models on behalf of and/or for the benefit of his future
employer, Acorn, with Acorn's support and encouragement.

10.     Carter had previously told colleagues at IA that he had or was going to copy and
keep IA's Models. When told by a subordinate IA employee that such conduct was illegal,
Carter argued that it was not because Schwab was closing IA.

11.     On October 22, 2004, the day after appearing in IA's offices with the new laptop
with DVD burner, Carter resigned from Schwab without warning. Had Carter remained at
Schwab for another week, he would have received a severance package from Schwab.

12.     On information and belief, Acorn paid Carter a substantial amount of money to
induce him to join Acorn before his severance payment from Schwab was paid to him and to

- 3 -

bring along to Acorn the IA proprietary information Carter had copied by exceeding his authorized access to IA computers, including the IA Models.

13. On information and belief, Acorn does not have an office in Illinois. On information and belief, Carter's value to Acorn is primarily the proprietary IA Models Carter unlawfully misappropriated from IA.

14. Defendants' conduct is already causing irreparable harm and threatens further irreparable harm to Schwab through the misappropriation and misuse of trade secret and other confidential information, and harm to Schwab's business.

15. Defendants' conduct against Schwab, which is described in more detail below, constitutes unfair competition, breach of fiduciary duty, inducement to breach fiduciary duties, misappropriation of trade secrets and conversion. Carter's conduct also violates Schwab's confidentiality policies to which Carter agreed as a condition of and throughout his employment with Schwab.

16. By this action, Schwab does not seek to restrain Carter from working for Acorn. Rather, Schwab seeks immediate injunctive relief to prevent Defendants from using and profiting from the information Carter has no right to retain or share with Acorn.

### PARTIES

17. Schwab is a full service investment and securities firm. Schwab is a California corporation with its principal place of business in San Francisco, California.

18. Brian Carter currently resides in Tinley Park, Illinois.

19. Acorn Advisory Management, L.L.C., is a diversified portfolio of hedge-fund assets. Acorn Advisory Management, L.L.C. is a Limited Liability Company formed in Delaware with its principal place of business in New York, New York.

- 4 -

20.     Acorn Advisory Capital, L.P. is a limited partnership formed in Delaware affiliated with Acorn Advisory Management, L.L.C. with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

21.     This District Court has personal jurisdiction over Defendants because they reside and/or do business in this District.

22.     The Court has federal question jurisdiction over this action. . The court's subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331 in that this case arises, in part, under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

23.     Venue also is proper in this District because Carter resides in the District and the events giving rise to the claims at issue in this Verified Complaint occurred here. See 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.      Carter received access to Schwab's confidential information
         pursuant to his fiduciary and contractual relationship with Schwab.**

24.     Schwab acquired IA's predecessor for substantial consideration, in part to acquire IA's proprietary Models and other intellectual property IA owned. Through IA, Schwab generated and maintained substantial amounts of confidential information, including proprietary investment research strategies and analytical tools. The Models provided Schwab with a competitive edge in the marketplace, and have substantial worth. The complex Models were kept confidential and were not disclosed to customers of IA or other individuals outside of Schwab.

25.     Schwab used the IA Models in developing similar models now used by Schwab Equity Ratings, which serves investment research needs of Schwab retail clients. Thus, despite Schwab's determination in 2004 to close IA, the continued confidentiality and protection of trade

- 5 -

secrets generated and maintained by IA provides Schwab with a continuing competitive advantage in other areas of its business.

26.    To protect the confidentiality of its trade secret information, Schwab has instituted numerous policies and precautions. Schwab has security at all of its offices and restricts access to confidential information on a need-to-know basis. Schwab also has other security provisions, including computer pass codes and detailed security procedures.

27.    To further protect the confidentiality of its information, Schwab also has confidentiality policies to which Carter agreed. For example, as recently as February 2004, Carter signed a Charles Schwab Confidentiality, Nonsolicitation and Assignment Agreement (the "Confidentiality Agreement"), expressly agreeing to protect the confidentiality of Confidential Information owned, maintained, or developed by Charles Schwab. A true and correct copy of the Confidentiality Agreement signed by Carter is attached hereto as Ex. A.

28.    The Confidentiality Agreement defines Confidential Information to include Schwab's confidential and trade secret information. *See* Ex. A at § 1.

29.    Pursuant to the Confidentiality Agreement, Carter agreed as follows (at § 4):

> I . . . will not, for any purpose, directly or indirectly, disclose, reproduce, use, or disseminate in any manner during or after my employment with Schwab, on my own behalf or on behalf of any other person, company or entity, any Confidential Information.

30.    Carter further agreed (at § 8):

> I agree that during my employment with Schwab, I will not remove any property of Schwab in original or copied form, including, but not limited to, any Confidential Information existing in any form from Schwab's premises, except as required in the ordinary course of my duties at Schwab and as necessary for me to perform my duties. I agree that I will promptly return to Schwab immediately upon Schwab's request, my acceptance of other employment, or the termination of my employment for any reason, any and all documents and materials that contain, refer to, or relate in any way to any Confidential Information, as well as any other property of Schwab in my possession or control . . .. I further agree that I will permit Schwab to inspect any materials provided by Schwab to me or developed by me as a result of or in connection with my employment with Schwab

- 6 -

when I accept other employment or otherwise separate from my
employment, regardless of where said materials are located.

31.    In the Confidentiality Agreement, Carter also agreed that in the event of a breach

of the Agreement by Carter, Schwab was entitled to injunctive relief including specifically (at

§ 11(a)):

I specifically CONSENT TO THE ISSUANCE OF INJUNCTIVE RELIEF
ordering, among other things: . . . (a) that I return to Schwab all records of any
kind or nature (including but not limited to original and duplicate, typed and
handwritten, soft (electronic, diskette) and hard copy and any other form)
containing, referring to, or otherwise based on Confidential Information, and that
I be prohibited from using or disclosing such records or the information in such
records.

32.    In reliance on his promises to maintain the confidentiality of Schwab's

confidential information, Carter was furnished with and granted access to substantial amounts of

Schwab's proprietary and confidential information.

33.    At the time of Carter's resignation, he had access to the entire information

network of the IA division, including access to the Models, the production platforms on which

the Models were processed, and customer information, but Carter was only authorized to access

the information network insofar as it was necessary for Carter to perform his duties as Director

of Research Technologies for IA.

**B.    Carter breached his duties to Charles Schwab, including by
misappropriating its confidential information.**

34.    While still serving as an employee of Schwab and in a position of trust and

confidence at Schwab, Carter coordinated with Acorn to divest Charles Schwab of proprietary

and confidential business information.

35.    On information and belief, Defendants agreed that Carter would resign from

Schwab without waiting one additional week for the severance package being offered by Schwab

and would bring along copies of IA's models and other confidential information useful to Acorn

in its business.

- 7 -

36.     On information and belief, Defendants have converted Schwab's confidential business information, including misappropriated copies of IA's Models. This information is Schwab's property and contains Schwab's proprietary and trade secret information.

37.     While Carter was entitled to have access to and to use this information to perform his duties for Schwab, he had no authorization or right to copy all or part of such records for personal use and was specifically required by his Confidentiality Agreement and Schwab's policies to return all such records and copies thereof to Schwab upon terminating from Schwab.

38.     Schwab has uncovered powerful evidence of Carter's misappropriation and conversion of Schwab's business information. For example, on October 18, 2004, Carter sent an email to Gary Sabot, a manager at Acorn, attaching documents that could facilitate Acorn's access to an information database licensed by Schwab and used in connection with the proprietary IA Models. On information and belief, Carter also provided Acorn with additional information facilitating Acorn's unauthorized access to this information database.

39.     On October 21, 2004, the day before he resigned, Carter came to IA's offices with a new, high-powered personal laptop computer – *i.e.*, not one of the computers issued to him by Schwab for use in connection with his work for Schwab. This new laptop computer contained a high-speed disc burner that allowed Carter to download and burn to a digital medium large amounts of data. On information and belief, Carter used this personal laptop computer to download and store copies of Schwab's confidential, trade secret information, including but not limited to copies of the Models, which Carter then removed from the Schwab IA office without authorization. Carter had informed other IA employees that he had intended to download information from Schwab's computers.

40.     Schwab's confidential trade secrets, including the Models, are not publicly available and cannot be reconstructed from other sources. The Models represent years of investment, calculations, research, and refinement of strategies and analytical tools.

- 8 -

41.     On information and belief, Carter copied and removed from Schwab's offices confidential information, including copies of the Models. On information and belief, this information was or is about to be delivered to Acorn.

42.     In connection with the filing of this lawsuit, Schwab is demanding the return of all confidential information taken by Carter and received by Acorn.

**C.     Defendants threaten to inflict serious and irreparable injury on Schwab.**

43.     On information and belief, Defendants continue to have possession or control of Schwab's proprietary and trade secret information, including the detailed, confidential Models and other proprietary business information belonging to Schwab.

44.     On information and belief, Defendants have used or are about to use the Schwab proprietary and trade secret information in their possession or control to do one or more of the following: (a) undermine Schwab's competitive advantages arising from its proprietary and trade secret information; (b) use Schwab proprietary and trade secret information to improve Acorn's own research technologies and strategies without compensating Schwab for the unauthorized use of this proprietary information; and (c) otherwise engage in acts constituting conversion and misappropriation of Schwab trade secrets and confidential information, breach of fiduciary duties, and other tortious conduct.

## COUNT I

## MISAPPROPRIATION OF TRADE SECRETS
### (AGAINST ALL DEFENDANTS)

45.     Schwab incorporates the above allegations.

46.     Schwab has protectable trade secrets in the Models and other confidential information to which Carter had full access while an employee of Schwab.

47.     Schwab derives economic value from these trade secrets due to them not being generally known to other persons who could obtain economic value from their disclosure or use.

- 9 -

48.     Schwab has made reasonable efforts under the circumstances to maintain its trade secrets' secrecy and confidentiality.

49.     Defendants have misappropriated or threaten to misappropriate Schwab's trade secrets.

50.     Schwab has been injured and is continuing to be injured by Defendants' misappropriation of its trade secrets.

## COUNT II

### CONVERSION
### (AGAINST ALL DEFENDANTS)

51.     Schwab incorporates the above allegations.

52.     Defendants have wrongfully, and without authorization, retained possession, custody or control over files and information belonging to Schwab.

53.     Schwab is the rightful owner of all copies of the Models, the platforms on which the Models are processed, customer records and information, and Schwab's business information taken by Carter at Acorn's direction or with Acorn's active support.

54.     Schwab's right to possession of this property is immediate, absolute, and unconditional.

55.     Schwab has been injured and is continuing to be injured by Defendants' misappropriation.

## COUNT III

### BREACH OF FIDUCIARY DUTY
### (AGAINST CARTER)

56.     Schwab incorporates the above allegations.

57.     As an employee of Schwab who was allowed access to Schwab's confidential and other information, Carter owed Schwab certain fiduciary duties.

58.     Among these fiduciary duties are the duty of loyalty and fair dealing while working for Schwab, the duty to advance the interests of Schwab, the duty to preserve Schwab's information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to Schwab's interests.

59.     Carter breached these duties by, among other things, converting Schwab's confidential and trade secret information to his personal use and the use of Acorn while affiliated with Schwab, and afterwards; using this information against Schwab's interests.

60.     Schwab has been injured and is continuing to be injured by Carter's breaches.

## COUNT IV

## BREACH OF CONTRACT
## (AGAINST CARTER)

61.     Schwab incorporates the above allegations.

62.     Carter signed and agreed to comply with the requirements set forth in the Confidentiality Agreement (Ex. A).

63.     In this Confidentiality Agreement, Carter expressly agreed that he would not divulge and disseminate Schwab's confidential and proprietary information.

64.     These terms are reasonable in that they impose restraints on Carter that are no greater than required to protect Schwab's legitimate interests, do not impose undue burden on Carter, and are not injurious to the public.

65.     These terms protect Schwab's legitimate interests in its trade secret and other confidential information and in its goodwill.

66.     Carter has willfully breached the terms of his Confidentiality Agreement by, among other things, converting to his personal benefit and the benefit of Acorn confidential business information owned and maintained by Schwab.

67.     Schwab has been injured and is continuing to be injured by Carter's breaches.

## COUNT V

## AIDING AND ABETTING AND/OR INDUCING A BREACH OF FIDUCIARY DUTY
### (AGAINST ACORN DEFENDANTS)

68.    Schwab incorporates the above allegations.

69.    As an employee of Schwab who was allowed access to Schwab's confidential and other information, Carter owed Schwab certain fiduciary duties.

70.    Among these fiduciary duties are the duty of loyalty and fair dealing while working for Schwab, the duty to advance the interests of Schwab, the duty to preserve Schwab's information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to Schwab's interests.

71.    On information and belief, Carter breached these duties by, among other things, converting Schwab's confidential and trade secret information to his personal use and the use of Acorn while affiliated with Schwab, and afterwards; using this information against Schwab's interests.

72.    On information and belief, Acorn assisted Carter in breaching his fiduciary duties and/or induced Carter to breach such duties to Schwab through one or more of the following acts: (a) compensating Carter if he left Schwab abruptly and without notice; (b) encouraging Carter to misappropriate copies of the Models and other confidential Schwab information prior to Carter's resignation; (c) requesting that Carter provide Acorn with information Acorn knew was proprietary Schwab information; (d) offering Carter a performance bonus based on Carter's ability to provide Acorn with the Models and other Schwab proprietary information.

73.    On information and belief, Acorn took such actions with knowledge that its actions would assist Carter in breaching his fiduciary duties and/or induced Carter to breach such duties to Charles Schwab.

74.     Schwab has been injured and is continuing to be injured as a result of the Acorn Defendants' aiding and abetting of Carter's breach of fiduciary duties and/or the Acorn Defendants' inducement to Carter to breach fiduciary duties.

<div align="center">

**COUNT VI**

**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**
**(AGAINST ALL DEFENDANTS)**

</div>

75.     Schwab incorporates the above allegations.

76.     Schwab maintains one or more computers and/or computer systems that are "protected computers" pursuant to 18 U.S.C. § 1030(e)(2)(B) because they are used in interstate commerce and communication. Schwab's confidential and proprietary information is stored on, and may be accessed from, one or more of these protected computers, access to which is controlled via secret passwords.

77.     Carter intentionally accessed Schwab's protected computers by using passwords that had been issued to Carter—only for Carter to perform his duties as Director of Research Technologies for IA—for the purpose of misappropriating Schwab's confidential and proprietary electronic information. On information and belief, Carter downloaded and copied and thus obtained substantial amounts of confidential business and financial information from Schwab's computers immediately before resigning and has retained this information to use for his benefit and the benefit of Acorn. On information and belief, Carter acted with Acorn's support and encouragement.

78.     Carter intentionally "exceeded authorized access," as that term is defined in 18 U.S.C. § 1030(e)(6), to Schwab's protected computers by logging on to said computers for the purpose of obtaining Schwab's confidential and proprietary information for Defendants' gain and for use in interstate commercial activities. Defendants have thus obtained information to which they were not entitled, including via interstate communication, thereby violating 18 U.S.C. § 1030(a)(2)(A) and (C).

<div align="center">- 13 -</div>

79. By exceeding, or attempt to exceed, authorized access to Schwab's protected computers, Defendant have caused Schwab loss or damage of at least, in the aggregate, five thousand dollars (US$5,000.00) during a one-year period preceding the filing of this Complaint.

80. Defendants have also, knowingly and with intent to defraud Schwab, exceeded Carter's authorized access to Schwab's protected computers and obtained Schwab's confidential and proprietary information, such information being of considerable value to Schwab, thereby violating 18 U.S.C. § 1030(a)(4).

**WHEREFORE**, Schwab respectfully requests the following relief:

A. Direct Defendants to return all originals and copies of information, documents and other things taken from Schwab, including all copies of the Models and other Schwab business information in Defendants' possession or control, in hard copy or electronically stored (all electronically stored records must also be deleted permanently from Defendants' computers or other electronic memory files);

B. Enjoin Defendants, their agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms and corporations acting in connection or participation with them or on their behalf, from revealing, disclosing or using in any manner information contained in the records of Charles Schwab, including the Models and any other Schwab business information;

C. Impose a constructive trust for Schwab's benefit on all proceeds of Carter's fiduciary breaches;

D. Award damages and attorney's fees and costs; and

E. Grant such other relief as just and appropriate.

November 3, 2004                          Respectfully submitted,

                                          CHARLES SCHWAB & CO., INC.

                                          By:

Eric D. Brandfonbrener
Darrell J. Graham
Jonathan Buck
PERKINS COIE LLP
131 S. Dearborn, Suite 1700
Chicago, IL 60603
Tel: (312) 324-8400
Fax: (312) 324-9400

*See Case File*
*for*
*Exhibits*

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

NOV 1 0 2004 WH

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CHARLES SCHWAB & CO., INC., )
)
)
)  No. 04 C 7071
Plaintiff, )
)  Honorable Amy J. St. Eve
v. )
)  Magistrate Judge Arlander Keys
BRIAN D. CARTER, ACORN ADVISORY )
CAPITAL MANAGEMENT, INC., and )
ACORN ADVISORY CAPITAL, L.P., )
)
Defendants. )
)

**DOCKETED**

NOV 1 2 2004

## NOTICE OF FILING

**TO:**   Eric D. Brandfonbrener
Darrel J. Graham
Jonathan Buck
PERKINS COIE LLP
131 South Dearborn
Suite 1700
Chicago, IL 60603

PLEASE TAKE NOTICE that on **November 10, 2004,** we filed in the United States District Court for the Northern District of Illinois, Eastern Division, the attached **Defendants' Memorandum on Subject Matter Jurisdiction,** a copy of which is hereby served upon you.

Dated: November 10, 2004

_Peter V. Baugher_
One of the Attorneys for Defendants

Peter V. Baugher
Arthur J. Howe
Anna E. Seder
Schopf & Weiss LLP
312 West Randolph, Suite 300
Chicago, Illinois 60606
(312) 701-9300

140634_1.DOC

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**F I L E D**

CHARLES SCHWAB & CO., INC.,                )
                                           )
                                           )
                                           )
                         Plaintiff,         )
                                           )
             v.                            )
                                           )
BRIAN D. CARTER, ACORN                     )
ADVISORY CAPITAL MANAGEMENT,               )
INC., and ACORN ADVISORY                   )
CAPITAL, L.P.,                             )
                                           )
                         Defendants.        )

NOV 1 0 2004  WH

No. 04 C 7071  **MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

Honorable Amy J. St. Eve

Magistrate Judge Arlander Keys

**DOCKETED**

NOV 1 2 2004

## DEFENDANTS' MEMORANDUM ON SUBJECT MATTER JURISDICTION

Defendants Brian D. Carter, Acorn Advisory Capital Management, Inc.

and Acorn Advisory Capital, L.P. ("Defendants"), through their attorneys, respectfully

submit this memorandum regarding the Court's subject matter jurisdiction over this

matter.

## I.    INTRODUCTION

Plaintiff Charles Schwab & Co., Inc. ("Plaintiff") originally filed a

Verified Complaint for Temporary Restraining Order, Preliminary Injunction, and Other

Relief against Defendants on November 2, 2004.  The Court *sua sponte* dismissed that

complaint because Plaintiff failed to adequately allege diversity jurisdiction.  Plaintiff

filed its First Amended Verified Complaint for Temporary Restraining Order,

Preliminary Injunction, and Other Relief ("Amended Complaint") on November 3, 2004.

The sole basis for federal jurisdiction asserted in Plaintiff's Amended Complaint is Count

VI, brought under 18 U.S.C. §1030, also known as the Computer Fraud and Abuse Act

("CFAA").

140624_1.DOC

At the November 8, 2004 hearing on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunctive Relief, the Court invited the parties to submit statements regarding subject matter jurisdiction. Defendants submit this Memorandum in response to the Court's invitation.

## II. 18 U.S.C. § 1030 IS AN ANTI-HACKING STATUTE INAPPLICABLE TO THE FACTS PLED

Plaintiff's Amended Complaint asserts the CFAA as the basis for this Court's subject matter jurisdiction in this case. Specifically, Plaintiff claims that Defendants violated 18 U.S.C. §§ 1030(a)(2)(A), (a)(2)(C) and (a)(4). (*See* Amended Complaint ¶¶ 78, 80.) These sections of the CFAA – *neither of which is a permitted ground for a private suit under § 1030(g)* – state:

> (a) Whoever --
>
> (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains--
>
> (A) information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.); [or] ***
>
> (C) information from any protected computer if the conduct involved an interstate or foreign communication;
>
> (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

18 U.S.C. §§ 1030(a)(2)(A), (a)(2)(C) and (a)(4).

The CFAA, however, allows a private plaintiff to bring a civil action in only certain circumstances under subsection (a)(5)(B):

2

Any person who suffers *damage* or *loss* by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of *subsection (a)(5)(B)*. Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages.

18 U.S.C. § 1030(g) (emphasis added).

18 U.S.C. § 1030(a)(5)(B)(i)-(v) provides:

(B) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused (or, in the case of an attempted offense, would, if completed, have caused) --

(i) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(iii) physical injury to any person;

(iv) a threat to public health or safety; or

(v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security;

18 U.S.C. §§ 1030(a)(5)(B)(i)-(v). Only § 1030(a)(5)(B)(i) could possibly apply here.

Plaintiff's Amended Complaint alleges violations of portions of the law for which there is no private right of action. And it fails to allege the "loss" that the CFAA requires to assert such a cause. The complaint alleges that "[b]y exceeding, or attempt [sic] to exceed, authorized access to Schwab's protected computers, Defendants have caused Schwab loss or damage of at least, in the aggregate, five thousand dollars ($5,000.00) during a one-year period preceding the filing of this Complaint." (Amended

Complaint ¶ 79.)  However, it fails to allege anywhere in the complaint the type of damage or loss that meets the statutory definitions.

18 U.S.C. § 1030 is an anti-hacking statute.  S. REP. NO. 101-544 (1990) ("This bill catches up with some problems already out of hand, by strengthening laws against computer abuse, deterring malicious computer hacking, and aiding prosecution of computer crimes without criminalizing creative attempts at legitimate experimentation."); Press Release, The White House, Assuring Security and Trust in Cyberspace (July 17, 2000), http://www.cotse.com/helpdesk/documents/whpr/pr51.html (proposing amendments to CFAA to "[s]trengthen the computer hacking law.").  It was enacted to prevent the destruction of data or impairment of service as a result of serious computer abuses, *Davies v. Afilias Ltd.*, 293 F. Supp. 2d 1265, 1273 (M.D. Fla. 2003), *not* to expand or federalize traditional state law causes of action such as misappropriation of trade secrets.

The statute defines damage and loss in this context.  "[T]he term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information." § 1030(e)(8).  Similarly, "the term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and *restoring the data*, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of *interruption of service* . . . ."  § 1030(e)(11) (emphasis added).

Plaintiff's Amended Complaint does not charge Carter -- let alone the Acorn defendants – with having caused any specific damage to Plaintiff's computer system or data.  The Amended Complaint also fails to allege that, as a result of Defendants' actions, Plaintiff incurred costs in conducting damage assessments, restoring

4

data, or due to an interruption of service. There is no allegation that Defendants unleashed a virus or a worm onto Plaintiff's system, or that they destroyed data, or that they interrupted Plaintiff's service in any way. Instead, the Amended Complaint contains only broad statements regarding Defendants' purported misappropriation of Plaintiff's "confidential and proprietary electronic information," many "on information and belief." (*See, e.g.*, Amended Complaint ¶ 77.)

## III. COUNT VI OF THE AMENDED COMPLAINT DOES NOT STATE AN ADEQUATE BASIS FOR FEDERAL JURISDICTION

### A. The CFAA Does Not Create a Federal Cause of Action for Alleged Trade Secret Misappropriation

In today's business world, almost all alleged trade secrets and proprietary data are stored on computers. If a simple allegation of misappropriation of electronic information were enough to establish jurisdiction under the CFAA, every state-law based trade secret misappropriation case could be transformed into a federal court claim. This is especially true where, as here, a former employee is accused of taking information from his former employer's computer system and sharing that information with his new employer. There is no indication that Congress intended the CFAA to result in such a sweeping expansion of federal jurisdiction. As discussed above, Congress' purpose was far more focused.

### B. Plaintiff Cannot Assert a Cause of Action for the Violations Specified in the Amended Complaint

A private right of action cannot be asserted under the provisions of the CFAA asserted as violations in the Amended Complaint. Indeed, "the Act limits civil enforcement to actions claiming a violation of § 1030(a)(5)(B)." *McLean v. Mortgage One & Fin. Corp.*, No. Civ. 04-1158, 2004 WL 898440 (D. Minn. Apr. 9, 2004) (in denying defendant counterclaimant's motion for preliminary injunction, court found that

5

defendant was not likely to succeed on its CFAA claim because claim was made under

§ 1030(a)(4)); *see also* § 1030(g), *supra.*[1]

**C.   This Court Lacks Federal Question Jurisdiction because Plaintiff has not Adequately Alleged that It Suffered "Damage" or "Loss"**

This Court does not have jurisdiction under the CFAA because the

Amended Complaint does not allege that Plaintiff suffered damage or loss as defined by

the CFAA. A recent decision from the Southern District of New York states that "… the

meaning of 'loss', both before and after the term was defined by statute, has consistently

meant a cost of investigating or remedying damage to a computer, or a cost incurred

because the computer's service was interrupted." *Nexans Wires S.A. v. Sark-USA, Inc.*,

319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004). In that case, plaintiffs alleged that defendants

violated the CFAA "by inducing [employees] to copy and delete the computer files …

which contained plaintiffs' 'confidential proprietary information.'" *Id.* at 471.

Defendants moved to dismiss the complaint, which the court treated as a motion for

summary judgment. The *Nexans Wires* court granted defendants' motion as to plaintiffs'

CFAA claim because plaintiffs failed to establish that they suffered a "loss" as defined by

the CFAA. As the court stated:

> …it seems that "loss" means any remedial costs of
> investigating the computer for damage, remedying the
> damage and any costs incurred because the computer
> cannot function while or until repairs are made. However,
> there is nothing to suggest that the "loss" or costs alleged
> can be unrelated to the computer.

*Id.* at 474.

---

[1] § 1030(g) was amended in 2001 to add the express requirement that actions be brought under (a)(5)(B). Pub. L. No. 107-56, 115 Stat. 272 (codified as amended at 18 U.S.C. § 1030) (2004).

Plaintiff's Amended Complaint does not assert that it suffered any "remedial costs of investigating the computer for damage, remedying the damage [or] any costs incurred because the computer cannot function while or until repairs are made." *Id.* Nor does Plaintiff allege any similar facts to establish that this Court has subject matter jurisdiction. *See also Davies*, 293 F. Supp. 2d at 1273 ("As the legislative history indicates, a civil cause of action [under the CFAA] was added to redress damage and loss as a result of serious computer abuses, such as transmission of viruses or destructive worms and use of fraud to access non-public information."); *Pearl Inv., LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 349 (D. Maine 2003) (plaintiff failed to establish damages under CFAA because plaintiff "sets forth no cognizable evidence that the Defendants' alleged conduct damaged its system in any quantifiable amount, let alone in an amount approximating more than $5,000 in one year."); *Tyco Int'l v. John Does 1-3*, No. 01 Civ. 3856 RCCDF, 2003 WL 21638205, *1 (S.D.N.Y. July 11, 2003) ("the [CFAA] allows recovery for losses beyond the mere physical damage to property, [but] the additional types of damages awarded by courts under the Act have generally been limited to those costs necessary to assess the damage caused to the plaintiff's computer system or to resecure the system in the wake of a hacking attack.") (citations omitted).

Plaintiff's Amended Complaint is also deficient in alleging that Plaintiff suffered damages as required by the CFAA.[2] The complaint contains no allegations that Plaintiff suffered "any impairment to the integrity or availability of data, a program, a system, or information." § 1030(e)(8). Plaintiff's failure to even attempt to allege damage as defined by the CFAA further undermines this Court's subject matter

---

[2] § 1030(a)(5)(B) requires that defendant have committed the conduct described in (a)(5)(A), each subparagraph of which requires an allegation that defendant's action *caused damage*.

jurisdiction. *Moulton v. VC3*, No. 1:00CV434-TWT, 2000 WL 33310901, *6 (N.D. Ga.
Nov. 7, 2000) (plaintiff's summary judgment motion granted on defendant's
counterclaim under CFAA because defendant's allegations of damage – the expenditure
of time and money to investigate plaintiff's activities – did not fall within the statute's
definition that "the damage must be an impairment to the *integrity* and *availability* of the
network [and] Defendant's network security was never actually compromised and no
program or information was ever unavailable as a result of [plaintiff's] activities.")
(emphasis in original).

    *George S. May Int'l Co. v. Hostetler*, No. 04 C 1606, 2004 WL 1197395
(N.D. Ill. May 28, 2004) (Kocoras, J.), should not lead to a different conclusion. In that
case, the individual defendant left plaintiff's consulting firm to start his own company.
The plaintiff filed suit against the individual defendant and his new firm, claiming,
among other things, that defendants infringed on plaintiff's copyrighted works and that
they violated the CFAA by "us[ing] access to [plaintiff's] computer system to take
several copyrighted documents with him when he left..." *Id.* at *1. Judge Kocoras
denied defendants' motion to dismiss for lack of subject matter jurisdiction and failure to
state a claim. The court found that there was no reason "why infringement of
copyrighted material taken from a protected computer system would not qualify as
impairment of the integrity of the copyrighted information." *Id.* at *4.

    *Hostetler* is distinguishable. First, unlike the Amended Complaint, the
*Hostetler* complaint expressly alleged that defendants' conduct "caused damage to
[plaintiff], *including damage to the integrity of [plaintiff's] data, programs, system and
information,* in an amount causing loss aggregating at least $5,000 in value during a one-
year period." (Complaint for Injunctive and Other Relief ¶ 48, Case No. 04 C 1606)

8

(emphasis added.) Second, although Judge Kocoras found that infringement of *copyrighted* material constituted damage under the CFAA, copyright infringement is, of course, its own cause of action and basis for federal jurisdiction. Plaintiff's Amended Complaint contains no such allegation. Third, the *Hostetler* plaintiff specifically alleged that defendants actually used some of the information that was supposedly misappropriated on their website. (Complaint for Injunctive and Other Relief ¶ 26, Case No. 04 C 1606.) Here, Plaintiff alleges no specific use that Defendants made of any purportedly misappropriated materials, let alone any loss or damage to its computer or data, as discussed earlier in this memorandum. (*See, e.g.*, Amended Complaint ¶¶ 36, 44, conclusory allegations themselves made on "information and belief".)

## IV.    CONCLUSION

For the reasons stated above, the Amended Complaint fails to adequately plead federal subject matter jurisdiction.

Dated:  November 10, 2004

Respectfully Submitted,

One of the Attorneys for Defendants

Peter V. Baugher
Arthur J. Howe
Anna Eisner Seder
SCHOPF & WEISS LLP
312 West Randolph Street, Suite 300
Chicago, Illinois 60606
312.701.9300

**Westlaw.**

Slip Copy                                                                                             Page 1
2004 WL 1197395 (N.D.Ill.), 2004 Copr.L.Dec. P 28,807
**(Cite as: 2004 WL 1197395 (N.D.Ill.))**

**C**
Motions, Pleadings and Filings

United States District Court,
N.D. Illinois, Eastern Division.

GEORGE S. MAY INTERNATIONAL COMPANY,
Plaintiff,
v.
Daniel L. HOSTETLER and Strategic Business
Partners, LLC, Defendants.

**No. 04 C 1606.**

May 28, 2004.

*MEMORANDUM OPINION*

KOCORAS, Chief J.

*1 This matter comes before the court on the motions of Defendants Daniel Hostetler and Strategic Business Partners, LLC ("SBP") to dismiss Counts I and II of the complaint and to stay proceedings in this case pending arbitration. For the reasons set forth below, the motion to dismiss is denied and the motion to stay is granted.

BACKGROUND

Plaintiff George S. May International Company ("GSMIC") is a consulting firm. Hostetler is a former employee of GSMIC; over the more than 15 years that he worked for the company, Hostetler held various management and executive positions. Hostetler held his last two positions with GSMIC pursuant to employment agreements, one executed on April 23, 1995, and the other on March 23, 2003.

Both contracts contained the following provision, captioned "Post Employment Dispute Resolution":

If, after employment, any dispute, claim or controversy shall arise between [Hostetler], on the one hand, and [GSMIC], on the other hand, as to any issue whatsoever the same shall be referred to and settled by the "arbitration" procedure set forth [within the agreement], which may be requested upon the application of any interested party, provided, however, that either party may seek

injunctive relief ... without resorting to or completing arbitration. No arbitrator shall have the authority to grant injunctive relief.

In 2003, Hostetler formed SBP, his own consulting firm. [FN1] In August of that year, Hostetler left GSMIC for SBP. According to the complaint, Hostetler used his access to GSMIC's computer system to take several copyrighted documents with him when he left; SBP is allegedly using the same in its own consulting activities. GSMIC also claims that, prior to his departure, Hostetler used $100,000 of GSMIC funds for his own benefit.

FN1. Although GSMIC's response assumes that the formation of SBP coincided with Hostetler's departure, the complaint does not make that allegation. The sole statement, contained in ¶ 20, states that Hostetler formed a consulting firm but does not specify when that occurred.

GSMIC filed the instant complaint in March 2004, alleging copyright infringement, violations of the Computer Fraud and Abuse Act ("CFAA"), breach of contract, breach of fiduciary duty, unjust enrichment, and common-law fraud. The prayer for relief seeks legal and equitable remedies. Hostetler and SBP have filed a motion to dismiss the copyright infringement and CFAA counts pursuant to Fed. Civ. Proc. 12(b)(1) and 12(b)(6), respectively, as well as a motion to stay the proceedings in this case pending arbitration pursuant to the arbitration clauses contained in Hostetler's two employment contracts.

LEGAL STANDARDS
A. Motions to Dismiss

The purpose of a motion to dismiss pursuant to Rule 12(b)(1) is to dismiss claims over which a federal court lacks subject matter jurisdiction. Jurisdiction is the "power to decide" and must be conferred upon a federal court. *In re Chicago, Rock Island & Pac. R.R. Co.,* 794 F.2d 1182, 1188 (7th Cir.1986). The plaintiff bears the burden of establishing that the jurisdictional requirements have been met. *See Kontos v. United States Dep't of Labor,* 826 F.2d 573, 576 (7th Cir.1987). When a defendant moves for dismissal pursuant to Rule 12(b)(1), the plaintiff must support its allegations with competent proof of jurisdictional facts. *See Thomson v. Gaskillwsa,* 315

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

U.S. 442, 446 (1942).

*2 Fed. R. Civ. Proc. 12(b)(6) evaluates the legal sufficiency of a plaintiff's complaint. _Gibson v. City of Chicago,_ 910 F.2d 1510, 1520 (7th Cir.1990). In ruling on a motion to dismiss, the court must accept all well-pleaded allegations as true and will not dismiss a case for failure to state a claim unless the plaintiff cannot prove any facts sufficient to support his claim. _Conley v. Gibson,_ 355 U.S. 41, 45-46 (1957). All inferences shall be drawn in a light most favorable to the plaintiff. _Jackson v. E.J. Branch Corp.,_ 176 F.3d 971, 978 (7th Cir.1999). To survive a motion to dismiss, a plaintiff must only provide a "short and plain statement" under Rule 8(a)(2); the particulars of the claim are not required. _Midwest Gas Servs. v. Ind. Gas Co.,_ 317 F.3d 703, 710 (7th Cir.2002).

B. Motion to Stay Pending Arbitration

The Federal Arbitration Act ("FAA") provides that an arbitration clause in a "contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It is well settled that arbitration is a favored means of dispute resolution, and the FAA established a clear policy favoring arbitration. _See Kiefer Speciality Flooring, Inc. v. Tarkett,_ Inc., 174 F.3d 907, 909 (7th Cir.1999). To effect this policy, courts liberally construe any contractual language pertaining to arbitration and resolve doubts in favor of arbitrability. _See Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,_ 460 U.S. 1, 24-25 (1983).

A party contesting the submission of the claim to arbitration must clearly show that the presumption of arbitrability does not apply. _See International Union of Operating Engineers, Local Union 103 v. Indiana Const. Corp.,_ 13 F.3d 253, 255-56 (7th Cir.1994). The arbitrability of a particular issue turns on principles of contract interpretation, as "a party cannot be required to submit to arbitration any dispute which he has not agree so to submit." _United Steelworkers v. Warrior & GulfNavigation Co.,_ 363 U.S. 574, 582, 80 S.Ct. 1347 (1960). A claim will be deemed arbitrable if an arbitration clause is capable of any interpretation that a claim is covered. _See International Union of Operating Engineers, Local Union 103 v. Indiana Const. Corp.,_ 13 F.3d 253, 255-56 (7th Cir.1994). If parties have a contract providing for arbitration of some issues, questions concerning the scope of issues subject to arbitration should be resolved in favor of arbitration. _See Miller v. Flume,_ 139 F.3d 1130, 1136 (7th Cir.1998).

DISCUSSION

A. Motion to Dismiss

_1. Count I: Copyright Infringement_

A viable claim for copyright infringement is comprised of two parts: the plaintiff must own a valid copyright, and the defendant must have copied constituent elements of the plaintiff's work that are original. _Feist Publications, Inc. v. Rural Telephone Serv. Co., Inc.,_ 499 U.S. 340, 361, 111 S.Ct. 1282, 1296 (1991). While copyright ownership and protection attach at the time a work is created, a suit for infringement cannot be brought until the copyright owner registers a copyright or has a registration application refused. 17 U.S.C. § 411(a); _Pickett v. Prince,_ 207 F.3d 402, 404 (7th Cir.2000).

*3 Hostetler's argument in support of his motion to dismiss Count I focuses on the fact that, although the complaint contains general allegations of both copyright registration and infringement, it provides specifics of both issues for only a few works for which GSMIC owns the copyright. Contrary to Hostetler's ultimate position, this shows that we do have subject matter jurisdiction. Allegations as to even one copyrighted and properly registered work would be sufficient to establish our jurisdiction in this case. As that is the only question directly presented by the 12(b)(1) motion, we decline to accept Hostetler's invitation to further define the precise parameters of Count I at this stage of the proceedings. Dismissal under 12(b)(1) is inappropriate, and the motion pertaining to Count I is correspondingly denied.

_2. Count II: Computer Fraud and Abuse Act_

Count II of the complaint is premised upon an alleged violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. As Hostetler correctly points out, the complaint does not specify the sections of the statute upon which it relies. Instead, the allegations contain language that could apply to violations of § 1030(a)(2)(C), § 1030(a)(4), or § 1030(a)(5). Hostetler attacks the sufficiency of the pleading only with respect to the latter two subsections, citing various authorities arising from factual settings distinguishable from those in the case at bar, making them of limited use to offer up guidance for our decision.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

A case decided in the Western District of Washington, cited by neither party, supplies us with an analogous factual situation and persuasive reasoning. In *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,* the plaintiff sued a competitor for luring away its employees after encouraging them to steal trade secrets out of the plaintiff's computer system. 119 F.Supp.2d 1121 (W.D.Wash.2000). The defendant moved to dismiss the CFAA count of the complaint, making much the same arguments as Hostetler and SBP do here. The court engaged in a thorough analysis of the statute and its application to a scenario in which an employee uses his or her access to an employer's computer system to appropriate the employer's intellectual property. Ultimately, the court concluded that, in a situation such as that presented here, causes of action are available under each of the subsections listed above. We are convinced that a like outcome is warranted in this case.

Hostetler's argument that the conduct attributed to him within the complaint did not exceed his authorized access falls flat. While Hostetler may very well be correct that he was entitled to access the information when he was employed by GSMIC, it is no stretch of the imagination to conclude that his authorization did not extend to removing copyrighted material from the computer system for his personal benefit or that of a competitor. *See id.* at 1125 (noting that an employee's prior authorization was lost when proprietary information was obtained and sent to a competitor).

*4 Moreover, Hostetler's contention that the loss alleged within the complaint cannot satisfy the statutory requirement of damages is inconsistent with the definition contained within the statute itself. For purposes of the CFAA, " 'damage' means any impairment to the integrity or availability of data, a program, a system, or information. 18 U.S.C. § 1030(e)(8). We see no principled reason, nor has Hostetler offered one, why infringement of copyrighted material taken from a protected computer system would not qualify as impairment of the integrity of the copyrighted information.

Hostetler also professes that, to the extent Count II relies on § 1030(a)(4), it must be dismissed for failure to comply with the particularity requirements of Fed. R. Civ. Proc. 9(b) because of its inclusion of terminology pertaining to fraudulent behavior. However, the *Shurgard* court again concluded that a cause of action under 18 U.S.C. § 1030(a)(4) is sufficiently pleaded if it alleges that the defendant

"participated in dishonest methods to obtain the plaintiff's secret information. *Shurgard,* 119 F.Supp.2d at 1126. GSMIC's complaint satisfies this standard.

Finally, we do not agree with SBP's claim that it cannot be included in the CFAA count. According to SBP, it was not formed at the time Hostetler allegedly acted and therefore no agency relationship was possible between it and Hostetler. Because there is no allegation that SBP independently accessed GSMIC's computers, SBP contends that no CFAA count can be pleaded against it.

While the complaint is not crystal clear, it is reasonable to infer from GSMIC's allegations that Hostetler was acting as an agent of SBP at the time the claimed acts occurred. The case SBP cites to counter the propriety of allegations against it is inapposite; in that case, there was no allegation of an agency relationship between the two defendants. *Role Models America, Inc. v. Jones,* 305 F.Supp.2d 564 (D.Md.2004). Citing *Shurgard,* the court in *Role Models* acknowledged that the presence of an agency relationship between defendants can make the difference between a viable claim and a 12(b)(6) dismissal. *Id.* at 567. That scenario is conceivable under the allegations advanced here.

Accordingly, the 12(b)(6) motion to dismiss Count II is denied in its entirety.

B. Motion to Stay Pending Arbitration

Hostetler's second motion stems from the arbitration provision of the two employment contracts entered by the parties in 1995 and 2003. According to Hostetler, the broad language of these provisions mandates arbitration of the causes of action listed in the complaint, with the exception of the requests for injunctive relief in Counts I and II.

GSMIC's response is twofold. The first is procedural; GSMIC contends that the motion is premature because neither party has initiated arbitration proceedings. Although we have no indication that arbitration has commenced, that presents no impediment to Hostetler's motion. *See, e.g., Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.,* 50 F.3d 388, 389 (7th Cir.1995). The second challenge is substantive; GSMIC argues that the presence of SBP, which was not a party to the arbitration agreement, and the requests for injunctive relief in its complaint add up to several nonarbitrable claims that this court has the discretion to consider

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1197395 (N.D.Ill.), 2004 Copr.L.Dec. P 28,807
(Cite as: 2004 WL 1197395 (N.D.Ill.))

despite any potential or even contemporaneous arbitration proceedings. *See Dickinson v. Heinold Securities, Inc.,* 661 F.2d 638 (7th Cir.1981).

*5 While we agree with GSMIC that we do have discretion to proceed on the nonarbitrable issues, we do not agree that the proper exercise of that discretion in this case would be to do so. Rather, this case presents a situation similar to that in *Air Freight Servs., Inc. v. Air Cargo Transport, Inc.,* 919 F.Supp. 321 (N.D.Ill.1996). Arbitrable issues include whether Hostetler breached his contractual obligations and, if so, how he did so as well as the factual underpinnings of the CFAA and copyright infringement counts. These issues are inextricably linked to any that we would consider in deciding the questions presented by the complaint that are not subject to arbitration. Although the arbitrator could only award part of the relief sought if GSMIC prevailed on its CFAA and copyright claims, there is no advantage to be gained by duplicative adjudication and potentially conflicting results therefrom. Consequently, we conclude that the more prudent course of action in these circumstances is to stay this litigation until GSMIC and Hostetler complete arbitration of issues falling within the ambit of the two employment agreements or both parties waive their entitlement to the same. *See Cabinetree,* 50 F.3d at 390-91.

## CONCLUSION

Based on the foregoing analysis, Hostetler's motion to dismiss Counts I and II of the complaint is denied. His motion to stay proceedings pending arbitration is granted.

2004 WL 1197395 (N.D.Ill.), 2004 Copr.L.Dec. P 28,807

Motions, Pleadings and Filings (Back to top)

•        1:04CV01606          (Docket) (Mar. 01, 2004)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
2004 WL 898440 (D.Minn.)
(Cite as: 2004 WL 898440 (D.Minn.))

Page 1

<u>Motions, Pleadings and Filings</u>

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.

Blake MCLEAN, Jesse Spaeth, Kris Kurth, Trevor
Anker, Ben Lambert, Lee Barron,
Keophosy Fongsumonth, Nathan Reardon, and Eric
Flamm, on behalf of themselves
and other past and present similarly situated,
Plaintiffs,
v.
MORTGAGE ONE & FINANCE CORPORATION,
and David Delavari, Defendants.

No. Civ.04-1158(PAM/JSM).

April 9, 2004.

Adam A. Gillette, <u>James H. Kaster</u>, Nichols Kaster
& Anderson, Craig William Trepanier, James C.
MacGillis, Trepanier & MacGillis PA, Mpls, MN, for
Plaintiffs.

<u>Gavin Paulson Craig</u>, Craig Law Office, Wayzata,
MN, for Defendanst.

MEMORANDUM AND ORDER

<u>MAGNUSON</u>, J.

*1 This matter is before the Court on Defendants'
Motion for a Temporary Restraining Order. Because
Plaintiffs have responded to the Motion, the Court
will convert the Motion into a Motion for Preliminary
Injunction.

BACKGROUND

Plaintiffs are former employees of Defendant
Mortgage One & Finance Corporation ("Mortgage
One"). Mortgage One is a mortgage broker. Plaintiffs
brought a Complaint against Mortgage One and its
President, Defendant David Delavari, alleging that
Defendants required them to work in excess of 40
hours per week without compensation in violation of
the Fair Labor Standards Act. The Complaint
purports to be on behalf of Plaintiffs and all others

similarly situated. Mortgage One contends that
Plaintiffs Kris Kurth, Nathan Reardon, Eric Flamm,
and Ben Lambert stole secret customer information,
in violation of Minnesota law and the confidentiality
and non-solicitation agreements they signed with
Mortgage One. [FN1] Mortgage One also asserts that
these Plaintiffs wrongfully entered a secure website
maintained by a lender and downloaded customer
information from that site, ostensibly in violation of
the Computer Fraud and Abuse Act, <u>18 U.S.C. §
1030</u>. Finally, Mortgage One alleges that Plaintiffs
are wrongfully attempting to lure employees away
from Mortgage One, in violation of Minnesota law
and their non-solicitation agreements. Mortgage One
seeks an injunction against all of these alleged
wrongs.

FN1. Mortgage One makes no allegations
with respect to the remaining five Plaintiffs.
However, the Motion does not otherwise
distinguish between Plaintiffs and seeks an
injunction against all Plaintiffs.

DISCUSSION

A preliminary injunction may be granted only if the
moving party can demonstrate: (1) a likelihood of
success on the merits; (2) that the balance of harms
favors the movant; (3) that the public interest favors
the movant; and (4) that the movant will suffer
irreparable harm absent the injunction. <u>Dataphase
Sys., Inc. v. C L Sys., Inc.</u>, 640 F.2d 109, 113 (8th
Cir.1981). Injunctive relief is considered to be a
"drastic and extraordinary remedy that is not to be
routinely granted." <u>Intel Corp. v. ULSI Sys. Tech.,
Inc.</u>, 995 F.2d 1566, 1568 (Fed.Cir.1993).

A. Likelihood of Success on the Merits

1. *Breach of Confidentiality and Non-Solicitation
Agreement*

Although Mortgage One contends that this Motion is
not based on the alleged breach of Plaintiffs'
confidentiality and non-solicitation agreements, much
of the discussion relating to whether Plaintiffs knew
or should have known that Mortgage One's customer
lists were confidential centers on the existence of
these agreements. Thus, the Court must preliminarily
determine whether these agreements are enforceable.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Mortgage One contends that the agreements were entered into at the inception of employment and are therefore supported by consideration and are valid. Plaintiffs, on the other hand, argue that they signed the agreements after beginning employment and that the agreements are therefore not valid. It is well settled in Minnesota that a restrictive covenant that is not part of the initial employment contract must be supported by independent consideration. *Freeman v. Duluth Clinic, Inc.,* 334 N.W.2d 626, 630 (Minn.1983). There is no evidence that the agreements at issue were supported by anything other than the promise of continued employment. Absent other consideration, the promise of continued employment does not constitute sufficient consideration for a restrictive covenant. *See Davies & Davies Agency v. Davies,* 298 N.W.2d 127, 130-31 (Minn.1980). Because there is a genuine dispute as to whether the agreements were signed before Plaintiffs began their employment, and because restrictive covenants are looked on with disfavor and carefully scrutinized, *Nat'l Recruiters, Inc. v. Cashman,* 323 N.W.2d 736, 740 (Minn.1982), Mortgage One has not established a likelihood of success on any of its claims seeking to enforce the covenants in the confidentiality and non-solicitation agreements.

### 2. *Computer Fraud & Abuse Act*

**\*2** Mortgage One contends that its claims under the Act arise under 18 U.S.C. § 1030(a)(4). (Defs.' Supp. Mem. at 10.) This section prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization ... [and thereby] obtain[ing] anything of value [of more than $5000]...." 18 U.S.C. § 1030(a)(4). The Act provides that one who suffers "damage or loss" because of a violation of the Act may bring a civil action for compensatory damages and injunctive relief. *Id.* § 1030(g). However, the Act limits civil enforcement to actions claiming a violation of § 1030(a)(5)(B), not § 1030(a)(4). Thus, Mortgage One cannot maintain a civil action on its claims for a violation of § 1030(a)(4), and is therefore not likely to succeed on its claims under the Act.

### 3. *Misappropriate of Confidential Information and Trade Secrets*

The crux of Mortgage One's claims of misappropriation is that Plaintiffs' stole Mortgage One's confidential customer lists. However, Mortgage One does not independently discuss this claim in its memorandum. Rather, Mortgage One quotes extensively from Plaintiffs' confidentiality

agreements, and seems to rely on the alleged violation of the confidentiality agreements as proof that Plaintiffs misappropriated Mortgage One's confidential and trade-secret information. Thus, Mortgage One does not discuss the requirements for trade secrets, such as whether the information was not generally known or readily available, or whether Mortgage One made reasonable efforts to maintain the secrecy of the information. Minn.Stat. § 325C.01, subd. 5.

Absent any evidence that the information at issue indeed constitutes trade secrets or confidential information, Mortgage One cannot show that it is likely to succeed on the merits of its misappropriation claims. Moreover, the Court has determined that there is a substantial question as to whether the confidentiality agreements are enforceable. Thus, Mortgage One may not rely on the existence of confidentiality agreements to establish that the information protected by those agreements is a trade secret. Mortgage One has failed to show that it is likely to succeed on the merits of its misappropriation claims.

### 4. *Other Claims*

Mortgage One also argues that it is likely to succeed on the merits of its claims regarding Plaintiffs' alleged interference with Mortgage One's employees. However, Mortgage One clearly states in its memorandum that its request for injunctive relief is based solely on the irreparable harm caused by Plaintiffs' alleged misappropriation of confidential customer information. (Defs.' Supp. Mem. at 8.) Thus, the Court will not analyze the merits of Mortgage One's other claims.

### B. Irreparable Harm

Mortgage One contends that Plaintiffs' activities in "obtaining [Mortgage One's] confident customer information and contacting prospective, current and former customers" are irreparably harming Mortgage One. (Defs.' Supp. Mem. at 8.) According to Mortgage One, the loss of a customer means not only that Mortgage One loses that customer's present business, but also the possibility of future business and referrals from that customer. Plaintiffs contend that any harm Mortgage One suffers can be easily quantified, and thus that there is no irreparable harm.

**\*3** The misappropriation of trade secrets can constitute irreparable harm if the victim can show a threat that those secrets will be used and will cause

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 898440 (D.Minn.)
**(Cite as: 2004 WL 898440 (D.Minn.))**

Page 3

the victim injury. However, because Mortgage One has failed to show that it is likely to succeed on the merits of its misappropriation claims, it has likewise failed to show that it will suffer any irreparable harm. *Int'l Bus. Mach. Corp. v. Seagate Tech., Inc.,* 941 F.Supp. 98, 101 (D.Minn.1992) (Magnuson, J.) (noting that for injunction to issue, movant must show both misappropriation of trade secrets and threat of disclosure of those secrets). The absence of irreparable harm alone justifies the denial of the Motion, and the Court need not consider the remaining *Dataphase* factors. *See, e.g., Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 738 (8th Cir.1989) (en banc) (injunction may not issue without a showing of irreparable harm); *Dataphase,* 640 F.2d at 114 n. 9 ("absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction").

CONCLUSION

The Court finds that Mortgage One is not entitled to an injunction. Accordingly, IT IS HEREBY ORDERED that Defendants' Motion for injunctive relief (Clerk Doc. No. 5) is DENIED.

Motions, Pleadings and Filings (Back to top)

• 0:04CV01158 (Docket) (Mar. 10, 2004)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Motions, Pleadings and Filings

United States District Court, N.D. Georgia.

Scott Alan MOULTON and Network Installation Computer Services, Inc .,
Plaintiffs
v.
VC3, Defendant.

**No. 1:00CV434-TWT.**

Nov. 7, 2000.

For plaintiffs: Kevin L. Ward and Erin S. Stone of Schulten, Ward & Turner, Atlanta, Ga.

For defendant: Michael W. Hogue of Nelson, Mullins, Riley & Scarborough, Columbia, S.C., and Donald L. Swift, III, of Nelson, Mullins, Riley & Scarborough, Atlanta, Ga.

ORDER

THRASH, D.J.

***1** This is a diversity action in which the Plaintiffs seek damages for defamation, tortious interference with business relations, and injunctive relief. The Defendant counterclaimed for defamation and asserted claims for alleged violations of the Georgia Unfair Trade Practices Act, O.C.G.A. § 10- 1-372, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Georgia Computer Systems Protection Act, O.C.G.A. § 16-6-90 *et seq.,* and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. It is before the Court on Plaintiffs' Motion for Summary Judgment [Doc. 14] and Defendant's Motion for Summary Judgment [Doc. 15]. For the reasons set forth below, the Court grants both motions.

I. BACKGROUND

Plaintiff Network Installation Computer Services, Inc. ("NICS") is a Georgia corporation in the business of installing and servicing computer networks for corporate, business and governmental entities. Plaintiff Scott Alan Moulton is the president and principal owner of NICS. Defendant VC3 is a South Carolina corporation with its principal place of business in Columbia, South Carolina. Defendant provides similar computer services as Plaintiff NICS. From August 1998 to December 30, 1999, Plaintiff NICS had a continuing service contract with Cherokee County to perform computer-related work including network administration for the Cherokee County 911 Center. Defendant contracted with the City of Canton to perform certain services with respect to Canton's computer network. To date, Defendant continues to provide computer services for the City of Canton.

Plaintiffs and Defendant first came in contact with each other on December 17, 1999, when Plaintiff Moulton arrived at the new site of the City of Canton Police Department. Chief Cantrell hired Plaintiff NICS to set up a router connecting the City of Canton Police Department with the Cherokee County 911 Center. During the course of the day, through conversations with Chief Cantrell and employees of Defendant, Plaintiff Moulton allegedly became concerned for the security of the server in the Cherokee County 911 Center.

As a result of his security concerns, it is undisputed that on December 21, 1999, Plaintiff Moulton performed a series of remote access tests on Defendant's servers. These tests included a port scan and a throughput test. A port scan is a method of checking a computer to see what ports are open by trying to establish a connection to each and every port on the target computer. If used by a network administrator on his own network, the scan is a method of determining any possible security weaknesses. If used by an outsider, the scan indicates whether a particular port is used and can be probed for weakness. A throughput test sends information across a network to test the speed with which a computer processes data. [FN1] Plaintiff

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 33310901 (N.D.Ga.), 2001-1 Trade Cases P 73,202
**(Cite as: 2000 WL 33310901 (N.D.Ga.))**

Moulton continued the remote access port scan on the morning of December 22, 1999, when Steven Nance, a network administrator for Defendant, sent Plaintiff Moulton an e-mail questioning the reason for the port scan. Plaintiff Moulton terminated the port scan immediately and responded that he worked for Cherokee County 911 Center and was testing security. Ardalan Shokoohi, a representative of Defendant; then contacted Defendant's client, Chief Cantrell of the City of Canton Police Department, to notify him of "suspicious activity" on Defendant's network. Mr. Shokoohi inquired if Chief Cantrell had authorized Plaintiff Moulton to run such a test. After responding that he had not granted Plaintiff Moulton such authorization, Chief Cantrell then contacted officials from Cherokee County to determine whether Cherokee County had granted the authorization. Cherokee County in turn confirmed that it had not authorized Plaintiff Moulton to conduct the activity. Subsequently, the Georgia Bureau of Investigation was contacted to investigate Plaintiff Moulton's actions.

> FN1. There is some dispute as to whether Plaintiff Moulton performed a throughput test or a ping flood. The tests are similar, although a ping flood carries a greater risk of slow down on the network. The distinction, however, does not affect the Court's decision and is, therefore, irrelevant.

*2 On December 30, 1999, a meeting was held at the Canton Police Department to discuss the activities that had taken place in the previous week. Attending the meeting were Ardalan Shokoohi and Alan Howard of Defendant VC3, Chief Cantrell, Plaintiff Moulton, various representatives of Cherokee County, the Chief of Police for Holly Springs, the Chief of Police for Woodstock, and GBI agent Eric Davis. At the meeting, a discussion ensued regarding the security of Defendant's network and Plaintiff Moulton's activities with respect to Defendant's network. At the conclusion of the meeting, Cherokee County terminated its business relationship with Plaintiffs Moulton and NICS. Several weeks later, Plaintiff Moulton was arrested pursuant to a State of Georgia arrest warrant and charged with criminal attempt to commit computing trespass against Defendant. Subsequent to the arrest, Plaintiffs filed this action

claiming damages for defamation, tortious interference with business relations, and injunctive relief. Defendant filed a counterclaim claiming damages for defamation, unfair trade practices, violations of the Computer Fraud and Abuse Act and of the Georgia Computer Systems Protection Act, commercial disparagement in violation of the Lanham Act, and injunctive relief.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 158-159, 26 L.Ed.2d 142, 90 S.Ct. 1598 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 91 L.Ed.2d 265; 106 S.Ct. 2548 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

## III. DISCUSSION
## A. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## 1. DEFAMATION

Defendant claims statements Plaintiff Moulton made concerning Defendant were defamatory. Three comments made by Plaintiff Moulton are at issue. First is a statement made by Plaintiff Moulton to C.J. Johns, information systems manager for the Cherokee County Sheriff's Office, on or about December 19, 1999, that Defendant had created security risks and that Defendant's network employees were stupid. Second were statements made by Plaintiff Moulton to C.J. Johns, on or about December 20, 1999, that the way Defendant planned to connect the Police Department to two systems created a security risk from the Internet. Finally, Defendant claims statements made at a meeting held on December 30, 1999, to multiple

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 33310901 (N.D.Ga.), 2001-1 Trade Cases P 73,202
**(Cite as: 2000 WL 33310901 (N.D.Ga.))**

Page 3

persons from the City of Canton and Cherokee County, that Defendant's network had created a security risk, were also defamatory. Plaintiffs assert that these statements were opinion, not fact, and are not actionable.

**\*3** "There is no wholesale defamation exemption for anything that might be labeled opinion ... [and] to say otherwise would ignore the fact that expressions of opinion may often imply an assertion of objective fact." *Eidson v. Berry,* 202 Ga.App. 587, 587-88, 415 S.E.2d 16 (1992) (citations and punctuation omitted); *Kendrick v. Jaeger,* 210 Ga.App. 376, 377, 436 S.E.2d 92 (1993). The pivotal question is whether the statements can reasonably be interpreted as stating or implying defamatory facts and, if so, whether the defamatory assertions are capable of being proved false. *Id.* Statements about which reasonable people might differ, however, and which cannot be proved to be true or false, are not actionable as defamation. *Kirsch v. Jones,* 219 Ga.App. 50, 51, 464 S.E.2d 4 (1996).

The statement allegedly made by Plaintiff Moulton that Defendant's employees were "stupid" falls into this category of nonactionable opinion or hyperbole. This statement reflects Plaintiff Moulton's subjective opinion of the relative intelligence of Defendant's employees. Reasonable people could differ as to whether or not these employees were intelligent. Therefore, this statement is not actionable defamation. The remaining statements deal primarily with the security of Defendant's network system. Computer security is also a subject on which reasonable people could differ. A network's security is relative to the risks posed. A network might be secure for one risk, and insecure as to another. Plaintiff Moulton's blanket assertions that Defendant's network contained security risks were statements to which reasonable people might differ and that are not capable of being proved true or false. Consequently, Plaintiff Moulton's statements are not actionable and Plaintiffs' Motion for Summary Judgment is granted as to Defendant's defamation claim.

## 2. UNFAIR TRADE PRACTICES

Defendant also claims that Plaintiffs violated the

Georgia Unfair Trade Practices Act [FN2] because Plaintiff Moulton's allegedly defamatory statements disparaged the business of Defendant through "false and misleading representations of fact." O.C.G.A. § 10-1-372(a)(8). Specifically, Defendant claims that Plaintiff Moulton disparaged Defendant's business by stating to numerous people, both at and prior to the December 30, 1999 meeting, that Defendant's network was insecure.

> FN2. In Defendant's Answer and Counterclaims, Defendant also asserts a violation of the South Carolina Unfair Trade Practices Act, S.C.Code Ann. § 16-16-10. Defendant does not address the South Carolina statute in its brief, and the Court holds that it does not apply in this case. Although Defendant is a citizen of South Carolina, both Plaintiffs are citizens of Georgia and the factual basis of both parties' claims occurred in Georgia. As such, the Court holds that Georgia law controls.

Defendant's claims of unfair trade practices cannot survive summary judgment. The entire basis for this claim are the statements which the Court has already held are opinion and, therefore, not defamatory. The Georgia Court of Appeals has held that the presence of privilege combined with the absence of malice eliminates any claim a plaintiff may have under the Unfair Trade Practices Act when based on allegedly defamatory statements. *Dominy v. Shumpert,* 235 Ga.App. 500, 506, 510 S.E.2d 81 (1998). In other words, a statement that is not defamatory cannot support a claim under the Unfair Trade Practices Act. It follows then that statements which are not defamatory because they are mere opinion cannot be the basis of an unfair trade practices claim that Defendant made false and misleading representations of *fact.* Plaintiffs' Motion for Summary Judgment as to Defendant's unfair trade practices claim is granted.

## 3. SECTION 43(A) OF THE LANHAM ACT

**\*4** Defendant also claims Plaintiffs violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Amendments to the Act in 1989 made actionable false statements by a defendant not only about his own products and services, but also about

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 33310901 (N.D.Ga.), 2001-1 Trade Cases P 73,202
**(Cite as: 2000 WL 33310901 (N.D.Ga.))**

the plaintiff's products or services, if in the context of commercial advertising or promotion. Section 43(a) now provides, in relevant part:

Any person who, on or in connection with any goods or services, ... uses in commerce any ... false or misleading representation of fact, which ... (2) in commercial advertising or promotion, misrepresents the nature, characteristics [or] qualities ... of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). In essence, Defendant is stating a claim for commercial defamation. To establish a commercial defamation claim under the Lanham Act, Defendant must show that (1) Plaintiff Moulton made false or misleading factual representations about the nature, characteristics or qualities of Plaintiffs' services; (2) that Plaintiff Moulton used the false or misleading representations "in commerce", on or in connection with any services; (3) that Plaintiff Moulton made the false or misleading representations in the context of commercial advertising or commercial promotion; and (4) that Plaintiff Moulton's actions made Defendant believe that they were likely to be damaged by such false or misleading factual representations. *National Artists Management Co. v. Weaving,* 769 F.Supp. 1224, 1230 (S.D.N.Y.1991). Plaintiffs cannot make out the first element of a commercial defamation claim because factual representations are required. This Court has already held that Plaintiff Moulton's statements were opinion and not fact. No claim for commercial defamation pursuant to the Lanham Act can be made based on representations which are mere opinion.

Even if Plaintiff Moulton's statements were factual, however, Defendant would not survive summary judgment on its commercial defamation claim. The Lanham Act requires that allegedly false statements be made in "commercial advertising or promotion." *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1077 (N.D.Ill.1993). A four part test determines whether a misrepresentation meets the "commercial advertising or promotion" requirement. The communication (1) must constitute commercial speech; (2) be made by a defendant in direct

competition with plaintiff; (3) for the purposes of influencing the purchase of its goods and services; and (4) "while the representations need not be made in a 'classic advertising campaign,' but may consist of more informal types of 'promotion,' the representations ... must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Gordon and Breach Science Publishers S.A. v. American Institute of Physics* 859 F.Supp. 1521, 1535-36 (S.D.N.Y.1994); *Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1384 (5th Cir.1996); *Garland Co. v. Ecology Roof Sys. Corp.,* 895 F.Supp. 274, 277 (D.Kan.1995); *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.,* 880 F.Supp. 1005, 1019-20 (S.D.N.Y.1994).

*5 Generally, claims pursuant to Section 43(a) meet this test because they involve paid advertisements by a competitor on television or radio, or in newspapers or magazines. Those statements not made in a traditional advertising campaign make for harder cases. The statute, however, is not meant to include all statements made by one competitor about its or another competitor's product. *Garland,* 895 F.Supp. at 279 (holding that "this court has found no indication that Congress, through its use of the language 'commercial advertising or promotion,' intended to extend Lanham Act coverage to every isolated alleged misrepresentation made to a potential customer by a business competitor"). In fact, it has been held that the "commercial advertising and promotion" requirement was to "ensure that...incidental representations were beyond the scope of the Act [and that] only promotional representations that are directed at the purchasing public can be reached by § 43(a) ." *Mobius,* 880 F.Supp. at 1020.

In this case, the Court holds that the statements that are the subject of the present action do not meet the test of "commercial advertising or promotion." The statements made by Plaintiff Moulton were not commercial speech. In evaluating whether Plaintiff Moulton's statements fall within commercial speech, the Court holds that the meaning of "commercial speech" in the context of § 43(a)(1)(b) of the Lanham Act tracks the First Amendment "commercial speech" doctrine. *Gordon & Breach,* 859 F.Supp. at 1536 (holding that "Congress

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 33310901 (N.D.Ga.), 2001-1 Trade Cases P 73,202
**(Cite as: 2000 WL 33310901 (N.D.Ga.))**

intended Section 43(a) to extend only to false and misleading speech that is encompassed within the 'commercial speech' doctrine developed by the United States Supreme Court"). Commercial speech has been defined by the Supreme Court as "expression related solely to the economic interests of the speaker and its audience" and "speech proposing a commercial transaction." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 561-62, 65 L.Ed.2d 341, 100 S.Ct. 2343 (1980); *United States v. Edge Broadcasting,* 509 U.S. 418, 426, 125 L.Ed.2d 345, 113 S.Ct. 2696 (1993); *see also, Fane v. Edenfield,* 945 F.2d 1514, 1517 (11th Cir.1991) (holding that "commercial speech furthers the economic interests of the speaker while also assisting the consumer audience"). Plaintiff Moulton's statements do not fit this definition. Although Defendant argues that it was Plaintiffs' intention to replace Defendant on certain projects for the customer, Plaintiff Moulton's statements regarding the security of Defendant's network hardly proposed to Cherokee County or the City of Canton that they switch network administrators. Additionally, Plaintiff Moulton's statements cannot be considered sufficiently disseminated to the purchasing public or for the purpose of influencing the purchase of his services. Plaintiff Moulton's comments were made to only one customer, and then only in regard to his concern for the security of the Cherokee County 911 Center which was his responsibility. In *Garland,* the court held that the defendant's misrepresentation, that was directed only at one customer, did not disseminate the misrepresentation sufficiently to the public. *Garland,* 895 F.Supp. at 279. This court disagreed with the court in Mobius, which held that the term "commercial advertising or promotion" could include contact with only one customer. *Mobius,* 880 F.Supp. at 1020. This Court agrees with the decision in Garland. Isolated representations to a single customer do not fit into the idea of "commercial advertising and promotion" in the marketing context. Also, in Mobius, the communication was expressly designed to discourage the customer from buying the plaintiff's product and to purchase defendant's. *Mobius,* 880 F.Supp. at 1021. It cannot be said that Plaintiff Moulton's statements were an "explicit invitation to purchase [his] services over that of [Defendant]." *Mobius,* 880 F.Supp. at 1020. Because Defendant cannot make out the elements of a commercial advertising or promotion, Plaintiffs' Motion for Summary Judgement on the Lanham Act claim should be granted.

### 4. GEORGIA COMPUTER SYSTEMS PROTECTION ACT

**\*6** Defendant also brings a claim under the Georgia Computer Systems Protection Act. O.C.G.A. § 16-6-90 *et seq.* This criminal statute makes illegal the use of a computer with the intention of "obstructing, interrupting, or in any way interfering with the use of a computer program or data; or altering, damaging or in any way causing the malfunction of a computer, computer network, or computer program, regardless of how long the alteration, damage, or malfunction persists." O.C.G.A. § 16-9-93(b)(2) and (3). When damage results from the criminal activity, the section also authorizes a civil suit for monetary recovery. O.C.G.A. § 16-9-93(g). According to the Court's research, no case construing the section exists. The Court holds that Defendant does not have a civil damages claim for violation of the Computer Systems Protection Act. Defendant argues that Plaintiff Moulton's activities constituted a violation of the Computer Systems Protection Act because a throughput test and a ping flood can slow down a network. In this way, Defendant asserts, Plaintiff Moulton's actions "interfered" with Defendant's network. However, Defendant itself admits that any slow down was negligible at best and not noticeable to the company or its customers. (Dep. of Ardalan Shokoohi, p. 23-24; Dep. of Steven Nance, p. 95-96). No reasonable jury could conclude that this constituted interfering with Defendant's network. Additionally, Defendant argues that it does not matter that the slow down was not noticeable because the statute states that an activity in violation of the statute can be actionable no matter how long it persists. However, the language that allows a claim for actions that are not noticeable to the victim apply only to activities which alter, damage or malfunction a network. There is no evidence that Plaintiff Moulton's activities resulted in any alteration, damage or malfunction of Defendant's network. In fact, Mr. Shokoohi stated that the tests Plaintiff Moulton performed did not even allow Plaintiff Moulton to log on or access the network. (Dep. of Ardalan Shokoohi, p. 25, 27-28). Therefore, the Court holds that Plaintiff Moulton's

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 33310901 (N.D.Ga.), 2001-1 Trade Cases P 73,202
**(Cite as: 2000 WL 33310901 (N.D.Ga.))**

Page 6

actions do not warrant a civil recovery for violation of the Georgia Systems Protection Act. The Court grants Plaintiffs' Motion for Summary Judgment as to this claim notwithstanding the fact that Plaintiff Moulton may be subject to criminal prosecution under the Act.

## 5. COMPUTER FRAUD AND ABUSE ACT

Finally, Plaintiffs seek summary judgment on Defendant's claim for violation of the Computer Fraud and Abuse Act. The Act forbids the "intentional [ ] accessing [of] a protected computer without authorization, [that] as a result of such conduct, recklessly causes damage." 18 U.S.C. § 1030(a)(5)(B). There is a dispute over whether the Defendant can make out the element of damage. Damage is defined in the Act as "any impairment to the integrity or availability of data, a program, a system, or information that causes loss aggregating at least $5000 ... or threatens public health or safety." 18 U.S.C. § 1030(e)(8). Defendant claims that its damage reaches the jurisdictional amount because the company had to expend time and money through the use of its employees to investigate Plaintiff Moulton's activities. However, this damage does not fit the statutory definition of damage. Defendant agrees that no structural damage to their network resulted from Plaintiff's activities. (Dep. of Ardalan Shokoohi, p. 25, 27-28). The statute clearly states that the damage must be an impairment to the *integrity* and *availability* of the network. Defendant's network security was never actually compromised and no program or information was ever unavailable as a result of Plaintiff Moulton's activities. Defendant also makes the claim that it has met the damage threshold because Plaintiff Moulton's actions threatened the public health and safety due to the public data stored and managed through Defendant's network. This argument fails to persuade the Court. As stated earlier, the tests run by Plaintiff Moulton did not grant him access to Defendant's network. The public data stored on Defendant's network was never in jeopardy. Plaintiff Moulton actions never threatened the public health and safety. Therefore, Defendant can not make out the damage element for a claim pursuant to the Computer Fraud and Abuse Act. Plaintiff's Motion for Summary Judgment is granted as to this claim.

## B. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### 1. DEFAMATION

*7 Plaintiffs claim that Defendant made defamatory comments concerning Plaintiffs both when Defendant contacted Chief Cantrell to inquire about Plaintiff Moulton's authorization to conduct the remote access tests, and during the December 30, 1999 meeting. Plaintiff Moulton argues that Defendant defamed him because statements were made against his trade, office or profession and imputed a criminal act to him. O.C.G.A. § 51-5-4. Words imputing a crime or making charges in reference to one's trade or profession constitute slander *per se,* and no special damages or malice need be shown. O.C.G.A. § 51-5-4(b); *Webster v. Wilkins',* 217 Ga.App. 194, 196, 456 S.E.2d 699 (1995). When the statements are conditionally privileged, however, malice can make them actionable by defeating the privilege. *Sparks v. Parks,* 172 Ga.App. 823, 825-26, 324 S.E.2d 784 (1984).

Defendant claims that the statements made by its employees were not defamatory because they were privileged. Georgia law provides that the following communications are privileged: (1) statements made in good faith in the performance of a public duty; (2) statements made in good faith in the performance of a legal or moral private duty; and (3) statements made with a good faith intent on the part of the speaker to protect his interest in a matter in which it is concerned. O.C.G.A. § 51-5-7(1)-(3). Defendant claims that the statements made by its employees were pursuant to the performance of a public duty. Specifically, the Defendant asserts that the statements were made in furtherance of an investigation by the police. Defendant is correct that statements made in the course of a police investigation are conditionally privileged and are not actionable absent actual malice. *Hardaway v. Sherman Enterprises, Inc.,* 133 Ga.App. 181, 210 S.E.2d 363 (1974). The statements made by Defendant's employees in the December 30, 1999 meeting were made in furtherance of a police investigation into possible criminal activity on the part of Plaintiff Moulton. A GBI agent, Eric Davis, was present for the meeting and Plaintiff was subsequently arrested in part due to information gained by Agent Davis. (Dep. of David King, p.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 33310901 (N.D.Ga.), 2001-1 Trade Cases P 73,202
**(Cite as: 2000 WL 33310901 (N.D.Ga.))**

11-18). Consequently, the statements are not actionable defamation.

The statement made by Mr. Shokoohi to Chief Cantrell, questioning Plaintiff Moulton's authority to perform tests on Defendant's network, arguably does not fall into the police investigation category. Although Chief Cantrell is the Chief of Canton Police, and quite possibly the law enforcement official to whom a possible crime is to be reported, there is no doubt that the Chief was also a client and customer of Defendant. Therefore, there may be an issue as to whether the Defendant's employee was furthering a police investigation when making this statement. The performance of a public duty, however, is not the only form of privilege available to Defendant. A statement may also be privileged when there is "good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons." *Sheftall v. Central of Ga. Ry. Co.,* 123 Ga. 589, 593, 51 S.E. 646 (1905). All of these elements must appear to rely successfully on the privilege. *Sheftall,* 123 Ga. at 593. The statement made by Mr. Shokoohi to Chief Cantrell is protected as privileged. When he made the statement, it had been determined that Plaintiff Moulton had performed a port scan on Defendant's network. An intrusion detection system on the network alerted the network administrator to suspicious activity taking place. (Dep. of Steven Nance, p. 32-34). Defendant had to communicate that it had observed suspicious activity on its network to Chief Cantrell in order to determine if he had authorized Plaintiff's activity. The statement appears to be made in good faith because Defendant was inquiring whether Plaintiff had authority, of which Defendant was unaware, to run the test. The statement was also properly limited in scope. Defendant did not even relay what type of test had been performed just that some "suspicious activity" had been detected. The publication was also made at a proper occasion and to the proper persons. Defendant did not contact Chief Cantrell until consulting Plaintiff Moulton and, when in response to Plaintiff Moulton's explanation that he was testing security, it only contacted the person who would have granted Plaintiff such authority. Defendant is allowed to rely on the privilege to refute Plaintiffs' allegation of defamation.

*8 Plaintiffs also argue that even if Defendant's statements were covered by privilege, the privilege is negated because the statements were made with actual malice. The question of malice is generally decided by a jury, but it does not follow that no question of malice can be decided as a matter of law. *Cohen v. Hartlage,* 179 Ga.App. 847, 852, 348 S.E.2d 331 (1986) (holding that plaintiff failed to establish malice sufficient to defeat conditional privilege enjoyed by allegedly libelous statements). To support the allegation that Defendant made these statements with actual malice, Plaintiffs point to the fact that Defendant suspected Plaintiffs were trying to replace it as computer consultants for the City of Canton; that Plaintiffs had actually replaced Defendant on a job for the city after Defendant had been unable to complete the task of connecting a router; and that Plaintiff Moulton had criticized employees of Defendant for their inexperience. In addition, Plaintiffs claim, Defendant's employees made the statements with full knowledge that Plaintiff Moulton's actions had done no damage to Defendant's system, and were already aware that Plaintiffs worked for the City of Canton when Defendant phoned Chief Cantrell to determine Plaintiff Moulton's authority. These facts do not defeat Defendant's privilege in making the allegedly defamatory statements. Regardless of whether Defendant suspected Plaintiffs were trying to replace them as consultants or that Plaintiffs had actually replaced Defendant on one specific job, Defendant must still be allowed to confirm or deny Plaintiff Moulton's authority to run tests on its network. Even if Defendant was aware that Plaintiffs were employed by the City of Canton, it still had the right to determine if the City had given Plaintiff Moulton specific authority to run a port scan on Defendant's network. Taking all of Plaintiffs' allegations as true, these facts do not contradict the fact that Defendant was simply confirming Plaintiff Moulton's authority to perform the activities and to further a criminal investigation once lack of authority was confirmed. Plaintiffs have failed to raise a genuine issue of material fact that Defendant acted with actual malice and is not entitled to the defense of privilege. The Court should grant Defendant's Motion for Summary Judgment on Plaintiffs' defamation claim.

2.  TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 33310901 (N.D.Ga.), 2001-1 Trade Cases P 73,202
(Cite as: 2000 WL 33310901 (N.D.Ga.))

Page 8

In order for Plaintiffs to succeed on a claim for tortious interference with contractual relations, they must show "(1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff." *Witty v. McNeal Agency,* 239 Ga.App. 554, 561, 521 S.E.2d 619 (1999). Plaintiffs are unable to establish the first element of a claim for tortious interference with business relations. The improper statements which Plaintiffs claim Defendant made must not be privileged in order to be actionable pursuant to this tort. The Court has already held that the allegedly defamatory statements made by Defendant's employees are privileged. In addition, Defendant has produced an affidavit by Mr. Lamar Hamill, County Manager for Cherokee County, that it was Plaintiffs' own action that caused the termination of business relations between Cherokee County and Plaintiffs, rather than any statements made by Defendant. (Affidavit of Lamar Hamill, P 6). Plaintiffs have not provided the Court with any evidence tending to show that Mr. Hamill's reason for terminating the business relationship at issue was, in reality, because of statements made by Defendant's employees. Because Plaintiffs have failed to raise a genuine issue of material fact that Defendant's statements were not privileged or that they were the proximate cause of the termination of Plaintiffs' business relationship, the Court should grant Defendant's Motion for Summary Judgment as to Plaintiffs' tortious interference with business relations claim.

## IV. CONCLUSION

*9 For the reasons set forth above, Plaintiffs' Motion for Summary Judgment [Doc. 14] is GRANTED, and Defendant's Motion for Summary Judgment [Doc. 15] is GRANTED. The Clerk is directed to close this file.

2000 WL 33310901 (N.D.Ga.), 2001-1 Trade Cases P 73,202

Motions, Pleadings and Filings (Back to top)

- 1:00CV00434 (Docket)

(Feb. 17, 2000)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Not Reported in F.Supp.2d
2003 WL 21638205 (S.D.N.Y.)
**(Cite as: 2003 WL 21638205 (S.D.N.Y.))**

**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

TYCO INTERNATIONAL (US) INC., Plaintiff,
v.
JOHN DOES, 1-3, Defendants.

**No. 01 Civ. 3856 RCCDF.**

July 11, 2003.

MEMORANDUM AND ORDER

FREEMAN, Magistrate J.

*1 Plaintiff Tyco International (US) Inc. ("Tyco") has been granted a default judgment against defendant Alan H. Kominz ("Kominz" or "Defendant") in this action. The matter was referred to me for the purposes of issuing a report and recommendation regarding Tyco's damages. Prior to issuing such a report and recommendation, however, the Court will, for the reasons stated below, first allow Tyco an opportunity to supplement its submissions to provide further support for its claimed compensatory damages.

*BACKGROUND*

On February 22, 2001, defendant Kominz attempted to overload the Tyco email server with emails (a so-called "denial of service" or "spamming attack"). (Amended Complaint, dated February 4, 2002 ("Am.Compl.") ¶ 12.) Although the attack was unsuccessful and did not cause any service outage, Tyco hired an investigative firm to locate and gather information about the hacker, whose identity was unknown at the time. (Am.Compl.¶ ¶ 14, 20.) Tyco commenced this action on May 7, 2001. (Dkt. No. 1.)

Defendant Kominz never responded to Tyco's complaint or its subsequently-filed amended complaint, and, on September 13, 2002, this Court (Casey, J.) granted a default judgment against

Kominz. The matter was referred to me to conduct an inquest and to report and recommend concerning Tyco's damages. On October 4, 2002, I issued a Scheduling Order requiring Tyco to serve and file Proposed Findings of Fact and Conclusions of Law ("Proposed Findings") no later than November 4, 2002. In that Order, I cautioned Kominz that if, by December 4, 2002, he did not respond to Tyco's submission or contact my chambers in writing to request an in-court hearing, it would be my intention to issue a report and recommendation concerning damages on the basis of Tyco's written submission alone. [FN1]

> FN1. Although I specified that Plaintiff was to serve on defendant Kominz a copy of the Scheduling Order, the Court also mailed a copy to Kominz. This copy was returned to the Court with a handwritten note stating that Kominz had left for Florida and was unreachable.

On November 4, 2002, Tyco timely filed its Proposed Findings. To date, Kominz has not responded to any of Tyco's submissions, nor has he contacted my chambers to request a hearing.

*DISCUSSION*

After reviewing Tyco's submissions, this Court has preliminarily concluded that Tyco has not sufficiently demonstrated its entitlement to the $136,026.94 in investigator's fees it seeks as compensatory damages. Tyco argues that, under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, [FN2] it is entitled to recover these fees as the "natural and foreseeable result" of Defendant's spamming attack. The cases Tyco cites, however, do not support this proposition.

> FN2. § 1030 provides, in relevant part:
> (a) Whoever ... (5)(A)(i) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; ... and (B) ... caused (or, in the case of an attempted offense, would, if completed, have caused) (i) loss ... aggregating at least $5,000 in value ... shall be punished as provided in subsection (c) of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

this section.
The CFAA also provides a civil right of action for victims under 18 U.S.C. § 1030(g).

While it is true, as Tyco points out (Proposed Findings at II.6), that the CFAA allows recovery for losses beyond mere physical damage to property, the additional types of damages awarded by courts under the Act have generally been limited to those costs necessary to assess the damage caused to the plaintiff's computer system or to rescue the system in the wake of a hacking attack. *See EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 584-85 (1st Cir.2001) (awarding costs of assessing damage); *United States v. Middleton*, 231 F.3d 1207, 1213-14 (9th Cir.2000) (awarding costs of "investigating and repairing the damage" [FN3]); *In re DoubleClick Inc. Privacy Litigation*, 154 F.Supp.2d 497, 524-25 (S.D.N.Y.2001) (recognizing only costs in remedying damage as recoverable under CFAA).

> FN3. Although the court in *Middleton* uses the word "investigating," it is clear from both the court's language ("investigating ... the *damage*" ) and the facts of the case that this investigation involved only assessing the damage to the system--not locating and collecting information about the hacker.

*2 Tyco cites *United States v. Sablan*, 92 F.3d 865 (9th Cir.1996), for the proposition that it is "foreseeable" that the victim of a hacking attack would incur costs in investigating that attack, *see id. at 870*, and then argues that such foreseeability supports a finding that investigative costs are compensable under the CFAA. (*See* Proposed Findings at II.6.) *Sablan,* however, was a criminal proceeding in which the court never reached the question of whether investigative costs could be recoverable as compensatory damages in a civil action. Rather, the court held that, for purposes of sentencing and calculating the proper amount of restitution, the victim's repair costs should be considered by the court, while the victim's cost of meeting with the FBI in response to the hacking attack should not. *Sablan*, 92 F.3d at 870.

Moreover, this Court disagrees with Tyco's assertion that the Court "routinely awards investigator's fees where such fees are necessary to track down the offending party." (Proposed Findings at II.7.) In support of this statement, Tyco cites three copyright cases where investigator's fees were awarded. (*See id.*, citing *Brown v. Party Poopers*, 2001 WL 1380536, at *7 (S.D.N.Y. Jul.9, 2001)*; *Arthur Kaplan Co., Inc. v. Panaria Intern., Inc.*, 1999 WL 253646, at *3 (S.D.N.Y. Apr.29, 1999)*; *Reuters Television Ltd. v. Cel Communications, Inc.*, 1995 WL 13188, at *3 (S.D.N.Y. Jan.13, 1995).) In all three of these cases, however, the investigators' fees were necessary not because the investigations located the offending parties, but because the investigations revealed infringing activity. Applying this reasoning to this case, Tyco's investigative costs would be compensable only if the investigation was necessary in order to reveal the actionable activity--*i.e.* the spamming attack. Tyco, however, did not need an investigation to reveal any acts of "spamming" because, by their nature, any such acts would have been immediately apparent when Tyco's servers received and registered the incoming emails. In this case, the only purpose of Tyco's investigation was to locate Kominz and collect information about him.

In any event, the fees awarded as reasonable in the copyright cases cited by Tyco, ranging from about $1,000 to $4,000, were far below the amount of $136,026.94 sought by Tyco. *Brown, 2001 WL 1380536, at *7* (awarding $1,373, but noting that the amount "seems a bit high"); *Arthur Kaplan, 1999 WL 253646, at *3* (awarding $1,056.38); *Reuters Television 1995 WL 13188, at *3* (awarding $4,000). Thus, even if the Court were to find it reasonable to award Tyco some amount of investigative fees for locating Kominz, these cases do not support an award of the magnitude sought by Tyco.

It may be that, although Tyco has not set forth any costs associated with assessing the damage and restoring its system after the attack, it did indeed incur such costs. If it did, and if it wishes to claim such costs as compensatory damages, then Tyco should explain them to the Court in detail. Additionally, to the extent that Tyco wishes to recover damages for the "significant portion of Tyco's email server capacity" occupied by Defendant's emails (Proposed Findings at I.11), it should make a good faith effort to quantify this loss, by, for example, providing a per-email cost of computer capacity. *See America Online, Inc. v. IMS*, No. 98-0011-A, 1998 U.S. Dist. LEXIS 20448, at *7 (E.D.Va. Nov.20, 1998) (using a per-email cost in awarding the value of computer capacity tied up by unsolicited bulk email activity).

### CONCLUSION
*3 For the foregoing reasons, it is hereby ORDERED that:

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21638205 (S.D.N.Y.)
(Cite as: 2003 WL 21638205 (S.D.N.Y.))

Page 3

(1) If Plaintiff wishes to supplement its submissions in support of compensatory damages in accordance with this Order, Plaintiff shall do so no later than August 1, 2003, by service and filing of a sworn affidavit and appropriate supporting documentation.

(2) Defendant shall submit his response, if any, to Plaintiff's supplemental submission no later than September 1, 2003. IF DEFENDANT (1) FAILS TO RESPOND TO PLAINTIFF'S SUBMISSION, OR (2) FAILS TO CONTACT MY CHAMBERS IN WRITING BY SEPTEMBER 1, 2003, TO REQUEST AN IN-COURT HEARING, IT IS MY INTENTION TO ISSUE A REPORT AND RECOMMENDATION CONCERNING DAMAGES ON THE BASIS OF PLAINTIFF'S WRITTEN SUBMISSION ALONE. *See Action S.A. v. Marc Rich & Co.,* 951 F.2d 504, 508 (2d Cir.1991) (Fed.R.Civ.P. 55(b)(2) "allows but does not require ... a hearing"); *Fustok v. ContiCommodity Servs. Inc.,* 873 F.2d 38, 40 (2d Cir.1989) ("[I]t [is] not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in a default judgment.").

2003 WL 21638205 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

•      1:01CV03856        (Docket) (May. 07, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Peter V. Baugher, one of the attorneys for Defendants, state that on November 10, 2004, I caused a copy of the foregoing Notice of Filing and **Defendants' Memorandum on Subject Matter Jurisdiction**, to be served by facsimile and first class mail upon the following:

Eric D. Brandfonbrener
Darrel J. Graham
Jonathan Buck
PERKINS COIE LLP
131 South Dearborn
Suite 1700
Chicago, IL 60603
Fax: 312.324.9400

Peter V. Baugher

140634_1.DOC

# EXHIBIT E

*Westlaw.*

Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 351929 (N.D.Ill.)

Charles **Schwab** & Co., Inc. v. **Carter**
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
CHARLES **SCHWAB** & CO., INC., Plaintiff,
v.
Brian D. **CARTER**, Acorn Advisory Management,
L.L.C., and Acorn Advisory Capital, L.P.,
Defendants.
**No. 04 C 7071.**

Feb. 11, 2005.

Darrell J. Graham, Eric D. Brandfonbrener, Jonathan
R. Buck, Perkins Coie LLC, Chicago, IL, for
Plaintiff.
Peter Vincent Baugher, Arthur J. Howe, Anna S.
Eisner, Schopf & Weiss, Chicago, IL, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

ST. EVE, J.
**\*1** Plaintiff Charles Schwab & Co., Inc. ("Schwab")
commenced this action against Defendants Brian D.
Carter ("Carter"), Acorn Advisory Management,
L.L.C. and Acorn Advisory Capital (collectively
"Acorn"), alleging violations of title 18, United
States Code, Sections 1030(a)(2)(A), (a)(2)(C), and
1030(a)(4) of the Computer Fraud and Abuse Act
("CFAA"), and various state law claims. Before the
Court is Defendants' motion to dismiss the CFAA
claim in Count VI pursuant to Federal Rules of Civil
Procedure 12(b)(6). The Court denies this motion for
the reasons discussed below.

BACKGROUND

Schwab alleges in its Second Amended Verified
Complaint ("SAVC") that Defendants engaged in a
plan to wrongfully copy Schwab's proprietary
financial modeling computer software and
accompanying files. Specifically, Schwab contends
that Acorn induced Carter, an employee of Schwab,
to copy computer information, resign from Schwab,
and take up employment with Acorn, delivering the

copied information to Acorn.

I. The Parties

Plaintiff Schwab is a California corporation. (SAVC
at ¶ 17.) Schwab formerly had a business division,
Schwab Soundview Capital Markets' Investment
Analytics Division ("IA"), for which Carter worked.
(*Id.* at ¶¶ 2-3.)Schwab closed that division on
November 1, 2004, and either transferred or laid off
all employees. (*Id.*) Defendant Carter is a former
employee of Schwab, where he worked as the
Director of Information Technology for IA. (*Id.* at ¶
1.) He resigned from Schwab on October 22, 2004,
and began working with Acorn. (*Id.* at ¶¶ 11-12.)

II. Relationship between Schwab, Carter, and Acorn

Carter worked as Director of Information Technology
for IA, a division of Schwab. (*Id.* at ¶ 2.) IA provided
analytical research to institutional clients, including
Acorn. (*Id.*) In September 2004, Schwab announced
that it intended to close IA. (*Id* . at ¶ 4.) Upon
learning such information, Acorn made an offer to
purchase the business unit and acquire IA's software
and a number of employees, including Carter. (*Id.* at
¶ 5.) Schwab turned down that offer because it
wanted to protect its business modeling software. (*Id.*
at ¶ 6.) After Schwab rejected Acorn's offer, Acorn
offered employment to Carter and several analysts
from IA. (*Id.* at ¶ 7.) The analysts declined the offer,
but Carter accepted it. (*Id.* at ¶¶ 7-8.)

III. Carter's Actions at the Behest of Acorn

Schwab alleges that on the weekend prior to October
18, 2004, Carter accessed approximately 15,000 of its
computer files. (*Id.* at ¶ 8.) Schwab had furnished
Carter with access to proprietary information, but
required that Carter agree to keep such information
confidential. (*Id.* at ¶¶ 26-27.)Further, Schwab
alleges that it restricts access to information on a
"need-to-know" basis, and that Carter had no reason
to access this information for the purposes of his
employment at Schwab. (*Id.* at ¶¶ 8, 26.)

**\*2** On October 18, 2004, Carter e-mailed confidential

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 351929 (N.D.Ill.)

information to Acorn concerning data sources that IA used in its research. (*Id.* at ¶ 8.) On October 21, 2004, Carter arrived at Schwab with a laptop computer capable of burning large amounts of information onto DVDs. (*Id.* at ¶ 9.) Schwab alleges that Carter, acting at the direction or on behalf of Acorn, used the computer to copy Schwab's proprietary business models. (*Id.*) On October 22, 2004, Carter resigned from Schwab. (*Id.* at ¶ 11.)Schwab alleges that Acorn paid Carter a considerable amount of money to leave Schwab prior to receiving his severance payment, and to deliver Schwab's proprietary business information to Acorn. (*Id.* at ¶ 12.)Finally, Schwab alleges that Defendants' actions caused Schwab to incur costs of at least $5,000 during a one-year period.(*Id.* at ¶ 79.)

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. *Triad Assoc., Inc. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir.1989). The Court will only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). When reviewing a motion to dismiss, the Court is restricted to reviewing the pleadings, which consist of the complaint, any attached exhibits, and the supporting briefs. *See Thompson v. Illinois Dept. of Prof'l Regulation,* 300 F.3d 750, 753 (7th Cir.2002). In making its determination, the Court must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff. *Jet, Inc. v. Shell Oil Co.,* 381 F.3d 627, 629 (7th Cir.2004).

## ANALYSIS

I. Language of the Statute

The CFAA is primarily a criminal statute, but it also creates a private cause of action in Section 1030(g).*Four Seasons Hotels and Resorts BV v. Consorcio Barr, S.A.,* 267 F.Supp.2d 1268, 1321 (S.D.Fla.2003).Section 1030(g)provides, in relevant part:

Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves one of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B).

18 U.S.C. § 1030(g). Defendants claim that this section creates a civil cause of action only for violations of Section 1030(a)(5)(B)(i)-(v). Because Schwab alleges a violation of Sections 1030(a)(2)(A), (a)(2)(C), and (a)(4), but not specifically Section (a)(5)(B), Defendants argue that Schwab has failed to state a claim upon which relief can be granted. The Court disagrees based on the plain language of the statute.

**\*3** "The cardinal rule of statutory interpretation is that courts must first look to the language of the statute and assume that its plain meaning accurately expresses the legislative purpose."*United States v. Miscellaneous Firearms, Explosives, Destructive Devices and Ammunitions,* 376 F.3d 709, 712 (7th Cir.2004) (quotation and citation omitted).Section 1030(g) does not limit private causes of action to violations of (a)(5)(B), but rather requires that a plaintiff suffer one of the factors listed in (a)(5)(B)(i)-(v) to state a claim under the statute. Sections 1030(a)(5)(B)(i)-(v) list five possible harms that a party might suffer as a result of conduct forbidden by the CFAA. None of the subsections includes any action or behavior that is prohibited. Instead, the subsection lists possible harmful results of violations of other parts of the statute.

In fact, Section 1030(g) defines that a civil action may be established when a "violation of this section" results in any of the "factors" listed in Section 1030(a)(5)(B)(i)-(v). "This section" refers to Section 1030. *See I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.,* 307 F.Supp.2d 521, 526 (S.D.N.Y.2004) ("Section 1030(g) affords a civil action for any CFAA violation"); *Four Seasons,* 267 F.Supp.2d at 1322 (recognizing claim under Section 1030(a)(5)(A)). The factors listed in Section 1030(a)(5)(B)(i)-(v) include "loss to one or more persons during any 1-year period ... aggregating at least $5,000 in value."*See*18 U.S.C. § 1030(a)(5)(B)(i).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                              Page 3
Not Reported in F.Supp.2d, 2005 WL 351929 (N.D.Ill.)

Here, Schwab alleges that Acorn induced Carter to copy computer information, resign from Schwab, and take up employment with Acorn, delivering the copied information to Acorn. Schwab also alleges that it incurred costs of at least $5,000 during a one-year period. As such, Schwab has properly alleged a civil cause of action under the CFAA.

II. Purpose of the CFAA

Despite the plain meaning of the statute, Defendants assert that the CFAA is only an anti-hacking statute that was not meant to create a federal private cause of action for misappropriation of confidential information or trade secrets. When possible, the Court determines Congressional intent from the unambiguous language of the statute. *See Miscellaneous Firearms, 376 F.3d at 712*. As discussed above, the language of Section 1030(g) unambiguously creates a cause of action under the CFFA not restricted to Section 1030(a)(5)(B)(i)-(v). "Where the meaning of a statute is unambiguous, our sole task is to apply it straightforwardly to the facts at issue without referring to legislative history or other devices." *United States v. Jones, 372 F.3d 910, 913 n. 2* (7th Cir.2004). Accordingly, the Court need not delve into the Congressional record as Defendants suggest.

Further, although Defendants argue that the statute should be narrowly construed as an "anti-hacking" statute, they do not explain why Carter's unauthorized access to Schwab's confidential information on its computer system and distribution of this information is not "hacking." Indeed, several district courts have recognized that damage caused by unauthorized access or access in excess of authorization to a computer system may be redressed under the CFAA. For instance, Chief Judge Charles Kocoras recognized that a plaintiff stated a claim under the CFAA when it alleged that the defendant had exceeded his authorized access and acquired trade secrets that were later used to the detriment of the plaintiff. *See George S. May Int'l Co. v. Hostetler, No. 04 C 1606, 2004 WL 1197305, *3 (N.D.Ill. May 28, 2004).* In *Four Seasons Hotel,* the Southern District of Florida acknowledged a claim under the CFAA when a licensee accessed the plaintiff's computer system without authorization. *See* 267 F.Supp.2d at 1323-4. In addition, a district court in

the Western District of Washington determined that a former employer properly stated a claim under the CFAA when it alleged that a former employee had sent e-mails including trade secrets and proprietary information to a competitor while still employed by the plaintiff. *See Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121, 1124 (W.D.Wash.2000); *see also Pacific Aerospace & Electronics, Inc. v. Taylor,* 295 F.Supp.2d 1188, 1195 (E.D.Wash.2003) ("Caselaw supports an employer's use of the CFAA's Civil Remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system"). In sum, these cases further support the Court's conclusion that Schwab has properly alleged a civil cause of action under Section 1030(g).

III. Rule of Lenity

*4 Finally, Defendants contend that the Court should apply the rule of lenity, and construe any ambiguity in the language of the statute in their favor. The rule of lenity dictates that when a statute's language is "grievously" ambiguous, the court should construe the statute in favor of the accused. *Chapman v. United States,* 500 U.S. 453, 462-463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991). Because the Court concludes that there is no ambiguity in the language of the statute, the rule of lenity does not apply.

CONCLUSION

For these reasons, the Court denies Defendants' motion to dismiss Count VI.

N.D.Ill.,2005.
Charles Schwab & Co., Inc. v. Carter
Not Reported in F.Supp.2d, 2005 WL 351929 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT F

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

---

In the Matter of                                          Case

## AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

| SIGNATURE | |
|---|---|
| FIRM | |
| STREET ADDRESS | |
| CITY/STATE/ZIP | |
| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) | TELEPHONE  NUMBER |
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE?          YES          NO | |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE?          YES          NO | |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR?          YES          NO | |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY?    YES      NO | |
| IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS.<br><br>RETAINED COUNSEL          APPOINTED COUNSEL | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

In the Matter of                                                            Case

## AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

| | |
|---|---|
| SIGNATURE | |
| FIRM | |
| STREET ADDRESS | |
| CITY/STATE/ZIP | |
| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) | TELEPHONE  NUMBER |
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE?        YES        NO | |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE?        YES        NO | |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR?        YES        NO | |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY?   YES      NO | |
| IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS. RETAINED COUNSEL          APPOINTED COUNSEL | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

In the Matter of                                          Case

## AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

| SIGNATURE |  |
|---|---|
| FIRM |  |
| STREET ADDRESS |  |
| CITY/STATE/ZIP |  |
| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) | TELEPHONE  NUMBER |
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE?          YES          NO | |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE?          YES          NO | |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR?          YES          NO | |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY?     YES          NO | |
| IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS.  RETAINED COUNSEL          APPOINTED COUNSEL | |

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES SCHWAB & CO., INC.,      ) | |
|                      ) | |
|      Plaintiff,          ) | Judge Amy J. St. Eve |
|                      ) | |
|      v.              ) | Magistrate Judge Arlander Keys |
|                      ) | |
| BRIAN D. CARTER, ACORN ADVISORY  ) | Case No. 04 C 7071 |
| MANAGEMENT, L.L.C., ACORN     ) | |
| ADVISORY CAPITAL, L.P., ACORN PARTNERS) | |
| L.P., DELPHI FINANCIAL GROUP, INC.,  ) | |
| DELPHI CAPITAL MANAGEMENT, INC., and  ) | |
| ROBERT ROSENKRANZ,      ) | |
|                      ) | |
|      Defendants.       ) | |

**FOURTH AMENDED COMPLAINT**

Plaintiff Charles Schwab & Co., Inc. ("Schwab"), by its attorneys, brings this

action for injunctive and other relief. Schwab complains as follows:

<u>**CASE OVERVIEW**</u>

1.     This action arises out of the actual and threatened misappropriation of Schwab's

confidential business information by Defendants as well as Defendants' efforts to destroy

documents and files evidencing that misappropriation. Prior to defendant Brian D. Carter's

("Carter") resignation from Schwab, he was the Director of Information Technology for Schwab

Soundview Capital Markets' Chicago-based Investment Analytics division ("IA"). Carter

resigned without notice on October 22, 2004, to join one or more of the following defendants:

Acorn Advisory Management, L.L.C., Acorn Advisory Capital, L.P., and Delphi Capital

Management, Inc. ("DCM") (collectively, with the other non-personal Defendants "Acorn").

2.     Prior to November 1, 2004, IA had been in the business of providing proprietary

analytical research to approximately 100 institutional clients nationwide, including Acorn or one

or more of its affiliates. The analytical research distributed by IA was derived from

approximately twelve trade secret financial models (the "IA Models"), which are confidential,
complex analytical formulations prepared over many years by and at great expense to Schwab
and maintained on Schwab's computer systems.

3.      Carter served IA in a supporting, technology capacity.  He did not develop the IA
Models or provide ongoing analytical research used to maintain the Models.  IA employed
numerous highly trained analysts (PhDs and MBAs) who, working with Carter, ran and
maintained the IA Models for Schwab.

4.      In or about September 2004, as part of a larger corporate restructuring, Schwab
announced it was closing IA, effective November 1, 2004.  Schwab's IA division continued to
provide its research from its Chicago office to institutional clients through the end of January
2005.  In connection with the closing of IA, Schwab offered its IA employees, including Carter,
generous severance packages or employment within other areas of Schwab.

5.      On or about October 1, 2004, Acorn made a written offer to acquire IA.  Acorn
and its affiliates manage in excess of $750 million in assets.  Acorn expressed interest to Schwab
in acquiring IA's Models, because, on information and belief, Acorn appreciated the value of
IA's Models, including to Acorn's business.  Acorn proposed to acquire all assets necessary to
operate the Models, including all of IA's intellectual property associated with the proprietary
Models IA had developed; Acorn also proposed to hire six IA employees, including Carter and
several of IA's analysts.

6.      Schwab rejected Acorn's offer.  Not only was the consideration offered by Acorn
inadequate, but Acorn's offer provided no protection for Schwab's brand and continuing
businesses, in particular Schwab Equity Ratings, the investment research offered to Schwab's
retail client base.  Schwab has made substantial investments in developing and advertising its
Schwab Equity Ratings, and the service is a vital component of Schwab's retail client offering.
Even though the model used by Schwab to generate the Schwab Equity Ratings was built from

- 2 -

scratch, it shares a "brand" with Schwab's IA Models. If Schwab sold IA's intellectual property

without appropriate controls and if the IA Models were then acquired by a Schwab competitor,

the brand, reputation and value of the Schwab Equity Ratings would be diluted and harmed.

Accordingly, Schwab decided to retain IA's confidential intellectual property, including the IA

Models.

7.      On information and belief, on or about Friday, October 15, 2004, *after* Schwab

rejected Acorn's offer to acquire IA, Rosenkranz, on behalf of Acorn, made offers to employ

Carter and several of IA's analysts. None of the IA analysts expressed interest in the Acorn

offers and Acorn ultimately withdrew them.

8.      Although all of the IA analysts Acorn tried to hire declined Acorn's offer, and

Rosenkranz withdrew these offers, he did not withdraw his offer to Carter. On Monday, October

18, 2004, on information and belief, in preparation for joining Acorn and with the support and

encouragement of, and at the direction of, Acorn, Carter e-mailed confidential information to

Acorn relating to certain of the outside data sources used in IA's Models. Schwab's records also

indicate that Carter accessed and copied huge volumes of Schwab computer information

(approximately 15,000 computer files in a single day) over the weekend preceding October 18,

2004. On information and belief, Carter did not access and copy this volume of data on

Schwab's behalf.

9.      Shortly before the weekend preceding October 18, 2004, also on information and

belief, in continuing preparation to join Acorn, Carter acquired a powerful, new, laptop,

containing a DVD burner, suitable for copying massive amounts of digital information, such as

IA's Models. This laptop was either Carter's personal property or the property of Acorn; it was

not one of the laptops Schwab provided Carter for use on Schwab's behalf. On information and

belief, Carter copied IA's Models and other computer information using this new laptop.

10.     On information and belief, Carter copied the IA Models on behalf of and at the direction of the Defendants.

11.     Carter had previously told colleagues at IA that he had or was going to copy and keep IA's Models.  Carter suggested that he and a group of IA employees could take the Models and open their own business based on the IA Models.  When told by a subordinate IA employee that such conduct was illegal, Carter argued that it was not because Schwab was closing IA.

12.     On October 22, 2004, the day after appearing in IA's offices with the new laptop with DVD burner, Carter resigned from Schwab without warning.  Had Carter remained at Schwab for another week, he would have received a severance package from Schwab.

13.     On information and belief, Acorn paid Carter a substantial amount of money to induce him to join Acorn before his severance payment from Schwab was paid to him and to bring along to Acorn the Schwab proprietary information Carter had copied by exceeding his authorized access to IA computers, including the IA Models.

14.     On information and belief, Acorn did not have an office in Illinois prior to Carter's resignation from Schwab.  On information and belief, Carter's value to Acorn is primarily the proprietary IA Models Carter unlawfully misappropriated from Schwab.

15.     Defendants' conduct is already causing irreparable harm and threatens further irreparable harm to Schwab through the misappropriation and misuse of trade secret and other confidential information, and harm to Schwab's business.

16.     Defendants' conduct against Schwab, which is described in more detail below, constitutes unfair competition, breach of fiduciary duty, inducement to breach fiduciary duties, misappropriation of trade secrets and conversion and represents unjust enrichment to Defendants.  Carter's conduct also violates Schwab's confidentiality policies to which Carter agreed as a condition of and throughout his employment with Schwab.

- 4 -

17. By this action, Schwab does not seek to restrain Carter from working for Acorn. Rather, Schwab seeks injunctive relief to prevent Defendants from using and profiting from the information Carter had no right to retain or share with Acorn.

## PARTIES

18. Schwab is a full service investment and securities firm. Schwab is a California corporation with its principal place of business in San Francisco, California. Schwab ran its IA division from offices in Chicago, Illinois, and continues to have certain investment research functions based in Chicago.

19. Brian Carter currently resides in Tinley Park, Illinois.

20. Acorn Advisory Management, L.L.C., is a Limited Liability Company formed in Delaware with its principal place of business in New York, New York. On information and belief, Acorn Advisory Management, L.L.C., is affiliated with Acorn Advisory Capital, L.P., Acorn Partners, L.P., Delphi Financial Group, Inc., and Delphi Capital Management, Inc., and is owned directly or indirectly by, and is under the control of, Robert Rosenkranz.

21. Acorn Advisory Capital, L.P. is a limited partnership formed in Delaware with its principal place of business in New York, New York. On information and belief, Acorn Advisory Capital, L.P. is affiliated with Acorn Advisory Management, L.L.C., Acorn Partners, L.P., Delphi Financial Group, Inc., and Delphi Capital Management, Inc. Acorn Advisory Capital, L.P. is owned directly or indirectly by, and is under the control of, Robert Rosenkranz. Acorn Advisory Capital, L.P. provides asset management services to Acorn Partners, L.P.

22. Acorn Partners, L.P., is a limited partnership formed in Delaware with its principal place of business in New York, New York. The corporate general partner of Acorn Partners, L.P. is owned directly or indirectly by, and is under the control of, Robert Rosenkranz. Acorn Partners holds hundreds of millions in investments. One or both of the above-identified Acorn Advisory entities performs investment management services for Acorn Partners.

23.     Delphi Capital Management, Inc. ("DCM"), is a Delaware corporation with its principal place of business in New York, New York.  DCM is a subsidiary of Delphi Financial Group, Inc.  Robert Rosenkranz is the senior officer of DCM.

24.     Delphi Financial Group, Inc. ("DFG") is a Delaware corporation with its principal place of business in New York, New York.  DFG is a publicly traded insurance holding company.  Robert Rosenkranz is its senior most officer and its largest shareholder.  DCM performs investment management services for DFG and affiliates.

25.     Robert Rosenkranz ("Rosenkranz") is a New York resident.  Rosenkranz is the chairman of DFG, the chief investment officer of Acorn Advisory Capital, L.P., the senior executive for DCM, and the beneficial owner of Acorn Advisory Capital, L.P., and the corporate general partner of Acorn Partners, L.P.  Rosenkranz participated in several meetings and numerous telephone conferences, including at least one meeting in Chicago with Carter.  Rosenkranz requested Carter to copy IA proprietary information before Carter resigned from Schwab.  Rosenkranz made an employment offer to Carter that contained inducements to Carter to breach obligations he owed to Schwab.  Rosenkranz is the largest shareholder in DFG and has substantial personal assets invested in Acorn Partners, L.P.

26.     Rosenkranz controls the activities of a cloud of affiliated entities, including but not limited to DCM, DFG, Acorn Advisory Management, Acorn Advisory Capital, and Acorn Partners.  Rosenkranz exerts control over these entities to his personal benefit and that of DFG and Acorn Partners.  These entities share a unity of interest and may disregard corporate formalities.  Among other things, the cloud of affiliated entities referenced above shares officers, controlling partners, employees, and assets.

27.     The cloud of affiliated entities have, on information and belief, agreed to jointly contribute to an enterprise whereby financial investment research based on financial modeling is undertaken to enhance the value of assets held by all entities.  Under this arrangement, DCM and

Acorn Advisory Capital contribute certain research skills and proprietary knowledge in order to grow assets that DFG, Acorn Partners, and Rosenkranz contribute to the enterprise. Profits generated by this enterprise are shared among the entities. The activities of the enterprise are substantially controlled by Rosenkranz through his dominant interest in each entity involved.

## JURISDICTION AND VENUE

28.    This District Court has personal jurisdiction over each of the Defendants because they reside and/or do business in this District or engaged in conduct and/or caused harms at issue in this case in this District.

29.    The Court has federal question jurisdiction over this action. The Court's subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331 in that this case arises, in part, under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Jurisdiction is also proper based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1), because complete diversity exists between the parties and the amount in controversy exceeds $75,000, including, without limitation, the value to Schwab of the injunctive relief requested herein. On information and belief, no defendant is a citizen of California and none of the members or partners of any of the defendants are citizens of California. However, because a number of the defendants are private entities, involved in the complex and secretive hedge fund business, Schwab cannot definitively determine the citizenship of the general and limited partners and members of these entities without being provided such information from Defendants. Schwab has sought in discovery the identities and citizenship of the partners and members of the various private entity defendants but has yet to be provided with that information.

30.    Venue also is proper in this District because Carter resides in the District and the events giving rise to the claims at issue in this Verified Complaint occurred here. *See* 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.**     **Carter received access to Schwab's confidential information**
           **pursuant to his fiduciary and contractual relationship with Schwab.**

31.     Schwab acquired IA's predecessor for substantial consideration, in part to acquire

IA's proprietary Models and other intellectual property IA owned.  Through IA, Schwab

generated and maintained substantial amounts of confidential information, including proprietary

investment research strategies and analytical tools.  The IA Models provided Schwab with a

competitive edge in the marketplace, and have substantial worth.  The complex IA Models were

kept confidential and were not disclosed to customers of IA or other individuals outside of

Schwab.

32.      Despite Schwab's determination in 2004 to close IA, the continued

confidentiality and protection of trade secrets generated and maintained by IA provides Schwab

with a continuing competitive advantage in other areas of its business.  The continued

confidentiality of the IA Models also preserves the Models' value for future direct or indirect use

and/or sale.

33.     To protect the confidentiality of its trade secret information, Schwab has instituted

numerous policies and precautions.  Schwab has security at all of its offices and restricts access

to confidential information on a need-to-know basis.  Schwab also has other security provisions,

including computer pass codes and detailed security procedures.

34.     To further protect the confidentiality of its information, Schwab also has

confidentiality policies to which Carter agreed.  For example, on November 14, 2000, Carter

signed a Charles Schwab Confidentiality, Nonsolicitation and Assignment Agreement (the

"Confidentiality Agreement"), expressly agreeing to protect the confidentiality of Confidential

Information owned, maintained, or developed by Charles Schwab.  A true and correct copy of

the Confidentiality Agreement signed by Carter is attached hereto as Ex. A.

- 8 -

35.     The Confidentiality Agreement defines Confidential Information to include Schwab's confidential and trade secret information.  *See* Ex. A at § 1.

36.     Pursuant to the Confidentiality Agreement, Carter agreed as follows (at § 2):

> I will not, for any purpose, directly or indirectly, disclose, reproduce, use, or disseminate in any manner during or after my employment with Schwab, any Confidential Information . . ..

37.     Carter further agreed (at § 5):

> I agree that I will promptly return to Schwab, upon its request or, in any event, immediately upon separation from my employment for any reason, all documents and materials that contain, refer to, or relate in any way to any Confidential Information, as well as any other Schwab property in my possession or control . . ..

38.     In the Confidentiality Agreement, Carter also agreed that in the event of a breach of the Agreement by Carter, Schwab was entitled to seek injunctive relief to enforce the Agreement (at § 8).

39.     In reliance on his promises to maintain the confidentiality of Schwab's confidential information, Carter was furnished with and granted access to substantial amounts of Schwab's proprietary and confidential information.

40.     At the time of Carter's resignation, he had access to the entire information network of the IA division, including access to the IA Models, the production platforms on which the  IA Models were processed, and customer information, but Carter only was authorized to access the information network insofar as it was necessary for Carter to perform his duties as Director of Research Technologies for IA.

**B.** **Carter breached his duties to Charles Schwab, including by misappropriating its confidential information.**

41.     While still serving as an employee of Schwab and in a position of trust and confidence at Schwab, Carter coordinated with Acorn and Rosenkranz to divest Charles Schwab of proprietary and confidential business information.

42.     On information and belief, Defendants, knowing that Carter occupied this position of trust and confidence and confidence of Schwab, agreed that Carter would resign from Schwab without waiting one additional week for the severance package being offered by Schwab and would bring along copies of the IA Models and other confidential information useful to Acorn in its business.

43.     On information and belief, Defendants have converted Schwab's confidential business information, including misappropriated copies of the IA Models . This information is Schwab's property and contains Schwab's proprietary and trade secret information.

44.     While Carter was entitled to have access to and to use confidential information to perform his duties for Schwab, he had no authorization or right to copy all or part of such records for personal use and was specifically required by his Confidentiality Agreement and Schwab's policies to return all such records and copies thereof to Schwab upon terminating from Schwab.

45.     Before he resigned, Carter acquired a new, high-powered personal laptop computer – *i.e.*, a new computer in addition to the computers issued to him by Schwab for use in connection with his work for Schwab.  This new laptop computer contained a high-speed disc burner that allowed Carter to download and burn to a digital medium large amounts of data.  On information and belief, Carter used this personal laptop computer to download and store copies of Schwab's confidential, trade secret information, including but not limited to copies of the IA Models, which Carter then removed from the Schwab IA office and retained without authorization.  Carter had informed other IA employees that he had intended to copy information from Schwab's computers.

- 10 -

46.     Schwab's confidential trade secrets, including the IA Models, are not publicly available and cannot be reconstructed from other sources.  The IA Models represent years of investment, calculations, research, and refinement of strategies and analytical tools.

47.     Carter copied and removed from Schwab's offices confidential information, including copies of the IA Models.  This information was delivered to Acorn and its affiliates.

48.     In connection with the filing of this lawsuit, Schwab demanded the return of all confidential information taken by Carter and received by Acorn and its affiliates.

49.     Schwab has uncovered powerful evidence of Carter's misappropriation and conversion of Schwab's business information.  For example, on October 18, 2004, Carter sent an email to Gary Sabot, a manager at Acorn, attaching documents that could facilitate Acorn's access to an information database licensed by Schwab and used in connection with the proprietary IA Models.

**C.     After being notified of this lawsuit, Carter destroyed information**
**he took from Schwab**

50.     Schwab filed its initial complaint in this action on November 2, 2004.  Schwab filed and served a motion to preserve evidence at the same time.

51.     On information and belief, Carter, after being notified that Schwab had filed this lawsuit, deleted information that he had wrongfully taken from Schwab that was stored on the computers that he was using on behalf of the other Defendants.

52.     On information and belief, Carter deleted this information with the purpose of preventing Schwab from determining what information Carter had misappropriated.

53.     Carter's intentional deletion of data from the computers he was using on behalf of the other Defendants has hindered Schwab's efforts in analyzing the information Carter misappropriated from Schwab, and Schwab has been unable to determine the extent of all the information that Carter has taken.

**D.**   **Defendants threaten to inflict serious and irreparable injury on Schwab.**

54.   On information and belief, Defendants continue to have possession or control of Schwab's proprietary and trade secret information, including the detailed, confidential IA Models and other proprietary business information belonging to Schwab.

55.   On information and belief, Defendants have used or are about to use the Schwab proprietary and trade secret information in their possession or control to do one or more of the following: (a) undermine Schwab's competitive advantages arising from its proprietary and trade secret information; (b) use Schwab's proprietary and trade secret information to improve Acorn's own research technologies and strategies without compensating Schwab for the unauthorized use of this proprietary information; and (c) otherwise engage in acts constituting conversion and misappropriation of Schwab trade secrets and confidential information, breach of fiduciary duties, and other tortious conduct.

## COUNT I

## MISAPPROPRIATION OF TRADE SECRETS
### (AGAINST ALL DEFENDANTS)

56.   Schwab incorporates the above allegations.

57.   Schwab has protectable trade secrets in the IA Models and other confidential information to which Carter had full access while an employee of Schwab.

58.   Schwab derives economic value from these trade secrets due to them not being generally known to other persons who could obtain economic value from their disclosure or use.

59.   Schwab has made reasonable efforts under the circumstances to maintain its trade secrets' secrecy and confidentiality.

60.   The Defendants have willfully, maliciously, intentionally, and with a wanton and conscious disregard to the rights of Schwab, misappropriated or threatened to misappropriate Schwab's trade secrets.

61.     On information and belief, Carter acted as the agent of the Defendants in misappropriating Schwab's trade secrets.

62.     Schwab has been injured and is continuing to be injured by Defendants' misappropriation of its trade secrets.

<div align="center">

**COUNT II**

**CONVERSION**
**(AGAINST ALL DEFENDANTS)**

</div>

63.     Schwab incorporates the above allegations.

64.     The Defendants have wrongfully, willfully, maliciously, intentionally, with a wanton and conscious disregard to the rights of Schwab,  and without authorization, retained possession, custody or control over files and information belonging to Schwab.

65.     Schwab is the rightful owner of all copies of the IA Models and related business information taken by Carter at the direction of Acorn and Rosenkranz or with their active support.

66.     Schwab's right to possession of this property is immediate, absolute, and unconditional.

67.     Schwab has been injured and is continuing to be injured by Defendants' misappropriation.

<div align="center">

**COUNT III**

**BREACH OF FIDUCIARY DUTY**
**(AGAINST CARTER)**

</div>

68.     Schwab incorporates the above allegations.

69.     As an employee of Schwab who was allowed access to Schwab's confidential and other information, Carter owed Schwab certain fiduciary duties.

70.     Among these fiduciary duties are the duty of loyalty and fair dealing while working for Schwab, the duty to advance the interests of Schwab, the duty to preserve Schwab's

<div align="center">- 13 -</div>

information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to Schwab's interests.

71.     Carter willfully, maliciously, intentionally, and with a wanton and conscious disregard to the rights of Schwab, breached these duties by, among other things, converting Schwab's confidential and trade secret information to his personal use and the use of Acorn while affiliated with Schwab, and afterwards; using this information against Schwab's interests.

72.     Schwab has been injured and is continuing to be injured by Carter's breaches.

<div align="center">

## COUNT IV

## BREACH OF CONTRACT
### (AGAINST CARTER)

</div>

73.     Schwab incorporates the above allegations.

74.     Carter signed and agreed to comply with the requirements set forth in the Confidentiality Agreement (Ex. A).

75.     In this Confidentiality Agreement, Carter expressly agreed that he would not divulge and disseminate Schwab's confidential and proprietary information.

76.     These terms are reasonable in that they impose restraints on Carter that are no greater than required to protect Schwab's legitimate interests, do not impose undue burden on Carter, and are not injurious to the public.

77.     These terms protect Schwab's legitimate interests in its trade secret and other confidential information and in its goodwill.

78.     Carter has willfully breached the terms of his Confidentiality Agreement by, among other things, converting to his personal benefit and the benefit of Acorn confidential business information owned and maintained by Schwab.

79.     Schwab has been injured and is continuing to be injured by Carter's breaches.

## COUNT V

### AIDING AND ABETTING AND/OR INDUCING A BREACH OF FIDUCIARY DUTY
### (AGAINST ALL DEFENDANTS EXCEPT CARTER)

80.     Schwab incorporates the above allegations.

81.     As an employee of Schwab who was allowed access to Schwab's confidential and other information, Carter owed Schwab certain fiduciary duties.

82.     Among these fiduciary duties are the duty of loyalty and fair dealing while working for Schwab, the duty to advance the interests of Schwab, the duty to preserve Schwab's information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to Schwab's interests.

83.     On information and belief, Carter breached these duties by, among other things, converting Schwab's confidential and trade secret information to his personal use and the use of Acorn and Rosenkranz while affiliated with Schwab, and afterwards; using this information against Schwab's interests.

84.     On information and belief, Acorn and Rosenkranz willfully, maliciously, intentionally, and with a wanton conscious disregard to the rights of Schwab, assisted Carter in breaching his fiduciary duties and/or induced Carter to breach such duties to Schwab through one or more of the following acts: (a) compensating Carter if he left Schwab abruptly and without notice; (b) encouraging Carter to misappropriate copies of the Models and other confidential Schwab information prior to Carter's resignation; (c) requesting that Carter provide Acorn with information Acorn and Rosenkranz knew was proprietary Schwab information; (d) offering Carter a performance bonus based on Carter's ability to provide Acorn with the IA Models and other Schwab proprietary information.

85.     On information and belief, Acorn and Rosenkranz willfully, maliciously, intentionally, and with a wanton and conscious disregard to the rights of Schwab, took such

actions with knowledge that such actions would assist Carter in breaching his fiduciary duties and/or induced Carter to breach such duties to Charles Schwab.

86.     Schwab has been injured and is continuing to be injured as a result of the Defendants' aiding and abetting of Carter's breach of fiduciary duties and/or the Defendants' inducement to Carter to breach fiduciary duties.

<div align="center">

**COUNT VI**

**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**
**(AGAINST ALL DEFENDANTS)**

</div>

87.     Schwab incorporates the above allegations.

88.     Schwab maintains one or more computers and/or computer systems that are "protected computers" pursuant to 18 U.S.C. § 1030(e)(2)(B) because they are used in interstate commerce and communication. Schwab's confidential and proprietary information is stored on, and may be accessed from, one or more of these protected computers, access to which is controlled via secret passwords.

89.     Carter intentionally accessed certain of Schwab's protected computers by using passwords that had been issued to Carter—only for Carter to perform his duties as Director of Information Technology for IA—for the purpose of misappropriating Schwab's confidential and proprietary electronic information. On information and belief, Carter downloaded and copied and thus obtained substantial amounts of confidential business and financial information from Schwab's computers immediately before resigning and has retained this information to use for his benefit and the benefit of the other Defendants. On information and belief, Carter acted with the support and encouragement of the other Defendants, and as their agent, in obtaining Schwab's confidential computer information.

90.     Carter intentionally "exceeded authorized access," as that term is defined in 18 U.S.C. § 1030(e)(6), to Schwab's protected computers by logging on to said computers for the purpose of obtaining Schwab's confidential and proprietary information for Defendants' gain

and for use in interstate commercial activities. Defendants have thus obtained information to which they were not entitled, including via interstate communication, thereby violating 18 U.S.C. § 1030(a)(2)(A) and (C).

91.     By exceeding, and attempting to exceed, authorized access to Schwab's protected computers, Defendants have caused Schwab to incur the loss in terms of the costs of responding to Defendants' conduct and conducting damage assessments of at least, in the aggregate, five thousand dollars (US$5,000.00) during a one-year period.

92.     Defendants have also, knowingly and with intent to defraud Schwab, exceeded Carter's authorized access to Schwab's protected computers and obtained Schwab's confidential and proprietary information, such information being of considerable value to Schwab, thereby violating 18 U.S.C. § 1030(a)(4).

## COUNT VII

## UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

93.     Schwab incorporates the above allegations.

94.     Schwab has protectable trade secrets in the IA Models and other confidential information to which Carter had full access while an employee of Schwab.

95.     Schwab derives economic value from these trade secrets due to them not being generally known to other persons who could obtain economic value from their disclosure or use.

96.     Defendants wrongfully misappropriated Schwab's trade secrets.

97.     Acorn provides investment management services for the benefit of Acorn Partners, L.P. and DFG.

98.     Rosenkranz is largest shareholder of Delphi Financial Group, Inc., an investor in Acorn Partners, L.P., the senior executive for Delphi Capital Management, Inc., and the beneficial owner of both Acorn Advisory Capital, L.P. and the corporate general partner of Acorn Partners.

99.     Acorn used Schwab's trade secrets for its own benefit and for the benefit of Acorn Partners, L.P., DFG, and Rosenkranz by, directly or indirectly, using Schwab's trade secrets directly or indirectly to develop an analytical model used to make investment decisions.

100.    Defendants have received a benefit as a result of their wrongful conduct.

101.    Defendants have unjustly retained the benefit of the use of Schwab's trade secrets without compensation to Schwab. Defendants' retention of benefits derived from Schwab's trade secrets violates fundamental principles of justice, equity, and good conscience.

## COUNT VIII

## SPOLIATION OF EVIDENCE

### (AGAINST ALL DEFENDANTS)

102.    Schwab incorporates the above allegations, and pleads the following in the alternative to counts I - VII:

103.    Defendants had a duty of care to preserve evidence related to information taken from Schwab stored that was stored on their computers and computers that Carter was using on behalf of the other Defendants, in that it was reasonably foreseeable that this evidence was material to this litigation.

104.    On information and belief, after he became aware of the filing of the initial complaint in this matter, Carter, acting as the agent of the other Defendants, breached that duty when, he deleted information he had taken from Schwab that was stored on the computers he was using on behalf of the other Defendants.

105.    On information and belief, Defendants, after they became aware of the filing of the initial Complaint in this matter, deleted various internal web documents posted by Carter relating to the trade secrets Carter took from Schwab.

106.     On information and belief, the information the Defendants deleted contained information related to the models that Carter wrongfully took from Schwab, and is essential evidence to support Schwab's claims against Defendants.

107.     Defendants willfully, maliciously, intentionally, and with gross negligence indicating a wanton and conscious disregard to the rights of Schwab, deleted the information before making the information available for Schwab's inspection.  Defendants deleted this information for the sole purpose of preventing Schwab from determining the extent of the confidential information Carter had taken and preventing Schwab from proving its claims.

108.     But for Defendants' destruction of evidence, Schwab had a reasonable probability of prevailing in its claims against the Defendants.

109.     In the event Schwab is unable to prove its claims against Defendants, that failure of proof was caused by Defendants' destruction of evidence.

110.     In the event Schwab is unable to prove its claims against Defendants, Schwab will have been injured.

**WHEREFORE**, Schwab respectfully requests the following relief:

A.     Direct Defendants to return all originals and copies of information, documents and other things taken from Schwab, including all copies of the Models and other Schwab business information in Defendants' possession or control, in hard copy or electronically stored (all electronically stored records must also be deleted permanently from Defendants' computers or other electronic memory files);

B.     Enjoin Defendants, their agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms and corporations acting in connection or participation with them or on their behalf, from revealing, disclosing or using in any manner information contained in the records of Charles Schwab, including the Models and any other Schwab business information;

C.     Impose a constructive trust for Schwab's benefit on all proceeds of Carter's fiduciary breaches;

D.     Award compensatory and punitive damages and attorney's fees and costs; and

- 19 -

E.   Grant such other relief as just and appropriate.

November 23, 2005                          Respectfully submitted,


                                            CHARLES SCHWAB & CO., INC.


                                     By:        s/ Eric D. Brandfonbrener

Eric D. Brandfonbrener                     Dan K. Webb
Darrell J. Graham                          Dane A. Drobny
Jonathan Buck                              Scott P. Glauberman
PERKINS COIE LLP                           Winston & Strawn LLP
131 S. Dearborn, Suite 1700                35 W. Wacker Drive
Chicago, IL 60603                          Chicago, IL 60601
Tel: (312) 324-8400                        Tel: (312) 558-5600
Fax: (312) 324-9400                        Fax: (312) 558-5700

# EXHIBIT A

# Confidentiality, Nonsolicitation and Assignment Agreement

In consideration of my employment, receipt of employment benefits, and/or continued employment by Charles Schwab & Co., Inc. and/or its parent company and its/their subsidiaries, affiliates or successors ("Schwab"), and other valuable consideration, the adequacy and receipt of which I acknowledge, I agree to abide by this Agreement during and after my employment with Schwab.

1. I understand and agree that, during and related to my employment with Schwab, I may obtain, or have access to, certain information which is confidential and/or proprietary to Schwab ("Confidential Information"). I understand that Confidential Information includes, but is not limited to:

    a. trade secrets, information about products and services (past, current or future), know-how, techniques, computer passwords, computer software designs, hardware configurations, policies and procedures, and research projects;

    b. market, financial, trade, and sales information and data, financial models or formulae, business plans, financial and business forecasts and estimates, and information about costs and profits;

    c. the identities of Schwab customers and prospective customers (including but not limited, to names, addresses, telephone numbers and/or social security numbers), any account, personal, business, financial and other information pertaining to such customers, and prospective customers, and customer and prospective customer lists in any form;

    d. account, personal or financial information pertaining to current and former employees of Schwab, business, financial, and other information pertaining to Schwab's vendors and independent contractors, and any lists of employees, vendors and/or independent contractors;

    e. all Developments, as defined in Paragraph 3 below, and all information which relates to Developments; and/or

    f. all information which Schwab has a legal obligation to treat as confidential, or which Schwab treats as proprietary or designates as confidential or for internal use only, whether or not owned or developed by Schwab.

2. I understand and agree that Schwab owns all such Confidential Information and desires (or is under legal obligations, in the case of information owned by others) to protect its confidential and proprietary nature. I will not, for any purpose, directly or indirectly, disclose, reproduce, use, or disseminate in any manner during or after my employment with Schwab, any Confidential Information unless: (a) such disclosure is required in the ordinary course of my duties at Schwab and necessary for me to perform my duties; or (b) I have received advance written consent from an authorized officer of Schwab. I will promptly notify Schwab if I become aware of or suspect any unauthorized (whether intentional or accidental) use or disclosure of Confidential Information.

3. I will promptly disclose in confidence to Schwab all inventions, improvements, designs, original works of authorship, formulas, processes, computer software programs, databases and trade secrets ("Developments") that I make, conceive, first reduce to practice, or create, either alone or jointly with others while I am employed by Schwab, and that: (a) result from any work performed by me for Schwab, whether or not in the normal course of my employment or during normal business hours; (b) reasonably relate to the actual or anticipated business, services, products, research or development of Schwab; or (c) are developed with the use of Schwab time, equipment, supplies, Confidential Information or facilities. I must promptly disclose Developments whether or not such Developments are patentable, copyrightable or protectible as trade secrets. I understand and agree that all Developments shall be the sole and exclusive property of Schwab, and I hereby irrevocably assign, transfer and convey to Schwab, exclusively and perpetually, all right, title and interest which I may have or acquire in and to such Developments throughout the world, including without limitation any copyrights and patents, and the right to secure registrations, renewals, reissues, and extensions thereof. I agree to sign any documents and to do all things necessary, without additional compensation, whether during my employment or after, to assist Schwab to register, perfect, maintain and enforce Schwab's rights in any Development, including without limitation any patent, copyright, trade secret or other right or interest. I understand that if I am now a California resident, or if I become a California resident while employed by Schwab, then this paragraph will not apply to any Developments which fully qualify under Section 2870 of the California Labor Code, which section is set forth in the accompanying Exhibit A.



PLAINTIFF'S
EXHIBIT
CARTER
1

Exhibit A

CS 000003

4. I agree that during my employment with Schwab, I will not, directly or indirectly, for my benefit or on behalf of any third party, solicit, induce, or attempt to solicit or induce: (a) any customer of Schwab to divert, transfer or take away any of Schwab's existing business or prospective business; or (b) any employee, vendor or independent contractor of, or consultant to, Schwab to leave their employment or assignment with Schwab.

5. I agree that I will promptly return to Schwab, upon its request or, in any event, immediately upon separation from my employment for any reason, all documents and materials that contain, refer to, or relate in any way to any Confidential Information as well as any other Schwab property in my possession or control including but not limited to electronic and telephonic equipment, credit cards, security badges, and passwords.

6. I further agree that for a period of eighteen (18) months after my employment with Schwab ceases, I will not, directly or indirectly, or on behalf of any third party: (a) solicit, induce or attempt to solicit or induce any existing and/or prospective customers I serviced (directly or indirectly) or whose identity I learned during my employment with Schwab to divert, transfer or otherwise take away business from Schwab; (b) sell or offer to sell any security, retirement, insurance or annuity product or related service to any customer or prospective customer of Schwab I serviced (directly or indirectly) or whose identity I learned during my employment with Schwab; or (c) solicit, induce or attempt to solicit or induce any employee, vendor or independent contractor of, or consultant to, Schwab, to leave his or her employment or assignment. Nothing in Paragraph 6 is intended to prevent me from discussing possible employment with any employee or independent contractor who contacts me directly of his or her own volition without my solicitation or attempted solicitation of him or her. Also, I understand that nothing in Paragraph 6 limits my absolute obligation under Paragraph 2 to never use Confidential information to solicit Schwab customers or prospective customers, or for any other purpose, at any time after my employment with Schwab ceases.

7. I represent and warrant that I do not have any agreement(s) with any former employer or other third party that would be breached by my performance of my duties at Schwab or that would limit, impair or otherwise adversely affect my performance of such duties, and that I will not take any action to breach any such agreement while I am employed by Schwab. In any event, I will not use or disclose to Schwab any confidential information that belongs to others. I have listed on Exhibit B to this Agreement all the confidential, proprietary, trade secret, non-solicitation and/or non-competition agreements to which I am subject. I agree that I will disclose my obligations under this Agreement to any prospective or future employer and that my obligations under this Agreement will survive the separation from my employment with Schwab regardless of the reason for the separation.

8. I understand and agree that any breach of this Agreement may subject me to disciplinary action, up to and including termination of my employment (if I am still employed at Schwab), and may cause irreparable injury to Schwab that cannot be adequately compensated by money damages and/or is incapable of precise calculation. If I breach this Agreement, I agree that Schwab has the right to seek equitable relief (including injunctive relief and specific performance) in addition to monetary damages and any other legal remedies which may be available. I consent to Schwab's obtaining equitable relief in the most expeditious forum to preserve the status quo pending resolution of any dispute relating to this Agreement.

9. If any provision of this Agreement is found to be invalid or unenforceable, that provision will be enforced to the maximum extent permissible, and the remaining provisions shall remain in full force and effect. I agree that the terms of this Agreement and any disputes arising out of it shall be governed by, and construed in accordance with, the laws of the state in which I was last employed by Schwab, without giving effect to such state's conflict of law principles. I understand and agree that nothing in this Agreement changes "at will" employment status with Schwab, and that either Schwab or I may end the employment relationship at any time, for any reason or no reason at all.

Signed: _____

Printed Name: _Brian D. Carter_   Date: _14 May 00_

CS 000004

**EXHIBIT A**

*California Labor Code Section 2870*

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

    (1)  relate at the time of conception or reduction to practice of the invention to the employer's business, or actually or demonstrably anticipated research or development of the employer; or

    (2)  result from any work performed by the employee for the employer.

(b) To the extent that a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

CS 000005

**EXHIBIT B**

**List of Prior Agreements**

Initials

CS 000006

## CERTIFICATE OF SERVICE

I, Eric D. Brandfonbrener, hereby certify that service of the foregoing **FOURTH AMENDED COMPLAINT** was effectuated pursuant to the ECF System on November 23, 2005, on:

Peter V. Baugher
Arthur J. Howe
Schopf & Weiss, LLP
312 West Randolph Street - Suite 300,
Chicago, Illinois 60606-1721
Fax: 312.701.9335

Paul R. Garcia
Michelle A.H. Francis
Lisa M. Barr
Kevin S. Ueland
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
Fax: 312.861.2200

/s/Eric D. Brandfonbrener _____

# EXHIBIT H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES SCHWAB & CO., INC., | ) | |
| | ) | |
| Plaintiff | ) | Judge Amy J. St. Eve |
| | ) | |
| v. | ) | Magistrate Judge Arlander Keys |
| | ) | |
| BRIAN D. CARTER, | ) | Case No. 04 C 7071 |
| ACORN ADVISORY MANAGEMENT, L.L.C., | ) | |
| ACORN ADVISORY CAPITAL, L.P., | ) | |
| ACORN PARTNERS, L.P., | ) | |
| DELPHI FINANCIAL GROUP, INC., | ) | |
| DELPHI CAPITAL MANAGEMENT, INC., | ) | |
| ROBERT ROSENKRANZ, | ) | |
| PERGAMON MASTER FUND, LTD, | ) | |
| PERGAMON PARTNERS, L.P., | ) | |
| PERGAMON OFFSHORE FUND, LTD., | ) | |
| PERGAMON ENHANCED MASTER FUND, LTD., | ) | |
| PERGAMON ENHANCED PARTNERS, L.P., | ) | |
| PERGAMON ENHANCED INVESTORS, L.P., | ) | |
| PERGAMON ENHANCED OFFSHORE FUND, LTD.,) | | |
| GREENBROOK, L.L.C., | ) | |
| PERGAMON ADVISORS, L.L.C, | ) | |
| PERGAMON OFFSHORE ADVISORS, L.P., | ) | |
| PERGAMON MANAGEMENT, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

## FIFTH AMENDED COMPLAINT

Plaintiff Charles Schwab & Co., Inc. ("Schwab"), by its attorneys, brings this

action for injunctive and other relief. Schwab complains as follows:

### CASE OVERVIEW

1.      This action arises out of the actual and threatened misappropriation of Schwab's

confidential business information by Defendants as well as Defendants' efforts to destroy

documents and files evidencing that misappropriation. Prior to defendant Brian D. Carter's

("Carter") resignation from Schwab, he was the Director of Information Technology for Schwab

Soundview Capital Markets' Chicago-based Investment Analytics division ("IA"). Carter

resigned without notice on October 22, 2004, to join one or more of the following defendants:

Acorn Advisory Management, L.L.C., Acorn Advisory Capital, L.P., and Delphi Capital
Management, Inc. ("DCM") (collectively, with Delphi Financial Group, Inc., "Acorn").

2.      Prior to November 1, 2004, IA had been in the business of providing proprietary
analytical research to approximately 100 institutional clients nationwide, including Acorn or one
or more of its affiliates. The analytical research distributed by IA was derived from
approximately twelve trade secret financial models (the "IA Models"), which are confidential,
complex analytical formulations prepared over many years by and at great expense to Schwab
and maintained on Schwab's computer systems.

3.      Carter served IA in a supporting, technology capacity. He did not develop the IA
Models or provide ongoing analytical research used to maintain the Models. IA employed
numerous highly trained analysts (PhDs and MBAs) who, working with Carter, ran and
maintained the IA Models for Schwab.

4.      In or about September 2004, as part of a larger corporate restructuring, Schwab
announced it was closing IA, effective November 1, 2004. Schwab's IA division continued to
provide its research from its Chicago office to institutional clients through the end of January
2005. In connection with the closing of IA, Schwab offered its IA employees, including Carter,
generous severance packages or employment within other areas of Schwab.

5.      On or about October 1, 2004, Acorn made a written offer to acquire IA. Acorn
and its affiliates manage in excess of $750 million in assets. Acorn expressed interest to Schwab
in acquiring IA's Models, because, on information and belief, Acorn appreciated the value of
IA's Models, including to Acorn's business. Acorn proposed to acquire all assets necessary to
operate the Models, including all of IA's intellectual property associated with the proprietary
Models IA had developed; Acorn also proposed to hire six IA employees, including Carter and
several of IA's analysts.

6.      Schwab rejected Acorn's offer.  Not only was the consideration offered by Acorn inadequate, but Acorn's offer provided no protection for Schwab's brand and continuing businesses, in particular Schwab Equity Ratings, the investment research offered to Schwab's retail client base.  Schwab has made substantial investments in developing and advertising its Schwab Equity Ratings, and the service is a vital component of Schwab's retail client offering.  Even though the model used by Schwab to generate the Schwab Equity Ratings was built from scratch, it shares a "brand" with Schwab's IA Models.  If Schwab sold IA's intellectual property without appropriate controls and if the IA Models were then acquired by a Schwab competitor, the brand, reputation and value of the Schwab Equity Ratings would be diluted and harmed.  Accordingly, Schwab decided to retain IA's confidential intellectual property, including the IA Models.

7.      On information and belief, on or about Friday, October 15, 2004, *after* Schwab rejected Acorn's offer to acquire IA, Rosenkranz, on behalf of Acorn, made offers to employ Carter and several of IA's analysts.  None of the IA analysts expressed interest in the Acorn offers and Acorn ultimately withdrew them.

8.      Although all of the IA analysts Acorn tried to hire declined Acorn's offer, and Rosenkranz withdrew these offers, he did not withdraw his offer to Carter.  On Monday, October 18, 2004, on information and belief, in preparation for joining Acorn and with the support and encouragement of, and at the direction of, Acorn, Carter e-mailed confidential information to Acorn relating to certain of the outside data sources used in IA's Models.  Schwab's records also indicate that Carter accessed and copied huge volumes of Schwab computer information (approximately 15,000 computer files in a single day) over the weekend preceding October 18, 2004.  On information and belief, Carter did not access and copy this volume of data on Schwab's behalf.

- 3 -

9.    Shortly before the weekend preceding October 18, 2004, also on information and belief, in continuing preparation to join Acorn, Carter acquired a powerful, new, laptop, containing a DVD burner, suitable for copying massive amounts of digital information, such as IA's Models.  This laptop was either Carter's personal property or the property of Acorn; it was not one of the laptops Schwab provided Carter for use on Schwab's behalf.  On information and belief, Carter copied IA's Models and other computer information using this new laptop.

10.    On information and belief, Carter copied the IA Models on behalf of and at the direction of the Defendants.

11.    Carter had previously told colleagues at IA that he had or was going to copy and keep IA's Models.  Carter suggested that he and a group of IA employees could take the Models and open their own business based on the IA Models.  When told by a subordinate IA employee that such conduct was illegal, Carter argued that it was not because Schwab was closing IA.

12.    On October 22, 2004, the day after appearing in IA's offices with the new laptop with DVD burner, Carter resigned from Schwab without warning.  Had Carter remained at Schwab for another week, he would have received a severance package from Schwab.

13.    On information and belief, Acorn paid Carter a substantial amount of money to induce him to join Acorn before his severance payment from Schwab was paid to him and to bring along to Acorn the Schwab proprietary information Carter had copied by exceeding his authorized access to IA computers, including the IA Models.

14.    On information and belief, Acorn did not have an office in Illinois prior to Carter's resignation from Schwab.  On information and belief, Carter's value to Acorn is primarily the proprietary IA Models Carter unlawfully misappropriated from Schwab.

15.    Defendants' conduct is already causing irreparable harm and threatens further irreparable harm to Schwab through the misappropriation and misuse of trade secret and other confidential information, and harm to Schwab's business.

16.     Defendants' conduct against Schwab, which is described in more detail below, constitutes unfair competition, breach of fiduciary duty, inducement to breach fiduciary duties, misappropriation of trade secrets and conversion and represents unjust enrichment to Defendants. Carter's conduct also violates Schwab's confidentiality policies to which Carter agreed as a condition of and throughout his employment with Schwab.

17.     By this action, Schwab does not seek to restrain Carter from working for Acorn. Rather, Schwab seeks injunctive relief to prevent Defendants from using and profiting from the information Carter had no right to retain or share with Acorn.

## PARTIES

18.     Schwab is a full service investment and securities firm. Schwab is a California corporation with its principal place of business in San Francisco, California. Schwab ran its IA division from offices in Chicago, Illinois, and continues to have certain investment research functions based in Chicago.

19.     Brian Carter currently resides in Tinley Park, Illinois.

20.     Acorn Advisory Management, L.L.C., is a Limited Liability Company formed in Delaware with its principal place of business in New York, New York. On information and belief, Acorn Advisory Management, L.L.C., is affiliated with Acorn Advisory Capital, L.P., Acorn Partners, L.P., Delphi Financial Group, Inc., and Delphi Capital Management, Inc., and is owned directly or indirectly by, and is under the control of, Robert Rosenkranz.

21.     Acorn Advisory Capital, L.P. is a limited partnership formed in Delaware with its principal place of business in New York, New York. On information and belief, Acorn Advisory Capital, L.P. is affiliated with Acorn Advisory Management, L.L.C., Acorn Partners, L.P., Delphi Financial Group, Inc., and Delphi Capital Management, Inc. Acorn Advisory Capital, L.P. is owned directly or indirectly by, and is under the control of, Robert Rosenkranz. Acorn Advisory Capital, L.P. provides asset management services to Acorn Partners, L.P.

22.    Acorn Partners, L.P., is a limited partnership formed in Delaware with its principal place of business in New York, New York. The corporate general partner of Acorn Partners, L.P. is owned directly or indirectly by, and is under the control of, Robert Rosenkranz. Acorn Partners holds hundreds of millions in investments. One or both of the above-identified Acorn Advisory entities performs investment management services for Acorn Partners.

23.    Delphi Capital Management, Inc. ("DCM"), is a Delaware corporation with its principal place of business in New York, New York. DCM is a subsidiary of Delphi Financial Group, Inc. Robert Rosenkranz is the senior officer of DCM.

24.    Delphi Financial Group, Inc. ("DFG") is a Delaware corporation with its principal place of business in New York, New York. DFG is a publicly traded insurance holding company. Robert Rosenkranz is its senior most officer and its largest shareholder. DCM performs investment management services for DFG and affiliates.

25.    Pergamon Master Fund, Ltd., Pergamon Partners, L.P., Pergamon Offshore Fund, Ltd., Pergamon Enhanced Master Fund Ltd., Pergamon Enhanced Master Fund, Ltd., Pergamon Enhanced Partners, L.P., Pergamon Enhanced Investors, L.P., Pergamon Enhanced Offshore Fund, Ltd., Greenbrook, L.L.C., Pergamon Advisors, L.L.C., Pergamon Offshore Advisors, L.P., and Pergamon Management, L.P. (collectively the "Pergamon Entities") are all affiliated with Robert Rosenkranz or entities controlled by Rosenkranz directly or through an entity controlled by Rosenkranz.

26.    Pergamon Master Fund, Ltd. ("Pergamon Master Fund"), serves as the "master fund" in a "master feeder relationship" and invests capital received from Pergamon Partners, L.P., a limited partnership organized under the laws of the state of Delaware; and Pergamon Offshore Fund, Ltd. Pergamon Master Fund and Pergamon Offshore Fund, Ltd. are incorporated under the laws of the Cayman Islands, and, on information and belief, their principal place of business is in New York.

- 6 -

27.     Pergamon Master Fund uses the stock selection model Defendants misappropriated from Schwab to invest the capital it receives.

28.     Pergamon Enhanced Master Fund, Ltd. ("Pergamon Enhanced Master Fund"), serves as the "master fund" in a "master feeder relationship" and invests capital received from Pergamon Enhanced Partners, L.P. (f/k/a Cassini, L.P.), a limited partnership organized under the laws of the state of Delaware; Pergamon Enhanced Investors, L.P.; a limited partnership organized under the laws of the state of Delaware; and Pergamon Enhanced Offshore Fund, Ltd. Pergamon Enhanced Master Fund and Pergamon Enhanced Offshore Fund, Ltd. are incorporated under the laws of the Cayman Islands, and on information and belief their principal place of business is in New York.

29.     Pergamon Enhanced Master Fund uses the stock selection model Defendants misappropriated from Schwab to invest the capital it receives.

30.     Greenbrook, L.L.C. ("Greenbrook") is a limited liability company organized under the laws of the state of Delaware.  The manager of Greenbrook is Defendant Acorn Advisory Capital, L.P.

31.     Greenbrook uses the stock selection model Defendants misappropriated from Schwab to invest the capital it receives.  The investors in Greenbrook are all subsidiaries of Delphi Financial Group, Inc.

32.     Pergamon Offshore Advisors, L.P. is a limited partnership organized under the laws of the state of Delaware.  Pergamon Offshore Advisors L.P. is the investment manager for Pergamon Master Fund, Pergamon Enhanced Master Fund, and Greenbrook, and, by using the model misappropriated from Schwab, decides which stocks these three funds buy and sell. Pergamon Offshore Advisors, L.P. earns incentive fees based on investment gains made by Pergamon Master Fund, Pergamon Enhanced Master Fund and Greenbrook.

33.     Pergamon Advisors, L.L.C. is a limited liability company organized under the laws of the state of Delaware. Pergamon Advisors, L.L.C. is the general partner of Pergamon Partners, L.P., Pergamon Enhanced Partners, L.P., and Pergamon Enhanced Investors, L.P. Pergamon Advisors, L.L.C. is responsible for the management of operations of these three partnerships, and receives incentive allocations based on the investment gains of these three partnerships.

34.     Pergamon Management, L.P. is a limited Partnership organized under the laws of the state of Delaware. Pergamon Management, L.P. provides management services for the other Pergamon Entities. The expenses of Pergamon Management, L.P. are paid for by Delphi Capital Management, Inc.. Pergamon Management, L.P. then reimburses Delphi Capital Management, Inc. for these expenses. Pergamon Management, L.P. receives management fees from the Pergamon Entities.

35.     Robert Rosenkranz ("Rosenkranz") is a New York resident. Rosenkranz is the chairman of DFG, the chief investment officer of Acorn Advisory Capital, L.P., the senior executive for DCM, and the beneficial owner of Acorn Advisory Capital, L.P., and the corporate general partner of Acorn Partners, L.P. Rosenkranz participated in several meetings and numerous telephone conferences, including at least one meeting in Chicago with Carter. Rosenkranz, acting on behalf and for the benefit of Acorn and the Pergamon Entities, requested Carter to copy IA proprietary information before Carter resigned from Schwab. Rosenkranz made an employment offer to Carter that contained inducements to Carter to breach obligations he owed to Schwab. Rosenkranz is the largest shareholder in DFG and has substantial personal assets invested in Acorn Partners, L.P.

36.     Rosenkranz controls the activities of a cloud of affiliated entities, including but not limited to DCM, DFG, Acorn Advisory Management, Acorn Advisory Capital, Acorn Partners, and the Pergamon Entities. Rosenkranz exerts control over these entities to his

personal benefit and that of DFG, Acorn Partners, and the Pergamon Entities. These entities share a unity of interest and may disregard corporate formalities. Among other things, the cloud of affiliated entities referenced above shares officers, controlling partners, employees, and assets.

37. The cloud of affiliated entities have, on information and belief, agreed to jointly contribute to an enterprise whereby financial investment research based on financial modeling is undertaken to enhance the value of assets held by all entities. Under this arrangement, DCM and Acorn Advisory Capital contribute certain research skills and proprietary knowledge in order to grow assets that DFG, Acorn Partners, and Rosenkranz contribute to the enterprise. Profits generated by this enterprise are shared among the entities. The activities of the enterprise are substantially controlled by Rosenkranz through his dominant interest in each entity involved.

### JURISDICTION AND VENUE

38. This District Court has personal jurisdiction over each of the Defendants because they reside and/or do business in this District or engaged in conduct and/or caused harms at issue in this case in this District.

39. The Court has federal question jurisdiction over this action. The Court's subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331 in that this case arises, in part, under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Jurisdiction is also proper based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1), because complete diversity exists between the parties and the amount in controversy exceeds $75,000, including, without limitation, the value to Schwab of the injunctive relief requested herein. On information and belief, no defendant is a citizen of California and none of the members or partners of any of the defendants are citizens of California. However, because a number of the defendants are private entities, involved in the complex and secretive hedge fund business, Schwab cannot definitively determine the citizenship of the general and limited partners and members of these entities without being provided such information from Defendants. Schwab has sought in discovery the

- 9 -

identities and citizenship of the partners and members of the various private entity defendants but
has yet to be provided with that information.

40.     Venue also is proper in this District because Carter resides in the District and the
events giving rise to the claims at issue in this Verified Complaint occurred here. *See* 28 U.S.C.
§ 1391.

## FACTUAL BACKGROUND

A.    **Carter received access to Schwab's confidential information
      pursuant to his fiduciary and contractual relationship with Schwab.**

41.     Schwab acquired IA's predecessor for substantial consideration, in part to acquire
IA's proprietary Models and other intellectual property IA owned.  Through IA, Schwab
generated and maintained substantial amounts of confidential information, including proprietary
investment research strategies and analytical tools.  The IA Models provided Schwab with a
competitive edge in the marketplace, and have substantial worth.  The complex IA Models were
kept confidential and were not disclosed to customers of IA or other individuals outside of
Schwab.

42.     Despite Schwab's determination in 2004 to close IA, the continued
confidentiality and protection of trade secrets generated and maintained by IA provides Schwab
with a continuing competitive advantage in other areas of its business.  The continued
confidentiality of the IA Models also preserves the Models' value for future direct or indirect use
and/or sale.

43.     To protect the confidentiality of its trade secret information, Schwab has instituted
numerous policies and precautions.  Schwab has security at all of its offices and restricts access
to confidential information on a need-to-know basis.  Schwab also has other security provisions,
including computer pass codes and detailed security procedures.

44. To further protect the confidentiality of its information, Schwab also has confidentiality policies to which Carter agreed. For example, on November 14, 2000, Carter signed a Charles Schwab Confidentiality, Nonsolicitation and Assignment Agreement (the "Confidentiality Agreement"), expressly agreeing to protect the confidentiality of Confidential Information owned, maintained, or developed by Charles Schwab. A true and correct copy of the Confidentiality Agreement signed by Carter is attached hereto as Ex. A.

45. The Confidentiality Agreement defines Confidential Information to include Schwab's confidential and trade secret information. *See* Ex. A at § 1.

46. Pursuant to the Confidentiality Agreement, Carter agreed as follows (at § 2):

> I will not, for any purpose, directly or indirectly, disclose, reproduce, use, or disseminate in any manner during or after my employment with Schwab, any Confidential Information . . ..

47. Carter further agreed (at § 5):

> I agree that I will promptly return to Schwab, upon its request or, in any event, immediately upon separation from my employment for any reason, all documents and materials that contain, refer to, or relate in any way to any Confidential Information, as well as any other Schwab property in my possession or control . . ..

48. In the Confidentiality Agreement, Carter also agreed that in the event of a breach of the Agreement by Carter, Schwab was entitled to seek injunctive relief to enforce the Agreement (at § 8).

49. In reliance on his promises to maintain the confidentiality of Schwab's confidential information, Carter was furnished with and granted access to substantial amounts of Schwab's proprietary and confidential information.

50. At the time of Carter's resignation, he had access to the entire information network of the IA division, including access to the IA Models, the production platforms on which the IA Models were processed, and customer information, but Carter only was authorized

to access the information network insofar as it was necessary for Carter to perform his duties as Director of Research Technologies for IA.

**B. Carter breached his duties to Charles Schwab, including by misappropriating its confidential information.**

51. While still serving as an employee of Schwab and in a position of trust and confidence at Schwab, Carter coordinated with Acorn and Rosenkranz to divest Charles Schwab of proprietary and confidential business information.

52. On information and belief, Defendants, knowing that Carter occupied this position of trust and confidence and confidence of Schwab, agreed that Carter would resign from Schwab without waiting one additional week for the severance package being offered by Schwab and would bring along copies of the IA Models and other confidential information useful to Acorn in its business.

53. On information and belief, Defendants have converted Schwab's confidential business information, including misappropriated copies of the IA Models . This information is Schwab's property and contains Schwab's proprietary and trade secret information.

54. While Carter was entitled to have access to and to use confidential information to perform his duties for Schwab, he had no authorization or right to copy all or part of such records for personal use and was specifically required by his Confidentiality Agreement and Schwab's policies to return all such records and copies thereof to Schwab upon terminating from Schwab.

55. Before he resigned, Carter acquired a new, high-powered personal laptop computer – *i.e.*, a new computer in addition to the computers issued to him by Schwab for use in connection with his work for Schwab. This new laptop computer contained a high-speed disc burner that allowed Carter to download and burn to a digital medium large amounts of data. On information and belief, Carter used this personal laptop computer to download and store copies of Schwab's confidential, trade secret information, including but not limited to copies of the IA Models, which Carter then removed from the Schwab IA office and retained without

- 12 -

authorization.  Carter had informed other IA employees that he had intended to copy information from Schwab's computers.

56.     Schwab's confidential trade secrets, including the IA Models, are not publicly available and cannot be reconstructed from other sources.  The IA Models represent years of investment, calculations, research, and refinement of strategies and analytical tools.

57.     Carter copied and removed from Schwab's offices confidential information, including copies of the IA Models.  This information was delivered to Acorn and its affiliates, including the Pergamon Entities.

58.     In connection with the filing of this lawsuit, Schwab demanded the return of all confidential information taken by Carter and received by Acorn and its affiliates.

59.     Schwab has uncovered powerful evidence of Carter's misappropriation and conversion of Schwab's business information.  For example, on October 18, 2004, Carter sent an email to Gary Sabot, a manager at Acorn, attaching documents that could facilitate Acorn's access to an information database licensed by Schwab and used in connection with the proprietary IA Models.

## C.     After being notified of this lawsuit, Carter destroyed information he took from Schwab

60.     Schwab filed its initial complaint in this action on November 2, 2004.  Schwab filed and served a motion to preserve evidence at the same time.

61.     On information and belief, Carter, after being notified that Schwab had filed this lawsuit, deleted information that he had wrongfully taken from Schwab that was stored on the computers that he was using on behalf of the other Defendants.

62.     On information and belief, Carter deleted this information with the purpose of preventing Schwab from determining what information Carter had misappropriated.

63.     Carter's intentional deletion of data from the computers he was using on behalf of the other Defendants has hindered Schwab's efforts in analyzing the information Carter misappropriated from Schwab, and Schwab has been unable to determine the extent of all the information that Carter has taken.

**D.     Defendants threaten to inflict serious and irreparable injury on Schwab.**

64.     On information and belief, Defendants continue to have possession or control of Schwab's proprietary and trade secret information, including the detailed, confidential IA Models and other proprietary business information belonging to Schwab.

65.     On information and belief, Defendants have used or are about to use the Schwab proprietary and trade secret information in their possession or control to do one or more of the following: (a) undermine Schwab's competitive advantages arising from its proprietary and trade secret information; (b) use Schwab's proprietary and trade secret information to improve Acorn's own research technologies and strategies without compensating Schwab for the unauthorized use of this proprietary information; and (c) otherwise engage in acts constituting conversion and misappropriation of Schwab trade secrets and confidential information, breach of fiduciary duties, and other tortious conduct.

<div align="center">

**COUNT I**

**MISAPPROPRIATION OF TRADE SECRETS**
**(AGAINST ALL DEFENDANTS)**

</div>

66.     Schwab incorporates the above allegations.

67.     Schwab has protectable trade secrets in the IA Models and other confidential information to which Carter had full access while an employee of Schwab.

68.     Schwab derives economic value from these trade secrets due to them not being generally known to other persons who could obtain economic value from their disclosure or use.

69.     Schwab has made reasonable efforts under the circumstances to maintain its trade secrets' secrecy and confidentiality.

70.     The Defendants have willfully, maliciously, intentionally, and with a wanton and
conscious disregard to the rights of Schwab, misappropriated or threatened to misappropriate
Schwab's trade secrets.

71.     On information and belief, Carter acted as the agent of the Defendants in
misappropriating Schwab's trade secrets.

72.     Schwab has been injured and is continuing to be injured by Defendants'
misappropriation of its trade secrets.

<div align="center">

**COUNT II**

**CONVERSION**
**(AGAINST ALL DEFENDANTS)**

</div>

73.     Schwab incorporates the above allegations.

74.     The Defendants have wrongfully, willfully, maliciously, intentionally, with a
wanton and conscious disregard to the rights of Schwab,  and without authorization, retained
possession, custody or control over files and information belonging to Schwab.

75.     Schwab is the rightful owner of all copies of the IA Models and related business
information taken by Carter at the direction of Acorn and Rosenkranz or with their active
support.

76.     Schwab's right to possession of this property is immediate, absolute, and
unconditional.

77.     Schwab has been injured and is continuing to be injured by Defendants'
misappropriation.

<div align="center">

**COUNT III**

**BREACH OF FIDUCIARY DUTY**
**(AGAINST CARTER)**

</div>

78.     Schwab incorporates the above allegations.

<div align="center">- 15 -</div>

79.     As an employee of Schwab who was allowed access to Schwab's confidential and other information, Carter owed Schwab certain fiduciary duties.

80.     Among these fiduciary duties are the duty of loyalty and fair dealing while working for Schwab, the duty to advance the interests of Schwab, the duty to preserve Schwab's information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to Schwab's interests.

81.     Carter willfully, maliciously, intentionally, and with a wanton and conscious disregard to the rights of Schwab, breached these duties by, among other things, converting Schwab's confidential and trade secret information to his personal use and the use of Acorn while affiliated with Schwab, and afterwards; using this information against Schwab's interests.

82.     Schwab has been injured and is continuing to be injured by Carter's breaches.

## COUNT IV

## BREACH OF CONTRACT
## (AGAINST CARTER)

83.     Schwab incorporates the above allegations.

84.     Carter signed and agreed to comply with the requirements set forth in the Confidentiality Agreement (Ex. A).

85.     In this Confidentiality Agreement, Carter expressly agreed that he would not divulge and disseminate Schwab's confidential and proprietary information.

86.     These terms are reasonable in that they impose restraints on Carter that are no greater than required to protect Schwab's legitimate interests, do not impose undue burden on Carter, and are not injurious to the public.

87.     These terms protect Schwab's legitimate interests in its trade secret and other confidential information and in its goodwill.

- 16 -

88.     Carter has willfully breached the terms of his Confidentiality Agreement by, among other things, converting to his personal benefit and the benefit of Acorn confidential business information owned and maintained by Schwab.

89.     Schwab has been injured and is continuing to be injured by Carter's breaches.

## COUNT V

## AIDING AND ABETTING AND/OR INDUCING A BREACH OF FIDUCIARY DUTY
### (AGAINST ALL DEFENDANTS EXCEPT CARTER)

90.     Schwab incorporates the above allegations.

91.     As an employee of Schwab who was allowed access to Schwab's confidential and other information, Carter owed Schwab certain fiduciary duties.

92.     Among these fiduciary duties are the duty of loyalty and fair dealing while working for Schwab, the duty to advance the interests of Schwab, the duty to preserve Schwab's information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to Schwab's interests.

93.     On information and belief, Carter breached these duties by, among other things, converting Schwab's confidential and trade secret information to his personal use and the use of Acorn and Rosenkranz while affiliated with Schwab, and afterwards; using this information against Schwab's interests.

94.     On information and belief, Acorn and Rosenkranz willfully, maliciously, intentionally, and with a wanton conscious disregard to the rights of Schwab, assisted Carter in breaching his fiduciary duties and/or induced Carter to breach such duties to Schwab through one or more of the following acts: (a) compensating Carter if he left Schwab abruptly and without notice; (b) encouraging Carter to misappropriate copies of the Models and other confidential Schwab information prior to Carter's resignation; (c) requesting that Carter provide Acorn with information Acorn and Rosenkranz knew was proprietary Schwab information; (d) offering

Carter a performance bonus based on Carter's ability to provide Acorn with the IA Models and other Schwab proprietary information.

95.     On information and belief, Acorn and Rosenkranz willfully, maliciously, intentionally, and with a wanton and conscious disregard to the rights of Schwab, took such actions with knowledge that such actions would assist Carter in breaching his fiduciary duties and/or induced Carter to breach such duties to Charles Schwab.

96.     Schwab has been injured and is continuing to be injured as a result of the Defendants' aiding and abetting of Carter's breach of fiduciary duties and/or the Defendants' inducement to Carter to breach fiduciary duties.

## COUNT VI

## VIOLATION OF COMPUTER FRAUD AND ABUSE ACT
### (AGAINST ALL DEFENDANTS)

97.     Schwab incorporates the above allegations.

98.     Schwab maintains one or more computers and/or computer systems that are "protected computers" pursuant to 18 U.S.C. § 1030(e)(2)(B) because they are used in interstate commerce and communication. Schwab's confidential and proprietary information is stored on, and may be accessed from, one or more of these protected computers, access to which is controlled via secret passwords.

99.     Carter intentionally accessed certain of Schwab's protected computers by using passwords that had been issued to Carter—only for Carter to perform his duties as Director of Information Technology for IA—for the purpose of misappropriating Schwab's confidential and proprietary electronic information. On information and belief, Carter downloaded and copied and thus obtained substantial amounts of confidential business and financial information from Schwab's computers immediately before resigning and has retained this information to use for his benefit and the benefit of the other Defendants. On information and belief, Carter acted with

- 18 -

the  support and encouragement of the other Defendants, and as their agent, in obtaining

Schwab's confidential computer information.

100.     Carter intentionally "exceeded authorized access," as that term is defined in 18

U.S.C. § 1030(e)(6), to Schwab's protected computers by logging on to said computers for the

purpose of obtaining Schwab's confidential and proprietary information for Defendants' gain

and for use in interstate commercial activities.  Defendants have thus obtained information to

which they were not entitled, including via interstate communication, thereby violating 18

U.S.C. § 1030(a)(2)(A) and (C).

101.     By exceeding, and attempting to exceed, authorized access to Schwab's protected

computers, Defendants have caused Schwab to incur the loss in terms of the costs of responding

to Defendants' conduct and conducting damage assessments of at least, in the aggregate, five

thousand dollars (US$5,000.00) during a one-year period.

102.     Defendants have also, knowingly and with intent to defraud Schwab, exceeded

Carter's authorized access to Schwab's protected computers and obtained Schwab's confidential

and proprietary information, such information being of considerable value to Schwab, thereby

violating 18 U.S.C. § 1030(a)(4).

## COUNT VII

## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

103.     Schwab incorporates the above allegations.

104.     Schwab has protectable trade secrets in the IA Models and other confidential

information to which Carter had full access while an employee of Schwab.

105.     Schwab derives economic value from these trade secrets due to them not being

generally known to other persons who could obtain economic value from their disclosure or use.

106.     Defendants wrongfully misappropriated Schwab's trade secrets.

107.    Acorn provides investment management services for the benefit of Acorn
Partners, L.P. and DFG.

108.    Rosenkranz is largest shareholder of Delphi Financial Group, Inc., an investor in
Acorn Partners, L.P., the senior executive for Delphi Capital Management, Inc., and the
beneficial owner of both Acorn Advisory Capital, L.P. and the corporate general partner of
Acorn Partners.

109.    Acorn used Schwab's trade secrets for its own benefit and for the benefit of Acorn
Partners, L.P., DFG, and Rosenkranz by, directly or indirectly, using Schwab's trade secrets
directly or indirectly to develop an analytical model used to make investment decisions.

110.    Defendants have received a benefit as a result of their wrongful conduct.

111.    Defendants have unjustly retained the benefit of the use of Schwab's trade secrets
without compensation to Schwab.  Defendants' retention of benefits derived from Schwab's
trade secrets violates fundamental principles of justice, equity, and good conscience.

## COUNT VIII

## SPOLIATION OF EVIDENCE

### (AGAINST ALL DEFENDANTS)

112.    Schwab incorporates the above allegations, and pleads the following in the
alternative to counts I - VII:

113.    Defendants had a duty of care to preserve evidence related to information taken
from Schwab stored that was stored on their computers and computers that Carter was using on
behalf of the other Defendants, in that it was reasonably foreseeable that this evidence was
material to this litigation.

114.    On information and belief, after he became aware of the filing of the initial
complaint in this matter, Carter, acting as the agent of the other Defendants, breached that duty

when, he deleted information he had taken from Schwab that was stored on the computers he was using on behalf of the other Defendants.

115. On information and belief, Defendants, after they became aware of the filing of the initial Complaint in this matter, deleted various internal web documents posted by Carter relating to the trade secrets Carter took from Schwab.

116. On information and belief, the information the Defendants deleted contained information related to the models that Carter wrongfully took from Schwab, and is essential evidence to support Schwab's claims against Defendants.

117. Defendants willfully, maliciously, intentionally, and with gross negligence indicating a wanton and conscious disregard to the rights of Schwab, deleted the information before making the information available for Schwab's inspection. Defendants deleted this information for the sole purpose of preventing Schwab from determining the extent of the confidential information Carter had taken and preventing Schwab from proving its claims.

118. But for Defendants' destruction of evidence, Schwab had a reasonable probability of prevailing in its claims against the Defendants.

119. In the event Schwab is unable to prove its claims against Defendants, that failure of proof was caused by Defendants' destruction of evidence.

120. In the event Schwab is unable to prove its claims against Defendants, Schwab will have been injured.

**WHEREFORE**, Schwab respectfully requests the following relief:

A.  Direct Defendants to return all originals and copies of information, documents and other things taken from Schwab, including all copies of the Models and other Schwab business information in Defendants' possession or control, in hard copy or electronically stored (all electronically stored records must also be deleted permanently from Defendants' computers or other electronic memory files);

B.  Enjoin Defendants, their agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms and corporations acting in connection or participation with them or on their behalf, from revealing,

disclosing or using in any manner information contained in the records of Charles Schwab, including the Models and any other Schwab business information;

C.      Impose a constructive trust for Schwab's benefit on all proceeds of Carter's fiduciary breaches;

D.      Award compensatory and punitive damages and attorney's fees and costs; and

E.      Grant such other relief as just and appropriate.

February 15, 2006              Respectfully submitted,


CHARLES SCHWAB & CO., INC.


By:        s/ Eric D. Brandfonbrener

Eric D. Brandfonbrener
Darrell J. Graham
Jonathan Buck
PERKINS COIE LLP
131 S. Dearborn, Suite 1700
Chicago, IL 60603
Tel: (312) 324-8400
Fax: (312) 324-9400

Dan K. Webb
Dane A. Drobny
Scott P. Glauberman
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700

# EXHIBIT A

# Confidentiality, Nonsolicitation and Assignment Agreement

In consideration of my employment, receipt of employment benefits, and/or continued employment by Charles Schwab & Co., Inc. and/or its parent company and its/their subsidiaries, affiliates or successors ("Schwab"), and other valuable consideration, the adequacy and receipt of which I acknowledge, I agree to abide by this Agreement during and after my employment with Schwab.

1. I understand and agree that, during and related to my employment with Schwab, I may obtain, or have access to, certain information which is confidential and/or proprietary to Schwab ("Confidential Information"). I understand that Confidential Information includes, but is not limited to:

   a. trade secrets, information about products and services (past, current or future), know-how, techniques, computer passwords, computer software designs, hardware configurations, policies and procedures, and research projects;

   b. market, financial, trade, and sales information and data, financial models or formulae, business plans, financial and business forecasts and estimates, and information about costs and profits;

   c. the identities of Schwab customers and prospective customers (including but not limited, to names, addresses, telephone numbers and/or social security numbers), any account, personal, business, financial and other information pertaining to such customers, and prospective customers, and customer and prospective customer lists in any form;

   d. account, personal or financial information pertaining to current and former employees of Schwab, business, financial, and other information pertaining to Schwab's vendors and independent contractors, and any lists of employees, vendors and/or independent contractors;

   e. all Developments, as defined in Paragraph 3 below, and all information which relates to Developments; and/or

   f. all information which Schwab has a legal obligation to treat as confidential, or which Schwab treats as proprietary or designates as confidential or for internal use only, whether or not owned or developed by Schwab.

2. I understand and agree that Schwab owns all such Confidential Information and desires (or is under legal obligations, in the case of information owned by others) to protect its confidential and proprietary nature. I will not, for any purpose, directly or indirectly, disclose, reproduce, use, or disseminate in any manner during or after my employment with Schwab, any Confidential Information unless: (a) such disclosure is required in the ordinary course of my duties at Schwab and necessary for me to perform my duties; or (b) I have received advance written consent from an authorized officer of Schwab. I will promptly notify Schwab if I become aware of or suspect any unauthorized (whether intentional or accidental) use or disclosure of Confidential Information.

3. I will promptly disclose in confidence to Schwab all inventions, improvements, designs, original works of authorship, formulas, processes, computer software programs, databases and trade secrets ("Developments") that I make, conceive, first reduce to practice, or create, either alone or jointly with others while I am employed by Schwab, and that: (a) result from any work performed by me for Schwab, whether or not in the normal course of my employment or during normal business hours; (b) reasonably relate to the actual or anticipated business, services, products, research or development of Schwab; or (c) are developed with the use of Schwab time, equipment, supplies, Confidential Information or facilities. I must promptly disclose Developments whether or not such Developments are patentable, copyrightable or protectable as trade secrets. I understand and agree that all Developments shall be the sole and exclusive property of Schwab, and I hereby irrevocably assign, transfer and convey to Schwab, exclusively and perpetually, all right, title and interest which I may have or acquire in and to such Developments throughout the world, including without limitation any copyrights and patents, and the right to secure registrations, renewals, reissues, and extensions thereof. I agree to sign any documents and to do all things necessary, without additional compensation, whether during my employment or after, to assist Schwab to register, perfect, maintain and enforce Schwab's rights in any Development, including without limitation any patent, copyright, trade secret or other right or interest. I understand that if I am now a California resident, or if I become a California resident while employed by Schwab, then this paragraph will not apply to any Developments which fully qualify under Section 2870 of the California Labor Code, which section is set forth in the accompanying Exhibit A.



PLAINTIFF'S
EXHIBIT
CARTER

Exhibit A

4. I agree that during my employment with Schwab, I will not, directly or indirectly, for my benefit or on behalf of any third party, solicit, induce, or attempt to solicit or induce: (a) any customer of Schwab to divert, transfer or take away any of Schwab's existing business or prospective business; or (b) any employee, vendor or independent contractor of, or consultant to, Schwab to leave their employment or assignment with Schwab.

5. I agree that I will promptly return to Schwab, upon its request or, in any event, immediately upon separation from my employment for any reason, all documents and materials that contain, refer to, or relate in any way to any Confidential Information as well as any other Schwab property in my possession or control including but not limited to electronic and telephonic equipment, credit cards, security badges, and passwords.

6. I further agree that for a period of eighteen (18) months after my employment with Schwab ceases, I will not, directly or indirectly, or on behalf of any third party: (a) solicit, induce or attempt to solicit or induce any existing and/or prospective customers I serviced (directly or indirectly) or whose identity I learned during my employment with Schwab to divert, transfer or otherwise take away business from Schwab; (b) sell or offer to sell any security, retirement, insurance or annuity product or related service to any customer or prospective customer of Schwab I serviced (directly or indirectly) or whose identity I learned during my employment with Schwab; or (c) solicit, induce or attempt to solicit or induce any employee, vendor or independent contractor of, or consultant to, Schwab, to leave his or her employment or assignment. Nothing in Paragraph 6 is intended to prevent me from discussing possible employment with any employee or independent contractor who contacts me directly of his or her own volition without my solicitation or attempted solicitation of him or her. Also, I understand that nothing in Paragraph 6 limits my absolute obligation under Paragraph 2 to never use Confidential Information to solicit Schwab customers or prospective customers, or for any other purpose, at any time after my employment with Schwab ceases.

7. I represent and warrant that I do not have any agreement(s) with any former employer or other third party that would be breached by my performance of my duties at Schwab or that would limit, impair or otherwise adversely affect my performance of such duties, and that I will not take any action to breach any such agreement while I am employed by Schwab. In any event, I will not use or disclose to Schwab any confidential information that belongs to others. I have listed on Exhibit B to this Agreement all the confidential, proprietary, trade secret, non-solicitation and/or non-competition agreements to which I am subject. I agree that I will disclose my obligations under this Agreement to any prospective or future employer and that my obligations under this Agreement will survive the separation from my employment with Schwab regardless of the reason for the separation.

8. I understand and agree that any breach of this Agreement may subject me to disciplinary action, up to and including termination of my employment (if I am still employed at Schwab), and may cause irreparable injury to Schwab that cannot be adequately compensated by money damages and/or is incapable of precise calculation. If I breach this Agreement, I agree that Schwab has the right to seek equitable relief (including injunctive relief and specific performance) in addition to monetary damages and any other legal remedies which may be available. I consent to Schwab's obtaining equitable relief in the most expeditious forum to preserve the status quo pending resolution of any dispute relating to this Agreement.

9. If any provision of this Agreement is found to be invalid or unenforceable, that provision will be enforced to the maximum extent permissible, and the remaining provisions shall remain in full force and effect. I agree that the terms of this Agreement and any disputes arising out of it shall be governed by, and construed in accordance with, the laws of the state in which I was last employed by Schwab, without giving effect to such state's conflict of law principles. I understand and agree that nothing in this Agreement changes "at will" employment status with Schwab, and that either Schwab or I may end the employment relationship at any time, for any reason or no reason at all.

Signed: _____   Printed Name: _____ Date: 14 NOV '00

CS 000004

<u>EXHIBIT A</u>

*California Labor Code Section 2870*

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actually or demonstrably anticipated research or development of the employer; or

(2) result from any work performed by the employee for the employer.

(b) To the extent that a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

CS 000005

**EXHIBIT B**

**List of Prior Agreements**

Initials

AT 947-4 (1/03)

CS 000006

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on February 15, 2006, he caused a true and correct copy of this **Fifth Amended Complaint** to be served by the Court's electronic filing system on:

Arthur J. Howe
Schopf & Weiss, LLP
312 West Randolph Street - Suite 300
Chicago, Illinois 60606-1721
FAX: (312) 701-9335

Paul R. Garcia
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
FAX: (312) 861-2200

_____ s/ Eric D. Brandfonbrener _____