**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| 24 HOUR FITNESS USA, INC., a California corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 08 CV 3853 |
| BALLY TOTAL FITNESS HOLDING CORP., a Delaware corporation, and MICHAEL SHEEHAN, an individual, | ) ) ) ) ) | Judge Joan Humphrey Lefkow Magistrate Judge Morton Denlow |
| Defendants. | ) ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO**
**DISMISS THE FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER**
**JURISDICTION AND/OR FOR FAILURE TO JOIN A NECESSARY PARTY**

## I.     INTRODUCTION

Defendants, Michael Sheehan and Bally Total Fitness Holding Corporation ("Defendants"), submit this reply in support of their motion to dismiss the First Amended Complaint of 24 Hour Fitness USA, Inc. ("24 Hour USA").

## II.     ARGUMENT

### A.     SHEEHAN REMAINS DOMICILED IN CALIFORNIA.

In our opening memorandum, we pointed out that 24 Hour USA and Defendant, Michael Sheehan, are both citizens of California. In response, 24 Hour USA does not dispute that as of July 7, 2008 (when 24 Hour's Complaint was filed) Sheehan's permanent residence was in California. 24 Hour USA nevertheless attempts to establish diversity of citizenship by arguing that, as of July 7, 2008, Sheehan intended to move to Illinois at some later date. 24 Hour USA's argument is unavailing for two reasons. First, 24 Hour USA's argument ignores Sheehan's testimony that his intent as of July 7, 2008 was to remain domiciled in California. Second, even if Sheehan had intended to move to Illinois after July 7, 2008, the law deems him a citizen of

California until he permanently abandons his California residence.  This had not happened as of July 7, 2008.  Indeed, Sheehan remains domiciled in California as of today.

Courts determine a party's domicile as of the date of the initiation of the underlying lawsuit. Fidelity & Deposit Co. v. Sheboygan Falls, 713 F.2d 1261, 1266 (7th Cir. 1983) (jurisdiction depends on the facts as they exist when the complaint is filed).  Moreover, a presumption exists in favor of a natural person's  old, established domicile over any alleged, newly acquired domicile. Id.   That presumption can be overcome only by evidence that the person has permanently abandoned his old residence.  Viacom Inc. v. Flynn, 1997 U.S. Dist. LEXIS 2317, at *2 (N.D. Ill. 1997); *see also* Restatement (Second) of Conflict of Laws, Section 2, Topic 2 – Special Note on Evidence for Establishment of A Domicil of Choice (1971) ("A domicil is not lost until another has been acquired, and the burden of establishing a change of domicil is upon the party who asserts it . . . This principle is heavily relied upon by the courts.")   Thus, to determine whether 24 Hour USA has satisfied its burden, the Court must consider four elements, including:  (1) physical abandonment of the first domicile (not just temporary departure); (2) physical presence in the new domicile; (3) intention not to return; and (4) intent to make the new location the party's actual domicile, not just an additional residence.  Koerber v. Apollo Golf, Inc., 1993 U.S. Dist. LEXIS 1721, at *4 (N.D. Ill. 1993).  Applying these principles to the instant case, it is manifest that 24 Hour USA has failed to satisfy its burden.

Although it is not his burden to do so, Sheehan has provided ample evidence demonstrating that, as of July 7, and currently:  (1) he has not abandoned his first domicile (i.e.*,* he owns a house in California and maintains his ***primary*** residence in California, where his family lives); (2) he has not physically established a new domicile in Illinois (i.e.*,* he stays in hotels when he works in Illinois, has not purchased or rented a residence, and has no current intention to do so); (3) he does, in fact, intend to return to his primary residence in California (i.e.*,* he returns to California every weekend where his family lives, and he has no intention of moving his family out of California); and (4) he does not intend to make Illinois his domicile (i.e.*,* while there is a possibility that he may establish ***a*** residence in Illinois at some future date, he intends to retain a

California home as his primary residence).  Declaration of Michael Sheehan Submitted in Support of Motion to Dismiss the First Amended Complaint ("Sheehan Decl."), ¶¶ 2, 6, 7, 9.)

Instead of negating these facts, 24 Hour USA merely points out that Sheehan admitted in his deposition that on or about June 20, 2008 he signed a letter agreement with Bally stating that he will establish *a* permanent residence in Illinois *after* July 7.  From this, 24 Hour USA leaps to the erroneous conclusion that, as of June 20, Sheehan's intention to become domiciled in Illinois was "fixed" and is dispositive of his domicile as of July 7.  This argument fails.

First, 24 Hour USA fails to distinguish between the distinct legal concepts of "residence" and "domicile."  Although Sheehan's letter agreement with Bally states that he will establish a permanent *residence* (i.e.*,* not merely renting on a temporary or impermanent basis) in Illinois, the agreement does not state that Sheehan will change his legal *domicile*.  Significantly, the letter agreement uses the term "permanent residence," not "primary residence."  Indeed, Sheehan has testified that even if he has multiple residences, Sheehan intends to keep his <u>primary</u> residence in California. Supplemental Declaration of Michael Sheehan ("Supp. Sheehan Decl."), ¶ 4 (a copy of which is attached hereto).  *See* Restatement (Second) of Conflict of Laws § 20 (1971) ("When a person with capacity to acquire a domicil of choice has more than one dwelling place, his domicil is in the earlier dwelling place unless the second dwelling place is his principal home").

Second, the fact that Sheehan intended, on June 20, to establish *a* residence in Illinois is irrelevant because between June 21 and July 7 intervening events occurred that caused Sheehan to change his mind.  Specifically, Sheehan has testified that between June 21 and July 7 (*i.e.*, even before this lawsuit was filed):  (1) Bally released Sheehan of his obligation to establish a permanent residence in Illinois by July 31; (2) Sheehan determined that there would be no reason for him to establish any residence in Illinois unless he prevails in the litigation with the 24 Hour Plaintiffs; and (3) based on the these two intervening events, Sheehan decided not to establish a permanent residence in Illinois unless and until it seems appropriate to do so.  (Supp. Sheehan Decl., ¶¶ 2, 3.)  Consequently, as of July 7, Sheehan did not have a specific intention to establish *any* residence, much less his *primary* residence, in Illinois.  (Supp. Sheehan Decl., ¶ 4.)  Although

there remained, as of July 7, a possibility that Sheehan might establish a residence in Illinois at a future date, a court's jurisdiction cannot be built on a foundation of vague and equivocal possibilities. As a matter of law, domicile is determined based on an individual's actual intent as it existed as of the date of initiation of the underlying lawsuit. Fidelity & Deposit Co., 713 F.2d at 1266.

Unable to controvert the foregoing, 24 Hour USA has resorted to *ad hominem* attacks – contending that Sheehan is lying regarding his intention to maintain his primary residence in California, and regarding the events that occurred between June 20 and July 7. In particular, 24 Hour USA argues that Sheehan's declaration contradicts prior deposition testimony and therefore constitutes fraudulent averments that should be disregarded by the Court. This argument, however, is fallacious. A review of the Sheehan deposition transcript reveals that 24 Hour USA never asked Sheehan a single question concerning: (1) if Sheehan intended to maintain his permanent residence in California (which he does); (2) if he intends to keep his ***primary*** residence in California (which he does); (3) whether he intends to maintain California as his legal domicile (which he does); (4) whether any circumstances changed between June 20 and July 7, which caused Sheehan to change his mind about establishing a permanent residence in Illinois (which, in fact, occurred); or (5) whether, between June 20 and July 7, the letter agreement requiring Sheehan to establish a permanent residence in Illinois was ever modified (which it was). (Exhibit "A" hereto.) In short, 24 Hour USA asked Sheehan at his deposition only about events as they existed as of June 20 and failed to inquire at all regarding the facts as they existed as of the relevant date for a jurisdictional analysis, July 7, or at any time in between.

In light of the foregoing, Sheehan's intent is clear; he intended as of July 7 and intends today to be domiciled in California. Moreover, if there is any ambiguity as to his intentions, the Court should consider the following factors: ownership of real property, location of residence(s), voter registration, states of vehicle registration and driver's licenses, location of financial accounts, states in which taxes are paid, maintenance of personal services in a particular state, and personal and business ties within any given state. *See, e.g.,* Viacom Inc., 1997 U.S. Dist. LEXIS

2317, at *4; *Hough v. Hough*, 1992 U.S. Dist. LEXIS 19670, at *3 (N.D. Ill. 1992).  A

consideration of these factors shows that Sheehan was domiciled in California for the past 13

years, including as of July 7.  The overwhelming majority of his property, including his clothing

and automobiles, remains in California.  (Sheehan Decl. ¶ 2.)  He is licensed to drive, registered

to vote, and pays taxes in California.  (Id. at ¶ 3.)  All of his financial accounts are held in

California banks.  (Id. at ¶ 4.)  He does not own or rent property in Illinois, but maintains his

home and mortgage in California.  (Id. at ¶¶ 4, 6.)  He maintains his utilities and personal services

(such as phone service and mail delivery) in California.  (Id. at ¶ 8.)  Sheehan and his family

intend to continue to live in California and maintain a home there as their primary residence even

if he one day purchases a second permanent residence in Illinois.  (Id. at ¶ 7; Supp. Sheehan

Decl., ¶ 4.)  In short, although it is not his burden to do so, Sheehan has provided overwhelming

evidence that he and 24 Hour USA are both citizens of California, and therefore, this Court lacks

diversity jurisdiction.

Although it is true that Sheehan listed his California house for sale, that fact does not

support the conclusion that he intends to establish a primary residence in Illinois.  Had 24 Hour

USA examined Sheehan about this subject at his deposition, it would have learned that Sheehan

intends (and, as of July 7, intended) to use the proceeds of the sale of his home – if it is sold at all

– to purchase a new primary residence *in California*.  (Supp. Sheehan Decl., ¶ 5.)  Moreover, had

24 Hour USA examined Sheehan concerning the reason he listed his house for sale, it would have

learned that:  (1) before moving to his current home in San Ramon, California, Sheehan lived in

Southern California; (2) Sheehan moved to San Ramon to be closer to 24 Hour USA's corporate

offices in Northern California; and (3) following his resignation from 24 Hour USA, Sheehan

decided to relocate his family back to Southern California, where he and his family intend to

maintain their primary residence.  (Supp. Sheehan Decl., ¶ 5.)

24 Hour USA also asks this Court to leap to the conclusion that because Sheehan is

allegedly wealthy enough to afford homes in California and Illinois, this supposed fact

demonstrates an intention to abandon his domicile in California and to treat Illinois as his "real

home." This argument too is flawed. It is precisely *because* Sheehan has the financial means to afford two permanent residences that the Court cannot assume that Sheehan's potential acquisition of a permanent residence in Illinois constitutes an intent to abandon his domicile in California. As 24 Hour USA notes, in today's world, individuals of economic means can afford multiple permanent residences. It is, therefore, incumbent upon the Court to carefully distinguish between an individual's permanent residences, and that individual's intention to make one of his residences his primary domicile. *See* Viacom Inc., 1997 U.S. Dist. LEXIS 2317 (finding that defendant intended to remain primarily domiciled in Florida, despite the fact that defendant also possessed a $2 million permanent residence in Illinois); *see also* 15 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 102.34[9] (Matthew Bender 3d ed.) (stating "[i]n determining which of the person's residences is his or her domicile, the court must focus on the intent of the party, which requires an examination of the entire course of the person's conduct").

Upon an examination of the evidence, as opposed to mere conjecture, the only possible conclusion is that Sheehan has never abandoned his domicile in California and has never changed his domicile to Illinois. In Viacom, the District Court for the Northern District of Illinois dealt with a situation in which the defendant owned a $2 million home in Illinois and spent three years treating Illinois as the "center of [Defendant's] business life." Viacom, 1997 U.S. Dist. LEXIS 2317, at *10. Regardless, the court found that the defendant was not domiciled in Illinois because he maintained a separate residence in Florida, kept his family in Florida, and treated Florida as his "true" home. Here, 24 Hour USA has made a far weaker evidentiary showing than that considered insufficient in Viacom. Unlike the defendant in Viacom, Sheehan has not purchased a residence in Illinois and has demonstrated that it has always been his intention to treat Illinois as merely a place to work before returning home to his family in another state. Id. at * 5; *see also* United States v. Scott, 472 F. Supp. 1073, 1079 (N.D. Ill. 1979) ("the residence of a spouse and other family members is a highly persuasive indication of the place intended as a permanent home"); Restatement (Second) of Conflict of Laws, Section 2, Topic 2 – Special Note on Evidence for Establishment of A Domicil of Choice (1971) ("Since a man's home will usually be

with his family, the place where his wife and children dwell is likely to be his domicil . . . So when he leaves his family behind and goes to another place, his domicil presumably remains unchanged.").

**B.    THIS CASE SHOULD ALSO BE DISMISSED FOR FAILURE TO JOIN 24 HOUR WORLDWIDE AS AN "INDISPENSABLE" PARTY.**

A separate and independent basis exists for dismissing this case for lack of diversity jurisdiction.  24 Hour Worldwide, Inc. ("24 Hour Worldwide") is a "required" and diversity destroying party pursuant to Rule 19 of the Federal Rules of Civil Procedure.

In opposing Defendants' motion under Rule 19, 24 Hour USA makes much of the fact that Defendants' moving papers do not explicitly distinguish between the terms "necessary" and "indispensable" parties.  However, the archaic practice of distinguishing between "necessary" and "indispensable" parties under Rule 19 has fallen into disfavor.  *See* Fed. R. Civ. Pr. 19, Advisory Committee's Notes - regarding 2007 amendments ("'Indispensable' was used only to express a conclusion reached by applying the tests of Rule 19(b).  It has been discarded as redundant.").

Under modern practice, the relevant question is not one of semantics, but is a substantive question concerning the potential applicability and impact of Rule 19.  Regardless of the nomenclature, the fact remains that the adjudication of 24 Hour USA's claims cannot legitimately proceed without joinder of 24 Hour Worldwide as a party.

**1.    24 Hour Worldwide Is A "Required" Party Because The 24 Hour Plaintiffs Have Certain Identical Interests But Distinct Causes Of Action, And Have Attempted To Impermissibly "Split" Their Claims In Separate Lawsuits.**

Under Rule 19(a)(1)(B), a "required" or "necessary" party is one that has an "interest relating to the subject matter of the action" and who should be joined to protect the interests of either:  (a) an absent party; (b) one of the present parties; *or* (c) the public interest in orderly and expeditious administration of justice. Fed. R. Civ. Pr. 19(a); Moore v. Ashland Oil, Inc., 901 F.2d 1445, 1447  (7th Cir. 1990) (purpose of Rule 19 is to "permit joinder of all materially interested parties . . . and avoid waste of judicial resources").  This is a fact-intensive inquiry, and the Courts must take into consideration the nuances of each situation.  Hunt v. Pepsico, Inc., 2004 U.S. Dist.

LEXIS 8773, at *9 (N.D. Ill. 2004) ("there is no precise formula for determining whether a particular nonparty must be joined"). The facts of this case conclusively establish that 24 Hour Worldwide is a necessary party pursuant to Rule 19(a) because 24 Hour USA and 24 Hour Worldwide (collectively, the "24 Hour Plaintiffs") have at least some identical interests, yet are impermissibly seeking to split their legal claims against Defendants.

No question exists that the 24 Hour Plaintiffs have an "interest relating to the subject matter of this action," as is required by Rule 19(a). Both 24 Hour USA and 24 Hour Worldwide have an identical interest in the trade secrets at issue in this lawsuit, and both purport to have suffered damages as a result of the misappropriation of such trade secrets. Moreover, 24 Hour Worldwide has an additional interest in the outcome of this lawsuit because it has attempted to reserve the right to argue that the purported misconduct underlying this action also supports a separate, and independent, lawsuit against Sheehan for the alleged breach of the Shareholder Agreement Sheehan entered into with 24 Hour Worldwide, and which contains prohibitions against the misuse of "Confidential and Proprietary Information" and a restriction on competition.

24 Hour Worldwide's interest in pursuing a separate lawsuit against Defendants for breach of the Shareholder Agreement is not theoretical or speculative. In the California Action, 24 Hour Worldwide alleged a breach of the Shareholder Agreement, arguing that, even if Sheehan's conduct did not constitute theft of trade secrets, it nevertheless purportedly constituted a breach of contract. After the Contra Costa Superior Court denied the 24 Hour Plaintiffs' request for a temporary restraining order, however, the 24 Hour Plaintiffs dismissed the breach of contract claim *without prejudice* and filed the Original Complaint initiating the instant action. Unlike the California Action, the Original Complaint and FAC do not contain any reference to or causes of action premised on the Shareholder Agreement. Instead, they are premised on the substantially narrower allegations concerning a purported violation of the Illinois Trade Secrets Act.

As the 24 Hour Plaintiffs originally alleged that the breach of the Shareholder Agreement supported the issuance of a temporary restraining order, one might wonder why they did not pursue a breach of contract claim in the instant litigation. The answer is provided in 24 Hour

USA's opposition brief to the instant motion, in which 24 Hour USA notes that it has not sued under the Shareholder Agreement because (as it is not a party to the Shareholder Agreement between Sheehan and 24 Hour Worldwide) it lacks standing to pursue such claims on behalf of 24 Hour Worldwide. (Opp'n, at 2, n. 1 ("While 24 Hour Fitness Worldwide was a proper party in the California action's claim for breach of a Shareholder Agreement between it and Sheehan, no such claim ever was pleaded in this action."))

In other words, the 24 Hour Plaintiffs take the position that – although they are in complete privity with respect to their trade secret claims, they are not in privity with respect to claims relating to the Shareholder Agreement. *See* <u>Secretary of Labor v. Fitzsimmons</u>, 805 F.2d 682, 687 (7th Cir. 1986) ("privity between parties is established where those parties' interests are so closely aligned that they represent the same legal interests.") It is readily apparent that 24 Hour Worldwide intends to "split" its Shareholder Agreement claims from those alleged in the instant lawsuit, and thereby reserve the opportunity to later sue Defendants under the Shareholder Agreement, regardless of the outcome of the instant lawsuit.

This is the precise outcome against which Rule 19 is intended to protect. Unless 24 Hour Worldwide is joined in the instant litigation: (1) Defendants will be subject to potential inconsistent obligations relating to the same purported misconduct; and (2) another court will be forced to engage in a time-consuming, expensive, and unnecessary adjudication of causes of action that could easily be addressed in the instant action, and that can only be resolved by reference to factual determinations that must be made in the instant dispute.

**2.    24 Hour USA Has Misstated The Legal Standard Concerning Res Judicata.**

24 Hour USA argues that Rule 19 does not apply because Defendants will not be subject to inconsistent adjudications absent the joinder of 24 Hour Worldwide. Specifically, 24 Hour USA contends that, because the 24 Hour Plaintiffs are purportedly "in privity," the doctrine of res judicata precludes 24 Hour Worldwide from "relitigating claims <u>that</u> <u>were</u> <u>or</u> <u>could</u> <u>have</u> <u>been</u> <u>raised</u>" in the current action by 24 Hour USA. This misses the point entirely. Defendants invoke Rule 19 because the 24 Hour Plaintiffs have taken the position that 24 Hour Worldwide is entitled

to pursue causes of action against Defendants that arise out of the same factual allegations underlying this lawsuit, but which cannot be raised in the current action by 24 Hour USA.  In other words, although 24 Hour USA and 24 Hour Worldwide may be in privity with respect to certain claims, they are not in privity with respect to all of their potential claims.

Although 24 Hour USA asserts that it is capable of adequately representing all of 24 Hour Worldwide's legal rights because it is in privity with 24 Hour USA, this is simply not true.  24 Hour USA is not a party or signatory to the Shareholder Agreement and, therefore, has no standing to sue Sheehan for the purported breach of that agreement – or by extrapolation, to sue Bally for the purported inducement of such a breach.

If 24 Hour Worldwide refiles a lawsuit relating to the Shareholder Agreement, Defendants will certainly argue that such claims should be dismissed for failure to join them in the current action.  However, there is no guarantee that Defendants will prevail on this argument, or that a court hearing 24 Hour Worldwide's claims would find the doctrine of res judicata applicable. The Seventh Circuit has long recognized that "[f]or res judicata to apply, the causes of action, as well as the parties, or their privies, must be identical."  United States v. Bailey, 957 F.2d 439, 443 (7th Cir. 1992), cert denied, 505 U.S. 1229 (1992) (citing Gray v. Lacke, 885 F.2d 399, 405 (7th Cir. 1989), cert denied, 494 U.S. 1029 (1990)) (emphasis added and removed).  Here, 24 Hour Worldwide may argue that its cause of action from breach of (or interference with) the Shareholder Agreement is distinct from the trade secret claims asserted by 24 Hour USA in the instant case and that:  (1) its claims are premised on substantively different causes of action than those at issue in the current case (i.e., contract claims, rather than statutory trade secret claims); (2) its claims require a lesser evidentiary burden and standard of proof than those applicable in the current case; (3) it seeks different damages than those requested in the current case (compensatory contract damages, rather than damages and injunctive relief pursuant to the Illinois Trade Secrets Act); and (4) it was not in complete privity with 24 Hour USA.

Ultimately, to invoke Rule 19, this Court is not required to determine if the doctrine of res judicata should or should not apply if 24 Hour Worldwide refiles a separate lawsuit.  Rather, it is

sufficient for this Court to find that another court ***"might"*** entertain a second lawsuit by 24 Hour Worldwide, which could lead to results inconsistent with those arrived at in this case  *See* Fed. R. Civ. Pr. 19(b) (court must consider "the extent to which a judgment rendered in the [entity's] absence ***might*** prejudice that person or the existing parties" (emphasis added)).[1]  That is certainly the case here.  It is revealing that the 24 Hour Plaintiffs have made specific efforts to preserve its right to sue Defendants in a separate lawsuit based on claims arising out of the Shareholder Agreement.

In Hunt, the District Court for the Northern District of Illinois, Eastern Division considered a situation very similar to that presented here.  In that case, the plaintiff alleged that the defendant had violated plaintiff's intellectual property rights.  The defendant sought to compel the joinder of a non-party under Rule 19(a) on the grounds that the non-party had an ownership interest in the intellectual property rights at issue, and therefore might later assert claims against the defendant based on the same basic conduct at issue in the plaintiff's complaint.  Just as in this case, the plaintiff objected to joinder on the grounds that:  (a) it and the interested third party were, arguably, in privity; and (b) defendant could avoid inconsistent obligations by relying on res judicata/collateral estoppel.  Although the District Court acknowledged that there was a distinct possibility that defendant might invoke such defenses in response to a subsequent lawsuit by an interested third party, the Court nevertheless found that joinder was appropriate because Rule 19(a)(2) requires only a showing that a party's interests ***may*** be harmed absent joinder of an interested party.  Specifically, the Court noted that "Rule 19 requires us to look beyond whether a

---

[1]  On its face, Rule 19(a) merely requires evidence that failure to join a necessary party "might"  prejudice an existing party.  24 Hour USA, however, contends that, in Davis Cos v. Emerald Casino, Inc., 268 F.3d 477, 479 (7th Cir. 2001), the Seventh Circuit held that such a risk may not be "hypothetical."  This is incorrect.  In the entire text of the Davis Cos. decision the Court never once used the word "hypothetical."  Although Davis Cos. does state, in passing, that a party seeking joinder should demonstrate a "substantial" risk of prejudice, this statement is dictum, is contrary to the language of Rule 19 itself, and is contrary to more recent authority.  In Hunt, 2004 U.S. Dist. LEXIS 8773, at **13-14, the Northern District, Eastern Division, held that to find that an entity is a necessary party, Rule 19(a)(2) requires only that a party's interests "may" be harmed.  In so holding, the Court specifically relied on and cited to Takeda v. Northwestern National Life Ins. Co., 765 F.2d 815, 821 (9th Cir. 1985), which states that a party must be joined even if there is only a "possibility" of prejudice absent joinder.  Even if the legal standard is that of a "substantial" risk of prejudice, Defendants have easily satisfied this standard.

non-party would be technically bound [by a judgment] and to consider whether the judgment would 'as a practical matter' impair the non-party's interests." Hunt, 2004 U.S. Dist. LEXIS 8773, at *12 (quoting Casualty Indemnity Exchange v. Village of Crete, 731 F.2d 457, 461 (7th Cir. 1984)) (internal quotations omitted).  Furthermore, the Court found it compelling that, even if the defendant could rely on the defense of res judicata, joinder of the non-party was necessary to ensure that defendants would not be subjected to the costs of multiple litigations relating to the same set of operative facts. Id. ("Rule 19 'should be employed to promote the full adjudication of disputes with a minimum of litigation effort'")

This case presents an even more compelling basis applying Rule 19.  In Hunt, the court applied Rule 19 even though the named plaintiff was not intentionally seeking to split its claims.  Here, however, the 24 Hour Plaintiffs have made a strategic decision not to assert all of their potential causes of action in a single lawsuit.  At any point, they could have substituted 24 Hour Worldwide as the named plaintiff in this case, instead of 24 Hour USA, so as to allow for the efficient and economical adjudication of all of the 24 Hour Plaintiffs' claims in a single action.  Instead, after naming 24 Hour Worldwide as a plaintiff in the Original Complaint, that entity was quickly dismissed.  Thus, the 24 Hour Plaintiffs have created a situation where the application of Rule 19 is the only means to ensure the efficient administration of justice and avoid a substantial risk of inconsistent results.

### 3.    24 Hour USA Has Misstated The Applicable Legal Standard For Judging Whether An Entity Is A Necessary Party.

Citing Burger King Corp. v. American Nat'l Bank and Trust Co. of Chicago, 119 F.R.D. 672 (N.D. Ill. 1988), Plaintiffs contend that 24 Hour Worldwide cannot be a necessary party because 24 Hour Worldwide's "only" interest in this case is a financial interest or "interest of convenience."  This is a misstatement of the law and the facts.   Although Burger King supports the general proposition that an entity should not be considered a necessary party if that entity has nothing more than an incidental financial interest, 24 Hour USA has failed to cite to the remainder of the holding in Burger King in which the court specifically found that an entity ***does*** constitute a

necessary party if that entity has "a legally protected interest in the subject matter of the action." Id. at 675 (emphasis removed). 24 Hour USA chose to edit this holding out of its citation to Burger King because 24 Hour Worldwide has, on multiple occasions, acknowledged that it has a legally protected interest in the subject matter of this litigation. This is a fact admitted by 24 Hour Worldwide in the California Action, the Original Complaint, and the FAC. In each of these pleadings, the 24 Hour Plaintiffs specifically acknowledged that 24 Hour USA and 24 Hour Worldwide have identical ownership interests in the intellectual property rights at issue in this litigation, and have both suffered damages as a result of the alleged misuse of that intellectual property.

In response, 24 Hour USA argues that the 24 Hour Plaintiffs should not be held responsible for statements made in the context of the California Action, the Original Complaint, and the FAC; and that any allegations made therein are not binding. This is disingenuous. First, as 24 Hour USA points out in its opposition brief, for purposes of this motion, the Court must assume that the allegations in the complaint(s) are true. Davis Cos., 268 F.3d at 479. Second, the affirmative allegations made in three separate complaints cannot, as 24 Hour USA contends, be considered a mere "clerical error." The complaint in the California Action was verified, and the allegations in the Original Complaint were made subject to Rule 11. In each of these pleadings, the 24 Hour Plaintiffs have expressly alleged that each of them is the owner of the trade secrets at issue, and each has been damaged by the conduct of Defendants. (California Action, ¶¶ 8-10, 18, 19; Original Complaint 10, 11, 15, 16, 24.)

24 Hour USA has also misstated the law by erroneously suggesting that a corporate parent can never be considered a "necessary" party in litigation brought by its subsidiary. The cases 24 Hour USA relies on in this regard merely state that a parent and its subsidiary are often adequate representatives of each other's rights – in situations where the non-party entity's only interest in the outcome of the litigation is with respect to the overall financial condition of the party entity. Etri, Inc. v. Nippon Miniature Bearing Corp., 1989 U.S. Dist. LEXIS 10129, *12-14 (N.D. Ill. 1989); Extra Equipamentos E Exportacao Ltda, et al. v. Case Corp., 361 F.3d 359, 364 (7th Cir.

2004). These cases do not address the situation raised in the instant case, where a parent and a subsidiary have overlapping interests arising out of a common set of factual allegations, but where the subsidiary *lacks the standing* to pursue at least one cause of action on the parent's behalf.  Id.

**4.    24 Hour Worldwide Is Also An "Indispensable" Party.**

Once an entity is deemed a necessary party under Rule 19(a), if joinder would defeat jurisdiction, the Court must consider whether that party satisfies Rule 19(b) – which formerly referred to "indispensable" parties.  Fed. R. Civ. Pr. 19(b).  In other words, the Court must "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Id.  In making this decision, a District Court should apply a four-factor test:  (1) the "extent to which a judgment rendered in [an entity's] absence ***might*** be prejudicial to . . . the existing parties"; (2) the extent to which, by protective provisions in the judgment or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the necessary party's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.  None of these factors are dispositive, and all must be considered.  *See* Burger King Corp., 119 F.R.D. at 679.  These four factors "overlap to a large extent" with those taken into consideration when analyzing whether an entity is a necessary party.  Id.  Here, the same facts that support 24 Hour Worldwide's status as a necessary party also demonstrate that 24 Hour Worldwide is an indispensable party.

First, as described above, there exists a substantial likelihood that, if 24 Hour Worldwide is not joined as a party, a judgment rendered in this case could be prejudicial to Defendants and to the public's interest in the efficient and complete disposition of legal disputes.

Second, there are no protective provisions that can be fashioned to prevent the prejudice that will result if the 24 Hour Plaintiffs are permitted to split their claims and potentially subject Defendants to inconsistent obligations.  Unless 24 Hour Worldwide is joined as a party, this Court will have no jurisdiction or mechanism by which to regulate any attempts by 24 Hour Worldwide to refile its claims relating to the Shareholder Agreement in another forum.

Third, a judgment rendered in 24 Hour Worldwide's absence will not be adequate or

complete.  Unless 24 Hour Worldwide is joined as a party, its contract-based claims against Defendants cannot be resolved except through additional and unnecessary litigation.

Fourth, even if the instant case is dismissed, the 24 Hour Plaintiffs, or any of them, will retain the right to attempt to refile their claims in another forum, assuming they determine, pursuant to their Rule 11 obligations, that it is appropriate to do so and subject to any defenses Defendants may have.  The Seventh Circuit has recognized that this is an adequate alternate remedy, even though it may limit a party's attempt to benefit from a forum-shopping strategy. *See* McGee v. Dresnick, 2005 U.S. Dist. LEXIS 18244, at *11 (N.D. Ill. 2005) (finding that plaintiff will suffer no prejudice because he could attempt to pursue his claims in a state court).

All four factors support a finding that 24 Hour Worldwide is an indispensable party, and this case cannot "in equity and good conscience" proceed without 24 Hour Worldwide as a party.  24 Hour Worldwide was a party when this litigation was initiated, and was only dismissed to create subject matter jurisdiction where none existed.

### III.    CONCLUSION

Based upon the foregoing, Defendants respectfully submit that the Court should dismiss this case for lack of subject matter jurisdiction because 24 Hour USA and Sheehan were both citizens of California as of the date of the filing of this action.  Alternatively, Defendants respectfully submit that the Court should compel the joinder of 24 Hour Worldwide and subsequently dismiss this case for lack of subject matter jurisdiction because 24 Hour Worldwide and Bally are both citizens of Delaware, and were so as of July 7.

Dated:  August 21, 2008                          WINSTON & STRAWN LLP

                                                 By:    /s/Kimball R. Anderson
                                                        WINSTON & STRAWN LLP
                                                        35 West Wacker Drive
                                                        Chicago, IL  60601-9703
                                                        Tel:    (312) 558-5600
                                                        kanderson@winston.com

                                                        Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys for Defendants Michael Sheehan and Bally Total Fitness

Holding Corporation, hereby certifies that he has caused a true and correct copy of the foregoing

Reply Memorandum Of Law In Support Of Defendants' Motion To Dismiss The First Amended

Complaint For Lack Of Subject Matter Jurisdiction And/Or For Failure To Join A Necessary

Party to be served via the Court's ECF filing system, this 21st day of August, 2008, addressed to:


R. Mark Halligan
Mark.Halligan@lovells.com
Deanna R. Swits
Deanna.swits@lovells.com
LOVELLS LLP
330 N. Wabash Avenue
Suite 1900
Chicago, IL 60611
Tel: 312-832-4400
Chicago, IL 60611


_____/s/Kimball R. Anderson_____

MICHAEL SHEEHAN,  JULY 22, 2008

Page 1

1    UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF ILLINOIS
3    EASTERN DIVISION
4  24 HOUR FITNESS USA, INC., a    )
5  California corporation,         )
6      Plaintiff,          )
7    vs.            )No. 08 cv 3853
8  BALLY TOTAL FITNESS HOLDING CORP., )
9  a Delaware corporation, and MICHAEL)
10 SHEEHAN, an individual,         )
11     Defendants.        )
12
13     The deposition of MICHAEL SHEEHAN, called for
14 examination, taken pursuant to the Federal Rules of Civil
15 Procedure of the United States District Courts pertaining
16 to the taking of depositions, taken before LISA SCHWAM,
17 CSR No. 840-4650, a Notary Public within and for the
18 County of Cook, State of Illinois, and a Certified
19 Shorthand Reporter of said state, at Suite 1900, 333 North
20 Wabash Street, Chicago, Illinois, commencing, on the 22nd
21 day of July, A.D. 2008, at 1:11 p.m.
22
23
24

Page 2

1  PRESENT:
2      LOVELLS LLP,
3      (333 North Wabash Street, Suite 1900,
4      Chicago, Illinois  60611,
5      312-832-4400), by:
6      MR. R. MARK HALLIGAN and
7      MS. DEANNA R. SWITS,
8        appeared on behalf of the Plaintiff;
9
10     24 HOUR FITNESS,
11     (12647 Alcosta Boulevard, Suite 500,
12     San Ramon, California  94583,
13     925-543-3368), by:
14     MS. KATHLEEN DEIBERT,
15       appeared on behalf of the Plaintiff;
16
17     WINSTON & STRAWN, LLP
18     (35 West Wacker Drive,
19     Chicago, Illinois  60601,
20     312-558-5858), by:
21     MR. KIMBALL R. ANDERSON,
22       appeared on behalf of the Defendant;
23
24     BALLY TOTAL FITNESS, GENERAL COUNSEL,

Page 3

1      (8700 West Bryn Mawr Avenue,
2      Chicago, Illinois 60631,
3      773-399-7626), by:
4      MS. KATHLEEN M. BOEGE,
5        appeared on behalf of the Defendant.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1      (Exhibits 1-3 marked as requested prior to
2      commencement of deposition.)
3      (WHEREUPON, the witness was sworn.)
4        MICHAEL SHEEHAN,
5  called as a witness herein, having been first duly sworn,
6  was examined and testified as follows:
7      MR. HALLIGAN: This is a special deposition
8  ordered by the Court relating strictly to the
9  issue of subject matter jurisdiction. And I don't
10 know, Mr. Anderson, if you want to make any other
11 statements on the record, but we're here on that
12 sole and limited issue pursuant to agreement we
13 reached last week.
14     MR. ANDERSON: I would describe it this way:
15 I don't believe the Court ordered it. I think
16 that the Court acknowledged that we were going to
17 try to voluntarily resolve the jurisdiction issues
18 that I have raised. And our view, our view being
19 that of the Defendants, is that the Federal Court
20 has no subject matter jurisdiction, and that any
21 orders that might have been issued would be
22 without enforcement. But we are here today
23 voluntarily producing Mr. Sheehan to provide
24 information regarding the citizenship issue that

MICHAEL SHEEHAN, JULY 22, 2008

Page 5

1  you've identified.
2       And you are correct that the subject matter will
3  be strictly limited to the citizenship issue as of the
4  filing date of the complaint made on July 8, 2008.
5       MR. HALLIGAN:  Well, I think the complaint
6  was filed on July 7th, 2008.  And I think then an
7  amended complaint was filed on July 8, 2008.
8       MR. ANDERSON:  Well, then I stand corrected.
9  Then the relevant date for the Court to determine
10 whether subject matter attaches is
11 July 7th, 2008.
12      MR. HALLIGAN:  And I will reserve any
13 objections to the statement by counsel.  And I
14 would like to start with Plaintiff's Notice of
15 Deposition of Defendant Michael Sheehan marked as
16 Deposition Exhibit 1.
17           EXAMINATION
18 BY MR. HALLIGAN:
19      Q.  Mr. Sheehan, have you had an opportunity to
20 review this notice of deposition when it was served?
21      A.  Yes.
22      Q.  And particularly, turning to page 3, the
23 Schedule A.  Page 3 and page 4.
24      A.  Yes.

Page 6

1      Q.  Number 1 on Schedule A requested that you bring
2  with you today, to this deposition, a true and correct
3  copy of any document consisting of or referring to or
4  relating to your agreement of employment with Bally Total
5  Fitness Holding Corporation and/or any entity related to
6  Bally Total Fitness Holding Corporation.
7       Did you bring those documents with you?
8      MR. ANDERSON:  Mr. Sheehan had directed his
9  staff to bring -- to gather responsive documents,
10 and I have here in my hand, and I am pushing them
11 across the table to you, the documents that the
12 staff has been able to obtain at this time.  And
13 that does include a redacted copy of a letter of
14 employment.
15      MR. HALLIGAN:  All right.  Well, I'm going to
16 hand -- Let the record reflect that I just
17 received, it looks like, three stapled documents
18 and one piece of paper, which appears to be a
19 photocopy of a driver's license from California.
20 BY MR. HALLIGAN:
21      Q.  So as we go through this, if the document
22 responsive to the request is in here, would you pull it
23 out for me so that I can match it up with the request.
24      And, again, the question on the floor, which has

Page 7

1  not been answered by the witness yet, is I had asked that
2  you bring with you today a true and correct copy of any
3  document consisting of or referring to or relating to any
4  agreement of employment with Bally Total Fitness Holding
5  Corporation and/or any entity relating to Bally Total
6  Fitness Holding Corporation.
7       Can you take a look at the pile and tell me if
8  there is any documentation responsive to Request No. 1 in
9  the documents your counsel just handed to me.
10      A.  Yes.
11      Q.  And can you provide me with that document so we
12 can mark it with an exhibit sticker.
13      MR. HALLIGAN:  Okay.  We're going to mark the
14 document that the witness has identified has
15 Exhibit 4.  And we'll go ahead and put an exhibit
16 sticker on this.
17      (Exhibit 4 marked as requested.)
18 BY MR. HALLIGAN:
19      Q.  Okay.  Handing you what you pulled out of the
20 stack and what I have marked as Exhibit 4, who did you
21 instruct to redact that document?
22      A.  My counsel.
23      Q.  Did you physically redact that document?
24      A.  No.

Page 8

1      Q.  Where is the unredacted document?
2      A.  I'm not sure.
3      Q.  Well, did you provide that to your counsel in an
4  unredacted format, and then your counsel redacted it?
5      A.  Yes.
6      Q.  Okay.  What was the date of that document?  When
7  did you receive that document?
8      A.  This document is not dated.
9      Q.  Well, the document -- It was dated, but somebody
10 intentionally removed the date.
11      MR. ANDERSON:  Well, I don't think that's a
12 fair statement.  I object to the form of the
13 question.  That misstates his testimony.  That's
14 just an argumentative speech.
15      MR. HALLIGAN:  All right.
16 BY MR. HALLIGAN:
17      Q.  Did you --
18      MR. ANDERSON:  Tell him the date you received
19 the document, if you remember.
20      THE WITNESS:  I don't recall the date I received this
21 document.
22 BY MR. HALLIGAN:
23      Q.  You don't recall the date you received the
24 document.  Well, you made your decision to join Bally at

2  (Pages 5 to 8)

MICHAEL SHEEHAN,　JULY 22, 2008

Page 9

1　the end of April 2008; isn't that correct?
2　　A. No.
3　　Q. Then what was the date that you made your
4　decision to join Bally?
5　　A. Late July -- or late June. I don't recall the
6　specific date.
7　　Q. Well, you began your interviews with Bally going
8　all the way back to the early part of 2008, correct?
9　　MR. ANDERSON: And what does this have to do
10　with jurisdiction?
11　　MR. HALLIGAN: I'm just trying to find out
12　when his intent was to move to Chicago.
13　　MR. ANDERSON: Well, you haven't established
14　anything on intent yet, and I'm not sure what the
15　question has to do in that regard.
16　　　But if you want to ask him about when he had his
17　first contact with Bally, if that's the question, I'll
18　allow that.
19　BY MR. HALLIGAN:
20　　Q. All right. We'll go with that.
21　　　When was your first contact with Bally?
22　　A. Sometime in 2008. I'm not sure of the exact
23　date.
24　　Q. Now, when you say "sometime in 2008," it was in

Page 10

1　the early months of 2008, correct?
2　　A. I can't recall the specific month.
3　　Q. Well, to the best of your recollection, it was
4　January, February or March, correct?
5　　A. I don't believe it was.
6　　Q. You don't believe it was January, February or
7　March?
8　　A. I don't believe it was January or February. It
9　Could have been March or April.
10　　Q. Okay. So you're saying your first contact with
11　Bally with respect to becoming the CEO of Bally was in
12　March or April? Is that your testimony?
13　　A. To the best of my recollection.
14　　Q. Okay. And you came to Chicago at that time?
15　　A. No.
16　　Q. Well, how many times did you come to Chicago?
17　　A. Once.
18　　Q. And when was that?
19　　A. I don't recall the exact date.
20　　Q. Well, was it March or April, correct?
21　　A. Incorrect.
22　　Q. Oh, it was incorrect.
23　　　Okay. So your first contact with Bally was in
24　March or April, but your actual visit to Chicago was in

Page 11

1　May? Is that your testimony?
2　　A. No. That's not my testimony.
3　　Q. Okay. When did you come to Chicago?
4　　A. I don't recall the exact date.
5　　Q. Well, was it in March or April? Now you're
6　saying it was earlier than March or April that you came to
7　Chicago.
8　　A. No.
9　　Q. Well, if your first contact with Bally is March
10　or April, then your visit to Chicago had to be about that
11　same time, correct?
12　　A. That's incorrect.
13　　Q. When was your visit to Chicago?
14　　A. I told you I don't recall the exact date.
15　　Q. I understand you don't recall the exact date.
16　I'm trying to get you to recall the month.
17　　　What month did you come to Chicago?
18　　A. I don't recall if it was May or June.
19　　Q. Okay. So now having established that your first
20　contact with Bally was in the month of March or April,
21　your first visit to Chicago was in May or June.
22　　　Then when was -- Now going back to Exhibit 4,
23　when did you receive that letter?
24　　A. That letter that's sitting right here

Page 12

1　(indicating)?
2　　Q. Right. It's been redacted. I can't read it.
3　Most of the document's been redacted, right? You've
4　testified that that was done by your lawyers. I can't
5　tell anything about the document. Everything's been
6　redacted.
7　　　I'm asking you what's the date --
8　　MR. ANDERSON: I ask that you stop testifying
9　about what you can and cannot tell. You can tell
10　a lot from the document that's relevant to the
11　citizenship issue. Why don't you just ask
12　questions instead of making a speech in advance of
13　them.
14　　MR. HALLIGAN: I'm not making any speeches.
15　I can't determine anything. What was selected
16　there is the only thing that you want me to see,
17　and I think that we're going to have to deal with
18　that separately.
19　BY MR. HALLIGAN:
20　　Q. All I'm trying to do is establish on the record
21　when you received that documentation, Exhibit 4.
22　　A. This redacted copy I received today.
23　　Q. No, not the redacted copy. I'm talking about
24　Exhibit 4 in its unredacted state.

3　(Pages 9 to 12)

MICHAEL SHEEHAN, JULY 22, 2008

Page 13

1    A. Late June.
2    Q. Late June. What date did you report for work at
3  Bally?
4    A. July 1.
5    Q. And what day of the week was that?
6    A. I believe that was Tuesday.
7    Q. You believe July 1 was a Tuesday?
8    A. Yes.
9    Q. Okay. When did you resign from 24 Hour
10 Fitness?
11   A. Late June.
12   Q. What day did you resign from 24 Hour Fitness?
13   A. It was a Monday. I don't recall --
14   Q. June 23rd?
15   A. June 23rd seems right.
16   Q. June 23rd seems right.
17      Okay. Looking at Exhibit 4, when is the first
18 point in time that you saw Exhibit 4?
19   A. I saw the redacted form --
20   Q. Not the redacted. All these questions are --
21 This was an unredacted document sent to your attention.
22      And my question is: When did you receive it?
23 When did you first see it with your eyes, Exhibit 4?
24   MR. ANDERSON: Okay. Well, that question you

Page 14

1 asked, and he said late June.
2 BY MR. HALLIGAN:
3    Q. But I don't know what you mean by late June.
4 You resigned on June 23rd from 24 Hour Fitness, a Monday.
5 You started as the CEO of Bally on July 1st. So you have
6 those dates.
7      When did you first see this document marked as
8 Exhibit 4?
9    A. Sometime in late June.
10   Q. After June 23, is that your testimony under
11 oath?
12   A. No.
13   Q. Okay. So you saw this document before
14 June 23rd?
15   A. Yes.
16   Q. Okay. So when you say late June, it's sometime
17 before June 23rd, correct?
18   A. Correct.
19   Q. But you don't know whether it was June 10th or
20 June 11th, June 12th, June 13th, June 14th, correct?
21   A. I don't have the recollection of the specific
22 date I first saw this.
23   Q. But the unredacted document would have the date
24 on it, correct?

Page 15

1    A. I don't know.
2    Q. Well, how did you see it? How did it come into
3  your possession, Exhibit 4?
4    A. It was e-mailed to me.
5    Q. By whom?
6    A. Gene Davis.
7    Q. Who is Gene Davis?
8    A. A member of the board.
9    Q. A member of the Bally board of directors?
10   A. Yes.
11   Q. Was anyone else copied on the e-mail?
12   A. I don't recall.
13   Q. And How do you know it came from Gene Davis?
14   A. That's my recollection.
15   Q. Now, this e-mail that gene Davis sent with
16 Exhibit 4, were there any other documents attached to this
17 e-mail other than Exhibit 4?
18   A. No.
19   Q. This was the only document, Exhibit 4,
20 correct?
21   A. Yes.
22   Q. Okay. Are there any other documents in the pile
23 that your counsel gave me that would reflect your
24 agreement of employment with Bally Total Fitness Holding

Page 16

1 Corporation and/or any entity related to Bally Total
2 Fitness Holding Corporation, other than what I marked as
3 Exhibit 4?
4    A. No.
5    Q. Okay. All right. Now, going back to the Notice
6 of Deposition, Number 1. Can you hand back to me Exhibit
7 4.
8      Number 2 says that I asked you to bring here
9 today any -- a true and correct copy of any document
10 consisting of, or referring or relating to, any offer of
11 employment made to Michael Sheehan by Bally Total Fitness
12 Holding Corporation and/or any entity related to Bally
13 Total Fitness Holding Corporation.
14      Did you bring those documents with you today?
15   A. I believe so.
16   Q. And can you look in the pile and tell me what
17 that document is.
18   MR. ANDERSON: Well, you took it out of his
19 pile.
20 By MR. HALLIGAN:
21   Q. Oh, you're saying Exhibit 4 constitutes the
22 offer of employment, too?
23      Question one was the agreement of employment.
24 Two was the offer of employment. There are different

MICHAEL SHEEHAN, JULY 22, 2008

Page 17

1  documents.
2      Are you saying 4 contains both the agreement of
3  employment and the offer of employment? Is that your
4  testimony?
5      A. This is the offer of employment.
6      Q. So Exhibit 4 is the offer of employment. Where
7  is the Actual employment agreement then?
8      A. There is not an employment agreement.
9      Q. You did not sign any employment agreement with
10  Bally to become their CEO?
11      A. I signed the offer of agreement, which is --
12  offer of employment -- which is the document you have
13  here.
14      Q. And where is your signature on Exhibit 4?
15      A. This document doesn't have a signature on it.
16      Q. Where did the signature go?
17      A. I believe it was sent back to Gene Davis.
18      Q. Wasn't it redacted? Look on Exhibit 4. Was
19  your signature block redacted from the document?
20      You're pointing to the very last page. I don't
21  have a copy.
22      What are you looking at on the last page? Let
23  me see. You pointed to the last page. So we have a clear
24  record, let me look at it.

Page 18

1      You gave me the page -- what is page 6 of the
2  exhibit. You see that? But your signature isn't there.
3  Where is the signed copy?
4      A. I'm not sure where the signed copy is.
5      Q. Okay. Let's go to number 3. Three was asking
6  you to bring any document consisting of, or referring to
7  or relating to, the rejection or acceptance made by
8  Michael Sheehan to any offer of employment by Bally Total
9  Fitness Holding Corporation and/or any entity related to
10  Bally Total Fitness Holding Corporation.
11      Did you bring that document with you?
12      A. Yes.
13      Q. Where is that document?
14      A. You have it.
15      Q. Oh, you're saying now Exhibit 4 is responsive to
16  three? Where is your signature showing acceptance of
17  employment on Exhibit 4?
18      A. That copy does not have a signature on it.
19      Q. Right. Well, the fact, is Mr. Sheehan, I do not
20  have any evidence here of your acceptance of the offer of
21  employment. There is no signed document that's been
22  produced, correct?
23      MR. ANDERSON: Well, you do have evidence of
24  it. He testified that he signed it.

Page 19

1      MR. HALLIGAN: I don't want you making speeches.
2      MR. ANDERSON: I object to your argument. Well,
3  You're sitting here making speeches. I'm just objecting
4  to your incorrect statements of fact.
5      MR. HALLIGAN: You're making speaking
6  objections influencing the witness's testimony. I
7  object to that. That's improper.
8      MR. ANDERSON: Go on and ask your questions.
9  If you're going to preface your questions with
10  arguments, I'm going to object.
11      MR. HALLIGAN: Well, that's fine. Just say
12  "object."
13  BY MR. HALLIGAN:
14      Q. My point is, and the question on the floor is:
15  Exhibit 4 does not have your signed signature, correct?
16      MR. ANDERSON: That's been asked and answered
17  now twice. Object.
18  BY MR. HALLIGAN:
19      Q. Correct?
20      A. Yes.
21      Q. And you don't know where the signed signature
22  is?
23      A. At this point, I don't know where it is.
24      Q. Okay. Four asks for a true and correct copy of

Page 20

1  any document consisting of, or referring or relating to,
2  the compensation benefits and/or relocation assistance
3  provided to Michael Sheehan by Bally Total Fitness Holding
4  Corporation and/or any entity related to Bally Total
5  Fitness Holding Corporation.
6      Did you bring those documents with you?
7      A. I believe they are in document 4 -- or
8  Exhibit 4.
9      Q. Okay. Show me in Exhibit 4, so we have a clear
10  record, of where you claim the compensation benefits and
11  relocation assistance is described in Exhibit 4.
12      Is it your testimony that the total extent of
13  documentation you received from Bally relating to
14  relocation assistance is set forth at pages 3 and 4 of
15  Exhibit 4?
16      MR. HALLIGAN: And I'd like to have that read
17  back so the witness clearly understands the
18  question.
19      (Record read as requested.)
20  BY THE WITNESS:
21      A. Yes.
22  BY MR. HALLIGAN:
23      Q. So looking at page 3 of Exhibit 4, your intent
24  in acceptance of the position of the CEO of Bally, was

MICHAEL SHEEHAN,  JULY 22, 2008

Page 21

1  premised on your obligation and intent to move your
2  permanent residence to the Chicago area, as reflected at
3  page 3, correct?
4      MR. ANDERSON:  Object to the form of the
5  question.  Could you read it back, please.
6      (Record read as requested.)
7  BY THE WITNESS:
8      A.  Can you clarify the question, please.
9  BY MR. HALLIGAN:
10      Q.  Can I clarify the question?  Paragraph 3 --
11  Strike that.
12      Page 3, which you pointed out, and page 4, after
13  you had an opportunity to review it, and you testified, is
14  the only documentation that you received from Bally
15  relating to relocation.
16      We established that, correct?
17      A.  The only documentation that I received.
18      Q.  From Bally relating to relocation?
19      A.  Yes.
20      Q.  States, you agree, you being Mr. Sheehan,
21  Michael Sheehan, you agree to move your permanent
22  residence to the Chicago area.  That was your agreement
23  and intent at the time you agreed and accepted the
24  position as CEO in what you now are saying was late June,

Page 22

1  correct?
2      A.  Can you clarify the question a little bit for
3  me.
4      Q.  Let's just take the words.  You agreed to move
5  your permanent residence to the Chicago area.
6      You understand what that means?
7      A.  Yes.
8      Q.  You agreed to move your permanent residence to
9  the Chicago area when you accepted the position as CEO of
10  Bally that was predicated upon your acceptance and intent
11  to move your permanent residence to Chicago?
12      A.  By July 31st, yes.
13      Q.  Oh.  So you're saying by July 31st.  You're
14  putting that qualifier on it.
15      But your intent at the time you accepted the CEO
16  position was to move your permanent residence to Chicago,
17  correct?
18      A.  On the date I accepted, yes.
19      Q.  All right.  Let's look at number 5.
20      And by the way -- just following up on that --
21  when you announced your resignation suddenly without
22  notice to Carl Liebert on Monday morning, June 23rd, you
23  met with him face to face to tell him you had decided to
24  become the CEO of Bally, correct?

Page 23

1      MR. ANDERSON:  Object to the form of the
2  question.  Assumes facts not in evidence.
3  Argumentative and unrelated to the citizenship
4  issue here.
5      MR. HALLIGAN:  Well, I think we've
6  established the citizenship issue.
7  BY MR. HALLIGAN:
8      Q.  I just want to confirm that you met with Carl
9  Liebert on the 23rd of June, correct?
10      A.  I believe so.
11      Q.  You told him you were moving to Chicago?
12      A.  No.
13      Q.  At that meeting, you told him that you were
14  moving to Chicago.  In fact, he asked about your wife.
15  And you said she will just have to get used to the Chicago
16  weather, correct?
17      A.  I don't recall that.
18      Q.  You don't recall that.  You told him you were
19  moving to Chicago on June 23rd when you met with him.
20      MR. ANDERSON:  Well, excuse him.  That's been
21  asked and answered.
22      MR. HALLIGAN:  He denied it.
23      MR. ANDERSON:  Do you have a different question?
24  BY MR. HALLIGAN:

Page 24

1      Q.  You deny that you told Carl Liebert on June 23rd
2  that you had accepted a position at Bally and you were
3  moving to Chicago?
4      MR. ANDERSON:  And, counsel, you just asked
5  exactly the same question.
6      MR. HALLIGAN:  It's fine.  I want to get the
7  answer.
8      MR. ANDERSON:  Well, You did get an answer.
9      MR. HALLIGAN:  I'm not sure we have a clear
10  answer.
11      MR. ANDERSON:  It's very clear to me.  He
12  said he didn't recall saying that.
13      MR. HALLIGAN:  That's not what he said.  He
14  denied it.
15  BY MR. HALLIGAN:
16      Q.  I want to deny it.
17      You did not tell Carl Liebert -- I don't want
18  any of this not recollection stuff.
19      Did you tell Carl Liebert when you met with him
20  on June 23rd -- When you announced you were resigning, you
21  told him you were moving to Chicago, correct?
22      MR. ANDERSON:  Counsel, it doesn't matter
23  what you want or don't want.  What matters is he
24  is telling -- He is going to give you a truthful

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087    800.708.8087    FAX: 312.704.4950

MICHAEL SHEEHAN, JULY 22, 2008

Page 25

1  answer.
2      MR. HALLIGAN: I want a truthful answer.
3      MR. ANDERSON: You're berating him.
4      MR. HALLIGAN: I'm not berating him. You're
5  interrupting the deposition.
6      THE REPORTER: One at a time, please.
7      MR. ANDERSON: And I am going one at a time. Counsel
8  keeps interrupting me.
9      MR. HALLIGAN: You're making speaking
10 objections which are improper. Simple question.
11 I'm going to get the answer.
12     MR. ANDERSON: Can I finish my remarks before
13 you interrupt me again?
14     MR. HALLIGAN: No. Honestly, I mean, all you
15 have to do is object, right?
16     MR. ANDERSON: So you're just going to keep
17 interrupting me?
18     MR. HALLIGAN: No. I mean, If you really
19 want to say something more, go ahead.
20     MR. ANDERSON: I do want to say something.
21     MR. HALLIGAN: Go ahead.
22     MR. ANDERSON: I want to say that your
23 argument and speechmaking on the record is
24 improper, and I object to it. He has answered

Page 26

1  your question now, the same question, twice. And
2  every time I attempt to object, you then interrupt
3  me.
4      I'm going to ask you if you could possibly just
5  ask the questions and refrain from speechmaking and
6  argument.
7      MR. HALLIGAN: All right.
8  BY MR. HALLIGAN:
9      Q. Do you deny under oath that you told Carl
10 Liebert you were moving to Chicago at the time you met
11 with him to announce your resignation on June 23rd?
12     MR. ANDERSON: Objection, asked and
13 answered.
14 BY THE WITNESS:
15     A. I do not recall ever saying that.
16 BY MR. HALLIGAN:
17     Q. You don't recall ever saying that.
18     Okay. Let's go to Number 5. Five was a true
19 and correct copy of any document consisting of, or
20 referring or relating to, any agreement for the purchase
21 of any real property from Michael Sheehan by Bally Total
22 Fitness Holding Corporation, any entity related to Bally
23 Total Fitness Holding Corporation and/or any agent or
24 other entity acting on behalf of any Bally entity.

Page 27

1      Did you bring that documentation with you
2  today?
3      A. I believe it's in document -- the document
4  you're holding.
5      Q. Exhibit 4?
6      A. Exhibit 4.
7      Q. Show me in Exhibit 4 what page you believe is
8  responsive to that Request No. 5.
9      Okay. You're pointing me to page 3. Is it
10 any -- Strike that.
11     Is there any other part of the document that
12 addresses this Request No. 5, other than page 3?
13     A. I think page 3 is all of it.
14     Q. You own two residences in California, correct?
15     A. No.
16     Q. How many residences do you own?
17     A. One.
18     Q. All right. And where is that residence
19 located?
20     A. San Ramon.
21     Q. So this is referring to the San Francisco area
22 residence, that's the San Ramon residence?
23     A. Yes.
24     Q. You sold your other home which was in Newport

Page 28

1  Beach?
2      A. Yes.
3      Q. When was that sold?
4      A. I believe February. January or February.
5      Q. January or February of 2008?
6      A. Yes.
7      Q. Now, we've established you reported for work in
8  Chicago on July 1st as the CEO of Bally. When did you
9  physically arrive in the state of Illinois or Chicago?
10     A. The evening before.
11     Q. What day of the week was that?
12     A. I believe it was Monday evening.
13     Q. So Monday evening, June 30th, you arrived
14 physically in the Chicago area. Did you land at O'Hare
15 airport?
16     A. Yes.
17     Q. Did you take a commercial airline flight?
18     A. Yes.
19     Q. What airline?
20     A. I don't recall.
21     Q. You don't recall if it was American Airlines or
22 United? You have no recollection of the plane you took?
23     A. At this point I don't recall which airline it
24 was.

7 (Pages 25 to 28)

MICHAEL SHEEHAN,  JULY 22, 2008

Page 29

1    Q.   You have travel records that would reflect
2  that?
3    A.   I believe so.
4    Q.   Did You turn in your expense reports to Bally
5  for that trip?
6    A.   If there were expense -- If there were
7  out-of-pocket expenses, yes.
8    Q.   Well, wasn't there out-of-pocket expenses to fly
9  from California to Chicago and to arrive on the evening of
10 June 30th?  Those were expenses, correct?
11   A.   I'm not sure they were out-of-pocket expenses.
12   Q.   If they weren't out-of-pocket expenses, who paid
13 for it?
14   A.   Bally.
15   Q.   All right.  Had Bally paid for other trips to
16 Chicago before that trip?
17   A.   Not that I'm aware of.
18   Q.   Well, what about that one time you came to
19 Chicago before?  Did Bally pay for that trip?
20   A.   I don't know who paid for that.
21   Q.   Well, when you say you don't know who paid for
22 that, are you saying that 24 Hour Fitness paid for that
23 previous trip to Bally or may have paid for it?
24   A.   No.

Page 30

1    Q.   Well, then, who paid for it if it wasn't Bally?
2    MR. ANDERSON:  Counsel, he has answered the
3  question three times now.  And furthermore, I
4  haven't a clue what this has to do with the
5  citizenship issue.  And until you explain to me,
6  I'm not going to allow you to ask the question a
7  fourth time.
8  BY MR. HALLIGAN:
9    Q.   Well, let's just keep it you're in Chicago on
10 June 30th because this is a special deposition.  I'll have
11 the opportunity to take your deposition again in this
12 litigation.
13      We'll --
14   MR. ANDERSON:  Maybe, maybe not.  Why don't
15 you just stick with the questions within the
16 subject matter today.
17   MR. HALLIGAN:  I think I'm within the subject
18 matter.  I'm testing the credibility and demeanor
19 and memory of this witness, and I'm entitled to do
20 that, Counsel.
21 BY MR. HALLIGAN:
22   Q.   Okay.  Let's just take this back.  You're in
23 Chicago now on June 30th.  And it's a Monday night.
24 You've arrived on a commercial airliner from California.

Page 31

1      Did anybody else come with you?
2    A.   No.
3    Q.   No one from your family?
4    A.   No.
5    Q.   Where did you stay after you arrived at the
6  airport?
7    A.   I believe it's called -- a Sheraton hotel.
8    Q.   Sheraton hotel located where?
9    A.   Very close to the Bally headquarters.  I'm not
10 sure the address or city it is in.
11   Q.   And you stayed there the evening of the 30th of
12 June?
13   A.   Correct.
14   Q.   And how many other nights did you stay there
15 other than the 30th of June?
16   A.   Can you clarify the time frame you're referring
17 to.
18   Q.   Well, Mr. Sheehan, it's Monday night.  You've
19 arrived in Chicago.  You're to report for work as the CEO
20 of Bally on Tuesday, July 1st.
21      You arrive in the airport, I assume, in the
22 evening on June 30th by your testimony, correct?
23   A.   Correct.
24   Q.   You need to have a place to sleep.  You're now

Page 32

1  in Chicago, in Illinois.  I've established you stayed at
2  the Sheraton hotel that's close to the corporate
3  headquarters of Bally.
4      Okay.  My next question is:  How many other
5  nights did you stay at the Sheraton once you were here on
6  the 30th of June?  Did you stay there, for example, on the
7  night of July 1st?
8    A.   Yes.
9    Q.   Did you stay there the night of July 2nd?
10   A.   Yes.
11   Q.   You stay there the night of July 3rd?
12   A.   No.
13   Q.   Where did you stay on the night of July 3rd?
14   A.   At my home in California.
15   Q.   Well, you had to fly back to California,
16 right?
17   A.   Correct.
18   Q.   Okay.  So when did you leave to go back to
19 California?
20   A.   July 3rd.
21   Q.   At what time on July 3rd?
22   A.   I don't recall.
23   Q.   At the end of the day?  At night?  After your
24 workday?

MICHAEL SHEEHAN,  JULY 22, 2008

Page 33

1    A.  Yes.  After my workday.

2    Q.  Okay.  So it would have been in the evening.

3  You flew back to California on the evening of July 3rd,

4  correct?

5    A.  Early evening, yes.

6    Q.  All right.  So when did you return to Chicago?

7  Your counsel's pointing to a document and showing his

8  finger.

9        Look, just -- I ask that you just answer the

10  questions I'm asking, okay?

11    MR. ANDERSON:  Okay.  He's got the itinerary

12  in front of him.

13    MR. HALLIGAN:  I'm testing his demeanor and

14  credibility and his recollection.

15    MR. ANDERSON:  Oh, for Pete's sake, you're

16  just wasting time.  You've got the itinerary right

17  in front of you.

18    MR. HALLIGAN:  I don't have any itinerary.

19  BY MR. HALLIGAN:

20    Q.  Put that document aside and just answer my

21  questions.  We'll come back to the document.

22        When did you return to Chicago from

23  California?

24    A.  Late Monday evening.

Page 34

1    Q.  And when you arrived on Monday evening, where

2  did you stay?

3    A.  At the same hotel.

4    Q.  The Sheraton hotel.

5    A.  I believe that's what it's called.

6    Q.  So when you say late Monday evening, it's

7  July 7, correct?

8    A.  Yes.

9    Q.  Okay.  And on July 8 -- did you go into the

10  corporate headquarters of Bally at any time on July 7th?

11    A.  No.

12    Q.  Okay.  On July 8 you reported for work as the

13  CEO?

14    A.  Yes.

15    Q.  And where did you stay on the evening of

16  July 8?

17    A.  At the same hotel, which is actually called the

18  Renaissance -- That's a correction.  Not the Sheraton.

19    Q.  Getting a chance to look at this documentation

20  now, you know it was a Renaissance hotel close to the

21  Bally corporate headquarters?

22    A.  No.  Just recalling that Sheraton didn't seem

23  right.

24    Q.  But my point is, the hotel you stayed at, we've

Page 35

1  established is the same hotel?

2    A.  Correct.

3    Q.  And it's close to the Bally headquarters?

4    A.  That's correct.

5    Q.  Where you work?

6    A.  That is correct.

7    Q.  But now you believe the name of the hotel is a

8  Renaissance hotel, as opposed to a Sheraton hotel,

9  correct?

10    A.  Yes.

11    Q.  That's after looking at this document your

12  counsel put in front of you, correct?

13    MR. ANDERSON:  I didn't put it in front of

14  him.

15    MR. HALLIGAN:  I don't have the document in front of

16  me.  I'm trying to ask the questions of the witness.

17  We'll get back to whatever else is in that pile.

18        I only have one set of it.  I haven't marked it

19  as an exhibit yet.  Haven't looked at it.

20  BY MR. HALLIGAN:

21    Q.  I'm just trying to find out where you were

22  physically staying in Illinois and the point is that you

23  now say it's the resonance.

24    MR. HALLIGAN:  In fact, let's just mark this document

Page 36

1  because -- since you're going to continue to point to it.

2  Let me just get it marked.

3    MR. ANDERSON:  Counsel, there you go again,

4  you interrupted me mid-sentence.  I think it's

5  professionally rude and, frankly, incompetent for

6  you to keep interrupting me.

7        It is the same document he produced to you at

8  the outset of the deposition.  And I would appreciate it

9  if you would stop interrupting me mid-sentence.

10    MR. HALLIGAN:  Well, the record will reflect

11  I'm not interrupting you.  You talk, you stop, and

12  then you indicate you're still making a speaking

13  objection, which I think is improper.

14        But my point is that the only document that's

15  been marked is Exhibit 4.  And the document that you gave

16  to the witness, and the witness put in front of him, I

17  believe, is a separate document.  And I'd like to mark it

18  as an exhibit now.

19        He has the only copy?  How did it get over

20  there?

21    MR. ANDERSON:  The fact is your recollection

22  is incorrect.  He handed you all these documents.

23  You then shoved them back in front of him when

24  he -- as you began asking questions about it.

MICHAEL SHEEHAN,  JULY 22, 2008

Page 37

1    MR. HALLIGAN:  I didn't shove it back in
2  front of him.  I gave it to him so he could select
3  a document responsive to a document request.
4       In any event, let's mark as Exhibit 5 another
5  document.  We'll get some foundation on it.
6       (Exhibit 5 marked as requested.)
7  BY MR. HALLIGAN:
8    Q.  Okay.  Handing you what now has been marked for
9  purposes of identification as Sheehan Exhibit 5 is an
10  e-mail communication that came from the Gant Travel
11  Management at ganttravel.com.
12       And it shows at the bottom of the first page of
13  this exhibit that the hotel where you stayed on the
14  evening of June 30, 2008, is the Renaissance O'Hare
15  located at 8500 West Bryn Mawr Avenue, Chicago, Illinois,
16  60631, which is close to the Bally headquarters.
17       This is a confirmation of the hotel that, in
18  fact, you did stay at, correct?
19    A.  Yes.
20    Q.  All right.  Now, you came back in the evening on
21  July 7.  And it's your testimony you stayed at this same
22  hotel again, correct, and reported for work on July 8th as
23  the CEO of Bally, correct?
24    A.  Yes.

Page 38

1    Q.  And that evening on Tuesday, the 8th, you stayed
2  again at the Renaissance hotel?
3    A.  Yes.
4    Q.  Okay.  Wednesday, July 9th, where did you
5  stay?
6    A.  At the Renaissance.
7    Q.  Thursday, July 10th, where did you stay?
8    A.  At the Renaissance.
9    Q.  Okay.  So that Friday, July -- Let's see.
10  Thursday is the 10th.
11       So Friday, July 11th, where did you stay?
12    A.  At home in California.
13    Q.  So you left on Friday in the evening -- on
14  Friday evening and returned to California?
15    A.  Yes.  I believe it was the evening.
16    Q.  In other words, you worked all day at Bally on
17  the 11th, and then in the evening you returned to
18  California on Friday, the 11th?  Is that your testimony?
19    MR. ANDERSON:  Object to the form of the
20  question.  His testimony is what it was.  It's not
21  proper to be asking him what his testimony is.
22  BY MR. HALLIGAN:
23    Q.  I'm trying to confirm when you left for
24  California on the 11th.

Page 39

1       Was it after the workday?
2    A.  I believe I left around 4 o'clock -- left the
3  office around 4 o'clock.
4    Q.  And headed to O'Hare Airport to return to
5  California on a commercial flight?
6    A.  Yes.
7    Q.  And then when did you return to Chicago?
8       I noticed you're looking at Exhibit 5.  Does
9  that help answer the question.
10    A.  It doesn't because it doesn't have my travel
11  itinerary on that date.
12    Q.  I assume that travel agency would have your
13  itinerary for that date?
14    A.  Yes.
15    MR. ANDERSON:  Object to the form of the
16  question.
17  BY MR. HALLIGAN:
18    Q.  The question is:  When did you return from
19  California?  Was it Sunday, July 13th?
20    A.  I don't recall if it was Sunday or Monday.
21    Q.  Well, do you recall when you reported for work
22  on Monday, the 14th?
23    A.  I don't recall if it was early afternoon or if
24  it was Monday morning on the 13th.

Page 40

1    Q.  Okay.  So if it was Monday morning, that would
2  mean you came in late on the 13th.  If it was Monday
3  afternoon, that means you came in on the morning from
4  California.
5    A.  That's correct.
6    Q.  So the evening of the 14th, where did you
7  stay?
8    A.  At the Renaissance.
9    Q.  Okay.  Tuesday, the 15th, you report to work as
10  the CEO of Bally at their corporate headquarters?
11    A.  Yes.
12    Q.  And where did you stay on the evening of the
13  15th?
14    A.  At the Renaissance.
15    Q.  On Wednesday, July 16th, you report as the CEO
16  of Bally -- report for work?
17    A.  Yes.
18    Q.  And where did you stay on the evening of the
19  16th?
20    A.  At the Renaissance.
21    Q.  On Thursday, July 17, you reported to work as
22  the CEO of Bally?
23    A.  Yes.
24    Q.  And where did you stay the evening of the

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087    800.708.8087    FAX: 312.704.4950

MICHAEL SHEEHAN,  JULY 22, 2008

Page 41

1  17th?
2      A.  At my home in California.
3      Q.  Okay.  So when did you go back to California?
4  On the evening of the 17th after work?
5      A.  I believe it was around 4 o'clock.
6      Q.  All right.  And when did you return to
7  Chicago?
8      A.  Monday afternoon.
9      Q.  July 21st?
10     A.  Yes.
11     Q.  And did you go into work at Bally when you
12  returned on Monday, July 21st?
13     A.  Yes.
14     Q.  And today is July 22nd.  Did you report to work
15  at Bally this morning?
16     A.  Yes.
17     Q.  Have you stayed at any other location other than
18  the Renaissance hotel in Chicago, Illinois, since
19  June 30?
20     A.  No.
21     Q.  And where are you staying tonight?
22     A.  At the Renaissance.
23     Q.  And these expenses at the Renaissance, all of
24  these expenses have been paid by Bally?

Page 42

1      A.  Yes.
2      Q.  All right.  Can I see the rest of the documents
3  here.  We've marked two of them.
4      MR. HALLIGAN:  Okay.  I'd like to mark the
5  following document as Exhibit 6.
6      (Exhibit 6 marked as requested.)
7  BY MR. HALLIGAN:
8      Q.  Who is Mary Raimondi, R-a-i-m-o-n-d-i?
9      A.  My admin assistant.
10     Q.  At Bally?
11     A.  Yes.
12     Q.  Do you have any other administrative assistants
13  other than Mary Raimondi?
14     A.  No.
15     Q.  Exhibit 6 has 2007 dates on there at the top.
16  That obviously should be 2008, correct?
17     A.  That is correct.
18     Q.  And is that your signature on that document, the
19  bottom?
20     A.  Yes.
21     Q.  All those expenses have been reimbursed by
22  Bally?
23     A.  I'm not sure they've been reimbursed.  I'm
24  assuming they will be.

Page 43

1      Q.  But you signed the document and turned it in for
2  reimbursement?
3      A.  Yes.
4      Q.  All right.  Can I borrow that back a second.
5      I want to hand you what I've previously marked
6  as Exhibit 3.
7      Exhibit 3 is a press release entitled "Bally
8  Total Fitness Announces New Chief Executive Officer,"
9  which was downloaded from the Internet.
10     Do you see that?
11     A.  Yes.
12     Q.  This is a copy of it.  It was posted on the 24th
13  of June.  Tuesday, June 24.  The dateline is Chicago,
14  Bally, CEO Sheehan.  Do you see that on the PRNewswire?
15     And it says, "Bally Total Fitness Holding
16  Corporation today" -- meaning June 24 -- "announced that
17  it has appointed Michael Sheehan to serve as its chief
18  executive officer effective July 1."
19     Is that a true statement?
20     A.  Yes.
21     Q.  The next sentence says, "Mr. Sheehan will also
22  serve as a member of Bally's board of directors."
23     Was that a true statement as of June 24?
24     MR. ANDERSON:  Excuse me, Counsel.  What does

Page 44

1  this have to do with citizenship?
2      MR. HALLIGAN:  Shows his intent to move to
3  Chicago.  His intent to be in Chicago.
4      MR. ANDERSON:  Doesn't say anything about
5  that.
6      MR. HALLIGAN:  Okay.
7      MR. ANDERSON:  Doesn't have a word about
8  where --
9      MR. HALLIGAN:  That's what the Court's going
10  to have to determine.
11     MR. ANDERSON:  You're going to have to
12  persuade me that this is relevant to citizenship
13  and not some other, you know, liability purpose.
14  It seems to me clearly the latter.
15     MR. HALLIGAN:  Well, if you're going to
16  instruct the witness not to answer, and the
17  question is:  Mr. Sheehan will also serve as a
18  member of Bally's board of directors, and that was
19  announced on June 24.  Is that a true statement?
20     MR. ANDERSON:  And my question to you is:
21  What does that have to do with where he has his
22  citizenship?
23     MR. HALLIGAN:  It establishes his intent,
24  which is what the whole purpose of this deposition

Page 45

1  is.
2      MR. ANDERSON:  That may be your purpose, but
3  i don't see how that remotely goes to his intent
4  to be a citizen one way or the other, whether he
5  is going to be a member of a board of directors.
6      MR. HALLIGAN:  Look, if you want to instruct
7  the witness not to answer.  The question remains.
8  I've asked him if the sentence, "Mr. Sheehan will
9  also serve as a member of the Bally board of
10 directors, the announcement on June 24," was that
11 a true statement, yes or no?
12     MR. ANDERSON:  I'll allow him to answer that.
13 I really don't -- I think you're going beyond the
14 boundaries of the agreed scope of this deposition.
15 BY THE WITNESS:
16     A.  Yes.
17     MR. HALLIGAN:  Okay.  I want to take a short
18 break here, and we'll be right back.
19     (Recess was taken from 2:17 p.m. until
20     2:29 p.m.)
21     MR. HALLIGAN:  All right.  So we took a short break
22 to get the signed signature page.  Do we have that now?
23     MR. ANDERSON:  Yes.  I walked across the
24 street to my office and located the page -- the

Page 46

1  signature page.  It appears that the paralegal
2  made a mistake and redacted the signature.
3      But I now have it here.  It's also dated, and
4  I'll tender you now the signature page.
5      MR. HALLIGAN:  Okay.  So let's make this
6  Exhibit 4-A.  It is now the signed page 6.
7      (Exhibit 4-A marked as requested.)
8  BY MR. HALLIGAN:
9      Q.  I'm handing you, Mr. Sheehan, what I have marked
10 as Exhibit 4-A.  Is that a true and correct copy of your
11 signature on Exhibit 4-A?
12     A.  Yes.
13     Q.  And June 20, 2008, is the date upon which you
14 accepted the conditions of employment to become the CEO of
15 Bally?
16     A.  No.
17     Q.  Well, it's dated June 20.
18     A.  Yes.
19     Q.  So when you signed it dated June 20, were you
20 accepting employment as the CEO of Bally on that date?
21     A.  No.
22     Q.  Well, it says, "Accepted this 20th day of
23 June 2008."
24     Can you state for the record what was accepted

Page 47

1  on that date.
2      MR. ANDERSON:  Object to the form of the
3  question.
4  BY THE WITNESS:
5      A.  That's the date I wrote in, the 20th.
6  BY MR. HALLIGAN:
7      Q.  No.  You say it says, "Accepted this blank day
8  of June 2008?"
9      Do you see that?
10     A.  Yes.
11     Q.  And you signed "Michael Sheehan," correct?
12     A.  Yes.
13     Q.  What did you accept on June 20, 2008?
14     A.  The agreement.
15     MR. HALLIGAN:  Thank you.  I have no further
16 questions.  That concludes the deposition.
17     MR. ANDERSON:  Signature is reserved.
18     You have the right to review the transcript and
19 to make sure that the court reporter has accurately
20 transcribed everything and to make sure that you actively
21 spoke.  And she will provide you with an errata page.  If
22 you see a mistake, you can submit an errata.  And if
23 everything is okay, you can sign it.
24     So that will all be coming to you soon in due

Page 48

1  course.
2      (Proceedings adjourned at 2:48 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MICHAEL SHEEHAN,  JULY 22, 2008

Page 49

1    IN THE UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF ILLINOIS
3    EASTERN DIVISION
4  24 HOUR FITNESS USA, INC., a    )
5  California corporation,        )
6    Plaintiff,          )
7    vs.         )No. 08 cv 3853
8  BALLY TOTAL FITNESS HOLDING CORP., )
9  a Delaware corporation, and MICHAEL)
10 SHEEHAN, an individual,         )
11    Defendants.          )
12
13    I hereby certify that I have read the foregoing
14 transcript of my deposition given at the time and place
15 aforesaid, consisting of Pages 1 to 48, inclusive, and I
16 do again subscribe and make oath that the same is a true,
17 correct, and complete transcript of my deposition so given
18 as aforesaid, and includes changes, if any, so made by me.
19
20    MICHAEL SHEEHAN
21 SUBSCRIBED AND SWORN TO
22 before me this  day
23 of    , A.D. 2008.
24    Notary Public

Page 50

1  STATE OF ILLINOIS )
2    ) SS:
3  COUNTY OF COOK  )
4    I, Lisa S. Schwam, a Notary Public within and
5  for the County of Cook, State of Illinois, and a
6  Certified Shorthand Reporter, Registered Professional
7  Reporter, and Certified Realtime Reporter, do hereby
8  certify:
9    That previous to the commencement of the examination
10 of the witness, the witness was duly sworn to testify the
11 whole truth concerning the matters herein;
12    That the foregoing deposition transcript was reported
13 stenographically by me, was thereafter reduced to
14 typewriting under my personal direction and constitutes a
15 true record of the testimony given and the proceedings
16 had;
17    That the said deposition was taken before me at the
18 time and place specified;
19    That I am not a relative or employee or attorney or
20 counsel, nor a relative or employee of such attorney or
21 counsel for any of the parties hereto, nor interested
22 directly or indirectly in the outcome of this action.
23    IN WITNESS THEREOF, I do hereunto set my hand and
24 affix my seal of office at Chicago, Illinois, this 23rd

Page 51

1  day of July, 2008.
2
3
4    Notary Public, Cook
5    County, Illinois.
6    My commission expires July 9, 2011
7
8  CSR No. 84-004650
9
10
11
12
13
14    I N D E X
15 WITNESS        EXAMINATION
16 MICHAEL SHEEHAN
17    By Mr. Halligan        5
18
19    E X H I B I T S
20 NUMBER            PAGE
21 Michael Sheehan Deposition Exhibits
22    No. 1        4
23    No. 2        4
24    No. 3        4

Page 52

1    No. 4        7
2    No. 4-A        46
3    No. 5        37
4    No. 6        42
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087    800.708.8087    FAX: 312.704.4950

1 | day of July, 2008.

2

3 | *Kissi Schwam*

4 | Notary Public, Cook

5 | County, Illinois.

6 | My commission expires July 9, 2011

7

8 | CSR No. 84-004650

9

10

11

12

13

14 |                    I N D E X

15 | WITNESS                         EXAMINATION

16 | MICHAEL SHEEHAN

17 |     By Mr. Halligan                      5

18

19 |                    E X H I B I T S

20 | NUMBER                           PAGE

21 | Michael Sheehan Deposition Exhibits

22 |     No. 1                              4

23 |     No. 2                              4

24 |     No. 3                              4

MICHAEL SHEEHAN,  JULY 22, 2008

52

1    No. 4

2    No. 4-A                                                    7

3    No. 5                                                     46

4    No. 6                                                     37

5                                                              42

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

$Ex.1$

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| 24 HOUR FITNESS USA, INC., a California corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. 08 cv 3853 |
| v. | ) ) ) | |
| BALLY TOTAL FITNESS HOLDING CORP., a Delaware corporation, and MICHAEL SHEEHAN, an individual, | ) ) ) ) | Judge Joan Humphrey Lefkow |
| | ) | Magistrate Judge Morton Denlow |
| Defendants. | ) ) | |

## PLAINTIFF'S NOTICE OF DEPOSITION OF DEFENDANT MICHAEL SHEEHAN

Plaintiff, 24 Hour Fitness USA, Inc. ("Plaintiff"), by and through its attorneys, hereby provides notice that commencing at **10:00 a.m. on July 17, 2008**, at the offices of Lovells LLP, 330 N. Wabash Ave., Chicago, IL 60611, Plaintiff will take the deposition of **MICHAEL SHEEHAN** pursuant to Rule 30 of the Federal Rules of Civil Procedure. The deposition will be taken upon oral examination before an official authorized by law to administer oaths and will continue from day to day until completed. Deponent is hereby requested to produce, prior to or at the commencement of the deposition, the documents listed on attached Schedule A. Pursuant to Rule 30(b)(2), testimony of the witness(es) may be recorded by both stenographic means and sound-and-visual means.

Dated: July 15, 2008

Respectfully submitted,

/s/ R. Mark Halligan

**R. Mark Halligan (IL 6200723)**
mark.halligan@lovells.com
**Deanna R. Swits (IL 6287513)**



deanna.swits@lovells.com
**LOVELLS LLP**
330 N. Wabash Avenue
Suite 1900
Chicago, IL 60611
Tel: 312 832 4400
Fax: 312 832 4444

*Attorneys for Plaintiff 24 Hour Fitness USA, Inc.*

## SCHEDULE A

1.  A true and correct copy of any document consisting of, or referring or relating to, any agreement of employment between Michael Sheehan and Bally Total Fitness Holding Corporation and/or any entity related to Bally Total Fitness Holding Corporation.

2.  A true and correct copy of any document consisting of, or referring or relating to, any offer of employment made to Michael Sheehan by Bally Total Fitness Holding Corporation and/or any entity related to Bally Total Fitness Holding Corporation.

3.  A true and correct copy of any document consisting of, or referring or relating to, the rejection or acceptance made by Michael Sheehan to any offer of employment by Bally Total Fitness Holding Corporation and/or any entity related to Bally Total Fitness Holding Corporation.

4.  A true and correct copy of any document consisting of, or referring or relating to, the compensation, benefits, and/or relocation assistance provided to Michael Sheehan by Bally Total Fitness Holding Corporation and/or any entity related to Bally Total Fitness Holding Corporation.

5.  A true and correct copy of any document consisting of, or referring or relating to, any agreement for the purchase of any real property from Michael Sheehan by Bally Total Fitness Holding Corporation, any entity related to Bally Total Fitness Holding Corporation, and/or any agent or other entity acting on behalf of any Bally entity.

6.  A true and correct copy of any document consisting of, or referring or relating to, any housing or other accommodations obtained for or utilized by Michael Sheehan since June 24, 2008.

7.  A true and correct copy of any document consisting of, or referring or relating to, any monetary expenditures made by, or on behalf of, Michael Sheehan since June 24, 2008,

3

including, but not limited to, bank and credit card statements, receipts, invoices, and/or any other confirmation of purchase.

8. A true and correct copy of any document consisting of, or referring or relating to, any travel arrangements made for or utilized by Michael Sheehan since June 24, 2008.

9. A true and correct copy of any document, from January 1, 2008 to the present, referring or relating to the intent of Michael Sheehan to remain a citizen of California or to become a citizen of Illinois and/or the intent of Bally Total Fitness Holding Corporation and/or any entity related to Bally Total Fitness Holding Corporation for Michael Sheehan to become a citizen of Illinois.

4

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing NOTICE OF DEPOSITION OF DEFENDANT MICHAEL SHEEHAN was served on the below counsel by email and hand delivery on July 15, 2008:

> Kimball R. Anderson
> Cardelle B. Spangler
> Amanda C. Wiley
> Winston & Strawn LLP
> 35 W. Wacker Drive
> Chicago, Illinois 60601
> kanderson@winston.com
> cspangler@winston.com
> awiley@winston.com

By: /s/ Deanna R. Swits_____
*An attorney for Plaintiff 24 Hour Fitness USA, Inc.*

5

Ex 2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| 24 HOUR FITNESS USA, INC., a California corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. 08 cv 3853 |
| v. | ) ) ) | |
| BALLY TOTAL FITNESS HOLDING CORP., a Delaware corporation, and MICHAEL SHEEHAN, an individual, | ) ) ) ) | Judge Joan Humphrey Lefkow |
| | ) | Magistrate Judge Morton Denlow |
| Defendants. | ) | |

## PLAINTIFF'S AMENDED NOTICE OF DEPOSITION
## OF DEFENDANT MICHAEL SHEEHAN

Plaintiff, 24 Hour Fitness USA, Inc. ("Plaintiff"), by and through its attorneys, hereby provides notice that commencing at **1:30 p.m. on July 22, 2008**, at the offices of Lovells LLP, 330 N. Wabash Ave., Chicago, IL 60611, Plaintiff will take the deposition of **MICHAEL SHEEHAN** pursuant to Rule 30 of the Federal Rules of Civil Procedure. The deposition will be taken upon oral examination before an official authorized by law to administer oaths and will continue from day to day until completed. Deponent is hereby requested to produce, prior to or at the commencement of the deposition, the documents listed on attached Schedule A. Pursuant to Rule 30(b)(2), testimony of the witness(es) may be recorded by both stenographic means and sound-and-visual means.

Dated:  July 17, 2008          Respectfully submitted,

/s/ R. Mark Halligan

**R. Mark Halligan (IL 6200723)**



mark.halligan@lovells.com
**Deanna R. Swits (IL 6287513)**
deanna.swits@lovells.com
**LOVELLS LLP**
330 N. Wabash Avenue
Suite 1900
Chicago, IL 60611
Tel: 312 832 4400
Fax: 312 832 4444

*Attorneys for Plaintiff 24 Hour Fitness USA, Inc.*

2

## SCHEDULE A

1. A true and correct copy of any document consisting of, or referring or relating to, any agreement of employment between Michael Sheehan and Bally Total Fitness Holding Corporation and/or any entity related to Bally Total Fitness Holding Corporation.

2. A true and correct copy of any document consisting of, or referring or relating to, any offer of employment made to Michael Sheehan by Bally Total Fitness Holding Corporation and/or any entity related to Bally Total Fitness Holding Corporation.

3. A true and correct copy of any document consisting of, or referring or relating to, the rejection or acceptance made by Michael Sheehan to any offer of employment by Bally Total Fitness Holding Corporation and/or any entity related to Bally Total Fitness Holding Corporation.

4. A true and correct copy of any document consisting of, or referring or relating to, the compensation, benefits, and/or relocation assistance provided to Michael Sheehan by Bally Total Fitness Holding Corporation and/or any entity related to Bally Total Fitness Holding Corporation.

5. A true and correct copy of any document consisting of, or referring or relating to, any agreement for the purchase of any real property from Michael Sheehan by Bally Total Fitness Holding Corporation, any entity related to Bally Total Fitness Holding Corporation, and/or any agent or other entity acting on behalf of any Bally entity.

6. A true and correct copy of any document consisting of, or referring or relating to, any housing or other accommodations obtained for or utilized by Michael Sheehan since June 24, 2008.

7. A true and correct copy of any document consisting of, or referring or relating to, any monetary expenditures made by, or on behalf of, Michael Sheehan since June 24, 2008,

3

including, but not limited to, bank and credit card statements, receipts, invoices, and/or any other confirmations of purchase.

8. A true and correct copy of any document consisting of, or referring or relating to, any travel arrangements made for or utilized by Michael Sheehan since June 24, 2008.

9. A true and correct copy of any document, from January 1, 2008 to the present, referring or relating to the intent of Michael Sheehan to remain a citizen of California or to become a citizen of Illinois and/or the intent of Bally Total Fitness Holding Corporation and/or any entity related to Bally Total Fitness Holding Corporation for Michael Sheehan to become a citizen of Illinois.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing PLAINTIFF'S
AMENDED NOTICE OF DEPOSITION OF DEFENDANT MICHAEL SHEEHAN was served
on the below counsel by email and hand delivery on July 17, 2008:

> Kimball R. Anderson
> Cardelle B. Spangler
> Amanda C. Wiley
> Winston & Strawn LLP
> 35 W. Wacker Drive
> Chicago, Illinois 60601
> kanderson@winston.com
> cspangler@winston.com
> awiley@winston.com

By: /s/ Deanna R. Swits
*An attorney for Plaintiff 24 Hour Fitness USA, Inc.*

5

$Ex.3$

Bally Total Fitness Announces New Chief Executive Officer                    Page 1 of 2



Home



About us | Mobile/PDA | News Alerts | Disclaimer | Contact

## Bally Total Fitness Announces New Chief Executive Officer

Posted : Tue, 24 Jun 2008 16.01.04 GMT

Author : Bally Total Fitness

Category : Press Release

News Alerts by Email click here )

Create your own RSS

News | Home

Choose Theme

Search

Web www.earthtimes.org

[Google Search]

You can

**Bally Total Fitness**
Everything to do with Bally Total Fitness items
Yahoo.com

**Gyms Near You**
We list the areas local gyms in one place. Find the gym you want today.
www.GymTicket.com

**Bally Total Fitness**
Check Out Local.com To Find Bally Total Fitness In Your Area!
Local.com

**Interim & Turnaround CEOs**
Altamont Mgmt - Your First Choice for Interim and Turnaround CEOs
www.altamontmanagement.com

Ads by Google

CHICAGO, June 24 IL-Bally-CEO-Sheehan

CHICAGO, June 24 /PRNewswire/ -- Bally Total Fitness Holding Corporation today announced that it has appointed Michael Sheehan to serve as its Chief Executive Officer, effective July 1. Mr. Sheehan will also serve as a member of Bally's Board of Directors.

Mr. Sheehan, age 46, served as the Chief Operating Officer of 24 Hour Fitness since 2005. Before serving as Chief Operating Officer, Mr. Sheehan served as Executive Vice President, Operations of 24 Hour Fitness. In addition to his comprehensive experience in the fitness industry, Mr. Sheehan has played key operational, finance and sales roles with multi-unit consumer retailers, including management roles with Pepsico, Nestle and Yum Brands, a food service holding company with well-known brands including Taco Bell, Kentucky Fried Chicken and Pizza Hut. Mr. Sheehan is a graduate of Oregon State University (Bachelor of Science, Finance).

Michael Feder, an interim manager from AlixPartners, LLP, serving as Chief Operating Officer of Bally Total Fitness, said, "We are delighted to welcome Mike to Bally. Our Board of Directors was committed to hiring a CEO who was the best possible fit for the role and they have certainly achieved that goal. We believe that Mike has the ideal blend of experience, leadership skills, creativity and commitment to health and fitness. I am confident that under Mike's leadership, Bally will thrive."

Mr. Sheehan said, "I am looking forward to joining the Bally team and I am eager to add value to this established brand. For many years, Bally has been a leader in the fitness industry -- Bally's facilities, fitness programming and personnel are among the best in the business. Under my leadership, Bally will continue to focus on providing high-quality comprehensive fitness experiences to our members."

About Bally Total Fitness

Bally Total fitness is among the largest commercial operators of fitness centers in the U.S., with 352 facilities operating under the Bally Total Fitness(R) and Bally Sports Clubs(R) brands. Bally offers a unique platform for distribution of a wide range of products and services targeted to active, fitness-conscious adult consumers.

SOURCE  Bally Total Fitness

Ads by Google

**Bally Total Fitness**
Check Out Local.com To Find Bally Total Fitness In Your Area!
Local.com

**Interim & Turnaround CEOs**
Altamont Mgmt - Your First Choice for Interim and Turnaround CEOs
www.altamontmanagement.com

**VICE PRESIDENT STRATEGY**
Vistage Builds Better Key Execs, Resources Exclusively for Execs
Vistage.com

**Free Local Gym Search**
Search prices and amenities for gyms in your area. Try it now
www.MyPerfectGym.com

**Teeth Whitening Warning**
7 Teeth Whitening Products Tested, Rated, & Reviewed. A Must Read!
www.Best-Teeth-Whitening.com

Current News

News Category

Business
Entertainment
Environment
General
Health
Sports
Technology
World

Ads by Google
Ballys.com
Ballys Locations
Jungle Gym
Fitness Models
Bally Total

PR Newswire

Copyright © 2008 PR Newswire. All rights reserved.

More



**Do Teeth Whiteners Work?**
Find Out Which Ones Can Brighten Your Smile, And Which Ones Can't!
www.Best-Teeth-Whitening.com

**Free Local Gym Search**
Search prices and amenities for gyms in your area. Try it now.
www.MyPerfectGym.com

**elements for women**
Expand your training business with an elements franchise
www.elementsforwomen.com

**health club billing**
health club management software and payment processing services
www.ehbinancial.com

Ads by Google

$Ex. 4$

### BALLY TOTAL FITNESS HOLDING CORPORATION
**8700 WEST BRYN MAWR**
**CHICAGO, ILLINOIS 60631**

## PERSONAL AND CONFIDENTIAL

Michael Sheehan

      Re:    Offer of Employment

Dear Mike:

      On behalf of the Board of Directors of Bally Total Fitness Holding Corporation (the "Company"), I am pleased to confirm to you the following offer to serve as the Company's Chief Executive Officer.

in Chicago, Illinois.                   and your office will be located

**REDACTED**



Michael Sheehan

Page 2

**REDACTED**

Michael Sheehan

Page 3

REDACTED

**Relocation Benefit**: Should you sell your San Francisco area residence within 18 months of the Start Date and the net sales price is less than your cost of acquiring that residence, plus documented capital improvements of approximately $50,000, the Company will reimburse you for the difference. If you are due the difference between the sales price and your cost of acquiring that residence, such payment will be grossed-up to cover taxes due on this payment. This benefit will be capped at $1 million, inclusive of any such tax gross up. You agree to move your permanent residence to the Chicago area promptly following the Start Date, but in any event not later than July 30, 2008. In addition, you will be eligible for the following relocation benefits:

-   You will be provided $10,000 net to cover all of your living expenses, any miscellaneous relocation expenses, and temporary housing expenses beyond the first 90-day period provided by the Company.

-   During your interim living period, the Company will pay for two trips a month for up to four months for you and your spouse (i.e., a maximum of eight trips for each of you) for home visits and/or house hunting trips in the Chicago area.

-   You will be provided up to 90 days of corporate apartment housing in the Chicago area during the period of time before you have relocated your household to a local residence.

Michael Sheehan

Page 4

- The Company will cover reasonable and customary closing costs (excluding discount points, hazard insurance, deposits and other prepaid expenses) associated with the sale of your existing primary residence in San Francisco and the purchase of a new residence in the Chicago area.

- A moving company approved by the Company will arrange for and cover the costs of packing and transporting your household goods and vehicles in accordance with company policy. All taxable relocation benefits will be grossed up in accordance with the Company's relocation policy.

- If you voluntarily leave the Company or are terminated for cause within 12 months from the date of the last relocation payment to you related to the sale of your San Francisco area residence, you will be required to reimburse the Company for all related payments.

REDACTED

Michael Sheehan

Page 5

REDACTED

Michael Sheehan

Page 6

**REDACTED**

Sincerely,

BALLY TOTAL FITNESS HOLDING
CORPORATION

Gene Davis
For the Board of Directors
Bally Total Fitness Holding Corporation

cc: Board of Directors

Accepted this __ day of June, 2008

_____

Michael Sheehan

06/22/2008   16:27    925-277-1495              FEDEX KINKO'S    5154                    PAGE   01

Michael Sheehan
June 20, 2008
Page 6

By official

*Redacted*

I trust these terms are acceptable to you and I look forward to working with you. Please indicate your acceptance of the above terms by signing in the space indicated below and returning a fully executed copy to me.

Sincerely,

BALLY TOTAL FITNESS HOLDING CORPORATION

Gene Davis
For the Board of Directors
Bally Total Fitness Holding Corporation

cc: Board of Directors

Accepted this 20 day of June, 2008

Michael Sheehan



Δ π EXHIBIT A
M Sheehan Deponent
2-22-08 Date        Rptr.
WWW.DEPOBOOK.COM

$Ex.5$

**Raimondi, Mary**

| | |
|---|---|
| **From:** | Gant Travel Management [bally@ganttravel.com] |
| **Sent:** | Wednesday, June 25, 2008 1:05 PM |
| **To:** | Raimondi, Mary |
| **Cc:** | Travel Department; Farruggia, Barbara |
| **Subject:** | 6/30/08: Ticketed Itinerary for MICHAEL SHEEHAN to Chicago IL |
| **Attachments:** | itineraryTSZFL4_25JUN.pdf |



Gant Travel Management

Gant Travel Management
650 East Devon, Suite 115
Itasca, IL 60143
Phone: (630) 227-3870 Fax: (630) 227-3875
Toll Free: (800) 323-7459

Add to Calendar

What is this?

Wednesday, 25JUN 2008 02:04 PM (EST)
**Passengers:** MICHAEL SHEEHAN (19000)
Agency Reference Number: TSZFL4
Agent: Louise -x1151

here for a copy of your E-ticket receipt

Please review this itinerary for accuracy and reply to this email within 24 hours if any discrepancies.
Ticketed itineraries are subject to airline fees and additional charges if changed for any reason.

| AIR | Monday, 30JUN 2008 |  |
|---|---|---|

United Airlines
From: (SFO) San Francisco CA, USA
To: (ORD) Chicago O'Hare IL, USA
Stops: 0
Seats: 03B
Equipment: Boeing 757 200 Jet

Flight Number: 830
Depart: 10:55 AM    Class: P-First
Arrive: 05:08 PM
Duration: 4 hour(s) 11 minute(s)
Status: CONFIRMED    Miles: 1846
Meal: LUNCH

DEPARTS SFO TERMINAL 3 - - ARRIVES ORD TERMINAL 1
Frequent Flyer number: UA00175825959 - M SHEEHAN
United Airlines Confirmation number is TSZFL4

**HOTEL    Monday, 30JUN 2008**

RENAISSANCE OHARE (RENAISSANCE)
8500 West Bryn Mawr Avenue Chicago IL 60631 US
Number of Rooms: 1
Phone: 773-380-9600
Rate: USD 229
Check out: Thursday, 3JUL 2008

Confirmation Number: 82036181
Fax: 773-380-9601
Room GUARANTEED TO MASTER CARD

BEST AVAILABLE RATE / NON SMOKING KING REQUESTED



/16/2008

GUARANTEED TO MASTERCARD / CANCEL BY 4PM DAY OF ARRIVAL

.R          **Thursday, 3JUL 2008**

United Airlines
From: (ORD) Chicago O'Hare IL, USA
To: (SFO) San Francisco CA, USA
Stops: 0
Seats: 02C
Equipment: Boeing 757 200 Jet
DEPARTS ORD TERMINAL 1 - - ARRIVES SFO TERMINAL 3
Frequent Flyer number: UA00175825959 - M SHEEHAN
United Airlines Confirmation number is TSZFL4

Flight Number: 907          Class: P-First
Depart: 05:05 PM
Arrive: 07:35 PM
Duration: 4 hour(s) 30 minute(s)
Status: CONFIRMED          Miles: 1846
Meal: DINNER

OTHER     **Wednesday, 1OCT 2008**
          THANK YOU FOR USING GANT TRAVEL

TRAVEL PURPOSE: RELOCATION
TRIP APPROVED 24JUN BY BARB FARRUGGIA
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
Contact Gant prior to departure if this transaction is not used.

**Ticket Information:**

Ticket for:     MICHAEL SHEEHAN
Date issued:    06/24/08        Invoice nbr: 0
'et Nbr:       0167512521838   Electronic: Yes        Amount: 2736.64 USD
 arged to:     CA**********08735

Svc fee for:    MICHAE SHEEHAN
Date issued:    06/24/08
Document Nbr: 8908133423974          Amount: 35.00 USD

Total Tickets: 2736.64
Total Fees:   35.00
Total Amount: 2771.64

The Gant Equation Great People + Fantastic Technology = Delighted Travelers
Be sure to visit our website for additional travel tools and information
Click here to get advance boarding passes on these carriers:
United

For After hours emergency service: 877-546-2406 - CODE WH6
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
For Domestic flights - check in 2 hours prior to departure
For International flights - check in 3 hours prior to departure
Contact Gant prior to departure if this transaction is not used.

If you need to cancel this hotel reservation, contact Gant Travel Management.
Be sure to obtain a cancellation number for your records.

 k you – Louise -x1151

## Raimondi, Mary

**From:** Gant Travel Management [bally@ganttravel.com]
**Sent:** Thursday, July 03, 2008 2:08 PM
**To:** Raimondi, Mary
**Cc:** Travel Department
**Subject:** 7/3/08: Ticketed Itinerary for MICHAEL SHEEHAN to San Francisco CA
**Attachments:** itineraryR5XV1W_03JUL.pdf



Gant Travel Management

Gant Travel Management
650 East Devon, Suite 115
Itasca, IL 60143
Phone: (630) 227-3870 Fax: (630) 227-3875
Toll Free: (800) 323-7459

Add to Calendar          What is this?

Thursday, 3JUL 2008 03:07 PM (EDT)
**Passengers:** MICHAEL SHEEHAN (19000)
Agency Reference Number: R5XV1W
Agent: Louise -x1151

. here for a copy of your E-ticket receipt

**Please review this itinerary for accuracy and reply to this email within 24 hours if any discrepancies.**
Ticketed itineraries are subject to airline fees and additional charges if changed for any reason.

| AIR | Thursday, 3JUL 2008 | |
|---|---|---|
| | American Airlines | Flight Number: 1835 |
| | From: (ORD) Chicago O'Hare IL, USA | Depart: 05:20 PM |
| | To: (SFO) San Francisco CA, USA | Arrive: 07:50 PM |
| | Stops: 0 | Duration: 4 hour(s) 30 minute(s) |
| | Seats: 20B | Status: CONFIRMED |
| | Equipment: McDonnell Douglas MD-83 Jet | Meal: FOOD TO PURCHASE |

Class: H-Coach

Miles: 1846

DEPARTS ORD TERMINAL 3 - - ARRIVES SFO TERMINAL 3
American Airlines Confirmation number is FDFYRZ

TRAVEL PURPOSE: RELOCATION
TRIP APPROVED 03JUL BY BARB FARRUGGIA
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
Contact Gant prior to departure if this transaction is not used.

**Ticket Information:**

Ticket for:   MICHAEL SHEEHAN
Date issued:   07/03/08          Invoice nbr: 0

Page 2 of 2

Ticket Nbr:     0017512523154  Electronic: Yes          Amount: 857.50 USD
  arged to:     CA**********06735

Svc fee for:    MICHAE SHEEHAN
Date issued:    07/03/08
Document Nbr: 8908136166453                        Amount: 35.00 USD

                          Total Tickets:  857.50
                            Total Fees:    35.00
                          Total Amount:  892.50

The Gant Equation Great People + Fantastic Technology = Delighted Travelers
Be sure to visit our website for additional travel tools and information
Click here to get advance boarding passes on these carriers:
American

For After hours emergency service: 877-546-2406 - CODE WH6
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
For Domestic flights - check in 2 hours prior to departure
For International flights - check in 3 hours prior to departure
Contact Gant prior to departure if this transaction is not used.

Thank you — Louise -x1151

Page 1 of 2

Raimondi, Mary

**From:** Gant Travel Management [bally@ganttravel.com]
**Sent:** Thursday, July 03, 2008 10:18 AM
**To:** Raimondi, Mary
**Cc:** Travel Department
**Subject:** 7/7/08: Itinerary for MICHAEL SHEEHAN to Chicago IL

**Attachments:** itineraryM0PV16_03JUL.pdf



Gant Travel Management

Gant Travel Management
650 East Devon, Suite 115
Itasca, IL 60143
Phone: (630) 227-3870 Fax: (630) 227-3875
Toll Free: (800) 323-7459

Add to Calendar          What is this?

Thursday, 3JUL 2008 11:17 AM (EDT)
**Passengers:** MICHAEL SHEEHAN (19000)
Agency Reference Number: M0PV16
Agent: Louise -x1151

k here for a copy of your E-ticket receipt

Please review this itinerary for accuracy and reply to this email within 24 hours if any discrepancies.
Ticketed itineraries are subject to airline fees and additional charges if changed for any reason.

**AIR**     **Monday, 7JUL 2008**

Southwest Airlines
From: (OAK) Oakland CA, USA              Flight Number: 3167          Class: K-Coach
To: (MDW) Chicago Midway IL, USA         Depart: 02:50 PM
Stops: 0                                 Arrive: 08:50 PM
                                         Duration: 4 hour(s) 0 minute(s)
Equipment: Boeing 737-700 Jet            Status: CONFIRMED            Miles: 1844
DEPARTS OAK TERMINAL 2
Southwest Airlines Confirmation number is 2JQQKD

**HOTEL**   **Monday, 7JUL 2008**

RENAISSANCE OHARE (RENAISSANCE)
8500 West Bryn Mawr Avenue Chicago IL 60631 US
Number of Rooms: 1
Phone: 773-380-9600                      Confirmation Number: 85572613
Rate: USD 229                            Fax: 773-380-9601
Check out: Friday, 11JUL 2008            Room GUARANTEED TO MASTER CARD
CONTACT GANT OR HOTEL DIRECTLY IF YOU NEED TO CANCEL THIS RESERVATION.
BE SURE TO OBTAIN A CANCELLATION NUMBER FOR YOUR RECORDS.

AVEL PURPOSE: RELOCATION
CONFIRMATION NUMBER FOR SOUTHWEST IS 2SK8WS
SOUTHWEST FREQUENT FLIER NUMBER APPLIED
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
Contact Gant prior to departure if this transaction is not used.

The Gant Equation Great People + Fantastic Technology = Delighted Travelers
Be sure to visit our website for additional travel tools and information
Click here to get advance boarding passes on these carriers:
Southwest

For After hours emergency service: 877-546-2406 - CODE WH6
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
For Domestic flights - check in 2 hours prior to departure
For International flights - check in 3 hours prior to departure
Contact Gant prior to departure if this transaction is not used.

Thank you – Louise -x1151

$Ex 6$

## BALLY TOTAL FITNESS

8700 W. Bryn Mawr, 2nd Floor, Chicago, IL 60631  (773) 380-3000

NAME:  Michael Sheehan

RETURN TO:  Mary Raimondi - Chicago corporate

WEEK ENDED SATURDAY:     7/5/2008

| DAY / DATE | SUNDAY 6/29/2007 | MONDAY 6/30/2007 | TUESDAY 7/1/2007 | WEDNESDAY 7/2/2007 | THURSDAY 7/3/2007 | FRIDAY 7/4/2007 | SATURDAY 7/5/2007 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| OVERNIGHT AT: CITY | | | Chicago | | | | | |
| MEALS: | | | | | | | | |
| BREAKFAST* | | $4.44 | | | | | | |
| LUNCH* | | | | | | | | $4.44 |
| DINNER* | | $11.00 | | | | | | $0.00 |
| ENTERTAINMENT* | | | | | $31.00 | | | $42.00 |
| SUBTOTAL | $0.00 | $15.44 | $0.00 | $0.00 | $31.00 | $0.00 | $0.00 | $0.00 |
| AIR-RAIL-BUS | | $2,771.64 | | | | | | $46.44 |
| TAXI | | $20.00 | | | | | | $2,771.64 |
| SEDAN SERVICE | | | | | | | | $20.00 |
| PARKING | | | | | | | | $0.00 |
| HOTEL ROOM | | | | | | | | $0.00 |
| HOTEL( to be reimbursed) | | | | | | | $842.35 | $842.35 |
| TELEPHONE | | | | | | | | |
| AUTO-GAS/TOLLS** | | | | | | | | $0.00 |
| OTHER** (gratuities) | | | | | | | | $0.00 |
| SUBTOTAL | $0.00 | $2,791.64 | $0.00 | $0.00 | $0.00 | $0.00 | $842.35 | $0.00 |
| TOTAL | $0.00 | $2,807.08 | $0.00 | $0.00 | $31.00 | $0.00 | $842.35 | $3,633.99 |
| LESS AMOUNTS PAID BY THE COMPANY (CIRCLE AMOUNTS ABOVE) | | | | | | | | $3,680.43 |
| LESS AMOUNTS PAID BY THE COMPANY (CIRCLE AMOUNTS ABOVE) | | | | | | | | ($2,771.64) |
| DUE TO (FROM) EMPLOYEE | | | | | | | | ($842.35) |
| | | | | | | | | $66.44 |

| DATE | BUSINESS PURPOSE OF EACH TRIP |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Δ π EXHIBIT 6
M. Sheehan
Deponent
7-22-08
Date _____ Rptr. _____
WWW.DEPOBOOK.COM

EMPLOYEE SIGNATURE _____   DATE  7/15/08

APPROVER SIGNATURE _____   DATE  7/16/08

* Complete reverse side when paying for meals/entertainment of others.

** Complete reverse side.

'o|o7|o8 — 11510g



**RENAISSANCE.**
CHICAGO O'HARE HOTEL **RENAISSANCE O'HARE SUITES**

8500 WEST BRYN MAWR AVENUE
CHICAGO, IL 60631
(773) 380 9600
RENAISSANCEHOTELS.COM/CHIBR

**GUEST FOLIO**

| 1630 | SHEEHAN/MICHAEL | 229.00 | 07/03/08 13:00 | 10245 |
|------|-----------------|--------|----------------|-------|
| ROOM | NAME | RATE | DEPART    TIME | ACCT# |

RENA
TYPE

06/30/08 17:52
ARRIVE    TIME

18

ROOM
CLERK    ADDRESS    PAYMENT

**MR#: 826031643**

DATE    REFERENCE    CHARGES    CREDITS    BALANCE DUE

| 06/30 | ROOM | 1630, 1 | 229.00 |
| 06/30 | ROOM TAX | 1630, 1 | 27.25 |
| 06/30 | OCC TAX | 1630, 1 | 8.02 |
| 07/01 | LAUNDRY | AG | 17.64 |
| 07/01 | ROOM | 1630, 1 | 229.00 |
| 07/01 | ROOM TAX | 1630, 1 | 27.25 |
| 07/01 | OCC TAX | 1630, 1 | 8.02 |
| 07/02 | FRESH | 38631630 | 31.90 |
| 07/02 | ROOM | 1630, 1 | 229.00 |
| 07/02 | ROOM TAX | 1630, 1 | 27.25 |
| 07/02 | OCC TAX | 1630, 1 | 8.02 |
| 07/03 | MC CARD | | |

$842.35

**TO BE SETTLED TO:    MASTERCARD    CURRENT BALANCE    .00**

THANK YOU FOR CHOOSING RENAISSANCE!  TO EXPEDITE YOUR
CHECK-OUT, PLEASE CALL THE FRONT DESK, OR PRESS "MENU" ON
YOUR TV REMOTE CONTROL TO ACCESS VIDEO CHECK-OUT.

-------------- EXP. REPORT SUMMARY --------------------

| 06/30 | ROOM | 229.00 | |
| | ROOM TAX | 27.25 | |
| | OCC TAX | 8.02 | |
| | | | |
| 07/01 | LAUNDRY | 17.64 | 264.27 |
| | ROOM | 229.00 | |
| | ROOM TAX | 27.25 | |
| | OCC TAX | 8.02 | |
| | | | |
| 07/02 | FRESH | 31.90 | 281.91 |
| | ROOM | 229.00 | |
| | ROOM TAX | 27.25 | |
| | OCC TAX | 8.02 | |
| | | | 296.17 |

GET ALL YOUR HOTEL BILLS BY EMAIL BY UPDATING YOUR MARRIOTT
REWARDS PREFERENCES. OR, ASK THE FRONT DESK TO EMAIL YOUR
BILL FOR THIS STAY. SEE "INTERNET PRIVACY STATEMENT" ON
MARRIOTT.COM
Marriott Rewards Account # 826031643
Date 06/30/08-07/03/08 Est. Eligible Revenue    $718.90
Est. Points Earned: 7189
For account activity: 801-468-4000 or www.Marriott.com

**RENAISSANCE.**
CHICAGO O'HARE HOTEL

8500 WEST BRYN MAWR AVENUE
CHICAGO, IL 60631
(773) 380 9600
RENAISSANCEHOTELS.COM/CHIBR

ACCOUNTS PAST 30 DAYS SUBJECT TO SERVICE CHARGE OF 1.5% PER MONTH (ANNUAL RATE OF 18%)
This statement is your only receipt. You have agreed to pay in cash or by approved personal check or to authorize us to charge your credit card for all amounts charged to you.
The amount shown in the credits column opposite any credit card entry in the reference column above will be charged to the credit card number set forth above. (The credit
card company will bill in the usual manner.) If for any reason the credit card company does not make payment on this account, you will owe us such amount. If you are direct-
billed, in the event payment is not made within 25 days after check-out, you will owe us interest from the check-out date on any unpaid amount at the rate of 1.5% per month
(ANNUAL RATE 18%), or the maximum allowed by law, plus the reasonable cost of collection, including attorney fees.

Signature X

FOR RESERVATIONS AT ANY RENAISSANCE HOTEL, CALL 1 (800) HOTELS-1

imondi, Mary

| From: | Gant Travel Management [bally@ganttravel.com] |
|-------|-----------------------------------------------|
| Sent: | Wednesday, June 25, 2008 1:05 PM |
| To: | Raimondi, Mary |
| Cc: | Travel Department; Farruggia, Barbara |
| Subject: | 6/30/08: Ticketed itinerary for MICHAEL SHEEHAN to Chicago IL |
| Attachments: | itineraryTSZFL4_25JUN.pdf |



Gant Travel Management

Gant Travel Management
650 East Devon, Suite 115
Itasca, IL 60143
Phone: (630) 227-3870 Fax: (630) 227-3875
Toll Free: (800) 323-7459

Add to Calendar          What is this?

Wednesday, 25JUN 2008 02:04 PM (EST)
**Passengers: MICHAEL SHEEHAN (19000)**
Agency Reference Number: TSZFL4
Agent: Louise -x1151

 here for a copy of your E-ticket receipt

**Please review this itinerary for accuracy and reply to this email within 24 hours if any discrepancies.**
Ticketed itineraries are subject to airline fees and additional charges if changed for any reason.

| AIR | Monday, 30JUN 2008 | |
|-----|--------------------|--|
| | United Airlines | Flight Number: 830        Class: P-First |
| | From: (SFO) San Francisco CA, USA | Depart: 10:55 AM |
| | To: (ORD) Chicago O'Hare IL, USA | Arrive: 05:06 PM |
| | Stops: 0 | Duration: 4 hour(s) 11 minute(s) |
| | Seats: 03B | Status: CONFIRMED        Miles: 1846 |
| | Equipment: Boeing 757 200 Jet | Meal: LUNCH |
| | DEPARTS SFO TERMINAL 3 - - ARRIVES ORD TERMINAL 1 | |
| | Frequent Flyer number: UA00175825959 - M SHEEHAN | |
| | United Airlines Confirmation number is TSZFL4 | |

| HOTEL | Monday, 30JUN 2008 | |
|-------|--------------------|--|
| | RENAISSANCE OHARE (RENAISSANCE) | |
| | 8500 West Bryn Mawr Avenue Chicago IL 60631 US | |
| | Number of Rooms: 1 | Confirmation Number: 82036181 |
| | Phone: 773-380-9600 | Fax: 773-380-9601 |
| | Rate: USD 229 | Room GUARANTEED TO MASTER CARD |
| | Check out: Thursday, 3JUL 2008 | |
| | BEST AVAILABLE RATE / NON SMOKING KING REQUESTED | |

GUARANTEED TO MASTERCARD / CANCEL BY 4PM DAY OF ARRIVAL

Thursday, 3JUL 2008

United Airlines
From: (ORD) Chicago O'Hare IL, USA
To: (SFO) San Francisco CA, USA
Stops: 0
Seats: 02C
Equipment: Boeing 757 200 Jet

Flight Number: 907          Class: P-First
Depart: 05:05 PM
Arrive: 07:35 PM
Duration: 4 hour(s) 30 minute(s)
Status: CONFIRMED        Miles: 1846
Meal: DINNER

DEPARTS ORD TERMINAL 1 - - ARRIVES SFO TERMINAL 3
Frequent Flyer number: UA00175825959 - M SHEEHAN
United Airlines Confirmation number is TSZFL4

OTHER          Wednesday, 1OCT 2008
          THANK YOU FOR USING GANT TRAVEL

TRAVEL PURPOSE: RELOCATION
TRIP APPROVED 24JUN BY BARB FARRUGGIA
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
Contact Gant prior to departure if this transaction is not used.

Ticket Information:

Ticket for:    MICHAEL SHEEHAN
Date issued:   06/24/08      Invoice nbr: 0
Ticket Nbr:    0167512521838  Electronic: Yes      Amount: 2736.64 USD
  rged to:     CA**********06735

Svc fee for:   MICHAE SHEEHAN
Date issued:   06/24/08
Document Nbr: 8908133423974        Amount: 35.00 USD

          Total Tickets: 2736.64
          Total Fees:    35.00
          Total Amount: 2771.64

The Gant Equation Great People + Fantastic Technology = Delighted Travelers
Be sure to visit our website for additional travel tools and information
Click here to get advance boarding passes on these carriers:
United

For After hours emergency service: 877-546-2406 - CODE WH6
Due to security regulations, a photo I.D. is required at check-in
Boarding pass must be obtained prior to entering security checkpoint.
For Domestic flights - check in 2 hours prior to departure
For International flights - check in 3 hours prior to departure
Contact Gant prior to departure if this transaction is not used.

If you need to cancel this hotel reservation, contact Gant Travel Management.
Be sure to obtain a cancellation number for your records.

nk you -- Louise -x1151

6/29/08 - 7/5/08

**2550 W. Lexington**
Chicago, IL
**312.666.1100**

*Looking for a cab to drive?*
**Drive With The Best!**
-Vans-
-Sedans-
-Hybrids-
-Wheelchair Vans-
-Stretch Crown Vics-
**Call 312-666-1100**
Want to lease your medallion?
We pay $550/month plus expenses.

Date **6/30**  Time **5:45**
From **Airport**
To **Residence**
Cab No._____ Driver_____
Cab Fare **$20**

Lost & Found: ChicagoDispatcher.com     Receipt Advertising: ChicagoDispatcher.com

included tip

---

**BENNIGAN'S**
8420 W BRYN MAWR
CHICAGO, IL 60631
773-380-1010

463 Chaunese

| Tbl 61/1 | Chk 3357 | Gst |
| Jun30'08 08:43PM | | |

| 1 Water | 0.00 |
| 1 GG Bacon Burger | 8.29 |
| Medium | |
| Wheat Bun | |
| No | |

| Subtotal | 8.29 |
| Tax | 0.79 |
| 08:57 Total | 9.08 |

Thank you for coming to
Bennigan's Grill & Tavern!!!

---

**BENNIGAN'S**
8420 W BRYN MAWR
CHICAGO, IL 60631
773-380-1010

Date:        Jun30'08 09:02PM
Card Type:   Visa
Acct #:      XXXXXXXXXXXX0708
Exp Date:    XX/XX
Auth Code:   00622B
Check:       3357
Table:       61/1
Server:      463 Chaunese
VSCA: Auth Driver
   MICHAEL SHEEHAN

Subtotal:        9.08

Tip:_____ 1 92

Total:_____ 11 00

Signature_____

I agree to pay above total
according to my card issuer
agreement.

CUSTOMER COPY



San Francisco Intl Airport
San Francisco, CA 94128
(650) 821-8954

```
Date:         Jun30'08 10:06AM
Card Type:    VISA
Acct #:       XXXXXXXXXXXX0708
Exp Date:     04/11
Auth Code:    096208
Check:        3965
Server:       125 EVANGELI
     MICHAEL              SHEEHAN

   btotal:              4.44

 ATUITY   -------------------------
   AL     -------------------------

SIGNATURE ------------------------
I agree to pay above total
according to my card issuer
agreement.
* * * CUSTOMER COPY * * *
```

```
HMSHOST
MACARONI GRILL 773-686-6180
CHICAGO O'HARE AIRPORT
CHECK:        5810
TABLE:        310/1
SERVER:       9455 MARCO
DATE:         JUL03'08  4:49PM
CARD TYPE:    VISA        AO 4*
ACCT #:       XXXXXXXXXXXX0708
EXP DATE:     XX/XX
AUTH CODE:    055098
     MICHAEL SHEEHAN

TOTAL:              26.17
TIP  ------------------   4 83
TOTAL ---------------------

X  _____mmmm___ 31 oo
I AGREE TO PAY THE ABOVE AMOUNT
IN ACCORDANCE WITH THE CARD
ISSUER'S AGREEMENT.
```